IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALEX NAIN SAAB MORAN, and<br>ALVARO PULIDO VARGAS, a/k/a<br>"German Enrique Rubio Salas,"<br><br>Defendants. | Case No. 19-20450-CR-Scola<br><br>**ORAL HEARING REQUESTED** |

**MOTION TO VACATE ORDER CONFERRING FUGITIVE STATUS
AND FOR LEAVE FOR SPECIAL APPEARANCE TO CHALLENGE INDICTMENT**

This is an exceptional case. Alex Nain Saab Moran ("Mr. Saab") is a foreign national and diplomat of Venezuela. While on mission as a special envoy for that nation in response to an unprecedented humanitarian crisis, he was arrested in Cape Verde at the insistence of the United States government, which seeks to prosecute him in this action. But Mr. Saab's status as a special envoy entitles him to absolute immunity under the Vienna Convention on Diplomatic Relations, and Eleventh Circuit precedent compels that result. The Court therefore lacks subject-matter jurisdiction over this action, and the arrest of Mr. Saab is unlawful.

On August 26, 2019, the Court issued a *sua sponte* order transferring Mr. Saab and his co-defendant to "fugitive status," on the basis that he has "not made an initial appearance." ECF No. 5. The Court should revisit that determination, vacate its order, and grant Mr. Saab leave to file a special appearance to challenge the Court's jurisdiction and the reach of the criminal statutes the government claims he violated.

This is not an ordinary fugitive-disentitlement case. Mr. Saab did not *flee* this Court's jurisdiction and cannot in any meaningful sense *return* to the United States. *See United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997). He was not here at any time relevant to the indictment, had no reason to be, and *still* has no reason to be, but for the indictment, which Venezuela has ordered him to oppose and resist. Because Mr. Saab owes his principal loyalty to

1

Venezuela, his adherence to that order cannot be viewed as bad-faith defiance of this Court's jurisdiction. He is, in short, no "fugitive." Indeed, the very existence of United States jurisdiction is in substantial doubt. Mr. Saab has "fundamental" challenges to the indictment that should be resolved as a predicate to extradition. *In re Hijazi*, 589 F.3d 401, 408 (7th Cir. 2009). The most troubling feature of this prosecution is that Mr. Saab is a diplomat entitled to absolute immunity, which deprives the Court of subject-matter jurisdiction. Further, the statutes at issue do not purport to reach Mr. Saab's wholly extraterritorial conduct.

The Court should therefore vacate its order conferring fugitive status on Mr. Saab and/or grant Mr. Saab leave to specially appear to move to dismiss the indictment. A draft motion to dismiss is attached to this filing. The Court should grant this motion and accept that motion for filing.

## CONCISE STATEMENT OF MATERIAL FACTS

### A. Mr. Saab's Diplomatic Roles and Missions

Mr. Saab is a dual citizen of Colombia and Venezuela. Mr. Saab has served, and continues to serve, diplomatic roles on Venezuela's behalf. In April 2018, Venezuela's foreign minister, Mr. Jorge Arreazo Montserrat, appointed Mr. Saab as:

> ***Special Envoy*** *of the Government of the Bolivarian Republic of Venezuela, with broad powers on behalf of the Bolivarian Republic of Venezuela to make arrangements for procuring basic goods and services, both paid for and received as humanitarian aid, for national social assistance programs, particularly food, supplies, machines and equipment for the production and processing of foodstuffs; medicines, materials, medical supplies and equipment. He is authorized to negotiate with governmental authorities, representatives of institutions and companies, both public and private, in order to find practical solutions to complex situations affecting the Bolivarian Republic of Venezuela as a result of commercial and financial restrictions since 2015.*

Exhibit A, Diplomatic Authorization (April 9, 2018). In 2020, Mr. Saab was charged with missions to Iran to deliver documents requesting humanitarian assistance needed to combat the Covid-19 pandemic in Venezuela. *See* Exhibit B, Letter from Arreaza to Saab (April 1, 2020). Mr. Saab was accredited to Ayatollah Ali Kamenei, Supreme Leader of the Islamic Revolution of Iran, and was

2

to carry letters asking for Iranian assistance. *See* Exhibit C, Letters from Venezuelan Officials to Iranian Officials (June 2020). Venezuela sought fuel, medical supplies, and food from Iran. *Id.* Iran, in turn, approved the missions. *See* Exhibit D, Verbal Note from Embassy of Iran Verbal to Ministry of People's Power for Foreign Affairs of Venezuela (June 8, 2020).

Mr. Saab also holds the permanent diplomatic post of Alternate Permanent Representative of the Bolivarian Republic of Venezuela to the African Union. *See* Exhibit E, Resolution Venezuela Ministry of Popular Power for Foreign Relations (Dec. 24, 2020). The United States recognizes the African Union as a public international organization, *see* Exec. Order No. 13,377, 70 Fed. Reg. 20,263 (April 13, 2005), and itself maintains an ambassadorial-level representative to the organization in Addis Ababa, Ethiopia, *see* Congressional Research Service, N. Cook & T. Husted, *The African Union (AU): Key Issues and U.S.-AU Relations* 16 (2016).

### B. Mr. Saab's Arrest and Detention Pursuant to This Prosecution

On June 12, 2020, Mr. Saab was arrested in Cape Verde, where his flight originating in Venezuela took a stopover to refuel *en route* to Iran pursuant to one of the special diplomatic missions described above. Cape Verde detained Mr. Saab pursuant to an INTERPOL red notice request issued by the United States. The red notice was predicated on this criminal action, filed July 25, 2019. *See* ECF No. 1 ("indictment").

The indictment concedes Mr. Saab's Colombian citizenship.[1] *Id.* at *3, ¶ 6. It alleges that, in a loosely defined time period between 2011 and 2015, Mr. Saab worked with four other Colombian citizens, one identified (Alvaro Pulido Vargas) and three unnamed "co-conspirators," *id.* at *5–6, ¶¶ 6–10, in a cryptically alleged scheme to make "bribe payments to Venezuelan foreign officials," *id.* at *4–5, ¶ 3. Mr. Saab denies this scheme and all allegations of the indictment concerning it or any conspiracy, bribery, or money laundering of any kind. Officials of both Venezuela and Ecuador have investigated the underlying transactions and found no wrongdoing.

---

[1] That indictment does not allege that Mr. Saab is also a citizen of Venezuela, but that is not a fact material to Mr. Saab's defenses.

Importantly, Venezuela conferred diplomatic status on Mr. Saab in 2018, after it was allegedly victimized by him. This memorandum addresses the allegations only for purposes of this motion and Mr. Saab's proposed motion to dismiss the indictment.

The alleged scheme, insofar as it can be discerned from the indictment, centered on a low-income housing project contract, which a company controlled by Mr. Saab and others is alleged to have obtained from the Venezuelan government. *Id.* at *5, ¶ 4. The concept of the corruption was allegedly to obtain government payments for the importation of construction materials (apparently to build the housing project) that did not occur. *Id.* at *5–7, ¶¶ 6–15. For example, an undifferentiated set of co-conspirators would allegedly cause one shipment to be imported and represent that multiple shipments were in fact made, such as by directing government officials to take different pictures of the same shipment in different locations and present them as proof of multiple shipments. *Id.* at *5–6, ¶ 7. An undifferentiated set of "co-conspirators" allegedly utilized a Venezuelan governmental tracking system "to submit multiple sets of false and fraudulent invoices and documents identifying it as a new shipment, even though it was not a new shipment."[2] *Id.*

The indictment alleges that accomplishing this required an undifferentiated group of co-conspirators to make corrupt payments to Venezuelan officials employed by three Venezuelan agencies that oversee imports: the National Integrated Service for the Administration of Customs Duties and Taxes (with the Spanish-language acronym "SENIAT"); the Commission for the Administration of Currency Exchange ("CADIVI"); and the Bolivarian National Guard of Venezuela ("GNB"). *Id.* at *2, ¶¶ 2–4, 8. The CADIVI manages the "tracking system" that is alleged to have made possible the fraudulent invoices representing non-existent imports. *Id.* at *2, ¶ 5.

---

[2] The undersigned counsel understand that the housing project is in fact complete, raising perplexing questions as to how that could have occurred if insufficient supplies were obtained toward that end.

The indictment does not (and could not) allege that Mr. Saab was present in the United States at any time relevant to the indictment. Mr. Saab, in fact, has not travelled to the United States in nearly three decades. There is no allegation that the tracking system, the housing project, the goods imported, the officials supposedly bribed, the agencies supposedly victimized by the supposed bribes, or the source of funds exploited in the supposed bribes have any connection to the United States. There is no allegation that the United States lost money or saw any national interest impaired by the alleged scheme. As noted, the alleged conspirators are not alleged to be U.S. citizens. The sparse alleged United States connections identified in the indictment are as follows:

- The unnamed co-conspirators (but not Mr. Saab) are alleged to have "spent significant time in Miami, Florida," Indictment at *3, ¶¶ 8–9 (Co-Conspirators 1 and 2); *id.* at *3, ¶ 10 (alleging that Co-Conspirator 3 "traveled frequently to Miami, Florida");
- CADIVI ordinarily pays for imported goods in U.S. dollars, *id.* at *2, ¶ 5;
- In March 2014, Co-Conspirators 1 and 3 (but not Mr. Saab) "met in Miami, Florida, to discuss the status of corrupt payments to Venezuelan government officials," *id.* at *7, ¶ 12;
- Sometime between March 2012 and December 2014, an undifferentiated group of co-conspirators (not alleged to be in the Untied States) caused wire transfers to be made from Venezuelan bank accounts to overseas bank accounts through the United States, *id.* at *7, ¶ 14;
- Sometime between January 2014 and September 2015, profits were distributed and expenses paid (not allegedly *from* the United States) "by, among other things, causing wire transfers to be made to bank accounts of Co-Conspirator 1 in the Southern District of Florida," *id.* at *7–8, ¶ 15;
- Seven wire transfers were made—it is unclear by whom, where, and for what purpose—from a Panamanian bank account to a bank account located in the Southern District of Florida, *id.* at *8–9, ¶¶ 1–2.

The government asserts one count of conspiracy to launder money under 18 U.S.C. § 1956(h) and seven counts of money laundering under 18 U.S.C. § 1956(a)(2)(A). Both statutes require that the allegedly laundered proceeds be derived from a "specified unlawful activity" or "SUA." The government cites one provision of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-3, as the principal SUA. This provision can only be violated by a person who is "in the territory of the Untied States." *Id.* A second SUA cited is an "offense against a foreign nation," 18 U.S.C. § 1956(c)(7)(B), but the indictment fails to allege a violation of the law of any nation other than the Untied States.

      **C.    Venezuela's Position on This Prosecution and Instructions to Mr. Saab to Resist Extradition**

Mr. Saab remains in custody in Cape Verde, and his diplomatic mission remains unfulfilled. On August 26, 2019, the Court issued a *sua sponte* order transferring Mr. Saab and his co-defendant to "fugitive status," on the basis that they have "not made an initial appearance." ECF No. 5. That is the most recent meaningful action in this case.

The Venezuelan government has vehemently objected to this prosecution. On July 1, 2020, Mr. Saab received correspondence from the Ministry of People's Power for External Relations instructing Mr. Saab to resist extradition to the United States and to resist disclosing Venezuelan state secrets in his possession. Exhibit F, Arreaza Letter to Saab (July 1, 2020). The letter calls this prosecution an "atrocious example of extraterritorial application of law by Donald Trump's government." *Id.* The correspondence warns Mr. Saab that disclosure of state secrets may subject him to prosecution in Venezuela. *Id.*

## ARGUMENT

At issue in this motion is the "fugitive disentitlement doctrine," which "limits access to courts by a fugitive who has fled a criminal conviction in a court in the United States." *Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir. 1998). It was first applied in 1876, when the Supreme Court "declined to entertain the petition of a criminal defendant who had escaped and remained at large when his petition arose before the Court." *Pesin v. Rodriguez*, 244 F.3d 1250, 1252 (11th Cir.

6

2001) (citing *Smith v. United States*, 94 U.S. 97 (1876)). But "[o]utside of the core fugitive disentitlement context, the Supreme Court has indicated that disentitlement is 'too blunt an instrument' to redress the indignity of a defendant's absence." *In re Hijazi*, 589 F.3d 401, 414 (7th Cir. 2009) (quoting *Degen v. United States*, 517 U.S. 820, 828 (1996)). And, even where the doctrine applies, it "is not jurisdictional in nature." *Pesin v. Rodriguez*, 244 F.3d 1250, 1252 (11th Cir. 2001). "Instead, the doctrine is an equitable one and rests upon the power of the courts to administer the federal courts system." *Id.*

The doctrine does not reach this case, and, if it did, justice can only be served by the Court's exercising discretion to permit Mr. Saab to enter a special appearance to raise legal arguments fundamental to the government's power to proceed.

**I.     The Fugitive Disentitlement Doctrine Does Not Reach This Case**

The fugitive disentitlement doctrine is a "blunt…instrument" that should not be applied haphazardly, even where "substantial" "interests" might be viewed as justifying it. *Degen*, 517 U.S. at 828. Its paradigmatic application involves a defendant who "has fled a criminal conviction in a court in the United States." *Magluta*, 162 F.3d at 664. The doctrine has also been extended in this Circuit to the case of a defendant present within the court's jurisdiction before being indicted and who "constructively flee[s] by deciding not to return." *United States v. Shalhoub*, No. 98-CR-00460, 2016 WL 8943847, at *2 (S.D. Fla. Jan. 26, 2016) (quoting *United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997)).

But the Seventh Circuit in *Hijazi* recognized that the doctrine cannot reach a defendant *never* within the court's jurisdiction and who therefore cannot be said to have constructively fled or declined to *return*. 589 F.3d at 412 ("Hijazi has never been in the country, he has never set foot in Illinois, and he owns no property in the United States. He therefore did not flee from the jurisdiction or from any restraints placed upon him."); *see also Shalhoub*, 2016 WL 8943847, at *2 (distinguishing *Hijazi* because, there, "the defendant had never been to Illinois," whereas, in *Shalhoub*, "Defendant lived in the Southern District prior to leaving for Saudi Arabia"). The court in *Hijazi* not only found application of the doctrine error in that circumstance, but found it so plain

as to justify the extraordinary writ of mandamus ordering a lower federal court to entertain the defendant's challenge to the indictment, notwithstanding his absence from the United States. *See* 589 F.3d at 414.

This case is like *Hijazi*, not *Shalhoub*. Mr. Saab does not live in the United States, never lived in the United States, never at any relevant time travelled to the United States, and does not own property here. He had no reason to come to the United States and still has no reason to come here. Someone who declines to travel here with no reason to travel here (but for the indictment) cannot in any sense be said to have *fled* the jurisdiction, nor even to have constructively fled by not having "returned." *Shalhoub*, 2016 WL 8943847, at \*2. Mr. Saab is therefore not a fugitive, constructively or otherwise.

Mr. Saab's status as a diplomat of Venezuela takes this case further beyond any conceivable reach of the fugitive disentitlement doctrine. Aside from having no reason to come to the United States on his own volition, Mr. Saab has been ordered to *resist* this prosecution and extradition because the Venezuelan government opposes it. Exhibit F, Arreaza Letter to Saab (July 1, 2020). Whatever duty to travel and stand trial here Mr. Saab might be alleged to have is entirely offset by Mr. Saab's duty of loyalty to Venezuela as its diplomat. The fugitive disentitlement doctrine posits a duty to "surrender [oneself] to the authorities." *Shalhoub*, 2016 WL 8943847, at \*2. Even if that duty could somehow (contrary to *Hijazi*) reach a person who was never subject to the "authorities" demanding surrender, it cannot colorably reach a person who owes allegiance to a different national authority, which in turn has ordered that person not to surrender. As Venezuela's citizen and diplomatic agent, Mr. Saab owes his primary allegiance to that nation. Any duty to the United States is secondary.

The fugitive disentitlement doctrine cannot apply here for the additional reason that Mr. Saab's challenges to the indictment are "fundamental." *Hijazi*, 589 F.3d at 408. In *Hijazi*, the Seventh Circuit found that a foreign national charged for acts that occurred outside the United States raised "fundamental" challenges to the extraterritorial reach of the United States mail and wire-fraud statutes, which gave that defendant a "clear and indisputable" right to mandamus relief.

8

*Id.* Here, Mr. Saab intends to raise a materially identical defense that the FCPA requires unlawful activity "in the United States," 15 U.S.C. § 78dd–3(a), and that the money-laundering statutes are not triggered in the absence of this "specified unlawful activity," 18 U.S.C. § 1956(a).

But that is only Mr. Saab's alternative argument. He intends to raise the far more fundamental argument that his diplomatic status deprives this Court of subject-matter jurisdiction. The Diplomatic Relations Act requires that a suit against a person entitled to immunity under the Vienna Convention on Diplomatic Relations "shall be dismissed," 22 U.S.C. § 254d, the Eleventh Circuit has held that special envoys like Mr. Saab are entitled to immunity under that convention, *Abdulaziz v. Metro. Dade Cnty.*, 741 F.2d 1328 (11th Cir. 1984), and immunity destroys this Court's "very power to act," *Hijazi*, 589 F.3d at 408; *Broidy Cap. Mgmt. LLC v. Benomar,* 944 F.3d 436, 443 (2d Cir. 2019) (recognizing that diplomatic immunity deprives United States courts of subject-matter jurisdiction). The United States' stunning demand that a diplomat engaged in a diplomatic and humanitarian mission of paramount urgency be arrested and tried in an action with no meaningful United States interest presents an anomalous circumstance where the fugitive-disentitlement doctrine simply cannot apply.

The "fugitive disentitlement is an exceptionally harsh sanction, to be disfavored whenever its application is not a matter of necessity." *Mastro v. Rigby*, 764 F.3d 1090, 1096 (9th Cir. 2014). A "narrow view of the fugitive disentitlement doctrine" is therefore required. *Id.* Here, it could apply only by a gross aggrandizement to reach a circumstance where it appears never before to have been applied. It should not be applied. "A court's inherent power is limited by the necessity giving rise to its exercise." *Degen*, 517 U.S. at 829. The only "necessity" here cuts against that doctrine's reach.

## II. Alternatively, the Court Should Exercise Its Discretion To Allow a Special Appearance

Even if the doctrine were applicable to this unique case, the Court's sound discretion and justice are best served by permitting Mr. Saab to specially appear to challenge his indictment. The "discretion" of the Court can and should be exercised to permit Mr. Saab to "present arguments

9

attacking the validity of this indictment and challenging the jurisdiction of the court." *United States v. Noriega*, 683 F. Supp. 1373, 1374 (S.D. Fla. 1988). "The present indictment is surrounded with special circumstances which militate in favor of allowing the defendant to attack its validity." *Id.*

The first is the government's troubling choice to prosecute a diplomat. It is bedrock international law, founded in treaty and custom, that a "diplomat" is "immune from suit." *Dostal v. Haig*, 652 F.2d 173, 176 (D.C. Cir. 1981). Mr. Saab should not have to surrender to extradition before raising that defense; his extradition should only occur if it is rejected. *Cf. Hijazi*, 589 F.3d at 407 ("[T]he reach of the statutes that Hijazi allegedly violated and the district court's authority to command his appearance are precisely the issues Hijazi wants the district court to resolve."). If, as is likely, the Court concludes that it lacks jurisdiction, Mr. Saab should be permitted to finish his diplomatic mission in service of Venezuela's plight against a humanitarian crisis. This is the rare case where justice is best served by hearing the defense before requiring the defendant to submit to custody in the United States.

A second special circumstance follows from the conflicting orders Mr. Saab faces. The United States has commanded his presence at trial, but the government of Venezuela has commanded Mr. Saab to resist that order, this prosecution, and extradition. To deprive Mr. Saab of any ability to challenge the indictment without violating the orders of Venezuela—the nation owed his allegiance as a citizen and diplomat and which can prosecute him for disloyalty—would confound the "equitable" underpinnings of the fugitive-disentitlement doctrine and work a bald injustice. *Pesin*, 244 F.3d at 1252.

A third special circumstance lies in the compelling defenses available to Mr. Saab. This Court in *Noriega* found a special circumstance from the questions "of first impression" the defense attorneys raised. *Noriega*, 683 F. Supp. at 1374. The statutory questions here, including those concerning the extraterritorial reach of the FCPA, fall on that plane, and the Court would benefit from "[a]rguments of counsel" in resolving these "delicate issues." *Id.* But a more profound problem is that the prosecution appears to have no foundation in the face of diplomatic immunity and to have been brought in defiance of international law and Eleventh Circuit precedent.

10

*Abdulaziz*, 741 F.2d 1328. If a defendant who raises close defenses deserves a hearing, so much more does a defendant who raises meritorious ones.

A fourth special circumstance is that "[t]he case is fraught with political overtones." *Noriega*, 683 F. Supp. at 1374–75. This prosecution is straining the government's already tenuous relations with Venezuela, which has overtly opposed the prosecution. This is, moreover, a stark interference between the diplomatic relations of two sovereigns, Venezuela and Iran, concerning a matter of extreme international urgency, the global Covid-19 pandemic and its impact in Venezuela. It is nothing short of a stunning intrusion into the international *status quo* for one nation to halt a diplomatic mission between two other nations, citing no connection or interest in those relations whatsoever. The Court need only imagine hypotheticals wherein the roles of these three nations are transposed (or substitute nations added) to see how alarming this state of affairs is.

A fifth special circumstance is related: the government has asserted precious little by way of a United States interest in this case. The diplomatic intercourse it has thwarted is, of course, not of concern to the United States. Moreover, the United States has only the barest alleged connection to the underlying supposed crimes. These concerned a Venezuelan public contract and alleged bribes of Venezuelan public officials in Venezuela by foreign nationals. Whatever technical arguments the government may lodge in support of its asserting jurisdiction in this case (which itself is subject to challenged at the indictment stage), the interests are, in truth, attenuated at best.

A sixth special circumstances is that the "floodgates" of special-appearance motions will not plausibly follow from the Court's leave for a special appearance here. *See Noriega*, 683 F. Supp. at 1374. It is not the case that "thousands of fugitives," *id.*, can colorably allege diplomatic status or present any documentary support for that status. As the exhibits to this motion show, Mr. Saab's assertion of immunity is squarely grounded in fact.

Finally, the government will not be prejudiced by a special appearance. Mr. Saab is currently detained in Cape Verde, where he has been for months. If the government prevails against Mr. Saab's defenses it will be in the same position as if Mr. Saab appears and defends the

11

indictment from United States soil. There is no advantage to the government to demanding that Mr. Saab first appear on United States soil and then present his defenses.[3]

## CONCLUSION

The motion should be granted. The Court should vacate its order conferring fugitive status of Mr. Saab and/or permit Mr. Saab to enter a special appearance challenging the indictment on grounds of diplomatic immunity.

---

[3] If the Court denies this motion it should be without prejudice to Mr. Saab's right to challenge the indictment in the event he ends up in United States custody and before the Court. *See Shalhoub*, 2016 WL 8943847, at *2 & n.3 (taking this approach).

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9**

Counsel has conferred with Counsel for the United States of America pursuant to Local Rule 88.9 in a good faith effort to resolve the issues raised in this motion and has been unable to do so.

**REQUEST FOR ORAL HEARING**

Mr. Saab respectfully requests that the Court set this motion for a hearing at its earliest convenience. This case presents a novel question on the reach of the fugitive disentitlement doctrine, Mr. Saab invokes the discretion of this Court in allowing him leave to make a special appearance under exceptional circumstances. Mr. Saab respectfully submits that the Court would benefit from oral presentation and the opportunity to question legal counsel.

January 21, 2021

Respectfully submitted,

David B. Rivkin, Jr.*
Lee A. Casey*
Jonathan R. Barr*
Kendall E. Wangsgard*
Richard B. Raile*
Baker & Hostetler LLP
1050 Connecticut Ave, NW
Suite 1100
Washington, DC 20036
drivkin@bakerlaw.com
(T) (202) 861-1500
(F) (202) 861-1783

*/s/ Lindy K. Keown*
Lindy K. Keown
Baker & Hostetler LLP
200 South Orange Avenue
Suite 2300
Orlando, FL 32801
lkeown@bakerlaw.com
(T) (407) 649-4000
(F) (407) 841-0168

Jonathan B. New*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, NY 10111
jnew@bakerlaw.com
(T) (212) 589-4200
(F) (212) 589-4201

*Attorneys for Defendant Alex Nain Saab Moran*

\* *Pro hac vice* applications forthcoming