UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case Number: 19-cr-20450-SCOLA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALEX NAIN SAAB MORAN,

Defendant.

_____/

UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
VACATE ORDER CONFERRING FUGITIVE STATUS AND FOR LEAVE FOR
SPECIAL APPEARANCE TO CHALLENGE INDICTMENT

The United States of America, by and through the undersigned counsel, hereby opposes

Defendant Alex Nain SAAB MORAN's ("SAAB MORAN") Motion To Vacate Order Conferring

Fugitive Status And For Leave For Special Appearance To Challenge Indictment (hereinafter "the

Motion").

BACKGROUND

On July 25, 2019, a Federal Grand Jury in the Southern District of Florida returned an

Indictment charging Saab Moran with one count of conspiring to launder money, in violation of

18 U.S.C. § 1956(h), and seven substantive counts of money laundering, in violation of 18 U.S.C.

§§ 1956(a)(2)(A).  These charges arose from SAAB MORAN's role in a bribery and money

laundering scheme with his co-defendant, Alvaro Pulido Vargas, a/k/a "German Enrique Rubio

Salas," ("Pulido Vargas").  In furtherance of the scheme, SAAB MORAN and Pulido Vargas

sought to unlawfully enrich themselves and their co-conspirators by making bribe payments to

Venezuelan government officials, in order to obtain improper business advantages, including the

approval of false and fraudulent documents related to the importation of construction goods and

materials, and to access Venezuela's government-controlled foreign currency exchange system, controlled by the Comisión de Administración de Divisas (the "CADIVI") or the Commission for the Administration of Currency Exchange, which administered legal currency exchange in Venezuela, to ensure payments were made in United States dollars based on false and fraudulent invoices and documents for goods that were never imported into Venezuela.

The Indictment alleges, in part, that in or around November 2011, SAAB MORAN and Pulido Vargas entered into a contract, through a company they owned and controlled, with the government of Venezuela to build low-income housing units (the "Housing Contract").  SAAB MORAN and his co-conspirators made numerous corrupt payments, by cash and wire transfer, to Venezuelan government officials in exchange for their assistance and influence in approving false and fraudulent invoices and documents for goods that were never provided.  As a result of these corrupt payments, SAAB MORAN and his co-conspirators received payments on the false and fraudulent invoices from the Venezuelan government.

Between on or about March 12, 2012, and on or about December 1, 2014, SAAB MORAN and his co-conspirators caused wire transfers totaling approximately $350,041,500 to be made from bank accounts in Venezuela owned and controlled by SAAB MORAN and Pulido Vargas, through correspondent bank accounts in the United States, and then to overseas bank accounts owned and controlled by SAAB MORAN and Pulido Vargas.

Between on or about January 16, 2014, and on or about September 15, 2015, SAAB MORAN and Pulido Vargas distributed profits and paid expenses related to the corrupt scheme by, among other things, causing wire transfers to be made to bank accounts of Co-Conspirator 1 in the Southern District of Florida, including the wire transfers described in Counts Two through Eight in the Indictment.

On July 25, 2019, the U.S. Department of Treasury, Office of Financial Asset Control ("OFAC") also sanctioned and designated SAAB MORAN and Pulido Vargas as "Specially Designated Nationals" and "Blocked Persons."  As a result, all of SAAB MORAN's and Pulido Vargas's property and interests in property, and property of any entities owned, directly or indirectly, 50 percent or more by them, that are in the United States or in the possession or control of U.S. persons, were blocked and required to be reported to OFAC.  *See*  Treasury Disrupts Corruption Network Stealing From Venezuela's Food Distribution Program, CLAP, United States Department of Treasury, Press Release, available at https://home.treasury.gov/news/press-releases/sm741, July 25, 2019.  In addition, OFAC's regulations generally prohibit all dealings by U.S. persons or persons within (or transiting) the United States involving any property of blocked or designated persons.  *Id.*  This press release was also made available in Spanish.  *Id.*

The Department of Justice and OFAC each issued separate press releases (OFAC in both English and Spanish) concerning their respective parallel actions involving SAAB MORAN and Pulido Vargas on July 25, 2019:

https://www.justice.gov/opa/pr/two-colombian-businessmen-charged-money-laundering-connection-venezuela-bribery-scheme

https://home.treasury.gov/news/press-releases/sm741

https://www.justice.gov/usao-sdfl/pr/two-colombian-businessmen-charged-money-laundering-connection-venezuela-bribery-scheme

News of the actions against SAAB MORAN were further announced, disseminated, and amplified by multiple news organizations (in English and Spanish) and the U.S. Embassies in Chile and Colombia.

https://infodio.com/260719/doj/treasury/alex/saab/corruption/ivan/duque

https://www.bloomberg.com/news/articles/2019-07-25/maduro-ally-alex-saab-charged-in-u-s-with-money-laundering

https://www.wsj.com/articles/u-s-issues-sanctions-over-alleged-corruption-in-venezuela-food-program-under-maduro-11564069148

https://www.eltiempo.com/justicia/investigacion/estados-unidos-comenzo-la-caceria-de-alex-saab-393320

https://cl.usembassy.gov/treasury-increases-pressure-on-alex-saab-and-his-network-in-venezuela/

https://co.usembassy.gov/treasury-sanctions-13-current-former-senior-officials-government-venezuela/

That same day, a Colombian lawyer claiming to represent SAAB MORAN issued a press release on his law firm's Twitter feed acknowledging the OFAC sanctions against SAAB MORAN and demanding "that the universal rights of presumption of innocence and due process, rights afforded to [SAAB MORAN] and to all, be respected."  *See* Exhibit 1 and accompanying certified translation.

On June 12, 2020, SAAB MORAN was detained in the Republic of Cabo Verde off the west coast of Africa pursuant to a provisional arrest warrant request by the United States and an INTERPOL Red Notice.  According to a translation of a Cabo Verdean Court Order, on June 18, 2020, SAAB MORAN was questioned in connection with the provisional arrest.  Exhibit 2 and accompanying translation, at 8-9.  The Order states that during that interrogation, SAAB MORAN "knew there were charges against him in the USA, that there was an international investigation about him, and he also knew there was an investigation against him in Colombia." *Id.* at 9.  Concerning his travel to Cabo Verde, SAAB MORAN stated that "he was traveling as a

representative of the Government of Venezuela, although bearing regular passports since the diplomatic passport remained in Venezuela." *Id.* The judge issuing the Order ratified and approved the provisional arrest. *Id.* at 10-11.

On June 21, 2020, the United States submitted an extradition request for SAAB MORAN to face the criminal charges filed against him in the Indictment. SAAB MORAN opposed his extradition. On July 31, 2020, a Cabo Verdean Court approved of the extradition of SAAB MORAN to the United States. SAAB MORAN appealed that decision and continues to oppose his extradition, which is currently on appeal in the Cabo Verdean judicial system.

On January 21, 2021, counsel for Baker Hostetler filed the pending Motion. [DE 10.]

## ARGUMENT

This Court should deny SAAB MORAN's motion without prejudice. First, there are concerns as to whether counsel who filed the Motion actually represent SAAB MORAN, as opposed to another entity or individual, and to date, counsel have been unwilling to provide any documentary proof substantiating their representation of SAAB MORAN. Second, under the fugitive disentitlement doctrine, SAAB MORAN should be precluded from availing himself of this Court's resources while he refuses to appear to answer the charges against him. Third, there are no compelling reasons for this Court to allow counsel from Baker Hostetler to specially appear to litigate this criminal case while SAAB MORAN is a fugitive opposing extradition to the United States to face the criminal charges filed against him.

**I. IT IS NOT CLEAR THAT COUNSEL WHO FILED THE PRESENT MOTION REPRESENT OR WERE ENGAGED BY SAAB MORAN AS OPPOSED TO ANOTHER ENTITY OR INDIVIDUAL**

The Court should deny the pending motion without prejudice due to concerns as to whether counsel who filed the Motion, purportedly on behalf of SAAB MORAN, actually represent the

defendant, as opposed to another entity or individual.  Prior to the filing of the pending motion, counsel from Baker Hostetler emailed undersigned counsel requesting a telephonic conference to discuss the filing of the Motion pursuant to Local Rule 88.9.  Prior to that telephonic conference, the undersigned attorneys requested a representation letter indicating that Baker Hostetler, in fact, represented SAAB MORAN and not some other entity or individual.  Counsel from Baker Hostetler responded:

> [W]e can confirm that we have been retained by Mr. Saab Moran and have a signed engagement letter. We are not at liberty to share the letter because it contains communications covered by the attorney client privilege and attorney work product protections.

Undersigned counsel then requested a redacted version of the engagement letter. Counsel from Baker Hostetler refused to provide a redacted letter or any other documentary support relating to their purported representation of SAAB Moran, noting that they were "not aware of any obligation for defense counsel to share their engagement letter with prosecutors."  Undersigned counsel explained that they were requesting the redacted engagement letter due to press reporting that made undersigned counsel want "to know if we were talking with lawyers representing Venezuela or lawyers representing Alex Saab." *See*, *e.g.*, "Maduro is paying Alex Saab defense with public funds, says Supreme Court in exile," El Pitazo, available at https://en.elpitazo.net/english/maduro-is-paying-alex-saab-defense-with-public-funds-says-supreme-court-in-exile/, Aug. 3, 2020.  While on the telephonic conference with counsel from Baker Hostetler, undersigned counsel again requested the redacted engagement letter, explained the unusual circumstances of this criminal case, and observed that, while there may be no legal obligation to produce the letter, the government had an interest in ensuring it was dealing with counsel that represented the interests of SAAB MORAN and not those of a third-party, including

representatives of the Maduro regime in Venezuela.[1]  Again, counsel from Baker Hostetler refused to provide undersigned counsel with such a letter or any other documentary support relating to their purported representation of SAAB MORAN.

In light of these concerns relating to the representation of SAAB MORAN, as well as counsel's refusal to provide an engagement letter from SAAB MORAN or other documentary support relating to the purported representation, the pending Motion should be denied without prejudice until such engagement letter or documentary support is produced either to undersigned counsel, or *ex parte* to the Court, and it is determined that counsel from Baker Hostetler does, in fact, actually represent SAAB MORAN, who is currently on house arrest in Cabo Verde fighting extradition, and has not received any visits from citizens of the United States.  Whether counsel from Baker Hostetler does, in fact, represent SAAB MORAN is of the utmost importance due to safety concerns associated with this case as they relate to SAAB MORAN and his family. *See* "Venezuelan charged in Miami money laundering case gunned down by motorcycle assassin," Miami Herald, Jay Weaver and Antonio Maria Delgado, available at https://www.miamiherald.com/news/local/article245436795.html, Sept. 2, 2020; *see also* "Venezuela's Maduro Is Calling His Left-Wing Critics 'Terrorists' and Throwing Them in Prison," Vice World News, available at https://www.vice.com/en/article/5dppg3/venezuelas-maduro-is-calling-his-left-wing-critics-terrorists-and-throwing-them-in-prison , Nov. 3, 2020.

---

[1] The United States' interest in ensuring it is dealing with proper counsel representing the interests of SAAB MORAN and not those of a third party, such as representatives of the Maduro regime in Venezuela, is further heightened by the fact that a letter to SAAB MORAN from Jorge Arreaza, Minister, The Ministry of People's Power of External Relations, was attached to the Motion, stating "We therefore ask that you take all necessary legal precautions to avoid extradition."  Motion, Ex. F.

## II.       SAAB MORAN IS A FUGITIVE UNDER THE FUGITIVE DISENTITLEMENT DOCTRINE

The Motion should be denied without prejudice because SAAB MORAN is a fugitive from justice, in that he has constructively fled the Southern District of Florida to avoid facing the criminal charges against him.  *United States v. Shalhoub*, 855 F.3d 1255, 1263 (11th Cir. 2017) (holding that a defendant "constructively fled" because he "knew of the indictment and 'refused to surrender himself to th[e] jurisdiction of the court'" (quoting *United States v. Barnette*, 129 F.3d 1179, 1184 (11th Cir. 1997)); *see also Barnette*, 129 F.3d at 1184 ("[I]ntent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities." (quoting *In re Assets of Martin*, 1 F.3d 1351, 1356 (3d Cir. 1993)).  There is ample evidence suggesting that SAAB MORAN is aware of the indictment against him, has been for nearly two years, and continues to refuse to surrender himself to the Southern District of Florida to face the criminal charges against him.  *Id.*  Now, under the threat of extradition from Cabo Verde, he seeks to avail himself of the benefits of this Court, but only if it benefits him.  *Barnette*, 129 F.3d at 1183; *see also Pesin v. Rodriguez*, 244 F.3d 1250, 1253 (11th Cir. 2001) (applying fugitive disentitlement doctrine because "it would be inequitable to allow [the fugitive] to use the resources of the courts only if the outcome is a benefit to her").

It is well established that a fugitive is not entitled to have his case adjudicated by the court before whom he refuses to appear.  *See Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970); *Ortega-Rodriguez v. United States*, 507 U.S. 234, 239-40 (1993).  However, SAAB MORAN seeks to have the Indictment against him dismissed without ever having to step foot into a United States courtroom.  "The fugitive disentitlement doctrine permits a district court to 'sanction or enter judgment against parties on the basis of their fugitive status.'"  *Shalhoub*, 855 F.3d at 1259 (quoting *Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir. 1998)).  "This doctrine accounts for

'the difficulty of enforcement against one not willing to subject himself to the court's authority, the inequity of allowing [a] "fugitive" to use the resources of the courts only if the outcome is an aid to him,' and 'the need to avoid prejudice to the nonfugitive party.'"  *Id.* (quoting *Barnette*, 129 F.3d at 1183).  "It also 'discourage[s] . . . flights from justice,' and protects the dignity of the courts."  *Id.* (quoting *Ortega–Rodriguez*, 507 U.S. at 241–42).

The Eleventh Circuit has held "that a 'defendant need not leave the jurisdiction' for the doctrine of fugitive disentitlement to apply."  *Id.* at 1263 (quoting *Barnette*, 129 F.3d at 1184).  "'[W]hile legally outside the jurisdiction, [the defendant] may constructively flee by deciding not to return.'"  *Id.* (quoting *Barnette*, 129 F.3d at 1184) (alterations in *Shalhoub*).  Whether the defendant was in his home country when the indictment was returned is "beside the point."  *Id.*  If the defendant "knew of the indictment and 'refused to surrender himself to th[e] jurisdiction of the court,' electing instead not to travel outside of [his home country] to avoid apprehension," the fugitive disentitlement doctrine applies.  *Id.*  "A fugitive is someone who has been offered process and refuses it."  *Id.* at 1264.  *See United States v. Martirossian*, 917 F.3d 883, 890 (6th Cir. 2019) ("a defendant need not be present in and leave a jurisdiction to become a fugitive; the mere refusal to report for prosecution can constitute constructive flight"); *id.* ("No one who is indicted and who declines to answer the charge has a right to be labeled a non-fugitive.").

Applying the above standards, SAAB MORAN's argument that he is not a fugitive fails.  SAAB MORAN knows of the federal indictment against him, but has refused to surrender himself to the jurisdiction of this Court.  The Indictment against him was filed in this Court on July 25, 2019, and made public that same day.  [DE 1.]  Press releases were issued by DOJ and the Indictment was publicized in the media and available on the internet.  *See supra.*  In addition, OFAC sanctioned and designated SAAB MORAN and issued a press release.  *Id.*  The OFAC

press release elicited a response from SAAB MORAN's lawyer in which he acknowledged the fact that SAAB MORAN had been sanctioned and designated. *See* Exhibit 1. Considering the publicity of the Indictment, the OFAC sanction and designation, and the fact that a lawyer claiming to represent SAAB MORAN acknowledged the sanction and designation, it belies reason that SAAB MORAN himself did not know of the Indictment. Further, upon questioning after his provisional arrest in Cabo Verde, SAAB MORAN admitted that he "knew there were charges against him in the USA, that there was an international investigation about him, and he also knew there was an investigation against him in Colombia." *See* Exhibit 2, at 9. SAAB MORAN did not come to the United States after learning of the Indictment filed against him. He has, therefore, constructively fled and is precluded from availing himself of the Court's resources in search of a favorable ruling.

Counsel from Baker Hostetler relies heavily on the Seventh Circuit's decision in *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009), despite the fact that the Eleventh Circuit has expressly disagreed with that decision. *See Shalhoub*, 855 F.3d at 1265 ("Notwithstanding what the Seventh Circuit has stated on this issue, . . . we submit that Shalhoub has an adequate remedy: appearance in the district court."); *see also United States v. Itriago*, No. 13-20050-CR-ZLOCH/HUNT, 2019 WL 1232128, at *2 (S.D. Fla. Feb. 8, 2019) ("The Eleventh Circuit explicitly declined to follow *Hijazi* in *United States v. Shalhoub*, 855 F.3d at 1264–65."). While counsel from Baker Hostetler cite the district court ruling in *Shalhoub*, they tellingly fail to cite the binding decision from the Eleventh Circuit in *Shalhoub* and omit any mention of the Eleventh Circuit's express departure from *Hijazi*.[2]

---

2 The district court's ruling in *Shalhoub*, No. 98-cr-00460-MIDDLEBROOKS, 2016 WL 8943847 (S.D. Fla. Jan. 26, 2016), moreover, provides SAAB MORAN no support. *See id*. at *2 ("the Eleventh Circuit also recognizes constructive flight as sufficient under the fugitive disentitlement doctrine"). Although the district court noted that

Counsel from Baker Hostetler argue that SAAB MORAN cannot have fled or constructively fled the jurisdiction because he never resided here, so he has no reason to return. *See* Motion at 7-8.  But whether SAAB MORAN ever resided in the United States or the Southern District of Florida is beside the point.  The relevant question in determining whether SAAB MORAN "constructively fled" is whether he "knew of the indictment and 'refused to surrender himself to th[e] jurisdiction of the court.'"  *Shalhoub*, 855 F.3d at 1263 (quoting *Barnette*, 129 F.3d at 1184); *see also Barnette*, 129 F.3d at 1184 ("[I]ntent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities." (quoting *In re Assets of Martin*, 1 F.3d at 1356).  For example, in *Shalhoub*, the Eleventh Circuit held that the district court did not abuse its discretion when it applied the doctrine of constructive flight to the defendant—even though he was already in his home country of Saudi Arabia when he was indicted—because he refused to surrender himself to the jurisdiction of the court, "electing instead not to travel outside Saudi Arabia to avoid apprehension." *Id.* at 1263; *see also Schuster v. United States*, 765 F.2d 1047, 1050 (11th Cir. 1985) (holding that regardless whether the appellant intended to flee at the time she left the country, her conduct after she left—including "resist[ing] extradition in New Zealand"—"established her status as a fugitive from this nation's criminal process"); *cf. United States v. Cantino*, 735 F.2d 718, 722 (2d Cir. 1984) (cited positively in *Schuster*, 765 F.2d at 1050 n.18) (determining that the defendant constructively fled from justice, even though he was being held in French prison and thus could not return, because "he actively resisted the extradition request throughout the proceedings"); *In re Kashamu*, 769 F.3d 490, 493 (7th Cir. 2014) ("It's true that Kashamu didn't literally flee the United States, since he was never in the United States.  But

---

Shalhoub had previously resided in the district, it did not suggest that that fact was dispositive with respect to its conclusion that Shalhoub was a fugitive.  *See id*. ("Defendant has knowledge of the charge—he retained counsel to challenge the indictment—and he has not returned: he has constructively fled."); *id*. ("Defendant's failure to surrender himself to the authorities is sufficient basis to determine that he is a fugitive.").

he knew he was under indictment in this country, yet rather than come here to fight the validity of the government's charges, he fought tooth and nail . . . to prevent his being extradited from the United Kingdom to the United States.").

Equally unavailing is the argument that this Court cannot or should not apply the fugitive disentitlement doctrine because SAAB MORAN has, in his view, strong challenges to the Indictment.  "If [SAAB MORAN] wants to challenge the indictment, he need only submit himself to the jurisdiction of the district court."  *Shalhoub*, 855 F.3d at 1265.  *See also Martirossian*, 917 F.3d at 889 (defendant "has a readily available means of obtaining a ruling on his motion to dismiss the indictment[:] [h]e can show up in the Southern District of Ohio, and the court as promised will decide his motion").

Counsel from Baker Hostetler also argue that the fugitive disentitlement doctrine should not apply to SAAB MORAN because in *Hijazi*, the Seventh Circuit found that a foreign national charged for acts that occurred outside the United States raised "fundamental" challenges to the extraterritorial reach of the United States mail and wire-fraud statutes with which Hijazi had been charged. *See Hijazi*, 589 F.3d at 408-09; *see also* 18 U.S.C. § 1343 (silent on the question of extraterritorial reach); 18 U.S.C. § 1031(a) (same).  That argument is entirely inapplicable, however, given that SAAB MORAN is charged under the money laundering statute, 18 U.S.C. § 1956 and the extraterritorial application of the money laundering statute at issue is explicitly set forth in the statute itself.  *See* 18 U.S.C. § 1956(f)(1) ("There is extraterritorial jurisdiction over the conduct prohibited by this section if in the case of a non-United States citizen, the conduct occurs in part in the United States…").  The Indictment alleges two specified unlawful activities: (a) felony violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-3; and (b) offenses against a foreign nation, specifically Venezuela, involving bribery of a

public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, as provided by Title 18, United States Code, Section 1956(c)(7)(B)(iv). [DE 1]. The government does not need to prove that SAAB MORAN committed either of these crimes, but only need to prove that he committed the charged money laundering violations. *See* Eleventh Circuit Pattern Jury Instructions (Criminal Cases), O.74.3 and O.74.5 (2020). The basis for these specified unlawful activities is clear on the face of the Indictment.

Contrary to any argument that the issues raised in the Motion would be a question of first impression, there have been several similar criminal cases filed in the Southern District of Florida charging individuals, including foreign government officials, through the extraterritorial application of the money laundering statute. *See, e.g., United States v. Juan Ribas Domenech*, No. 20-cr-20179; *United States v. Orsoni*, No. 19-cr-20725-Cooke; *United States v. Lennys Rangel*, No. 19-cr-20726; *United States v. Jose Raul De La Torre Prado*, No. 19-cr-20580; *United States v. Arturo Escobar Dominguez*, No. 18-cr-20108; *United States v. Convit Guruceaga, et al.*, No. 18-cr-20685-Williams; *United States v. Andrade Cedeno*, No. 17-cr-80242-Rosenberg; *United States v. Marcelo Reyes Lopez*, No. 17-cr-20747.

*Hijazi* is further distinguishable from the case at hand because SAAB MORAN had more contacts with the United States. *See Shalhoub*, 855 F.3d at 1264-65 (distinguishing *Hijazi* because Shalhoub "has significant contacts with the United States"). The Motion itself outlines some of the contacts that SAAB MORAN and his co-conspirators had in the United States, which include: co-conspirators travelling to Miami, Florida and meeting in Miami, Florida "to discuss the status of corrupt payments to Venezuelan government officials;" causing "wire transfers to be made from Venezuelan bank accounts to overseas bank accounts through the United States;" and causing wire transfers "from a Panamanian bank account to a bank account located in the Southern District of

Florida.".  *See* Motion at 5.  As such, SAAB MORAN and his co-conspirators had significant contact with the United States.  This is especially evidenced by SAAB MORAN and his co-conspirators' reliance on the U.S. financial system, including using U.S. correspondent bank accounts to move U.S. dollars from one foreign bank account to another and moving money to a U.S. bank account belonging to a co-conspirator, in furtherance of the bribery and money laundering scheme.  *See* Hearings on the Role of U.S. Correspondent Banking in International Money Laundering, Subcommittee on Investigations of Senate Committee on Government Affairs (opening statements of Senator Susan M. Collins, Subcommittee Chairman), March 1, 2001, available at https://www.govinfo.gov/content/pkg/CHRG-107shrg71166/html/CHRG-107shrg71166.htm (last visited Feb. 10, 2021) ("Correspondent banking thus enables the respondent bank to provide services to its customers that otherwise would be unavailable because of geographic limitations. Correspondent banking is an integral part of the domestic and international banking systems. Without correspondent banking, in fact, it would often be impossible for banks to provide comprehensive nationwide and international banking services - among them, the vital capability to transfer money by wire with amazing speed and accuracy across international boundaries.").

Like the defendant in *Barnette*, counsel from Baker Hostetler's position is that SAAB MORAN "only wishes to use this court in an attempt to receive a favorable judgment—the only judgment by which, it appears, he will abide."  129 F.3d at 1184.  And like the court in *Barnette*, this Court should "decline to participate."  *Id*.  There is little reason to think that SAAB MORAN, who has refused to surrender himself to the jurisdiction of this Court, would comply with an adverse order from this Court.  He should therefore not be entitled to seek a favorable ruling from this Court.  *See Martirossian*, 917 F.3d at 889-90 (applying the fugitive disentitlement doctrine in

part because "none of the pleadings filed by Martirossian's lawyers indicates that he would agree to submit to the court's jurisdiction if the court ruled against his motion to dismiss the indictment and determined that  18 U.S.C. § 1956 applies to his conduct").

As such, the Motion should be denied without prejudice.

## III.     THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO ALLOW COUNSEL TO SPECIALLY APPEAR AND CHALLENGE THE PENDING INDICTMENT AGAINST SAAB MORAN

SAAB MORAN remains a fugitive with no intention to willingly submit himself to this Court's jurisdiction, and none of the so-called "special circumstances" listed by counsel from Baker Hostetler weigh in favor of this Court allowing counsel to specially appear in search of a favorable ruling for SAAB MORAN.  Counsel relies on *United States v. Noriega*, 683 F. Supp. 1373, 1374 (S.D. Fla. 1988), but *Noriega* was an exceptional case and one that the court itself suggested would be of "minimal" precedential value.

The Motion raises the allegedly "troubling choice to prosecute a diplomat" and continually raises the specter of "diplomatic immunity."  Motion at 10.  The Motion cites no cases, however, in which a foreign diplomat representing one country before another foreign (*i.e.*, non-U.S.) country was afforded immunity from prosecution by the United States for violating the laws of the United States.  Further, despite the claims by counsel for Baker Hostetler that SAAB MORAN is a purported diplomat or "special envoy," SAAB MORAN does not enjoy immunity under the International Organizations Immunities Act, 22 U.S.C. §§ 288–288l, or the Diplomatic Relations Act, 22 U.S.C. §§  254a-254e, as claimed by counsel from Baker Hostetler.[3]   Under the

---

[3] None of the documents attached to the Motion in support of the claim that SAAB MORAN is a purported diplomat or "special envoy" is properly authenticated or non-hearsay under Federal Rules of Evidence 902(3) and 803(8).  Federal Rule of Evidence 902(3) provides that the following type of evidence is "self-authenticating" and requires no extrinsic evidence of authenticity in order to be admitted:

International Organizations Immunities Act, 22 U.S.C. §§ 288–288l, representatives to such organizations have immunity from "legal process relating to acts performed by them in their official capacity and falling within their functions as such representatives." *Id.* § 288d(b). Similarly, the Diplomatic Relations Act establishes diplomatic immunity as a defense. 22 U.S.C. § 254d ("Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations, under sections 254b or 254c of this title, or under any other laws extending diplomatic privileges and immunities, shall be dismissed. Such immunity may be established upon motion or suggestion by or on behalf of the individual, or as otherwise permitted by law or applicable rules of procedure"). However, SAAB MORAN has never been entitled to such immunity under either the Diplomatic Relations Act or the International Organizations Immunities Act. *See id.*, 22 U.S.C. § 288e(a) ("No person shall be entitled to the benefits of this subchapter, unless he (1) shall have been duly notified to and accepted by the Secretary of State as a representative, officer, or employee; or (2) shall have been designated by the Secretary of State, prior to formal notification and acceptance, as a prospective representative, officer, or employee; or (3) is a member of the family or suite, or servant, of one of the foregoing accepted or designated representatives, officers, or employees."). As noted by the attached Exhibit 3, the Department of State has never been notified that SAAB MORAN is a member of or representative to any foreign mission in the United States, including Venezuela's bilateral mission, a member of the Delegation of the African Union Mission at

---

A document that purports to be signed or attested by a person who is authorized by a foreign country's law to do so. The document must be accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester — or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating to the signature or attestation.

Fed. R. Evid. 902(3).

Washington, D.C.; or a member of the Office of the Permanent Observer for the African Union to the United Nations.  Exhibit 3.  As such, the Department of State "Office of Foreign Missions is not aware of a basis for Alex Nain SAAB MORAN to enjoy immunity from the criminal or civil jurisdiction of the United States."  *Id.*  "[C]ourts have generally accepted as conclusive the views of the State Department as to the fact of diplomatic status." *Abdulaziz v. Metropolitan Dade County*, 741 F.2d 1328, 1331 (11th Cir. 1984) (citing *Carrera v. Carrera*, 174 F.2d 496, 497 (D.C. Cir. 1949)); *In re Baiz*, 135 U.S. 403, 432 (1890) (The Court noted that it does "not assume to sit in judgment upon the decision of the executive in reference to the public character of a person claiming to be a foreign minister, and therefore have the right to accept the certificate of the State Department that a party is or is not a privileged person ...."); 22 U.S.C. § 2656 (Secretary of State's responsibility to manage foreign affairs).

The cases cited in the Motion do nothing to support the position that SAAB MORAN is protected by any immunity.  In *Dostal v. Haig*, 652 F.2d 173 (D.C. Cir. 1981), the court addressed whether the due process clause was violated when the United States relied on its immunity in refusing to consent to a German court, a matter wholly inapposite to the issue here.  The Motion's reliance on *Abdulaziz v. Metropolitan Dade Co.*, 741 F.2d 1328 (11th Cir. 1984) is also unavailing. In that case the State Department certified that a Saudi Arabian prince qualified for diplomatic status in the United States, thereby conferring immunity under the Diplomatic Relations Act.  Here, as noted above, the State Department has taken no such action.  Counsel from Baker Hostetler seem to argue that a diplomat need not be accredited to, or otherwise accepted by, the United States in order to receive the privileges and immunities accorded to diplomats in the United States. That is simply not the case, particularly where the State Department has asserted that it is not aware of a basis for an individual to enjoy diplomatic immunity in the United States.  *See United States v.*

*Sissoko*, 995 F.Supp. 1469, 1471 (S.D. Fla. 1997) (refusing to accord the benefits of a diplomat absent appropriate certification from the State Department).  *Cf. Republic of Mexico v. Hoffman*, 324 U.S. 30, 35 (1945) (in sovereign immunity case, Court states that it is "not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize").

Counsel from Baker Hostetler next notes that the "government of Venezuela" has purported to command SAAB MORAN to resist his extradition.  Specifically, the Motion cites to a letter dated July 1, 2020, drafted by representatives of the Maduro regime in Venezuela nearly a year after SAAB MORAN was indicted and during which time SAAB MORAN made no attempt to submit to the jurisdiction of this Court. This letter is not the reason for SAAB MORAN's refusal to appear before this Court and is only now being used as a pretextual justification.  As the Eleventh Circuit has made clear, "If [SAAB MORAN] wants to challenge the indictment, he need only submit himself to the jurisdiction of the district court."  *Shalhoub*, 855 F.3d at 1265.  And once SAAB MORAN is in the United States and before the Court facing the charges against him in the Indictment, his decisions will be his own, made knowingly, freely and voluntarily, and cannot be dictated by another person or entity.

The Motion next claims that issues of "first impression" warrant this Court's consideration of SAAB MORAN's claims.  No such issues exist in this matter.  As noted above, the statutory questions here are not matters of first impression.  SAAB MORAN is charged in a money laundering conspiracy and the Indictment clearly explains the conduct that occurred in the United States.  The statute expressly addresses its extraterritorial jurisdiction.  The Indictment alleges two specified unlawful activities, violation of the FCPA and offenses against a foreign nation, namely Venezuela, involving bribery of a public official, and the misappropriation, theft, and

embezzlement of public funds by and for the benefit of a public official.  As cited above, many similar cases have been brought in this very district.  The additional argument that "the prosecution appears to have no foundation in the face of diplomatic immunity," also fails.  Simply put, SAAB MORAN has no such immunity protection, so the argument is meritless.

The Motion next argues that the court should consider this matter because of the "political overtones" regarding diplomatic relations between Venezuela and Iran.  This matter has nothing to do with diplomatic relations between Venezuela and Iran.  "[A] defendant cannot defeat personal jurisdiction by asserting the illegality of the procurement of his presence."  *United States v. Darby*, 744 F.2d 1508, 1531 (11th Cir.1984).  SAAB MORAN is the subject of legal extradition proceedings in Cabo Verde and this Court should respect that ongoing process.  If SAAB MORAN is legally extradited to the United States from Cabo Verde, SAAB MORAN cannot claim or establish "shocking governmental conduct sufficient to convert an abduction which is simply illegal into one which sinks to a violation of due process."  *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 66 (2d Cir. 1975).

The Motion also argues that the United States has little "interest in this case."  Motion, at 11.  However, as stated above, the criminal case against SAAB MORAN has several connections to the United States.  Therefore, this argument to disregard the fugitive disentitlement doctrine and allow counsel from Baker Hostetler to specially appear is unavailing.

Counsel from Baker Hostetler also argue that if the Court allows them to specially appear and hears their motion to dismiss the Indictment, there will not be a "floodgate" of special appearances.  *See* Motion, at 11 (*citing United States v. Noriega*, 683 F. Supp. 1373, 1374 (S.D. Fla. 1988)).  They are wrong.  If counsel from Baker Hostetler are allowed to specially appear and argue their motion to dismiss the Indictment, particularly in light of SAAB MORAN purportedly

obtaining diplomatic and/or special envoy status <u>after</u> the criminal conduct alleged in the Indictment, one can reasonably expect the "floodgates" of such motions to open.  Indeed, it is possible that if counsel for Baker Hostetler is successful, the Maduro regime (whom the United States does not recognize as the Government of Venezuela) will seek to "appoint" as diplomats or special envoys more and more fugitive defendants in criminal cases filed in the United States, after their criminal conduct, in order to afford them with an opportunity to seek the dismissal of charges against them and thwart multiple prosecutions in the United States.

Finally, the Motion argues that the government will not be prejudiced by a special appearance and that there "is no advantage to the government to demanding that Mr. Saab first appear."  The United States has every interest in ensuring defendants charged by the grand jury appear before the Court.  Allowing fugitive defendants to use the courts in an attempt to procure favorable judgments while being able to ignore unfavorable rulings runs contrary to that goal.  *See Barnette*, 129 F.3d at 1184.  Further, requiring the government to respond to a motion to dismiss prior to SAAB MORAN appearing before this Court would consume the resources of the government and this Court, and provide SAAB MORAN with insight into the government's case prior to determining whether he wants to even submit himself to the jurisdiction of the United States.

The "special circumstances" alleged by counsel for Baker Hostetler fail to support a special appearance in this criminal case.  While SAAB MORAN's underlying arguments will ultimately fail, they should not be addressed until he submits himself to the jurisdiction of this Court.

## **CONCLUSION**

For the foregoing reasons, the United States of America respectfully requests that the Motion be denied based on the fugitive disentitlement doctrine without prejudice to renewal when

the Defendant appears.   In the alternative, and to the extent the Court does not grant the government's request to deny the Motion based on the fugitive disentitlement doctrine, the United States requests 30 days from the date of the Court's order to respond to Defendant's Motion to Dismiss the Indictment on the merits. Such an extension would allow the government to fully address the substantive claims.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


By: /s/ *Kurt K. Lunkenheimer*_____
     Kurt K. Lunkenheimer
     Assistant U.S. Attorney
     Court ID No. A5501535
     99 N.E. 4th Street
     Miami, Florida 33132-2111
     TEL (305) 961-9008
     Kurt.Lunkenheimer@usdoj.gov

DANIEL S. KAHN
ACTING CHIEF, FRAUD SECTION
Criminal Division
U.S. Department of Justice

By: /s/*Alexander Kramer*_____
     Alexander Kramer
     Trial Attorney
     Criminal Division, Fraud Section
     U.S. Department of Justice
     Court ID No. A5502240
     1400 New York Ave. NW
     Washington, DC 20005
     TEL (202) 768-1919
     alexander.kramer@usdoj.gov

## **Certificate of Service**

I HEREBY CERTIFY that on February 22, 2021, a true and correct copy of the foregoing

document was electronically filed with the Clerk of the Court using the CM/ECF system which

would provide a copy to counsel of record.

/s/*Kurt K. Lunkenheimer*
Kurt K. Lunkenheimer
Assistant United States Attorney
