IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALEX NAIN SAAB MORAN, *et al.*,

Defendants.

Case No. 19-20450-CR-Scola

## MOTION TO COMPEL PRODUCTION OF DISCOVERY MATERIALS

Pursuant to Fed. R. Crim. P. 16 and *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, Defendant Alex Nain Saab Moran ("Defendant" or "Mr. Saab") respectfully moves to compel discovery and production of materials in the possession of the Departments of Justice ("DOJ"), State ("State"), Treasury ("Treasury") and Defense ("DOD") that are material to his defense of diplomatic immunity. Specifically, Defendant seeks all information from the relevant time period, including emails, texts, electronic communications, notes, diplomatic cables, reports, memoranda, or other documents (other than press reports) relating to the following:

(1)     Mr. Saab's service as a special envoy, or other diplomatic role, on behalf of Venezuela;

(2)     whether any other country, or any international or supranational organization, considered Mr. Saab to be a special envoy, or as serving in any other diplomatic role, on behalf of Venezuela;

(3)     Mr. Saab's role in Venezuela's State-to-State activities with Iran, including any exchange between Venezuela and Iran for oil, gold, food, or medical supplies;

(4)     travel by Mr. Saab to or from Iran, and the purpose of such travel;

(5)     the flight, diversion or detention of the plane on which Mr. Saab was traveling on or about June 12, 2020, which landed in Cape Verde;

(6)     knowledge by U.S. government personnel of Mr. Saab's diplomatic status, appointment as a special envoy or activities taken on behalf of the Venezuelan government; and

    (7)        documents found on Mr. Saab's person or plane following his detention/arrest in Cape Verde, and any inventory or chain-of-custody information relating to such documents.

At the conference on July 15, the Court ordered the government to produce all such unclassified documents in the possession of DOJ by August 15, 2022, with the exception of documents possessed by the Office of International Affairs ("OIA"). With respect to OIA or State documents, the Court ordered the government to use its "best efforts" to obtain and produce those documents by the same date. In addition, the government represented that it had requested DOD to search for responsive documents and it expected a response from DOD by August 22. Those dates have all passed, yet the government has not produced *any* new documents.

Unfortunately, it is clear that absent a Court order, the government will not conduct a full search or produce documents critical to Defendant's diplomatic immunity defense in time for them to be utilized during briefing for the scheduled evidentiary hearing. Defendant has been patient, with counsel conferring multiple times over the last nine months with the expectation that the government would diligently search for and produce all responsive unclassified documents. With Defendant's opening brief on diplomatic immunity due in 22 days for the hearing beginning on October 31, this Court's intervention is necessary for Defendant to have timely, meaningful access to material information in the federal government's possession.

## CONCISE STATEMENT OF MATERIAL FACTS

More than nine months ago, on November 18, 2021, Defendant first requested *Brady* and Rule 16 material from the government—including materials "in the possession, custody or control of any agency . . . allied with, or cooperating with, the prosecution . . . **that are material . . . to the preparation of the Diplomatic Immunity defense**. . . ." *See* Exhibit A to the Declaration of Kendall Wangsgard ("Wangsgard Decl.") filed herewith at 3, ¶ 4 (emphasis added); *see also id*. at 1 n.1; *id*. at 4, ¶ 7. The government has long been aware of the critical nature of materials related to Defendant's diplomatic immunity defense, which was briefed even before Defendant's extradition. Defendant's requests were reiterated in numerous telephonic

meetings with counsel, including May 23, June 16, June 28, July 12, August 9, August 16, and August 24, 2022, and via supplemental letter dated June 23, 2022.

 *May 23, 2022 Meeting of Counsel*: The parties conducted an informal discovery conference on May 23, 2022. Counsel for Mr. Saab observed that, from the documents that *had* been produced to date, it appears they relate to, and arise out of, Mr. Saab's activities as a special envoy from Venezuela to Iran and their very existence and the circumstances in which they were seized manifest Mr. Saab's status as a special envoy. Further, defense counsel requested production of NSC, DOD, DOS, or DOJ communications that address Mr. Saab's diplomatic status in light of public book excerpts and related press. Likewise, counsel for Mr. Saab stated its belief that there is substantial evidence that the government was aware of both of Mr. Saab's two prior trips to Iran and that it was also aware of all of the particulars of his third trip to Iran.

 *June 16, 2022 Meeting of Counsel*: During a June 16, 2022 telephonic meeting, counsel for the government stated its belief that the government had fulfilled its *Brady*/Rule 16 obligations (but would continue to consider the issue) and the "prosecution team" did not possess material relevant to diplomatic immunity other than the recent book penned by former Defense Secretary Mark Esper.[1] *Esper* details involvement by DOD, State and U.S. intelligence in Mr. Saab's capture/detention and the government's awareness that "[a]t Maduro's direction, Saab was reportedly on a special mission to negotiate a deal with Iran for Venezuela to receive more fuel, food and medical supplies." *Id.* at 327. The government reported that former-Secretary Esper declined to speak with the government. It also advised that it was not aware of a requirement to proactively seek information possessed by other federal agencies or departments based on its position that they were not part of the "prosecution team." Wangsgard Decl. ¶ 7.

 After defense counsel disagreed with that narrow view of the *Brady*/Rule 16 obligations, counsel for the government invited defense counsel to present them with a contrary written argument/authority regarding the contended contours of the government's *Brady* obligations. *Id.*

---

[1] *A Sacred Oath: Memoirs of a Secretary of Defense During Extraordinary Times* (2022) (*see* Wangsgard Decl. Ex. B, hereinafter *Esper*)

One week later—on June 23, 2022, Defendant submitted a nine-page letter, informing the government of its obligations under *Brady* and Rule 16. *See* Wangsgard Decl. Ex. C at 5-9. This June 23 letter detailed the publicly-known investigative and prosecutorial involvement, *inter alia*, of State, Treasury, DOD and OIA in the investigation of Mr. Saab and the relevant precedent requiring DOJ to provide the requested documents and information. *Id*. at 2, 6 nn. 5-9. The June 23 letter also included specific requests for documents, emails, communications, notes, texts, and memoranda related to Mr. Saab's diplomatic immunity defense.

*June 28, 2022 Meeting of Counsel*: During a follow-up telephonic meeting on June 28, 2022, the government stated that it would provide information related to governmental awareness of Mr. Saab's status as a diplomat or special envoy at the time of travel "to the extent [that the] prosecution team" was aware of such information. Wangsgard Decl. ¶ 8. But counsel for the government again stated its view that elements of the intelligence community, including DOD, State, and the CIA, are not part of the "prosecution team." *Id.* Counsel for the government did confirm that it was trying "to be helpful" and "alleviate any concerns," and thus would make prudential search requests and provide further details regarding the response thereto by other agencies.[2] *Id.* The parties agreed to work together to expedite the review process (e.g., developing appropriate search terms to eliminate potential false hits). The parties also agreed to consider an adjournment (*see* ECF No. 114 (July 5, 2022)) because there was not enough time to complete the searches and reviews before the then-scheduled briefing deadline.[3] *Id.*

*July 12, 2022 Meeting of Counsel*: During a follow-up telephonic meeting on July 12, 2022, the government stated that it had requested materials from DOD, State, and the CIA on an

---

[2] Counsel for the government also stated that while it did not necessarily think it had an obligation to do so, it was seeking information from Cape Verde via MLAT based on certain defense requests but would not be seeking additional information from other countries (e.g., Colombia or Venezuela).

[3] The Parties advised the Court on June 30, 2022, that "[a]lthough the Parties do not necessarily agree on the scope of the government's Brady and Rule 16 obligations, the government has agreed to search its own records and to request the Department of State, Department of Defense and the Central Intelligence Agency to search their records for documents responsive to many of the Defendant's requests." *See* ECF No. 113 (June 30, 2022).

expedited basis, though it did not believe it was legally required to do so under either *Brady* or Rule 16. *Id.* ¶ 9. It advised that State had not yet responded, the review of CIA materials would begin the following week, and DOD had begun a search that was anticipated to yield results by August 22. *Id*. Regarding Treasury/OFAC, government counsel advised that it would not seek information. Finally, regarding *DOJ's own materials*, the government stated that it had not made any formal request of either OIA or the National Security Division ("NSD") but would internally discuss defense counsel's request for information possessed by these DOJ components. *Id.*

    <u>July 15, 2022 Status Conference and Resulting Court Order</u>: Three days later, at this Court's July 15 status conference, the government acknowledged that it was "in discussions" with defense counsel about its *Brady*/Rule 16 obligations and had delayed responding because defense counsel "told us they would look into the legality" of Defendant's requests and the government "didn't hear from [defense counsel] on that." *See* Transcript, ECF No. 122, at 14:1-8. Government counsel also observed that there is "no motion to compel." *Id*. at 14:9. Government counsel did advise that "out of an abundance of caution" it was doing some document reviews outside the prosecution team. *Id.* at 5:2-6. These reviews did not begin, however, until after the June 23 letter to the government. *Id.* at 8:4-15. At the conference, counsel for Mr. Saab requested the Court's assistance in helping expedite discovery, particularly with respect to OIA and State given the upcoming evidentiary hearing. *Id.* at 8:23-11:20.

    Accordingly, at the July 15 status conference, this Court entered an order as follows:

> The Government must provide to the Defendant all unclassified *Brady* and *Giglio* materials in the custody, possession, or control of [DOJ] no later than **August 15, 2022**, except for such material in the possession, custody or control of the [OIA].

*See* ECF No. 116. Regarding OIA and State, the Court ordered the government to "make its best efforts" to obtain and produce "unclassified *Brady* or *Giglio* material in the possession, custody, or control of [OIA] and/or [State] no later than **August 15, 2022**." *Id*. Regarding *classified* material, the Court ordered the Government to "disclose to the Defendant its awareness of such material and—to the extent known—its volume" that is in the possession, custody or control of

the "Department of Justice (including [OIA]) or [State] . . . ." *Id*. Following the conference, the

parties met and discussed search terms that might expedite the ordered review.

*August 9, 2022 Meeting of Counsel*: On August 9, 2022, with the benefit of this Court's

order, counsel again conferred. Regarding DOJ materials, the government stated that, setting

aside OIA, it would be able to meet the August 15 deadline set by the Court with respect to non-

classified materials but advised that it would not be making a substantial production. Wangsgard

Decl. ¶ 10. Regarding OIA, counsel for the government advised that it had identified 55,000

potentially relevant unclassified OIA emails based on search terms and time parameters, which it

hoped would be reduced by deduping. Counsel warned that it would be unable to complete this

OIA review by August 15 and indicated that OIA counsel had asked for the opportunity to

conduct a privilege review before any OIA documents were produced. *Id.*

Regarding State, the government reiterated that it had requested State to perform a

search, and that it understood State was in the process of responding to the request. However,

State had not provided a date certain for determining the volume of materials or when a

production would be made. *Id*. ¶ 11. The government also reiterated that it would not seek any

information from Treasury. *Id*. ¶ 12. The government stated that it expected the "next update"

from DOD on August 22. *Id.* ¶ 13. Finally, the government warned of likely litigation regarding

*classified* materials under the Classified Information Procedures Act ("CIPA"). *Id.* ¶ 11.

*August 15, 2022 Letter to Defense Counsel*: On August 15, 2022—the deadline by which

this Court ordered production of *unclassified* DOJ material (except OIA) and "best efforts" for

the production of *unclassified* OIA and State Department material, ECF No. 116—the

government sent defense counsel a two-page "summary of unclassified information" letter. The

government did not produce any other new documents.[4]

---

[4] To be clear, this motion is focused on the materials responsive to the issue of diplomatic
immunity. While the government has made various disclosures to counsel, beginning November
2021, they are not tailored to the specific Rule 16 and *Brady/Giglio* materials directly implicated
in the upcoming motion to dismiss and evidentiary hearing.

In its letter, DOJ stated that it searched for material "in the possession of the DOJ investigative team assigned to this criminal case," specifically "reports contained by the [DEA, FBI, HIS, and CBP]." *Id.* The letter then briefly summarized two things: (1) some "DEA Reports of debriefs of your client that were produced in discovery"; and (2) DEA telephonic interviews with a source of information ("SOI"). Wangsgard Decl. ¶ 14. The letter also contained an ambiguous and unsourced third paragraph, obliquely stating that "the information that led to Saab Moran's detention in Cape Verde, was that Saab Moran was traveling to Iran from Venezuela and that he was traveling with an Iranian delegation." *Id.* ¶ 15. The letter does not elaborate where, when, why, or from whom, this "information" was obtained, or provide details about the substance of the information, such as the meaning of "Iranian delegation." *Id.* It also does not address conflicting statements (and a seeming recantation) by the SOI. *Id.* ¶ 14.

Regarding OIA and State material—for which the Court's order required "best efforts" to turnover unclassified information by August 15—the DOJ provided no material whatsoever despite having identified 55,000 potentially responsive unclassified DOJ OIA documents targeted for review. The government also did not advise defense counsel of the volume, if any, of *classified Brady* or *Giglio* material in the possession of DOJ. *Cf.* Order, ECF No. 116.

*August 16, 2022 Meeting of Counsel*: On August 16, the day following receipt of DOJ's "summary" letter, the parties again conferred telephonically. Government counsel stated that the summary letter constituted DOJ's *entire* disclosure of non-classified DOJ materials in satisfaction of the Court's order (other than OIA materials). Wangsgard Decl. ¶ 16. The government also stated that the four entities mentioned in the summary—i.e., DEA, FBI, HSI, CBP—were the entities for which information was searched, and that it had asked those entities only to search for "reports," not other types of information, such as emails, texts, notes, memoranda, etc., which defendant had specifically requested. *Id.*

In addition, government counsel acknowledged that it had not sought materials from other components of DOJ (other than OIA, and one Civil Division attorney who was working with State). In particular, they had not requested documents from NSD. *Id.* When defense

counsel suggested that government counsel call NSD and speak with someone to identify the division's relevant record custodians so as to develop a search plan, the government replied that it would discuss the matter internally. *Id.*

Regarding OIA, the government indicated that it had narrowed/de-duped the unclassified OIA emails from approximately 55,000 to 39,000 and was beginning to review them. *Id.* The government advised that it might take 2-3 weeks to review them, but it was not sure, and it would update defense counsel before the August 26 status conference. *Id*.

Regarding State materials, the government advised that it had not received any further information from State beyond the fact that State was pulling together information. *Id.* ¶ 17. Counsel for the government noted that State is aware of this Court's upcoming status conference on August 26, and expressed hope that there would be further clarity by then. *Id.* The government reiterated that it anticipated CIPA litigation over classified documents and did not know if all State materials would end up being classified. *Id.*

Regarding DOD, government counsel stated that DOD was still slated to provide them with information about the result of its search, but not actual documents, by August 22. *Id.* ¶ 18.

*August 24, 2022 Meeting of Counsel*: On August 24, 2022, counsel again conferred. DOD had ***failed*** to meet its self-imposed August 22 deadline and it had provided no other update or documents. *Id.* ¶ 19. Regarding OIA, counsel for the government stated that it had reviewed about one-third of the non-classified documents and that it was still on track for the estimated completion date (in an additional 2-3 weeks). *Id.* ¶ 20. However, with respect to other DOJ components such as NSD, government counsel stated that it was not expanding the search beyond what it "traditionally considers the prosecution team [and] investigative agencies involved" plus OIA and one other Civil Division attorney. *Id.* The government stated that it had conducted no searches of any NSD materials. *Id.* The government further stated that they would not search any emails or communications of DOJ trial attorneys or Assistant U.S. Attorneys. *Id.*

Regarding State, counsel for the government advised that State had completed its internal review and pull of documents and was in the process of transferring the unclassified material to

the DOJ review platform. *Id.* ¶ 21. Although counsel for the government did not yet know the exact volume of documents, they understood from preliminary estimates that there would be about 2,200 unclassified State records for review and perhaps an equal amount of classified. *Id.*

Regarding the August 15 summary letter, counsel for the government confirmed that it would not produce any underlying documents, including the DEA Form-6 reports, and that the government "stands by the summary." *Id.* ¶ 22. Further, counsel for the government stated that it believes all communications pertaining to Mr. Saab's plane being stopped in Cape Verde were telephonic. In response to questioning by defense counsel about documents that memorialized or discussed the information received in such telephone calls, the government indicated there "potentially" could be notes from the case agent. *Id.* Defense counsel again requested the production of all documents and information related to the summary letter, as well as the identities of persons who might have relevant information about the communications concerning Mr. Saab's plane. *Id.* Counsel for the government declined and stated that provision of the summary letter satisfied their *Brady* obligations. *Id.*

Counsel for the government also stated that they had checked with the lead case agent, who confirmed that he did not have any text communications, but the government had not expanded its review further to either (1) other agents on the "investigation team" or (2) other forms of communications (such as emails, notes, etc.) beyond reports and "cables." *Id.* Defense counsel disagreed with the government's narrow view of its obligation to search for and produce all documents, records and communications that potentially contain *Brady*/Rule 16 information.

In summary, despite being ordered to turn over "all unclassified *Brady* and *Giglio* materials in the custody, possession, or control of the Department of Justice no later than **August 15, 2022**," (except OIA), ECF No. 116, the government has provided only a two-page "summary" of unclassified information, some of which had previously been disclosed. Moreover, the government has admitted that its identification of unclassified *Brady* and *Giglio* materials was limited by a decision not to search all potentially relevant materials, such as e-mails, texts, electronic communications, notes, memoranda and other documents, that were

specifically identified in the defendant's discovery requests. Rather, the government only asked DEA, FBI, HSI and CBP to search their reports and cables, and declined to request any documents from NSD. These efforts are insufficient under *Brady*, Rule 16 and this Court's order.

Incredibly, Defendant has received *no additional unclassified source documents* since the date of the Court's order. Moreover, DOJ has not required a search to be done of emails, texts, notes and electronic communications of even its admitted lead investigative agency, DEA, or its other investigative partners. The government has elected not to search any material from NSD or Treasury. It has searched OIA emails—narrowing them to 39,000—but has not yet turned any over, or even discussed a rolling production. It has requested materials from State and DOD but repeatedly intimated that these requests may not prove fruitful because the materials may (or will soon) be classified, necessitating months-long CIPA litigation. Moreover, the government has failed to secure even a commitment from State to adhere to a schedule for production.

## ARGUMENT

While the government has dragged its feet in discharging its discovery obligations, the Defendant has languished in pretrial detention, unable to obtain highly material information regarding his affirmative defense of diplomatic immunity.

## I.     THE GOVERNMENT IS OBLIGATED TO PRODUCE THE MATERIALS

Three principles underlie the government's discovery obligation in a criminal case. First, Rule 16 requires that the government disclose all documentary or tangible evidence in its "possession, custody or control" that is "material to preparing the defense[.]" Fed. R. Crim. P. 16(a)(1)(E). Second, the government's constitutional obligation under *Brady* requires it to turn over all evidence "favorable to the accused" that is "material either to guilt or to punishment." *Brady*, 373 U.S. at 87; *United States v. Agurs*, 427 U.S. 97, 107 (1976). Third, under both Rule 16 and *Brady*, the government must turn over materials possessed by *any* agency or department that played a role in either the investigation or prosecution.

A.      **The Government's Constitutional Obligation Under** *Brady v. Maryland*

1.      *The Evidence is Favorable to the Accused and Material to Punishment*

Binding authority has declared that the essential purpose of *Brady* is "to equalize access to available evidence" in the name of fundamental fairness, and "it is rarely justifiable for the prosecutors to have exclusive access to a storehouse of relevant fact." *Calley v. Callaway*, 519 F.2d 184, 224 (5th Cir. 1975) (*en banc*) (quoting *Dennis v. United States*, 384 U.S. 855, 873 (1966)). The Due Process Clause grants defendants a right to all "evidence favorable to the accused" "material to either guilt or punishment." *Brady*, 373 U.S. at 87; *Agurs*, 427 U.S. at 107; *accord United States v. Starrett*, 55 F.3d 1525, 1555 (11th Cir. 1995); *see also* L. R. 88.10(c).

*Brady* evidence is any evidence that favors the defense by casting doubt on the government's case, either substantively or via impeachment. *See United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992). "[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995); *accord Agurs*, 427 U.S. at 108; U.S. Dep't of Justice Manual § 9-5-002.A. "This is as it should be. Such disclosure will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Kyles*, 514 U.S. at 439.

At the pretrial discovery stage, as here, the "materiality" of favorable evidence is assessed by whether it relates to guilt or punishment, not whether the "result of the proceeding would have been different" had the information been disclosed.[5] *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005). As *Brady* made clear, the government's due process obligation is to share any evidence that "relates to guilt or punishment," *Brady*, 373 U.S. at 87, and is favorable to the accused because it "tends to help the defense by either bolstering the defense's

_____

[5] Even if the appellate standard—"different result"—is used, however, the material requested by Mr. Saab must still be turned over, as he seeks information in the government's possession relating to his status as a diplomat *in transitu*. Such information will, if withheld, undoubtedly alter the outcome of the proceeding.

case or impeaching prosecution witnesses." *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1199 (C.D. Cal. 1999).

> The prosecutor cannot be permitted to look at the case *pretrial* through the end of a telescope an appellate court would use *post-trial*. Thus, the government must always produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed—with the benefit of hindsight—as affecting the outcome of the trial. The question *before trial* is not whether the government thinks that disclosure of the information or evidence it is considering withholding might change the outcome of the trial going forward, but whether the evidence is *favorable*. . . .

*Safavian*, 233 F.R.D. at 16 (emphasis added); *accord Sudikoff*, 36 F. Supp. 2d at 1198-99; *United States v. Acosta*, 357 F. Supp. 2d 1228, 1233 (D. Nev. 2005); *United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wisc. 2004).

Here, the requested material is directly relevant to Mr. Saab's diplomatic immunity defense and "material to . . . punishment." *Brady*, 373 U.S. at 87. An individual entitled to diplomatic immunity cannot, by definition, be punished; he is "immune" from the court's authority. *See* 22 U.S.C. § 254d ("Any action or proceeding brought against an individual who is entitled to [diplomatic] immunity . . . shall be dismissed."); *see also Abdulaziz v. Metro. Dade Cnty*., 741 F.2d 1328, 1331 (11th Cir. 1984). This is clear from Section 40 the 1961 Vienna Convention on Diplomatic Relations, which declares that any diplomatic agent who "passes through or is in the territory of a third State . . . while proceeding to take up or to return to his post" is entitled to "inviolability." Inviolability means that the *in transitu* diplomat "shall not be liable to any form of arrest or detention" and he must be free from "any attack on his person, freedom or dignity." Vienna Convention on Dipl. Rel. (1961), at art. 29. Indeed, federal law makes it a felony to "imprison[] . . . [an] internationally protected person or make[] any other violent attack upon the person or liberty of such person . . . ." 18 U.S.C. § 112(a). An "internationally protected person," moreover, is defined as any "representative . . . or agent of a foreign government, or international organization who at the time and place concerned is entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity . . . ." 18 U.S.C. § 1116(b)(4)(B); *see also* 18 U.S.C. § 112(c). It is thus clear

that under both international and domestic law, an individual entitled to *in transitu* diplomatic immunity *cannot be punished* by a third country, not even the United States.

Accordingly, any material relating to Mr. Saab's diplomatic immunity is "material to . . . punishment" and must be turned over. *Brady*, 373 U.S. at 87.

        2.     *The Government's* Brady *Obligation Extends to Materials in the Possession of State, Treasury and DOD*

Binding authority "has declined to draw a distinction between different agencies under the same government" for purposes of *Brady* compliance. *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979); *accord United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir. 1973), *overruled on other grounds*, *United States v. Henry*, 749 F.2d 203, 206 n.2 (5th Cir. 1984). The government "cannot compartmentalize the Department of Justice" because there is "no suggestion in *Brady* that 'different arms' of the government are severable entities." *Deutsch*, 475 F.2d at 57. Indeed, in *Deutsch*, the court made clear that the Department of Justice could not "deny having access" to materials possessed by another portion of the federal government and must attempt to obtain such materials under *Brady* because different portions of the same government are not "third parties" but the *same party*. *Id*.

When complying with its *Brady* obligation, therefore, the "prosecutor's office is . . . the spokesman for the Government." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing Restatement (Second) of Agency § 272)). The "duty to produce requested evidence falls on the state" *qua* state and all agents who are part of the prosecution team, in whatever agency or department they work. *Martinez v. Wainwright*, 621 F.2d 184, 186 (5th Cir. 1980). The prosecution team "includes both investigative and prosecutorial personnel." *Antone*, 603 F.2d at 569. Indeed, as the DOJ's own Manual recognizes, the "prosecution team" includes "federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case." U.S. Dep't of Just. Manual § 9-5.001.B.2.

The indictment of Mr. Saab was the culmination of investigative effort by numerous federal departments and agencies that monitored Mr. Saab's overseas activities for many months,

assisted in his interception while *in transitu* on a diplomatic mission, and extradited him from Cape Verde. These federal departments and agencies "pooled their investigative energies" against Mr. Saab and are all part of the prosecution team against him. *Antone*, 603 F.2d at 569.

       *DOJ's Involvement*: Multiple divisions of DOJ have been involved in the prosecutorial effort against Mr. Saab. As the DOJ's press release announcing Mr. Saab's extradition states:

> The Justice Department's [OIA] provided substantial assistance in securing Saab's arrest and extradition, as did INTERPOL Washington. This case was investigated by DEA Miami with assistance from the FBI's Miami Field Office and Homeland Security Investigation's Miami Field Office. FBI's International Operations Division transported Saab from Cabo Verde to the United States.

*See* Press Release, U.S. Dep't of Justice (Oct.18, 2021).[6] In addition, the NSD's involvement in the investigation of Mr. Saab is evident by the fact that on July 1, 2020—approximately two weeks after Mr. Saab was detained/arrested in Cape Verde while en route to obtain Iranian oil for Venezuela—the Department of Justice filed a forfeiture action against four Iranian oil tankers bound for Venezuela. *See United States v. All Petroleum-Product Cargo Aboard the Bella*, Civ. No. 20-1791 (D.D.C. July 1, 2020). The Iranian tankers "were carrying oil to Venezuela . . . in exchange for gold." *Esper* at 318, 325. The two countries were "working together more closely than ever before" and there was "good cause for concern about the deepening collaboration between them." *Id.* at 319. The Iranian tankers were then successfully seized by DOJ on August 14, 2020, while en route to Venezuela. *See id.* at 325; *see also* Press Release, U.S. Dep't of Justice, *Largest U.S. Seizure of Iranian Fuel from Four Tankers* (Aug. 14, 2020).[7] It was a "great initiative by Justice and State" that "achieved everything that we were originally trying to do— stop the shipments" and "Barr and Pompeo did a great job." *Esper* at 325.

       The forfeiture action against the Iranian oil tankers was "handled by the National Security Division" and the U.S. Attorney's Office in D.C. *See* Press Release, U.S. Dep't of

---

[6] https://www.justice.gov/opa/pr/colombian-businessman-charged-money-laundering-extradited-united-states-cabo-verde

[7] https://www.justice.gov/opa/pr/largest-us-seizure-iranian-fuel-four-tankers

Justice (Aug. 14, 2020).[8] It is reasonable to conclude, therefore, that given Mr. Saab's known, prominent diplomatic role in procuring Iranian oil for Venezuela—and the perceived national security threat those two nations posed to the U.S.—the NSD played a meaningful role in the U.S. government's investigatory and prosecutorial effort against him.

To date, despite this Court's order regarding production, it has provided only a two-page summary of DEA/FBI/HSI/CBP "reports" (but not other documents), no NSD material, and only a general sense of the volume of relevant emails (but not other documents) in the possession of OIA. This does not comply with the Court's order, much less *Brady*.

*State's Involvement*: State's involvement in the investigation and prosecution of Mr. Saab is extensively detailed in *Esper* (at 327-32). As elaborated above, State was heavily involved in the interdiction of Iranian oil tankers that were the culmination of Mr. Saab's diplomatic efforts to exchange Venezuelan gold for Iranian oil. *Id.* at 318-19, 325. The Secretary of State sits on the National Security Council ("NSC"), whose involvement in investigating Mr. Saab's activities on behalf of Venezuela is also well-documented. *Id*. at 319-322, 324, 328-29. Indeed, according to Secretary Esper, "State, Justice, and the NSC . . . were working on this case" because "Saab was a very important player, and access to him could really help explain how Maduro and his regime worked. It was important to get custody of him." *Id*. at 327.

Indeed, because Mr. Saab was extradited, State necessarily played a role in the U.S. government's prosecutorial effort against him, as all requests for extradition must be made by diplomatic note sent from State. U.S. Dep't of Justice Manual § 9-15.240, -300. Moreover, the government introduced evidence in from State, ECF No. 24-3, characterizing a declaration from State as stating that it is not aware of any basis for Mr. Saab to assert immunity and that it is not aware of his diplomatic status. ECF No. 24 at 17. In light of this, counsel for the government acknowledged to the Court that "because of . . . that declaration we submitted, we thought it was

---

[8] https://www.justice.gov/opa/pr/largest-us-seizure-iranian-fuel-four-tankers

prudent that we go beyond the prosecution team for that instance. . . ." Transcript, ECF No. 122, at 14:16-19.

To date, however—despite this Court's order for "best efforts" to obtain relevant, non-classified materials from State by August 15—no materials have been turned over and the government has not even provided an anticipated date for any such production.

*DOD's Involvement*: DOD's involvement in the investigation and prosecution of Defendant is also elaborated in *Esper* (at 327-32). In addition to confessing that Mr. Saab was en route to Iran on a "special mission to negotiate a deal with Iran for Venezuela to receive more fuel, food, and medical supplies" when detained in Cape Verde, Secretary Esper recounts that DOD was heavily involved in discussions with both State and NSC about Saab's oil-for-gold negotiations and whether to involve the U.S. military to interdict the Iranian tankers, *id*. at 318-25, and to ensure Mr. Saab's extradition. *Id*. at 327-31.

Ultimately, DOD became involved in the effort to ensure Mr. Saab's extradition. In August 2020, the DOD dispatched the Coast Guard cutter USCGC *Bear* "to deter Venezuela and Iran from plotting to spirit Mr. Saab away from the island" because Mr. Saab was a potentially valuable asset in the U.S. government's effort to overthrow Maduro. Eric Schmitt & Julie Turkewitz, *Navy Warship's Secret Mission Off West Africa Aims to Punish Venezuela*, N.Y. Times, Dec. 22, 2020[9]; *accord Esper* at 330; *id*. at 323, 327. Just a few months later, in late November 2020, the DOD deployed the Navy warship USS *San Jacinto* "to keep an eye— somehow—on Saab while supposedly deterring outside intervention" by countries angered by his detention in violation of international law, such as Iran and Venezuela. *Esper* at 331.

DOD's use of Coast Guard and Navy assets was designed to ensure Mr. Saab's successful extradition to face charges in the U.S. The DOD thus played a critical role in the present prosecution, and any material in the DOD's possession relating to the categories of requested information must be turned over pursuant to *Brady*.

---

[9] https://www.nytimes.com/2020/12/22/us/politics/navy-cape-verde-venezuela.html

*The Treasury Department's Involvement*: The Treasury's connection to the investigation and prosecution of Mr. Saab is likewise patent. On July 25, 2019, the Office of Foreign Assets Control ("OFAC") sanctioned Mr. Saab based on his work on behalf of Venezuela's national food subsidy program. *See* Press Release, U.S. Dep't of Treasury, Treasury Disrupts Corruption Network Stealing from Venezuela's Food Distribution Program, CLAP (July 25, 2019).[10] That OFAC and the Justice Department "pooled their investigative energies" against Mr. Saab, *Antone*, 603 F.2d at 569, is evident from the fact that OFAC's sanctions announcement and DOJ's indictment were filed on the same day—July 25, 2019. This was not a coincidence.

In addition, the government has provided to defense counsel multiple documents, seized from Mr. Saab upon his arrest in Cape Verde, describing an "oil for gold" diplomatic exchange between Iran and Venezuela, whereby Iran sent oil to Venezuela in return for Venezuelan gold. As these documents show, U.S. intelligence and law enforcement agencies—including Treasury/OFAC—were well aware of the "oil for gold" diplomatic exchange, in which Mr. Saab served as Special Envoy. Indeed, approximately two months prior to Mr. Saab's OFAC sanction and indictment, OFAC sanctioned the Venezuelan state mining company and its President, on the basis that Venezuela had been trading its gold to for other goods. *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions Venezuela's State Gold Mining Company and its President for Propping Up Illegitimate Maduro Regime (Mar. 19, 2019).[11] OFAC has confirmed in another instance that, when "increas[ing] pressure" on Mr. Saab "and his network in Venezuela," it "**closely coordinated** these actions with the [DEA and CBP], **among other U.S. government partners**." *See* Press Release, U.S. Dep't of Treasury, Treasury Increases Pressure on Alex Saab and His Network in Venezuela (emphasis added).[12] Treasury's extensive investigation into Mr. Saab's activities and close coordination with DOJ's lead investigative agency, and its resulting imposition of sanctions against him, his associates and even vessels

---

[10] https://home.treasury.gov/news/press-releases/sm741
[11] https://home.treasury.gov/news/press-releases/sm631
[12] https://home.treasury.gov/news/press-releases/sm778

carrying Iranian oil, all indicate that Treasury was an integral player in the U.S. government's investigative and prosecutorial efforts against Mr. Saab, necessitating turnover of the requested materials.

### B.     The Government's Rule 16 Obligations

As the Eleventh Circuit has recognized, the "purpose of Rule 16 is to promote the fair administration of justice[.]" *United States v. White*, 846 F.2d 678, 692 (11th Cir. 1988). To accomplish this goal, Rule 16 requires that the government grant a criminal defendant access to any materials "within the government's possession, custody, or control" that are "material to preparing the defense . . . ." Fed. R. Crim. P. 16(a)(1)(E).[13]

Information is "material" to the defense within the meaning of Rule 16 if it is helpful to the preparation of the accused's defense, regardless of whether such information is exculpatory or inculpatory. *Jordan*, 316 F.3d at 1250 ; *accord United States v. Marshall*, 132 F.3d 63, 67 (D.C. Cir. 1998). Disclosure is required under Rule 16 even if the information would "not rise to the level that would trigger the Government's obligation under *Brady*. . . ." *United States v. Aref*, 533 F.3d 72, 80 (2d Cir. 2008); *accord United States v. Amawi*, 695 F.3d 457, 471 (6th Cir. 2012). Thus, Rule 16 is broader than *Brady*. *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019); *United States v. Caro*, 597 F.3d 608, 620 (4th Cir. 2010); *United States v. Baker,* 453 F.3d 419, 424 (7th Cir. 2006); *United States v. Conder*, 423 F.2d 904, 911 (6th Cir. 1970).

Moreover, while Rule 16(a) extends to materials within the "possession, custody, or control of the government," this requirement "includes materials in the hands of a governmental investigatory agency closely connected to the prosecutor." *Jordan*, 316 F.3d at 1249. Moreover, the prosecutor's duty of granting access to information material to the defense is continuing. Fed. R. Crim. P. 16(c). Thus, if the prosecutor "finds additional material previously requested and

---

[13] Of course, Rule 16 is the minimum requirement for discovery, and a District Court can order additional discovery in the interest of fairness. *See, e.g., United States v. Jordan*, 316 F.3d 1215, 1249 n.69 (11th Cir. 2003)*, United States v. Thomas,* 548 F. Supp. 3d 1212, 1221 (M.D. Fla. 2021)

ordered that is subject to discovery under the rule, he must promptly notify the other party or his attorney or the court of the existence of the additional material." *United States v. James*, 495 F.2d 434, 436 (5th Cir. 1974). Accordingly, the material requested by this motion falls well within the government's obligation under Rule 16, as it is "material to preparing the defense" of diplomatic immunity. *See* Fed. R. Crim. P. 16(a)(1)(E).

## CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, Defendant respectfully requests that the Court order that the government expeditiously provide the unclassified *Brady*/Rule 16 materials as provided for in the attached proposed order.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 88.9

Counsel has conferred with Counsel for the government pursuant to Local Rule 88.9 in a good faith effort to resolve the issues raised in this motion and has been unable to do so.


Date: August 25, 2022

Respectfully submitted,

BAKER & HOSTETLER LLP

/s/ *Lindy K. Keown*
Lindy K. Keown (FL: 117888)
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801
Tel: (407) 649-4000
lkeown@bakerlaw.com

/s/ *David B. Rivkin, Jr.*
David B. Rivkin, Jr. (*pro hac vice*)
Elizabeth Price Foley (FL: 92380)
Jonathan R. Barr (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
drivkin@bakerlaw.com
efoley@bakerlaw.com
jbarr@bakerlaw.com

Jonathan B. New (*pro hac vice*)
45 Rockefeller Plaza
11th Floor
New York, New York 10111
Tel: (212) 589-4200
jnew@bakerlaw.com