# EXHIBIT 35

**§ 622 Effect of treaties upon individuals**   The binding force of a treaty and its effects concern in principle the contracting states only, and not their nationals.[1] This rule can, as has been said by the Permanent Court of International Justice,[2] be altered by the express or implied terms of the treaty, when its provisions become self-executory (even, occasionally, as regards persons who are not nationals of the contracting state concerned).[3] Otherwise, if treaties contain provisions affecting rights and duties of persons or bodies under the jurisdiction of the contracting states, each contracting state is bound to take such steps as are necessary, according to its internal law, to ensure that their rights and duties are consistent with the requirements of the treaty. According to the laws of some states, the official publication of a treaty may be sufficient for this purpose, but in other countries other steps are necessary, such as the enactment of a statute by Parliament.[4]

**§ 623 Effect of changes in government upon treaties**   As treaties are binding upon the contracting *states*, changes in the government, or even in the form of government, of one of the parties do not, as a rule, affect the binding force of treaties.[1] Thus, for instance, a treaty of alliance concluded by a state remains valid, even when the ministry changes. No state can avoid the obligations of a treaty merely because it was concluded by it under a previous government. When a monarchy becomes a republic, or *vice versa*, its treaty obligations

---

[1] See generally McNair, *Treaties*, pp 78–110, 322–39. On the question whether the failure of nationals to invoke a treaty can bring about its desuetude see § 646, n 3.

[2] The Court has held that the intention of the contracting parties may show that the treaty is self-executing and itself confers rights upon the subjects of one state against another state, enforceable in the former state's national courts: see Advisory Opinion as to *Jurisdiction of the Courts of Danzig* (1928), Series B, No 15 (but note the differing constructions put upon this case by McNair, *Treaties*, pp 336–9). See also §§ 7, 375; *McCandless v United States, ex rel Paul Diabo*, AD, 4 (1927–28), No 363; and *Confiscation of Austrian Property in Yugoslavia Case* (1960), ILR, 40, p 175 (noted by Abel, ICLQ, 10 (1961), pp 344–6). The Court of Justice of the European Communities has held in numerous decisions that provisions of the treaties establishing the European Communities have direct effects for individuals in the member states: see § 19, nn 81, 82. See also § 442, n 5, as to decisions relating to the European Convention on Human Rights.

[3] See *Steiner and Gross v Polish State*, AD (1927–28), No 287, in which it was held that a national of a state not a party to the Convention establishing the tribunal hearing the case could bring an action against Poland, one of the parties to the Convention. See also *Glenn v Compania Cubana de Aviacion SA*, ILR, 19 (1952), No 101. On the question of the effect of some treaties on nationals of states which are not parties to these treaties see generally Capitant, *Les Traités de droit privé dans leur application aux nationaux des tiers états* (1928); McNair, *Treaties*, ch 17.

[4] As to the modes in which the provisions of treaties are made applicable in the national law of various states, see § 19; see also §§ 375, 636, above. As to the interpretation of treaties by municipal courts, and the extent to which they may refer to a treaty in interpreting a municipal enactment passed to give effect to it, see § 631, n 2.

[1] But the outbreak of a rebellion may interfere with the performance of a treaty: see *In re Nepogodin*, ILR (1955), p 90. The recognition of a new government, particularly when it is a revolutionary government (see § 44), may necessitate an overhauling and confirmation (see § 659) of existing treaty relationships: see, for instance, the unratified Draft of Proposed General Treaty between the UK and the Russian Federal Soviet Socialist Republics in 1924, Cmd 2215. See also § 57, n 4; McNair, *Treaties*, pp 668–72, 676–80; O'Connell, *State Succession in Municipal Law and International Law* (1967), ii, ch 7; *Harv Research* (1935), pt III, pp 1045–55. See also *ibid*, pp 1066–77, on the effect of territorial changes.

normally remain the same. All such changes, important as they may be, do not of themselves alter the person of the state which concluded the treaty.[2] If, however, a treaty provision essentially presupposes a certain form of government, then a change from such form makes such provision void.

**§ 624 Amendment of treaties**  A treaty[1] may be amended[2] by a further treaty between the parties; the amending treaty is subject to the normal rules for treaties regarding conclusion and entry into force, reservations and provisional application,[3] unless the treaty itself otherwise provides.[4] A treaty may also be amended by an oral agreement, or by a tacit agreement evidenced by the subsequent practice of the parties.[5]

---

[2]  See, eg *Masinimport v Scottish Mechanical Light Industries Ltd* (1976) SC 102; ILR, 74, p 559. Not to be confused with the effect of a change in the government is the effect of a change in international status upon treaties, as, for instance, if a hitherto full sovereign state becomes part sovereign, or *vice versa*, or if a state merges entirely into another, and the like. This is a case of succession of states, which has been discussed at §§ 60–70; see also § 654. As to the extent to which treaties are binding on rebel authorities, see McNair, *Treaties*, pp 676–80.

[1]  As to the amendment of a treaty before it has entered into force, see, as to the Olive Oil Agreement 1956 and the Protocol of Amendment 1958, UN Juridical YB (1974), pp 194–5.

[2]  See generally Scelle, *Théorie juridique de la révision des traités* (1936); Blix, ICLQ, 5 (1956), pp 447–65, 581–96. Jenks, BY, 14 (1933), pp 43–64; Hoyt, *The Unanimity Rule in the Revision of Treaties* (1959); Leca, *Les Techniqeus de révision des conventions internationales* (1961); Detter, *Essays on the Law of Treaties* (1967), pp 71–82. For examples of treaty provisions regarding the amendment or revision of the treaty in question, see Blix and Emerson, *The Treaty-Maker's Handbook* (1973), pp 223–45; *Handbook of Final Clauses*, UN Doc ST/LEG/6 (1957), pp 130–52 (this collection of final clauses has been updated by successive Annexes to *Multilateral Treaties in respect of which the Secretary-General performs Depositary Functions*, published periodically in the series ST/LEG/SERIES E, most recently E/8 (1990)).

As to the 'process, not exactly of amendment, but of what is known as emendation, ie adjustment to accommodate a different outlook', see *Beagle Channel Arbitration* (1977), ILR, 52, pp 93, 157. The tribunal found it not an illegitimate proceeding as such, but one the acceptability of which in particular cases depends on how compelling are the reasons which support it and the degree of adjustment contained.

As to the significance of a provision that an agreement may be 'revised', see the Advisory Opinion on the *Interpretation of the Agreement of 25 March 1951 between the WHO and Egypt*, ICJ Rep (1980), pp 73, 91–2.

To be distinguished from amendment procedures is the practice adopted in many treaties of providing for periodic review conferences. These are primarily concerned with reviewing the way in which a treaty has operated, rather than with adopting amendments: but, of course, a review of a treaty's operation may reveal a need for its amendment. The line between review meetings and amendment conferences may not always be clear. For examples of various forms of review provisions see UN Charter, Art 109; Antarctic Treaty 1959, Art XII. 2(a); Treaty on the Non-Proliferation of Nuclear Weapons 1968, Art VIII.3. See generally Carnahan, AJ, 81 (1987), pp 226–30.

[3]  See § 598ff, § 614ff, and §612, n 3.

[4]  Vienna Convention, Art 39. For the case in which a treaty confers rights or obligations on third states, see § 626.

[5]  The ILC proposed an article dealing with modifications of a treaty by subsequent practice (draft art 38; YBILC (1966), ii, pt 2, p 236), but this was not adopted by the Vienna Conference on the Law of Treaties. That such subsequent practice may amend a treaty is demonstrated by the *USA–France Air Transport Services Agreement Arbitration* (1963), ILR, 38, pp 182, 248–55, and the *Italy–USA Air Transport Arbitration* (1965), ILR, 45, p 393. See also the *Taba Award* (1989), ILR, 80, p 224, for the acceptance by the parties of a situation not in conformity with the terms of a treaty requiring that certain boundary posts be inter-visible. Subsequent practice may some-