# EXHIBIT 40

must take this route, and can not be permitted to insist on carving out a route of his own.

> Whart. Com. Am. Law, § 168.

A person coming into the United States as the diplomatic representative of a foreign state, with credentials from governing powers not recognized by this Government, is accorded diplomatic privileges merely of transit, and this of courtesy, not of right, and such privileges may be withdrawn whenever there shall be cause to believe that he is engaged in, or contemplates, any act not consonant with the laws, peace, and public honor of the United States.

> Cushing, At. Gen., 1855, 8 Op. 471.
>
> Such a person, being charged with unlawful recruiting, was saved from prosecution on condition of not becoming chargeable with any further offense and of departing from the country within a reasonable time. (Cushing, At. Gen., 1855, 8 Op. 473.)

General Henderson, minister from Texas to France (before the annexation of Texas), was arrested in New York, on his return from France to Texas, on an alleged debt. The court discharged him from arrest, and held that the want of a passport made no difference in the case.

> Holbrook v. Henderson, 4 Sandf. 619.

A foreign minister passing through this country on his way to his station is exempt from service of process in a civil suit.

> Wilson v. Blanco, 4 N. Y. S. 714, 56 N. Y. Super. Ct. 582.

In October, 1854, Mr. Soulé, American minister at Madrid, who had been attending the Ostend conference, arrived at Calais, in France, intending to return to his post by way of Paris. On his arrival at Calais he was provisionally stopped under an order of the minister of the interior that he should not be allowed to "penetrate into France" without the knowledge of the Government. Mr. Mason, American minister at Paris, on hearing of the action of the authorities at Calais, immediately addressed a protest to the French Government, not only against the interruption of Mr. Soulé's journey, but also against the refusal, as he supposed, of the French Government to permit Mr. Soulé to pass through that country. Mr. Drouyn de l'Huys, then minister of foreign affairs, replied that the Government of the Emperor had "not wished . . . to prevent an envoy of the United States crossing French territory to go to his post in order to acquit himself of the commission with which he was charged by his Government," but that " between this simple passage and the sojourn of a foreigner, whose

*Soulé's case.*

antecedents have awakened, I regret to say, the attention of the authorities invested with the duty of securing the public order of the country, there exists a difference, which the minister of the interior had to appreciate;" that "if Mr. Soulé was going immediately and directly to Madrid the route of France was open to him;" that if, on the contrary, he "intended to go to Paris with a view of tarrying there, that privilege was not accorded to him. It was, therefore, necessary to consult him as to his intentions, and it was he who did not give the time for doing this."

This last statement refers to the fact that Mr. Soulé, on being stopped at Calais, immediately left and returned to his post by way of England and Portugal.

> Mr. Mason, min. to France, to Mr. Marcy, Sec. of State, No. 37, Oct. 30, 1854, H. Ex. Doc. 1, 33 Cong. 2 sess. 22; Mr. Mason to Mr. Drouyn de l'Huys, Oct. 27, 1854, id. 23; Mr. Drouyn de l'Huys to Mr. Mason, Nov. 1, 1854, id. 24–27; Lawrence's Wheaton (1863), 422; Calvo, Droit Int. (3rd ed.), I. 603.
>
> With regard to the action of the French Government in detaining Mr. Soulé, it should be explained that Mr. Soulé, who was a native of France and a naturalized citizen of the United States, was currently reported to have made speeches adverse to the Government of Louis Napoleon and to have held communication with some of its adversaries.
>
> In concluding his note to Mr. Mason, November 1, 1854, M. Drouyn de l'Huys said: "The minister of the United States in Spain is free. I repeat it, to pass through France. Mr. Soulé, who has no mission to fulfil near the Emperor, and who, conformably with a doctrine sanctioned by the law of nations, would need, on account of his origin, a special agreement to enable him to represent, in his native land, the country of his adoption—Mr. Soulé, as a simple private individual, comes within the pale of the common law which has been applied to him, and he can not lay claim to any privilege."
>
> Mr. Mason, replying on November 6, 1854, said: "I have not failed to observe the declaration that Mr. Soulé's residence in France will not be authorized by the Emperor's Government. As his public duties require him to reside in Spain, he has no intention, as far as I am informed, of remaining or residing in France. I therefore forbear entering into any examination of the reasons suggested for the determination to deny to him the privilege, or of the manner in which he has been notified of the purpose of the Imperial Government. . . . I have much satisfaction in receiving the assurance given in the emphatic declaration of your excellency 'that the minister of the United States to Spain is at liberty to traverse France' towards his post, and obeying the commission with which he is charged by his Government. The recognition of this right is all that I have to ask of the Emperor's Government in the premises." (H. Ex. Doc. 1, 33 Cong. 2 sess. 27–28.)
>
> As to the case of Mr. Soulé and a diplomatic agent's rights of innocent passage, see Hall, Int. Law (4th ed.), 322–324.
>
> That the nation through whose territory the minister passes, may at its option prescribe his line of transit, is stated in Field's Code of Int. Law, § 136. See 2 Philimore's Int. Law, 186–189.

> As to the transmission through a third country of packages addressed by a foreign office to its ministers, without examination by customs officers of such third country, see Mr. Bayard, Sec. of State, to Mr. Phelps, min. to England, No. 947, Aug. 8, 1888, MS. Inst. Great Britain, XXVIII. 580, enclosing a copy of Mr. Bayard to Mr. Tree, min. to Belgium, No. 371, July 24, 1888.
>
> Exemption from customs duties is usually conceded to a diplomatic representative in transit through a third state; but his status in such state "lacks the extraterritorial element of immunity belonging to him in the country to which he is accredited." (Inst. to Dip. Off. (1897), secs. 6, 61.

(2) BY SEA.

§ 644.

" I received your letter of the 14th, suggesting the idea of asking open letters from the French and British ministers addressed to the commanders of their armed vessels, to insure to you an uninterrupted passage, leaving me to determine on the propriety of asking. On reflection, I am persuaded they can not be necessary, and I exceedingly doubt the propriety of asking for them. The armed vessels of neither nation would violate the rights of a *public minister;* and no passport to *him* could afford security to the *merchant* vessel in which he takes his passage. She must at all events be subjected to the usual examinations. If a public minister going to his place of destination must pass through the territories of the belligerent powers, passports for him though a neutral would be expedient; but the ocean being the highway of all nations, it would seem to me to derogate from our equal rights as a sovereign power, to seek protection there under any passport but our own."

> Mr. Pickering, Sec. of State, to Mr. King, min. to England, June 17, 1796, MS. Inst. U. States Ministers, III. 178.

A belligerent has no right to stop the passage of a minister from a neutral state to the other belligerent, unless the mission of such minister be one hostile to the first belligerent.

> Mr. J. Q. Adams, Sec. of State, to Mr. Brown, Dec. 23, 1823, MS. Inst. U. States Ministers, X. 140.

By a despatch of February 8, 1866, Mr. Charles A. Washburn, minister resident of the United States to Paraguay, informed the Department of State that he had been hindered and delayed in the military lines of the allies who were then at war with Paraguay on his return to Asuncion. On April 16, 1866, Mr. Seward wrote to Mr. Washburn that the President considered this action to be " inconvenient " and " not altogether courteous," although he desired " to regard it as a not unfriendly proceeding."

**Washburn's case.**

Digitized by Google