# Exhibit 1

**Copy of:**

The Judgment given in the Appeal reports no. 07/2021 (Extradition Proceedings no. 42/19-20), in which the Appellant is: **ALEX NAIN SAAB MORAN** and the Defendant is **The Barlavento Court of Appeal**.

## SUPREME COURT OF JUSTICE

### Judgment No. 28/2021

They agree, in Plenary, at the Supreme Court of Justice:

## I. REPORT

**ALEX NAIN SAAB MORAN**, businessman, of Venezuelan nationality, born on December 21, 1971, detained in the Prison of the Island of Sal, at order of the Barlavento Court of Appeal, best identified in the case file, not complying with that Court judgment of January 4, 2021, which authorized his extradition to the **United States of America (USA)**, lodged an appeal against it, formulating the following conclusions:

a) The competent Judgment on appeal violates all the assumptions of the extradition process, whether those established by the Constitution of the Republic [CR or CRCV], or those established by international instruments that bind the State of Cabo Verde and also in the International Judiciary Cooperation Law [LCJ].

b) In the extradition process, all the evidence procedures that aim to demonstrate the negative assumptions that justify the refusal of international cooperation are allowed, namely all those assumptions that are related to the observance of the fundamental principles of the criminal process, embodied in the CR and in the international instruments to which Cabo Verde is party, accordingly, in circumscribing the required evidence to Article 55 of the LCJ, the defendant's agreement violates the right of the Person to be extradited to be heard, and is therefore null and void.

c) The contested judgment violates article 30(4) of the Constitution, which requires the detainee to be immediately informed of the reasons that determined his detention, as well as articles 269 paragraph 1 of the CPP [Criminal Procedure Code] and Article 31 of the LCJ which establish the formal requirements for an arrest warrant.

d) The contested judgment violated article 30(3)(f) of the Constitution that equates detention for the purpose of extradition to preventive imprisonment, for which reason the contested judgment also violated the rules of criminal procedure regarding the application of coercion measures;

e) It is manifestly illegal to deprive a person of his or her freedom based on an informal request by a foreign police officer, namely the arrest of the Appellant for the purpose of extradition;

f) International acts relating to Interpol were never approved, ratified or published in the Official Bulletin of the Republic of Cabo Verde, in violation of the provisions of Article 12 of the Constitution and the applicability of the instruments

of this international body without observing the provisions of the Constitution on the reception and validity of international treaties;

g) The act of the Minister of Justice that authorizes the extradition of the Appellant and, for all legal purposes, is an administrative act, being subject to all legal remedies for annulment, under the principle of effective judicial protection provided for in article 243 e) of the Constitution;

h) The penalty indicated in the diplomatic note is 20 years imprisonment for each of the counts listed in the indictment, the diplomatic note provides for eight counts and being eight counts for 20 years, the foreseeable penalty applicable in the USA is 160 years;

i) In the present case, the Appellant's extradition cannot be accepted due to his possible sentence to 160 years of imprisonment, which, considering current global life expectancy, constitutes a *de facto* or perpetual life sentence;

j) In accordance with international law, extradition must be denied if the requesting State is unable to guarantee that the requested person will not be subjected to cruel and inhuman treatment;

k) The appealed judgment indicates as the period of commission of the acts by the Person to be extradited the years 2011 or 2012 to 2014 (Point 2. of items a) and e) of the Request for Extradition and pages. 2, 2v. and pages 3, « *for the acts took place between March 2012 and December 2014*»;

l) The statute of limitations (limitation) 5 (five) years (Cfr. pp. 4 and Exhibit E pp. 83 and 83 v.);

m) The limitation period of the criminal procedure of five years, then has already ended in 2019 and can no longer be interrupted, even if by personal notification of the Appellant, which did not happen;

n) It is a public order of the State of Cabo Verde that the Person to be extradited must be personally notified of the extradition request by the USA;

o) The notification of the formal extradition request and the notification of the judicial order admitting this request are personal;

p) The interpretation of this rule as sufficient notification of the representative for the purposes of article 55.1 of the LCJ violates articles 1, 3.2-3, 35.6, 15, 17.4-5. and 18 of the Constitution, and is therefore unconstitutional, and therefore inapplicable by the courts (articles 277.1 and 211.3 of the Constitution);

q) The Extradition requested by the USA is based on political reasons and should be refused under the terms of the law and the UNTOC Convention, should it apply in the present case; in fact;

r) Publication is a requirement for the effectiveness of the normative acts subject to it (Article 2.1 of Law no. 87/VII/2001 of January 10) and the Presidential Decree that ratifies the UNTOC treaty does not seem to have been published by the defendant State;

s) The Appellant is a Special Envoy of the RBV [Venezuela] for the RII [Iran] and enjoys immunity from jurisdiction and personal inviolability, in accordance with customary international law, and the lack of jurisdiction of the State of Cabo Verde to judge a Special Envoy in transit on its territory determines the absolute lack of jurisdiction of the Cabo Verdean courts;

t) The status of Special Envoy does not necessarily have to be recognized by the political power; by delegating this competence exclusively to the political power,

the Court violated the principle of separation of powers, the independence of the judiciary and violated the provisions of articles 2 paragraph 2, 211 paragraph 1 and 7 of CRCV;

u) The Special Envoy Status cannot be denied to the Person to be extradited by an excessive formalism which is contrary to Consuetudinary International Law and Unanimous Doctrine, requiring prior information from the third State, thus distorting the secret and Ad Hoc Envoy function of the Person to be extradited;

v) Finally, the transit visa accepted by the 1969 New York Convention and International Law, as being sufficient to prove the information of the 3rd State, was attached to the process, but with a manifestly bad evaluation of this irrefutable evidence by the Court *a quo*,

w) as well as the diplomatic passport of the Person to be extradited was not valued in the proceedings and the defense allegations Special Envoy Status, as a whole;

x) The appointment of the Person to be extradited, Mr. ALEX SAAB, as permanent representative, ad interim, to the African Union, is effective immediately;

y) In this framework, he enjoys a double status which gives him a **complementary protection**, by virtue of the Conventional, Customary and Jurisprudential International Law;

z) In fact, he is protected in its quality of Special Envoy of Venezuela and in his quality of Permanent Representative, by Interim, to the African Union.

aa) From an unlawful act in international law of the State of Cabo Verde, which is the detention of the Appellant, in his capacity as Special Envoy of the RBV, cannot derive any jurisdiction of the RCV and jurisdiction of its Courts for the maintenance of an unlawful detention carried out by its police authorities;

bb) The lack of jurisdiction of the courts of Cabo Verde constitutes a procedural exception (article 156.1(b) of the CPP) and of its own motion (articles 157 and 161 of the CPP), notwithstanding the claim by the Respondent;

cc) The detention of the Appellant, his continued incarceration violates the provisions of Article 269 paragraph 1(b) of the CPP and article 39 of the LCJ, could not be used in violation of Cabo Verde's rules of criminal procedure and data processing and for the detention of the Appellant;

dd) The Constitution and the CPP submit the entire criminal process to the adversarial principle and not just certain stages, which would seem to be chosen or discretionary by judges (Articles 35.6 of the Constitution and 5 of the CPP);

ee) as the ordinary legislator has broadened and extended the scope of the constitutional principle of adversarial proceedings to the entire criminal process (Article 5 of the CPP), which cannot be considered a non-existent or unwritten rule, never to be applied by judges and courts,

ff) without observance, in any case, of any contradictory procedure imposed by the Constitution and the law (Article 35.6 of the Constitution and Article 5 of the CPP), before the decision is taken, in particular the hearing of the Appellant and because it interferes with his fundamental and inalienable rights and the restriction of his right to freedom (Article 17.4.3 of the Constitution);

gg) rules of criminal procedure constitute all those which may be adopted with the content of aggravating, restricting or limiting the rights and the situation of the detainee or the Person to be extradited and without opening the contradictory

procedure and hearing the party whose rights are being restricted or limited, so that those rules, insofar as they determine the procedural status of the detainee or extraditee are unconstitutional for violation of Articles 15, 17.4-5. and 18. 0 of the Constitution and, therefore, inapplicable by the courts (articles 277.1 and 211.3 of the Constitution);

hh) By granting the possibility to the Public Prosecutor's Office to intervene twice in the extradition process and the Appellant only once, the contradictory principle (Article 35.6 of the Constitution) and the law (Article 5 of the CPC) were infringed, so that the contested decision must be considered null and void, pursuant to Articles 150, 151 and 152 of the CPC;

ii) The violation of the rules on the audition, hearing and personal notification of the Appellant provided in articles 54, 55 and 56 of the JCL as practiced by the appealed Court violates the constitutional and legal principle of adversarial proceedings and constitutes omissions of acts and procedural stages and generates irreparable nullities;

jj) Since the decision ordering the extradition of the Appellant, Mr. Alex Naim Saab Moran, to the United States of America, is an irremediable nullity as provided for in Article 151 of the CPP;

kk) Regarding the hearing provided for in article 56 of the LCJ, there was no hearing of the Person to be extradited, which is mandatory and indispensable in extradition proceedings;

ll) The Appellant filed, in due course, his opposition, requesting measures of proof, submitting documents, listing witnesses, and further protesting that additional documents be submitted;

mm)     The Court *a quo* held that it was not necessary to adduce evidence but decided absolutely not to adduce the evidence requested by the Appellant in his opposition;

nn) The Court *a quo* was obliged to respect the adversarial principle;

oo) In view of the above, the Court *a quo*, when making its decision, disregarded the adversarial principle, a principle with constitutional protection, arising from the principle of the Democratic Rule of Law, which it was required to comply with under the terms of the fundamental law;

pp) Thus violating article 35(6) of the Constitution of the Republic of Cabo Verde and article 5 of the Criminal Procedure Code, and therefore constituting an incurable nullity, in accordance with article 151(g) of the CPP, which is hereby requested for all legal purposes;

qq) In the absence of reciprocity in relations between States and in international judicial cooperation, Extradition cannot be granted;

rr) Thus, the interpretation of the rule of number 3 of article 6 of the LCJ in the sense that it allows international judicial cooperation, in the form of extradition, when the USA expressly states that it will never grant it to Cabo Verde in this situation is unconstitutional for violation of the principle of Article 11.1 of the Constitution;

ss) Furthermore, by constitutional imposition, the reciprocity of advantages is one of the principles of international relations (article 11.1 of the Constitution);

tt) Therefore, reciprocity cannot be waived by law, in this case the LCJ, under penalty of unconstitutionality, when another party in international relations with Cabo Verde expressly states that it can never ensure reciprocity;

uu) The lack of reciprocity is only applicable to other forms of judicial cooperation provided for in article 1.1 of LCJ and never to judicial cooperation in the form of extradition as it implies fundamental rights such as the right to liberty and deprivation of liberty (articles 29.1 and 30.1 of the Constitution) and the right to free movement of the person (article 51.1.2 of the Constitution);

vv) Thus, the interpretation of the rule of number 3 of article 6 of the LCJ in the sense that it allows international judicial cooperation, in the form of extradition, when the USA expressly states that it never grants it to Cabo Verde in this situation is unconstitutional for violation of the principle of reciprocity of advantages contained in Article 11.1 of the Constitution;

ww)      Failure of the requesting State to assure the respondent State of the respect of the principle of speciality provided by the organs and institutions of the requesting State and which are binding according to the legal-constitutional system of the USA;

xx) The judgment under appeal is null and void, as the ECOWAS Court - (ECW/CCJ/APP/43/20) - has determined, with direct and immediate effect in the CV legal order, under the CRCV art.12.3, and 210 paragraph 2, *"he (the Person to be extradited) shall not be extradited until the decision on the merits is rendered"*.


The Public Prosecutor's Office at the Barlavento Court of Appeal responded to the appeal, presenting the following conclusions:


1. In criminal matters, it can be said that extradition is a form of international judicial cooperation, in which the requesting state asks the requested state to hand over a person who is in its territory, for the purposes of criminal prosecution, or of serving a sentence or security measure depriving him or her of his/her liberty, for an offence of which the courts of the requesting state are competent.

2. In the case of passive extradition, in which Cabo Verde is the requested State, the admission of extradition is regulated by international treaties and conventions and, in their absence or even insufficiency, by the law on international cooperation and also by the Criminal Procedure Code.

3. It is the responsibility of the judicial authorities of the requested State to carry out the legal penal classification of the facts, in accordance with its own law, in order to determine the existence of the conditions that determine extradition,

4. By not approving, ratifying or signing the said protocol, Cabo Verde certainly had in mind reservations to its sovereignty, since this is a matter of exclusive jurisdiction of the National Courts, it is more than evident that the State, for reasons of sovereignty, cannot abdicate its jurisdiction in passive extradition proceedings.

5. It is therefore considered, with regard to this matter, as fully reproduced what has already been alleged in the opposition to extradition, as well as everything else alleged to date.

6. The request was made in accordance with the requirements that shape the granting or refusal of extradition, all in the light of the CRCV, the Law of International

Legal Cooperation in Criminal Matters, and other laws of the Republic with extradition related issues.

7. All his rights, including the right to a hearing and the right to contradiction, have been duly observed;

8. There is no evidence of any violation, with a view to a presumed nullity, moreover one that is irreconcilable;

9. There are no legal grounds for refusing extradition under the terms of articles 6, 7, 8 and 32 of our internal law of cooperation, as the request satisfies the requirements of article 23 and 44 of our law of cooperation.

10. None of the rules contained in the Convention, nor the additional protocols, confer competence to determine the national courts to enforce their decisions, much less the competence to modify coercive measures, since they do not have jurisdiction over national courts, which are organs of sovereignty, as stated in the articles described above.

11. The norms emanating from competent organs of international organizations to which Cabo Verde belongs, only take direct effect in the internal order, if this is expressly established in the respective constitutive treaties.

12. Therefore, this proclaimed attribution of the quality of "special envoy" does not enjoy support in international law.

Having had sight of the case, the Honorable Attorney General of the Republic requested that the appeal be dismissed, invoking for such the arguments presented on pages 521 to 534 overleaf.

The Appellant replied to the Public Prosecutor's Office promotion.

Both the Appellant and the Public Prosecutor's Office submitted opinions in support of the pleas and arguments invoked by them.

Once the other legal aspects are taken into account, it is necessary to consider and decide.

## II.    GROUNDS

As it is known, the power of cognition of the court of appeal is limited by the issues raised in the appeal's conclusions, except for those of its own motion.

### II. 1.   Issues to be considered

Let us see, then, what issues are raised in the conclusions of the appeal, which, for their length, are condensed into the following conclusive summary.

1. Detention of the Person to be extradited
   a) Failure to communicate the reasons for detention and failure to comply with the formal requirements of an arrest warrant (item (c)).
   b) Violation of the rules of criminal procedure regarding the application of coercive measures (item (d)).
   c) Deprivation of liberty only on the basis of an informal request from a foreign police officer (item (e)).
   d) INTERPOL acts have never been ratified nor published (items (j) and (cc)).
   e) Non-existence of an arrest warrant against the Person to be extradited.

2. Act of the Minister of Justice is an administrative act (item (g)).
3. Failure to provide documentary evidence (items (b), (ll), (mm), (oo) and (pp)).
4. Failure to notify the Person to be extradited personally of the extradition request and its adoption (items (n), (o) and (p)).
5. Failure to hear the Person to be extradited (item (kk)).
6. Violation of the adversarial principle (items (dd), (ee), (ff), (gg), (hh), (ii), (jj), (mm), (nn) and (pp).
7. Risk of being sentenced to life imprisonment (items (h) and (i)).
8. Lack of guarantee that the Person to be extradited will not be subjected to cruel and inhumane treatment (item (j)).
9. Crimes prescription (items (k), (l) (m)).
10. Extradition for political reasons (par. q)).
11. Non publication of the treaty or Presidential decree.
12. State of Special Envoy and Ambassador (items (s), (t), (u), (v), (w), (y), (z), (aa), and (bb))
13. Violation of the principle of reciprocity (qq), (rr), (ss), (tt), (uu) and (vv)).
14. Lack of guarantees of respect for the principle of speciality (ww)).
15. Nullity for failure to abide by the ruling of the ECOWAS Court (xx)).

To this conclusive summary, and as it has already been shown, other issues may be added, resulting from the examination of the case records, if their ex-officio knowledge is required.

### II. 2. Proven facts

The knowledge of such questions presupposes that we establish the matters of fact relevant to the object of the appeal, which are as follows:

A. The Cabo Verdean Judicial Police arrested the Appellant on the 12th of June, 2020, when the plane in which he was traveling from Venezuela to Iran made a stopover at the Amilcar Cabral Airport on Sal Island for refueling;

B. After his detention, the Appellant was brought before the District Court of Sal on the 14th of June, 2020, and subsequently before the Barlavento Court of Appeal on the 18th of June, 2020;

C. At that High Court the Appellant was heard by a Magistrate Judge who then made an order of the same date confirming his detention;

D. The Appellant has challenged his detention either by writ of habeas corpus or by ordinary appeal;

E. Both challenges were dismissed by the Supreme Court of Justice;

F. The Appellant filed an appeal to the Constitutional Court against the decision of the Supreme Court of Justice denying the habeas corpus petition, which declined to hear the appeal on the grounds that the conditions for its interposition have not been met;

G. On the 6th of July, 2020, the Public Prosecutor's request for extradition of the Appellant to the United States of America was registered, dated the 3rd of July, 2020;

H. The case having been concluded on the 7th of July, 2020, the Judge Magistrate to whom the case had been distributed issued an order on the same date stating that the request had been accompanied by the documents required by law and that there was no obstacle to proceeding with the case, therefore ordering compliance with the provisions of Article 55 of Law 6/VIII/2011 of August 29, known as the Law on International Judicial Cooperation (LCJI)

I.   On the 8th of July 2020, the Appellant's lawyer was notified of the above-mentioned order;

J.  On the 8th of July, 2020, the Appellant submitted to the Court the request on pages 164 to 166, in which he claimed the lack of personal notification of the abovementioned order, as well as the fact that he was not heard in person during the judicial process, considering that such omissions constitute irreparable nullities;

K. On the 16th of July, 2020 the Appellant presented his written opposition to the extradition request (pages 167 to 197)

L. The above-mentioned pleading was divided by the Appellant in two parts: (A), which he termed "PREVIOUS QUESTIONS"; and (B) which he termed "OPPOSITION".

M. As regards the PREVIOUS QUESTIONS, the Appellant raised the following issues:

- o The complete falsity of the process, alleging, in particular, that "the facts and acts attributed to the Person to be extradited in the extradition process, namely in the request signed by PRC[1], and in the documents handed over by the USA are all false";
- o The unconstitutionality of the rule in article 55, paragraph 2, of the LCJI, in the part and in the measure in which it states that *"the opposition in the extradition process can only be based on the fact that the detainee is not the person claimed or that the conditions for extradition are not met";*
- o The agreement of accession of Cabo Verde to INTERPOL is not published in the official Gazette of the State, so it cannot be applied by the Courts, also not imposing on the National Police the duty to comply with the regulations of that organization, nor can it *"act motu proprio, based on good will cooperation to arrest, detain or perform any police act that results in the restriction of the rights to liberty and security of the national or foreigner";*
- o The red alert published on the 13th of June, 2020 cannot be used as legal grounds for the detention of the Person to be extradited, which occurred on the 12th of June, 2020, and it is also true that the legality of this red alert

---

[1] District Prosecutor

was contested by the Person to be extradited and Venezuela before the competent organs of INTERPOL, so the Cabo Verdean Judiciary should not use the red alert to justify the continued detention of the Person to be extradited;

o   The Person to be extradited, who never left the plane, never entered Cabo Verde since he never crossed the border, it was therefore forbidden for the PJ [Judiciary Police] to *"enter and conduct a night search in the aircraft, search and arrest the Person to be extradited in the absence of a warrant";*

N. As for the part that designated as OPPOSITION, the Appellant raises the following issues:

o   The statute of limitations of the criminal procedure, according to US law the 5-year statute of limitations, has already expired, counting from the date of the commission of the facts (December 2014);

o   Immunity from jurisdiction/Special Envoy: Cabo Verdean courts are absolutely incompetent to hear this extradition request since the Person to be extradited enjoys immunities arising from his status as special envoy of the Bolivarian Republic of Venezuela;

o   Non-observance of the principle of reciprocity: the instrument invoked for the extradition of the Person to be the extradited is United Nations Convention on Transnational Organized Crime, approved by resolution of the National Assembly No. 92/VI/04, of May 31, 2004; but there is no Presidential Decree of ratification of this convention, therefore it cannot serve as a basis for the extradition request. In the absence of an extradition treaty, in order for extradition to take place, it would be necessary to observe the principle of reciprocity. However, the United States has explicitly and formally declared that it does not apply the reciprocity principle with Cabo Verde;

o   Non-compliance with the principle of speciality: the extradition request was not prepared on the basis of a formal declaration of guarantee that the person claimed will not be judged for facts other than those on which the request is based and which are prior or contemporaneous with the request;

o   Negative cooperation requirements: the case in reference is part of the USA's efforts to weaken the regime of the President of the RBV of which the Person to be Extradited is a supporter; There is reason to believe that the motive for requesting extradition is based on political or ideological reasons rather than criminal punishment, and therefore the extradition request should be refused;

o   International human rights demands/ aggravation of the of procedural service: if extradited, the Person to be extradited risks not benefiting from fair trial, in addition to the risk of being subjected to torture, inhuman, degrading or cruel treatment;

o   Penalty: The Person to be extradited risks being punished with 160 years in prison, which in effect amounts to life imprisonment;

O. After citing other reasons to support his opposition to the Extradition, such as his personal condition and his family situation, the Appellant concludes by submitting a list of 10 witnesses whose hearing he requested, in addition to an opinion on Interpol.

P. On the 17th of July, 2020 the case was concluded to the Honorable Judge Rapporteur who on the same date issued the following order:

> To the Public Prosecutor's Office, in view of the document on pages 164 to 166 (application of the Person to be Extradited arguing insurmountable nullities);

> Send to the Public Prosecutor's Office for signature, pursuant to Article 55, paragraph 3, of Law No. 6/VIII/2011, of 29 August;

Q. In compliance with this order, the Public Prosecutor's Office attached an opinion to refute the arguments put forward by the Person to be extradited in his opposition, concluding that all the prerequisites for authorizing the requested extradition were met;

R. On the 27th of July, 2020 the Rapporteur of the case at the Barlavento Court of Appeal issued an order dismissing the request of Person to be extradited, arguing that there were insurmountable nullities;

S. This refusal was notified to the Attorney of the Person to be extradited on the 27th of July, 2020;

T. On that same date the Hon. Rapporteur issued the following order:

> "No circumstance stands in the way of knowing the subject matter of the proceedings.
> Taking into account the provisions of Article 57 of Law No. 6 / VIII / 2011 of 29 August, the signatures of the Assistant Judges, taking into account the procedural deadlines established and because we are at the end of the judicial year.
> The case will be presented in the next Conference to be held".

U. On the same day, the 27th of July, 2020, the case was submitted to the 1st Assistant Judge who, on the same day, gave his approval;

V. On the following day, the 28th of July, the 2nd Assistant Judge gave his approval;

W. On the 31st of July the case records were presented to the conference, and the ruling authorizing the extradition of the Appellant to the United States of America was approved.

X. This decision was appealed to the Supreme Court of Justice (STJ), which in its decision number 57/2020, of 16th of October, partially granted the appeal and ordered the proceedings to be annulled.

Y. After observing the legal procedure, a new ruling was issued in conference, which is now being contested and which proves the following facts:

> 1. In criminal case No. 19-20450-CR-SCOLA, pending before the United States District Court for the Southern District of Florida, an indictment was filed on the 25th of July, 2019, against Alex Saab Nain Moran and another individual, Alvaro Pulido Vargas, charging Alex Saab Nain Moran with conspiracy to commit money laundering in violation of Title 18 United States Code, Sections 1956 (h) (Crime One) and seven counts of money laundering in violation of Title 18 United States Code, Sections 1956 (a)(2)(A) and 2 (Counts Two through Eight);

2. The indictment resulted from a 4-year joint investigation of DEA/US Drug Enforcement Administration and FBI/Federal Bureau of Investigation which revealed that from November 2011 through approximately September 2015, in the Southern District of Florida and elsewhere, Alex Nain Saab Moran and others conspired to launder approximately $350 million in proceeds from an illegal bribery scheme in which they made payments to Venezuelan officials in order to obtain undue business advantages and gain access to the Venezuelan government-controlled foreign exchange system.

3. Alex Saab Nain Moran and his co-conspirators laundered the fraudulent proceeds through wire transfers from bank accounts located in Venezuela to accounts, and through accounts, in the United States, including in the Southern District of Florida, and on to foreign bank accounts that they controlled.

4. Due to the charges, an arrest warrant was issued against Alex Saab Moran on the 25th of July, 2019 by the United States District Court for the Southern District of Florida.

5. The 8 charges against the Person to be extradited are:

   (a) First Count: Conspiracy to Commit Money Laundering, in violation of Title 18 U.S. Code Section 1956(h);
   (b) Second Count: Money Laundering, in violation of Title 18 U.S. Code, Section 1956(h) violation of Title 18 U.S. Code, Sections 1956(a)(2)(A) and 2;
   (c) Third Count: Money Laundering, in violation of Title 18 U.S. Code, Sections 1956(a)(2)(A) and 2;
   (d) Fourth Count: Money Laundering, in violation of Title 18 of the United Title 18, United States Code, Sections 1956(a)(2)(A) and 2;
   (e) Fifth Count: Money Laundering, in violation of Title 18 of the United States, Sections 1956(a)(2)(A) and 2;
   (f) Sixth Count: Money Laundering, in violation of Title 18 of the United Code, Sections 1956(a)(2)(A) and 2;
   (g) Seventh Count: Money Laundering, in violation of Title 18 of the United States, Sections 1956(a)(2)(A) and 2;
   (h) Eighth Count: Money Laundering, in violation of Title 18 of the United States, Sections 1956(a)(2)(A) and 2.

6. All of the events charged against the Person to be extradited occurred in the United States of America, in the Southern District of Florida.

7. The indictment was issued in the absence of Person to be extradited.

8. The facts constituting the crimes of money laundering and criminal organization are also provided for in Cabo Verdean law as crimes and punishable by prison sentences from 4 to 12 years, under Article 39 of Law No. 38/VII/2009 of April 27, the first crime, and the others, 2 to 6 years in prison, under Article 291 of the Criminal Code.

9. There is no knowledge of any other criminal proceedings pending before Cabo Verdean courts against the Person to be extradited for the same facts that form the basis of the extradition request.

10. The indictment was issued by the United States District Court for the Southern District of Florida,

11. the United States Code, Title 18, Section 3282, requires that criminal proceedings commence no more than five years after the commission of the crime, and the charges were issued on the 25th of July 2019, the first indictment charges the Person to be extradited with a crime that lasted until September 2015, and the second indictment

charges the Person to be extradited with a crime that occurred on 29 October 2014, both charges having been issued within the statute of limitations (pages 81 of the indictment).

12. The authorities of the United States of America intend that the Person to be extradited be extradited to stand trial for the crimes of which he is accused.

13. Her Excellency the Minister of Justice, by order dated the 2nd of July, 2020, considered the extradition request admissible and granted it (pages 146 and 147 of the case records).

14. With the extradition request, the competent authorities of the United States of America have offered formal guarantees with respect to the principle of specialty, that they will not detain, prosecute, or punish the Person to be extradited for any offenses other than those listed in the extradition request, and that the Person to be extradited will not be re-extradited to a third state (page 38 overleaf).

15. The Government of the United States offers such other appropriate assurances as the Cabo Verde Court deems necessary with respect to any aspect of this extradition request (pages 37 and 33 of the record, principle of speciality, limitation of sentences, and re-extradition), as well as assurances that if extradited, the Person to be extradited will not be sentenced to life imprisonment or capital punishment. That under Cabo Verdean law, which provides for a maximum prison term of 35 years, assurances are offered that the indictment of Person to be extradited will be reduced from 8 crimes to 1, and that he will be charged with one crime, the first of which is conspiracy to commit money laundering, in violation of Title 18 of the United States Penal Code, Section 1956 (h), and is subject to a maximum sentence of 20 years' imprisonment, pages 540 to 555.

16. The Person to be extradited is a citizen of the Bolivarian Republic of Venezuela and a native of Colombia, where he was born on the 21st of December, 1971, son of Luis Amir Saab Rada and Rosa Moran Abuancha, bearer of ordinary passports number PE142610 and 146601956 (issued in Colombia and Venezuela, respectively. Statements by the Person to be extradited and photocopies of the ordinary passports are presented in the attached records of detention).

17. On the 12th of June, 2020, the Person to be extradited was arrested on the island of Sal when he made a technical stopover on a private commercial plane from Venezuela, where he lived, before being arrested.

18. Detained and presented to the judicial authorities, having been heard in the Court of Sal and later by the TRB [Barlavento Court of Appeals], during the second hearing, the Person to be extradited only said that he had in his possession two ordinary passports (from Venezuela and Colombia), as he showed them and they are in the case file.

19. At the time of his hearing and validation of detention by the BCA, the Person to be extradited did not present any diplomatic passport or any document proving the status of Special Envoy of the Venezuelan Government, to which he claims to be;

20. All the documentation attached to the case was submitted later;

21. The crimes of which he is accused took place in the United States of America

22. The government of the United States has presented the formal guarantee provided in articles 17 and 44(1)(c) that the Person to be extradited will not be extradited to a third state or detained to serve a sentence or for any other purpose, for acts other than those on which the request is based.

Having established the facts of the case, we will now examine the questions raised by the Appellant which have been set out in the conclusive summary drawn up.

### II. 3. KNOWLEDGE OF THE ISSUES RAISED

#### II.3.1 On the lawfulness of the detention of the Person to be extradited

In his appeal, the Person to be extradited raises a number of questions which, in his view, may affect the legality of his detention, which are as follows:

> f) Failure to communicate the reasons for detention and the absence of a warrant for detention issued in triplicate (subparagraph (c))
> g) Violation of the rules of criminal procedure with regard to the application of measures of coercion (item (d)).
> h) Deprivation of liberty only on the basis of an informal request from a foreign police officer (item (e)).
> i) INTERPOL acts have never been ratified nor published (items (f) and (cc))

Without prejudice to the particular analysis that each of these issues may deserve, it should be made clear that the illegality of the detention of the Person to be extradited was raised before the judicial authority to which he was brought, following his detention, with arguments that, from his point of view, supported the alleged illegality.

All the arguments raised by the Person to be extradited concerning the alleged illegality of his detention have been examined and decided by the lower court and by this Supreme Court of Justice, both in habeas corpus proceedings No. 36/2020, which resulted in decision No. 28/2020 of the 1st of July, 2020, and in the ordinary appeal, which resulted in decision No. 48/2020 of the 31st of August.

By way of example, the legality of the coercive measure that was applied to the Person to be extradited - provisional detention at the time - was exhaustively examined and decided in the ordinary appeal in decision no. 48/2020, which, instead of being reproduced in this decision, for the sake of procedural economy, is attached to the case for all due purposes.

Moreover, the Person to be extradited is currently under a different coercive measure - the obligation to stay at a place of residence - the legality of which was recently examined by this Supreme Court of Justice in decision no. 18/2021, of February 20.

Likewise, also by way of example, the legal relevance of the alleged non-ratification by Cape Verde and of the non-publication in the internal order of the legal acts regarding INTERPOL was pondered either in decision no. 28/2020, as well as in decision no. 48/2020.

In these decisions, the understanding that the detention of the Person to be extradited is supported by article 39 of the LCJ and that the information on which the authority of the National Criminal Police can base itself can come from various sources, namely directly from a foreign State or via INTERPOL. In other words, it is not imperative that the information on which the Cabo Verdean Police bases its decision to make an arrest, not directly requested, under the terms of article 39 of the LCJ, must reach it via INTERPOL.

We now add that, if there is permission under Cabo Verde Law to use information made available via the INTERPOL alert system, in order to make an arrest not directly requested in Cabo Verde of a citizen found in the national territory, the validity of the use made of this system by the competent Cabo Verdean authority cannot depend on the fact that Cabo Verde on a formal and legal level is part to these instruments.

The Republic of Cabo Verde, as a sovereign state, is the one which, in its own interest, intends to take advantage of an effective system existing in the field of international police cooperation, even though it may not be legally bound to the international body managing this system. And it is not in any way prevented from doing so.

And, this being the case, it is of no use for the present case to proceed to the scrutiny of whether the State of Cabo Verde is bound by the constitutive instrument of INTERPOL and other instruments of that organization that are complementary to it.

That is, for the case at hand, it is legally irrelevant that the legal acts referring to INTERPOL have not, eventually, been ratified by the Republic of Cabo Verde nor published in the Cabo Verdean internal order, because the title of validity of the use that is made of the information received through this system is a national law, approved by the Cabo Verdean Parliament.

It should be added, also in the context of the scrutiny of the legality of the detention, that it is not clear what the Appellant means when he states that one cannot deprive someone of his liberty *"only on the basis of an informal request from a foreign police officer"*.

If this means that such a request can only be made, as seems to be the Appellant's understanding, through *"letters rogatory sent from a Foreign State to the Respondent State"*, the statement does not seem accurate.

What is certain is that, as was demonstrated in decision n° 28/2020, with reference to the relevant constitutional jurisprudence and doctrine, detention not directly requested, as was the case, can take place, even if the Cabo Verdean Judicial Police Authority is not yet in possession of a formal warrant. It is enough for it to be in possession of official information that legitimizes the arrest.

Such official information, which for the Cabo Verdean authorities is not required to take the form of a "request", much less a warrant, but rather "information", may come to their knowledge by any means allowed by Cabo Verdean law, including, *"in cases of urgency and danger in delay"*, *"any means of telecommunication"*, as stated in Article 269°, no. 3, of the CPP, followed by confirmation by warrant.

Still on the alleged illegality of his detention, the Appellant claims that the contested decision violated article 30 paragraph 4 of the Constitution of the Republic, insofar as it requires that the detainee be immediately informed of the reasons for his detention.

It therefore appears that, as far as the Appellant is concerned, the arresting authority did not immediately inform him of the reasons for his detention.

This is not, however, the version of that Entity, as can be confirmed from the statement signed by the latter on page 1431.

This Court has no reason to question the veracity of this information, particularly since, had the reasons for the detention of the Person to be extradited had occurred, the normal rule, in the light of the rules of common experience, would be that this illegality had been raised by the person concerned before the judicial authority to which he was brought following his detention, which would have had to issue an appealable decision.

On the contrary, to corroborate the assertion of the authority that carried out the arrest of the Person to be extradited is the report of the validation of this arrest before the Barlavento Court of Appeal, which expressly states as far the Person to be extradited is concerned that *"they informed him that there was an INTERPOL arrest warrant against him, although they didn't show it to him, and they told him the reason for his arrest".*

The court order that confirmed the legality of the detention invokes as its basis several provisions of the Cabo Verdean legislation.

In the grounds on which it was challenged, it was fully confirmed by the Supreme Court of Justice.

Therefore, and in the absence of new elements, there is no reason to censure the detention of Person to be extradited.

Finally, the Person to be extradited alleges that the provisions of article 269 of the CPP have been violated, namely because the arrest warrant was not issued in triplicate, as required by article 269 of the CPP.

The nullity prescribed in article 269, for non-compliance with the formal requirements established in relation to the arrest warrant, is a nullity dependent on challenge, which must take place within a certain period of time.

It is not clear that this alleged nullity has been argued before the judicial authority to which the Person to be extradited was brought following his arrest.

In any case, as this is not an irreparable nullity, arguable or known of its own motion at any time, it can no longer be argued at this stage, since the title of the detention Person to be extradited for extradition purposes is now not the act of the National Judicial Police Authority, but a judicial decision that scrutinized its legality, and which was confirmed on appeal by this Supreme Court of Justice.

Finally, the Appellant says that there is no warrant for his arrest.

But he himself contradicts this statement, recognizing in paragraph 32 of Part V of his his OPPOSITION that:

> *"After the facts described above, the US District Court for the Southern District of Florida, issued a warrant for the arrest of the Person to be extradited on the 25th of June of 2019 for money laundering offenses ( . . . )".*

This acknowledgment is taken up in paragraph 377 of the pleadings on appeal and is fully corroborated by the document on pp. 65 overleaf and 122 overleaf, which accompanied the extradition request.

Now, given the date to which the Person to be extradited himself attributes the erroneous warrant against his person, it is absolutely incontrovertible that on the 12th of June, 2020, when he was arrested by the Cabo Verdean Criminal Police, he was already being sought by the American judicial authorities, to be subject to criminal proceedings in the United States, thus confirming the legality of his detention.

Therefore, and in conclusion, the legality of the detention of the Person to be extradited, for the purpose of extradition, is a matter settled by the Judicial Courts.

### II. 3. 2 Act of the Minister of Justice authorizing the continuation of the case.

In point g) of the conclusions of the appeal, the appellant says that "*the act of the Minister of Justice authorizing extradition is to all intents and purposes an administrative act, and is subject to all contentious means of recourse for annulment, by virtue of the principle of effective judicial protection provided for in article 243(e}, of the Constitution*".

It is certain that, with this conclusion, it is intended to oppose the statement made in the judgment under appeal that the decision in reference is "a political act, not subject to *judicial appreciation*" (pages 1013 vº).

On this matter, this Supreme Court has to ponder and decide the following. Despite the growing reflection on the nature of the act of the Minister of Justice, in order to determine whether or not it is open to litigation, there is still no consensus in the doctrine and jurisprudence on this matter.

At first glance, the Government's decision, understood as the culmination of an administrative phase, designated as such by the International Judicial Cooperation Law itself in article 46, paragraph 1, which is confirmed by article 48, cannot but be seen as an administrative act.

In fact, according to some legal scholars, if it were not an administrative act, there would be no need for the legislator to provide that it cannot be contested when it is used to deny an extradition request (article 24, no. 2 of the LCJ).

However, as it is an administrative act, and not a strictly political one, it may not meet all the requirements that allow it to be challenged in court. At least this is the understanding that has already been expressed by Portuguese Administrative Jurisprudence, in a summary condensed in the following terms:

> "*The Resolution of the Council of Ministers authorizing the follow-up of the passive extradition process is not a definitive and enforceable administrative act susceptible of litigious challenge, so the appeal against it must be rejected, given its manifest illegality.*"[2]

As it does not seem indispensable for this Court to pronounce itself at this precise moment on the controversy in question, it is only necessary to note that, since this is an

---

[2] Ruling of the Supreme Administrative Court of Portugal on 04-12-1986, Lopes Rocha, dgsi.pt

administrative act, the legality of the act should be scrutinized by the competent court in the first place.

However, we are not aware, to date, of any decision by the competent jurisdiction declaring the invalidity of the act of the Minister of Justice authorizing this request for judicial passive extradition to proceed.

However, regardless of the decision that may be taken in the event of an objection to this act, it must be recognized from the outset, and as will be better shown below, that there are aspects or grounds that preside over the decision of the Minister of Justice that will not be subject to judicial scrutiny.

### II. 3. 3 Omission of evidential steps

In the conclusions of the appeal, more precisely in points *(b), (ll), (mm), (oo) and (pp)*, the Appellant raises the issue of the omission of measures of proof.

The Appellant states, in essence, that "*he lodged his opposition in due time, requested measures of proof, for which purpose he submitted documents, listed witnesses and further protested*", but the Court appealed decided not to carry out the requested measures of proof at all.

The evidence referred to by the Appellant, consisting in the examination of witnesses, is a matter that has already been the subject of a thorough examination and pronouncement by this Supreme Court in its ruling no. 57 /2020 of October 16, 2020 (pages 689 to 719), whose reasoning and decision are unequivocal in the sense that the right to raise this issue in a timely manner was precluded, which is why the case was only cancelled in order to give the Person to be Extradited the opportunity to present his allegations last.

And it will not be any consideration made by the appealed court that will have the aptitude to revive the timeliness of this allegation.

As regards the documentary evidence, it must be agreed that this is not exactly a case of failure to take steps, but rather of a failure to value or a deficiency of value in the sentence, more precisely in the judgment on the facts, of the evidence already in the case-file.

As the Person to be Extradited has been able to present, together with his opposition and throughout the proceedings, the documentary evidence he considers relevant, it is not clear on what basis the allegation of violation of the adversarial principle, made in paragraph (oo) of the Appellant's conclusions, can be founded.

The same can be said in relation to the alleged occurrence of the incurable nullity foreseen in article 151, paragraph g), of the CPP, concerning the omission of a procedural phase.

One can only understand one and the other allegation in the understanding of the Person to be Extradited, but already rejected by this Supreme Court of Justice, that the Court of Appeal should hold the trial in a hearing in which, with due regard for the adversary, evidence would be produced.

In fact, it has already been demonstrated that this hearing before the panel of the Court of Appeal does not take place in extradition proceedings, since the trial is held in conference.

The alleged omission of evidence is therefore unfounded, insofar as it was intended to obtain the examination of the 10 witnesses on the list drawn up at the end of the statement in the OPPOSITION to the extradition request on page 197 of the case-file.

We will now look at another aspect referred to as omission of proof, but which, as already mentioned, has to do with the theme of the case and the relevance of the evidence, in this case documentary evidence, since the evidence was excluded, for the reasons given above, through the examination of witnesses.

Here, the question raised by the Appellant implies an understanding of Articles 55(2) and 46(3) of the LCJ.

Article 55(2) provides that "*opposition (to extradition) may be based only on the fact that the person claimed is not the person in custody or that the conditions for extradition are not met*",

The meaning of this provision, as is sufficiently clear from its text, without the need to resort to other elements, is that the Person to be Extradited is entitled to lodge an opposition, but this opposition can only be based on two sets of arguments intended to demonstrate the following (i) either he is not the person claimed, or (ii) the prerequisites for extradition are not met.

It is, therefore, a norm that is not properly aimed at the matter of evidence, but rather at the objection that must be contained in the OPPOSITION.

This is to say that once the facts have been alleged, which tend to substantiate any of these grounds, whether they refer to the identity of the person claimed or to the non-verification of the presuppositions for extradition, he must be allowed to produce evidence.

Article 46 (3) is different, in that it provides that "*no evidence whatsoever may be introduced in respect of the facts alleged against the Person to be Extradited*".

This provision can only be interpreted as meaning that only with respect to the facts alleged by the Requesting State to the Person to be extradited is evidence inadmissible.

Although the boundary between the "*facts alleged*" of the Person to be Extradited and the "*grounds for extradition*", and we can even admit a certain overlapping of their contiguous zones, there has been a solid consensus in Comparative Extradition Law that the Courts of the Requested State, in this case the Cabo Verdean Courts, are not allowed to produce evidence on the facts that the Requesting State imputes to the Person to be Extradited.

This is what, in Brazilian doctrine and jurisprudence, is called *limited litigiousness*, following what, in comparative law, it is called the *Belgian model*.

And there is no unconstitutionality in this, insofar as we are not dealing with a pure criminal procedure. The Requested State is not imputing any crime to the Person to be extradited, nor is it making a judgment of guilt, much less formulating a legally relevant judgment of suspicion regarding his person.

Therefore, the Appealed Court was right in not considering the documentary evidence tending to prove any fact relating to the charges made against the Person to be Extradited

in the United States, in essence the facts referred to in Articles 1 to 72 under the heading "THE PREVIOUS ISSUES" of the Opposition.

As to the assessment of the documentary evidence attached to the case-file, a decision will be made in due course as may be justified in the examination of the relevant issues, without prejudice to the previous conclusion that the alleged omission of evidence with respect to the witnesses whose examination has been requested is unfounded.

### II. 3. 4. Omission of personal notification

In this matter and according to the facts established, once the request for extradition had been admitted by the appealed court, the Person to be extradited was ordered to be notified in the person of his representative to oppose the request.

However, the Appellant argues that, contrary to the procedure adopted by the Appealed Court, he is entitled to be notified personally of the extradition request and the decision admitting it.

The matter was considered and decided in Judgment No. 48/2020, in terms that are transcribed below:

"Let us look, in more detail, at the reasons set out by the Appellant on this topic, initially set out in an application, arguing nullities and taken up in the present appeal:

1. *The judicial phase of the extradition process "is intended to decide, after hearing the interested party, whether or not to grant extradition, on the merits of the formal and substantive conditions, without admitting any evidence as to the facts alleged against the Person to be Extradited" (article 46.3 of the LCJMP).*
2. *The Appellant was heard in the judicial process of provisional detention and confronted with the Request now formulated by the District Attorney's Office, at the request of the United States of America,*
3. *therefore, once the administrative phase is over and the judicial phase of the extradition process has begun*
4. *the Person to be extradited must be summoned in person and heard in judicial extradition proceedings.*
5. *Notification of the formal extradition request and notification of the judicial order admitting the request are personal*
6. *as follows when it comes to notification of the indictment, the order to indict or not to indict, or materially equivalent orders, and notification, also, to the trustee (article 142 of the CPP, applicable by article 4.2 of the LCJMP).*
7. *the formal extradition request and the order initiating the extradition process, since they are equivalent to the indictment or indictment in ordinary criminal proceedings, must be the subject of personal notification to the Appellant, under the terms of the aforementioned rule, under penalty of nullity (article 142.2 of the CPP and, therefore, of the nullity of article 151.b) of the CPP, as well as in violation of the requirement of the Appellant's intervention at this initial stage of the extradition process (article 151.d) of the CPP),*
8. *and the interpretation of this rule, as the notification of the agent for the purposes of article 55.1 of the LCJMP is sufficient, violates articles 1, 3.2.3, 35.6, 15,*

> *17.4.5. and 18 of the Constitution, and is therefore unconstitutional, and therefore inapplicable by the courts (articles 277.1 and 211.3 of the Constitution).*

9. *The judicial extradition process begins with the request of the Prosecution's Office, according to the law, reporting the viability order of the Minister of Justice and Labor and articulating the request under the terms of articles 23 and 44 of the LCJMP.*

10. *It should be noted that, in provisional detention, there is still no administrative pronouncement favorable to the extradition judicial process and few elements are known of the process for the Appellant to pronounce on them.*

11. *With the formal presentation of the extradition request and its admission by the Tribunal, the immediate hearing of the Appellant should be scheduled to comment on the formal and substantive conditions of the criminal extradition process and manifest,*

12. *if appropriate, again express its opinion as to whether or not extradition to the States should be accepted.*

13. *This hearing, in the extradition judicial process, was not scheduled by the Court of Appeals, much less held,*

14. *this constitutes the omission of a procedural stage and of the Appellant's intervention and constitutes an incurable nullity of article 151.d) and g) of the CPP, applicable by article 4.2 of the LCJMP, and interpretation and application of the law that is inconsistent with the Constitution in violation of personal dignity, due process and effective judicial protection, in accordance with the norms of articles 1, 3.2.3, 22.1.6 of the Constitution and articles 277.1, 211.3, 211.4 of the Constitution.*

To the Appellant's reasons, the Prosecution Office responds as follows:

*The only legally required, and therefore mandatory, face-to-face hearing of the Person to be extradited is the one that takes place in the act following the arrest, whether this took place in advance, before the extradition request was formulated, or after the positive decision of the administrative phase.*

*In fact, the terms under which the Person to be Extradited must be heard are legally defined in article 54 of the LCJ, when he is informed of his right to oppose or consent to extradition and the specific terms under which he may do so.*

*It is not, therefore, necessary to rehearse the Person to be extradited in person, which in fact, as a complete repetition of the previous hearing, becomes a completely useless act that is incompatible with the procedural speed of the extradition process, and is therefore dismissed as illicit (article 130 of the Code of Civil Procedure - CPP).*

Weighing the arguments put forward by the Appellant and the Public Prosecution Service, and also taking into due consideration what the law says, and the understanding of this Supreme Court that the Appellant is not right.

Indeed, there is no provision of the LCJ requiring that the extradition request be formally notified to the Person to be extradited, much less that he be notified personally.

Personal notification to the Person to be Extradited is expressly required by law[3] and is for his face-to-face hearing by the judge (which strictly speaking is not notification of the extradition request), an act that follows his arrest for extradition, under the terms of article 53 of the LCJ.

Nor does the same law require that the Person to be extradited, having been heard at this time, even if not directly requested, as was the case here, be heard in person by the Court once again after the extradition request has been received and admitted.

On the foregoing can be seen from the judgment No. 58/2017, of August 1, of this Court, whose extract is reproduced below:

*"Now, with the hearing in the process of provisional detention, during which the Appellants stated that they did not accept extradition and that they did not waive the rule of speciality, the legal requirement of their hearing is shown to have been observed, it being certain that, having already been heard at the time of provisional detention and expressed their opposition to the request, a subsequent hearing, will already be the one intended to enable them to make written opposition to the request, in compliance with the principle of adversarial proceedings, which will take place under Article 55 of the International Judicial Cooperation Act.*

*They further allege that they were not heard in the extradition judicial proceedings because they were not personally summoned to oppose the request, since the warrant stated that the Persons to be extradited were to be summoned to their chosen domicile.*

*However, Article 55 does not mandate hearing the Person to be extradited in person, but rather to make the proceedings available to his lawyer or defender to raise written opposition and to indicate means of proof. "*

The above understanding, which is not justified to be changed, has sufficient support in the doctrine and judicial praxis developed in a normative framework very similar to the Cabo Verdean one, in which the national legislator will surely have been inspired, especially with regard to procedural processing, as António Bernardo Colaço, then Deputy Prosecutor General (DPG) at the Lisbon Court of Appeal, tells us:

*"With regard to passive extradition, the "démarches" are processed synthetically in the following manner: when the accused is arrested by the Interpol National Office of the Judicial Police (GNI), the procedure of articles 4 5 and following of Dec.-Law 43/91 is generally followed. The Person to be Extradited is presented within 24 hours to the DPG (M)) at the competent Court of Appeal (TR) for the latter to promote his immediate hearing by the Judge-Rapporteur. The decision made by the judge is immediately communicated to the Prosecution Office, the Ministry of Justice, the Ministry of Foreign Affairs, the Ambassador of the person to be extradited country and GNI (...)*

*(. . .) However, the procedure becomes more complex if the detainee opposes extradition. We must await the Portuguese government's position on the request made by the requesting state. This is how it works: after receiving the request through the Ministry of*

---

[3] In addition, of course, to personal notification of the decision ordering extradition, which is not at issue in this appeal.

*Foreign Affairs, the Ministry of Justice submits the diplomatic request to the Prosecution Office for consideration as to its legality. When the request is considered to be in order, or regularized, it is submitted to the Government. If the process is to continue, it is sent hierarchically to the DPG at the Court of Appeal so that the extradition request can be formalized there:*

*The adjective procedure follows with the preliminary assessment of the request, the adversarial phase, involving the opposition of the Person to be Extradited, the production of evidence and the final decision, the latter subject to appeal."*

As can be seen, there is no provision for the Person to be extradited to be personally notified of the extradition request or of his admission, nor is there room for a second hearing in person before the Court.

It is true that the Doctrine was written in the context of Decree-Law 43/91 of January 22, which was replaced by Law 144/99 of August 31. But the part of the judicial process concerning passive extradition has not changed in any way, so the transcription made here remains entirely up-to-date.

Therefore, it is reaffirmed that, taking only the provisions of the LCJ as the directly applicable legal framework, the right to which the appellant claims to be entitled to personal service and a second hearing in person before the Court does not arise from them.

However, in support of his claim, the appellant says that this right to be notified in person would result from similarities with certain situations provided for in the Code of Criminal Procedure, a law of subsidiary application, such as the requirement of personal notification of the indictment to the accused.

But he is wrong, insofar as the extradition process is specifically regulated by the LCJ, which does not provide for personal notification of the extradition request or a second hearing in person before the court.

As for the possible unconstitutionality of this interpretation, it is unfounded precisely because, despite the affinities between the two processes, which justify the subsidiary application of the criminal process to the judicial process of passive extradition, the intention to automatically transpose into the latter all the guarantees of defense that the Constitution and the international instruments on human rights for the former, primarily because in passive extradition the requested state, in this case the State of Cabo Verde, is not imputing any criminal responsibility or formulating any judgment of guilt, with the risk of subsequent imposition of a criminal penalty on the Person to be Extradited.

On the grounds set out above, the alleged nullity, due to the alleged omission of personal notification of the extradition request and of the face-to-face hearing of the Person to be extradited before the Court at a time subsequent to the admission of the extradition request, is dismissed."

We see no reason to change such understanding.

## II.3.5. Omission of the hearing

Since this is the same issue that has already been the object of consideration and decision by this Supreme Court and, for the sake of procedural economy, we limit ourselves to reproducing what on this alleged omission was said in Judgment No. 57/2020:

*"From what has already been said, the first reason invoked to sustain the violation of the adversarial principle - the decision taken without hearing the Appellant - does not appear to be well-founded. Indeed, it is an incontrovertible fact that the Appellant was heard, in the terms established by law, and had the opportunity to submit in writing his opposition to the extradition request",*

We reiterate the understanding based on a similar line of argumentation as the one used to dismiss the failure to personally notify the Person to be Extradited of the extradition request and its admission, taken here for all intents and purposes, that the law does not require, either directly or indirectly, that the Person to be Extradited be heard in person at a second hearing before the Judge.

In our view, this solution does not violate any rule of the Constitution or principle enshrined therein.

## II.3.6. Violation of the adversarial principle

The Appellant raises the question of the violation of the adversarial principle in a number of paragraphs of his conclusions, namely: *(dd), (ee), (ff) (gg) (hh), (ii), (jj), (mm), (nn) and (pp)*.

In points *(dd)* to *(gg)*, the Appellant limits himself to stating anodyne opinions, which naturally do not lend themselves to challenge, but whose relevance would only be evident if we were faced with a situation in which the Code of Criminal Procedure was the first body of norms to be applied. But it is not. Its application is subsidiary, in the sense that it can only take place in cases not expressly provided for in LCJ, as enshrined in article 4(2).

In *point (hh)*, the plea of violation of the principle of adversarial proceedings, enshrined in Articles 35(6) of the Constitution and 5 of the Code of Criminal Procedure, is based on the allegation that the Court granted the Prosecution Office the possibility of intervening twice in the proceedings and the appellant only once, so that "*the judgment under appeal must be considered null and void, in accordance with Articles 150, 151 and 152, CPP*".

The appellant does not specify the interventions that were granted to one or the other of the interveners, so that one can, in a certain comparison, assess the correctness of the allegation that one was allowed to intervene twice and the other only once.

What we can safely say is that whenever the Prosecution Office intervened in the case, the Person to be Extradited was always given the opportunity to make his opposition or, at least, to make his remarks, and it is certain that he was always assured of being in the last position, an aspect that was part of the *ratio decidendi* of ruling 57/2020, which ordered the partial annulment of the case and following which the principle of adversarial proceedings was strictly observed with regard to the succession of interventions by the Prosecution Office and the Person to be Extradited.

Therefore, if the issue raised in paragraph (*hh*) is considered relevant, it must be dismissed.

In points *(ii), (jj)* and *(kk)* the Appellant takes up issues already examined and decided with respect to other matters, namely the omission of personal notification of the extradition request and its admission, the omission of a second hearing in person before the judge after receipt of the extradition request and the failure to hold the hearing, in the sense that the omission of such acts, as has been emphatically pointed out, does not constitute insurmountable nullities, namely those referred to in paragraphs (d) and (g) of Article 151 of the CPP.

Sub-paragraphs *(mm)* to *(pp)* also include matters already considered and decided, and it is certain that this is not an incurable nullity.


## II.3. 7. Risk of life sentence

In points *(h)* and *(i)* the Appellant states that, since the diplomatic note refers to the sentence indicated for each of the eight "*counts*" listed in the "*indictment*" as 20 years, the Appellant's extradition cannot be accepted because he risks a sentence of 160 years' imprisonment, which, considering overall life expectancy, constitutes a *de facto* or life sentence.

In this regard, it should be said that having become aware of this defense, the requesting State, through the intermediary of the Prosecution Office, sent a document to the case in which it undertakes that, if extradition is authorized, it will prosecute the Person to be Extradited for a single "*count*" only, so that if he is convicted, he will not be sentenced to more than 20 years.

This guarantee cannot but be considered valid and sufficient.

In fact, according to article 6, paragraph 1(f) of the LCJ, the request for cooperation is refused if it concerns an offence punishable by imprisonment or a detention order for life or a detention order for an unlimited period of time.

However, in accordance with the provisions of paragraph 2, of the same Article 6, the provisions of subparagraph (f) do not prevent cooperation:

> "*if with respect to extradition for crimes to which corresponds, under the law of the requesting State, a penalty or, a security measure depriving or restricting liberty with a perpetual character or of indefinite duration, the requesting State offers guarantees that such penalty or security measure will not be applied or enforced.*"

It is common knowledge that in the United States, the Prosecution Office is part of the Executive Department of Justice, to which it is hierarchically dependent, and, as such, it obeys orders from above, in particular to waive prosecution for certain offenses.

On the other hand, we share the understanding of Minister Celso de Mello, of Brazil's Supreme Court, expressed in Extradition Case 633, judged on 28-08-1996, by that high instance, according to which:

> *"The diplomatic note, which is worth for what it contains, enjoys presumption of authenticity and veracity. It is a formal document whose legal effectiveness derives from the conditions and peculiarities of its transit through diplomatic channels. The sincerity of the diplomatic commitment is presumed. This presumption of truthfulness - always subject to the possibility of demonstration to the contrary - stems from the principle of good faith, which governs, internationally, the political-legal relations between sovereign states."*

Therefore, the question raised that the Person to be Extradited risks, in case of conviction, *de facto* life imprisonment or a sentence of indefinite duration is dismissed.

And, for the same reasons, the Courts must presume, until proven otherwise, a presumption that the State of Cabo Verde would also certainly expect to benefit from, in the opposite situation, that if extradition is authorized the requesting State will not subject the Person to be Extradited to cruel or inhuman treatment.

## II.3.8. Prescription of crimes

In paragraphs (k), (l) and (m), the Appellant claims that the crimes against him are time-barred. He claims that, the facts in the indictment having occurred in the years 2011 or 2012 to 2014, and the limitation period being five years, the conclusion to be drawn is that the limitation period for the criminal proceedings took place at the end of 2019 and could not be interrupted, even if by personal notification of the Appellant, which did not happen.

On this claim, the Appealed Court pondered and decided as follows:

> In the part entitled "OPPOSITION", the defense of the Person to be extradited, states that the criminal proceedings against the Person to be extradited are extinguished for the same facts, pursuant to Article 9. The Person´s to be Extradited defense claims that the PRC indicates as the period of commission of the Person´s to be Extradited acts the years 2011 or 2012 to 2014, and indicates the limitation period of 5 years, which was prescribed at the end of 2019

> (...) That, according to the provisions of the law of the USA, the 5-year limitation period has already elapsed, counting from the date of the commission of the facts (December 2014) and until the date of the notification to the Person to be Extradited of the request for extradition from the USA and the order of admissibility of the request by the Barlavento Court of Appeal.

> In fact, extradition will be refused if the criminal proceedings have been extinguished or the penalty prescribed, either under the law of the requesting state or under the law of the requested state, which is not the case here since the criminal proceedings against the Person to be Extradited have not been extinguished and the indictment was issued within the 5-year period stipulated in the United States Code.

> The United States Code, regarding the matter of statute of limitations, in Title 18, Section 3282, directs that criminal proceedings be commenced no later than five

years after the commission of the crime. The charges against the Person to be Extradited were handed down on July 25, 2019, the first charge charging the Person to be Extradited with a crime that lasted until September 2015, and, the second charge, charging the Person to be Extradited with a crime that occurred on October 29, 2014, so the charges were handed down within the prescriptive period, i.e., the facts occurred until September 2015 and the charges against the Person to be Extradited took place in July 2019, i.e., before the prescriptive period occurred (cfr. fls. 81 of the records). On the other hand, the Person to be extradited was notified of the admission of the extradition request, by the TRB, on July 08, 2020, cfr. fls. 163 of the records.

That is why the criminal proceedings against the Person to be extradited are not extinct, and the indictment was issued within the 5-year period stipulated in the United States Code.

As demonstrated by the sentence, the assumption of fact from which the Appellant starts is wrong, since it is stated in the indictment that:

The decision in question is not open to challenge, the sense of which is strengthened if one takes into account the provisions of Article 13(1)(a) of the LCJ, according to which the grounds for interruption or suspension of the statute of limitations are effective in Cabo Verde, according to the law of the state making the request.

Indeed, considering the dates of the commission of the offenses established, without challenge in this part, in the sentence, the interruptive or suspensive fact of the prescription of the criminal procedure that occurred on July 25, 2019, and, further, the circumstance that, according to Cabo Verdean law, what prevails is what is established in the law of the requesting State, the prescription of the criminal procedure did not occur, and for this purpose the issue of the possible lack of notification to the Person to be Extradited is irrelevant.


## II.3.9. Extradition for political reasons

The Appellant claims in paragraph (*q*) of his conclusions that his extradition requested by the United States is based on political grounds and should therefore be refused under the law and the UNTOC Convention, should it apply to the present case.

On this claim the Appealed Court considered and decided in the following terms:

It invokes negative requirements for cooperation, namely political and ideological convictions.

According to the defense, "*the Person to be Extradited is a supporter of the Government of Venezuela, and carries out missions in the name and on behalf of Venezuela; the extradition process is part of the USA's efforts to weaken the regime of the President of the BRV; the criminal proceedings initiated against the Person to be Extradited and the related extradition request are the latest effort by the USA to interfere in Venezuela's internal affairs, (, . .); that there is, therefore, a basis to believe that the motive for requesting extradition is based on reasons of*

*a political or ideological nature, rather than reasons of criminal punishment, and that the extradition request should therefore be refused."*

Now, the defense wants to give the idea that, in practice, even if he has committed the crimes for which his extradition has been requested, he cannot be extradited because it is a persecution of the Venezuelan regime. The political differences between the US and the BRV are public, they are known, given the wide coverage by the media. For some time now it has had great repercussions both in the foreign and domestic media.

However, the basis of the extradition request does not deal with facts related to political persecution by the Venezuelan government, nor against the regime of the President of the BRV. The facts contained in the request, refer to the extradited person,

Alex Nain Saab Moran, a citizen of Venezuela and native of Colombia, accused of committing crimes of money laundering under the law of the United States, from which we can conclude that the crimes for which the Person to be Extradited is being prosecuted are not of a political nature, nor do they appear to be for political or ideological reasons.

It is now up to this Appellate Court to assess and decide whether the Appellant is right.

The reasons for such a conclusion are detailed in Chapter V of the OPPOSITION TO EXTRADITION and are presented in articles 340 to 404 of the appeal statement.

In essence, they aim to highlight the evolution of relations between the United States and the Bolivarian Republic of Venezuela (BRV) in a context of successive sanctions imposed, targeting in particular figures in the government or those close to them.

In this context, it is claimed that the request for extradition of the Appellant is motivated by political reasons, more precisely because of his political and ideological convictions, as he is a supporter of the government of the BRV and is considered to be a man of confidence of its President, who has entrusted him with missions to help circumvent the blockade of that country, including the one he was on when the plane in which he was traveling made a stopover in Cabo Verde and was eventually arrested.

Contrary to what the Appellant maintains, although the Appealed Court made express mention of the fact that the crime with which he is charged is not a political crime, it did not fail to also scrutinize the alleged and possible motives which, in its view, might be behind the extradition request, in order to finally refute that assertion.

Completely overruling the Appealed Court's analysis and decision, this Court is of the opinion that the constitutional prohibition of extradition on political grounds cannot be effectively ignored. On the contrary, it must be taken into account at all times.

On the other hand, it is necessary to consider the terms in which this requirement, to which the appellant refers, is characterized in the law, to the effect that the extradition request is refused when:

*"There are "substantial grounds for believing that cooperation is requested for the purpose of prosecuting or punishing a person on account of his race, religion,*

*sex, nationality, language, political or ideological beliefs, or membership of a particular social group."*

The law requires from the outset that there must be "well-founded reasons* to presume. In other words, the law is not satisfied with just any reasons, much less with mere impressions.

On the other hand, and as far as this case is concerned, the refusal must take place if there are such reasonable grounds to presume that the cooperation is requested with the purpose of persecuting or punishing someone for his or her "*political or ideological convictions*".

Well, we begin by noting that the Person to be Extradited is professionally a businessman, with interests in Colombia, his country of origin, and in Venezuela, and that he does not hold any official position or function in the latter country, other than what he calls the missions entrusted to him, namely by the respective President of the Republic,

He says he has been cooperating with the government of that country to help circumvent the effects of the sanctions, especially with regard to supplies.

There is no reason to refute this claim.

However, it is common experience, especially at the international level, that an individual, in this case a businessman, can make his services available to a government, to help it face more difficult situations arising from international sanctions, without being motivated by any political or ideological convictions, or at least of political-ideological convictions similar to those of the holders of the government, and that may be the basis of the international blockades imposed on the country.

Therefore, the mere fact that the Person to be Extradited put his expertise and business know-how at the service of the Government of the BRV, presumably for reasons that are not merely altruistic, as it is common experience that no businessman does, does not imply that he has political and ideological convictions, which could serve as a starting point for the conclusion that the request for cooperation was made in order for him to be persecuted for such reasons.

There is, therefore, no basis for the presumption that, in requesting the extradition of the businessman Alex Saab Moran, the United States, in whose territory he is accused of facts that could constitute money laundering crimes, the prosecution of which is required by an international treaty, is doing so for political reasons or with the aim of persecuting him for reasons of his political and ideological convictions.

## II.3.10. Non-publication of the Treaty ratification act

The Appellant claims that the Treaty which serves as the basis for this extradition request cannot be invoked as a founding instrument for the request for judicial cooperation with a view to his passive extradition, since the act of the President of the Republic ratifying it has not been published in the Official Gazette.

To this end, the appellant invokes the provisions of article 269, paragraph 1(a) of the Constitution of the Republic, which requires the obligatory publication, under penalty of legal ineffectiveness, of "*international treaties and agreements and the respective notices of ratification or accession*".

But he is wrong.

According to article 27 of the Vienna Convention on the Law of Treaties, a norm that has the nature of customary international law, as is consensually admitted, and is therefore part of the Cabo Verdean legal order, pursuant to article 12, paragraph 1, of the Constitution of the Republic:

*"A party may not invoke the provisions of its domestic law to justify the non-compliance with a treaty. This rule is without prejudice to Article 46".*

It follows, without difficulty, that the need to invoke the provisions of Article 46 does not arise.

Therefore, the lack of publication of the ratification notice of the treaty in reference, while it may condition the legal effectiveness of this instrument, cannot, however, be invoked as grounds by the State of Cabo Verde, including its judicial institutions, to evade its obligations towards the other contracting party.


**II.3.11. Breach of "*special envoy*" and "*ambassadorial*" status**

The Appellant takes up in points (s) (t), (u) (v) (w), (y), (z), (aa) and (bb) of the conclusions of this appeal his alleged status of Special Envoy which was allegedly violated by the Cabo Verdean Courts.

This issue is intrinsically linked to the issue of lack of jurisdiction or incompetence of the Cabo Verdean Courts, also already analyzed by this Supreme Court in its Judgment No. 48/2020 in terms that are reproduced below:

**1. The Appellant's status as Special Envoy**

The reasons given by the Appellant to justify his claim to be a Special Envoy were exhaustively set out in the report of this case, so here we can only summarize them as follows:

The Appellant was mandated by the Bolivarian Republic of Venezuela to deal with matters of interest of that State, namely obtaining food and medicine to cope with the Covid-19 pandemic, in the Islamic Republic of Iran, a State which, by *note verbale* of 8 June, gave its assent for the Appellant to be received and to deal with the local authorities with the matters he had been tasked with;

On June 12, 2020, during a technical stopover for refueling on Sal Island, the Appellant was detained by the Cabo Verdean Police, allegedly at the request of the United States;

On June 13, the Venezuelan Foreign Minister formally claimed before his Cabo Verdean counterpart that the Appellant enjoyed immunity under international law;

On June 14, the Venezuelan Ambassador accredited to the Government of Cabo Verde informed that Government that the Appellant was traveling as a representative of the President of his country, His Excellency Nicolas Maduro

Moros, and therefore enjoyed immunity *ratione personae*, in the same terms as that Head of State would have enjoyed;

The immunity of special envoys stems from customary rules of international law, contained in the United Nations Convention on Special Missions of 1969, to which Cabo Verde is bound.

It is necessary, therefore, to assess the validity of the arguments invoked by the appellant.

For the sake of rigor in delimiting the object of this analysis, it seems pertinent to bear in mind that the Appellant does not claim the status of a career diplomat posted to any Venezuelan mission abroad, nor is he a high-ranking holder of any public office of that state, which could inherently result in an immunity *ratione personae*.

His condition is that of a citizen with dual nationality, Colombian and Venezuelan, who at the time of his arrest was traveling on an ordinary Venezuelan passport.

Despite the apparent informality with which the Appellant was traveling, this alone would not be (and will not be), in the opinion of this Supreme Court, a sufficient reason to deny him the status of someone appointed by the sovereign Government of that country, at its convenience, as its special envoy, or on a special mission, to deal with matters of state with any other state that agreed to receive him in that capacity.

This, in tribute to the principle of procedural economy, which is urgently required in a case of *Habeas Corpus*, in which the STJ must render its decision within five days from the date of submission of the application[4], despite the solid arguments exhaustively developed by the Appellant in order to justify an obligation of the State of

---

[4] Imposition of article 20, paragraph 6, of the CPP, which, in practice, and most of the time, ends up resulting in only one day or 24 hours, to discuss, draft and publish the decision.

SUPREME COURT OF JUSTICE

Cabo Verde, arising from international law of customary origin contained in the Convention of the United Nations on Special Missions, an understanding that, at first glance, does not give rise to questioning on the part of this Court, and it is not the solution of this legal question that the recognition of the status claimed by the Appellant will depend on.

In other words, even if the Appellant has been entrusted with a Special Mission by his country, it does not follow that the State of Cabo Verde, even if it feels bound by the provisions, or at least by the provisions of the said Convention reflecting customary international law, should automatically recognize this status.

To better understand what is said, it is important to bear in mind that under Article 1 of the Convention the "special mission" is defined as

> *"a temporary mission, representing the State, which is sent by one State to another State with the consent of the later for the purpose of dealing with it on specific questions or of performing in relation to it a specific task".*

Taking into account the definition transcribed above, which brings out a decisive element that is the consent of the two States, and for the purposes of immunities, the status of special envoy claimed by the Appellant would only be, in principle, legally relevant only for the two states in question: Venezuela, as the sending state, and Iran, as the receiving state.

It cannot be said, however, that a third State, such as Cabo Verde, in whose territory the plane he was flying made a stopover for refueling, would be indifferent to this special status of the Appellant.

In fact, if certain conditions were met, the Appellant could have his status recognized by Cabo Verde, as a third state, as follows from Article 42 of the Convention, which we will reproduce, in relevant part:

> *(Transit through the territory of a third State)*
>
> *1. If a representative  of the sending State in  the  special  mission  or  a member of its diplomatic staff passes  through  or is in the territory  of a third State  while*

*proceeding to take up his functions or returning to the sending State, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return. The same shall apply in the case of any members of his family enjoying privileges or immunities who are accompanying the person referred to in this paragraph, whether travelling with him or travelling separately to join him or to return to their country.*

*(...)*

*4. The third State shall be bound to comply with its obligations in respect of the persons mentioned in paragraphs 1, 2 and 3 of this article only if it has been informed in advance, either in the visa application or by notification, of the transit of those persons as members of the special mission, members of their families or couriers, and has raised no objection to it.*

*(...)*

As we have said, the recognition of the status of Special Envoy of the Appellant by a third State, through which he is in transit, depends on the verification of certain requirements, which are those indicated in Article 42, paragraph 4. In other words, this State is only obliged to observe the inviolability and immunities of a special mission if it has previously been informed, by means of a visa application or notification of the transit of the person(s) on mission without objection,

Therefore, it is clear that the status of special envoy cannot result, contrary to what the Appellant seems to maintain, only from a unilateral declaration of the State that says it sent him on a mission *(sending state).* It also depends on the consent, either of the state of destination *(receiving state),* or, if this situation occurs, the state where he will transit through *(third state).*

Since it is consensual that such consent is necessary, as the Appellants' own understanding of the matter (namely in article ... of his petition), as well as the cases invoked, the practice of the States and the jurisprudence he mentions, only a doctrinal element from a recognized authority is cited as a corroborating element for the case of a third state:

*"The same obligations as under Vienna Convention are laid on transit States in regard to members of special missions. But in this case the obligations arise only where the transit State has been informed in advance, either in the visa application or by notification of the transit of the persons concerned as members of the special mission, members of their families, or couriers, and has raised no objection to it."[1]*

---

[1] SATOW'S DIPLOMATIC PRACTICE, sixth edition, edited by Sir Ivor Roberts, p.192.

However, it has not been proven, or at least it has not been proven so far, that with regard to the State of Cabo Verde the requirements of Article 42, paragraph 4 of the Convention, on which the recognition of the status of special envoy depends, for the purposes of enjoyment of inviolability and immunities before Cabo Verdean courts.

What has just been said does not mean that it is practically and definitively impossible for the Appellant to have this intended status of special envoy recognized by whoever is entitled to it, in the later stages of the extradition process, with decisive consequences on the outcome of the process.

As sustained by the German Federal Supreme Court in the *Tabatabai* case mentioned by the Appellant, an understanding that cannot fail to deserve, *" the necessary bilateral consent may even be given retroactively"*[2]

What is reiterated is that there is no evidence in the record to date that the State of Cabo Verde has consented to the Appellant's transit through its territory with the status of special envoy.

And, without such consent, the Cabo Verdean Courts cannot recognize the status of Special Envoy to the Appellant, which means that he does not enjoy the inviolability and immunities to which he claims, based on the 1969 UN Convention on Special Missions.

Therefore, the exception of lack of jurisdiction of the Cabo Verdean Courts to order the detention of the Appellant is unfounded.

In Judgement No. 48/2020 this understanding was reiterated, and the allegation of an attempt to apply for a visa, other than through official channels, or the possession of a diplomatic passport, is absolutely irrelevant to reverse it.

Is there any further justification for answering the question that the Appellant has decided to raise in this appeal?

---

[2] COMMITIEE  OF LEGAL ADVISERS  ON PUBLIC  INTERNATIONAL LAW (CAHDI), Replies by States to the questionnaire on "Immunities of Special Missions", Strasbourg 11 July 2018, p, 63.

To the alleged status of *"special envoy"*, which was not granted to him, for the reasons already explained, the Appellant now adds that of acting *"ambassador"* or *"representative"* of the RBV to the African Union.

In other words, since the Appellant is already being detained by order of the Cabo Verdean judicial authorities, with a view to ensuring his surrender to the requesting State, should extradition be authorized, the RBV decided to grant him the status of diplomat, with the notable purpose of trying to neutralize the effects of the ongoing extradition process.

It should be recognized that, although it is not very common to see such a way of proceeding in international relations, there are some cases in which it is possible to use this mechanism to try to cover himself with retroactive diplomatic immunity, who was already in trouble with the law.

In the case of the Appellant, the same problem of recognition of such status by the State of Cabo Verde would always remain, which is not yet demonstrated in the record.

Therefore, and only on the basis of the information in the file up to this point, it is legally irrelevant for this Supreme Court of Justice the unilateral act by which the RBV intends to make someone already detained in Cabo Verde, for purposes of extradition, its *"representative"* to an international organization, even if it is the continental organization, the African Union.

And it has not been invoked, nor has it been possible to identify the legal instrument that would oblige the State of Cabo Verde and its institutions to recognize the alleged immunity of the Person to be extradited, in his new capacity as interim acting *"representative"* of the RBV to the African Union.

## II.3.12. Infringement of the principle of reciprocity

The Appellant invokes a violation of the principle of reciprocity (items *qq)) rr), ss), tt), uu)* and *vv))*.

The thesis sustained by the Appellant is based essentially on three arguments.

The first is the recognition by the United States that they will not be in a position to ensure to Cabo Verde to respect the principle of reciprocity, if the situation is reversed.

The second is that the waiver of the reciprocity principle only applies to other forms of international judicial cooperation, but never to extradition.

The third is that dispensing with the principle of reciprocity in such circumstances violates Article 11, paragraph 1 of the Constitution of the Republic.

To this question the appealed court answered as follows:

There is no reason to alter the meaning of this decision of the appealed Court.

Indeed, in the part where she opted to dispense with the requirement of the reciprocity principle, the act of the Minister of Justice is a political judgment that is not subject to the scrutiny of the Courts.

This understanding is corroborated by doctrine and jurisprudence as referred to by Miguel Joao Costa[3]:

> "strictly administrative decision. The attribution to the Minister of Justice of the possibility of demanding reciprocity on a case-by-case basis evidences the political character of the principle of reciprocity. The preamble of Decree-Law n. 4 3 / 91 stated already that reciprocity "is conceived as a "unilateral political act of the Government". Also the jurisprudence unequivocally excludes reciprocity from the ambit of judicial intent. In the end, also in the doctrine the question seems to meet consensus".
>
> Therefore, we can safely say that the judgement on the cause for refusal "lack of reciprocity" belongs exclusively to the Executive - thus leaving the exception to the rule that the causes of mandatory refusal are subject to judicial review."

Would this solution be unconstitutional, for possible violation of the provisions of Article 1, paragraph 1 of the Constitution, as the Appellant claims?

Our answer is no.

---

[3]  DEDERE AUT JUDICIARE? A Decisão de Extraditar ou Julgar a Luz do Direito Português, Europeu e Internacional, instituto Jurídico da Faculdade de Direito de Coimbra, Junho de 2014, pág. 80.

Even for the Portuguese Constitution, which has a much less flexible conception of the reciprocity principle than the one accepted by the Cabo Verdean Constitution, it was never seen that this faculty granted exclusively to the Executive to dispense with the reciprocity requirement, in certain circumstances and in the name of other values, would have been considered unconstitutional.

A majority of the reason is that it would not be so in a Constitution, such as the Cabo Verdean one, which has accepted the formula *"reciprocity of advantages",* from which a greater freedom of political judgment of the circumstances derives for the receiver of the rule.

Finally, it should be added that, due to its systematic placement, the exemption of reciprocity is possible in any form of international judicial cooperation, including, therefore, passive extradition.

## II.3.13.   Respect for the principle of speciality

The Appellant states in conclusion *ww)* of his pleas that there is a lack of assurance on the part of the Appellant State as to the respect of the principle of speciality, which is binding under the constitutional legal system of the United States.

This question was analyzed by the appealed court in the following terms:

In fact, the whole explanation of the defense regarding the principle of specialty is correct, but its dissertation on the lack of formal guarantee of the Requesting State, the USA, regarding extradition, does not correspond to the truth.

The requesting State, when sending its formal extradition request, stated the guarantee that the defense "requires".   There is a formal, express statement in the record in this regard, safeguarding the principle of specialty, offering formal guarantees that it will not detain, prosecute or punish the Person to be extradited for any offenses other than those listed in the extradition request, and that the Person to be extradited will not be re-extradited to a third state.

This is clear from the statement made by the United States through its Ambassador to Cabo Verde, on pages 540 to 555 of the case, so that the alleged issue does not arise.

There are no reasons for a decision to the contrary.

The guarantees offered by the requesting State under the principle of specialty are valid and sufficient, and the law does not require that they be binding under the legal-constitutional system of the United States.

In this case, the word of the requesting State is enough, for the understanding of Minister Celso de Mello of the Brazilian Supreme Court is fully applicable here.

## II.3.14.  Decision of the ECOWAS Court of Justice

The Appellant contends in section *xx)* of his Opinion that the contested judgment is null and void because the ECOWAS Court has determined, with direct and immediate effect in the legal order of Cabo Verde, under Articles 12(3) and 210(2), both of No. 210, paragraph 2, both of the Constitution of the Republic that it the extradition of the Person to be extradited should not be authorized until the Court has rendered its decision.

The defense states that the ECOWAS Court decided, clearly and unequivocally, that, *"The right to freedom and security, arguing that his detention is illegal and violates his right to freedom (. . .) because he enjoys immunity and inviolability by virtue of the principle of non-interference in the UN Charter and his status as Special Envoy.  Since at the time of his detention he was performing a special mission on behalf of Venezuela, and was not the subject of an arrest warrant or even a Cape Verde red alert. "*

It should be noted that in relation to the ECOWAS Court's decision, an order has already been issued in this case, which is reproduced here in its entirety, on pages 950 to 958, through which the defense complained to the BCA conference.  To confirm that this Court is not aware of any decision rendered by the ECOWAS Court of Justice.   In fact, what is known is what is spread by the national and foreign media, as well as the document attached to the request submitted by the defense of the Person to be extradited, which should have been removed from the case file. Furthermore, as stated in the order under reference, since not even Cabo Verde has signed the Protocol that grants legitimacy to the ECOWAS Court on the issue of alleged violations of fundamental rights, the violations of fundamental rights, the decisions of this Court, in this matter, are not binding on Cabo Verde.

Let's see if the Appellant is right.

The involvement of the ECOWAS Court in the present extradition case, which is being handled by the Cabo Verdean Courts, took place when the Person to be extradited decided to lodge a complaint with that jurisdiction against the Republic of Cabo Verde for alleged violation of human rights, with the request to adopt provisional measures.

This involvement raises aspects that denote some complexity. Indeed, the Person to be extradited managed to obtain two interim measures from ECOWAS jurisdiction, namely:

> That the Person to be extradited be placed in house arrest;

> That extradition be not allowed until the ECOWAS Court had ruled on the merits of the appeal brought before it.

Faced with this decision, the Respondent Court refused to obey it on the grounds that the State of Cabo Verde is not bound by the ECOWAS Protocol A/SP.1/01/05, which gives the ECOWAS Court the competence to receive individual complaints against Member States for alleged violation of human rights, as it has never been signed by any representative of the State of Cabo Verde.

To know, therefore, which side will be the right side is to assess whether effectively the State of Cabo Verde must obey the decisions of the ECOWAS Court issued in the exercise of jurisdiction conferred on it by the protocol of 2005.

The main argument of the State of Cabo Verde for refusing to comply with such decisions is that it considers itself not legally bound by the said protocol.

To this, the Appellant responds that Cabo Verde is bound by the decisions of that Court for two main reasons:

> Because this protocol is a legal text issued by a supranational organization of which Cabo Verde is a member, therefore its binding would be automatic by virtue of what is stated in article 12, paragraph 3 of the Constitution of the Republic.

> Because Article 210, paragraph 2 of the Constitution states that Justice is also governed by courts established through treaties, conventions or international agreements to which Cabo Verde is a party, in accordance with their respective rules of jurisdiction and procedure.

The counter arguments deserve to be analyzed.

First, however, it is worth bearing in mind that the additional jurisdiction conferred on the ECOWAS Court by the 2005 Protocol ended up transforming the Court into a human rights jurisdiction, which, like everywhere else, raises delicate problems in the relationship with Member States, especially in terms of binding its decisions.

Basically, in this case of human rights jurisdictions, it is a question of knowing how to reconcile the principle of the sovereignty of states with their compliance with orders that try to impose international courts on them.

Observation of what is happening around the world lets us immediately perceive an element that cannot be underestimated in the analysis of this relationship. We are referring to the indispensable **consent of the States**, a manifestation of their sovereignty, to submit not only to an international jurisdiction, but also to the specific powers that are conferred upon such jurisdiction.

In other words, the consent of the State does not derive only from its membership in an international organization with a Court, contrary to what might appear at first sight.

Such consent must also be necessary, as seems evident, for the competences that are gradually being conferred on such a Court by means of appropriate legal instruments.

The evolution of the European Court of Human Rights (ECHR), the most powerful human rights jurisdiction known, is a prime example of this.

In fact, in light of the original competencies of the ECHR, access to this Court, that is, the right to file complaints, was reserved only for States and the institutions of the Council of Europe, in particular the Commission.

One wonders why? The answer seems simple: because until then the member states of this organization had not, in the exercise of their sovereignty, given their consent to be sued by individuals.

Only with the 1990 Protocol No. 9 did individuals and NGOs have direct access to the ECHR to file complaints.

Yet this only covered those states that had expressed their acceptance, by ratifying this protocol, to be sued for individual complaints. States that had not ratified this protocol could not be sued.

For example, some members of the Council of Europe have never accepted, much less ratified, this Protocol No. 9. It was a sovereign choice, dictated, of course, by the convenience of those countries, which was always respected by the other States and by the institutions of the Council of Europe.

It would be with Protocol no. 11, of 1994, but which only came into force in 1998, after being ratified by all the States, that the latter, without exception, began to accept being sued for individual complaints.

At the African level, the current situation is, at least in formal terms, similar to that of the European System under Protocol No. 9, mentioned above.  That is, the freedom of each State, in the exercise of its sovereignty, to accept, or not, to be sued for individual complaints.

Thus, of the 55 states that make up the African Union (AU), only 30 have signed and ratified the Protocol that created the African Court on Human and Peoples' Rights (TADHP).

Of these 30, only 10 have made the declaration that they accept being sued for claims brought by individuals or NGOs.

Consequently, none of the 45 states that have not made a declaration accepting the jurisdiction of the TADHP to receive individual complaints, although they are party to the legal instrument that created this jurisdiction, can be sued before this Court by individuals.

From this brief incursion into the evolution of the European and African experiences, with respect to human rights jurisdictions and their relations with the States, this essential and unavoidable element is confirmed, which is the need for the consent of the States to submit to certain competencies of the corresponding courts.

This means that a state may be a member of a particular international organization. It may even have ratified the initial protocol relating to the Court of that organization. Still, it

may not accept some of the specific competences of that Court, namely the competence to be sued for individual complaints.

That is what, as we have seen, some European countries did with regard to Protocol 9 on the competences of the ECHR; that is what Cabo Verde did with regard to the 2005 Protocol on the ECOWAS Court; and that is what some ECOWAS countries even did with regard to the Protocol on the TADHP, to mention only those cases.

Does that mean that States that do not recognize this specific competence of the TADHP to receive individual complaints, cannot participate in the choice of Judges of this Court, nor have their nationals as judges of this Court?

If so, African countries that have never accepted to be sued by the African Court of Human Rights for individual complaints, cannot participate in the choice of Judges of that Court, nor have their nationals as judges of that Court. But they do participate and have had judges.

The foregoing seems to legitimize the conclusion that the intervention of a certain State in the approval of the Protocol of a Court of Human Rights, its participation in the selection of judges of that Court, or even the presence of its nationals within that jurisdiction, are far from entailing the acceptance of the full extent of its powers.

Let us now examine the arguments invoked by the Appellant to support the binding nature of the State of Cabo Verde to the decisions of the ECOWAS Court, taken under the Protocol of 2005, starting with the alleged supranationality of ECOWAS, a quality that, according to this argument, would dispense with the formal procedure of reception in the internal order of its legal instruments.

First of all, it should be noted that, except for a possible oversight, the text of the Revised Treaty of 1993 does not expressly attribute the nature of a supranational organization to ECOWAS.

Therefore, this alleged supranationality has been a construction on the basis of inferences drawn from some provisions of the Revised Treaty, particularly from its Article 9 which states that "*the decisions of the Conference (of Heads of State and Government) shall be binding on Member States and Community institutions, except as provided in Article 15(3)*".

A certain passage from a judgment of the Court of Justice in the case of Saidykhan v. The Gambia, which we will reproduce in pertinent part, also contributed greatly to this thesis of the supranationality of ECOWAS:

> *"ECOWAS is a supra national authority created by Member States wherein they expressly ceded some of their sovereign powers to ECOWAS to act in their common interest. Therefore in respect to those areas where the Member States have ceded part of their sovereign powers to ECOWAS) the rules made by ECOWAS A SUPERSEDES RULES MADE BY INDIVIDUAL Member State if they are inconsistent."*

The persuasive force of arguments drawn from a Treaty provision and a Court decision appears, however, to have been undermined or compromised, either by the *praxis* of the Community itself, or by other, much more recent, Court decisions, or even by the Cabo Verdean doctrine that has addressed the matter.

As for the *praxis* of the Community, it points to the sense that, although supranationality may be a goal to achieve, in the interpretation and practice of the Conference of Heads of State and Government, it is not yet an assumed reality.

Indeed, if ECOWAS were, formally and effectively, a supranational organization, there would be no need to subject the various protocols that have been adopted since the entry into force of the Revised Treaty of 1993, to individual signature and ratification by the Member States, in accordance with their constitutional order, as a condition for their definitive entry into force.

On the contrary, the imposition of this procedure shows a clear awareness on the part of the states represented at the highest level that this is not (yet) a supranational organization.

At the level of the Court, one can find decisions calling for the binding of member states to the protocols, not because of the supranational nature of ECOWAS, but because they have at least affixed their signature, a fact that in good faith, and in light of Article 18 of the Vienna Convention on the Law of Treaties, prevents them from backing out of assuming the obligations arising from that signature.

An example of this is the judgment, rendered in the case of Hans Capehart Williams SR and Mardia OPaykue Williams v. Republic of Liberia and others, which is reproduced below in pertinent part:

> "*Treaties are bidding only to the parties to them. They enter into force either by mere signature or ratification or both, depending on their provisions. The Supplementary Protocol A/SP.1/01/05 of 2005 conferring jurisdiction on this Court in respect of human rights violations occurring in ECOWAS Member States qualifies as a Treaty. The Court takes judicial notice of the fact that the 1st defendant is a signatory to the treaty. By .Article 1181) of the Protocol:*
>
> *This Additional Protocol shall enter into force provisionally upon signature by the Heads of State and Government. Therefore, the signatory Member States and ECOWAS undertake to begin implementing all the provisions (with emphasis on ours) of this Protocol.*
>
> *It follows that since the 1″ Defendant signed the treaty in question, it cannot be seen to argue it is not bound because of non-ratification*
>
> *(…)*
>
> *Consequently, even if the 1st Defendant has not ratified the treaty, it is bound by its provisions at the time of signature, provided that at least Nine Member States (which may exclude the 1st Defendant) have ratified it.* "[4]

This argument is of enormous importance because it highlights the significantly more recent understanding of the ECOWAS Court itself that it is not in the supposed supranational nature of ECOWAS that lies the justification for member states to be automatically bound by its legal instruments.

It is, rather, in its express acceptance by the Member States, through at least the signature of an accredited representative.

Therefore, at least a signature is required to conclude that a state is bound by an ECOWAS Protocol.

Therefore, since ECOWAS is not a supranational organization for the time being, and Cabo Verde has not even signed the 2005 Protocol, there is no basis for it to consider itself bound to such an instrument and, by powers conferred on it by such an instrument of which it is not a part.

This understanding is supported by the Cabo Verdean doctrine. The Juspublicist José Pina Delgado, already in 2006, therefore in the validity of the Revised Treaty, and after the 2005 Protocol had been approved, wrote the following:

---

[4] Judgment nº ECW/CCJ/JUD/25/15, SUIT ECW/CCJ/APP/06/14.

"*Putting aside outright the first argument, according to which "Cabo Verde has to accede to certain Protocols sooner or later", which is an evident misunderstanding, since no state has the obligation to bind itself to an international instrument of which it is not interested in being a part (...) (emphasis added)*".[5]

This observation was not made in the abstract. With it, the author is refuting the opinion of some who predicted that, sooner or later, Cabo Verde would have to accede to the ECOWAS Protocols, particularly the one that enshrines the ECOWAS security mechanism,[6] after all the object of the wise reflection in reference.

More recently, in a study of unavoidable importance for the topic in question[7], the same author would reaffirm that "*accession to these protocols is optional and some of them are not even in force*" (emphasis added).

In the study just mentioned, the author is peremptory about the claim of attributing to ECOWAS the nature of a supranational organization:

"*Regardless, for purposes of the Cabo Verdean Constitution, ECOWAS is not a supranational organization, since the country has not bound itself to any of the treaties that would represent and with the limitations pointed to this supranationality. In this sense, not being the African Union and ECOWAS, supranational organizations, at least for the purposes of Article 12 (3), this, in theory, should be read from its most literal sense has no applicability today.*" (emphasis added).[8]

The thesis is based on sufficiently persuasive arguments to justify its acceptance by this Court.

---

[5] **A vinculação de Cabo Verde ao Mecanismo de Segurança da CEDEAO**, Revista de Direito e Cidadania, Year IX, No. 27, 2007/2008, p.131 and following.

[6] Whose formal designation is **Protocol relating to the Mechanism for Conflict Prevention, Management, Resolution, Peacekeeping and Security**, of 10 December 1999, published in the Official Journal of the Community, v. 37, 1999.
[7] **O Direito Internacional Público no Direito Cabo-verdiano**, José Pina Delgado, with the collaboration of António Andrade.
[8] Study in reference, p. 27.

Finally, it must be added that the recognition that the Cabo Verdean Courts would come to make to ECOWAS, as a supranational organization, in the sense that its acts would automatically enter into force in the internal legal order, without any act of mediation, would carry the risk of reducing to ashes the sovereignty of the Republic of Cabo Verde, since all the protocols, starting with the famous and controversial one on Defense and Security, which has already taken years and years of consideration with a view to a possible decision on its signature, approval and ratification, and others approved even in the absence of any representative of the State of Cabo Verde, would become instruments by which our country would have long been bound, even without knowing it.

For all the reasons stated above, the thesis that intends to see ECOWAS as a supranational organization, for the purposes of the provisions of article 12, paragraph 3, of the Constitution of the Republic, cannot be accepted by the Cabo Verdean Judicial Courts.

This implies adherence to the alternative understanding that the binding of the Republic of Cabo Verde to any ECOWAS Protocol will have to presuppose, at a minimum, the signature of such an instrument by its representative, an elementary, albeit incomplete, expression of the sovereignty of the State of Cabo Verde.

This did not happen with the Protocol of 2005, so the State of Cabo Verde is not legally bound by it, for any legal purpose, namely to be obliged to comply with decisions rendered by the ECOWAS Court of Justice within the scope of the powers deriving from such instrument.

This conclusion is not infirmed by the fact that the State of Cabo Verde has appointed Judges who have had or are sitting in that Court, or even by the circumstance that the President of its Supreme Court inherently integrates the Community Council of Justice, insofar as the country is a party to the Court, whose initial protocol was signed by the Head of its Government.

The African Court is a paradigmatic example of a Court to which several countries are not bound by its competences to receive individual complaints, for alleged violation of human rights, but not for this reason they cannot designate judges to integrate it, precisely because they are parties to the Protocol that established the Court, although they do not recognize certain specific competences.

Let us move on to the second argument invoked to justify the obligation of Cabo Verdean courts to comply with the decisions of the ECOWAS Court of Justice rendered in the context of individual complaints filed against the State of Cabo Verde for alleged

violation of human rights in its territory, Article 210, paragraph 2, of the Constitution of the Republic, which is reproduced below:

> "*Justice is also administered by courts established through international treaties, conventions or agreements to which Cabo Verde is a party, in accordance with their respective rules of jurisdiction and procedure.*"

As already stated in relation to the ECOWAS Court of Justice, this constitutional provision cannot but be interpreted in the sense that the recognition by the State of Cabo Verde of the administration of justice done by these courts presupposes consent by the State of Cabo Verde, not only to the creation or existence of the Court, but also to the respective rules of jurisdiction and procedure.

It would be absurd to interpret this rule in such a way that a state, in this case the state of Cabo Verde, would allow itself to be bound by the decisions of a Court, whose jurisdiction is unknown from the outset or which, being initially known and subject to consent, will subsequently be substantially expanded and modified, without the consent of that state.

Imagine that the Conference of Heads of State and Government of ECOWAS would decide to add criminal jurisdiction to the current powers of the Court of Justice of that Community, i.e. to judge crimes committed within each Member State, to issue arrest warrants against citizens of Member States, etc. etc.

Surely neither Cabo Verde nor any other state would accept the Court's decisions in this matter without having expressed its prior consent by signing and ratifying the instrument conferring this additional jurisdiction on the Court.

The same would be true if the African Union decided to confer criminal jurisdiction on its Court.

Therefore, article 210, paragraph 2, of the Constitution of the Republic must be interpreted in the sense that it makes the recognition of justice administered by such courts dependent, even if implicitly, on the consent of the State of Cabo Verde as to the rules defining their competence and procedure.

A final word, still on this subject, to say that, even if the state of Cabo Verde were bound by the decisions of the ECOWAS Court issued in individual complaints for alleged

violation of human rights, non-compliance with such decisions would only constitute a matter of the state's international responsibility.

It would never be a matter of direct compliance with such decisions by national courts.

## III. DECISION

*On the above grounds, the Judges of this Supreme Court agree to dismiss the appeal and confirm, for all legal effects, the appealed decision.*

1.  *Confirm the judicial authorization for the extradition of the Appellant to the United States;*

2.  *The extradition now authorized is for the Person to be extradited to be subject to prosecution for only one of the crimes he is accused of, in accordance with the guarantee offered by the requesting State.*

*The appeal against the decision of the same Court of Appeal which refused to grant the ECOWAS Court's order that the Person to be Extradited be placed under house arrest is hereby dismissed.*

*Note and notify.*

Praia, March 16, 2021

João da Cruz Gonçalves

Manuel Alfredo Semedo

Maria Teresa Alves Évora Barros

Anildo Martins

Benfeito Mosso Ramos

**ACCORDINGLY ACCEPTED:**

**Registry of the Supreme Court of Justice, on the seventeenth day of March in the year two thousand and twenty-one.**

**The Law Clerk**

**Luís Acácio Cardoso da Silva Delgado**

COPIA:

Do acórdão proferido nos autos de

Recurso Crime nº 07/2021 (Autos do Processo

de Extradição nº 42/19-20), em que é Recorrente:

**ALEX NAIN SAAB MORAN** e Recorrido, O **Tribunal**

da Relação de Barlavento,

## SUPREMO TRIBUNAL DE JUSTIÇA

### Acórdão nº 28 /2021

Acordam, em Plenário, no Supremo Tribunal de Justiça:

## I. RELATÓRIO

**ALEX NAIN SAAB MORAN**, empresário, de nacionalidade venezuelana, nascido a 21 de Dezembro de 1971, detido no Estabelecimento Prisional da Ilha do Sal, à ordem do Tribunal da Relação de Barlavento, já melhor identificado nos autos, não se conformando com o acórdão desse Tribunal, de 04 de Janeiro de 2021, que autorizou a sua extradição para os **Estados Unidos da América (EUA)**, dele interpôs recurso, formulando as seguintes conclusões:

a) O douto acórdão em recurso viola todos os pressupostos do processo de extradição, quer os fixados pela Constituição da República, quer os fixados por instrumentos internacionais que vinculam o Estado de Cabo Verde e bem assim na Lei da Cooperária Judiciária Internacional.

b) No processo de extradição são permitidas todas as diligências de prova que visam a demonstração dos pressupostos negativos que justificam a recusa de cooperação internacional, nomeadamente, todos aqueles pressupostos que se prendem com a observância dos princípios fundamentais do processo penal, consubstanciados na CR e nos instrumentos internacionais de que Cabo Verde é parte, nesta conformidade, ao circunscrever a prova requerida ao artigo 55.° da LCJ, o acórdão em recorrido viola o direito de audiência do extraditando, sendo por isso nulo e de nenhum efeito.

c) O acórdão recorrido viola o artigo 30.° n.° 4 da Constituição que impõe a comunicação imediata do detido das razões que determinaram a sua detenção e bem assim os artigos 269.° n°. 1 do CPP e artigo 31.° do LCJ que estabelecem os requisitos formais de um mandato de detenção.

d) Acórdão em recurso violou o artigo 30.°, no. 3, al f) da Constituição que equipara a detenção para efeitos de extradição a prisão preventiva pelo que o acórdão recorrido violou igualmente as regras do processo penal em matéria da aplicação das medidas de coação;

e) É manifestamente ilegal privar uma pessoa da sua liberdade com base num pedido informal de um policial estrangeiro, nomeadamente a detenção do recorrente para efeitos de extradição;

f) Os actos internacionais relativos à Interpol nunca foram aprovados, ratificados ou publicados no Boletim Oficial da República de Cabo Verde, em violação do disposto no artigo 12.° da Constituição e a aplicabilidade dos instrumentos desta instância internacional sem a observância do estabelecido na

1



## SUPREMO TRIBUNAL DE JUSTIÇA

Constituição sobre a recepção e vigência de tratados internacionais;

g) O acto do Ministro da Justiça que autoriza a extradição do recorrente é para todos os efeitos legais um ato administrativo, sendo sujeito a todas as vias de recurso contencioso de anulação, por força do princípio da tutela jurisdicional efetiva previsto no artigo 243.º e) da Constituição;

h) A pena indicada na nota diplomática é de 20 anos de prisão para cada um dos *"counts"* constantes do *"indictment"*, prevendo-se na nota diplomática, oito *"counts"* e sendo oito *"counts"* por 20 anos a pena previsivelmente aplicável nos USA é de 160 anos;

i) No presente caso, a extradição do Recorrente não pode ser aceite em razão de sua possível condenação a 160 anos de prisão, a qual, considerando-se a atual expectativa de vida global, constitui uma prisão perpétua *de facto* ou de caracter perpetua;

j) De acordo com o direito internacional, a extradição deve ser negada caso o Estado requerente não seja capaz de garantir que a pessoa procurada não será submetida a um tratamento cruel e desumano;

k) O acórdão recorrido indica como o período de cometimento dos actos pelo Extraditando aos anos de 2011 ou 2012 a 2014 (Ponto 2. das alíneas a) e e) do Requerimento do pedido de Extradição e fls. 2, 2v.º e fls 3, *"por os factos terem ocorrido entre março de 2012 e dezembro de 2014");*

l) O prazo de prescrição (limitation) 5 (cinco) anos (Cfr. fls. 4 e Exhibit E fls. 83 e 83 v.º);

m) O prazo de prescrição do procedimento criminal de cinco anos, então, já teve lugar no final de 2019 e já não pode ser interrompido, ainda que por notificação pessoal do Recorrente, que não aconteceu;

n) Constitui ordem pública do Estado de Cabo Verde a obrigatoriedade da notificação pessoal ao Extraditando do pedido de extradição pelos USA;

o) A notificação do pedido formal de extradição e a notificação do despacho judicial que admite esse pedido são pessoais;

p) a interpretação dessa norma como bastando a notificação do mandatário para os fins do artigo 55.1 da LCJ, viola os artigos I.º, 3.2.3, 35.6,15. º, 17.4.5. e 18. º da Constituição, sendo por isso inconstitucional, e, por isso, inaplicáveis pelos tribunais (artigos 277.1 e 211.3 da Constituição);

q) A Extradição requerida pelos USA é baseada em motivos políticos e deve ser recusada nos termos da lei e da Convenção UNTOC, caso se aplicasse no presente caso; com efeito;

r) A publicação é requisito de eficácia dos actos normativos a ele sujeitos (artigo 2.1 da Lei n.º 87/VII/2001, de 10 de Janeiro) e o Decreto Presidencial de ratificação do tratado UNTOC não se revela ter sido publicado pelo Estado requerido.



## SUPREMO TRIBUNAL DE JUSTIÇA

s) O Recorrente é Enviado Especial da RBV para o RII e beneficia da imunidade de jurisdição e da inviolabilidade pessoal, nos termos do direito internacional consuetudinário e a falta de jurisdição do Estado de Cabo Verde para julgar um enviado especial em trânsito no seu território determina a incompetência absoluta dos Tribunais cabo-verdianos;

t) O Estatuto de Enviado Especial não precisa de ser reconhecido necessariamente pelo poder político; ao delegar essa competência em exclusividade ao poder político o Tribunal violou o princípio da separação dos poderes, a independência do poder judicial e violou as disposições dos artigos 2.° n.° 2, 211.° n.° 1 e 7.° da CRCV;

u) o Estatuto de Enviado Especial não pode ser negado ao Extraditando por um formalismo excessivo contra o Direito Internacional Consuetudinário e a Doutrina unânime, exigindo uma informação prévia do Estado terceiro, desnaturando a função secreta e de Enviado Ad Hoc do Extraditando;

v) Por fim, o visto de trânsito aceite pela Convenção de NY de 1969 e o Direito Internacional, como sendo bastante para provar a informação do 3° Estado foi juntado no processo, mas com uma manifesta má valoração dessa prova irrefutável, pelo Tribunal *a quo,*

w) Tanto quanto assim também como o passaporte diplomático do extraditando não valorado no processo e as alegações da defesa sobre o Estatuto de Enviado Especial, no seu todo;

x) A nomeação do Extraditando, Sr. ALEX SAAB, como representante permanente, ad interino, junto da União Africana, tem efeito imediato;

y) Neste quadro, goza de um duplo Estatuto que lhe confere uma **proteção complementar,** em virtude do Direito Internacional Convencional, Consuetudinário e Jurisprudencial;

z) Com efeito é protegido na sua qualidade de Envido Especial da Venezuela e na sua qualidade de Representante Permanente, por Interino, junto da União Africana.

aa) De um acto ilícito em direito internacional do Estado de Cabo Verde, que é a detenção do Recorrente, na sua qualidade de enviado especial da RBV, não pode derivar qualquer jurisdição da RCV e competência dos seus Tribunais para a manutenção de uma detenção ilícita efectuada pelas suas autoridades policiais;

bb) A incompetência dos tribunais de Cabo Verde constitui urna excepção processual (artigo 156.1.b) do CPP) e de conhecimento oficioso ((artigos 157. ° e 161. ° do CPP), não obstante a arguição pelo Requerente;

cc) A detenção do Recorrente a sua manutenção viola as disposições do artigo 269. °, n.° 1 al. b) do CPP e o artigo 39. ° da LCJ não podia ser utilizada em violação das regras do processo penal de Cabo Verde e de processamento de dados e para a detenção do Recorrente;





## SUPREMO TRIBUNAL DE JUSTIÇA

dd) A Constituição e o CPP submetem todo o processo penal ao princípio do contraditório e não apenas determinadas fases, que parece seriam escolhidas ou discricionariamente eleitas pelos juízes (artigos 35.6 da Constituição e 5.° do CPP);

ee) tendo o legislador ordinário alargado e estendido o âmbito do princípio constitucional do contraditório a todo o processo penal (artigo 5.º do CPP), que não pode ser considerado como norma inexistente ou não escrita, para nunca ser aplicada pelos juízes e tribunais,

ff) sem observância, em qualquer dos casos, de qualquer contraditório imposto pela constituição e pela lei (artigo 35.6 da Constituição e artigo 5.º do CPP), antes da tomada da decisão, nomeadamente a audição do Recorrente e por ter a ver com os seus direitos fundamentais e irrenunciáveis e a restrição do direito à liberdade (artigo 17.4.3 da Constituição);

gg) constituindo normas do processo penal todas aquelas em que podem ser tomadas com o conteúdo de agravamento, de restrição e de limitação dos direitos e da situação do detido ou extraditando e sem a abertura do contraditório e a audição da parte que sofre a restrição ou limitação dos direitos, pelo que essas normas na medida em que determinam relevância na situação processual do detido ou extraditando são inconstitucionais por violação dos artigos 15. °, 17.4.5. e 18. ° da Constituição e, por isso, inaplicáveis pelos tribunais (artigos 277.1 e 211.3 da Constituição);

hh) Concedendo o Tribunal recorrido a possibilidade do Ministério Público ter duas intervenções no processo de extradição e o Recorrente apenas uma intervenção infringiu-se o princípio contraditório (artigo 35.6 da Constituição) e na lei (artigo 5. ° do CPP), pelo que o acórdão recorrido deve ser considerado nulo e de nenhum efeito, nos termos dos artigos 150.º, 151.º e 152. ° do CPP;

ii) A violação das normas sobre a audição, audiência e a notificação pessoal do Recorrente previstas no artigo 54, 55. ° e 56. ° da LCJ conforme praticada pelo Tribunal recorrido viola o princípio constitucional e legal do contraditório e constitui omissões de actos e de fases processuais e geradoras de nulidades insanáveis.

jj) Sendo, Nula a decisão que ordena a Extradição do Recorrente, o Sr. Alex Naim Saab Moran, para os Estados Unidos da América, por nulidade insanável, prevista nos termos da alínea d) do artigo 151.º do CPP;

kk) Em relação à audiência prevista no artigo 56.º da LCJ, não foi realizada audição do extraditando, que é obrigatória e imprescindível em fase de processo judicial de extradição;

ll) O Recorrente deduziu, em tempo, a sua oposição, requereu diligências de prova, para o efeito, juntando documentos, arrolando testemunhas e ainda





## SUPREMO TRIBUNAL DE JUSTIÇA

protestando juntar mais documentos;

mm)  O Tribunal *a quo* entendeu não ser necessária a realização de prova, contudo decidiu, em absoluto, não realizar as diligencias de prova requeridas pelo Recorrente na sua oposição;

nn) Tribunal *a quo* estava obrigado a dar cumprimento ao princípio do contraditório;

oo) Pelo exposto, o Tribunal *a quo,* ao proferir a sua decisão, preteriu o princípio do contraditório, princípio esse com tutela constitucional, decorrência do princípio do Estado de Direito Democrático, que lhe impunha cumprir nos termos da lei fundamental;

pp) Violando assim o artigo 35. °, n.° 6, da Constituição da República de Cabo Verde e o artigo 5.° do Código de Processo Penal, constituindo, por isso, nulidade insanável, nos termos do artigo $151.^0$, al. g) do CPP, o que se requer desde já, para todos os efeitos legais;

qq) Não havendo reciprocidade nas relações entre Estados e na cooperação judiciária internacional não pode ser concedida a Extradição;

rr) Desse modo, a interpretação da norma do número 3 do artigo 6.° da LCJ no sentido que permite a cooperação judiciária internacional, sob a forma de extradição, quando os USA afirmam expressamente que nunca a concedem a Cabo Verde em situação é inconstitucional por violação do princípio da reciprocidade de vantagens constante do artigo 11.1 da Constituição;

ss) Acresce que, por imposição constitucional, a reciprocidade de vantagens é um dos princípios das relações internacionais (artigo 11.1 da Constituição);

tt) pelo que a reciprocidade não pode ser dispensada pela lei, no caso a LCJ, sob pena de inconstitucionalidade, quando uma outra parte nas relações internacionais com Cabo Verde afirma expressamente que nunca pode assegurar a reciprocidade.

uu) A falta de reciprocidade apenas é aplicável às outras formas de cooperação judiciária previstas no artigo 1.1. da LCJ e nunca à cooperação judiciária sob a forma de extradição por implicar com direitos fundamentais como o direito à liberdade da pessoa a sua privação (artigos 29.1 e 30.1 da Constituição) e o direito à livre deslocação da pessoa (artigo 51.1.2 da Constituição);

vv) Desse modo, a interpretação da norma do número 3 do artigo 6.° da LCJ no sentido que permite a cooperação judiciária internacional, sob a forma de extradição, quando os USA afirmam expressamente que nunca a concedem a Cabo Verde em situação é inconstitucional por violação do princípio da reciprocidade de vantagens constante do artigo 11.1 da Constituição.

ww)  Falta de garantia pelo Estado requerente ao Estado requerido da observância do princípio da especialidade prestada pelos órgãos e instituições do Estado requerente e que sejam vinculantes em função do sistema jurídico-

5





## SUPREMO TRIBUNAL DE JUSTIÇA

constitucional dos USA;

xx) O acórdão ora recorrido é nulo, por o Tribunal da CEDEAO - (ECW / CCJ / APP / 43/20) - ter determinado, com efeito directo e imediato na ordem jurídica de CV, ao abrigo da CRCV art.12.3, e 210 n.° 2, *«não devendo este (o Extraditando) ser extraditado, até que se profira a decisão de mérito»*.

O Ministério Público junto do Tribunal da Relação de Barlavento respondeu ao recurso, apresentando as seguintes conclusões:

1- Em matéria penal, pode-se dizer que a extradição é uma forma de cooperação judiciária internacional, em que o Estado requerente pede ao Estado requerido a entrega de uma pessoa que se encontra no território deste, para efeitos de procedimento criminal, ou de cumprimento da pena ou de medida de segurança privativa de liberdade, por infração cujo conhecimento seja da competência dos tribunais do Estado requerente.

2- Quando se trata de extradição passiva, em que Cabo Verde é o Estado requerido, a admissão da extradição é regulada pelos tratados e convenções, internacionais, e, na sua falta, ou mesmo insuficiência, pela lei relativa á cooperação internacional e ainda pelo Código de Processo Penal, sendo certo que a aplicação da lei interna cabo-verdiana é, pois, subsidiária.

3- Cabe ás autoridades judiciais do Estado requerido proceder á qualificação jurídico-penal dos factos, segundo a sua própria lei, para apurar da existência dos pressupostos que determinam a extradição.

4- Ao não aprovar, ratificar ou assinar o dito protocolo, teve Cabo Verde em vista, com certeza, reservas á sua soberania, pois que, tratando-se de matéria da exclusiva competência dos Tribunais Nacionais, é mais do que evidente que o Estado, por razões de soberania, não pode abdicar-se de sua competência em processo de extradição passiva.

5- Dá-se, pois, por isso, quanto á esta matéria, por integralmente reproduzido o já alegado em sede de oposição á extradição, bem como ao todo mais já alegado até á presente data.

6- O pedido foi feito de acordo com os requisitos que enformam a concessão ou recusa de extradição, tudo á luz da CRCV, Lei da Cooperação Jurídica Internacional em Matéria Penal e

6





## SUPREMO TRIBUNAL DE JUSTIÇA

demais leis da República com conexões á matéria de extradição.

7- Todos os seus direitos, nomeadamente de audiência e do contraditório foram devidamente observados;

8- Não se verifica qualquer violação, com vista a uma pretensa nulidade, ademais insanável;

9- Não existem fundamentos jurídicos para, nos termos dos artigos 6°, 7°, 8° e 32°, da nossa lei interna de Cooperação, ser recusada a extradição, satisfazendo, o pedido, as exigências quer do artigo 23°, quer do artigo 44°, na nossa Lei da Cooperação.

10- Nenhuma das normas constantes da Convenção, nem dos protocolos adicionais, conferem competência para determinar aos tribunais nacionais o cumprimento de suas decisões, muito menos competência para alterar medidas de coação, uma vez que não tem jurisdição sobre os tribunais nacionais, que são órgãos de soberania, conforme plasmado nos artigos acima descritos.

11- As normas emanadas de órgãos competentes de organizações internacionais de que Cabo verde faça parte, só vigoram diretamente na ordem interna, se tal se encontrar expressamente estabelecido nos respetivos tratados constitutivos.

12- Não goza, pois, essa propalada atribuição da qualidade de" enviado especial", de suporte no direito internacional.


Tendo tido vista no processo, o Excelentíssimo Procurador Geral da República promoveu que o recurso seja julgado improcedente, invocando para tal os fundamentos expostos a fls. 521 a 534 v°.

À promoção do Ministério Público respondeu o Recorrente.

Quer o Recorrente quer o Ministério Público juntaram pareceres em abono dos fundamentos e argumentos por eles invocados.

Com os demais vistos legais, cumpre apreciar e decidir.


## II. FUNDAMENTAÇÃO

7



## SUPREMO TRIBUNAL DE JUSTIÇA

Como é sabido o poder de cognição do tribunal de recurso é delimitado pelas questões suscitadas nas conclusões do recurso, salvo aquelas que forem de conhecimento oficioso.

### II.   1.   Questões a serem apreciadas.

Vejamos, então, quais as questões suscitadas nas conclusões do recurso, as quais, pela sua extensão, ficam condensadas na síntese conclusiva que se segue.

1. Detenção do Extraditando
   a) Não comunicação das razões da detenção e inobservância dos requisitos formais de um mandado de detenção (alínea c)).
   b) Violação das regras do processo penal em matéria de aplicação das medidas de coacção (al. *d)*).
   c) Privação da liberdade apenas com base em pedido informal de policial estrangeiro (*al. e)*).
   d) Actos da INTERPOL nunca foram ratificados nem publicados (alíneas. *f) e cc)*)
   e) Inexistência do mandado de captura contra o Extraditando.
2. Acto da Ministra da Justiça constitui um acto administrativo (alínea g)).
3. Omissão de diligências de prova (alíneas *b), ll), mm), oo) e pp)*).
4. Omissão da notificação pessoal ao Extraditando do pedido de extradição e da sua admissão (alíneas *n), o) e p)*).
5. Omissão da audiência do Extraditando (*alínea kk)*)
6. Violação do princípio do contraditório (alíneas *dd), ee), ff), gg), hh), ii), jj)*), *mm), nn) e pp)*.
7. Risco de ser condenado a prisão perpétua (alíneas *h) e i)*)
8. Falta a garantia de que o Extraditando não será submetido a tratamento cruel e desumano (*al. jj)*).
9. Prescrição dos crimes (alíneas *k), l) e m)*).
10. Extradição por motivos políticos (*al. q)*).
11. Não publicação do Tratado e não publicação do Decreto Presidencial que o ratificou.
12. Estatuto de Enviado Especial e de Embaixador (alíneas *s), t), u), v), w), y), z), aa) e bb)*)
13. Violação do princípio da reciprocidade (*qq), rr), ss), tt), uu) e vv)*).

8





**SUPREMO TRIBUNAL DE JUSTIÇA**

14. Falta de garantias de respeito pelo princípio da especialidade (*ww*)).
15. Nulidade por não acatamento da decisão do Tribunal da CEDEAO (*xx*)).

A essa síntese conclusiva, e como já se deixou antever, poderão vir a ser aditadas outras questões que resultarem do exame dos autos, se o seu conhecimento oficioso se impuser.

## II.   2.   Factos provados

O conhecimento de tais questões pressupõe que se fixe a matéria de facto que é relevante para o objecto do recurso e que é a seguinte:

A. A Polícia Judiciária Cabo-verdiana procedeu à detenção do Recorrente no dia 12 de Junho de 2020, quando o avião em que viajava da Venezuela para o Irão fez uma escala no Aeroporto Amílcar Cabral na Ilha do Sal para reabastecimento;

B. Após a sua detenção o Recorrente foi presente ao Tribunal da Comarca do Sal no dia 14 de Junho de 2020 e, subsequentemente, ao Tribunal da Relação de Barlavento, no dia 18 de Junho de 2020;

C. Nesse Tribunal Superior o Recorrente foi ouvido por uma Juíza Desembargadora que, de seguida, proferiu despacho da mesma data, confirmando a sua detenção;

D. O Recorrente impugnou a sua detenção quer através de uma providência de *habeas corpus*, quer através de um recurso ordinário;

E. Ambas as impugnações foram julgadas improcedentes pelo Supremo Tribunal de Justiça;

F. Contra a decisão deste Supremo Tribunal de Justiça que indeferiu o pedido de *habeas corpus* o Recorrente interpôs recurso de amparo para o Tribunal Constitucional, que declinou conhecer do objecto do recurso por considerar que não estavam reunidos os pressupostos para a sua interposição;

G. No dia 06 de Julho de 2020 procedeu-se à autuação do Requerimento do Ministério Público, datado de 03 de Julho de 2020, pelo qual se promoveu o cumprimento do pedido de extradição do Recorrente para os Estados Unidos da América;



9



## SUPREMO TRIBUNAL DE JUSTIÇA

**H.** Concluso o processo a 07 de Julho de 2020, a Juíza Desembargadora a quem o mesmo fora distribuído, prolatou nessa mesma data despacho asseverando que o pedido se mostrava instruído com os documentos exigidos por lei, não havendo qualquer obstáculo ao prosseguimento dos autos, pelo que ordenou o cumprimento do disposto no artigo 55° da Lei n° 6/VIII/2011, de 29 de Agosto, conhecida como a Lei de Cooperação Judiciária Internacional (LCJI);

**I.** No dia 08 de Julho de 2020 procedeu-se à notificação do advogado do Recorrente do despacho atrás referido;

**J.** Nesse mesmo dia 08 de Julho de 2020 o Recorrente apresentou ao Tribunal o requerimento das fls. 164 a 166 em que arguiu a falta de notificação pessoal do despacho em referência, bem como a sua não audição presencial no processo judicial, considerando que tais omissões configuram nulidades insanáveis;

**K.** No dia 16 de Julho de 2020 o Recorrente apresentou a sua oposição escrita ao pedido de extradição (doc. fls. 167 a 197);

**L.** O referido articulado foi dividido pelo Recorrente em duas partes: (A), que designou por "QUESTÕES PRÉVIAS"; e (B) que intitulou "OPOSIÇÃO";

**M.** Em sede das QUESTÕES PRÉVIAS o Recorrente suscitou as seguintes questões:

- A falsidade integral do processo, alegando, nomeadamente, que "os factos e os actos imputados ao Extraditando no processo de extradição, nomeadamente no pedido assinado pelo PRC[1], e nos documentos entregues pelos USA são todos falsos";

- A Inconstitucionalidade da norma do artigo 55°, n° 2, da LCJI, na parte e na medida em que dispõe que "*a oposição no processo de extradição só pode fundamentar-se em não ser o detido a pessoa reclamada ou não se verificarem os pressupostos da extradição*";

- O acordo de adesão de Cabo Verde à INTERPOL não está publicado no jornal oficial do Estado, pelo que não pode ser aplicado pelos Tribunais, não impendendo igualmente sobre a Polícia Nacional o dever de dar cumprimento aos regulamentos dessa organização, nem podendo também a

---

[1] Procurador da República de Círculo

10



**SUPREMO TRIBUNAL DE JUSTIÇA**

mesma "*agir motu próprio, com base em cooperação de boa vontade para prender, deter ou praticar qualquer acto policial de que resulta a restrição dos direitos à liberdade e segurança de nacional ou estrangeiro*";

- O alerta vermelho publicado no dia 13 de Junho de 2020 não pode ser utilizado como fundamento legal para a detenção do Extraditando, ocorrida no dia 12 de Junho de 2020, sendo ainda certo que a legalidade desse alerta vermelho foi contestada pelo Extraditando e pela Venezuela perante os órgãos competentes da INTERPOL, pelo que o Judiciário cabo-verdiano não deve utilizar o alerta vermelho para justificar a detenção contínua do Extraditando;

- O Extraditando, que não saiu do avião, não chegou de entrar em Cabo Verde, pois não transpôs qualquer posto fronteiriço, pelo que era vedado à PJ "*entrar e proceder à busca noturna na aeronave, à revista e à detenção do Extraditando na falta de um mandado judicial*";

**N.** Já na parte que designa por OPOSIÇÃO, o Recorrente suscita as seguintes questões:

- A prescrição do procedimento criminal, pois que de acordo com a lei dos USA já decorreu o prazo de prescrição de 5 anos, contado da data do cometimento dos factos (Dezembro de 2014);

- Imunidade de jurisdição/enviado especial: os tribunais Cabo-verdianos são absolutamente incompetentes para conhecerem desse pedido de extradição uma vez que o Extraditando goza de imunidades que decorrem do seu estatuto de enviado especial da República Bolivariana da Venezuela;

- Inobservância do princípio da reciprocidade: o Instrumento invocado para a extradição do Extraditando é a Convenção das Nações Unidas sobre a Criminalidade Organizada Transnacional, aprovada por resolução da Assembleia Nacional nº 92/VI/04, de 31 de Maio de 2004; mas não há qualquer Decreto Presidencial de ratificação dessa convenção, pelo que a mesma não pode servir de base à extradição solicitada. Na ausência de um tratado de extradição, para que a mesma possa ter lugar seria necessária observância do princípio

11



## SUPREMO TRIBUNAL DE JUSTIÇA

da reciprocidade. Mas, os Estados Unidos de forma explícita e formal declararam que não aplicam o princípio da reciprocidade com Cabo Verde;

- Inobservância do princípio da especialidade: o pedido de extradição não foi instruído com base numa declaração de garantia formal de que a pessoa reclamada não será julgada por factos diversos dos que fundamentam o pedido e lhe sejam anteriores ou contemporâneos;

- Requisitos negativos de cooperação: o processo em referência faz parte dos esforços dos USA em enfraquecer o regime do Presidente da RBV de que o Extraditando é apoiante, realizando missões em nome e por conta da Venezuela; o processo penal iniciado contra o Extraditando e o pedido de extradição conexo são o mais recente esforço por parte dos USA em interferir nos assuntos internos da Venezuela; Existe um fundamento para crer que o motivo de requerer extradição embasa-se em razões de natureza política ou ideológica, que propriamente em razões de punição criminal, pelo que o pedido de extradição deve ser recusado;

- Exigências internacionais de direitos humanos/agravamento da situação processual: caso seja extraditado, o Extraditando arrisca-se a não beneficiar do "fair trial", para além do risco de ser sujeito a tortura, tratamento desumano, degradante ou cruel;

- Pena: o Extraditando corre o risco de ser punido com uma pena de 160 anos de prisão, o que redunda, de facto, numa prisão perpétua;

**O.** Após invocar outras razões para fundamentar a sua oposição à Extradição, como a sua condição pessoal e a sua situação familiar, o Recorrente conclui apresentando uma lista de 10 testemunhas cuja audição requereu, para além da junção de um parecer sobre a Interpol.

**P.** No dia 17 de Julho de 2020 o processo foi concluso à Excelentíssima Juíza Relatora que na mesma data proferiu o seguinte despacho:

*Ao MP, face ao documento das fls. 164 a 166 (requerimento do Extraditando arguindo nulidades insanáveis);*

12



## SUPREMO TRIBUNAL DE JUSTIÇA

*Vista ao MP, nos termos do artigo 55°, n° 3, da Lei n° 6/VIII/2011, de 29 de Agosto;*

**Q.** Em cumprimento desse despacho o MP juntou um parecer à intenção de rebater os argumentos expendidos pelo Extraditando na sua oposição, concluindo que estavam reunidos todos os pressupostos para se autorizar a extradição requerida;

**R.** A 27 de Julho de 2020 a Relatora do processo no Tribunal da Relação de Barlavento proferiu despacho em que indeferiu o requerimento anteriormente apresentado pelo Extraditando arguindo nulidade insanáveis;

**S.** Esse indeferimento foi notificado ao Advogado do Extraditando no dia 27 de Julho de 2020;

**T.** Nessa mesma data a Excelentíssima Relatora proferiu o seguinte despacho:

> *"Nenhuma circunstância obsta ao conhecimento do objecto do processo.*
> *Tendo em atenção o disposto no artigo 57° da Lei n° 6/VIII/2011, de 29 de Agosto, aos vistos aos Srs. Juízes Adjuntos, tendo em atenção os prazos processuais estabelecidos e por estarmos em final de ano judicial.*
> *O processo será apresentado na próxima Conferência a ter lugar"*

**U.** No mesmo dia 27 de Julho de 2020 foi com vista ao 1° Juiz Adjunto que ainda nesse dia apôs o seu visto;

**V.** No dia seguinte, 28 de Julho, o 2° Juiz Adjunto apôs o seu visto;

**W.** No dia 31 de Julho os autos foram apresentados à Conferência, tendo sido aprovado o acórdão a autorizar a extradição do Recorrente para os Estados Unidos da América.

**X.** Esse acórdão foi objecto de recurso para STJ que através do seu acórdão n° 57/2020, 16 de Outubro, concedeu parcial provimento ao recurso e ordenou a anulação do processado, devendo ser o mesmo retomado com a notificação do Extraditando para produzir as suas alegações finais.

**Y.** Observada a tramitação legal foi proferido, em conferência, novo acórdão, ora objecto de impugnação, que dá como provados os seguintes factos:

**1.** No âmbito do processo criminal n° 19-20450-CR-SCOLA, pendente no Tribunal Distrital dos Estados Unidos para o Distrito Sul da Flórida, foi proferida, em 25 de julho de 2019, a acusação contra Alex Saab Nain Moran e um outro indivíduo, o Álvaro Pulido Vargas, acusando *Alex* Saab Nain Moran, de conspiração para cometer lavagem de dinheiro,

13



## SUPREMO TRIBUNAL DE JUSTIÇA

em violação ao Título 18 do Código dos Estados Unidos, Seção 1956 (h) (Crime Um) e sete imputações de lavagem de instrumentos monetários, em violação ao Título 18 do Código dos Estados Unidos, Secções 1956 (a)(2)(A) e 2 *(Acusações* Dois a Oito);

**2.** *A* acusação resultou de uma investigação conjunta da DEA/Agência Antidrogas Americana e FBI/Agência Federal de Investigações, que durou 4 anos e revelou que de Novembro de 2011 até aproximadamente Setembro de 2015, no Distrito Sul da Flórida e alhures, Alex Nain Saab Moran e outros conspiraram para lavar aproximadamente 350 milhões de dólares US$, em rendimentos de um esquema ilegal de suborno, no qual fizeram pagamentos a autoridades venezuelanas a fim de obter vantagens comerciais indevidas e conseguir acesso ao sistema de cambio de valores estrangeiros controlados pelo governo da Venezuela

*3.*     *Alex* Saab Nain Moran e seus co-conspiradores lavaram os proventos fraudulentos através de transferências electrónicas de contas bancárias localizadas na Venezuela, para contas, e através de contas, nos Estados Unidos, inclusive no Distrito Sul da Flórida, e seguindo para contas bancárias no estrangeiro por eles controladas.

**4.** Devido as acusações, foi emitido um mandado *de* prisão contra Alex Saab Moran, em 25 de julho de 2019 pelo Tribunal Distrital dos Estados Unidos para o Distrito Sul da Flórida.

**5.** *As* 8 acusações imputadas ao extraditando são:

**a)**     Primeira Acusação: Conspiração para cometer Lavagem de Dinheiro, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(h);

**b)**     Segunda Acusação: Lavagem de Instrumentos Monetários, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(a)(2)(A) and 2;

**c)**     Terceira Acusação: Lavagem de Instrumentos Monetários, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(a)(2)(A) e 2;

*d)* Quarta Acusação: Lavagem de Instrumentos Monetários, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(a)(2)(A) e *2;*

**e)** Quinta Acusação: Lavagem de Instrumentos Monetários, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(a)(2)(A) e 2;

**f)** Sexta Acusação: Lavagem de Instrumentos Monetários, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(a)(2)(A) e 2;

**g)** Sétima Acusação: Lavagem de Instrumentos Monetários, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(a)(2)(A) e 2;

**h)** Oitava Acusação: Lavagem de Instrumentos Monetários, em violação ao Título 18 do Código dos Estados Unidos, Seção 1956(a)(2)(A) e 2.

**6.** Todos os factos imputados ao extraditando ocorreram nos Estados Unidos da América, no Distrito Sul da Flórida.

**7.** A acusação decorreu na ausência do extraditando.

**8.** Os factos constitutivos dos crimes de Lavagem de Capitais e organização criminosa são igualmente previstos na lei cabo-verdiana como crimes e puníveis com penas de prisão, de 4 a 12 anos, ao abrigo do artigo 39° da Lei n° 38/VII/2009, de 27 de Abril, o primeiro crime, e, de 2 a 6 anos de prisão, nos termos do art.° 291° do Código Penal, os demais.

14



## SUPREMO TRIBUNAL DE JUSTIÇA

**9.** Não há conhecimento de que corra perante os tribunais cabo-verdianos qualquer outro processo criminal contra o extraditando pelos mesmos factos que fundamentam o pedido de extradição.

**10.** *A* acusação foi proferida pelo Tribunal Distrital dos Estados Unidos para o Distrito Sul da Flórida,

**11.** O Código dos Estados Unidos, Título 18, Seção 3282, exige que o processo penal seja iniciado, no máximo, cinco anos após a comissão do crime, tendo as acusações, sido proferidas em 25 de julho de 2019, sendo que a primeira imputa ao extraditando um crime que perdurou até setembro de 2015, e, a segunda acusação, imputa ao extraditando um crime que ocorreu em 29 de outubro de 2014, tendo as acusações sido proferidas dentro do período prescritivo (fls.81 dos autos).

**12.** *As* autoridades dos Estados Unidos da América pretendem que o Extraditando seja extraditado para ser julgado pelos crimes de que é acusado.

**13.** Sua *Excelência,* a Sra. Ministra da Justiça, por despacho datado de 02 de julho de 2020 considerou admissível e deferiu o pedido de extradição (f Is. 146 verso e 147 dos autos).

**14.** Com o pedido de extradição, as autoridades competentes dos Estados Unidos da América ofereceram garantias formais no que respeita ao princípio de especialidade, de que não deterá, processará, ou punirá o extraditando por quaisquer outros delitos para além dos que constam do pedido de extradição, e de que o extraditando não será reextraditado para terceiro Estado (f Is. 38 verso dos autos).

**15.** O governo dos Estados Unidos oferece outras garantias adequadas que o tribunal de Cabo Verde considere necessárias, relativamente a quaisquer aspectos deste pedido de extradição (f Is. 37 verso e 33 dos autos, princípio de especialidade, limitação de sentenças e reextradição), bem como a garantia de que, se for extraditado, o extraditando não será condenado a prisão perpétua, nem à pena capital. Que, nos termos da legislação de Cabo Verde, que prevê a pena máxima de prisão de 35 anos, oferecem garantias que a acusação do extraditando será reduzida de 8 crimes para 1, passando a ser acusado por um crime, o primeiro, o de conspiração para cometer lavagem de Dinheiro, em violação ao Título 18 do Código Penal dos Estados Unidos, Secção 1956 (h), ficando sujeito a uma pena máxima de 20 anos de prisão, fls. 540 a 555.

**16.** O extraditando é cidadão da Republica Bolivariana da Venezuela e natural da Colômbia, onde nasceu em 21 de dezembro de 1971, é filho de Luís Amir Saab Rada e de Rosa Moran Abuancha, portador dos passaportes ordinários números PE142610 e 146601956 (emitidos respetivamente na Colômbia e na Venezuela. Declarações do extraditando e fotocópias dos passaportes ordinários apresentados nos autos de detenção em anexo).

**17.** No dia 12 de Junho de 2020 o Extraditando foi detido na Ilha do Sal quando fez uma escala técnica num avião comercial, particular, vindo da Venezuela, onde residia, antes de detido.

**18.** Detido e apresentado às autoridades judiciais, tendo sido ouvido no Tribunal do Sal e posteriormente o TRB, durante a segunda audição, o Extraditando só disse que tinha em seu poder dois passaportes ordinários (da Venezuela e da Colômbia), como os exibiu e se encontram no processo.

**19.** No momento da sua audição e validação da detenção pelo TRB o Extraditando não apresentou nenhum passaporte diplomático ou qualquer documento

15



### SUPREMO TRIBUNAL DE JUSTIÇA

comprovativo do estatuto de enviado especial do governo venezuelano, a que se arroga;

**20.** Toda a documentação junta ao processo foi apresentada posteriormente;

**21.** Os crimes que lhe são imputados e pelos quais foi acusado ocorreram nos Estados Unidos da América;

**22.** O governo dos Estados Unidos apresentou a garantia formal prevista nos arts 17° e 44° n° 1 alínea c), de que o extraditando não será extraditado para um terceiro estado nem detido para cumprimento de pena ou para outro fim, por factos diversos dos que fundamentaram o pedido.

Fixada a matéria de facto, passemos a analisar as questões suscitadas pelo Recorrente e que ficaram vertidas na síntese conclusiva que ficou elaborada.

## II. 3. CONHECIMENTO DAS QUESTÕES SUSCITADAS

### II.3. 1. Da legalidade da detenção do Extraditando

Na sua impugnação o Extraditando invoca uma série de questões que, a seu ver, poderão afectar a legalidade da sua detenção, que são as seguintes:

 f) Não comunicação das razões da detenção e inexistência de mandado de detenção passado em triplicado (alínea *c*))

 g) Violação das regras do processo penal em matéria de aplicação das medidas de coacção (al. *d*)).

 h) Privação da liberdade apenas com base em pedido informal de policial estrangeiro (*al. e*)).

 i) Actos da INTERPOL nunca foram ratificados nem publicados (alíneas. *f*) *e cc*))

Sem prejuízo da análise particular que cada uma dessas questões possa vir a merecer, convém deixar claro que a ilegalidade da detenção do Extraditando foi suscitada perante a autoridade judiciária a quem o mesmo foi presente, no seguimento da sua detenção, com a invocação de argumentos que, na sua perspectiva, sustentavam a arguida ilegalidade.

Todos os fundamentos então expendidos pelo Extraditando atinentes à alegada ilegalidade da sua detenção foram objecto de apreciação e decisão pela primeira instância e por este Supremo Tribunal de Justiça quer em sede da providência

16





**SUPREMO TRIBUNAL DE JUSTIÇA**

de habeas corpus nº 36/2020 sobre a qual recaiu o acórdão nº 28/2020, de 1 de Julho de 2020, quer em sede de recurso ordinário em cujos autos se prolatou o acórdão nº 48/2020, de 31 de Agosto.

Cita-se, a título de exemplo, que a legalidade da medida de coacção que foi aplicada ao Extraditando, na altura a detenção provisória, foi exaustivamente apreciada e decidida, em sede de recurso ordinário, no acórdão nº 48/2020, peça que, em vez de se reproduzir no presente aresto, com custos para o princípio da economia processual, se junta ao processo para os devidos efeitos.

Acresce que o Extraditando se encontra presentemente sob uma diferente medida de coacção – obrigação de permanência em habitação -- cuja legalidade foi recentemente apreciada por este Supremo Tribunal de Justiça no acórdão nº 18/2021, de 20 de Fevereiro.

De igual modo, também a título meramente exemplificativo, a relevância jurídica da alegada não ratificação por Cabo Verde e da e não publicação na ordem interna dos actos jurídicos atinentes à INTERPOL foi ponderada quer no acórdão nº 28/2020, quer no acórdão nº 48/2020.

Nesses arestos foi sufragado o entendimento de que a detenção do Extraditando encontra respaldo no artigo 39º da LCJ e que a informação em que se pode basear a Autoridade de Polícia Criminal Nacional pode lhe advir por várias vias, nomeadamente directamente de um Estado estrangeiro ou via a INTERPOL. Ou seja, não é imperativo que as informações em que se baseia a Polícia Cabo-verdiana para efectuar determinada detenção, não directamente solicitada, nos termos do artigo 39º da LCJ, tenham de lhe chegar via INTERPOL

Acrescentamos agora que, havendo permissão da Lei Cabo-verdiana para se socorrer de informações disponibilizadas via o sistema de alerta da INTERPOL, para se proceder a detenção não directamente solicitada em Cabo Verde de cidadão encontrado no território nacional, a validade do uso que é feito desse sistema pela competente Autoridade Cabo-verdiana não pode estar na dependência do facto de Cabo Verde, no plano formal e jurídico, fazer parte desses instrumentos.

A República de Cabo Verde, enquanto Estado soberano, é que, no seu próprio interesse, pretende tirar benefício de um eficaz sistema existente no domínio da

17



**SUPREMO TRIBUNAL DE JUSTIÇA**

cooperação policial internacional, ainda que possa não estar juridicamente vinculado ao organismo internacional gestor desse sistema. E não está, por qualquer forma, impedida de o fazer.

E, sendo esse o caso, não assume qualquer utilidade para o presente caso proceder ao escrutínio sobre se o Estado de Cabo Verde está vinculado ao instrumento constitutivo da INTERPOL e a outros instrumentos dessa organização que lhe sejam complementares.

Isto é, para o caso em apreço é juridicamente irrelevante que os actos jurídicos referentes à INTERPOL não tenham, eventualmente, sido ratificados pela República de Cabo Verde, nem publicados na ordem interna cabo-verdiana, pois o título de validade do uso que é feito das informações recebidas via esse sistema é uma lei nacional, aprovada pelo Parlamento Cabo-verdiano.

Cabe acrescentar, ainda em sede do escrutínio da legalidade da detenção, que não se compreende bem o que pretende dizer o Recorrente quando afirma que não se pode privar alguém da liberdade "*apenas com base em pedido informal de policial estrangeiro*".

Se com isso se pretende que esse pedido só pode ser feito, como parece ser o entendimento do Recorrente, através de "*carta rogatórias enviadas de um Estado Estrangeiro ao Estado requerido*", a afirmação não se afigura rigorosa.

O que é seguro é que, como ficou demonstrado no acórdão nº 28/2020, com referência à jurisprudência constitucional e doutrina pertinentes, a detenção não directamente solicitada, como foi o caso, pode ter lugar, mesmo que a Autoridade da Polícia Judiciária Cabo-verdiana não esteja ainda munido de um mandado formal. Basta-lhe que esteja na posse de informações oficiais que legitimem a detenção.

Tais informações oficiais, que não se exige que assumam para as autoridades cabo-verdianas a forma de um "pedido", muito menos de um mandado, mas sim "informações", podem chegar ao seu conhecimento por qualquer meio admitido pela lei Cabo-verdiana, incluindo, "*caso haja urgência e perigo na demora*", "*qualquer meio de telecomunicação*", como decorre do artigo 269º, nº 3, do CPP, seguindo-se confirmação por mandado.

Ainda em sede da alegada ilegalidade da sua detenção, alega o Recorrente que o acórdão recorrido violou o artigo 30º, nº 4, da Constituição da República, na

18



## SUPREMO TRIBUNAL DE JUSTIÇA

parte em que esta impõe a comunicação imediata ao detido das razões da sua detenção.

Infere-se, assim que, para o Recorrente, a autoridade que procedeu à sua detenção não lhe comunicou de imediato as razões da sua detenção.

Não é, entretanto, esta a versão dessa Entidade, como se pode confirmar da declaração por ela assinada a fls.1431.

Este Tribunal não tem razões para pôr em causa a veracidade dessa informação, tanto mais que, tivesse ocorrido a omissão das razões da detenção do extraditando, o normal, à luz das regras da experiência comum, é que essa ilegalidade tivesse sido suscitada pelo interessado perante a autoridade judiciária a quem foi presente no seguimento da sua detenção que haveria de sobre isso proferir alguma decisão susceptível de recurso.

Muito pelo contrário, a corroborar a afirmação da Entidade que procedeu à detenção do Extraditando está o auto da validação dessa detenção perante o Tribunal da Relação de Barlavento donde consta expressamente do Extraditando de que: "*o informaram que havia um mandado da detenção da interpol contra ele, embora não lho tenham mostrado, e depois disseram-lhe o motivo da sua detenção*".

O despacho judicial que confirmou a legalidade da detenção invoca como seu fundamento várias disposições da legislação Cabo-verdiana.

Nos fundamentos em que foi impugnado, foi inteiramente confirmado pelo Supremo Tribunal de Justiça.

Assim sendo, e na ausência de novos elementos, não existe qualquer motivo para se censurar a detenção do Extraditando.

Alega finalmente o Extraditando que se violou o disposto no artigo 269º do CPP, nomeadamente porque o mandado de detenção não foi passado em triplicado, como manda o artigo 269º do CPP.

A nulidade prescrita no artigo 269º, por inobservância dos requisitos de forma estabelecidos em relação ao mandado de detenção é uma nulidade dependente de arguição, o que deve ter lugar dentro de certo prazo.

19



## SUPREMO TRIBUNAL DE JUSTIÇA

Não se consegue descortinar que essa alegada nulidade tenha sido arguida perante a autoridade judiciária a quem o Extraditando foi presente no seguimento da sua detenção.

Em todo o caso, não se tratando de uma nulidade insanável, arguível ou de conhecimento oficioso a todo o tempo, a mesma já não pode ser arguida nesta fase, até porque o título da detenção do Extraditando para efeitos de extradição passou a ser não o acto da Autoridade da Polícia Judiciária Nacional, mas sim uma decisão judicial que escrutinou a sua legalidade, e que foi confirmada, por via de recurso, por este Supremo Tribunal de Justiça.

Finalmente, diz o Recorrente que não existe mandado de captura contra a sua pessoa.

Mas, é o próprio que contraria tal afirmação ao reconhecer no parágrafo 32 da Parte V da sua OPOSIÇÃO que:

> "*Após os factos descritos acima, o Tribunal Distrital dos USA do Distrito Sul da Flórida, emitiu um mandado de prisão contra o Extraditando em 25 de Junho de 2019 por crimes de lavagem de dinheiro (…)*".

Esse reconhecimento é retomado no parágrafo 377 das alegações de recurso e é inteiramente corroborado pelo documento das fls. 65 v° e 122 v°, que instruíram o pedido de extradição.

Ora, atendendo à data a que o próprio extraditando atribui à emissão do mandado contra a sua pessoa, torna-se absolutamente incontroverso que no dia 12 de Junho de 2020, data em que o mesmo foi detido pela Polícia Criminal Cabo-verdiana, o mesmo já estava sendo procurado pelas autoridades judiciárias americanas, para ser sujeito a procedimento criminal nos Estados Unidos, confirmando-se assim a legalidade da sua detenção.

Assim sendo, e concluindo, a legalidade da detenção do Extraditando, para efeitos de extradição, é, para os Tribunais Judiciais, questão resolvida.

**II. 3. 2. Acto da Ministra da Justiça que autorizou o prosseguimento do processo.**



## SUPREMO TRIBUNAL DE JUSTIÇA

Na alínea g) das conclusões do recurso diz o Recorrente que "*o acto do Ministro da Justiça que autoriza a extradição é para todos os efeitos um acto administrativo, sendo sujeito a todas as vias de recurso contencioso de anulação, por força do princípio da tutela jurisdicional efectiva previsto no artigo 243º, alínea e), da Constituição*".

Por certo que com essa conclusão pretende-se insurgir contra a afirmação feita no acórdão recorrido de que a decisão em referência é "*um acto político, não passível de apreciação judicial*" (fls. 1013 vº).

Sobre isto, tem este Supremo Tribunal a ponderar e a decidir o que se segue.

Apesar da crescente reflexão que tem vindo a suscitar a natureza do acto do Ministro da Justiça, para efeitos de se saber se o mesmo é ou não passível de impugnação contenciosa, não se verifica ainda um consenso na doutrina e na jurisprudência a esse respeito.

À primeira vista, a decisão do Governo, entendida como o culminar de uma fase administrativa, como tal designada pela própria Lei da Cooperação Judiciária Internacional no seu artigo 46º, nº 1, o que é confirmado pelo artigo 48º, não pode deixar de ser vista como um acto administrativo.

Na verdade, sustenta certa doutrina, não fosse uma acto administrativo, não haveria necessidade de o legislador dispor que o mesmo não é contenciosamente impugnável quando assuma o sentido de indeferimento do pedido de extradição (artigo 24º, nº 2, da LCJ).

Mas, sendo um acto administrativo, e não estritamente político, o mesmo pode não reunir todos os requisitos que permitem a sua impugnabilidade contenciosa. Pelo menos é o entendimento que já chegou de ter acolhimento expresso pela Jurisprudência administrativa portuguesa, num sumário condensado nos seguintes termos:

> "*A Resolução do Conselho de Ministros que autoriza o seguimento do processo de extradição passiva não é acto administrativo definitivo e executório susceptível de impugnação contenciosa, pelo que deve ser rejeitado o recurso dela interposto dada a sua manifesta ilegalidade.*"[2]

Não se afigurando indispensável a este Tribunal que se pronuncie neste preciso momento sobre a controvérsia em apreço, apenas cumpre registar que, a se

---

[2] Acórdão do Supremo Tribunal Administrativo de Portugal, de 04-12-1986, Lopes Rocha, dgsi.pt

21



**SUPREMO TRIBUNAL DE JUSTIÇA**

tratar de um acto administrativo, o escrutínio da sua legalidade deverá competir em primeira linha à jurisdição competente para o efeito, sendo certo que até lá o mesmo não deixará de beneficiar da presunção da sua legalidade.

Não se tem, porém, conhecimento, até este momento, de qualquer decisão da jurisdição competente a declarar a invalidade do acto da Ministra da Justiça que autorizou o prosseguimento do presente pedido de extradição judicial passiva.

Entretanto, independentemente da decisão que se vier a recair sobre a eventual impugnação desse acto, não se deixa de reconhecer desde já, e como será melhor demonstrado mais adiante, que há aspectos ou fundamentos que presidem ao sentido da decisão da Ministro da Justiça que estarão subtraídos ao escrutínio judicial.

## II. 3. 3. Omissão de diligências de prova

Nas conclusões do recurso, mais precisamente nas alíneas *b), ll, mm), oo) e pp),* o Recorrente suscita a questão da omissão de diligências prova.

Fundamenta o Recorrente dizendo na essência que *"deduziu, em tempo, a sua oposição, requereu diligências de prova, para o efeito, juntando documentos, arrolando testemunhas e ainda protestando juntar mais"*, mas o Tribunal recorrido decidiu, em absoluto, não realizar as diligências de prova requeridas.

As diligências de prova a que se refere o Recorrente, que consistem na inquirição de testemunhas, constituem matéria que foi já objecto de apreciação e exaustiva pronúncia por parte deste Supremo Tribunal no seu acórdão nº 57/2020, de 16 de Outubro de 2020 (fls. 689 a 719), cuja fundamentação e decisão são inequívocos no sentido de que se deixou precludir o direito de se suscitar tempestivamente essa questão, razão pela qual o processado só foi objecto de anulação para que se proporcionasse ao Extraditando a oportunidade de apresentar em último lugar as suas alegações.

E não será qualquer consideração feita pelo Tribunal recorrido que terá aptidão de fazer ressuscitar a tempestividade dessa arguição.

Na parte relativa à prova documental há de se convir que não se estará propriamente perante uma omissão de diligências, mas, eventualmente, perante

22



## SUPREMO TRIBUNAL DE JUSTIÇA

não valoração ou deficiente valoração na sentença, mais precisamente no julgamento da matéria de facto, da prova que já constava dos autos.

Ora, tendo sido proporcionado ao Extraditando apresentar juntamente com a sua oposição e ao longo do processo a prova documental que considera relevante, não se vê em quê que se poderá basear a alegação de violação do princípio do contraditório, feita na alínea *oo)* das conclusões do Recorrente.

O mesmo se diga em relação à alegada ocorrência da nulidade insanável prevista no artigo 151º, alínea g), do CPP, referente à omissão de fase processual.

Só se poderá compreender uma e outra alegação no entendimento do Extraditando, mas já rejeitado por este Supremo Tribunal de Justiça, de que o Tribunal da Relação deveria realizar o julgamento em audiência, na qual, com observância do contraditório, se procederia à produção da prova.

Efectivamente já foi demonstrado que essa audiência perante o colectivo do Tribunal da Relação não tem lugar no processo de extradição, pois o julgamento é feito em conferência.

Improcede, assim, a alegada omissão de diligências de prova, naquilo em que se pretendia obter a inquirição das 10 testemunhas que constam da lista elaborada na parte final do articulado da OPOSIÇÃO ao pedido de extradição, a fls. 197 dos autos.

Passa-se, assim, a cuidar de um outro aspecto referido como omissão de diligência de provas, mas que no fundo, e como já se disse, tem a ver com o *thema probando* e com a relevância da prova, no caso da prova documental, uma vez que se excluiu pelas razões expostas a prova por inquirição de testemunha.

Nesta sede, a questão suscitada pelo Recorrente implica uma compreensão dos artigos 55º, nº 2, e 46º, nº 3, da LCJ.

Reza o artigo 55º, nº 2, que *"a oposição (à extradição) só pode fundamentar-se em não ser o detido a pessoa reclamada ou em não se verificarem os pressupostos da extradição"*.

O sentido dessa disposição, como resulta com suficiência do seu texto, sem necessidade de recurso a outros elementos, é de que ao Extraditando assiste o direito de deduzir oposição, mas ela só pode ser centrada em dois conjuntos de argumentos tendentes a demonstrar o seguinte: (i) ou não é a pessoa reclamada, ou (ii) não se verificam os pressupostos para a extradição.

23



## SUPREMO TRIBUNAL DE JUSTIÇA

É, por conseguinte, uma norma não destinada propriamente à matéria da prova, mas sim à impugnação que deve constar da OPOSIÇAO.

Isso para dizer que uma vez alegados factos, tendentes a substanciar qualquer um desses fundamentos, quer referentes à identidade da pessoa reclamada, quer alusivos à não verificação dos pressupostos para a extradição, tem de se lhe admitir produzir a prova.

Coisa diferente é o que dispõe o artigo 46°, n° 3, na parte em que dispõe *"não sendo admitida prova alguma sobre os factos imputados ao extraditando"*.

A tal disposição só pode ser atribuída o sentido de que apenas em relação aos factos imputados pelo Estado Requerente ao Extraditando é que não se admite prova alguma.

Embora possa ser ténue ou fluída a fronteira entre *"factos imputados"* ao Extraditando e os *"pressupostos da extradição"*, podendo até admitir-se uma certa sobreposição das suas zonas contíguas, tem sido sólido o consenso no Direito Comparado da Extradição no sentido de que aos Tribunais do Estado requerido, nos caso os Tribunais Cabo-verdianos, não é dado produzir a prova sobre os factos que o Estado Requerente imputa ao Extraditando.

É aquilo a que na Doutrina e Jurisprudência Brasileira se chama de *contenciosidade limitada*, seguindo aquilo a que no Direito Comparado se chama o *modelo belga*.

E daí não ocorre nenhuma inconstitucionalidade, na exacta medida em que não se está em sede de um processo criminal puro. O Estado requerido não está a fazer qualquer imputação de crime ao Extraditando, nem está a fazer um juízo de culpa, muito menos a formular um juízo de suspeição, jurídico-penalmente relevante, em relação à sua pessoa.

Por conseguinte, decidiu bem o Tribunal recorrido ao não considerar a prova documental tendente a provar qualquer facto que se prende com as imputações feitas ao Extraditando nos Estados Unidos, na essência os factos referidos nos artigos 1 a 72 do Título "DAS QUESTÕES PRÉVIAS" da Oposição.

Quanto à valoração da prova documental junta aos autos será oportunamente feita a pronúncia que se justificar na apreciação das questões em que isso se mostrar relevante, sem que fique prejudicada a conclusão anterior no sentido

24



## SUPREMO TRIBUNAL DE JUSTIÇA

da improcedência da alegada omissão de provas, no que toca às testemunhas cuja inquirição foi requerida.

## II. 3. 4. Omissão de notificação pessoal

Nesta sede e consoante a matéria de facto que resultou provada, uma vez admitido o pedido de extradição pelo Tribunal Recorrido, ordenou-se a notificação do Extraditando, na pessoa do seu mandatário, para deduzir oposição a esse pedido.

Argumenta, entretanto, o Recorrente que, contrariamente ao procedimento adoptado pelo Tribunal Recorrido, assiste-lhe direito a ser notificado pessoalmente do pedido de extradição e da decisão que o admite.

A questão foi obecto de apreciação e decisão no acórdão nº 48/2020, em termos que se passa a transcrever:

"Vejamos, mais em detalhe as razões expostas pelo Recorrente sobre esse tópico, inicialmente vertidas num requerimento arguindo nulidades e retomadas no presente recurso:

1. *A fase judicial do processo de extradição "destina-se a decidir, com audiência do interessado, sobre a concessão da extradição, por procedência das condições de forma e de fundo, não sendo admitida prova alguma sobre os factos imputados ao extraditando" (artigo 46.3 da LCJIMP).*

2. *O Requerente foi ouvido no processo judicial de detenção provisória e confrontado com o Requerimento ora formulado pela Procuradoria da República de Círculo, a pedido dos Estados Unidos da América,*

3. *pelo que terminada a fase administrativa e iniciada a fase judicial do processo de extradição,*

4. *o Extraditando tem de ser notificado pessoalmente e ouvido em processo de judicial de extradição.*

5. *A notificação do pedido formal de extradição e a notificação do despacho judicial que admite esse pedido são pessoais,*

6. *conforme decorre sempre que se trata da notificação da acusação, do despacho de pronúncia ou não pronúncia ou despachos materialmente equivalentes e notificação igualmente ao mandatário (artigo 142. ° do CPP, aplicável pelo artigo 4.2 da LCJIMP).*

7. *O pedido formal de extradição e o despacho que dá início ao processo de extradição, por serem um despacho equivalente ao despacho de acusação ou pronúncia no processo crime ordinário comum, tem de ser objecto de notificação pessoal ao Requerente, nos termos da norma referida, sob pena de nulidade (artigo 142.2 do CPP e, por isso, insanável do artigo 151.b) do CPP, assim como em violação da obrigatoriedade da intervenção do Requerente nesta fase inicial do processo judicial de extradição (artigo 151.d) do CPP),*

8. *e a interpretação dessa norma como bastando a notificação do mandatário para os fins do artigo 55.1 da LCJIMP viola os artigos 1°, 3.2.3, 35.6,15. °, 17.4.5. e 18. ° da Constituição, sendo por isso inconstitucional, e, por isso, inaplicáveis pelos tribunais (artigos 277.1 e 211.3 da Constituição).*

25



## SUPREMO TRIBUNAL DE JUSTIÇA

9. *O processo judicial de extradição inicia-se pelo requerimento do Ministério Público, conforme a lei, dando conta do despacho de viabilidade da Ministra da Justiça e do Trabalho e articulando o pedido nos termos dos artigos 23. ° e 44. ° da LCJIMP.*

10. *Repare-se que, na detenção provisória, ainda não há um pronunciamento administrativo favorável ao processo judicial de extradição e poucos elementos se conhecem do processo para o Requerente se pronunciar sobre eles.*

11. *Com a apresentação formal do pedido de extradição e sua admissão pelo Tribunal, deveria ser marcada a imediata audição do Requerente para se pronunciar sobre as condições formais e de fundo do processo penal de extradição e manifestar,*

12. *se for o caso, novamente a sua opinião sobre a aceitação ou não da extradição para os Estados*

13. *Essa audição no processo judicial de extradição não foi marcada pelo Tribunal da 2.a Instância e, muito menos realizada,*

14. *pelo que constitui a omissão de uma fase processual e de intervenção do Requerente e constitui nulidade insanável do artigo 151.d) e g) do CPP, aplicável pelo artigo 4.2 da LCJIMP e interpretação e aplicação da lei desconforme com a Constituição em violação da dignidade pessoal, do processo equitativo e da tutela jurisdicional efectiva, conforme as normas dos artigos 1.', 3.2.3., 22.1.6 da Constituição e artigos 277.1., 211.3, 211.4 da Constituição.*

Às razões do Recorrente contrapõe o MP o seguinte:

*A única audição presencial do extraditando legalmente exigida, por isso obrigatória, é a que ocorre no ato seguido à detenção, quer a mesma tenha ocorrido antecipadamente, antes da formulação do pedido de extradição, quer ocorra após a decisão positiva da fase administrativa.*

*Efetivamente, os termos em que a audição do extraditando deva observar encontram-se legalmente definidos no artigo 54. ° da LCJ, altura em que o mesmo é informado, designadamente, do seu direito de se opor à extradição ou de a consentir, bem como os concretos termos em que o poderá fazer.*

*Não é, pois, exigível que se volte a auscultar presencialmente o extraditando, o que na verdade, por se revelar numa completa repetição da audição anterior, torna-se um ato completamente inútil e incompatível com a celeridade processual do processo de extradição, por isso, dispensado por ser ilícito (artigo 130. ° do Código de Processo Civil -CPC).*

Ponderados os argumentos expendidos pelo Recorrente e pelo Ministério Público, e tendo ainda em devida conta aquilo que diz a lei, é entendimento deste Supremo Tribunal de que não assiste razão ao Recorrente.

Efectivamente, não existe disposição da LCJ a impor que o pedido de extradição seja formalmente notificado ao Extraditando, muito menos que lhe seja notificado pessoalmente.

26

**SUPREMO TRIBUNAL DE JUSTIÇA**

A notificação pessoal ao Extraditando que é expressamente imposta por lei[3] é para a sua audição presencial pelo Juiz (que em rigor não é a notificação do pedido de extradição), acto que se segue à sua detenção para extradição, nos termos do artigo 53º da LCJ.

Não impõe também o mesmo diploma que, tendo sido ouvido nesse momento, ainda que em virtude da detenção provisória não directamente solicitada, como foi o caso, o Extraditando volte a ser ouvido presencialmente pelo Tribunal após a recepção e a admissão do pedido de extradição.

Sobre o que fica exposto pode-se ver do acórdão nº 58/2017, de 01 de Agosto, deste Tribunal, cujo extrato se passa a reproduzir:

> *"Ora, com a audição no processo de detenção provisória, no decurso da qual os recorrentes declararam que não aceitavam a extradição e que não renunciavam à regra da especialidade, mostra-se observada a imposição legal da sua audição, sendo certo que, tendo sido já ouvidos por ocasião da detenção provisória e manifestado a sua oposição ao pedido, uma subsequente audição, já será aquela que se destina a facultar-lhes deduzir oposição escrita ao pedido, em observância do princípio do contraditório, que terá lugar nos termos do art.° 55° da Lei da Cooperação Judiciária Internacional.*
> *Alegam ainda que não foram ouvidos no processo judicial de extradição, porque não foram notificados pessoalmente para deduzirem oposição ao pedido, já que do mandado constava a notificação dos extraditandos na pessoa do seu domicílio escolhido.*
> *Porém, o artigo 55.° não manda ouvir pessoalmente o extraditando, mas sim facultar o processo ao seu advogado ou defensor para deduzir oposição escrita e indicar meios de prova."*

O entendimento exposto, que não se justifica ser alterado, tem suficiente respaldo na Doutrina e na praxis judiciária desenvolvidas num quadro normativo muito semelhante ao Cabo-verdiano, no qual seguramente se terá inspirado o legislador nacional, especialmente no que diz respeito à tramitação processual, como dá conta António Bernardo Colaço, então Procurador Geral Adjunto junto do Tribunal da Relação de Lisboa:

> *"No que tange à extradição passiva, as "démarches" processam-se sinteticamente da seguinte maneira: quando o reclamado é detido pelo GNI, segue-se geralmente a tramitação dos artigos 45° e seguintes do Dec.-Lei nº 43/91. O extraditando é apresentado no prazo de 24 horas ao PGA (M)) no Tribunal de Relação (TR) competente para este promover imediatamente a sua audição pelo Juiz-*

---

[3] Para além, é claro, da notificação pessoal da decisão que ordena a extradição, mas que não está em causa no presente recurso.



## SUPREMO TRIBUNAL DE JUSTIÇA

*Desembargador Relator. Da decisão proferida pelo Juiz é dado imediato conhecimento ao PGR, ao MJ ao MNE ao Embaixador do país do extraditando e ao GNI (…)*

*(…) A tramitação torna-se, todavia, mais densa no caso de o detido se opor à extradição. Há que aguardar pela posição do Governo Português face ao pedido formulado pelo Estado requerente. As coisas passam-se do seguinte modo: recebido o expediente através do MNE, o MJ submete o pedido diplomático à apreciação sobre a legalidade ao PGR. Quando o pedido é considerado regular, ou regularizado o mesmo, este é submetido à apreciação do Governo. Caso o processo deva prosseguir, este é enviado pela via hierárquica ao PGA junto do TR para que aqui seja formalizado o cumprimento do pedido de extradição:*

*Segue-se a tramitação adjectiva com a apreciação liminar do pedido, a fase do contraditório, envolvendo esta a oposição do extraditando, a produção da prova e a decisão final, esta passível de recurso".*

Como se pode ver, não se prevê nem a notificação pessoal ao Extraditando do pedido de extradição, nem da sua admissão, e nem há lugar a uma segunda audição presencial dele perante o Tribunal.

É certo que que a Doutrina que ficou exposta foi elaborada no quadro do Decreto-Lei nº 43/91, de 22 de Janeiro, o qual viria a ser substituída pela Lei nº 144/99, de 31 de Agosto. Mas a tramitação do processo judicial de extradição passiva, na parte que ora interessa, não sofreu qualquer alteração, pelo que a transcrição feita conserva plena actualidade.

Assim sendo, reafirma-se que, tomando como quadro normativo directamente aplicável apenas as disposições da LCJ, delas não resulta o direito a que se arvora o Recorrente à pretendida notificação pessoal e a uma segunda audição presencial perante o Tribunal.

Entretanto, em abono do entendimento que pretende ver acolhido, diz o Recorrente que tal direito a ser notificado pessoalmente resultaria da similitude com certas situações previstas no Código de Processo Penal, diploma de aplicação subsidiária, como a obrigatoriedade da notificação pessoal da acusação ao arguido.

Mas, não lhe assiste razão na medida em que a tramitação do processo de extradição, está especialmente regulada pela LCJ, que não prevê a

28



**SUPREMO TRIBUNAL DE JUSTIÇA**

pretendida notificação pessoal do pedido de extradição ou uma segunda audição presencial perante o Tribunal, não havendo lugar neste caso à aplicação subsidiária do CPP, pois não se está nem perante caso omisso nem situação que justifica recurso à analogia com as situações descritas pelo Extraditando.

Quanto à possível inconstitucionalidade dessa interpretação, ela não se mostra procedente precisamente porque, apesar das afinidades entre os dois processos, justificando a aplicação subsidiária do processo penal ao processo judicial de extradição passiva, ainda assim não se afigura fundada a pretensão de se transpor de forma automática para este último todas as garantias de defesa que a Constituição e os Instrumentos Internacionais dos direitos do homem, reservam para o primeiro, desde logo porque na extradição passiva o Estado requerido, no caso o Estado de Cabo Verde, não está a imputar qualquer responsabilidade criminal ou a formular qualquer juízo de culpa, com risco de subsequente imposição de uma sanção penal ao extraditando.

Com os fundamentos que ficam expostos julga-se improcedente a invocada nulidade, por alegada omissão de notificação pessoal do pedido de extradição e da audição presencial do Extraditando perante o Tribunal em momento subsequente à admissão do pedido de extradição."

Não se vê razões para se alterar tal entendimento.

### II. 3. 5. Omissão da audiência

Por se tratar da mesma questão que foi já objecto de apreciação e decisão por este Supremo Tribunal, e por uma questão de economia processual limitámo-nos a reproduzir o que sobre essa alegada omissão foi dito no acórdão nº 57/2020:

> "Pelo que já ficou dito, a primeira razão invocada para sustentar a violação do princípio do contraditório – a tomada de decisão sem audição do Recorrente – não se afigura procedente. Efectivamente constitui facto incontroverso que o Recorrente foi ouvido, nos termos estabelecidos por lei, e teve oportunidade de apresentar por escrito a sua oposição ao pedido de extradição".

**SUPREMO TRIBUNAL DE JUSTIÇA**

Reiteramos o entendimento baseado na linha argumentativa similar à expendida para considerar improcedente a omissão da notificação pessoal do Extraditando do pedido de extradição e da sua admissão, aqui tida por reproduzida para todos os efeitos, que a lei não impõe, nem directa nem indirectamente, que o Extraditando seja ouvido presencialmente numa segunda audiência perante o Juiz.

Em nosso entender, tal solução não viola qualquer norma da Constituição ou princípio nela consignado.

### II.3.6. Violação do princípio do contraditório

O Recorrente suscita a questão da violação do princípio do contraditório numa série de alíneas das suas conclusões, a saber: *dd), ee), ff) gg) hh), ii), jj), mm), nn) e pp)*.

Nas alíneas *dd)* a *gg)* o Recorrente limita-se a afirmar opiniões anódinas, que não se prestam naturalmente à contestação, mas cuja pertinência só seria evidente se se estivesse perante uma situação em que o Código de Processo Penal fosse o primeiro corpo normativo a ser aplicado. Mas, não é. A sua aplicação é subsidiária, no sentido de só poder ter lugar nos casos não expressamente previstos na LCJ, como decorre do artigo 4º, nº 2, deste último diploma.

Na alínea *hh)* a arguição da violação do princípio do contraditório, vertido nos artigos 35º, nº 6, da Constituição, e 5º do Código de Processo Penal, baseia-se na alegação de que o Tribunal teria concedido ao Ministério Público a possibilidade de duas intervenções no processo e ao Recorrente apenas uma, pelo que "*deve ser considerado o acórdão recorrido nulo e de nenhum efeito, nos termos dos artigos 150º, 151º, e 152º do CPP*".

O Recorrente não especifica as intervenções que foram concedidas a um e a outro dos intervenientes processuais, para que se possa, num certo confronto, aferir do acerto da alegação de que a um foi consentido intervir duas vezes e a outro apenas uma vez.

O que se pode afirmar com segurança é que, sempre que o Ministério Público teve intervenção no processo, se proporcionou ao Extraditado deduzir

30



**SUPREMO TRIBUNAL DE JUSTIÇA**

oposição ou, ao menos fazer as suas observações, sendo certo que se lhe assegurou sempre se posicionar em último lugar, aspecto que aliás integrou a *ratio decidendi* do acórdão n° 57/2020, que mandou anular parcialmente o processado e na sequência do qual se passou a observar com todo o rigor o princípio do contraditório no que diz respeito à sucessão das intervenções do MP e do Extraditando.

Assim sendo, a se considerar relevante a questão suscitada na alínea *hh)* a mesma tem de ser julgada improcedente.

Na alíneas *ii), jj) e kk)* o Recorrente retoma questões já analisadas e decididas a propósito de outras matérias, nomeadamente da omissão da notificação pessoal do pedido de extradição e da sua admissão, da omissão de uma segunda audição presencial perante o Juiz, após o recebimento do pedido de extradição e de não realização da audiência, no sentido de que a omissão de tais actos, como se deixou enfaticamente sublinhado, não constitui nulidades insanáveis, nomeadamente as referidas nas alíneas d) e g) do artigo 151 do CPP.

As alíneas *mm) a pp)* integram também questões já apreciadas e decididas, sendo certo que não se está perante nulidade insanável.


## II.3.7. Risco de condenação em prisão perpétua

Nas alíneas *h)* e *i)* o Recorrente afirma que, referindo-se a nota diplomática que a pena indicada para cada dos oito "*counts*" constantes do "*indictment*" é de 20 anos, a extradição do Recorrente não pode ser aceite em razão de se arriscar a uma pena de 160 anos de prisão, a qual, considerada a expectativa de vida global, constitui uma prisão perpétua de facto ou de caráter perpétuo.

Sobre esse aspecto há a dizer que tendo tido conhecimento desse meio de defesa o Estado requerente fez chegar ao processo, por intermédio do Ministério Público um documento em que se compromete a, caso seja autorizada a extradição, proceder criminalmente contra o Extraditando por apenas um único "*count*", pelo que, a ser condenado, ao mesmo não será imposta pena superior a 20 anos.

Essa garantia não pode deixar de ser considera válida e suficiente.



## SUPREMO TRIBUNAL DE JUSTIÇA

Na verdade, nos termos do artigo 6º, nº 1, alínea f), da LCJ, o pedido de cooperação é recusado quando respeitar a infracção a que corresponda pena de prisão ou medida de segurança com carácter perpétuo ou de duração ilimitada.

Entretanto, em conformidade com o disposto no nº 2, do mesmo artigo 6º, o disposto na alínea f) não obsta à cooperação:

> "*se com respeito a extradição por crimes a que corresponda, segundo o direito do Estado requerente, pena ou medida de segurança privativa ou restritiva da liberdade com carácter perpétuo ou de duração indefinida, o Estado requerente oferecer garantias de que tal pena ou medida de segurança não será aplicada ou executada*".

É do conhecimento geral que nos Estados Unidos o Ministério Público integra o Departamento de Justiça do Executivo, de que é hierarquicamente dependente, e, nessa qualidade, obedece a ordens que superiormente lhe são transmitidas nomeadamente para renunciar à prossecução penal por certas infracções.

Por outro lado, partilhamos do entendimento do Ministro Conselheiro Celso de Mello, do Supremo Tribunal Federal do Brasil, expresso no processo de Extradição 633, julgado em 28-08-1996, por essa alta instância, segundo o qual:

> "A *nota diplomática, que vale pelo que nela se contem, goza de presunção de autenticidade e de veracidade. Trata-se de documento formal cuja eficácia jurídica deriva das condições e peculiaridades de seu trânsito por via diplomática. Presume-se a sinceridade do compromisso diplomático. Essa presunção de veracidade — sempre ressalvada a possibilidade de demonstração em contrário — decorre do princípio da boa fé, que rege, no plano internacional, as relações político-jurídicas entre Estados Soberanos*".

Assim sendo julga-se improcedente a questão suscitada no sentido de que o Extraditando arrisca-se, em caso de condenação, à pena de prisão perpétua de facto ou a uma pena de duração indefinida.

E pelas mesmas razões têm os Tribunais de presumir, até prova em contrário, presunção de que por certo o Estado de Cabo Verde também esperaria beneficiar, em situação inversa, de que, caso seja autorizada a extradição o Estado requerente não submeterá o Extraditando a tratamento cruel ou desumano.





## SUPREMO TRIBUNAL DE JUSTIÇA

### II.3.8. Prescrição de crimes

Nas alíneas k), l) e m) o Recorrente alega a prescrição dos crimes que lhe são imputados. Afirma que tendo os factos constantes da acusação ocorrido nos anos 2011 ou 2012 a 2014, e sendo prazo de prescrição de cinco anos, a conclusão a se extrair é que a prescrição do procedimento criminal teve lugar no final de 2019, não podendo ser interrompida, ainda que por notificação pessoal do Recorrente, que não aconteceu.

Sobre essa pretensão o Tribunal Recorrido ponderou e decidiu o seguinte:

Na parte intitulada "OPOSIÇÃO", a defesa do Extraditando, refere que o procedimento criminal contra o extraditando se encontra extinto pelos mesmos factos, nos termos do art.º 9º. Alega a defesa do extraditando que o PRC indica como o período de cometimento dos actos do extraditando aos anos de 2011 ou 2012 a 2014, e indica o prazo de prescrição 5 anos, que ocorreu no final de 2019 (…). Que de acordo com o previsto na lei dos USA, já decorreu o prazo de prescrição de 5 anos, contado da data do cometimento dos factos (dezembro de 2014) e até à data da notificação ao Extraditando do pedido de extradição dos USA e do despacho de admissibilidade do pedido pelo Tribunal da Relação de Barlavento.

Na verdade, a extradição será recusada se o procedimento criminal estiver extinto ou a pena prescrita, quer segundo o direito do Estado requerente quer segundo o direito do Estado requerido, o que não se verifica no processo pois que o procedimento criminal contra o extraditando não se encontra extinto, tendo sido a acusação proferida dentro do prazo dos 5 anos estipulados no Código dos Estados Unidos.

O Código dos Estados Unidos, relativamente à matéria da prescrição, no Título 18, Seção 3282, ordena que o processo penal seja iniciado, no máximo, cinco anos após a comissão do crime. As acusações contra o extraditando foram proferidas em 25 de julho de 2019, sendo que a primeira imputa ao extraditando

33



**SUPREMO TRIBUNAL DE JUSTIÇA**

um crime que perdurou até setembro de 2015, e, a segunda acusação, imputa ao extraditando um crime que ocorreu em 29 de outubro de 2014, pelo que as acusações foram proferidas dentro do período prescritivo, ou seja, os factos ocorreram até Setembro de 2015 e as acusações contra o extraditando tiveram lugar em julho de 2019, isto é, antes de ocorrer o período de prescrição (cfr. fls. 81 dos autos). Por outro lado, o extraditando foi notificado da admissão do pedido de extradição, pelo TRB, em 08 de julho de 2020, cfr. fls. 163 dos autos.

Razão pela qual não se encontra extinto o procedimento criminal contra o extraditando, tendo sido a acusação proferida dentro do prazo dos 5 anos estipulados no Código dos Estados Unidos.

Como demonstrado pela sentença, o pressuposto de facto de que parte o Recorrente é errado, pois consta da acusação que.

Não suscita reparos a decisão em apreço, cujo sentido sai reforça se se tiver em conta o disposto no artigo 13º, nº 1, alínea a), da LCJ segundo qual produzem efeitos em Cabo Verde os motivos de interrupção ou de suspensão da prescrição segundo o direito do Estado que formula o pedido.

Efectivamente, considerando as datas da comissão das infrações estabelecidas, sem impugnação nessa parte, na sentença, o facto interruptivo ou suspensivo da prescrição do procedimento criminal que ocorreu em 25 de Julho de 2019, e ainda à circunstância de que, de acordo com a lei Cabo-verdiana, o que prevalece é o que está estabelecido no Direito do Estado requerente, não ocorreu prescrição do procedimento criminal, sendo para isso irrelevante a questão da eventual falta de notificação ao Extraditando.

### II.3.9. Extradição por motivos políticos

Alega o Requerente na alínea q) das suas conclusões que a sua extradição requerida pelos Estados Unidos é baseada em motivos políticos, pelo que deve ser recusada nos termos da lei e da Convenção UNTOC, caso a mesma fosse de aplicar ao presente caso.

34



## SUPREMO TRIBUNAL DE JUSTIÇA

Sobre essa pretensão ponderou e decidiu o Tribunal Recorrido nos seguintes termos:

Invoca requisitos negativos de cooperação, nomeadamente convicções políticas e ideológicas.

Conforme a defesa, "*o extraditando é apoiante do Governo da Venezuela, e realiza missões em nome e por conta da Venezuela; o processo de extradição faz parte dos esforços dos USA para enfraquecer o regime do Presidente da RBV; o processo penal iniciado contra o Extraditando e o pedido de extradição conexo são o mais recente esforço por parte dos USA em interferir nos assuntos internos da Venezuela, (…); que existe, por isso um fundamento para crer que o motivo de requerer a extradição embasa-se em razões de natureza política ou ideológica, que propriamente por razões de punição criminal, pelo que o pedido de extradição deve ser recusado*".

Ora, a defesa pretende passar a ideia de que na prática mesmo que tenha cometido os crimes pelos quais foram pedidos a sua extradição, não pode ser extraditado porque se trata de perseguição ao regime venezuelano. As divergências politicas entre os EUA e a RBV, são públicas, são conhecidas, dada a larga cobertura pelos órgãos de comunicação social. De há algum tempo para cá tem vindo a ter grande repercussão quer a nível da comunicação social estrangeira quer a nível nacional.

Porém, o fundamento do pedido de extradição não trata de factos ligados à perseguição política do Governo da Venezuela, nem contra o regime do Presidente da RBV. Os factos constantes no pedido, referem-se ao extraditando, Alex Nain Saab Moran, cidadão da Venezuela e natural da Colômbia, acusado por factos ligados à prática de crimes de lavagem de dinheiro, segundo a lei dos Estados Unidos, donde se pode concluir que, os crimes por que é perseguido o extraditando não são de natureza política e nem nos parece que sejam por razões políticas e ideológicas, pelo que não procede a questão alegada.

35



## SUPREMO TRIBUNAL DE JUSTIÇA

Cumpre agora a este Tribunal de Recurso apreciar e decidir se assiste razão ao Recorrente.

As razões em que se estribam essa conclusão estão detalhadas no capítulo V da OPOSIÇÃO À EXTRADIÇÃO e mostram-se retomadas nos artigos 340 a 404 das alegações do Recurso.

Na essência com elas pretende-se pôr em evidência a evolução das relações entre os Estados Unidos e a República Bolivariana da Venezuela (RBV) num contexto pautado por sucessivas sanções impostas por queles a esta última, visando em particular figuras do Governo ou a elas tidas como próximas.

Nesse contexto pretende-se que o pedido de extradição do Recorrente seria motivado por razões políticas, mais precisamente pelo facto das suas convicções políticas e ideológicas como apoiante do Governo da RBV, tido como homem de confiança do respectivo Presidente que lhe têm incumbido de missões para ajudar a contornar o bloqueio a esse País, nomeadamente a em que se encontrava quando o avião em que viajava fez uma escala em Cabo Verde e acabou por ser detido.

Contrariamente ao que sustenta o Recorrente, embora o Tribunal Recorrido tenha feito menção expressa ao facto de que o crime imputado ao mesmo não ser um crime político, não deixou de escrutinar também as alegadas e eventuais motivações que no seu entender poderão estar por detrás do pedido de extradição, para finalmente refutar essa asserção.

Sufragando inteiramente a análise e a decisão do Tribunal Recorrido, entende este Tribunal que não se pode efectivamente ignorar a proibição constitucional de extradição por motivos políticos. Muito pelo contrário, ela deve ser tida permanentemente em conta.

Por outro lado, há que levar em consideração os termos em que esse requisito, a que faz alusão o Recorrente, se encontra caracterizado na lei, com o sentido de que o pedido de extradição é recusado quando:

> "*Houver fundadas razões para presumir que a cooperação é solicitada com o fim de perseguir ou punir uma pessoa em virtude da sua raça, religião, sexo, nacionalidade, língua, das suas convicções políticas ou ideológicas ou da sua pertença a um grupo social determinado*".

36



## SUPREMO TRIBUNAL DE JUSTIÇA

A lei exige desde logo que haja "*fundadas razões*" para se presumir. Ou seja, a lei não se basta com quaisquer razões, muito menos com meras impressões.

Por outro lado, e no que releva para esta sede, a recusa deve ter lugar se houver essas fundadas razões para presumir que a cooperação é solicitada com o fim de perseguir ou punir alguém em virtude das suas "*convicções políticas ou ideológicas*".

Ora, começa-se por constatar que o Extraditando é profissionalmente um Empresário, com interesses na Colômbia, seu país de origem, e na Venezuela, e que não desfruta de qualquer cargo ou função oficial neste último país, a não ser aquilo a que chama das *missões* que lhe são confiadas, nomeadamente pelo respectivo Presidente da República.

Diz que tem vindo a cooperar com o Governo desse País para ajudar a contornar os efeitos das sanções, em especial no que toca ao abastecimento.

Não há razões para se refutar essa alegação.

Porém, é da experiência comum, em especial no plano internacional, que um individuo, no caso um empresário, pode colocar os seus préstimos à disposição de um Governo, para o ajudar a enfrentar situações mais difíceis decorrentes de sanções internacionais, sem ser motivado por quaisquer convicções políticas ou ideológicas, ou pelo menos de convicções político-ideológicas afins às dos titulares do Governo, e que poderão estar na base dos bloqueios internacionais impostos ao País.

Por conseguinte, o mero facto de o Extraditando ter colocado a sua *expertise* e o seu *know how* de empresário ao serviço do Governo da RBV, presumivelmente por razões que não serão meramente altruísticas, como é de experiência comum que não faz qualquer empresário, não decorre que ele seja portador de convicções politicas e ideológicas, que poderiam servir de ponto de partida para a conclusão de que a solicitação da cooperação foi feita com o fim de ele ser perseguido em virtude de tais razões.

Não existe, pois fundamento, para se presumir que, ao solicitar a extradição do empresário Alex Saab Moran, os Estados Unidos, em cujo território o mesmo está acusado de factos susceptíveis de integrarem crimes de lavagem de capitais, cuja repressão é demandada por um tratado internacional, estarão a fazê-lo por



## SUPREMO TRIBUNAL DE JUSTIÇA

motivações políticas ou com o fim de o perseguir por razões das suas convicções políticas e ideológicas.

### II.3.10. Não publicação do acto de ratificação do Tratado

Pretende o Recorrente que o Tratado que serve de base ao presente pedido de extradição não pode ser invocado cum instrumento-fundamento do pedido de cooperação judiciária, visando a sua extradição passiva, uma vez que não se mostra publicado no Boletim Oficial o acto do Presidente da República que terá procedido à sua ratificação.

Para o efeito, convoca o Recorrente o disposto no artigo 269º, nº 1, alínea, a), da Constituição da República que impõe a publicação obrigatória, sob pena de ineficácia jurídica, dos "*tratados e acordos internacionais e os respectivos aviso de ratificação ou adesão*".

Mas, não lhe assiste razão.

De acordo com o artigo 27º da Convenção de Viena sobre o Direito dos Tratados, norma que tem a natureza de direito internacional costumeiro, como é consensualmente admitido, fazendo, por conseguinte, parte da ordem jurídica Cabo-verdiana, nos termos do artigo 12º, nº 1, da Constituição da República:

"*Uma parte não pode invocar as disposições de seu direito interno para justificar o inadimplemento de um tratado. Esta regra não prejudica o artigo 46.*".

Resulta sem dificuldades que não se coloca a necessidade de se convocar o disposto no artigo 46º.

Assim sendo, a falta de publicação do aviso de ratificação do tratado em referência, podendo condicionar a eficácia jurídica desse instrumento, não pode, contudo, ser invocado como fundamento pelo Estado de Cabo Verde, nisso incluindo as suas instituições judiciárias, para se eximir às obrigações para com outra parte contratante.

### II.3.11. Violação do estatuto de "*enviado especial*" e de "*embaixador*"

38



# SUPREMO TRIBUNAL DE JUSTIÇA

O Recorrente retoma nas alíneas *s), t), u,) v), w), y), z), aa) e bb)* das conclusões do presente recurso o seu alegado estatuto de enviado especial que teria sido violado pelos Tribunais Cabo-verdianos.

Trata-se de uma questão intrinsecamente ligada à questão da falta de jurisdição ou da incompetência dos Tribunais Cabo-verdianos, também já analisada, por este Supremo Tribunal no seu acórdão nº 48/2020 em termos que se passa a reproduzir:

### 1. Da qualidade do Requerente como enviado especial

As razões invocadas pelo Requerente para justificar a pretendida qualidade de enviado especial fora exaustivamente expostas no relatório do presente aresto, pelo que aqui cabe apenas fazer delas a seguinte síntese:

O Requerente foi mandatado pela República Bolivariana da Venezuela para tratar de assuntos de interesse desse Estado, nomeadamente a obtenção de alimentos e medicamentos para se fazer frente à pandemia da covid-19, na República Islâmica do Irão, Estado que, através de nota verbal de 8 de Junho, deu o seu assentimento para que o Requerente fosse recebido e tratasse com as autoridades locais dos assuntos de que fora incumbido;

Em 12 de Junho de 2020, durante uma escala técnica para reabastecimento na Ilha do sal o Requerente foi detido pela Polícia Cabo-verdiana, supostamente a pedido dos Estados Unidos;

Em 13 de Junho o Ministros das Relações Exteriores da Venezuela alegou formalmente perante o seu homólogo Cabo-verdiano que o Requerente gozava de imunidade à luz do Direito Internacional;

Em 14 de Junho o Embaixador da Venezuela acreditado junto do Governo de Cabo Verde informou esse Governo que o Requerente viajava como representante do Presidente do seu País, Sua Excelência Nicólas Maduro



## SUPREMO TRIBUNAL DE JUSTIÇA

Moros, razão pela qual gozava da imunidade *ratione personae*, nos mesmos termos que o teria desfrutado aquele Chefe de Estado;

A imunidade dos enviados especiais decorre de regras costumeiras de direito Internacional, vertidas na Convenção das Nações Unidas sobre Missões Especiais de 1969, a que Cabo Verde se acha vinculado.

Cumpre, pois, aferir da procedência dos argumentos invocados pelo Recorrente.

Por uma questão de rigor na delimitação do objecto da presente análise, afigura-se pertinente ter presente que o Requerente não se arvora ao estatuto de diplomata de carreira, colocado nalguma missão da Venezuela no exterior, nem de alto titular de algum cargo público desse Estado, do qual pudesse resultar por inerência uma imunidade *ratione personae*.

A sua condição é a de um cidadão, com a dupla nacionalidade, colombiana e venezuelana, que aquando da sua detenção encontrava-se a viajar com um passaporte ordinário da Venezuela.

Apesar da aparente informalidade com que viajava o Requerente, isso por si só não seria (e não será), no entendimento deste Supremo Tribunal, motivo suficiente para se lhe recusar estatuto de alguém indigitado soberanamente pelo Governo desse País, de acordo com as suas conveniências, para, como seu enviado especial, ou numa missão especial, tratar de assuntos de Estado com qualquer outro Estado que aceitasse recebê-lo nessa qualidade.

Isso para adiantar, em homenagem ao princípio da economia processual, que se impõe com premência numa providência de *Habeas Corpus*, em que o STJ tem que prolatar a sua decisão no prazo de cinco dias, contados da data da apresentação do pedido[4], que apesar dos sólidos argumentos exaustivamente desenvolvidos pelo Requerente em ordem a fundamentar uma obrigação do Estado de Cabo

---

[4] Imposição do artigo 20º, nº 6, do CPP, que, na prática, e na maior parte das vezes, acaba por se traduzir em apenas um dia ou 24 horas, para discutir, redigir e publicar a decisão.



## SUPREMO TRIBUNAL DE JUSTIÇA

Verde, decorrente do Direito Internacional de origem costumeira vertido na Convenção das Nações sobre Missões Especiais, entendimento que, à primeira vista, não suscita questionamento da parte deste Tribunal, não é da solução dessa questão jurídica que dependerá o reconhecimento do estatuto a que se arvora o Requerente.

Dito por outras palavras, ainda que o Requerente tenha sido incumbido de uma Missão Especial pelo seu País, daí não decorre que o Estado de Cabo Verde, mesmo sentindo-se vinculado às disposições, ou ao menos às disposições da referida Convenção que refletem direito internacional costumeiro, tenha de lhe reconhecer automaticamente esse estatuto.

Para melhor se compreender o que fica dito, importa ter presente que nos termos do artigo 1º da Convenção a "special mission" é definida como

> "*a temporary mission, representing the State, which is sent by one State to another State with the consent of the later for the purpose of dealing with it on specific questions or of performing in relation to it a specific task*".

Tendo em conta a definição que fica transcrita, donde sobressai um elemento decisivo que é o consentimento dos dois Estados, e para efeitos de imunidades, o estatuto de enviado especial que reclama o Requerente só seria, em princípio, juridicamente relevante para os dois Estados em presença: a Venezuela, como o Estado que o enviou (*sending state*), e o Irão, como Estado que aceitou recebê-lo (*receiving state*).

Não se pode, entretanto, dizer que um terceiro Estado, como Cabo Verde, em cujo território o avião que seguia fez escala para reabastecimento, seria à partida e de todo em todo indiferente a esse estatuto especial do Requerente.

Na verdade, verificados certos pressupostos, o Requerente podia ver o seu estatuto reconhecido por Cabo Verde, enquanto terceiro estado, como decorre do artigo 42º da Convenção, que passamos a reproduzir, na parte que releva:





## SUPREMO TRIBUNAL DE JUSTIÇA

*(Transit through the territory of a third State)*

*1. If a representative of the sending State in the special mission or a member of its diplomatic staff passes through or is in the territory of a third State while proceeding to take up his functions or returning to the sending State, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return. The same shall apply in the case of any members of his family enjoying privileges or immunities who are accompanying the person referred to in this paragraph, whether travelling with him or travelling separately to join him or to return to their country.*

*(....)*

*4. The third State shall be bound to comply with its obligations in respect of the persons mentioned in paragraphs 1, 2 and 3 of this article only if it has been informed in advance, either in the visa application or by notification, of the transit of those persons as members of the special mission, members of their families or couriers, and has raised no objection to it.*

(…)

Como se disse, o reconhecimento do estatuto de enviado especial do Requerente por um terceiro Estado, pelo qual esteja em trânsito, depende da verificação de certos requisitos, que são os indicados no nº 4 do artigo 42º. Ou seja, esse Estado só se constitui na obrigação de observar a inviolabilidade e as imunidades de uma missão especial se tiver sido previamente informado, através de um pedido de visto ou de uma notificação, do trânsito da(s) pessoa(s) em missão e não tenha colocado objecção.

Assim sendo, resulta claro que o estatuto de enviado especial não pode resultar, ao contrário do que parece sustentar o Requerente, apenas de uma declaração



## SUPREMO TRIBUNAL DE JUSTIÇA

unilateral do Estado que diz que o enviou em missão (*sending state*). Depende também do assentimento, quer do Estado do destino (*receiving state*), quer, se se verificar essa situação, do Estado por onde vai passar em trânsito (*third state*).

Sendo consensual a necessidade desse consentimento, como aliás dão o próprio entendimento que da matéria o Requerente denota, (nomeadamente no artigo... da sua petição), bem como (dão) conta os casos invocados a prática dos Estados e a jurisprudência por ele mencionadas, apenas se cita como elemento corroborador para o caso de terceiro estado um elemento doutrinário provindo de reconhecida autoridade:

> "*The same obligations as under Vienna Convention are laid on transit States in regard to members of special missions. But in this case the obligations arise only where the transit State has been informed in advance, either in the visa application or by notification, of the transit f the persons concerned as members of the special mission, members of their families, or couriers, and has raised no objection to it.*"[5]

Ora, não está provado, ou pelo menos não resulta provado até agora, que no que toca ao Estado de Cabo Verde se verificaram os pressupostos indicados no artigo 42º, nº 4, da Convenção, de que depende o reconhecimento do estatuto de enviado especial, para efeitos de gozo de inviolabilidade e de imunidades perante os Tribunais cabo-verdianos.

O que se acaba de dizer não significa uma impossibilidade prática e definitiva de o Requerente vir a ter esse pretendido estatuto de enviado especial reconhecido por quem de direito, nas ulteriores fases do processo de extradição, com decisivas consequências sobre o desfecho do mesmo.

Como sustentou o Supremo Tribunal Federal Alemão no caso *Tabatabai*, mencionado pelo Requerente, entendimento que não pode deixar de merecer

---

[5] SATOW'S DIPLOMATIC PRACTICE, sixth edition, edited by Sir Ivor Roberts, p.192.



## SUPREMO TRIBUNAL DE JUSTIÇA

acolhimento deste Tribunal, "*the necessary bilateral consent may even be given retroactively*"[6].

O que se reafirma é que por ora não existe prova no processo de que o Estado de Cabo Verde consentiu em que o Requerente transitasse pelo seu território com estatuto de enviado especial.

E, sem esse consentimento, os Tribunais Cabo-verdianos não podem reconhecer ao Requerente o estatuto de enviado especial, o que significa que o mesmo não goza de inviolabilidade e de imunidades a que se arvora, tendo por base a Convenção das Nações Unidas sobre Missões Especiais de 1969.

Improcede, pois, a excepção da incompetência dos Tribunais Cabo-verdianos para ordenarem a detenção do Requerente.

No Acórdão nº 48/2020 tal entendimento foi reiterado, sendo absolutamente irrelevante para reverter o mesmo a alegação de tentativa de solicitar um visto, que não pelas vias oficiais, ou a titularidade de um passaporte diplomático.

Será que se justifica adiantar algo mais para responder à questão que Recorrente decidiu recolocar em sede do presente recurso?

Ao pretenso estatuto de "*enviado especial*", que não lhe foi reconhecido, pelas razões sobejamente expostas, vem agora o Recorrente acrescentar o de "*embaixador*" ou "*representante*" interino da RBV junto da União Africana.

Ou seja, encontrando-se o Recorrente já em detenção por ordem das autoridades judiciárias Cabo-verdianas, com vista a assegurar a sua entrega ao Estado requerente, caso venha a ser autorizada a extradição, a RBV decidiu outorgar-lhe o estatuto de diplomata, com o notório propósito de tentar neutralizar os efeitos do processo de extradição em curso.

Cumpre reconhecer que, embora não seja muito comum assistir a essa forma de se proceder nas relações internacionais, existem alguns casos em que se

---

[6] COMMITTEE OF LEGAL ADVISERS ON PUBLIC INTERNATIONAL LAW (CAHDI), Replies by States to the questionnaire on "Immunities of Special Missions", Strasbourg 11 July 2018, p. 63.



## SUPREMO TRIBUNAL DE JUSTIÇA

socorreu desse mecanismo para se tentar cobrir com a imunidade diplomática retroactiva, quem já se encontrava envolvido em problemas com a lei.

No caso do Recorrente subsistirá sempre o mesmo problema do reconhecimento de tal estatuto pelo Estado de Cabo Verde, o que não se encontra até este momento demonstrado nos autos.

Por conseguinte, e apenas com base nos dados que constam até este momento do processo, é juridicamente irrelevante para este Supremo Tribunal de Justiça o acto unilateral pelo qual a RBV pretende fazer de alguém, já detido em Cabo Verde, para efeitos de extradição, seu *"representante"* junto de uma organização internacional, mesmo que seja a organização continental, a União Africana.

E não se invocou, como também não se consegue descortinar, o instrumento jurídico que obrigaria o Estado de Cabo Verde e as suas instituições a reconhecer a pretensa imunidade do Extraditando, na sua nova qualidade de *"representante"* interino da RBV junto da União Africana.

### II.3.12. Violação do princípio da reciprocidade

Alega o Recorrente que há violação do princípio da reciprocidade (alíneas *qq), rr), ss), tt), uu) e vv)*).

A tese sustentada pelo Requerente assenta essencialmente em três argumentos. O primeiro é o reconhecimento pelo Estados Unidos de que não estarão em condições de assegurar a Cabo Verde o respeito pelo princípio da reciprocidade, caso a situação venha a ser inversa.

O segundo é de que a dispensa do princípio da reciprocidade apenas se aplica às outras formas de cooperação judiciária internacional, mas nunca à extradição.

O terceiro é de que a dispensa do princípio da reciprocidade em tais circunstâncias é violadora do artigo 11º, nº 1, da Constituição da República.

A essa questão o Tribunal recorrido deu a seguinte resposta:

Não há razão para se alterar o sentido dessa decisão do Tribunal recorrido.





## SUPREMO TRIBUNAL DE JUSTIÇA

Efectivamente, na parte em que optou por dispensar a exigência do princípio da reciprocidade o acto da Ministra da Justiça releva de um juízo político que está subtraído ao escrutínio dos Tribunais.

Esse entendimento é corroborado pela doutrina e pela jurisprudência conforme refere Miguel João Costa[7]:

> *"decisão estritamente administrativa. A atribuição ao Ministro da Justiça da possibilidade de exigir reciprocidade de modo casuístico evidencia o carácter político do princípio da reciprocidade. Já o preâmbulo do Decreto-Lei n. 43/91 afirmava que a reciprocidade "é concebida co um acto político unilateral do Governo". Também a jurisprudência exclui inequivocamente a reciprocidade do âmbito da intervenção judicial. Por fim, também na doutrina a questão parece reunir consenso".*
>
> *Portanto podemos concluir com segurança que o juízo acerca da causa de recusa "ausência de reciprocidade" pertence exclusivamente ao Executivo – deixando assim firmada a excepção à regra de que as causas de recusa obrigatória são passíveis de apreciação judicial"*

Será essa solução inconstitucional, por eventual violação do disposto no artigo 11°, n° 1, da Constituição, como pretende o Recorrente?

A nossa resposta é negativa.

Mesmo para a Constituição Portuguesa que tem uma concepção do princípio da reciprocidade muito menos flexível do que a acolhida pela Constituição Cabo-verdiana nunca se viu que essa faculdade concedida exclusivamente ao Executivo de dispensar a exigência da reciprocidade, em certa circunstância e em nome de outros valores, tivesse sido considerada inconstitucional.

Por maioria de razão não será assim perante uma Constituição, como a Cabo-verdiana que acolheu a fórmula "reciprocidade de vantagens" da qual decorre para o destinatário da norma uma maior liberdade de julgamento político das circunstâncias.

Acresce finalmente que, pela sua colocação sistemática, a dispensa da reciprocidade é possível em qualquer forma de cooperação judiciária internacional, incluindo, por conseguinte, a extradição passiva.

---

[7] DEDERE AUT JUDICIARE? A Decisão de Extraditar ou Julgar à Luz do Direito Português, Europeu e Internacional, Instituto Jurídico da Faculdade de Direito de Coimbra, Junho de 2014, pág. 80.

46



## SUPREMO TRIBUNAL DE JUSTIÇA

### II.3.13. Respeito pelo princípio da especialidade

Diz o Recorrente na conclusão *ww)* das suas alegações que falta garantia da parte do Estado Requerente da observância do princípio da especialidade, que sejam vinculantes em função do sistema jurídico constitucional dos Estados Unidos.

Esta questão foi analisada pelo Tribunal Recorrido nos seguintes termos:

Na verdade, toda a explanação da defesa no que concerne ao princípio da especialidade está correta, mas a sua dissertação sobre a falta de garantia formal do Estado Requerente, os EUA, quanto à extradição, não corresponde à verdade. O Estado requerente ao enviar o seu pedido formal de extradição fez constar a garantia que a defesa "exige". Existe declaração expressa e formal nos autos sobre esta matéria, onde se salvaguarda o princípio da especialidade, oferecendo garantias formais de que não deterá, processará ou punirá o extraditando por quaisquer outros delitos para além dos que constam do pedido de extradição, e de que o extraditando não será reextraditado para terceiro Estado.

Consta da declaração expressa pelos Estados Unidos, apresentada por intermédio do seu Embaixador em Cabo Verde, a fls. 540 a 555 do processo, pelo que não procede a questão alegada.

Não há razões para uma decisão em sentido contrário.

As garantias oferecidas pelo Estado requerente em sede do princípio da especialidade são válidas e suficientes, não exigindo a lei que sejam vinculantes em função do sistema jurídico-constitucional dos Estados Unidos.

Basta neste caso a palavra do Estado Requerente, pois tem aqui plena aplicação a menção ao entendimento do Ministro Celso de Mello do Supremo Tribunal do Brasil.

### II.3.14. Decisão do Tribunal de Justiça da CEDEAO





## SUPREMO TRIBUNAL DE JUSTIÇA

Afirma o Recorrente na alínea *xx)* das suas conclusões que o acórdão recorrido é nulo, por o tribunal da CEDEAO ter determinado, com efeito directo e imediato na ordem jurídica de Cabo Verde, ao abrigo dos artigos 12º, nº 3, e 210º, nº 2, ambos da Constituição da República que não se deveria autorizar a extradição do Extraditando, até que esse Tribunal tivesse proferido a decisão de mérito.

Refere a defesa que o Tribunal da CEDEAO decidiu, de forma clara e inequívoca, que, "*O direito à liberdade e segurança, alegando que a sua detenção é ilegal e viola o seu direito à liberdade (…) porque goza de imunidade e inviolabilidade em razão do princípio da não ingerência da Carta da ONU e de seu status de Enviado Especial. Uma vez que no momento da sua detenção estava a executar uma missão especial em nome da Venezuela, e não era objecto de um mandato de detenção ou mesmo de um alerta vermelho de Cabo Verde*".

De referir que em relação à decisão do Tribunal da CEDEAO, já foi proferido um despacho nestes autos, que aqui de dá por reproduzido na íntegra, de fls. 950 a 958, através do qual a defesa reclamou para a conferência do TRB, tendo sido proferido um acórdão por este e dele já notificado. Para confirmar que este Tribunal não tem conhecimento de qualquer decisão proferida pelo Tribunal de Justiça da CEDEAO. Na verdade, o que se conhece é o que se espalha pela comunicação social nacional e estrangeira, bem como o documento anexo ao requerimento entregue pela defesa do extraditando, que aliás, devia ter sido mandado desentranhar do processo. Para além disso, conforme dito no despacho em referência, uma vez que nem sequer Cabo Verde assinou o Protocolo que concede legitimidade ao Tribunal da CEDEAO quanto à questão de alegadas violações de direitos fundamentais, as decisões desse Tribunal, nessa matéria, não vinculam Cabo Verde.

Vejamos se assistirá razão ao Recorrente

O envolvimento do Tribunal da CEDEAO no presente processo de extradição, que corre seus termos pelos Tribunais Cabo-verdianos, teve lugar a partir do

48



## SUPREMO TRIBUNAL DE JUSTIÇA

momento em que o Extraditando decidiu apresentar uma queixa junto dessa jurisdição contra a República de Cabo Verde, por alegada violação dos direitos do homem, com o pedido de adoção de medidas provisórias.

Tal envolvimento comporta aspectos que denotam alguma complexidade.

Efectivamente o Extraditando conseguiu obter da jurisdição da CEDEAO duas medidas provisórias, a saber:

> Que o Extraditando fosse colocado em detenção domiciliária;

> Que não se autorizasse a extradição enquanto essa instância não se tivesse pronunciado sobre o mérito do recurso nela interposto.

Confrontado com tal decisão o Tribunal Recorrido recusou-lhe obediência com fundamento em como o Estado de Cabo Verde não está vinculado ao protocolo da CEDEAO A/SP.1/01/05, que confere ao Tribunal Dessa organização a competência para receber queixas individuais contra os Estados Membros, por alegada violação dos direitos do homem, em virtude de nunca ter assinado por qualquer representante do Estado de Cabo Verde.

Saber, assim de que lado estará a razão passa por aferir se efectivamente o Estado de Cabo Verde deve obediência às decisões do Tribunal da CEDEAO proferidas no exercício da competência que lhe confere esse protocolo de 2005.

O argumento principal do Estado de Cabo Verde para recusar acatamento a tais decisões reside no facto de se considerar como não vinculado juridicamente ao dito protocolo.

A isso contrapõem o Recorrente dizendo que Cabo Verde está vinculado às decisões desse Tribunal essencialmente por duas ordens de razões:

> Porque esse protocolo é um texto jurídico emanado de uma organização supranacional de que Cabo Verde faz parte, logo a sua vinculação seria automática por força do que dispõe o artigo 12°, n° 3, da Constituição da República.

> Porque o artigo 210°, n° 2, da Constituição dispõe que a Justiça é também administrada por tribunais instituídos através de tratado, convenções ou acordos internacionais de que Cabo Verde seja parte, em conformidade com as respectivas normas de competência e processo.

49





## SUPREMO TRIBUNAL DE JUSTIÇA

Os argumentos que ficam contrapostos merecem ser analisados.

Antes, porém, justifica-se ter presente que a adicional competência que foi conferida ao Tribunal da CEDEAO pelo Protocolo de 2005 acabou por transformar esse Tribunal numa jurisdição dos Direitos do Homem, o que, como um pouco por todo o lado, suscita delicados problemas no relacionamento com os Estados Membros, sobretudo em matéria de vinculação às suas decisões.

No fundo trata-se de saber, neste caso em sede das jurisdições dos Direitos do Homem, como conciliar o princípio da soberania dos Estados com o acatamento de ordens que lhes tentam impor tribunais internacionais.

A observação do que se passa pelo mundo deixa perceber desde logo um elemento que não pode ser subestimado na análise dessa relação. Referimo-nos ao indispensável **consentimento dos Estados**, manifestação da sua soberania, em se submeterem não só a uma jurisdição internacional, mas também às competências específicas que são conferidas a tal jurisdição.

Ou seja, o consentimento do Estado não decorre, ao contrário do que poderá parecer à primeira vista, apenas da sua adesão a uma organização internacional dotada de um Tribunal.

Esse consentimento deve também ser necessário, como parece evidente, para as competências que vão sendo gradualmente conferidas a esse Tribunal, através de apropriados instrumentos jurídicos.

A evolução do Tribunal Europeu dos Direitos do Homem (TEDH), a mais pujante jurisdição dos direitos do homem que se conhece, constitui exemplo paradigmático daquilo que se acaba de dizer.

Na verdade, à luz das competências originárias do TEDH, o acesso a esse Tribunal, ou seja, o direito de nele apresentar queixas, estava reservado apenas aos Estados e às Instituições do Conselho de Europa, em especial a Comissão. Excluída estava, assim, a apresentação de queixas por indivíduos ou organizações não governamentais (ONGs).

Pergunta-se porquê? A resposta parece-nos simples: porque até aí os Estados membros dessa organização não tinham, no exercício da sua soberania, dado o seu **consentimento** a que fossem demandados por particulares.

50





## SUPREMO TRIBUNAL DE JUSTIÇA

Só com o Protocolo nº 9, de 1990, é que os indivíduos e as ONGs passaram a ter directo acesso ao TEDH para apresentarem as suas queixas.

Ainda assim, isso só abrangia os Estados que tivessem exprimido a sua aceitação, **mediante a ratificação desse protocolo**, em serem demandados por queixas individuais. Os Estados que não ratificaram esse protocolo, não podiam ser demandados.

Por exemplo, alguns membros do Conselho de Europa nunca aceitaram, muito menos ratificaram, esse protocolo nº 9. Tratou-se de uma opção soberana, ditada por certo pelas conveniências desses países, que foi sempre respeitada pelos demais Estados e pelas instituições do Conselho de Europa.

Seria já com o protocolo nº 11, de 1994, mas que entrou em vigor apenas em 1998, após a sua ratificação por todos os Estados, que os mesmos, sem excepção, passaram a aceitar ser demandados por queixas individuais.

No plano africano a situação actual é, ao menos no plano formal, similar àquela em que se encontrava o Sistema Europeu no quadro do Protocolo nº 9, acima referido. Ou seja, o da liberdade de cada Estado de, no exercício da sua soberania, aceitar, ou não, ser demandado por queixas individuais.

É assim que, dos 55 Estados que integram a União Africana (UA), apenas 30 assinaram e ratificaram o Protocolo que criou o Tribunal Africano dos Direitos do Homem e dos Povos (TADHP).

Desses 30, apenas 10 fizeram a declaração em como aceitam ser demandados por queixas apresentadas por indivíduos ou ONGs.

Por conseguinte, nenhum dos 45 Estados que não fizeram a declaração de aceitação da competência do TADHP para receber queixas individuais, embora seja parte no instrumento jurídico que criou essa jurisdição, pode ser demandado junto desse Tribunal por indivíduos.

Dessa breve incursão pela evolução das experiências europeia e africana em matéria das jurisdições de direitos do homem e das suas relações com os Estados, confirma-se esse elemento essencial e incontornável que é a necessidade do **consentimento dos Estados** para se submeterem a determinadas competências dos correspondentes tribunais.

51





## SUPREMO TRIBUNAL DE JUSTIÇA

Isso significa que um Estado pode ser membro de uma determinada organização internacional. Pode até ter ratificado o protocolo inicial referente ao Tribunal dessa organização. Ainda assim, é-lhe lícito não aceitar algumas das competências específicas desse Tribunal, nomeadamente a competência para ser demandado por queixas individuais.

Foi o que, e como já vimos, fizeram alguns países europeus em relação ao Protocolo nº 9 relativo às competências do TEDH; foi o que fez Cabo Verde em relação ao Protocolo de 2005 referente ao Tribunal da CEDEAO; e foi o que fizeram mesmo alguns países da CEDEAO em relação ao Protocolo sobre o TADHP, para só falar desses casos.

Significará isso que os Estados que não reconhecem essa competência específica do TADHP para receber queixas individuais, não podem participar da escolha de Juízes desse Tribunal, nem ter os seus nacionais como juízes desse Tribunal?

Se assim fosse, países africanos que jamais aceitaram ser demandados por queixas individuais junto do Tribunal Africano dos Direitos do Homem, não podiam participar da escolha dos Juízes desse Tribunal, nem ter nele seus nacionais como juízes. Mas, participam e têm tido nele juízes.

O que se expôs até aqui parece legitimar a conclusão de que a intervenção de certo Estado na aprovação do Protocolo de um Tribunal de direitos do homem, a sua participação na escolha dos juízes desse Tribunal, ou mesmo a presença de seus nacionais no seio dessa jurisdição, estão longe de acarretar a aceitação da plenitude das suas competências.

Passemos então, a analisar os argumentos invocados pelo Recorrente, tendentes a sustentar a vinculação do Estado de Cabo Verde às decisões do Tribunal da CEDEAO tomadas ao abrigo do Protocolo de 2005, começando pelo atinente à alegada supranacionalidade da CEDEAO, qualidade que, em conformidade com esse argumento, dispensaria o procedimento formal de recepção na ordem interna dos seus instrumentos jurídicos.

Começa-se por constatar que, salvo possível falha na localização, no texto do Tratado Revisto de 1993 não se encontra a atribuição à CEDEAO, ao menos de forma expressa, da natureza de organização supranacional.

52



## SUPREMO TRIBUNAL DE JUSTIÇA

Por conseguinte essa alegada supranacionalidade tem sido uma construção na base de inferências extraídas de algumas disposições do Tratado Revisto, nomeadamente do seu artigo 9 que diz que "*as decisões da Conferência (dos Chefes de Estado e de Governo) têm força obrigatória em relação aos Estados Membros e às Instituições da Comunidade, salvo o disposto no número 3 do artigo 15*".

Muito contribuiu também para essa tese da supranacionalidade da CEDEAO uma determinada passagem de um acórdão do Tribunal de Justiça proferido no processo *Saidykhan v. Gâmbia,* que passamos a reproduzir, na parte que interessa:

> "*ECOWAS is a supra national authority created by Member States wherin they expressely ceded some of their sovereign powers to ECOWAS to act in their common interest. Therefore, in respect to those areas where the Member States have ceded part of their sovereign powers to ECOWAS, the rules made by ECOAS A SUPERSEDES RULES MADE BY INDIVIDUAL Member State if they are inconsistent.*"

A força persuasiva dos argumentos retirados de uma disposição do Tratado e de uma decisão do Tribunal surge, entretanto, infirmada ou comprometida, quer pela *práxis* da própria Comunidade, quer por outras decisões do Tribunal, muito mais recentes, quer ainda pela doutrina Cabo-verdiana que se tem debruçado sobre a matéria.

Quanto à práxis da Comunidade ela aponta para o sentido de, podendo a supranacionalidade ser uma meta a atingir, na interpretação e na prática da Conferência dos Chefes de Estado e de Governo ela não constitui ainda uma realidade assumida.

Na verdade, fosse a CEDEAO formal e efectivamente uma organização supranacional, não haveria qualquer necessidade de se sujeitar os diversos protocolos que foram aprovados a partir da entrada em vigor do Tratado Revisto de 1993, à assinatura e à ratificação individual pelos Estados Membros, cm conformidade com a sua ordem constitucional, como condição para a sua entrada em vigor em definitivo.

Pelo contrário, a imposição da observância desse procedimento deixa perceber uma clara consciência dos Estados representados ao mais alto nível de que não se está (ainda) perante uma organização supranacional.





## SUPREMO TRIBUNAL DE JUSTIÇA

A nível do Tribunal pode-se encontrar decisões que apelam à vinculação dos Estados Membros aos protocolos, não pela natureza supranacional da CEDEAO, mas sim porque, ao menos apuseram a sua assinatura, facto que em boa fé, e à luz do artigo 18º da Convenção de Viena sobre o Direito dos Tratados lhes impede de recuar na assunção das obrigações decorrentes dessa assinatura.

Exemplo disso é a sentença, proferida no caso *Hans Capehart Williams SR and Mardia OPaykue Williams v. Repúblico of Liberia and others*, que se passa a reproduzir na parte que interessa:

> *"Treaties are biding only on parties to them. They come into effect either by mere signatures or ratification or by both, depending on the provisions thereof. Supplementary Protocol A/SP.1/01/05 of 2005 which confers jurisdiction on this Court with regard to human rights violation occurring in Member States of ECOWAS qualifies as a Treaty. The Court takes judicial notice of the fact that the 1ˢᵗ Defendant is a signatory to the treaty. By Article 1181) of the Protocol:*
>
> *This Supplementary Protocol shall enter into force provisionally upon signature by Heads of States and Government. Accordingly, the signatory Member States and ECOWAS hereby undertake to star implementing all (emphasis ours) provisions of this Protocol.*
>
> *It follows that since the 1ˢᵗ Defendant signed the treaty in question, it cannot be seen to argue it is not bound because of non-ratification*
>
> *(…)*
>
> *Consequently, even if the 1ˢᵗ Defendant did not ratify the treaty, it is bound by its provisions upon signature, provided at least Nine Member States(which may exclude the 1ˢᵗ Defendant) have ratified it"*[8]

Essa argumentação reveste-se de enorme importância por pôr em evidência o entendimento do próprio Tribunal da CEDEAO, significativamente mais recente, de que não é na suposta natureza supranacional da CEDEAO que reside a justificação para os Estados membros ficarem automaticamente vinculados aos seus instrumentos jurídicos.

---

[8] Judgmente nº ECW/CCJ/JUD/25/15, SUIT ECW/CCJ/APP/06/14.

54



## SUPREMO TRIBUNAL DE JUSTIÇA

É, sim, na sua aceitação expressa pelo Estados Membros, através de, pelo menos, a assinatura de um seu credenciado representante.

Por conseguinte, pelo menos a assinatura é exigida para se concluir que certo Estado está vinculado a determinado Protocolo da CEDEAO.

Logo, não sendo por ora a CEDEAO uma organização supranacional, e não tendo o Estado de Cabo Verde sequer assinado o Protocolo de 2005, não existe fundamento para que o mesmo se possa considerar vinculado a tal instrumento e, por conseguinte, às decisões do Tribunal de Justiça proferidas ao abrigo das competências que lhe foram conferidas por tal instrumento de que não faz parte.

Este entendimento encontra respaldo na Doutrina Cabo-verdiana. O Juspublicista José Pina Delgado já em 2006, por conseguinte na vigência do Tratado Revisto, e depois de se ter aprovado o Protocolo de 2005, escreveu o seguinte:

> "*Deixando liminarmente de lado o primeiro argumento segundo o qual "Cabo Verde tem que aderir a determinados Protocolos mais cedo ou mais tarde", que se trata de evidente equívoco, já que nenhum Estado tem a obrigação de se vincular a um instrumento internacional do qual não esteja interessado em fazer parte (…)* (sublinhado nosso)"[9].

Essa observação não foi feita no abstracto. Com ela o Autor está a refutar a opinião de alguns que prognosticavam que, mais tarde ou mais cedo, Cabo Verde teria que aderir aos Protocolos da CEDEAO, nomeadamente àquele que consagra o mecanismo de segurança da CEDEAO[10], afinal o objecto da douta reflexão em referência.

Mais recentemente num estudo de incontornável importância para o tópico em apreço[11], esse mesmo autor viria a reafirmar que "*a adesão a esses protocolos é facultativa e alguns deles nem sequer estão em vigor*" (sublinhado nosso).

---

[9] **A vinculação de Cabo Verde ao Mecanismo de Segurança da CEDEAO**, Revista de Direito e Cidadania, Ano IX, Nº 27, 2007/2008, p.131 e seguintes.

[10] Cuja designação formal é **Protocolo relativo ao Mecanismo de Prevenção, Gestão, Resolução de Conflitos, Manutenção da Paz e Segurança**, de 10 de Dezembro de 1999, publicado no Jornal Oficial da Comunidade, v. 37, 1999.

[11] **O Direito Internacional Público no Direito Cabo-verdiano**, José Pina Delgado, com a colaboração de António Andrade.



## SUPREMO TRIBUNAL DE JUSTIÇA

Neste estudo que se acaba de mencionar o autor é peremptório sobre a pretensão de se atribuir à CEDEAO a natureza de uma organização supranacional:

> "*Independentemente disso, para efeitos da Constituição Cabo-verdiana, a CEDEAO não é uma organização supranacional, uma vez que o país não se vinculou a nenhum dos tratados que representariam e com as limitações apontadas a essa supranacionalidade. Neste sentido, não sendo a União Africana e a CEDEAO, organizações supranacionais, pelo menos para efeitos do artigo 12º (3), este, em tese, deve ser lido a partir do seu sentido mais literal: não tem aplicabilidade hodierna.*" (sublinhado nosso).[12]

A tese assenta em argumentos suficientemente persuasivos que justificam o seu acolhimento por este Tribunal.

Acresce finalmente que o reconhecimento que os Tribunais Cabo-verdianos viessem a fazer à CEDEAO, como uma organização supranacional, no sentido de os seus actos entrarem automaticamente em vigor na ordem jurídica interna, sem qualquer acto de mediação, comportaria o risco de reduzir a cinzas a soberania da República de Cabo Verde, pois todos os protolocos, a começar pelo célebre e controverso sobre a Defesa e Segurança, que já leva anos e anos de ponderação com vista à eventual decisão sobre a sua assinatura, aprovação e ratificação, e outros aprovados até na ausência de qualquer representante do Estado de Cabo Verde, passariam a ser instrumentos a que o nosso país estaria há muito vinculado, mesmo sem o saber.

Por todas as razões que ficam expostas a tese que pretende ver na CEDEAO uma organização supranacional, para efeitos do disposto no artigo 12º, nº 3, da Constituição da República, não pode ser acolhida pelos Tribunais Judiciais Cabo-verdianos.

Isso implica a adesão ao entendimento alternativo de que a vinculação da República de Cabo Verde a qualquer Protocolo da CEDEAO terá que pressupor, no mínimo, a assinatura de tal instrumento por um seu representante, expressão elementar, ainda que incompleta, da soberania do Estado de Cabo Verde.

---

[12] Estudo em referência, p. 27.

56



## SUPREMO TRIBUNAL DE JUSTIÇA

Isso não aconteceu com o Protocolo de 2005, pelo que o Estado de Cabo Verde não se encontra a ele juridicamente vinculado, para qualquer efeito legal, nomeadamente para o de ser obrigado a acatar as decisões proferidas pelo Tribunal de Justiça da CEDEAO no âmbito das competências que derivam de tal instrumento.

Esta conclusão não é infirmada pelo facto de o Estado de Cabo Verde ter designado Juízes que tiveram ou têm assento nesse Tribunal, ou ainda pela circunstância de o Presidente do seu Supremo Tribunal integrar, por inerência, o Conselho de Justiça de Comunidade, na medida em que o País é parte do Tribunal, cujo protocolo inicial foi assinado pelo Chefe do seu Governo, sendo ainda certo que não existe evidência de que se tem recusado aceitar os compromissos, mas apenas esses, que decorrem dessa assinatura.

O Tribunal Africano é exemplo paradigmático de um Tribunal a que vários Países não estão vinculados às suas competências para receber queixas individuais, por alegada violação dos direitos do homem, mas nem por isso deixam de poder designar juízes para o integrarem, precisamente porque são parte no Protocolo que instituiu o Tribunal, embora não lhe reconheçam certas competências específicas.

Passemos ao segundo argumento invocado para se justificar a obrigação de os Tribunais Cabo-verdianos acatarem as decisões do Tribunal de Justiça da CEDEAO proferidas no âmbito de queixas individuais apresentada contra o Estado de Cabo Verde por alegada violação dos direitos do homem no seu território, o artigo 210º, nº 2, da Constituição da República, que se passa a reproduzir:

> "*A Justiça é também administrada por tribunais instituídos através de tratados, convenções ou acordos internacionais de que Cabo Verde seja parte, em conformidade com as respectivas normas de competência e de processo.*"

Como já foi dito em relação ao Tribunal de Justiça da CEDEAO essa disposição constitucional não pode deixar de ser interpretada no sentido de que o reconhecimento por parte do Estado de Cabo Verde da administração justiça feita por esses tribunais pressupõe consentimento do Estado de Cabo Verde, não só à criação ou existência do Tribunal, mas também às respectivas normas de competência e de processo.





## SUPREMO TRIBUNAL DE JUSTIÇA

Seria absurda a interpretação dessa norma que pudesse conduzir a que um Estado, no caso o Estado de Cabo Verde, se deixa vincular às decisões de um Tribunal, cujas competências são à partida ignoradas ou que, sendo inicialmente conhecidas e objecto de consentimento, serão ulteriormente substancialmente ampliadas e modificadas, sem o consentimento desse Estado.

Imagine-se que a Conferência dos Chefes de Estado e de Governo da CEDEAO decidiria acrescentar às actuais competências do Tribunal de Justiça dessa Comunidade a competência criminal, isto é, para julgar crimes cometidos no interior de cada Estado Membro, para emitir mandados de captura contra cidadãos dos Estados Membros, etc. etc.

Seguramente que nem Cabo Verde, nem qualquer outro Estado, aceitaria as decisões do Tribunal nessa matéria, sem que tivesse expresso o seu prévio consentimento, através da assinatura e da ratificação do instrumento que conferisse essa competência suplementar a esse Tribunal.

O mesmo se diga se a União Africana decidisse conferir competência criminal ao seu Tribunal.

Por conseguinte, o artigo 210º, nº 2, da Constituição da República tem de ser interpretado no sentido de que faz depender, ainda que implicitamente, o reconhecimento da justiça administrada por tais tribunais do consentimento do Estado de Cabo Verde quanto às regras definidoras da respectiva competência e de processo.

Uma palavra final, ainda sobre esta matéria, para dizer que, ainda que o Estado de Cabo Verde estivesse vinculado às decisões do Tribunal da CEDEAO proferidas em sede de queixas individuais, por alegada violação dos direitos do homem, o não acatamento dessas decisões constituiria apenas uma questão da responsabilidade internacional do Estado.

Nunca de directo acatamento de tais decisões pelos Tribunais Nacionais.

### III. DECISÃO

*Com os fundamentos acima expostos, acordam os Juízes deste Supremo Tribunal em negar provimento ao recurso e confirmar, para todos os efeitos legais, a decisão recorrida.*

58



## SUPREMO TRIBUNAL DE JUSTIÇA

1. *Confirmar a autorização judicial para a extradição do Recorrente para os Estados Unidos;*
2. *A extradição que ora se autoriza é para que o Extraditando seja sujeito a procedimento criminal por um único dos crimes que lhe são imputados, em conformidade com a garantia oferecida pelo Estado requerente.*

*Fica prejudicado o conhecimento do recurso interposto da decisão do mesmo Tribunal da Relação que recusou acatamento à ordem do Tribunal da CEDEAO para que o Extraditando fosse colocado em detenção domiciliaria.*

*Registe e notifique.*

*Praia, 16 de Março de 2021*

João da Cruz Gonçalves

Manuel Alfredo Semedo

Maria Teresa Alves Évora Barros

Anildo Martins

Benfeito Mosso Ramos

ESTÁ CONFORME:

Secretaria do Supremo Tribunal de Justiça, aos dezassete dias do mês de Março do ano de dois mil e vinte e um.

O Escrivão de Direito

Luis Acácio Cardoso Da Silva Delgado

59