# Exhibit 2



12th September 2021

Dear Sirs,

**Re: Portuguese into English (UK) Certified Translation**

Language Reach Limited is a UK-registered professional translation and interpreting company and a fully qualified registered member of The Association of Translation Companies (Member No. 2018ATCR1238). We hereby confirm that we have translated the enclosed document(s) from Portuguese into English (UK).

As a responsible translation agency we only employ certified linguists to work with us. We are satisfied with the linguistic accuracy and hereby confirm that the English (UK) written translation of the Portuguese document(s) represents its fair and accurate linguistic message as intended in the original file(s).

We hereby confirm that this is a true and correct translation and certify the linguistic accuracy.

For more information, please contact Language Reach Limited on +44 (0) 208 677 3775.

Yours sincerely,

**Lucia Petrulli**
Project Manager





Registered in England & Wales 07635166 Tel: +44 (0) 208 677 3775 Email: info@languagereach.com
Address: Unit F11B, Parkhall Business Centre, London, SE21 8EN



**Copy:**

Of the Ruling handed down in the case records of Appeal for Specific Inspection of Constitutionality No. 2/2021, in which **Alex Nain Saab Moran** is the Appellant and the **Supreme Court of Justice** is the Defendant

# CONSTITUTIONAL COURT

# RULING No. 39/2021

**(Alex Saab v. STJ – Supreme Court of Justice, referring to the application of unconstitutional rules in the Ruling on the arrest and detention of a person, in the Ruling on the extradition process and in the extradition authorisation and refusal to apply a hypothetical rule arising from regional instruments due to unconstitutionality).**

## I. Report

1. Mr. **Alex Nain Saab Moran**, a Venezuelan and Colombian citizen, with other identification in the file, appeals to this Court, alleging that, in the extradition process that took place in the Barlavento Court of Appeal and the Supreme Court of Justice, conducting the extradition authorisation and its confirmation, unconstitutional rules were applied or alternatively there was a refusal to apply infra-constitutional rules for reasons of unconstitutionality.

1.1. The Appeal was filed at the secretary of the appealed body, which issued the challenged decision, *Ruling 28/2021, dated 16th March*, on 25th March of the same year.

1.2. Through it:

1.2.1. He indicated that the Appeal is filed under sub-sections a) and b) of Article 77, as inferred from the passage in which it says that it "hereby comes, under (…) 77.1.a and b) (…)" "to file an Appeal for specific review of constitutionality (…) of Ruling 28/2021, dated 16th March, taken by the Honourable Supreme Court of Justice in the Appeal Crime Records – Extradition Records No. 42/2020";



12/09/2021

1

1.2.2.  In relation to decision-making segments to which he imputes defects of unconstitutionality or incompatibility with international norms (customary or conventional), therefore potentially revealing an indirect unconstitutionality, the document points to what he calls "previous questions" that were not admitted by the Supreme Court of Justice, a refusal of admission confirmed by the Constitutional Court following a Complaint, as "*Thema decidendum*", a) "Primum", "Secundium" and "Tertium" – First, second and third subjects to be decided and adjudicated on; b) "new questions" in paragraph nine (4 to 11) and, c) "complements to the previous questions", adding that these would have been taken up by the STJ, which, in their respect, will have promoted new arguments.

1.2.3.  Whereas he says that the Appeal is also filed under sub-section b) of paragraph 1 of Article 77 of the Law on the Organisation, Functioning and Process of the Constitutional Court, indicates, at times, the specific rules and principles, at times the precepts where they would be accommodated, and which he considers to have been affected by decision-making segments of the Ruling under appeal taken by the Supreme Court of Justice, which allegedly applied and enforced standards or refused to apply and enforce standards.

1.2.4.  He indicated documents in which he raised questions of constitutionality.

1.3.  It was admitted by the appealed body through Ruling 35/2021, dated 31st of March.

2.  Referred by this highest court and received at the Constitutional Court on the 8th April, the Rapporteur to whom Advisory Judge Pina Delgado was assigned for certainty, following the preliminary assessment imposed on him, under paragraph 1 of Article 86 of the Law of the Constitutional Law Court, recognised that:

2.1.  The pleading of the Appeal's filing, despite mentioning that it was being filed under sub-sections a) and b) of Article 77, did not expressly indicate when it was dealing with one case and when it was dealing with the other in relation to the various contested items, especially cases of refusal of application due to unconstitutionality; all the constitutional or international legal parameters indicated were not sufficiently precise, that in relation to Question 5-B and, partially, in relation to Question 10-G, the pleading had not been indicated where the question of constitutionality had been raised,



and, above all, that in relation to several items, despite the imputation of defects of unconstitutionality or of incompatibility with international norms (customary or conventional), and, with the Appellant having the burden of marking and defining them, they were minimally specified in relation to Q -6, Q-11, Q-12, imprecisely formulated in relation to C, Q-8, Q-9 and Q-10, invalidly identified in relation to Q-4, Q-5 and Q-8, without the demonstration of any normative content in relation to Q-7, and without clearly explaining his intentions in relation to the complements of previous questions.

2.2. For these reasons, the Rapporteur invited the Appellant to: a) identify the situation in which he was appealing the refusal to apply a rule by the appealed judicial body on the grounds of unconstitutionality; b) in relation to the parameters indicated to clearly explain the constitutional norm or norms that he considers violated and which result from the precepts he identifies, especially in cases where the same normative provision accommodates at the same time several different norms, such as Articles 1, 11 paragraph 1; 12, 15, 17 paragraphs 4 and 5, and Articles 18 and 22 paragraph 3, of the Fundamental Law of the Republic; c) point out the documents in which he raised the issues of unconstitutionality referred to as Q. 5-B and in the third segment of Q.10 – G; d) within the strict framework of the questions that he has already presented, clearly indicate all the norms that he seeks that the Court explores, namely, in the case of interpretative norms, to construct them as precisely as possible.

2.3. Hence, it issued an improvement order on 26 April 2021, of which the Appellant was notified on 27 April.

3. In the improvement document submitted to this Court on 3 May, therefore within the five-day period available for that purpose, the Appellant:

3.1. Presented, according to his own numbering and nomenclature, twelve questions of constitutionality, numbered from Q1-A to Q3-C and Q4-C to Q12-I.

3.1.1. In relation to Q1-A, he raises a question that he claims to have raised in his Appeal in points k) a m) of Appeal 44/2020, in points 94 to 101 o) and p) of the conclusions of Appeal 07/2021 to Ruling 28/2021 and in a response to the ATTORNEY GENERAL'S OFFICE, he says that it refers to the personal notification of the extraditee, the person whose extradition is sought, of the extradition request and the order that admits it,



CERTIFIED TRANSLATION
12/09/2021
REG-07635166
LANGUAGE REACH

3

considering that the decision applied the rules under Articles 5, 24 paragraph 1, Article 141, paragraphs 1 and 2, last part, Article 151, sub-section a), and 55 of the Law of International Judicial Cooperation on Criminal Matters with the meaning that of the order of the Minister of Justice on the admissibility of the request for extradition requested by the United States of America does not have to be notified to the Appellant of the fulfilment of the request with the TRB – Barlavento Court of Appeal, and that, within the scope of the extradition process, the notification of the same is not personal or / and, that notification of the request for extradition from the requesting State made only to the appointed lawyer is sufficient. This is in violation of several constitutional and international norms that identify, namely Articles 1, 3 paragraphs 2 and 3, Articles 15, 17 paragraphs 1, 2, 4 and 5, Article 18, paragraphs 6 and 7, Article 245, sub-section c ), all from CRCV; Article 14, paragraph 3, sub-section a) of the International Covenant on Civil and Political Rights, Articles 10 and 11, paragraph 1 of the Universal Declaration of Human Rights and Article 9 of the African Charter of Human Rights and Peoples.

3.1.2. He points out and clarifies that in relation to Q2-B, which designates that: "No trial in person (b) with the hearing of the extraditee, the person whose extradition is sought, (a), despite the extraditee, the person whose extradition is sought, having required steps and production of evidence" issues of unconstitutionality that would have been raised under points ff), gg ), ii), ll) of Appeal 44/2020, in points ii), kk) of the conclusions and points 7 to 15, 18 to 25, 94 to 101 of Titles I, II and VI of Appeal 28/2021 and in points 36 to 41 of the Response to the ATTORNEY GENERAL'S OFFICE, and that they attach to the application of the rule under Articles 56, paragraph 2, of the Law of Judicial Cooperation, and under Articles 151, subsection d), g), i), 349, apply 350, 378 and 363 of the CPP, with the interpretative sense that in the course of the passive extradition process it does not require that the Ruling in the TRB, as a court of first instance and not of Appeal, be made in a hearing but rather in a conference, stating that the law does not impose, neither directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge, which would violate the constitutional provisions contained under Article 32 paragraph 4, Article 35 paragraphs 6, 7 and 9, Article 211 paragraph 4, of the CRCV and Article 14 paragraph 2, sub-section d) of the International Covenant on Civil and Political Rights. In his assessment, this was one of the most serious unconstitutionalities that the case records suffer, as the Appellant was prevented from demonstrating that the facts imputed do not constitute a crime before the Cape Verdean legal system, in violation of the principle of double criminality, and that the STJ Ruling admits, without contesting and in violation of the rules of application of the criminal law in the section, in his opinion, that the U.S. law would be applicable to all acts imputed to the Applicant, including those that would constitute a predicate offense for the crime of money laundering.


CERTIFIED TRANSLATION
12/09/2021
REG-07635166
LANGUAGE REACH

4

3.1.3. In relation to Q3-C, which the Appellant designates as: "a) Failure to carry out the steps of evidence required by the extraditee, the person whose extradition is sought; b) the interpretation of the rule contained under Article 155 of the CPP in the sense that it was up to the extraditee, the person whose extradition is sought, to proceed by complaint and not by Appeal, that is, he did not use the appropriate means in view of the failure to carry out the diligence required by the Lower Court, said in another way as to demand the examination of evidence after the decision that there is an ordinary appeal to the STJ", a question that would have been raised under points nn), oo), eee, and fff) of the conclusion of Appeal 44/2020, in sub- sections ll, mm), nn), oo), pp) and points 42 to 55 of Title IV of the Opinion of Appeal 07/2021 of Ruling 28/2021 and 42 to 55 of Title VIII of the Reply to the ATTORNEY GENERAL'S OFFICE. This is because, in his opinion, the Court applied the rules under Articles 3, 5, 173, 355 of the CPP, Articles 55 paragraphs 1 and 2 (2nd Part), 46 paragraph 3, and 56 of the Law of Judicial Cooperation and also Articles 454 and 579 of the Code of Civil Procedure with the sense and meaning of the rule under Article 55, paragraph 2, of the Law of Judicial Cooperation that the extraditee, the person whose extradition is sought, has the right to file opposition, but it can only be centred on two sets of arguments tending to demonstrate that he is not the person sought or that there are no presuppositions of extradition verified, since, despite the existence of a certain overlapping in the contiguous zone, in the courts of the requested State it is not possible to produce evidence on the facts that the requesting State imputes to the extraditee, the person whose extradition is sought, not constituting any unconstitutionality because there is no imputation of crime being imputed on the extraditee, the person whose extradition is sought, much less to formulate a juridical-criminally relevant suspicioNo. Quoting a long passage of the Ruling of the STJ, he says that in the application of legal norms there was a violation of the constitutional norms under Articles 35 paragraphs 6 and 7, 22, paragraph 1, of the CRCV because the controversy is limited to only two themes and to not consider the defence in relation to other aspects of the extradition process, when, in this case, it would be imperative to question the law applicable to the relevant alleged facts to attest the fulfilment of the double criminality requirement established under Article 31 paragraph 2, of the Law of Judicial Cooperation - which would, in turn, be the interpretative norm of paragraph 4 under Article 32 of the Constitution - and the rules under Articles 3 and 4 of the Criminal Code on the application of criminal law in the section, also refraction of the same criminal constitutional guarantee with a traditional place in Cape Verdean constitutionalism.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF.07635166

3.1.4. With regard to Q4-A referred to as: "The illegality of the arrest and detention of the extraditee, the person whose extradition is sought, based on an informal request by a police body of conventional origin, without due ratification, promulgation and publication", duly raised in his opinion by points f) and cc) of the conclusion of the Appeal and Articles 42 to 48 of point V of Appeal No. 7/2021 to Ruling 28/2021 and point VII of the Reply to the opinion of the ATTORNEY GENERAL'S OFFICE, states that the rules under Articles 4 and 39 of the Law on Judicial Cooperation were applied in the sense that it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the arrest and detention of individuals based on official information, namely from INTERPOL, with it being legally irrelevant that the acts relating to INTERPOL have not, eventually, been ratified by the Republic of Cape Verde, nor published in the domestic legal system insofar as the use made of the information received through this system is a national law. Such a normative sense would be inconsistent with Article 12 paragraph 4, 14, 262 and 269 of the Fundamental Law, as Cape Verde could not integrate (invoke or apply) in its legal system, through a third law or other legislative instrument, acts or constitutive instruments of an international organisation (or instrument of international cooperation), even if it were in the simplified form, without its reception in the internal domestic system following, with respect to the organic and formal presuppositions provided for in a higher legal norm, violating, in his opinion, fundamental principles inherent to the Democratic Rule of Law, namely the principle of hierarchy of sources, the principle of competence, the principle of typicality of laws and the principle of legality of administration and what he calls the key principle of the constitutional binding of the legislator regarding the production normative that he infers from some constitutional norms that he identifies.

3.1.5. He would mark Q5-B called: "On the illegality of the Appellant's arrest and detention (of the arrest and detention not directly requested in violation of the principle of proportionality)", which he says is a new question, advanced in the Ruling of the STJ 28/2021 rendered in the records of the Appeal crime 07/2021, the fact that the Supreme Court of Justice, despite having invoked the rule inserted under Article 269, paragraph 3, when stating that information may come to its knowledge by any means allowed by Cape Verdean law, including, in the event that any emergency and danger in delay, by any means of communication, as follows from Article 269, paragraph 3, followed by confirmation by warrant, neither invokes nor fully applies it, thus constituting the refusal to apply a rule. In doing so, the STJ depletes an essential part of the aforementioned legal precept,



rendering it void and violating constitutional rights, freedoms and guarantees, indicating Article 17, paragraph 2, 244 paragraph 2, and Article 9 paragraph 2, as well as Article 9 paragraph 2, of the International Covenant on Civil Rights and Politicians, and Article 9 of the Universal Declaration of Human Rights. He substantiates his position saying that the conditions of detention, namely out of flagrante delicto, can only happen under the terms of the law, which did not happen, because any arrest warrant for the extraditee, the person whose extradition is sought, is unknown. In this case, the arrest and detention of the extraditee, the person whose extradition is sought, restricts his fundamental rights, going beyond the balance between the forms of cooperation between the States and the rights, namely the freedom of the extraditee, the person whose extradition is sought, the principle of proportionality provided for under Article 244 paragraph 2, and an arbitrariness forbidden under Article 9 of the UDHR and Article 9 paragraph 2, of the ICCPR - The International Covenant on Civil and Political Rights.

3.1.6. In relation to Q 6-C entitled: "On the Illegality of the arrest and detention of the Extraditee, the person whose extradition is sought, (Lack of arrest warrant)", which, according to him, had been raised under point c) and point V of the conclusion of the Appeal to Ruling 28/2021 and point VII of the Response to the ATTORNEY GENERAL'S OFFICE, the rules under Article 39 of the LCJ would have been applied in the sense that an individual can be detained without a court order, without issuing a red alert from INTERPOL and without knowing any fact that clearly justifies his arrest and detention, as it would constitute a violation of the norms he says indicated and of the principle of proportionality, citing in addition Articles 17 paragraphs 1 and 2, 30, No. 4, and 244, paragraphs 2 and 7, sub-sections b) and d) of the Fundamental Law, Article 6 of the African Charter of Human Rights and Peoples, Article 9 paragraph 2, of the International Covenant on Civil and Political Rights and Article 9 of the Universal Declaration of Human Rights.

3.1.7. Regarding the Q7-D presented as: "On the illegality of the arrest and detention of the extraditee, the person whose extradition is sought, (Non-communication of the reasons for the arrest and detention" and which will have been placed in the process through sub-section c) of the conclusion and under point V of the Appeal, as well as under point VII of the Reply to the ATTORNEY GENERAL'S OFFICE, he maintains that the rules under Articles 269 paragraphs 1 and 4, of the CPP and Article 31 paragraph 1, and 39 of the LCJ were applied in the sense that in the alleged illegality of his arrest and detention, the Appellant argues that the Ruling violated Article 4 paragraph 4, of the Constitution of the Republic in the part in which it requires immediate communication to the detainee of the reasons for his arrest and detention. Citing the prescription under Article 30, paragraph 4, of the Constitution, he presents a jurisprudence based on a doctrinal work that



assigns to the Constitutional Court of the Portuguese Republic and Article 269, paragraph 1, of the CPP, to conclude that in the application of the aforementioned legal rules there was a violation of the rules contained under Article 17, paragraphs 1 and 2, Article 12, and Article 30 paragraphs 1 and 4, all of the Constitution, Article 6 of the African Charter of Human Rights and Peoples, Article 9, paragraph 2, Article 14, paragraph 3, sub-section a) of the International Covenant on Civil and Political Rights and Article 9 of the Universal Declaration of Human Rights. He concludes by saying that by admitting that it is enough to inform the formal suspect that he is being extradited without indicating the different facts, each of which is punishable by the law of the requesting State and that the lawyers of the extraditee, the person whose extradition is sought, became aware of the charges made against him fifteen days after the arrest of the extraditee, the person whose extradition is sought, and that in the event of a warrant existing, which is not verified in this case, all the information provided for by law should be included in the warrant that would be delivered to the extraditee, the person whose extradition is sought, as well as the eight counts that would support the request.

3.1.8. With regard to Q8-E, which denominates violation of the principle of reciprocity, he asserts that the rules under Articles 3, paragraph 3, and 6, paragraph 3 of the Law of Judicial Cooperation were applied in the sense that the waiver of reciprocity is possible in any form of international judicial cooperation, including, therefore, extradition, in violation under Articles 7, sub-section l), 11, paragraph 1, and Article 25, paragraph 1, of the CRCV, unconstitutionality that had been raised in points qq ) to vv) and points 236 to 277 of Appeal 07/2021 of the decision of Ruling 28/2021 and in the Reply to the Opinion of the ATTORNEY GENERAL'S OFFICE, 1-5, 13-17, 36-37.

3.1.9. Then Q9-F, which designates violation of the principle of specialty and extradition for political reasons, raised, according to information provided, under points ww) and set down under Articles 303 to 309 of Appeal 07/2021 of the decision of Ruling 28/2021 and in Response to the Opinion of the ATTORNEY GENERAL'S OFFICE, 29-41, in which he alleges that a rule arising from Article 17 of the LCJ was applied according to which the authorised extradition is so that the extraditee, the person whose extradition is sought, is subject to criminal proceedings for only one of the crimes that he is charged with in accordance with the guarantee offered by the requesting State. Because, in his opinion, this decision does not correspond to the guarantee given in diplomatic note No. 103 from the USA, in which this country proposes to abandon all charges and seek extradition only on the basis of element 1 of the indictment, nor does it correspond to the need to intervention of a judicial body in cases of offering guarantees of effective reduction of the prosecuting items,



CERTIFIED TRANSLATION
12/09/2021
REG-07635166
LANGUAGE REACH

allowing criminal prosecution beyond the precise legal limits (2 alternatives so as to choose one) and beyond the two specifically predefined crimes and not any of the remaining 6 others. Therefore, it violates Articles 11 paragraph 1, Articles 15, 17 paragraphs 4 and 5, and Article 18 of the CRCV – Cape Verde Constitution, as these would require that the guarantees be provided by the judiciary and not by administrative bodies of the requesting State that are not binding on the courts, which are free to judge the Appellant for the entirety of what is contained in the indictment.

3.1.10. Regarding the following question (10-G), identified as: "Perpetual nature of the penalty" and which will have been raised in points h) to j) and set down under Articles 727 to 759 of the Appeal of the decision of Ruling 28/2021 and in the Response to the Opinion of the ATTORNEY GENERAL'S OFFICE, Tit. V, 10-46, he considers that Article 6, paragraph 2, sub-section a) has been applied in the sense that a valid and sufficient guarantee given by an Embassy of the requesting State permits extradition to a country that applies the death penalty or life imprisonment would be a misinterpretation of this rule, insofar as it requires that the request be made by an irrevocable and binding act on its courts and other entities. In his perspective, such understanding would be inconsistent with Articles 1, paragraphs 1 and 2, Articles 24, 38 paragraph 2 of the CRCV – Cape Verde Constitution. In this case, the requirement that the requesting State offer guarantees that such penalty or security measure will not be executed. He further argues that in a similar situation the Supreme Court of Justice had not accepted that a similar diplomatic note from the same requesting State would constitute an adequate guarantee, which would specifically violate Article 1 paragraph 1 and 2, and Article 24, and that he would be faced with a typical masked extradition that would have political motivation in its wake due to the association that the requesting State established between the extraditee, the person whose extradition is sought, and Venezuela, something that would not be admitted even under Article 38 paragraph 1, sub-section a) of the CRCV, nor by the jurisprudence, namely that of the USA.

3.1.11. In the following item that he calls "immunity", he indicates that the decision applied the rules under Articles 156 paragraph No. 1, sub-section b), and Articles 157 and 161 of the CPP with the sense that the absolute incompetence of the Cape Verdean courts to hear and examine a matter relating to immunity under International Public Law arises from a prior assessment or political position, leading to the denial of recognition of the extraditee, the person whose extradition is sought, as a special envoy, after the official recognition of his status by the sending State and by the State that was going to receive him.



Thus, in violation under Article 2 paragraph 2, Articles 7 and 11 paragraph 1, Article 12 paragraphs 1 and 2, 211, No. 1, and Articles 2, paragraph 1, and 103 of the United Nations Charter, which had already been raised through sub-sections s), t), u), v), w), x), y), s), aa), bb) of the conclusions and points 104 to 277 of Appeal 07/2021 to Ruling 28/2021 and points 1 to 108 of the Reply to the ATTORNEY GENERAL'S OFFICE.

3.1.12. With regard to Q 12-I, as he says, raised in the conclusion of point xx and Articles 525 to 647 of title XV of Appeal 07/2021 of the decision of Ruling 28/2021, he alleges that the STJ refused to apply the rules under Articles 15, paragraph No. 4, of the Constitutive Treaty and Articles 34, 89 and 90 of the Protocols of 1991 and 2005 on the ECOWAS Court of Justice, insofar as he will have understood that a treaty enters the Cape Verdean legal system, and has full effectiveness, in accordance with the Constitution, must be signed and ratified and that Cape Verde has not signed the additional protocols that recognise the competence of the ECOWAS Court of Justice in matters of human rights and that ECOWAS is not a supranational organisation for the purposes of paragraph 3 under Article 12 of the CRCV, which contradicts the provisions of paragraphs 1 to 3 under Article 12 of the Fundamental Law, the court not recognising the supranational nature of ECOWAS, the fact that Cape Verde signed the Protocol establishing the ECOWAS Court of Justice and the Treaty Constitutive of this organisation has been ratified and published in the *Cape Verde Official Gazette* and also the rule in paragraph 2 under Article 210 of the CRCV – Cape Verde Constitution.

3.2. He concludes by considering having carried out the improvement, presenting the requirements presented by the law through this document, referring, however, in the relevant part to the request already formulated in the application for filing the Appeal.

3.3. Upon receipt of the improvement document, surpassing the issue of paragraph 1 under Article 86, on 5 May 2021, the Rapporteur complied with the provisions of paragraph 4 of the same provision, sending notification to the Appellant to present final arguments. As this is a process that by law is considered urgent, he decided to set the period provided for under paragraph 2 under Article 88 to fifteen days.

4. Finally, on 28 May 2021, he submitted the final version of his document of closing arguments set out in 122 pages and marked by an introductory part in which the Appellant introduces and presents himself in person and characterises the special context of the extradition process in which he is involved, discusses the role of the Constitutional Court and the



approach that he understands that its judges should take in relation to the constitutional issues that they consider in these records and, finally, pronounces on the fulfilment of the conditions for the issues that he brings to the Court to be admitted.

4.1. He then discusses his first question of constitutionality regarding his entitlement to personal notification of an extradition request and the request that admits it, presenting a set of information imposed by the law that will be resumed later, some decisive arguments to leverage his allegations that this duty of personal notification was disregarded through contrary normative understanding and that, for him, they would be in non-compliance of various constitutional precepts. From the premise that the extradition process has effects on personal freedom would have a criminal nature, which would result in the application of basic principles and constitutional and legal guarantees on this matter. As a result, only with personal notification, the formal suspect, the main interested party in the process, could fully exercise his defence, and the simple notification of his agents is not enough. Moreover, as, in his understanding, this Court has stated in several Rulings, from this would derive the legitimacy of this body, through this type of process, to repair the unconstitutionality of the interpretation made by the Ruling or resolve the legal-normative issue.

4.2. Regarding the second question of constitutionality associated with the not in person trial with hearing of the extraditee, the person whose extradition is sought, despite the fact that he requested evidence, a segment in which he promotes legal theses according to which this would be one of the most serious unconstitutionalities suffered, the case file prevented the extraditee, the person whose extradition is sought, from demonstrating before the Cape Verdean legal system, that the facts attributed to him, do not constitute a crime, which would be contrary to the principle of double criminality and the principle of legality. He then discusses this issue, adducing arguments to support his thesis, and then goes on to discuss the lack of territorial connection in the case. And it focuses on considerations about the right of a formal suspect to be heard, as currently, as he informs, has happened in Portugal, when due diligence is required, also within the spirit of the CPP. In this case, the Appellant requested due diligence and asked for the document to be attached, thus requiring a public hearing, which was not held by the Court. He also discusses the extradition process and its phases, and in the judicial phase, the Appellant's hearing would take place. Denying due diligence and investigation of evidence,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
R 07635166

specifically the hearing, after the promotion of the judicial phase of the process, based on a previous hearing in the administrative phase, would violate sub-sections a) and b) of paragraph 1 under Article 77 of the Code of Criminal Procedure, which would materialise rules of Constitutional Law and International Human Rights Law. He cites jurisprudence of the Constitutional Court referring to the right to be heard and to be heard provided for under Article 35, as well as national doctrine. Failure to hear the extraditee, the person whose extradition is sought, on the grounds of urgency to hand him over to the requesting State is a violation of several of his rights.

He also adds that the position of the judicial body would be even more violating because there was a requirement for steps to take evidence that, if they were carried out, they would know that he was charged with eight crimes and not seven, thus without being able to better prepare his defence in opposition, and also because it confirmed the decision on the basis of facts in relation to which he was not heard. In a context in which this was a case with enormous potential for media contamination and global dissemination, considering the inherent geopolitical links, which can undermine the systemic and organisational balance of the Cape Verdean legal system itself.

He further alleges that it was understood that it was not necessary to carry out the evidence without the court having justified it as it should and based on the existing legal network and mentioned its position, in violation of general principles of process, the adversarial system and the due legal process that imposes the prior submission to debate by the parties, violating Article 35, paragraph 6 of the Constitution and leading to irremediable annulment pursuant to the terms under Article 155, g) of the CPP.

And, finally, that the limitations that were placed on the production of evidence prevented him from demonstrating that the accusation brought against him could not be met by the Cape Verdean legal system due to incompatibility with the principle of double criminality, namely from the statement of arguments which he presents to conclude that the facts that the Appellant has been accused of before the Florida Court do not fulfil any penal type under the Cape Verdean legal system, so that the Appellant could not be extradited to the U.S.A. based on them, due to the lack of double criminality requirement. In this sense, the Supreme Court of Justice did not address the issue in the slightest, starting from false considerations and not considering the rules of law enforcement in the area.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
RL07635166

12

Thus, violating the principle of *nullum crimen sine lege*, that a person may only be found guilty of a crime in respect of acts which constituted a crime at the time of their commission, recognised by the Constitution and by International Law, also applicable in cases where the handing over of a person who is in Cape Verdean territory is requested. In addition to this, it would translate into the principle of double criminality, which, therefore, finds its constitutional position under paragraph 4 under Article 32 of the Constitution, which is included in an interpretative rule inserted under paragraph 2 under Article 31 of the Law of International Judicial Cooperation on Criminal Matters. The decision of the Supreme Court of Justice, on considering that the principle of double criminality was fulfilled, convicted an innocent person, because it is not enough for the requesting country to qualify the fact as a crime of money laundering, it would also be necessary for it to constitute a crime of money laundering before the Cape Verdean legal system. In the specific case, in his diction and phrasing, as the facts occurred abroad and in contact with a legal system different from the one that requested the extradition, there is a conflict of criminal laws in the section in which Cape Verdean law requires the application of the law of the place where the facts occurred, in this case the Law of Venezuela, to the exclusion of any other and that of the USA. Even if considering that this assessment should be made not specifically, but in principle, the revenues from a contract for the construction of social housing cannot, under Cape Verdean law, generate funds of criminal origin, susceptible to being the object of money laundering, because in this case, the State of Venezuela would be considered to have committed a crime, which would give the matter a political rather than a legal nature. The facts in question have no criminal relevance in the Cape Verdean legal system for lack of a prior crime. Such procedure is followed by American courts, which also do not recognise jurisdiction to their courts in cases similar to that of the Appellant. Hence the violation of the principle of double criminality and claim the violation by this rule of the constitutional principle of publicity and orality.

4.3. In relation to the third item, which deals with the limitations that were imposed on the opposition that it deduced and the steps of evidence that he requested, he says that they did not allow him to demonstrate that the facts that constitute the prior crime of money laundering occurred in Venezuela, therefore, according to Cape Verde's conflict resolution rules on the application of the country's criminal law in the area, the criminal relevance of these facts should be verified in accordance with the law of the South American country and not in the light of that of the United States of America and were essential for to determine the Appellant's effective participation in the alleged unlawful behaviour, and other



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

aspects that he could produce evidence, namely about his health status, about the payment of the visa, mission documents, and several others, aspects about which he could provide evidence, how he was able to do it in relation to other aspects such as the aggravation of his procedural situation, the validity of his arrest and detention and also the political context of his arrest and detention. He also considers that the rejection of carrying out the investigation of the required evidence, which would constitute omission of the necessary steps, was treated by the Supreme Court as a mere irregularity; the alleged annulment is covered by a decision of this judicial body, and this is only admitted separately when the procedural violation is not, even indirectly or implicitly, covered by a court order. If there is a court decision that presupposes the act as defective or vitiated, the proper way to react against the illegality is not the plea or claim for annulment, but the challenge of the respective court decision through the filing of the competent Appeal. On the other hand, the allegation of irregularity in the omission of a pronouncement and the decision taken on it does not allow an Appeal, since the only Appeal that would be admissible would be the final decision, pursuant to Article 49, paragraph two, of the Law of Judicial Cooperation, so that the imposition of the prior complaint of irregularity, without being in the case of an Appeal, would result in a legal impossibility. Therefore, the Ruling would be illegal and null in the segment in which it rejected the carrying out of due diligence, and the interpretation made under Article 155 is unconstitutional.

4.4. The Applicant then considers, in a point where he explains his fundamental thesis that the Republic of Cape Verde could not integrate, invoke or apply in its legal system through an internal law or other legislative instrument, acts or instruments constituting an international organisation (or instrument of international cooperation), even be it in simplified form without its reception respecting the organic and formal presuppositions set forth in a superior legal norm for violating several fundamental principles inherent to the Rule of Law and that, in addition, the Constitution of INTERPOL and other cited texts are treaties that refer to the ratification, a matter of domestic law regulated among others by paragraph 2 under Article 12 of the Constitution. He considers that the country is part of the organisation, but the Interpol texts would require approval by the National Assembly, despite being, in his opinion, an agreement in a simplified form. However, it was not published, despite the constitutional legal regime in force at the time demanding it, determining its ineffectiveness, the same happening with its approval that belonged to that same sovereign body.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

14

Without this, the Judiciary Police could not rely on INTERPOL's precepts, standards or philosophy to arrest and detain a person or perform any procedural act that results in the restriction of the right to freedom and security of a person because the instruments of this organisation do not have legal effectiveness in the Cape Verdean legal system, not least because the unconstitutionality of this instrument was never declared by the Constitutional Court and was never confirmed by the Government, and the signature is not sufficient to subject the State to all the obligations arising from a treaty.

4.5. He dedicates the following part to the illegality of the Appellant's unsolicited detention in a context in which the Appellate Court did not justify the fulfilment of the requirements under Article 269, third paragraph, of the CPP, which he invokes, but does not apply, emptying an essential part of the legal precept on omitting the requirement of immediacy, still disregarding Article 268 of the same statute. He fights for the application of the CPP rules on coercive measures and on communication of acts between judicial authorities and police bodies for the purpose of detaining a person, in the sense that it can only be carried out on the basis of a letter rogatory or execution of foreign criminal sentences. He adds that so far, there is no warrant in the process, restricting his fundamental rights, which are excessively limited, without a fundamental duty being able to prevail over a fundamental right, based on the principle of international cooperation between States to achieve the right to freedom in a disproportionate way and other principles of the rule of law, also violated in the case. He concludes that the detention of the extraditee, the person whose extradition is sought, is arbitrary and violates several norms.

4.6. As for the sixth question regarding the illegality of the arrest and detention for lack of an arrest warrant, which addresses the right to bodily freedom, considering that the detention of an individual which may result in his constitution as a formal suspect depends on a warrant. The idea that a police may deprive an individual of their freedom on the basis of an informal request from a foreign police agency is not compatible with the principle of legality. In this specific case, the arrest warrant is in the name of Álvaro Enrique Pulido Vargas and not the Appellant, so the red alert would be null and void. Therefore, the interpretation of the appealed judicial body is unconstitutional,



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

15

it being even more pernicious for depriving the Appellant of having an effective knowledge of the charges on him and without being able to exercise an active role in his defence, this understanding being excessive. He adds that the appealed or contested Ruling goes so far as to consider that the arrest may not be accompanied by an arrest warrant, forgetting that it has to be processed in accordance with the current procedural law, that the red alert was issued in contravention of the rules of INTERPOL data processing and that it seems to result that the legislator has the understanding that the temporary custody in the extradition process is about protective custody. Thus, since the intervention of this body is illegal, the entire detention process is null and void and without any legal effect. Hence, he requires the declaration of unconstitutionality of a norm for violation of a set of constitutional and international provisions.

4.7. In a similar sense, he discusses the illegality of the detention of the extraditee, the person whose extradition is sought, for his not having been communicated the reasons for his detention to him, because, in light of the applicable legal and constitutional rules, he disagrees with the interpretation according to which it is sufficient to inform the Appellant that he is being extradited without stating the exact distinct facts. Even so, the arrest and detention would still be valid. In his specific case, the lawyers only learned of the charge made against him fifteen days after his arrest, and he was not informed of the reasons for the mobilisation of that instrument of extradition and of his rights as a formal suspect. In the warrant, according to him, non-existent, it should contain this information and the eight counts that substantiate the request of extradition. Basically, he will only be able to organise his defence if elements are communicated to him that allow him to understand the specific facts that are imputed to him, resulting from guarantees provided for under International Law and by the Internal System for the Protection of Rights to guarantee an open and transparent process, in accordance with the principle of good faith, especially in its dimension of loyalty, already dealt with by this Court. On the contrary, the decision, in order to comply with the Constitution, should be constructed in the sense that every person detained or imprisoned must be immediately informed, in a clear, detailed, objective and understandable manner, of the reasons for their arrest or imprisonment and of their constitutional rights, through a warrant to be delivered on the spot.

4.8. In the next segment, he discusses the violation of the principle of reciprocity, professing the understanding that extradition is a matter of international relations and the reciprocity of advantages is one of the principles that govern the international relations of the State pursuant to paragraph 1 under Article 11 of the Constitution, and cannot be excluded from this fundamental guideline.



16

Hence, we come to his most important legal thesis in this segment, that the ordinary law cannot rule out reciprocity in relations between the country and a foreign country, in this case the United States of America. He also adds the argument that it would have to do with the treatment of foreigners temporarily in Cape Verde, insofar as it would require them to be accorded treatment compatible with the rules of International Law, and with the rule on the extension of rights to foreigners under Article 25, which, as he understands, only excludes political rights. These constitutional rules would prevent the reciprocity of advantages from being dispensed with in the extradition process. In the specific case, the Minister of Justice should have demanded reciprocity from the requesting State, especially since it is a foreigner in transit with limited connections to the State of Cape Verde.

4.9. Regarding the violation of the principle of specialty and extradition for political reasons, he voices the thesis that the decision to confirm the Appellant's extradition violated the principle of specialty which, in his opinion, is safeguarded by constitutional norms and laws. This principle arises from the constitutionality and the fact that the principle of specialty is a principle of International Law of direct application in our legal system, which would also have a subjective dimension. In the specific case, he points out that the court decisions do not correspond to the guarantee given in the diplomatic note 103 of the USA - which he quotes - nor do the guarantees correspond to the need for intervention of a judicial court of the Requesting State regarding the offer of the guarantee of effective reduction of counts of the indictment in relation to the Appellant, especially considering what peers would refer to as the effectiveness of this commitment and the possibility of the Appellant not receiving a fair trial. In the absence of an extradition treaty between the two countries, neither the extraditee, the person whose extradition is sought, nor Cape Verde will be able to contest any violation of these guarantees, nor may this result from the Convention to Combat Transnational Organised Crime. In this sense, Cape Verde cannot shirk its duty to ensure the application of the guarantees given by the Requesting State in this matter. In addition to this, the direction given to the matter, by not choosing the alternatives presented by the Requesting State, makes it difficult for the Appellant to defend, as the lawyer will have to prepare the defence in relation to all crimes, also verifying that the State guarantee was provided by the Ambassador, which does not bind the judicial courts and that the judicial body under appeal did not analyse the guarantees provided, contrary to the duties of the requested States to ensure that they meet the legal requirements.



4.10. Regarding the issue of life imprisonment, the insufficiency of the guarantee of non-application given is pointed to because it is provided by an Embassy, which violates Article 38, paragraph 2, final part, the principle of human dignity, the principle of equality and the principle of protection of trust. He also points out that in another case the STJ – Supreme Court of Justice, considered that this type of guarantee would not be adequate and that what is at stake is an extradition for political reasons, considering the tense relationship between the two countries and the role attributed to the Appellant in the public affairs of his country, and that is why he has been claiming that it is masked extradition, which the Constitution would reject. He argues about the first of the points that debated the issue of extradition in cases of application of the sentence of life imprisonment with the intervention of several jurists, including current judges of the Court. Therefore, he challenges the Court to also apply this brake to foreign citizens, as it generates an insurmountable contradiction that started to be allowed after the constitutional revision, hurting the essence of the Cape Verdean citizen and his sense of equality and recognition of the dignity of the human being and other principles of treatment of foreigners.

In his opinion, since there is some oscillation between the thinking expressed by the Court and its judges, it would be considered that equal treatment should be guaranteed to all with regard to penalties, otherwise, and outside the realm of political rights, nationals and non-nationals would be treated differently, contrary to the principle of equality. In addition, the principle of protection of trust would be at stake because the Supreme Court reversed the orientation that it had already accepted in a similar situation without any justification or explanation of public interest and frustrating the Appellant's expectations in the decision itself and in the conduct of the process. Furthermore, he adds that in this case, the Appellant is being required by another State and not by the International Criminal Court. That is why the decision is unconstitutional because it grants extradition to a country that applies life imprisonment and because in that country, he would run the risk of irreversible damage to his physical integrity.

4.11. Regarding the issue of immunities, in addition to indicating information regarding the formal requirements prescribed by law, he says that without violating the principle of separation of powers, national courts have



CERTIFIED TRANSLATION LANGUAGE REACH
12/09/2021
RE 7635166

constitutional powers to not deny immunities and transfer this competence to the political power and, in so doing, in the case that would result from him being special envoy, violate constitutional and international norms, imputing the requesting State to have tried to restrict the decision-making freedom of the courts that intervened in the process. This is because the Appellant is a special envoy from Venezuela, having invoked that status in the first hours of his detention. Therefore, it being incumbent on the Appellate Court to hear the matter, it should do so, namely by taking the initiative to interact with the Government or vice versa. Going on to discuss applicable international law, he says that it would result from the 1969 New York Convention, and asserts that, being indisputable that the Appellant would qualify as a special envoy, the Supreme Court of Justice could not have considered that he would not be protected by inviolability and immunities, which he considers a misinterpretation of International Law because prior notification would be a merely formal condition and, in this case, Venezuela was not in a position to anticipate it given the unplanned and purely technical nature of the stopover in Cape Verde. Therefore, what would matter, in such a context, would be to know if this country was informed as soon as possible, a question that he claims, should be answered positively. The other condition provided for by the applicable rule would not require that consent be expressed, another aspect that the Supreme Court misinterprets and unconstitutionally, since, in such cases, once informed what Cape Verde should do was to object, which it did not do, violating Venezuela's rights. Even though Cape Verde was notified, albeit belatedly, it was up to it to express this objection to Venezuela, which it did not. It concludes the point by summarising an important segment of its legal thesis by saying that Cape Verde should be considered a transit State which, having been notified of the passage through its territory of a special mission and having raised no objections, had an obligation under international law, to respect the immunity and impunity of the Claimant. And not subjecting him to detention and subjecting him to extradition proceedings. The State of Cape Verde still had the duty to try to diplomatically resolve the dispute and if it had opposed the transit and recognition of immunities, it should have acted differently, informing Venezuela of its disagreement or declaring the Appellant persona non grata, under penalty to generate the international responsibility of the State.

He also says that the Supreme Court of Justice has failed to recognise that as of 24th December, the Appellant was Venezuela's Alternate Permanent Representative to the African Union,



thus generating a double accreditation, which would be governed by contemporary and conventional International Law, according to the jurisprudence of the ICJ. In this case, Cape Verde should have immediately recognised this statute and, in case of disagreement, to have formally expressed an objection to Venezuela, which, once again, it did not do. Nor did it try to peacefully resolve this dispute. In these cases, it would be obliged by international custom to allow the passage of that representative, provided he is innocent. In the event the country did not consider it so, it had an obligation to claim it before the entities involved. He introduces a point according to which when someone is appointed as a representative to an international organisation or State, this act takes effect immediately, resulting in a duty to suspend any ongoing judicial or administrative proceedings inconsistent with this immunity and inviolability. It arises in relation to the court's finding that the appointment had been opportunistic and abusive, which would be a serious allegation and not materially demonstrated in a framework where a presumption of good faith prevails in favour of the sending State, concluding that even were this to be proven, the only applicable sanction would be to declare the beneficiary *persona non grata*. Finally, the Convention on Diplomatic Relations, U.S. law, and U.S. jurisprudence recognise retroactive diplomatic immunity. For all these reasons, he concludes, proclaiming that depriving a person of his freedom when he has two mandates to represent the State, which was not duly evaluated by the Court, would be a serious violation of many rules of diplomatic law.

4.12. After transmitting the formal information relevant for the purposes of the law, he discusses the matter referring to an opinion by Professor Wladimir Brito which is in the records, and pointing out that Cape Verde is part of the original and revised treaties of the regional organisation, of the 1991 Protocol, being linked in particular to its Article 11, paragraph 1, it being irrelevant whether or not it has ratified the 2005 one, since it is being applied provisionally and is not an ordinary treaty. Such an organisation would be supranational depending on its characteristics. Also because being an integral part of the ECOWAS Revised Protocol, even a State that has not ratified the protocol is obliged to apply all its decisions under the aforementioned 1991 Protocol and because the country did not diverge from it when it was adopted by the Conference of Heads of State and Government, for having appointed judges to integrate it and to be part of its Judicial Council, intervening in the process resulting from the State's complaint to that judicial body.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
RL207635166

20

These behaviours would therefore prevent the country from denying its jurisdiction and in light of the rules of the organisation and the interpretation that the Court of ECOWAS makes of them, it has the duty to comply with its decisions that are enforceable in Cape Verde and in full.

He added the thesis that such obligation would result from the fact that the Protocol is being provisionally applied, a situation regulated by International Law, with the States intending to include the provision that attributes competence to the ECOWAS Judicial Tribunal to judge on matters of human rights. In addition, there would always be a material and substantial duty to accept the decision of ECOWAS and that would be able to address any formal issue. This is namely because it is a human rights issue, due to the effects of the ECOWAS legal network composed of treaties, protocols and bylaws, as it was not recognised that there was implicit ratification, according to the methodology adopted by the Protocol and without an integrated reading of the provisions of the instruments mentioned, due to the primacy of International Law and the jurisprudence of the ECOWAS JUDICIAL TRIBUNAL, also referring to the principle of essentiality in signature and ratification, the extensive application of the principle of good faith in its positive and negative aspects and the extensive application of the principle of *pacta sunt servanda*. He ends by bringing up the *estoppel* doctrine, designated as limitation, applicable insofar as the Prime Minister attended the Conference where this instrument was negotiated, which would be equivalent to acceptance and approval of the Complementary Protocol. And the fact that the country participated in the process, which would also refer to the doctrine of *forum prorogatum*, which would oblige it, since, after having objected to the jurisdiction of the Court and had rejected it, rejecting the preliminary objections, having submitted to the jurisdiction of the Court. Therefore, the fact that Cape Verde has not signed the Complementary Protocol does not mean that it has not ratified it by conduct.

4.13. That said, he presents conclusions, referring to the twelve questions of constitutionality that he raised, he refers to the violated parameters and asks that its unconstitutionality be declared by joint violation or, if so understood, subsidiary, and consequently ordering the courts to his immediate release.

4.14. The final allegations were accompanied by five opinions, some of which with attached documents, whose merger and attachment was authorised by the Advisory Judge Rapporteur.



5. In turn, the Public Prosecutor's Office, when it had the opportunity to counter-claim, submitted a 29 page document, which also begins with general considerations that the Appellant argued the unconstitutionality of practically all LCJ rules, some of which, in the its opinion, irrelevant to the decision of the case and that which puts itself in crisis more than norms are the decisions on the merits taken by the Appellate Court. Therefore, it built its answer not only to discuss the issues of constitutionality, but also to refute these other allegations of the Appellant, insofar as he wants the Court to rule on the merits. Recalling that the Appeal for constitutionality does not have as its object the decision itself, but only the part in which it applies an unconstitutional rule or refuses its application for reasons of unconstitutionality, which also limits the cognitive power of the Court, which cannot replace the ordinary court, limited to dealing with the question of unconstitutionality. It also chooses to discuss the difference between the extradition process and the criminal process, which, in its opinion, cannot be confused, as one refers to a procedure instituted by the State against a person and the other to the fulfilment of a duty within the scope of international judicial cooperation. As a result of this distinction, the CPP is always applied with the necessary adaptations, and it is not possible to intend its application to extradition as if it were a criminal case. It then refers to issues of unconstitutionality.

5.1. As for the requirement of personal notification of the extraditee, the person whose extradition is sought, it points out that there are applicable rules of their own, and this issue cannot be given any relevance unless it was in situations of trial in the absence or without representation by a lawyer. In this specific case, the extraditee, the person whose extradition is sought, even acknowledges that he became aware of the promotion through his lawyers. In addition, the Appeal is not justified because it is an irrelevant rule for the specific case, considering that the extraditee, the person whose extradition is sought, was aware of everything he alleges that he was not personally notified through his lawyer, exercised his right of defence, presenting all the legally admissible means of evidence during all procedural stages. It concludes that no constitutional norm or principles were violated with the interpretation and application of the LCJ.

5.2. With regard to the trial in person, with the hearing of the extraditee, the person whose extradition is sought, it says that despite the fact that he required evidence, the Appellant is also not correct because the rule that does not require the hearing of the extraditee, the person whose extradition is sought, in a hearing does not violate any



constitutional norm or principle as, in its understanding, it has been the orientation of the Constitutional Court of the Portuguese Republic, with no reservation being placed on the fact that the decision is taken in consultation. Therefore, literally, there would be no obstacle to not holding a trial in person and not hearing the extraditee, the person whose extradition is sought, as has also been the position of the STJ.

      5.3. Regarding the absence or not carrying out investigation of evidence and the interpretation given to Article 155 of the Code of Criminal Procedure, it also says that there is no constitutional inconsistency, as even in the scope of criminal procedure, the law assigned the power of direction to the judge, allowing him to reject useless proceedings and investigative measures. Furthermore, the jurisprudence of the Portuguese courts, of other countries and of Cape Verde have considered that it is not appropriate for the formal suspect to defend the crimes of which he is accused by the requesting State, since he will have the opportunity to do so before the courts of this country. It also considers that the Appellant refers to international instruments that do not contain any provision relating to extradition, and are therefore not applicable, and that he understands that he should have been authorised to present evidence to defend his procedural position, based on a wrong assumption of that the extradition processes are small point trials, but that they are not intended to assess the assumptions of the imputation of crimes to the agent who is the target of the extradition process, but simply to ensure the existence of sufficient evidence, in light of the law of the Requesting State or of a treaty, to allow the handing over of the extraditee, the person whose extradition is sought, to the Requesting State so that the latter can judge him for the facts of which he is accused and assess his guilt or innocence. In his view, such a solution is based on diverse and valid foundations, since the assessment of this issue would lead to the sovereignty of the Requesting State being in question or restricted, the assessment of the assumptions of imputation requires an understanding of the criminal law of the Requesting State whose interpretation by the Respondent State, would always be risky, insofar as it is a foreign law, with its particularities, the fact that the requests do not, as a rule, specify the totality of the grounds underlying the accusation directed at the extraditee, the person whose extradition is sought, leading to the requested State tried to assess the guilt from an incomplete record, thus generating a series of inconveniences; the reassessment of the assumptions for attributing the facts to the accused would place a significant burden on the Respondent State. This implies a thorough analysis of all the evidence presented by both parties insofar as the violation of the law of the requested State would not be at stake.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

23

Therefore, it concludes that the formal suspect is unable to produce evidence to support or sustain his position, without this resulting, always in his diction, the limitation of his defence, as he may do so before the Requesting State, under the terms established by the procedural law of the latter. This would be an understanding supported by Portuguese jurisprudence that serves as a reference to the Cape Verdean one, given the similarity between the laws and it is not understood how these provisions could undergo such different interpretations, as in Portugal the prohibition of the extraditee, the person whose extradition is sought, to present his criminal defence does not constitute a constitutional violation. He says that the allegations about the fact that this prevented him from raising objections to the principle of specialty and the prohibition of double criminality which are pillars of the extradition process. However, these principles do not imply an analysis of the evidence relating to the facts that support the accusation in the requesting State, but only of the facts on which the extradition request is based. Finally, on this first segment, it says that the case law of the United States goes in the opposite direction of what is alleged by the Appellant, as it is also in line with the model adopted by the LCJ, in the sense of containing limitations to the presentation of evidence of defence in the process criminal during the extradition process. Even when they admit that the formal suspect presents, at the judge's discretion, and in a limited way, evidence to explain the accusations against him, in the specific case, he wants to directly oppose the facts that support the accusation, which is directly contrary to the American and Cape Verdean jurisprudence. Furthermore, it is argued that even if he could present contradictory evidence, it is not clear that it would help him. It concludes that the procedural regime of extradition ensures constitutionally protected defence guarantees, namely the right to a double degree of jurisdiction, not reaching the extent to which violation of the principle of *ne bis in idem*, or principle against double jeopardy, may be at stake. On the other hand, as to the means of reaction of evidence proceedings (by complaint or by Appeal), there is no constitutional problem, namely the lack of effective judicial protection, as there is an adequate procedural means to react to a given court decision, which the extraditee, the person whose extradition is sought, did not use

5.4. Regarding the illegality of the arrest and detention of the extraditee, the person whose extradition is sought, based on an informal request by a police agency of conventional origin (INTERPOL), without the due ratification, promulgation and publication, it says that this is an irrelevant rule for the decision of the case, insofar as the contested provision, Article 39, provides that it is the criminal police and not the INTERPOL National Office that can make an arrest.



Therefore, regardless of membership of that organisation, the criminal police can arrest and detain under that provision, as effectively happened in this case. Thus, there is no violation of any provision or constitutional principle as the Public Prosecutor's Office, as it asserts, had been saying and, apparently, would result from an opinion that it put together.

5.5. In relation to the illegality of the Appellant's arrest and detention not being directly requested in violation of the principle of proportionality, he describes the legal system and says that the detention in question and the legal system do not deserve any reservations considering what the restrictions of rights should be, namely the principle of proportionality, and this possibility should not be considered unconstitutional, as, by way of comparison, the Portuguese Constitutional Court had already concluded.

5.6. With regard to the illegality due to the lack of an arrest warrant, it argues that this issue does not generate any unconstitutionality either. The only difference between a request for prior arrest and detention and arrest and detention not directly requested is that, in the latter case, the person's State of origin is unaware of their presence in the country. In such cases, the basis for detention is information from the criminal police authorities that a certain foreign citizen is wanted, information that may or may not be accompanied by the existence of international arrest warrants. In this context, if the country of origin disseminates such information, it would take steps to make a request for the extradition of that citizen if it knew of his whereabouts. It also informs that the placement of the Red Notice is done by INTERPOL's national offices, which must meet certain requirements, including the delivery of an international arrest warrant, passing through the scrutiny of a commission of experts. It also says that the case records contain an international arrest warrant against the Appellant issued by the judicial authorities of the United States about which there is a manifest lapse which consisted in the addition of the arrest warrant records with the name of another person, and there is, as it says, no doubt of that there is a court order against the Appellant, since only on that basis would a Red Notice be issued, which, in its understanding, would contain the photograph and data of Alex Saab. It says that for the Court's knowledge a copy of the correct warrant is attached. Therefore, from what is above, it considers that Article 39 LCJ does not violate any constitutional provision or principle.



5.7. In relation to raising the illegality of the arrest and detention of the extraditee, the person whose extradition is sought, for not communicating the reasons for this, it says that this issue of unconstitutionality is not autonomous. This type of arrest and detention not directly requested can occur without the existence of any arrest warrant, so it is natural that the accusations that justify the arrest and detention are not communicated in complete and absolutely rigorous terms, it being sufficient that the potential extraditee, the person whose extradition is sought, is informed at that time that it is an arrest for extradition purposes.

5.8. With regard to reciprocity, it discusses the legal regime and essentially adheres to facts that mark the present situation, considering that the United States does not refuse to extradite in identical situations. What they cannot do is grant an absolute guarantee in this regard, that the legal basis for the Appellant's extradition is the Palermo Convention that the country was obliged to comply with. Finally, there is no obligation to refuse an extradition request for lack of reciprocity. It promotes an interpretation of paragraph 3 under Article 3 in the sense that the specific situation is part of a circumstance that justifies extradition, since the crime of money laundering is a form of serious crime that the country is committed to fighting. Furthermore, it says that it is a purely political decision that is not subject to the appreciation of the courts, therefore a valid and effective political act of exclusive competence of the executive power and indisputable by the courts. Therefore, even if, hypothetically, it was considered that there was an absence of reciprocity in the case, not only is this absence not a reason for mandatory refusal, but the assessment of the matter is excluded from the Cape Verdean courts by virtue of the decision of the Minister of Justice.

5.9. It says that under the segment entitled specialty/extradition for political reasons, the Appellant only invokes the unconstitutionality of the interpretation of the principle of specialty, which demonstrates that political reasons are not the basis of the extradition request. And it verbalises the understanding that it attacks the decision on the merits itself and not the interpretation given to the legal provisions applied. It further argues that there is an express guarantee in the records of compliance with the principle of specialty, an institute that emerges from the trust between the States. In this regard, the competent authority over the sufficiency or insufficiency of this guarantee is the court of law, as the Constitutional Court limits itself to analysing the conformity of the rule applied with the Fundamental Law.



The guaranties regarding the penalty and specialty would suffice, and the defence does not dispute that they bind the entire U.S. executive, including the Department of State and the Department of Justice. There is no reason to believe that they will not be complied with, especially so that the State can obtain the cooperation of other States. In addition, when the defence argues that the diplomatic notes do not determine that the American courts would or would not be bound by the guarantees provided, it demonstrates incomprehension about the role of the American courts in the extradition process, as this can only consider accusations brought to it by the Public Prosecutor's Office, that is, the Ministry of Justice. Furthermore, the punitive power would be limited in several ways. The allegation that the guarantees should have been verified is unfounded because the notes attest that the Department of Justice is bound by the guarantees provided, confirming that they will only bring charges for one of the charges, which would limit the scope of the court's intervention. Such conclusions would not be altered by the LCJ and the Portuguese jurisprudence cited by the Applicant. Therefore, there would be no disagreement in the interpretation of the standard with the CRCV – Constitution of Cape Verde.

5.10. Under the title of perpetual character of the penalty, a lifetime sentence, it begins by not saying that the Appellant is not correct because even when the crime is punished with such a penalty, he could still be extradited if the requesting State formulates a valid guarantee of non-application or execution. This can be done in different ways, as long as it is legally binding, as is the case. In addition, the crimes for which the Appellant was accused are not of a perpetual nature and the United States has given guarantees that it will only prosecute for one crime and has experience of commutation of sentences in the context of international judicial cooperation, which was accepted by the court. This, in its final conclusion, would not violate the Constitution.

5.11. Regarding the issue of immunities, it considers that the competence to recognise the status of special envoy belongs to the executive branch and not to the judiciary, being a political act that cannot be indicated by the courts, as demonstrated by the various requests made by Venezuela to the Government. This, once again, what the Appellant is doing is attacking the decision on the merits and not a matter of constitutional non-compliance. In this case, there is no problem of separation of powers or any other, and the courts do not bind the State to international treaties or obligations, as this always depends on political will, having nothing to do with the exercise of jurisdiction, power which is limited to applying the right resulting from those obligations assumed by other powers.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
R627635166

27

It concludes that it is an incorrectly posed question of constitutionality.

5.12. In the item on ECOWAS it says that the question of constitutionality is not correctly formulated. The Appeal seems to place the assessment of constitutionality on the rules of the Treaty of that organisation, which does not seem to make sense, as, in principle, the constitutionality of rules of domestic law can only be assessed. The question raised has nothing to do with constitutionality, but with the interpretation and application of International Public Law , which, in its view, is beyond the competence of the Constitutional Court.

5.13. Therefore, it concludes that the Appeal for specific review of constitutionality is unfounded, considering that no rule was applied or interpreted in violation of any rule or constitutional principle.

5.14. With the allegations, an opinion and documents were also presented, which were attached, preceding authorisation given by order of the Rapporteur.

6. However, still in the instructional phase of the process,

6.1. The Rapporteur, pursuant to paragraph 1 under Article 62 of the Constitutional Court Law, issued an order requesting elements he deemed important to the National Assembly, the Prime Minister's Office, the Ministry of Foreign Affairs, Cooperation and Regional Integration, the Ministry of Justice, the Supreme Court of Justice, the Sotavento Court of Appeal and the Barlavento Court of Appeal.

6.2. With the exception of those addressed to the Barlavento Court of Appeal and the Prime Minister's Office, all requests were satisfied, and all these elements were transferred to the file so that, if necessary, they could be consulted by the advisory judges and procedural interveners.

7. The following incidents result from those processed:



CERTIFIED TRANSLATION

LANGUAGE REACH

12/09/2021

RL7635166

28

7.1. On 9 June 2021, the Appellant filed a request with the Secretariat of the Constitutional Court requesting the adoption of provisional measures that would result from a decision of the United Nations Human Rights Committee, in view of the suspension of the extradition process filed by the State of Cape Verde against the Appellant, until that body decided to communicate on the merits, a request that was rejected by this Court through the decision taken in these records on the 29th of the same month and year (Ruling 30/2021), also rejecting, through Ruling 36/2021, dated 30th of July (unpublished), plea for annulment of this Ruling raised by the Appellant.

7.2. On 28 June 2021, even before the assessment of the counter-claims presented by the counter-interested party, the Public Prosecutor's Office, the Appellant presented two documents requesting copies, since the secretariat would have refused to provide them. After it was fined, the Rapporteur granted one of the requests and rejected another with the same content.

7.3. Subsequently, on 2 August 2021, the Appellant requested, through an application, the addition to the records of three decisions of the ECOWAS Court of Justice, a request that was granted by order of the Advisory Judge Rapporteur dated 3 August 2021.

8. However, taking into account the preparation of the Ruling in this case, the following acts were performed:

8.1. By means of orders dated 9th and 16th of July 2021, the Advisory Judge Rapporteur opened visits to the 1st Deputy, Presiding Advisory Judge of the Constitutional Court, Pinto Semedo and the 2nd Deputy, Advisory Judge Aristides Lima, respectively.

8.2. After the viewing, on 28 July 2021, the Rapporteur ordered the distribution of the memorandum and requested the corresponding registration of the case in a table for the purposes of Ruling, with the Presiding Advisory Judge having scheduled the session for 13 August of the same year, as per order of August 3rd.

8.3. Both the Public Prosecutor's Office and the Appellant, although for different reasons, requested the adjournment of the hearing, and the Honourable Presiding Advisory Judge, in the use of his powers, dismissed both for lack of sufficient grounds. The request made by the Appellant to allow his presence and participation in the hearing and



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
R 7635166

granting his agents at least one hour to present oral allegations was not considered because it entered at a time close to the hearing and it was not possible to give the Public Prosecutor's Office, as a counter-interested party, an opportunity to respond and the Court to meet to consider the matter, in addition to appearing, *prima facie*, not to rely on any procedural rule applicable by this Court in terms of specific inspection of an Appellant and recognised by the Law of the Constitutional Court or by the Code of Civil Procedure.

8.4. As previously scheduled, from 9:00 am on 13th August, the public hearing was held, with the presence of the Advisory Judges, the representative of the Public Prosecutor's Office, the Appellant's team of lawyers, the secretary of the Constitutional Court and citizens who attended, having followed the formalities provided for by the Law.

8.5. At the public hearing, considering the requests made by the Appellant to extend the period of closing arguments, presence and participation, the Presiding Advisory Judge informed everyone about the rite to be followed under the law, commenting on the request to speak by the Appellant's representative and reiteration of the request for adjournment, rejecting them; he then gave the floor to the Advisory Judge Rapporteur, who briefly presented the object of the Appeal and read the draft memorandum he had prepared based on the requests for inspection made by the Appellant.

8.6. Subsequently, the Presiding Advisory Judge gave the Appellant's representative team the opportunity to speak for a period of fifteen minutes, which were divided by two of its members. The first, commenting on points in the memorandum, drew attention to the fact that he had inventoried several aspects in the documents that were not considered by him and that he believed to be relevant, namely the issue of double criminality and its relationship with the principle of legality, insofar as in which the issue was not well dealt with by the Public Prosecutor's Office, which confused it with the principle of *ne bin in idem*, as well as a second issue, that of the political motivation for extradition which, contrary to what the Public Prosecutor's Office had said, in its opinion would be broadly mirrored in the final allegations document, arguing that this aspect, given the constitutional treatment reserved to it, is essential, especially because in its understanding, the accusation would, in fact, be against the State of Venezuela and public entities of that country and not against the Appellant;



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

the second representative to intervene focused on question 12 regarding the ECOWAS Court of Justice, promoting a discussion on the issue of sovereignty in light of the protection of human rights, referring to the idea that, in view of the rights of people, the State loses its prerogative to do what it wants, an aspect that relates both to the United Nations Human Rights Committee and to the ECOWAS Court of Justice, whose pronouncements must be observed, and in question 1, since it would be necessary to notify the person who is the main interested party in the process, the extraditee, the person whose extradition is sought.

8.7. The Public Prosecutor's Office, in turn, in its fifteen-minute intervention as a counter-interested party, stated that, through its Appeal, the Appellant is not challenging rules, but attacking the appealed body's own decision on the merits, rather than limiting himself to questions of constitutionality, that the law nowhere is obliged to notify the extraditee, the person whose extradition is sought, as long as he is assured of the possibility of organising his defence and that that does not result in any unconstitutionality; jurisprudence shows that not holding a public hearing does not violate the Constitution; with the evidence that it intended to produce what the Appellant wanted to call into question, the sovereignty of the Requesting State; despite saying there was political motivation, they did not put it; in relation to the complaint, they were mistaken in using the appropriate means of reaction, not being situations that violate the aforementioned conventions, which, in its opinion, do not regulate extradition; steps of evidence can be refused by the courts; they say there was no order, but there was; INTERPOL was formed without having a formal treaty because its members are not States but criminal police bodies; the CPP is applied to extradition proceedings only as a last resort; there is no political reason to allow criminals to go unpunished; the ECOWAS Court of Justice has no jurisdiction over Cape Verde and the Human Rights Committee can only make recommendations.

8.8. In the end, the Advisory Judge Rapporteur made considerations that he deemed pertinent regarding the expectation of having issues raised in the documents known to the Court, stating that his knowledge was conditioned to its challenge in the application of the Appeal, as improved, as norms applied by the appealed judicial body, the only ones scrutinised in the context of specific inspection of constitutionality. The Presiding Advisory Judge declared the hearing closed.



9. However, on 19 August an allegation of annulment of Ruling 37/2021, dated 9th of August was filed, which had confirmed orders from the Advisory Judge Rapporteur and rejected the request for removal of parts from the records filed by the Public Prosecutor's Office; was rejected by Ruling 38/2021, dated 27th of August.

10. On 13th August, as previously scheduled,

10.1. The Court began the process of deliberation in consultation, starting with a presentation by the Appellant on the issues they had to decide as to the ability to know and the extent to which it can be known of the twelve questions asked, answering some questions and requests for information made by the Advisory Judges;

10.2. Suspended, it was continued on the 16th, 17th, 19th, 27th and 30th of August, to discuss the admissibility and merits, with all issues having been decided.

10.3. Once the votes had been counted and the Advisory Judge Rapporteur being in the minority in relation to a single issue, the Court opted for a shared wording of the Ruling with the contribution of all judges in the elaboration and preparation of its segments that deserved unanimity and with the writing of the two judges that formed the majority in relation to the point that generated divergence. This is what will be explained below.

**II. Rationale**

1. The Appellant, in general and regardless of his ability to know, brings to the attention of this Court issues of clearly constitutional relevance arising from the possible application of norms of infra-constitutional value or judicial interpretation in the context of an extradition process that ran its course with the common courts, pointing out, namely, to the possibility of there being constitutional non-conformity between norms applied in the process and constitutional or international norms; of having applied unconstitutional rules in the process and of having refused the application of rules for reasons of unconstitutionality, in a context in which some may, in principle, be viable in the sense of leading to Rulings of unconstitutionality.



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

32

1.1. For the purpose of delimiting the object of this Appeal for the specific inspection of constitutionality, the Constitutional Court intends to make the following considerations:

1.1.1. The definition of the object and the approach to follow result from the powers it can assume in this type of process due to the limits imposed on it by the Constitution and by the law that adopts and establishes the regime that limits the object of this Appeal to a verification of conformity between norms, even if hypothetical, of infra-constitutional value and norms of constitutional standard that can be traced back to a situation of direct or indirect unconstitutionality. It is prohibited from discussing the merits of the appealed judicial decision, considered by itself, as well as the conduct and assessment of facts that can be attributed to the appealed judicial power and, for a majority of reasons, matters that are merely ordinary in nature, even if normative.

1.1.2. In this case, a lot of arguments were reserved for factual issues, which it was sought to prove and document, attributing harmful conduct to the Appellate Court's rights, but, in this case, they are of little importance for the analysis of the merits of issues of normative unconstitutionality. These are mere elements that the Court receives, but whose potential impact on this type of process is potentially very limited. When the Court, in accordance with a practice adjusted to a system that has another constitutional Appeal to challenge conduct that harms rights, even when it assesses the constitutionality applied to a specific case, it limits itself to doing so from an exclusively perspective normative, without entering into questions of application of interpretations or other conducts that escape this nature. Therefore, the only direct outcome of a request for specific review of constitutionality is, according to Article 93 of the Constitutional Court Law, the declaration of unconstitutionality of the rule, leading to a duty of reform of the Ruling by the Appellate Court, which shall comply the part of its decision that is the subject of the Appeal, to that Ruling.

1.1.3. And it does so only as a judicial body with powers to protect the Constitution, the Mother Law of the Republic, without intruding on the powers of the powers that conduct the State's foreign policy or that of the judicial courts, sovereign to interpret the ordinary law without constitutional connection, outside this normative benchmarking framework,



and limiting itself to assuming its role as protector of the Constitution. Any effect arising from its decisions and reflecting on the positive or negative reputation of the State does not result from any assumption of a role in preserving the country's external image or in controlling the conduct of foreign policy, in this dimension outside the Court (*Ruling 10/2020, dated 20 March [Referring to the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America*], Rapporteur: Advisory Judge Aristides R. Lima, published in the *Official Gazette*, 1st Series, No. 86 dated 23rd of July 2021, p. 1731 ff., B 5), but simply to keep the Constitution of the Republic and all that it entails in terms of values, principles and rules, including the precepts concerning foreign policy and International Law.

1.2. The Constitutional Court also observes that the basis for many allegations of unconstitutionality stems from different perspectives of the Appellant, on the one hand, and of the Public Prosecutor's Office, on the other, on the nature of the extradition process.

1.2.1. The first apparently considers that this will be a kind of criminal procedure to which the main principles and solutions of the Criminal Procedure Constitution and the Code of Criminal Procedure apply, and the second rationalises a sharper distinction between the two forms of procedure.

1.2.2. In this matter, the Constitutional Court is convinced that the extradition process and the criminal process concur in the sense that they can ultimately lead to the allocation of the same right: freedom of movement recognised under Article 30 of the Constitution of the Republic. However, they have different purposes and their own legitimation bases. As such, consolidated through different constitutional regimes.

1.2.3. Extradition, as a kind of international judicial cooperation in criminal matters, is registered in a register in which a State assists a counterpart in obtaining custody of a person who is criminally prosecuted or serving a sentence, and which is justified by the State's foreign policy interests of also being able to access other people it is interested in prosecuting criminally in similar situations for the good administration of justice, of preventing it from being seen internationally as a State that is associated with the commission of crimes,



34

to prevent a crime from going unpunished and to participate in the fight against transnational crimes that it deems serious, as the final part of paragraph 2 under Article 11 of the Fundamental Law tells us specifically, which directs the State to participate in the international fight against terrorism and transnational organised crime, establishing here a public interest that the government must pursue under the terms of *Ruling 30/2019, dated 30*[th] *of August 30 (AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the initiative private and the rights of defence, the adversarial system and access to the prosecution's evidence)*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, No. 110, 29th October 2019, pp. 1766-1789, 6.5.1.

1.2.4. On the other hand, the criminal procedure, the chain of acts from which a person is subjected to a trial aimed at determining the commission of a crime and its legal consequences, is justified by the need for the State to criminally hold a person subject to its jurisdiction for purposes of protecting legal assets, ultimately constitutional, and thus to do justice, ensure the preservation of social order and protect the individual rights of other parties.

The constitutional indications regarding the extradition process and the criminal procedure demonstrate the development of regimes that, starting partially from the same basis, are considered as situations that can justify the deprivation of the natural freedom of the person recognised under Article 30: the sentence condemning by the commission of acts punishable by imprisonment (para. 2), on the one hand, or the course of an extradition request (paragraph three, sub-section f)), on the other.

In this sense, they have a common regime established by the same Article 30, namely the rights provided for under paragraphs 4, 5 and 6, namely that the person be informed, in a clear or understandable way, of the reasons for his arrest and detention and of his constitutional or legal rights, to be authorised to contact a lawyer directly or through their family or trusted person; to the identification of those responsible for their detention or imprisonment and for their interrogation, and to immediately inform their family or person indicated by them of the deprivation of freedom from which they suffer, with a brief description of the reasons that motivated it. In the same sense, the Constitutional Court understands that any person detained, regardless of the reason, is referred to any of the items of paragraph 3 under Article 30 of the Constitution in the event of being subject to protective custody or similar,



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

have the rights provided for under Article 31. And, finally, returning to the generic formulations with Article 36, on habeas corpus, to make use of this constitutional remedy to protect their right to bodily freedom. Among these norms, however, there is a regulatory split between situations that potentiate the deprivation of freedom by the commission of a crime conducted by Cape Verdean authorities for the purposes of internal Ruling and execution, to which Articles 32 to 35 apply to matters of deprivation of freedom, and those in which the State acts as a mere collaborator in initiatives of criminal prosecution of another similar entity, regulated under Article 38. Several principles adopted and established in these norms are regulated or applied with content different from that accepted by the provision on extradition, namely Article 33 which prohibits the application of a perpetual deprivation of freedom or unlimited or indefinite duration, guaranteeing that, pursuant to paragraph 2 under Article 38, it is verbatim limited to the Cape Verdean citizen, or, for example, the one who welcomes the principle of presumption of innocence, which cannot be considered extensively in extradition, under penalty of not being able to extradite those who have not yet been convicted by a final and unappealable decision in a foreign country.

From this, however, it does not follow that the constitutional rights of an extraditee, the person whom extradition is sought, are limited to Articles 30, 31 or 36. Not carrying the guarantees contained in Article 38 of the Constitution, in general, procedural in nature, they are applied to this type of process, such as any other, those arising from paragraph 1 under Article 22 on access to justice, especially the guarantee of a fair process, which, in the broad terms accepted by this Court in *Ruling 15/2017, dated 26 July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings,* Rapporteur: JC Pina Delgado, published in the *Official Gazette*, 1st Series, No. 35, 6th June 2018, pp. 844-856, 3.2.1 and then in *Ruling 24/2018, dated 13th of November, Alexandre Borges v. STJ, on violation of the rights to the adversarial system, hearing and defence in criminal proceedings, fair and equitable process, bodily freedom and the guarantee of presumption of innocence and the right not to be discriminated against,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 88, 28th December 2018, pp. 2132-2152, 2.1; *Opinion 1/2021, dated 15th of February Relating to the Third Amendment to the Code of Criminal Procedure*, Rapporteur: Advisory Judge Pinto Semedo, published in the *Official Gazette*, 1st Series, No. 25, dated 8th March 2021, pp. 814-831, 7) ), is, in its terms, applicable to any type of proceeding (see also, being associated, among other effects, with the effectiveness of the means of defence and to the recognition of the prerogative of exercising the contradictory.



It can be considered here that a proper extradition process also emerges from it, covering several important procedural rights, namely to the defence, the adversarial system and the hearing, adapted to the nature of the extradition process both from the perspective of considering its particularities as an international cooperation mechanism that is intended to be swift, as well as to recognise effective guarantees arising from the general guarantee to the fair process in a context in which, ultimately, the right to bodily freedom is affected in the terms suggested by these decisions.

In this regard, the legislator, as long as it manages to achieve a harmonisation between the constitutionally legitimate public interest of providing international cooperation in criminal matters, especially in the field of combating terrorism and transnational organised crime, and the effective protection of the basic rights of the extraditee, the person whose extradition is sought, that arises from these constitutional indications, it may adopt the procedural model of extradition that it deems most appropriate, namely reserving its own procedural regime, complete or not, and submitting or not the filling in of any regulatory omissions to the Code of Criminal Procedure. In this sense, the aforementioned Ruling had already been stated in the sense that the structure of a fair and equitable process does not have implications for how it can be legally conformed, depending ultimately on the type of relationship to which each type of mechanism in which it will be applied, taking into account the substantive values that each one of them intends to protect, including considering its prospective interveners (*Ruling 15/2017, dated 26th of July 26, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 3.2.1).

Although this is not decisive for the definition of the specific rules that will constitute the object of this appeal, even when the Court analyses the legal precept(s) where they would be housed, under penalty of tampering with the intention of the appealed body itself, it will have to verify when the contested decision actually applied a rule arising from the Code of Criminal Procedure and when it simply applied the rules of the Law on International Judicial Cooperation in Criminal Matters - as, as a general rule, it sought to do so, embodying its own understanding that the point from a legal point of view, these would be processes with different legal regimes, although they may be connected in cases of regulatory omission of the last statute – but the Appellant understood that he should have applied these other rules of the Code of Criminal Procedure.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

2. Having made this framework regarding the approach of this Constitutional Court, before analysing the merits of the appeal, it is absolutely necessary to verify the presence of the necessary conditions to examine the questions of constitutionality raised, which passes, first, for assessing whether the appeal assumptions, general and special, for the admissibility of the appeal are met, and, secondly, whether the presuppositions and requirements for the ability to examine each question of constitutionality are present.

In this matter, it reports to the jurisprudence that has built in relation to the admissibility of appeals for specific inspection of constitutionality that have risen (*Ruling 8/2017, dated 29th of June 29, Sal Hotéis v. STJ*, Rapporteur: Advisory Judge Aristides R. Lima, published in the *Official Gazette*, 1st Series, No. 42, 21st July, 2017, pp. 903-910; *Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, pp. 844 -856; *Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, referring to the rule provided for under paragraph 1 of Article 2 of Law No. 84/VI/2005, regarding the principle of holding public hearings in the courts, and the guarantee of a public hearing in criminal proceedings, as well as guarantees of a fair trial, the adversarial system and the broad defence,* Rapporteur Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 100, 24th September 2019, pp . 1618-1653), including those relating to claims for non-admission of the same (*Ruling 4/2017, dated 13th of April 13, Vanda Oliveira v. STJ, [on dismissal of a specific inspection appeal due to untimeliness]*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series No. 27, 16th May 2017, pp. 650-659; *Ruling 20/2019, dated 30th of May, Edílio Ribeiro da Cruz v. TRS, on dismissal of a specific inspection appeal due to untimeliness*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 79, 22nd July 2019, pp. 1214-1223; *Ruling 35/2019, dated 18th of October, Alírio Vieira Barros and Others v. TRS, on the rejection of a specific inspection appeal for non-application of the contested rule,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 110, 29th October 2019, pp. 1813-1824; *Ruling 12/2020, dated 16th of April, Ana Brazão Gocht v. STJ [on the rejection of an appeal for a specific inspection of constitutionality for not raising a question of unconstitutionality in an appropriate procedural way*



38

Rapporteur: Presiding Judge Pinto Semedo, published in the *Official Gazette*, 1st Series, No. 86, 23rd July 2020, pp. 1786-1792; *Ruling 01/2021, dated 12th of January, Alex Saab v. STJ, on the rejection of a specific inspection appeal [for not exhausting the ordinary remedies]*, Rapporteur: Advisory Judge Aristides R. Lima, published in the *Official Gazette*, 1st Series, No. 25, 8th March 2021, pp. 832-836; *Ruling No. 26/2021, dated 25th of May, Okechwkwu Onuzuruibgo et al. President of the TRS, for non-admissibility of an appeal for a specific inspection of constitutionality for non-application of a contested rule*, Rapporteur: Advisory Judge Pina Delgado, still pending publication, available at https://www.tribunalconstitucional.cv/index.php/acordaos/ ; *Ruling No. 27/2021, dated 25th of May, Adilson Staline v. President of the TRS, for inadmissibility of an appeal for a specific inspection of constitutionality for non-application of a contested rule,* Rapporteur: Advisory Judge Pina Delgado, at this time still pending publication, available at https://www.tribunalconstitucional.cv/index.php/acordadaos/ ), almost all rejected.

    2.1. The appeal for specific review of constitutionality was admitted by the Honourable Supreme Court of Justice through *Ruling 35/2021, dated 31st of March,* unpublished, as, in its understanding, the assumptions of timeliness, legitimacy of the Appellant and the appealability of the decision and the fact that the various issues of constitutionality were raised by the Appellant from the moment of his provisional detention, maintaining them consistently throughout the entire process until the moment in which his extradition was confirmed. However, it is clear from paragraph 4 under Article 83 of the Law of the Constitutional Court that the positive decision of admissibility of the appealed judicial body does not bind the Constitutional Court, which must re-evaluate them if doubts remain about their adequate fulfilment (*Ruling 4/2017, dated 13th of April, Vanda Oliveira v. STJ, [on dismissal of a specific inspection appeal due to untimeliness],* Rapporteur: Advisory Judge Pina Delgado, 2.1.1), even because, in this case, it is true that the Supreme Court of Justice analysed the presence of all the general presuppositions, in relation to the special ones and the requirements of ability to know and examine, limited its assessment to a general finding that the issues had been raised throughout the process.

    2.2. In relation to the general assumptions, it is necessary, by their nature and by the fact that the appealed judicial body has already done so, a perfunctory and general analysis, covering all its items, to verify whether the Court is competent, if the Claimant has legitimacy, if it was filed in a timely manner and if all the ordinary means of appeal have been exhausted.



2.2.1. Insofar as the Constitution attributes powers to this Court to oversee the constitutionality and legality (Article 215, paragraph 1, sub-section a)) and adopts and establishes under paragraph 1 of Article 281 that it is possible to appeal against decisions of the courts that refuse the application, with grounds in unconstitutionality, of any rule or that apply rules whose unconstitutionality has been raised in the process, taken up by sub-section c) under Article 11 of the Law of the Constitutional Court, which develops its procedural regime in Chapter II of Title II of Part II, would not be a point of contention that the assumption of competence is fulfilled.

2.2.2. As the Appellant extraditee, the person whose extradition is sought, in the main proceedings, who extradition was confirmed by the appealed judicial body following the appeal he filed, there is no doubt that, in light of sub-section b) of paragraph 1 under Article 76 of the Law of the Constitutional Court, he is a person who, in accordance with the law regulating the process in which the decision was rendered – Article 58, first paragraph, of the Law on International Judicial Cooperation in Criminal Matters – has standing to file an appeal for specific inspection of constitutionality.

2.2.3. The appeal was filed at the secretariat of the Supreme Court of Justice on 25 March 2021, a decision dated 16 March of the same month. According to Article 81 of the Law of this Court and the firm jurisprudence of this Court regarding the counting system (*Ruling 4/2017, dated 13th of April, Vanda Oliveira v. STJ, [on dismissal of a specific inspection appeal due to untimeliness*], Rapporteur: Advisory Judge Pina Delgado, 2.3.4; *Ruling 20/2019, dated 30th of May, Edílio Ribeiro da Cruz v. TRS, on dismissal of a specific inspection appeal due to untimeliness*, Rapporteur: Advisory Judge Pina Delgado, 2), the Appellant had a procedural period of ten days to file this constitutional appeal. Therefore, regardless of the date on which the person was notified, no other conclusion can be reached unless it was filed in due course.

2.2.4. Finally, since there has been no waiver of the right to appeal or any period has elapsed from its filing or situation in which the appeal cannot proceed for procedural reasons referred to in paragraph 4 under Article 77 of the Law of the Constitutional Court,



40

it would be necessary to ensure the exhaustion of the ordinary means of appeal established in the procedural law in which the decision was rendered pursuant to paragraph 2 of that same legal provision. It will be prosaic given that which was reported to consider that one is facing an appeal against a decision of the Supreme Court of Justice that upheld a decision by the Court of Appeal of Barlavento to authorise the Appellant's extradition. Under the terms of the applicable procedural regime arising from the Law on International Judicial Cooperation in Criminal Matters, namely the aforementioned Article 58, there was no other ordinary remedy to be exhausted, also complying with this important assumption (*Ruling 01/2021, dated 12th of January, Alex Saab v. STJ, on dismissal of a specific inspection appeal [for non-exhaustion of ordinary remedies],* Rapporteur: Advisory Judge Aristides R. Lima, 9).

2.2.5. Given, for these reasons, all general and special requirements for the admissibility of the appeal have been fulfilled.

3. Allowing, in this way, to analyse whether the special presuppositions and requirements of ability to examine are present, which should require special attention precisely because, understandably, given their extent and complexity, they do not seem to have been exhaustively considered by the appealed judicial body.

3.1. It therefore requires the autonomous analysis of all constitutionality issues raised in order to verify that,

3.1.1. First, a rule was indicated that the Appellant intends to challenge, a requirement that stems from the nature of the appeal for the specific inspection of constitutionality, whose object is strictly a normative control, and from the references in Article 77 that fully reflect situations of unconstitutionality that revolve around application, and of paragraph 1 under Article 82, which impose on the Appellant the indication of the norm whose unconstitutionality the Court is intended to assess. Standard understood in a broad sense as any deontic statement, real or hypothetical, expressed or implied in a specific precept or inferred from a set of precepts, which prescribe or describe conducts or behaviours, prohibiting or permitting them, or conferring a power or a right.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
R607635166

Although it is possible to discuss the need to extend this concept beyond the norm in its most evident meaning, which arises from the guidelines of the emerging meaning of its normal interpretation to encompass any normative basis effectively applied by a court - insofar as they are subject to scrutiny by means of appeal for protection – the fact is that not only the Constitutional Court Law when mentioning in paragraph 2 under Article 93 the possibility of the rule in question being based on a certain interpretation of this same rule, but also the practice of the Cape Verdean constitutional jurisdiction since the moment it was assumed by the Supreme Court of Justice as the Constitutional Court, it had recognised it (by *Ruling No. 15/04, dated 28th of May, MpD v. Court of the District of Praia* Rapporteur: Presiding Judge Benfeito Mosso Ramos; *Ruling 17/04, dated 11th of November, Joaquim Jaime Monteiro v. Court of Auditors*, Rapporteur: Presiding Judge Benfeito Mosso Ramos; Ruling 09/09, dated 29th of May, *Manuel Evangelista Évora v. Supreme Court of Justice*, Rapporteur: (ile.), unpublished) and the Constitutional Court has consistently maintained since the beginning of its activities (*Ruling 8/2017, dated 29th of June, Sal Hotéis v. STJ,* Rapporteur: Advisory Judge Aristides R. Lima, 16; *Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 2.2.1), adhering to this tradition.

But, therefore, the Court pays particular attention to the fulfilment of this requirement to remove any temptation to use this type of process for the purposes of reviewing constitutionality arising from the conduct of judicial courts without a normative nature, which, in our constitutional system, may be challenged through the filing of appeals for protection, at least in cases where they relate to the violation of rights, freedoms and guarantees (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour process*, Rapporteur: Advisory Judge Pina Delgado, 2.2.1), the indistinct use of the same resource being unsuitable to raise both questions of normative unconstitutionality and unconstitutionality of conduct (*Ruling 15/2017, dated 26th of July, INPS v. STJ , on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 2.2.1; *Ruling 9/2018, dated 23rd of May, INPS v. STJ: Request of Clarification and Reform of the Ruling*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 35, 6th June, 2018, pp. 4.5; *Ruling 35/2019, dated 18th of October, Alírio Vieira Barros and Others v. TRS, on the rejection of a specific inspection appeal for non-application of the contested rule,* Rapporteur: Advisory Judge Pina Delgado, 2; *Ruling 12/2020, dated 16th of April,*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

*Ana Brazão Gocht v. STJ [on the rejection of an appeal for a specific inspection of constitutionality for not raising a question of unconstitutionality in a procedurally adequate manner]*, Rapporteur: Advisory Judge Pinto Semedo, 5.3). Or also for the purpose of reviewing questions of fact appreciated by the ordinary courts in accordance with their respective competences, removed from this jurisdiction as had already been understood in previous cases (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 1). Thus, the identification of the norm that this Court is intended to scrutinise is essential both in cases where the Appellant alleges that an unconstitutional norm in its essential meaning was applied during the process, as it is aggravated in cases in which imputation is brought to the attention of the Court of use of unconstitutional normative meaning to decide an ordinary question. Thus, it is up to the Appellant to cut as precisely as possible, this hypothetical rule that guarantees the viability of the assessment itself, and the investigation of any of them that have not been sufficiently defined, must be refused.

Therefore, the satisfaction of the first admissibility requirement is guaranteed insofar as the Appellant indicates a rule that was applied by the appealed judicial body to substantiate a decision taken in the context of a proceeding in which he was a procedural intervener, being a requirement of the same that if it is a rule, in the strict sense of the word, even if it does not refer to any precept or set of precepts. That is, that it contains a statute and a prescription potentially remissible to a general and abstract nature, albeit imagined, as if it had been constructed by a legislator. In cases where it arises from a mere interpretative acceptance resulting from a precept or a set of precepts, it is the Appellant's responsibility to delimit it, and the Court is not responsible for doing so on his behalf.

3.1.2. Second, if it is actually a question of constitutionality. This depends on whether there is a parameter of the Fundamental Law with which the contested rule is incompatible, and, for obvious reasons, the Court cannot consider any matter of ordinary legality that does not have any direct or indirect connection of constitutionality, as this is sovereign territory of the judicial courts (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings,* Rapporteur: Advisory Judge Pina Delgado, 1;



*Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, referring to the rule set forth under paragraph number 1 of Article 2 of Law No. 84/VI/2005, referring to the principle of holding public hearings in the courts, and the guarantee of public hearing in criminal proceedings, as well as guarantees of a fair trial, to the adversarial system and to the broad defence*, Rapporteur Advisory Judge Pina Delgado, 4.2.), according to its organisation and competences, which must be respected so that the Constitutional Court remains within the scope under Article 78 and within the limits of its constitutional function and does not become a new ordinary instance of nullification or cassation.

3.1.3. Third, if there has been such indication of a rule and it addresses the issue of unconstitutionality, directly or indirectly, it must be certified whether its unconstitutionality was clearly raised during the process as follows from paragraph 2 under Article 76 and in the final part of sub-section b) of paragraph 1 under Article 77 of the Law of the Constitutional Court, which means, in the sense adopted by the Ruling of admission of the Supreme Court of Justice, that it must be invoked at the first procedural opportunity presented to the Appellant (*Ruling 35/2019, dated 18th of October, Alírio Vieira Barros et al. v. TRS, on the rejection of a specific inspection appeal for non-application of a contested rule,* Rapporteur: Advisory Judge Pina Delgado, 1.7; *Ruling 12/2020, dated 16th of April, Ana Brasão Gocht v. STJ [on the rejection of an Appeal for a specific review of constitutionality for not raising a question of unconstitutionality in a procedurally adequate manner]*, Rapporteur: Presiding Judge Pinto Semedo, 8), that he has done it consistently, not abandoning its constitutionality issues or hesitating in relation to them and, finally, has raised the issue of constitutionality or non-compliance with International Law in an express way so that the Appellate Court could recognise it and appreciate it.

Therefore, it is required that it is done as clearly as possible and that it is procedurally appropriate. Thus, ensuring that the constitutionality issues are legitimate and not a last minute procrastination Appeal to postpone the production of effects of the judicial decision, and that, unless it proves impossible from a procedural point of view, the judicial courts, that are also bodies charged with protecting the Constitution in a diffuse way, must refuse the application of unconstitutional rules, having the opportunity to consider such questions of constitutionality before appealing to the Constitutional Court (*Ruling 15/2017, dated 26th of July, INPS v . STJ, on* the constitutionality of the appeal period of five days in labour proceedings,



12/09/2021

44

Rapporteur: Advisory Judge Pina Delgado, 2.1.6; *Ruling 35/2019, dated 18th of October, Alírio Vieira Barros and Others v. TRS, on the rejection of a specific inspection appeal for non-application of the contested rule,* Rapporteur: Advisory Judge Pina Delgado, 1.7; *Ruling 12/2020, of April 16, Ana Brasão Gocht v. STJ [on the rejection of an Appeal for a specific review of constitutionality for not raising a question of unconstitutionality in a procedurally adequate manner*], Rapporteur: Presiding Judge Pinto Semedo, 5.3).

      3.1.4. Fourth, whether the contested provision was actually applied by the Court as a basis for deciding a question put to it by the Appellant. Within the framework of the organisation and economy of the Cape Verdean constitutional system, it is not, on the one hand, legitimate for the Constitutional Court to act as a general reviewer of the constitutionality of the rules and interpretations promoted by judicial bodies in the framework of the exercise of their functions, nor on the other hand, would it be in a position to do so within the time allowed to decide these issues and innumerable equally urgent processes that are being processed therein. The object of the Appeal for specific review of constitutionality is, primarily, to prevent an entity, especially an individual, from being harmed by the application of an unconstitutional rule or by the refusal to apply a rule based on unconstitutionality, and, only as an accessory, the defence of the Constitution of the Republic. Therefore, what matters in these cases are simply the situations in which the rule in question is actually used by the Appellate Court as a *ratio decidendi,* that substantiates the specific decision that it rendered, being out of any assessment situations in which, as an *obiter dicta*, other things said, it is limited to refer to a rule as a side argument inserted in its reasoning or resort to mere rhetorical arguments or *ad ostentationem*, and even less to situations in which an Appellant imputes to the courts the application of fictitious rules or resulting from undue extrapolations on what was actually applied (see. *Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, regarding the rule provided for under paragraph 1 of Article 2 of Law No. 84/VI/2005, regarding the principle of holding public hearings in the courts, and the guarantee of a public hearing in criminal proceedings, as well as guarantees of a fair trial, the adversarial system and ample defence*, Rapporteur: Advisory Judge Pina Delgado, 3.2).



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

3.1.5. Finally, arising from paragraph 2 under Article 86 of the Constitutional Court Law, it is assessed whether the issue to be decided is simple, namely because it has already been the subject of a previous decision of the Court, if it is manifestly unfounded or if, considering the incidental nature of the Appeal for specific review of constitutionality, a possible decision of unconstitutionality cannot affect the appealed decision in terms of its reform in a sense favourable to the Appellant. In such cases, the Constitutional Court may, as to the first hypothesis, know it summarily, even in the initial phase, without subjecting it to a lengthy inquiry, or, as to the second and third hypotheses, refuse to examine them.

3.1.6. With regard to the refusal to apply a rule due to unconstitutionality, for obvious reasons, the ability to know and examine the issues depends essentially on: firstly, there has been a refusal to apply a rule by the Appellate Court, even if it is a hypothetical deontic or ethical statement constructed by any procedural intervener; secondly, that the basis for this non-application of this norm was its unconstitutionality; thirdly, that the Court has not yet ruled on the constitutionality of this rule; fourthly, that a decision not declaring it to be unconstitutional may have repercussions in the main proceedings.

3.1.7. Based on these criteria which, with the exception of the latter - since it is the first time that an allegation of refusal to apply a rule is dealt with due to unconstitutionality - the Court has systematically applied based on strict scrutiny - insofar as in the Cape Verdean constitutional system, there is already a means of protection of rights violations, the Appeal for protection – it is that wherein it will be verified whether the questions raised can be investigated and explored on the merits.

3.2. Thus, it can be assessed whether effectively the constitutionality issues that were challenged by the Appellant in the file meet all these conditions, specifically considering the normative construction presented by the Appellant in his filing the Appeal in the improved version, insofar as it is this that defines the object of the Appeal and not the final pleadings document, in which the Appellant must present the arguments and legal grounds intended to substantiate what he challenges through that exordial pleading, in such a way that they can be considered by the appellate body itself and, subsequently, by the rapporteur, for the purposes of



first decision of admissibility or appraisal for the purposes of paragraphs 1 and 2 under Article 86 of the Law of the Constitutional Court, respectively, not allowing any extension of the object of the Appeal by expanding the incidence of the contested rule by amending its terms, namely if it is merely hypothetical, let alone the requests (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the five-day appeal period in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 2.1.5).

**3.2.1. If the interpretation that will have been given to Articles 5, 24, first paragraph, 141, paragraphs 1 and 2, 142, second paragraph, last part, 151, subsection h) of the Code of Criminal Procedure and Article 55, first paragraph, of the Law of International Judicial Cooperation on Criminal Matters , in the sense that the order of the Minister of Justice on the admissibility of the extradition request and the promotion of the fulfilment of the request before a Court of Appeal do not have to be personally notified to the extraditee, the person whose extradition is sought, it being sufficient that if they are to the constituted lawyer, it would be contrary to the Constitution, due to incompatibility with the guarantees of broad defence, the adversarial system and to the Appeal in sanctioning procedures.**

A - In this specific case, the Appellant understands that the appealed judicial body will have applied a rule resulting from the interpretation that introduced the legal provisions referenced in the sense that *the order of the Minister of Justice on the admissibility of the extradition request and the promotion of compliance with the request together to a Court of Appeal do not have to be notified to the extraditee, the person whose extradition is sought, they just need to be notified to the appointed lawyer.* Therefore, it does not seem to us to raise doubts that such a formulation fulfils the basic elements of a legal norm, containing a stipulation and a provision, and it can be considered that it was properly constructed by the Appellant, although, for reasons that had already been advanced, such a hypothetical rule, under the terms in which it was applied by the appealed judicial body, does not result from an interpretation that has been issued to provisions of the Code of Criminal Procedure, but exclusively from the Law of Judicial Cooperation (p. 26: "there is no provision of the LCJ to impose that the extradition request be formally notified to the extraditee, the person whose extradition is sought,"), as, in his own understanding, only this was applicable to the question raised, considering that there was no regulatory omission to be filled by reference to this other statute.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

47

B - It can also be considered that some of the parameters indicated, whose arguments were developed in his allegations, have a constitutional nature, namely the right of defence, the guarantee to the adversarial system and the guarantee to the Appeal.

C – In relation to the burden of raising the matter in a procedurally appropriate manner, it is easily verified that as soon as he was notified to file opposition following an order from Her Honour the Advisory Judge Rapporteur, and before deducting it, he argued several annulments, among which was the fact that he was not personally notified (Extradition Files, v. I, f. 164 et seq., para. 4), obtaining the appropriate response of the TRB – Barlavento Court of Appeal, considering that Article 55 does not oblige notifying personally the extraditee, the person whose extradition is sought, (Ibid, ff. 286 back and ss, *in fine*). He took up it again in the application for filing an ordinary Appeal, after being applied, with considerations of unconstitutionality (Ibid, v. II, f. 309 et seq., para. 29-33). As such, they were considered and decided upon by the Supreme Court of Justice (Ibid, II, 2.b). The issue was reconsidered by the TRB – Barlavento Court of Appeal, in the framework of *Ruling 48/2020-21* (Ibid., v. III, f. 1033 et seq., II, pp. 6-7), reinstated via the Ordinary Appeal for that decision (Ibid., V. III, f. 1035 et seq., A-I, para. 7 and following), and, finally, assessed by the contested decision. Therefore, there is no doubt that the question of constitutionality was posed in a timely and consistent manner throughout the process and so that the judicial bodies that intervened could know and resolve it, fulfilling this requirement of ability to know and examine.

D – The Supreme Court of Justice, after analysing the matter, considered it unfounded because in its opinion, the personal notifications that are imposed by law would only be those referred to under Article 53 of the LCJ and the extradition decision, with no unconstitutionality in this understanding since the law does not imply any determination of automatic transposition to the extradition process of all the defence guarantees that the Constitution and the International Human Rights Instruments reserve for criminal proceedings. It can therefore be accepted that the appealed judicial body had to apply a hypothetical rule according to which there is no need for personal notification to an extraditee, the person whose extradition is sought, of the ministerial decision to authorise the extradition process and the decision to promote it to an Appeal Court, as long as they are notified to their representative.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

48

E – It cannot be said that the allegation of unconstitutionality of this normative formula is, in principle, manifestly unfounded. However, in relation to the feasibility and, above all, the usefulness of a decision of unconstitutionality, this is a question that the Court can ask. For the double reason of already having an understanding drawn up in *Ruling 50/2019, dated 27th of December, Luís Firmino v. STJ, on violation of the right to Appeal and to defence in criminal proceedings for lack of personal and direct notification of a condemnatory Ruling,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 14, dated 4th of February 2020, pp. 337-347, 2.4. (understanding reiterated by *Ruling No. 13/2020, dated 23rd of April, António Zeferino de Oliveira and Rafael Alves Lima v. STJ, on violation of the right to Appeal and defence in criminal proceedings for lack of personal and direct notification of Ruling,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 86, 23 July 2020, pp. 1792-1803, by *Ruling No. 19/2020, dated 8th of May, Paulo Alexandre Monteiro Ramos Andrade v. STJ , on the guarantee not to be kept in protective custody outside the legal deadlines*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 86, dated 23rd July 2020, pp. 1836-1847; and by *Ruling 25 /2021, dated 30th of April 30, Walter dos Reis v. STJ, on violation of the guarantee of not being subject to protective custody without being heard, the right to adversary proceedings and defence, the right to a prior hearing and to the Appeal,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, I Series, No. 62, dated 21st June 2021, pp. 1895-1902, 3.3), from which, from a constitutional point of view, the importance of personal notification is not based on a formal basis of having to communicate procedural acts to a person, but essentially on a teleological perspective of being able to effectively exercise their defence, contradict and eventually appeal. Therefore, the knowledge that she may have of certain decisions that impact her procedural position can either be direct or indirect, in terms of the procedural law in question.

The duty to notify the agent of a procedural act that has an impact on the interests of an extraditee, the person whose extradition is sought, is an unavoidable requirement of the principle of due process applied to the extradition process in its dimension of the right of defence, the right to exercise the adversarial system and the right to appeal of a decision that may affect their freedom. With regard to the personal notification of the extraditee, the person whose extradition is sought, this Court still maintains the understanding drawn up in these Rulings that, from a constitutional point of view, the relevance of the personal notification is limited to its instrumentality for the exercise of the guarantee of defence, of the guarantee to the adversarial system and the guarantee to the Appeal.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

More importantly, in an extradition proceeding, with regard to the effects of these rights on the obligation of personal notification, the Court cannot reach any conclusion that in a situation in which the extraditee, the person whose extradition is sought, exercises his right of defence, to contradict and to appeal through their agent, a hypothetical rule disregarding the need to notify him personally of certain procedural acts could be unconstitutional. In this sense, considering that the issue had already been the subject of repeated decisions of the Court applicable to this situation and that these judges who compose it do not see any reason to review their general understanding of the issue, it is not worth considering it more closely.

Furthermore, even were the Constitutional Court to adopt a stricter understanding of personal notification in the context of an extradition process, this would not necessarily have any effect leading to the reform of the appealed or contested Ruling , as the Supreme Court of Justice would not have to determine that the case be brought to the court, annulling all subsequent proceedings, so that the Appellant could be personally notified of the order of the Minister of Justice on the admissibility of the extradition request and the promotion of compliance with the request before a Court of Appeal and could exercise everything that, after all, he has already exercised. Because the fact is, that there is nothing in the case file to indicate that he was not aware of them through his agents, he was able to defend himself, contradict what he deemed relevant, plead null and, above all, oppose the request for extradition, as effectively he did. Therefore, the putative decision of unconstitutionality, which in addition to being very unfeasible due to the jurisprudence of this Court, would, in practice, be innocuous and unnecessary, not leading to any relevant change in the appealed decision.

F – For these reasons, the Constitutional Court decides summarily to dismiss the question of unconstitutionality raised.

3.2.2. **The interpretation that will have been given to Article 56, paragraph two, of the Law of Judicial Cooperation, and Articles 3, 151, sub-section d), g) and i), 349, 350, 358 and 363 of the Code of Criminal Procedure in the sense that the course of the passive extradition process does not require that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, be made in a hearing, but rather in consultation,**



**insofar as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge, would be inconsistent with the Constitution, due to incompatibility with the guarantees of full defence and a public hearing, as well as the principle of criminal legality.**

A – A linguistic formula constructed in terms according to which *the course of the passive extradition process does not require that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, be made in a hearing, but rather in consultation, insofar as that the law does not determine, neither directly nor indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge,* would be contrary to the Constitution, corresponds to a legal norm, even if hypothetical, insofar as it contains a provision, it integrates a statute and is characterised by the elements that represent it. Although once again, in the opinion of this Court, it does not derive, under the terms in which it was applied by the Appellate Court, from any rule of the Code of Criminal Procedure, since in the hermeneutics that promoted such a sense it is inferred exclusively from the Law of Judicial Cooperation, namely of its Article 56, second paragraph.

B – In relation to the parameters that the Appellant develops through the arguments he presented above, it appears that he understands that this hypothetical rule would be contrary to the guarantees of ample defence, provided for in paragraph 7 under Article 35 of the Constitution and in sub-section d) of paragraph 3 under Article 14 of the ICCPR - The International Covenant on Civil and Political Rights, to the publicity of the criminal hearing in paragraph 9 under Article 35 of the Constitution, as well as the principle of criminal legality recognised by paragraph 4 under Article 32 of the Fundamental Law, and by paragraph 1 under Article 9 of the ICCPR - The International Covenant on Civil and Political Rights, and Article 6 of the ACHPR, later corrected to Article 7. Regardless of its individual suitability, an issue that the Court will eventually consider on the merits, it is certain that at least some of these parameters are applicable to the specific issue and, therefore, constitutional in nature, it is assured that it raised a relevant question of constitutionality, direct or indirect. What happens is that, by virtue of what the Court has already considered preliminarily, the rights of an extraditee, the person whose extradition is sought, essentially derive from the principle of due process, therefore having a right to the defence, the adversarial system and the Appeal adequate and appropriate for the extradition process, in addition to that the objective principles of the system are applicable to it, the principle of the public hearing of the courts recognised by paragraph 4 under Article 211 of the Constitution, which should constitute the parameters to preside over this constitutionality inquiry.



CERTIFIED TRANSLATION LANGUAGE REACH
12/09/2021
RE 07635166

C - The application of this rule ultimately refers to the Appellant's reaction to the decision of the Reporting Judge dated 7th of July 2020, which determined the continuation of the extradition process, which considered that there was omission of procedural stages for failure to carry out immediate hearing of the Applicant after the formal submission of the extradition request (para. 11), and raising its non-compliance with the principles of human dignity, due process and effective judicial protection (para. 15). In view of the answers that he was getting, he insisted with the same allegations in the subsequent interventions that he had, propitiating the posing of the question of unconstitutionality to the Supreme Court of Justice through an ordinary Appeal. Therefore, there will be no doubts that the question of direct constitutionality was posed in a timely and consistent manner throughout the process and in such a way that the lower court could recognise and assess it. On the other hand, it is not detected that it has alerted this Court of possible non-conformity of not holding a public hearing with the aforementioned sub-section d) of paragraph 2 under Article 14 of the International Covenant on Civil and Political Rights, which recognises a right of a person accused of an offense being present in the process or with other international norms, making it impossible to independently assess possible non-conformity between the applied norm and International Law.

D – The Supreme Court of Justice, analysing the matter, also considered it unfounded because it understood, referring to understandings previously drawn up in the case file, that there would be no need to speak of a violation of the adversarial principle, since the Appellant had been heard and was able to deduce opposition and that the law would not require the extraditee, the person whose extradition is sought, to be heard in person at a second hearing before the judge, such solution not violating any constitutional rule or principle, also maintaining on pages 23 of its learned decision that the hearing before the Collective of the Court of Appeal has no place in the extradition process, since the Ruling is made in consultation, as has already been shown. In its assessment, such an understanding would not be inconsistent with the Constitution, namely because the extradition process is not a criminal process, thus it is not forbidden for the ordinary legislator to establish that the trial does not take place in consultation and also because of its understanding that the orientation of these defects is that only when a hearing is determined should it be public. It is considered, therefore, that the appealed judicial body applied the contested rule.



E – In this case, it is not verified that the Constitutional Court has considered the same issue with the outlines in which it is posed, even though it has already adopted general understandings on the constitutional provisions that refer to public hearings. When it commented on the obligation to hold hearings, it did so in the context of a criminal procedure and a sanctioning process and not exactly in an extradition process that implied the application of a real or hypothetical rule arising from the Law of International Judicial Cooperation on Criminal Matters. In the same vein, there will be no elements, from the outset, at the stage of admissibility, to consider that the claim of unconstitutionality that the Appellant brings to this Court is manifestly unfounded, nor can it be concluded that any decision of unconstitutionality of this Court will be useless and insusceptible to have an impact on the base process.

F - Therefore, the conditions are met for the Court to scrutinise on the merits the rule applied by the appealed judicial body in the sense that the *processing of the passive extradition process does not impose that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, whether made at a hearing, but in consultation, as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge*, is not in compliance with the Constitution due to incompatibility with the guarantees of the defence, the adversarial process and the Appeal and with the principle of a public hearing in the courts.

3.2.3. **The interpretation that will have been given to Articles 3, 5, 173, of the Code of Criminal Procedure, 55, paragraphs 1 and 2 (second part), 46, third paragraph, and Articles 454 and 579 of the Code of Civil Procedure in the sense of that the extraditee, the person whose extradition is sought, has the right to file opposition, but, despite the requirement for due diligence of testimonial evidence, she can only rely on the fact that he is not the person sought or that the assumptions of extradition are not met, it would be contrary to the Constitution by incompatibly with the guarantee of ample defence and with the clause that establishes the jurisdiction of the courts, of a party, and the**



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

**interpretation that will have been given to Article 155 of the CPP in the sense that it was up to an extraditee, the person whose extradition is sought, to proceed by complaint and not by Appeal to react procedurally to a decision that rejects a request for the examination of witnesses, due to non-compliance with the clause that defines a basically accusatory structure for the criminal procedure and the guarantees to the Appeal and to the effective judicial protection, provided for by the Constitution, of the other.**

A - Here, the Appellant is actually challenging two interpretations, a rule resulting from a hermeneutic determination made by the appealed judicial body according to which the extraditee, the person whose extradition is sought, has the right to file opposition, but, despite the requirement for due diligence of testimonial evidence, it can only be centred on demonstrating that he is not the person being sought and/or that the extradition requirements are not met, and another under which it was up to the extraditee, the person whose extradition is sought, to proceed by complaint and not by Appeal to react procedurally to another decision that rejected the request made by the Appellant of examination of witnesses, is/are non-conforming to the Constitution. In the Court's understanding in one case or the other, the two formulations would have a normative nature, which, for the time being, is sufficient to attest to the fulfilment of this requirement, even though the norm imputed to the Supreme Court of Justice was once again not inferred by this *Excelso Pretorio,* Supreme Body, from the provisions of the Code of Criminal Procedure, but exclusively from paragraph 2 under Article 55 and the final part of paragraph 3 under Article 46 of the Law of International Judicial Cooperation on Criminal Matters .

B – The parameters indicated, namely the right to defence, the guarantee to the Appeal and the guarantee to effective judicial protection invoked by the Appellant, have a constitutional dimension, and are therefore able to base a Ruling on the assessment of constitutional compliance. Although in this Court's understanding they all derive from Article 22 of the Constitution and from the fair and equitable process clause adapted to the extradition process, they do not fail to refer to issues of a constitutional nature.

C - The question on which the first normative segment depends was posed in a timely manner from the moment the Appellant became aware that the evidentiary steps he requested had not been carried out, namely the examination of witnesses when he was notified of Ruling TRB 244 /2019-20, dated 31st of July, a decision which ordered his extradition to the requesting State.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

The TRB – Barlavento Court of Appeal, regarding the steps of evidence intended to determine the merits or not of the extradition request, ruled, using paragraph 3 under Article 43 and paragraph 2 under Article 55, in the sense that it considered them to be dilatory measures, insofar as in which they would take place within the framework of the ongoing criminal procedure in the United States of America and not before the Cape Verdean justice system (p. 11). Following this decision, the Appellant, considering that there was a Ruling by the TRB – Barlavento Court of Appeal, re-submitted the matter to the STJ - Supreme Court of Justice, charging that body with the attribution of an incorrect interpretation, as this will have prevented him from providing evidence on a set of issues that could have an impact on the extradition process (para. 34-41) and questioned the constitutionality, for violation of the contradictory and broad defence principles, and international norms, of the limitation introduced by paragraph 2 under Article 55, in the interpretation according to which the extraditee, the person whose extradition is sought, cannot bring their view of the facts, the veracity and their effective occurrence, thus being unconstitutional for being disproportionate and for violation of their fundamental rights (para. 678-702).

In relation to the second segment, the Appellant raised the question of not having questioned the witnesses he had listed, alleging violation of paragraph 3 under Article 35 of the Constitution, through an ordinary Appeal addressed to the Supreme Court of Justice (para. 158-164), which, in its regard, through *Ruling 57/2020, dated 16th of October*, understood that, as it was a mere irregularity, it should have been argued within three days from the moment he had been notified of *Ruling TRB 244 /2019-20, dated 31st of July,* which authorised his extradition. Having issued the records following that decision, since the *a quo* body, the body under appeal, considered that the irregularity embodied in the omission of pronouncement would be remedied, it posed the question again in the second ordinary Appeal that he filed, this time against *Ruling TRB 47/2010-2021, dated 4th of January.*

D - As a result of the allegation and request, on the one hand, the Supreme Court of Justice can be attributed with the application of the first rule, insofar as this body, starting from a broad consideration, and formulated in a positive way, in accordance with which, once facts are alleged, intended to substantiate any of these grounds, whether referring to the identity of the person sought, or alluding to the non-verification of the extradition assumptions, the production of evidence must be admitted to extraditing, applied a rule arising from paragraph 2 under Article 55 and paragraph 3 under Article 46 of the Law of International Judicial Cooperation in Criminal Matters



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 757635166

under which it would not be admitted to provide any evidence on the facts alleged against the extraditee, the person whose extradition is sought, only on the other allegations. In this sense, it can be admitted, at the limit, that a rule was applied by the appealed judicial body as a basis for concluding that the TRB was right in not considering the documentary evidence tending to prove any fact relating to the attributions made to the Extraditee, the person whose extradition is sought, in the States United States of America, in this specific and non-expandable sense that the only matter on which proof cannot be provided is that which refers to the facts imputed to the extraditee, the person whose extradition is sought, by the Requesting State.

In turn, in relation to the second segment, it does not seem that it can be concluded that the appealed or contested Ruling had applied the rule proposed by the Appellant for the purposes of scrutiny of constitutionality, as the Supreme Court of Justice found that the matter had already been widely dealt with by *Ruling 57/2020, dated 16th of October*, which adopted unequivocal reasoning in the sense that the right to timely raise this issue was precluded, emphasised as *ratio decidendi*, the non-timely raising of the issue. Therefore, the appealed judicial body was not Ruling on the form of the reaction, but simply that its remedy was due to the time of the reaction, which it considered not to correspond to what was required for what it classified as a mere irregularity. Thus, this Court understands that the segment of the rule as constructed by the Appellant was not applied by the appealed judicial body, so that it cannot rule on the merits of this challenge.

E - With the limitations mentioned above, considering that this Court has not rendered any decision on the matter corresponding to the first segment of the rule that it may know in such a way as to anticipate the merits, that it cannot be concluded a priori that the question of constitutionality is manifestly unfounded and that a possible decision of unconstitutionality would still be useful, nothing prevents examining this specific issue of unconstitutionality.

F - Therefore, the Court will assess on the merits the rule applied by *Ruling 28/2021, dated 16th March*, of the Supreme Court of Justice, inferred from paragraph 2 under Article 55 and from the final part of paragraph 3 under Article 46 of the Law of International Judicial Cooperation on Criminal Matters, according to which *the extraditee, the person whose extradition is sought, has the right to file opposition, but, despite the requirement for due diligence of testimonial evidence,*



12/09/2021

*it can only be based on the fact that he is not the person sought or that the requirements for extradition are not met*, it is inconsistent with the Constitution due to incompatibility with the guarantee of defence.

    3.2.4. **The interpretation given to Articles 4 and 39 of the Law on International Judicial Cooperation in Criminal Matters in the sense that it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the arrest and detention of individuals who, according to official information, namely that of INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts relating to this organisation have not been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use that is made of information received via this system arising from a national law, would be inconsistent with the Constitution due to incompatibility with the rule of reception of conventional international norms, with the rule that establishes the effects of non-publication of this type of act and with certain principles inherent to the Rule of Law.**

    A – The Appellant considers that the Supreme Court of Justice has applied an interpretative rule according to which *it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the arrest and detention of individuals who, according to official information, namely from INTERPOL*, are sought by competent foreign authorities, *and it is not relevant that the acts relating to this international organisation have not been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use made of the information received via this system stems from a national law.* Such formulation contains normative content, namely based on a prevision and a statute, bringing together the characteristics of a norm that an abstract legislator could have created. In this sense, there is nothing to prevent the first requirement of ability to know and examine being considered fulfilled, but with the exclusion of part of the basic precept, Article 4 of the Law of International Judicial Cooperation on Criminal Matters, as at no time it seems to have served as basis for the hypothetical norm constructed by the Supreme Court of Justice, which seems to be anchored exclusively in Article 39 of this statute.



B - The petitioner further asserts under paragraph 321 of his final arguments that such a normative statement would carry a defect of constitutionality arising from the form of its approval, namely by the fact that an ordinary law, in this case the Law of International Judicial Cooperation on Criminal Matters has submitted to an international organisation whose constitutive and regulatory instruments were not incorporated into the internal legal system of the State of Cape Verde. This follows from the key point of his argument, set out in paragraph 322, that this would violate the principle of hierarchy of sources, the principle of competence, the principle of typicality of laws, the principle of legality of administration and the principle of constitutional binding on production normative that apparently is connected to Articles 262 and 269 and to Articles of Title X of the Constitution. Although the association between these constitutional precepts and the contested rule is not very clear, insofar as a possible effect of constitutional non-conformity can be discussed with paragraph 2 under Article 12 of the Constitution and with sub-section c) of paragraph 1 under Article 269, it can be considered that there is a question of normative constitutionality underlying this question.

C - The Court understands that, despite the variations with which the issue was being dealt with, also due to the grounds that the courts that intervened several times in the actual decision-making chain of an extradition process they were using, from the moment the Supreme Court of Justice in a writ of habeas corpus presented its understanding that the Appellant's detention was carried out under the terms of what was lawful to do under Cape Verdean Law (point 4), the Appellant was consistently raising the argument, namely in the opposition he deduced (para. 18), he insisted on putting the same question in the document of Ordinary Appeal that he addressed to the Supreme Court of Justice on 13th August 2020 (para. 18), often arguing, depending on the specific grounds formulated by the TRB, the issue of Cape Verde's link to INTERPOL instruments and its domestication (p. 12), as happened in the second Ordinary Appeal (V and sub-section b) of the conclusions). Through the contested decision, the Supreme Court of Justice came to assume the interpretation attributed to it and which is challenged in the present case. Therefore, there is no doubt that the Appellant raises the question of constitutionality at the first procedural opportunity that he has after its application by a court of law.



D – Moreover, this was effectively the rule applied by the Supreme Court of Justice, when under item II.3.1, after disregarding the usefulness of any inquiry regarding the ratification and publication of these instruments, it resorted to a decisional basis according to which the question Cape Verde's international link to these INTERPOL instruments would be irrelevant, insofar as the use of this organisation's police information transmission mechanisms would derive from Cape Verde's own domestic law, as the validity title of the use that is made of the information through the INTERPOL system is a national law, approved by the Cape Verdean Parliament.

E - The Constitutional Court did not consider any issue of normative constitutional non-compliance with the same content, nor can it be said that the constitutional challenge in question is manifestly unfounded or that a possible decision of unconstitutionality would be useless, insofar as any hypothetical decision in this regard, could have an impact on the assessment of the legality of his arrest and detention and have repercussions on the contested ruling.

F - It is therefore possible to review the constitutionality of a rule arising from Article 39 of the Law on Judicial Cooperation, according to which *it is lawful for the criminal police authorities to carry out, under the terms of the procedural law in force, the arrest and detention of individuals who, according to information Officials, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to this international organisation have not eventually been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use that is made of information received via this system, stems from a national law,* due to possible incompatibility with the rules of reception of conventional international norms and the effects of their publication and with certain principles inherent to the rule of law.

3.2.5. **The interpretation that will have been given to Article 39 of the LCJ and Article 269 of the Code of Criminal Procedure, in the sense that information for the arrest and detention of a person may come to the knowledge of the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunications, as follows from Article 269 of the CPP, followed by confirmation by**



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

a warrant that is not subject to the criterion of immediacy, would be contrary to the Constitution and International Law for incompatibility with the right to bodily freedom, with the principle of legality and proportionality of police measures, as well as the right of a person to be informed of the reasons for his detention and to receive immediate notification of all charges brought against him provided for under paragraph 2 of Article 9 of the ICCPR - The International Covenant on Civil and Political Rights.

A – The Appellant alleges that a hypothetical rule arising from Articles 39 of the LCJ and 269, paragraph No. 3, of the CPP was applied, according to which *information for the arrest and detention of a person may come to the knowledge of the authorities by any means permitted by Cape Verdean law, if there is urgency and danger in the delay by any means of telecommunications, as follows from Article 269 of the CPP, followed by confirmation by a warrant that is not subject to any time period.* An effect that stems from the fact that the Distinguished and Illustrious Supreme Court of Justice has disregarded the expression "immediately" that allegedly would be part of the regime applicable by remission. In the Constitutional Court's understanding, there are no doubts that such a formulation would have a normative nature, insofar as it comprises a stipulation and a provision

B – Regardless of what is understood regarding the merits of the non-compliance allegations, he refers to a constitutional dimension that adopts and establishes the right to bodily freedom and the principles of legality and proportionality of police measures. Since the objective of the contested rule is to strictly define the means of communication of information between the police authorities, in this specific segment, there would not be put at stake any rights derived from paragraph 2 under Article 9 of the ICCPR - The International Covenant on Civil and Political Rights, namely those of the person detained to be informed of the reasons for their arrest and detention and to receive immediate notification of all charges brought against them, nor the right to information under Article 9 of the UDHR, not least because this legal instrument, not being a treaty, cannot formally be a parameter in the process of inspection of constitutionality, even if indirect, but conceived as a mere means of interpreting the norms of rights, freedoms and guarantees, under paragraph 3 of Article 17 of the Constitution.

C – The Appellant alleges that this is a new issue, as its application was originally made by the Supreme Court of Justice in the appealed or contested Ruling, which



to be confirmed, in accordance with the jurisprudence cited of this Court (*Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, referring to the rule provided for under paragraph 1 of Article 2 of Law No. 84/VI/2005, referring to the principle of holding public hearings in the courts, and the guarantee of a public hearing in criminal proceedings, as well as guarantees of a fair process, the adversarial system and ample defence,* Rapporteur Advisory Judge Pina Delgado, 4.2. and ss.), depends on a check on whether the question was raised at the first opportunity subsequent to that application. It is, in fact, only in *Ruling 28/2021, dated 16th March*, that a formula is identified to consider that the official information that legitimises the request can reach the police authority by any means allowed by Cape Verdean law, including by any means of telecommunications, followed by confirmation by warrant. Therefore, it is confirmed that this is an issue that, in general, could only have been raised procedurally after its application, considering this condition to be fulfilled.

D – In this regard, the Supreme Court of Justice, in response to the Appellant's allegation, replied that official information may reach the Cape Verdean authorities by any means permitted by Cape Verdean Law, including, in cases of urgency and danger in the delay, by any means of telecommunication, as would follow from Article 269, paragraph 3, of the Code of Criminal Procedure, followed by confirmation by warrant. There will be no doubt that this was the applied standard. However, to support his allegation of unconstitutionality, the Appellant understands that the rule effectively applied by the appealed judicial body goes beyond that insofar as it would also derive from it the element that the subsequent presentation of the arrest warrant would not impose immediacy, since this criterion under paragraph 3 of Article 269 of the Code of Criminal Procedure was not considered, which, in his view, would determine the unconstitutionality of the hypothetical rule. But, the fact is that this understanding cannot be attributed to the rule that the Supreme Court of Justice applied, since the fact is that, deliberately or not, the issue of immediacy was not considered by that body, which was limited to applying a rule according to the which *information for the arrest and detention of a person may come to the attention of the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunication, as follows from Article 269 of the CPP, followed by confirmation by warrant.*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

61

E - The exclusion in itself of a possible segment of the rule based on the expression immediacy made by the contested ruling, which even seems justified to the Constitutional Court for reasons that will be discussed below, or the possible erroneous application of the reference to the Code of Criminal Procedure does not lead back, for itself alone, to a normative issue, but simply one of conduct. Therefore, it is not subject to challenge through an Appeal for specific inspection of constitutionality, but through another constitutional appeal. The only rule that can be investigated in this type of process is the one that was effectively applied by the Supreme Court of Justice in the terms defined above. Namely because the Court has not yet had any decision on this issue, it is not manifestly unfounded and because a possible declaration of unconstitutionality would prove useful insofar as it is likely to affect the contested decision.

F - Therefore, the Court considers that it can assess on the merits the question of whether the rule applied by the appealed judicial body according to which *information for the arrest and detention of a person may come to the attention of the authorities by any means allowed by Cape Verdean Law, if there is urgency and danger in the delay by any means of telecommunications, as follows from Article 269 of the CPP, followed by confirmation by a warrant,* it is non-compliant with the Constitution due to incompatibility with the right to bodily freedom, with the principle of legality police measures and with the principle of proportionality of police measures.

3.2.6. **The interpretation that will have been given to Article 38, third paragraph, sub-section a) and 39 of the LCJ, and Article 269, third paragraph, of the Code of Criminal Procedure, in the sense that a person can be arrested and detained for the purposes of extradition, without requiring the existence of a warrant or issuance of a red alert by INTERPOL and without knowing any fact that clearly justifies it, would be contrary to the Constitution and International Law for incompatibility with the right to bodily freedom provided for under Article 30 of the Constitution, the principle of legality and proportionality of the police measures provided for under paragraph 2 of Article 244, as well as the right of a person to be informed of the reasons for his arrest and detention and to receive immediate notification of all charges brought against him provided for under paragraph 2 of Article 9 of the ICCPR - The International Covenant on Civil and Political Rights.**



A – The Appellant considers that the Supreme Court of Justice has also applied a rule according to which a person can be detained for the purposes of extradition, without requiring that there be a warrant or issuance of a red alert by INTERPOL and without knowing any fact that clearly justifies it, a formula that, in the understanding of this Court, represents a norm and, as such, permissive of a typical scrutiny of a specific inspection of constitutionality. In this case, the hypothetical rule was also constructed from an interpretation brought under Article 39 of the Law of Judicial Cooperation International, not appearing, by the content of its decision, that the Supreme Court of Justice understood that paragraph 3 of Article 38 of the same statute or Article 269, third paragraph, of the Code of Criminal Procedure would be an applicable, or that this was necessary for the configuration of the enabling norm for arrest and detention.

B – Particularly because the Appellant indicates practically the same parameters that he defined for the previous question, some of which reveal some relationship with the contested hypothetical rule, this requirement can be considered fulfilled. However, it is necessary to comply with the parameters indicated: paragraphs 2 under Article 17, and Article 244, second paragraph, all of the Constitution, Article 6 of the African Charter, Article 9, paragraph 2, of the Covenant and Article 9 of the UDHR. Because paragraph 2 under Article 17 of the Constitution alone is incapable of being an autonomous parameter for a verification of normative constitutionality, Article 9 of the Universal Declaration of Human Rights and Peoples would be another auxiliary interpretation standard and paragraph 2 of the Article 9 of the ICCPR - The International Covenant on Civil and Political Rights, recognises the right to information of a detained person, and does not seem to have a direct connection with the contested rule, as the absence of a warrant to make an arrest of a wanted person is not the same thing as the content of a warrant, and only that one is in question in this item, the other being able to be placed in the next one. In this specific segment, what is at stake is not the right to be informed of criminal charges or other procedural information, but rather a guarantee that a person will not be arbitrarily detained. Therefore, the only parameters that fit this question would be the very right to freedom of movement and the principles of legality of police measures and the correlated principle of proportionality of police measures.

C - Regarding the timeliness of the issue of constitutionality, as well as the consistency of its maintenance, it appears that the Appellant is already in



opposition to extradition referred to in section III, paragraphs 40-41, that it would not be compatible with the principle of legality, the idea that a police authority of a State can deprive an individual of his freedom on the basis of an informal request from a foreign police agency, and that this principle would be violated when a warrant is required and the person is arrested without it. Subsequent to the interpretations made by the courts regarding the issue – from the outset the TRB through its *Ruling 48/2020-2021, dated 4th of January*, pp. 13-15 – continued to argue the incompatibility of the interpretations in the sense that the law did not impose the presentation of a warrant with the principle of legality (Appeal, paragraphs 65-66), a constitutional principle. On the other hand, however, it was not possible to identify the issue of compliance with International Law, which must be raised autonomously so that it can be known and appreciated by the judicial court before submitting it to the Constitutional Court.

D – The decision of the Supreme Court of Justice inserted in *Ruling 28/2021, dated 16th March*, was to reject all the Appellant's requests in this segment with the argument that, referring to its *Ruling 28/2020*, the arrest and detention was not directly requested, as he understood to be the case, it can take place even if the national judicial police authority is not yet in possession of a formal warrant, it being sufficient for it to be in possession of official information that legitimises the arrest and detention, which does not have to take the form of a request, much less of a warrant, it being certain that the latter would, as stated above, be confirmed subsequently. Therefore, the rule that the appealed judicial body applied was simply one under which a person can be detained for the purposes of extradition, without requiring a warrant, just being in possession of official information that legitimises the arrest and detention. It does not seem that the lack of news/red alert or facts that clearly justify the extradition have also been explicitly considered, since in the Ruling to which the reasoning referred, it was taken for granted that they existed, concluding that the official information had been transmitted initially by a Foreign State and then by the INTERPOL information system (p. 32) and that there was knowledge of facts that justified the detention for extradition purposes known through these communications.



E and F - With this clipping, considering that the Court has not yet rendered any decision on this matter, that the allegations of unconstitutionality are not manifestly unfounded and that a decision declaring unconstitutionality may prove useful and reverberate in the main proceedings, the Court will hear the question as to whether a rule applied according to which *a person can be arrested and detained for the purposes of extradition, without requiring that there be a warrant, as long as one is in possession of official information that legitimises his arrest and detention*, is inconsistent with the Constitution for incompatibility with the right to bodily freedom, with the principle of legality of police measures and with the principle of proportionality of police measures.

3.2.7. **If the interpretation that has been given to Articles 269, paragraphs one and four, and Article 31, paragraph three, and Article 39 of the LCJ, in violation of the imposition of immediate communication to the detainee of the reasons for his detention, would be contrary to the Constitution, due to incompatibility with the right to bodily freedom and the guarantee that the person is immediately informed, in a clear and understandable manner, of the reasons for his detention and imprisonment recognised by paragraph 4 under Article 30 of the Constitution.**

A – In the document filing the specific inspection appeal, as improved, the Appellant also invokes the occurrence of an unconstitutionality resulting from the interpretation that will have been given to Articles 269, paragraphs one and four of the Code of Criminal Procedure, and Articles 31, third paragraph and 39 of the LCJ, *in violation of the imposition of immediate communication to the detainee of the reasons for his arrest and detention*, would be contrary to the Constitution.

This interpretation cannot be known and examined by the Court because, first, as presented, it does not have a normative nature, not extracting from this formula a deontic statement that would enable this Court to proceed with its review of constitutional compliance through specific inspection of constitutionality, as is drawn up, it is just a statement about the conduct of a judicial body.

B - Second, it is very doubtful, that even implicitly, the Supreme Court has adopted any understanding that it would not be necessary to present the detainee with the reasons for his detention in his argument, since what he says, according to what



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

was proven from the analysis of the file that it promoted, is that the Appellant's allegation, mentioned above, did not correspond to what the police authority had declared, and that it had no reason to question the veracity of the information that had been provided for it. Even because if that had happened, what would be natural is that this might nave been raised by the interested party before the judicial authority who presented him/her following his detention so that he could decide, which did not happen and because, in fact, in his opinion, the case of confirmation of this detention with the Barlavento Court of Appeal states information that he was communicated, that there was an arrest warrant issued by INTERPOL and the reason for his detention (p. 19). Therefore, he did not deny that this duty was imposed. Based on the same normative principle, it was simply understood that, in the specific case, it had confirmed that such communication had occurred, an aspect whose verification is not for the Court to carry out in the context of specific inspection.

C – For the above reasons, the Constitutional Court cannot know and examine the merits of the interpretation attributed to the Supreme Court of Justice as it is not normative in nature and has not been applied by this judicial body.

3.2.8. **The interpretation given to Article 6, third paragraph, and Article 3, third paragraph, of the LCJ, according to which exemption from reciprocity is possible in any form of international judicial cooperation, including extradition, would be contrary to the Constitution due to incompatibility with the principle of reciprocity of advantages inserted under paragraph 1 of its Article 11, the principle of equivalency of foreigners to nationals transferred into paragraph 1 under Article 25 and the rule for the treatment of foreigners in transit provided for under Article 7 l).**

A - As alleged by the Appellant, a rule arising from Articles 3, third paragraph, and Article 6, third paragraph, both of the LCJ, was applied, according to which, by its systematic placement, the *waiver of reciprocity is possible in any form of international judicial cooperation, including extradition,* a formula that clearly corresponds to the elements required to configure a legal norm, containing a stipulation, integrating a provision, being structured as if it were a deontic or ethical statement constructed by an imaginary legislator. However, it does not seem that such a hypothetical rule refers to Article 6, paragraph 3, of the Law of International Judicial Cooperation on Criminal Matters, but possibly to paragraph 4 of the same provision,



because if the former concerns guarantees of non-application of life imprisonment, it is the latter that provides for reciprocity. But even this paragraph can only be relevant to the configuration of the specific rule applied by the Supreme Court of Justice, in its last part which, referring to paragraph 3 under Article 3, provides that the refusal imposed by the first segment when it is not guaranteed reciprocity would have, as an exception, the provisions of paragraph 3 under Article 3 of the Law.

B – The same procedural intervener argues that such an interpretative norm would suffer from a defect of unconstitutionality due to non-compliance with the principle of reciprocity of advantages provided for under paragraph 1 of Article 11 of the Constitution and the principle of equivalence of foreigners to nationals transferred into paragraph 1 of Article 25 and with a rule in Article 7, sub-section l), which would oblige the alien in transit to be treated in a manner compatible with international human rights standards, which, regardless of whether they are promising parameters or not, at this stage is sufficient to consider that there is an underlying question of constitutionality on which the Court can rule.

C - The interpretation that the courts were applying regarding reciprocity goes back to *Ruling 244/2019-20, dated 31st of July,* unpublished, transferred to the Extradition Records, v. I, 290 et seq.), in the sense that it would be possible to dispense with it whenever this proves advisable due to the nature of the fact or the need to combat certain forms of criminality (III, p. 11). From that moment, the Appellant consistently invokes the question, not only raising problems of compatibility with International Law and with ordinary law, but also with paragraph 1 under Article 11 of the Constitution, for violation of the principle of reciprocity of advantages (para. 191), doing it again in the Second Ordinary Appeal of the decision that authorised the extradition which he submitted to the Supreme Court of Justice in the conclusions qq and ss. Therefore, there will be no other determination that within what was required not only raised the question of possible application of a normative understanding likely to be unconstitutional, as it did in a timely and consistent manner throughout the process in such a way as to allow the judicial bodies involved to realise that it was a matter of constitutionality.



D – Also for this reason, the Illustrious Supreme Court of Justice, when, in item II.3.12, considered the issue raised by the Appellant that the waiver of reciprocity, as it says, would violate Article 11, paragraph one, of the Constitution, responded in the negative, determining this understanding the appeal's failure in this segment. For that reason, it cannot be ignored that the interpretative norm in question was applied by the Supreme Court of Justice as a *ratio decidendi* of the question put to it by the Appellant.

E - Despite having already developed discussions on the principle of reciprocity of advantages in the scrutiny of norms inserted in a treaty, the Court has never ruled on the specific question raised in this context that emerged from the application of an interpretative norm arising from the Law on International Judicial Cooperation in Criminal Matters. It cannot be said at this stage that the Appeal is manifestly unfounded, even though the defect in constitutionality invoked by the Appellant is not at all evident in the light of the parameters indicated, thus allowing the Constitutional Court to assess it on the merits.

F - Therefore, the Court decides to scrutinise the hypothetical rule arising from Article 6, paragraph 4, last segment, and Articles 3, paragraph 3, of the Law of International Judicial Cooperation on Criminal Matters applied by the Supreme Court of Justice, according to which *the exemption from reciprocity is possible in any form of international judicial cooperation, including extradition*, for possible non-compliance with the Constitution, for incompatibility with the principle of reciprocity of advantages, with the principle of equivalence of nationals and non-nationals and with the rules of treatment of foreigners in transit in a manner compatible with international human rights law.

3.2.9. **If the interpretation that will have been given under Article 17 of the LCJ, according to which the extradition that is authorised is so that the extraditee, the person whose extradition is sought, is subject to criminal prosecution for one of the crimes charged to him, in accordance with the guarantee offered by the requesting State, would be inconsistent with the Constitution for incompatibility with Articles 15, 17, paragraphs 4 and 5, and 18 of the Constitution.**



A – Regarding the present challenge, the Appellant tells us, through the improvement part of his petition of Appeal that the decision of the Appeal "proceeded with the application under Article 17 of the LCJ with the following meaning, "the extradition that is now authorised it is for the Extraditee, the person whose extradition is sought, to be subject to criminal prosecution for one of the crimes imputed to him, in accordance with the guarantee offered by the Requesting State", adding further that the decision does not correspond to the guarantee given by Diplomatic Note No. 103 of the United States, through which this country proposes to abandon all other charges and seek extradition only on the basis of element 1, nor does it correspond to the need for the intervention of a judicial body of the Requesting State in offering the guarantee of effective reduction of the points of the indictment in relation to the Appellant.

Therefore, as follows from the wording itself, the object of the Appellant's challenge in this segment is not a deontic statement which, in any case, does not follow from what has been set out, but is a segment of the rhetorical device part of the appealed Ruling. Therefore, in this case, a normative principle that legitimises the decision is not at issue, which is not constructed by the Appellant himself, but the actual merit of the decision itself, an element of the appealed judicial act that cannot be scrutinised by the Constitutional Court in the context of specific inspection of constitutionality.

B – The lack of explicitness of a norm and the fact that, in practice, a challenge is being launched to the decision itself and not to the normative foundation that legitimises it, would be reasons that would prevent the Constitutional Court from hearing and examining this issue. But, in addition to this, even if these obstacles to hearing and examining the merits of the matter were overcome, the parameters presented result from a block of constitutionality that, as it has not been implemented in specific principles and rules, promotes a normative vagueness that makes any inquiry unfeasible constitutionality, especially because in relation to the other parameters effectively explained, namely Article 15, which contains a generic rule imposing a duty to respect and guarantee the free exercise of rights and freedoms and the fulfilment of constitutional and legal duties, paragraphs 4 and 5 under Article 17, which regulate the restriction of rights, and Article 18, which contains three principles of the regime of rights, freedoms and guarantees - that of direct applicability, that of binding of all public entities and that of binding private entities – it is not very clear how they would be affected by these specific conducts of the appealed judicial body.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

The only parameter that would still refer to a specific constitutional basis would be the principle of specialty if it were considered as an international customary rule that imposed an obligation on a State - Defendant - to impose on another State - Respondent - a limitation on the submission of an extraditee, the person whose extradition is sought, to criminal proceedings or execution of penalties for fact or conviction other than those authorised by the extradition decision, projecting a guarantee of title to an extraditee, the person whose extradition is sought. It is certain that if there were a rule in this regard, it would be part of Cape Verdean Law under paragraph 1 of Article 12 of the Fundamental Law. For the reason, to the extent that paragraph 4 of the same provision applies, it would occupy a supra-legal hierarchical position. There could be a situation of indirect unconstitutionality subject to scrutiny by this Court.

However, it is not possible to find the grounds on which the Appellant is based for alleging the existence of an international customary rule with such content that it would have been incorporated by the system of automatic reception of customary rules under paragraph 1 of Article 12 of the Constitution. And this is important because in the presence of an unwritten norm, the proof of its existence is essential to avoid frivolous arguments to attract a court, which should recognise them, trying to identify it, thus suggesting the main norm it represents that source of International Law, sub-section b) under paragraph 1 of Article 38 of the International Court of Justice when associating international custom with evidence.

By making consecrated very early in the *Case of the Right to Asylum* (Colombia v. Peru), dated 20th of December 1950, reproduced in *Asylum Case (Colombia v. Peru)* in: *International Court of Justice Reports of Judgements, Advisory Opinions and Orders,* The Hague, ICJ, 1950, pp. 276-277, that the party who relies on a custom (…) must prove that it is established (…)", i.e. that "the rule invoked (…) is in accordance with a uniform and constant practice of the States concerned and that this practice is the expression of a right (…)", the International Court of Justice has laid down the doctrine arising from international practice and associated with the general principle of law of the *onus probandi actori incumbit* that the burden of proof is on the person invoking the existence of an international customary norm,



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

which applies to both universal and regional ones. Insofar as paragraph 1 of Article 12 incorporates the customary legal regimes that internationally bind the State of Cape Verde, it also does so in relation to the procedural rules that regulate its invocation before the courts. Therefore, it is up to the procedural intervener to present the practice and *opinio juris,* an opinion of law or necessity, aimed at proving the existence of a customary rule that invokes or, at least, indicate the judicial or doctrinal authorities that would indirectly help to determine the existence of this rule under the terms represented by sub-section b) of paragraph 1 under Article 38 of the Statute of the International Court of Justice and as recently proclaimed by the Commission on International Law (*Draft Conclusions on Identification of Customary International Law With Commentaries*, New York, ILC, 2018, Conclusion 3; Conclusions 13 -14), so that from them the practice can be verified and *opinio juris,* an opinion of law or necessity, essential for the configuration of a customary rule.

But, even if it is possible to overcome the fact that the Appellant has not provided proof of practice and *opinio juris*, as he should, to support the existence of an international custom that he claims with the outline it claims to have, the Constitutional Court cannot give as justified, the idea that there would be an international customary norm in the alleged sense. Assuming that a pattern of treaties and domestic legislation (*Draft Conclusions on Identification of Customary International Law With Commentaries*, Conclusion 6.2), one can derive both a practice, and arguably an *opinio juris*, from which a Requesting State has the duty not to subject an extraditee, the person whose extradition is sought, to trial for crimes that do not result from the act granting the extradition, that same legal regime is also part of the rule that institutes an exception in the sense that, with the consent of the Respondent State, the extraditee, the person whose extradition is sought, may be subject to trial for the commission of other punishable acts or subjecting him to serving a sentence for other crimes.

This is evidenced by the practice itself and arguably the *opinio juris* that can be attributed to the State of Cape Verde, insofar as the Law of International Judicial Cooperation on Criminal Matters allows, through sub-section b) of paragraph 4 under Article 17, that the State that authorises the transfer, after previously hearing the suspect, the formal suspect or the convict, consent to the derogation of the specialty rule or the possibility that, pursuant to paragraph 5 of the same provision, the State may request the extension of cooperation to facts different from those on which the request was based,



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

upon a new request presented and instructed under the terms of that law. The same results from the standard of treaties that Cape Verde has celebrated in this area, namely with the Portuguese Republic (text published in the *Official Gazette*, 1st Series, No. 17, dated 7th of June 2004, pp. 402-417, Article 56, first paragraph, b)), with the Kingdom of Spain (text published in the Official Gazette, 1st Series, No. 15, 14 April 2008, Article 15 b)) or within the scope of the Community of Portuguese Language Countries (text published in the *Official Gazette*, 1st Series, No. 12, 21st February 2004, Article 6, paragraph 1, b)).

In addition, it should be noted that there are several universal and regional multilateral treaties to combat transnational organised crime that do not provide for the specialty rule, an aspect that is also taken into account by Cape Verde's special legislation, when it asserts through paragraph 1 under Article 18 that the immunity deriving therefrom ceases in cases where, by treaty, convention or international agreement to which Cape Verde is a party, there is no place to benefit from the specialty rule, as would be Article 16 of the Palermo Convention on Transnational Organised Crime and other treaties that are mirrored in its text.

As a result of this indication from Article 14 (Rule of Specialty) of the United Nations Model of Extradition Treaties, which recommends limiting it, on the one hand, to crimes whose extradition was granted by the Respondent State, but, on the other hand, foreseeing exceptions based on "any other crime that [it] consents to", contemplating that it is granted in relation to crimes that the treaty itself allows, and commenting that the discretion to consent or not is limited by the provision of the treaty, because if it allows the extradition of that crime, the State must necessarily consent (*Revised Manual on the Model Treaty on Extradition and on the Model Treaty on Mutual Assistance on Criminal Matters,* Vienna, UNODC, 2002, pp. 52-53). And also from sub-section a) of paragraph 1 under Article 34 of the Model Law on Extradition that the United Nations recommends, which provides for the possibility of subjecting the extraditee, the person whose extradition is sought, to criminal proceedings and re-extradition for crimes other than those that justified the extradition provided that, among other causes, the competent State authorities expressly give their consent (Model Law on Extradition, Vienna, UNODC, 2004, p. 57).



Thus, it is very debatable that this gave rise to an obligation to impose this rule on another State, much less that individual rights anchored in Customary International Law itself emerged, namely because there are also treaties, especially at this time multilateral, that do not contain the specialty rule and because a significant paragraph of bilateral treaties that provide for it also allow the Respondent State to waive the right to which it would be entitled, allowing deviations from that rule.

Therefore, the international customary rule as instructed by the Appellant does not exist in the international legal sphere. Regardless of the assessment made of this development, customary international law inevitably derives from the practice and *opinio juris* of States, without the content it expresses being in the least bit relevant. And the fact is, in the customary international dimension, the rule of specialty still leads back to a register of regulation of interstate relations, deriving from it essentially States' rights. Although they produce beneficial effects for individuals subject to extradition proceedings, they do not establish any subjective right under International Law. These, if they exist, are those that are translated into a specific treaty, which will bind its parties, or provided for by the domestic law of States with a constitutional or ordinary basis.

C - Due to lack of normative content and enforceable scrutiny parameter, the Constitutional Court will not hear and examine the question of whether the *interpretation that will have been given under Article 17 of the LCJ, according to which the extradition that is authorised is for the extraditee, the person whose extradition is sought, is subject criminal prosecution for one of the crimes charged to him,* in accordance with the guarantee offered by the requesting State, would be contrary to the Constitution.

**3.2.10. The interpretation that will have been given to Article 6, paragraph No. 2, sub-section b) of the Law of Judicial Cooperation and to Article 45, paragraph one, of the Penal Code, according to which extradition is granted to a Requesting State where it is applies the death penalty and life imprisonment when the guarantee is given by its Embassy and not by an irrevocable and binding act for its courts and other entities, it would be contrary to the Constitution due to incompatibility with the principle of equality, to the right not to be discriminated against and the obligation of the Requesting State to provide guarantees in the event of application of a perpetual measure.**



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

A - In this regard, the Appellant alleges verbatim in the document of improvement that the rules that the contested decision applies of the provisions indicated in the sense that "it brought to the process, through the Public Prosecutor's Office, a document in which it undertakes (...). This guarantee cannot but be considered valid and sufficient", explaining that it would be a misinterpretation to consider as a valid and sufficient guarantee that given by an Embassy of the Requesting State, allowing extradition to a country that applies the death penalty or life imprisonment, in this case to 160 years of imprisonment, since, in practice, what the rules arising from sub-section a) of paragraph 2 under Article 6 of the Law of Judicial Cooperation and paragraph 1 under Article 45 of the Penal Code would require is that the request was made by an irrevocable and binding act of its courts and other entities. And adding that the Supreme Court had accepted another understanding in a previous case before an identical diplomatic note and that extradition for political reasons would also be involved. With this formulation, whose normative content is far from being very evident, what the Appellant is questioning is the merit of the decision - which he considered that, in fact, certain guarantees provided by a State would be sufficient - as he understands, as he says, that they are misinterpretations of the applicable legal precepts, and conduct promoted by the Supreme Court of Justice throughout its decision, not a norm that has been applied by the Honourable judicial body that issued the decision whose sections were placed in crisis.

B – Since the possibility of applying the death penalty, which is not in question, is not relevant in this specific case, it is irrelevant that the Requesting State provides, amongst its list of applicable penalties, that of death. In this sense, based on the construction presented by the Appellant in his filing the Appeal, as improved, the only relevant issue is that which refers to the sentence of life imprisonment. In this regard, even if it were possible to infer a specific rule from the linguistic formulas presented by the Appellant, the main problem that arises is that, in the opinion of this Court, there is not exactly a question of constitutionality to be resolved. Precisely because, despite all the debate that has taken place and that can legitimately be continued on the goodness of the constitutional solution, the fact is that the constituent legislator of the review took a position on the issue,



whose most obvious effect was the "deconstitutionalisation" of the protection reserved for the non-national in cases of application of a life sentence.

The original version of the 1992 Constitution (published in the *Official Gazette*, 1st Series, No. 12, 25th September 1992, pp. 1-44) was achieved, insofar as it allowed only the extradition of the non-national, prohibiting that of the Cape Verdean, it was expressly limited in cases of application of the death penalty or the life sentence (Article 35, third paragraph), essentially maintaining the same regime with the constitutional revision promoted by *Constitutional Law 1/1999* (published in the *Official Gazette*, 1st Series, No. 43, Supplement, 23rd November 1999, pp. 2-34, with correction published in the *Official Gazette*, 1st Series, No. 3, 14th February 2000, pp. 17 -18), since sub-section b) of paragraph 3 of the renumbered Article 37 continued with the same prohibition. All this was changed in 2010. In fact, paragraph 17 under Article 1 of Constitutional Law No. 1/2010, published in the *Official Gazette*, 1st Series, No. 17, 3rd May 2010, pp. 394-407 (according to amended version published in the *Official Gazette*, 1st Series, No. 28, 26th June 2010, pp. 1003-1009), which carried out the second ordinary revision of the Constitution, amended this constitutional provision in the part where there was a guarantee of the non-national not to be extradited for crimes that correspond to a life sentence, a guarantee that became exclusively that of the national citizen, which, with this same revision, became extraditable in some situations, according to the current Article 38. At this time, as assumed by all the judges of this Court through *Ruling 10/2020, dated 20th of March [Referring to the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America],* Rapporteur: JC Aristides R. Lima, E 7, and of the concurring vote of Advisory Judge Pina Delgado, 12.3.1, the only holders of this guarantee are national citizens.

It cannot primarily prevent such a conclusion on the unequivocal will of the legislator from being accepted by the fact that it can derive protection based on the principle of the dignity of the human being, in the principle of equality, in the principle of equality of nationals and foreigners, in the principle of human dignity, in the principle of protection of trust or in the rule that prohibits the application of the sentence of life imprisonment, since, respectively, it does not place a general limit on the constituent legislator to establish in the text of the Constitution a distinction between persons for reasons of nationality and without guaranteeing the equivalence of nationals and foreigners, even outside the scope of political rights,



namely with regard to guarantees against extradition, with the constitutional regime in force also not having any effect of prohibiting the application of the penalty in question, insofar as it is intended to prohibit it only in national territory. This is absolutely understandable, considering that what is protected when the extradition of national citizens is more intensely limited is, ultimately, a Cape Verdean national's right to belong to his land (*Ruling No. 20/2018, of 16th October, Uchechukwu Eseonwu and Chijioke Duru v. STJ, on breach of guarantee of presumption of innocence in its in dubio pro reo dimension,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 68, 25th October 2018, pp. 1639-1648, 1.3, in the sense that only in extreme situations and with more accentuated guarantees, is he allowed to be extradited, not happening to a national of a foreign country or stateless person.

With the loss of a constitutional standard of the guarantee with Constitutional Revision Law No. 1/2010, for this specific issue, the regime that regulates the extradition of foreigners or stateless persons is, at this moment, merely legal, insofar as the Law itself of Judicial Cooperation International in Criminal Matters makes it conditional on the provision of certain guarantees, since under the terms of sub-section f) of paragraph 1 of its Article 6, the request for cooperation is refused when respecting the offense corresponding to imprisonment or of a security measure of perpetual character, not preventing, however, from granting cooperation in such cases, if, pursuant to sub-section b) of paragraph 2 of the same provision, the Requesting State offers guarantees that such penalty or measure security will not be applied or enforced. Therefore, it is not a matter over which the Court has jurisdiction, since in the case of a deconstitutionalised domain over it, an interpretive monopoly is projected for the judicial courts and, in this case, the Supreme Court of Justice, which dictates the last word on it.

If constitutional issues still arise, they would be of a different nature. Sometimes, it seems that the Appellant's constitutional challenge is based on the interesting understanding that, after all, the problem lies with the very de-constitutionalisation of the limitation of the possibility of extradition of foreigners or stateless persons in situations of application of a life sentence, namely because they are in dissonance with constitutionalised values of the Political Community that reflect the identity of the Constitution of the Republic of Cape Verde as the dignity of the human being or equality.



However, this being the case, the constitutionality defect would have to be imputed to paragraph 17 under *Article 1 of Constitutional Law No. 1/2010*, which established the new constitutional regime on the matter, and not to the interpretation attributed to the Supreme Court of Justice. Although it is not clear that, in the context of specific review of constitutionality, this type of scrutiny on constitutional rules would be open to the Constitutional Court, the fact is, that in this case, it would be difficult to impute the application of a constitutional rule to the appealed judicial body, which, for not having been argued, it was not even considered.

C – For these reasons, the Constitutional Court cannot hear this challenge.

3.2.11. **The interpretation that will have been given to Articles 156, paragraph one, sub-section b), 157 and 161 of the Code of Criminal Procedure, in the sense that the absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of Law International Public arises from a previous assessment or political position, leading to the recognition of the status of special envoy would only fall to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status both by the sending state and by the state that was to receive him, would be inconsistent with the Constitution for incompatibility with the principle of independence of the courts, with the principle of non-intervention/non-interference in the internal affairs of other States and with rules that establish the preferential application of International Law in relation to ordinary law.**

A - It is considered that the construction presented, although referring to a hypothetical standard, reveals a deontic nature, characterised by two interconnected but autonomous regulations, respectively that: *The absolute incompetence of the Cape Verdean courts to hear a matter relating to the immunity of International Public Law results from a prior political assessment and another that the recognition of the status of Special envoy would only fall to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status by allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as special envoy, after recognition of his status by both the sending State and the receiving State.*



B - The Appellant indicated both constitutional parameters (principle of independence of the courts; principle of non-interference and rule of precedence for the application of this instrument when there is a conflict with other conventional international regulations) and international (rule to provide for the recognition of special envoy immunities in Transit States and the principle of non-intervention). Therefore, the Constitutional Court is satisfied that the question addresses potential problems of direct constitutionality or compliance with international law.

C – Although with several nuances, the issue of jurisdictional immunities has accompanied the Appellant's allegations since the moment of his arrest and his placement in an extraordinary injunction for habeas corpus, which was filed with the secretariat of the Honourable Supreme Court of Justice on 26th June 2020. With the non-acceptance of the thesis of the absolute incompetence of Cape Verdean courts to detain and subject him to extradition proceedings, he insisted on the allegations that there would be an obligation for a Transit State to recognise inviolability and immunities from the jurisdiction of a person who has been appointed by a State to carry out a mission in another that agrees with it and that by not recognising the Republic of Cape Verde, it would be interfering in the relations between these two States in contravention of the provisions of International Law. Finally, in the last Appeal, the issue of violation of the principle of the independence of the courts, was not actually considered in sub-section t) from its conclusions that the status of special envoy does not necessarily need to be recognised by the political power, and that, thus, the appealed judicial body, by delegating this competence exclusively to the bodies that represent it, violated the principle of separation of powers and that of the independence of the courts.

D - In the understanding given by the Supreme Court of Justice, referring to a previous decision, without the consent of the State of Cape Verde for the Appellant to transit through its territory as a special envoy, the courts cannot recognise a person with the status of a special envoy and, thus, not enjoying inviolability and immunities based on the United Nations Convention on 1969 Special Missions (p. 44), which is far from corresponding to the norm whose application is attributed to it.



In this sense, the first part of the rule that was designed is insusceptible to be scrutinised, for the reason that it was not applied by the appealed judicial body, which, at no time, can be accused of having used as a basis for decision-making the rule according to which the absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of International Public Law stems from a previous assessment or political position. The Court's *ratio decidendi* cannot be extracted from clipped segments without connection with the previous rationalisation used by the Court. Therefore, if we pay attention to the normative reasons presented by the Supreme Court of Justice to consider that there would not be an obligation to recognise the inviolability and immunities of members of a special mission, it is that it was previously informed, through visa or notification, of the transit and not objected to, and, therefore, that status could not only result from a declaration by the sending State, but also from the consent of the State of destination and the State of transit. It is the absence of this essential consent, which, in his opinion, has not been proven, that would prevent the recognition by Cape Verdean courts of their immunities and inviolability based on this status of special envoy.

The Supreme Court of Justice did not consider itself inhibited from verifying whether the Appellant enjoyed such inviolability and immunities in Cape Verde. So much so that it proceeded to determine this question. The only thing that made the State of Cape Verde to depend (not necessarily the Government) would be to know whether or not it consented to the Applicant's transit in the country's territory as a special envoy, without, moreover, in the contested decision requiring that such was expressed, only implying that, hypothetically, it would result from the fact that Venezuela had previously informed of this transit and that this country has not objected. Therefore, considering the allegation to be unfounded because it was not established that the State of Cape Verde having been previously informed, had agreed in this way with the transit by not objecting to it. Naturally, such a rule would not have the power to be contrary to the principle of independence of the courts, as it maintains the jurisdictional function of deciding a matter within its competence, as it effectively did, without any interference from the Government and, before the assessed party, without the need to consult the same, because the Appellant admits that the Government of the Bolivarian Republic of Venezuela, for technical reasons, did not inform the State of Cape Verde in advance, only doing so after the Appellant was already on the ground and had been detained.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

Regarding the issue of not having also recognised the Appellant as Alternate Permanent Representative of the Bolivarian Republic of Venezuela to the African Union, the Constitutional Court expresses its doubts whether the Supreme Court of Justice used as its *ratio decidendi* the argument that absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of International Public Law  is based on a previous assessment or political position. It is true that it constructs a sentence according to which the same problem of recognition of this status by Cape Verde would persist in the specific situation, which had not yet been demonstrated in the records and that, therefore, the unilateral act of Venezuela that it intended to make someone already detained in Cape Verde for extradition purposes their representative to an organisation, would be legally irrelevant, even if it is continental, the African Union. However, in the decisive part of his argument, what he says is that the Appellant did not invoke, nor was it possible to unveil the instrument that would oblige the State of Cape Verde and its institutions to recognise the alleged immunity of the extraditee, the person whose extradition is sought, in the new capacity referred to (pp. 44-5).

Therefore, the reason for not recognising these inviolabilities and immunities in this case is essentially related to the absence of elements that would allow the Supreme Court of Justice to assess and decide on this allegation of absolute incompetence, namely because it was a unilateral act of Venezuela and because no legal basis had been indicated to support the allegation. And here the Constitutional Court would have the same difficulty even in defining specific parameters that a judicial body could use in such circumstances. Even in the context of closing arguments, where he discusses in more detail about the double protection he would enjoy, the Appellant refers generically to Customary International Law, to Conventional International Law and to the jurisprudence of the International Court of Justice, he speaks of binding legal obligations and a duty of compliance, cites the duty to peacefully resolve a dispute, invokes the duty of respect for the International Law of Diplomatic Relations and cites the Vienna Convention on Diplomatic Relations regarding U.S. jurisprudence on retroactive immunities.

CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

But, as the Illustrious Supreme Court of Justice has very perceptively pointed out, at no time is it possible to identify the specific conventional or customary rule that binds the State of Cape Verde and that would impose a duty of recognition of inviolability and immunities from criminal jurisdiction by third party States to whoever has been appointed by another to represent them in a Regional International Organisation, specifically the African Union, without apparently any condition beyond the unilateral communication of that State, even if he was already in its territory.

Or this would depend on the existence of a conventional norm that should have been identified, or at least a customary norm that must be properly demonstrated from the presentation of the relevant practice and the *opinio juris* of the States. It doesn't seem to us that this has happened in this segment, making it almost impossible to make any assessment. It is not possible to determine whether a diplomatic representative in transit is being considered or which statute it is effectively invoking in the light of International Law, given that, in this regard, even the international rules that have been recognised to regulate similar situations do not fail to condition transit to a visa issued by the Third Party State. This issue, in addition to, in itself, limiting the hearing and examining of the matter by the Constitutional Court, denotes an inappropriate placement of an issue of non-conformity between Domestic Law and International Law, which makes it unfeasible to be placed before an ordinary judicial body, the subsequent promotion of the question of indirect unconstitutionality and its hearing and examining by this Court.

E – The segment that the Court can hear and examine was not the subject of any previous decision that allowed to reject it by mere reference to this jurisprudence, nor can it be considered, immediately, and without facing the argument presented by the procedural interveners, as manifestly unfounded or useless, or that a decision of unconstitutionality is not likely to reverberate in the main proceedings.

F – In this sense, if the Court can determine the compatibility with the Constitution and with the International Law of the segment of the rule constructed according to which *the recognition of the status of special envoy would only be the responsibility of the State of Cape Verde,*



*without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status by both the sending state and the receiving state to receive,* but no longer to the segment that refers to the absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of International Public Law  stems from a previous assessment or political position and the allegations associated with the fact that he was appointed Alternate Ambassador of the Bolivarian Republic of Venezuela for this country.

**3.2.12. If the interpretation under Articles 15, paragraph 4, and Articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, in order to determine compliance with the ECOWAS Court of Justice decision, whose application the Supreme Court of Justice refused, on the grounds that, in order for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and ratified. Since Cape Verde did not sign the protocols that recognise jurisdiction of the ECOWAS Court of Justice in terms of human rights and since it is not a supranational organisation for the purposes of paragraph 3 under Article 12 of the Constitution, it would be contrary to the Fundamental Law, namely the principle of national sovereignty.**

A – In this case, deviating from the previous allegations, the Appellant did not charge the Appellate Court with the application of an unconstitutional rule, either real or hypothetical. Before that, it refused to apply certain norms that would bind the State of Cape Verde and that would integrate the Cape Verdean legal system. And he did so apparently because he considered the hypothetical rule arising from the combined application under Articles 15, paragraph 4, and Articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, in the sense that Cape Verde's supranational character and the linkage of Cape Verde to the legal regime of the Court of Justice would oblige Cape Verde to execute a decision imposing provisional measures imposed by that court would be contrary to the Constitution for violating the principle of national sovereignty.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

B – In this regard, from the analysis of the appealed decision, it is evident that this proposal for the interpretation of the legal regime was rejected by the High Court. This Supreme Body, after having raised in a transversal way, the problem of compatibility between the sovereignty of the State and a duty to comply with a decision of that court, discussed what it considered the permissive element of harmonisation between them: the consent of the State. Focusing specifically on the issue of the supra-nationality of ECOWAS, which, based on practice, rejected decisions by the sub-regional court itself in the sense that the link to the 2005 Protocol stems from the signing of this instrument, and from national doctrine, it considered, made in light of the internal constitutional order, that, if Cape Verdean courts were to recognise this regional organisation as a supranational organisation, in the sense that its acts would automatically enter the internal legal sphere, without any act of mediation, the sovereignty of Republic would be reduced to ashes. Hence, it rejects the application of paragraph 3 under Article 12 in the specific case, the same happening with paragraph 2 under Article 210, once again considering that the key issue is whether or not the State of Cape Verde consented to the exercise jurisdiction by an international court, without which any treaty would be inapplicable and would pose a risk of unilateral expansion of competences by the regional bodies themselves, unacceptable to any State. In conclusion, it established a decisive understanding that even if Cape Verde were bound by these decisions, their non-compliance would only constitute a matter of international responsibility, not resulting from an obligation to comply with these decisions by the domestic courts.

Thus, at the limit, it can be considered that the reason that led the Supreme Court to refuse the application of the rules would impose, according to the Appellant, a duty of internal compliance with the decisions of the Court of Justice of the Economic Community of West African States based on the application of paragraph 3 under Article 12 of the Constitution and paragraph 2 under Article 210 is that, in their opinion, ECOWAS is not a supranational organisation, nor having Cape Verde consented through binding, the 2005 Protocol to its jurisdiction to receive complaints for violations of rights submitted by individuals. Such putative obligation would violate the principle of national sovereignty, therefore referring to a ground or motive of constitutionality.

C – Despite the existence of a synthetic and lateral pronouncement, the issue was never the object of a specific decision by this Court. Furthermore, by itself, it would not have the power to be classified as manifestly unfounded. Therefore, the only obstacle to their full knowledge of the merits would arise from being able to discuss the capacity of a decision of this Constitutional Court to have repercussions in the main proceedings. The reason for this has to do with the fact that the refusal to apply the hypothetical rules as constructed by the Appellant, whose application the Appellate Court refused to apply for reasons of unconstitutionality concerns the assessment that exclusively considered *Ruling 7/2020, dated 2nd of December of the TJ of ECOWAS Court of Justice,* relevant in the part that determined the suspension of the extradition process until the merits were assessed and decided, which happened later through *Ruling 07/2021, of 15 March*, of the same body, the regional court, which the Supreme Court of Justice did not consider on the appealed ruling. This creates a problem of usefulness of a possible decision of unconstitutionality that the Court may pronounce in the perspective of it being able to influence the appealed decision, namely by determining its reform in the sense of the Court's decision, because it is considering the Court, which, after all, that rule with the meaning that the judicial body under appeal, refused to apply for reasons of unconstitutionality, was not unconstitutional, means that it should be applied with that same meaning. However, what happens is that the act that was intended to be carried out through that rule, the decision of the ECOWAS Court of Justice dated 7th of December, was limited to imposing the adoption of certain provisional measures, namely placing the Applicant there under house arrest under supervision of the judicial authorities of the Respondent State, in order to guarantee him better conditions of accommodation and access to medical treatment and visits, compatible with his personal situation, at the expense of the plaintiff himself, and that he was not extradited until it was to deliver the decision on the merits.

At this moment, as is evident, the factual situation concerning the first question would be overcome, with only the measure of not being extradited until the decision on the merits is issued, which has already been rendered, determining that Regional Praetorium that the Appellant's detention will have been illegal and that his continued detention violates his right to personal freedom, resulting in the imposition of that court that the Appellant be released immediately and that all procedures and processes aimed at extraditing him to the USA be interrupted, in addition to arbitrating compensation.



CERTIFIED TRANSLATION LANGUAGE REACH

12/09/2021

REF: 7635166

It does not seem to this Court that the issue raised by the Public Prosecutor's Office that it would not be possible to scrutinise norms of International Public Law in specific inspection processes prevents the admission of this constitutional issue, since the impossibility of the Constitutional Court, in general, to scrutinise treaty norms is not general, precisely because from the moment these rules are incorporated into the domestic legal system, they are subject to scrutiny as rules are covered, in this particular case, by what is provided for under sub-section a) of the paragraph of Article 281 of the Constitution, which refers to the appropriateness of an Appeal to the Constitutional Court of decisions that refuse the application, based on unconstitutionality, of "any norm", not seeming to exclude those of international origin, even because if so, even incorporated treaty norms could not be unenforced by the courts if contrary to the Constitution, as they must do.

The question here is whether, in view of this subsequent development, the judicial body under appeal, could still reform its Ruling in the sense resulting from the Constitutional Court's decision, in such a way as to ensure some useful effect to the decision. Not without some hesitation the Court considers this requirement to be fulfilled, on the assumption that a possible Ruling of non-constitutionality of the aforementioned hypothetical rule that the Supreme Court of Justice has disapproved, as the formulation of its reasoning is so broad that it could also be applied to the final decision on the merits of the regional court, would allow the appealed body to still retain jurisdictional powers to complete its fulfilment in Cape Verde. In this sense, it will be scrutinised whether the rule constructed by the Applicant according to which *Articles 15, paragraph 4, and Articles 34, 89 and 90 of the Constitutive Treaty of ECOWAS and the Protocols Relating to the Court of Justice of ECOWAS of 1991 and of 2005, would determine compliance with the decision of the ECOWAS Court of Justice* is unconstitutional as the Supreme Court of Justice considered to refuse its application.

### 3.2.13. Other allegations of rights violations

Throughout the written documents he was submitting to the Court and at the oral hearing, the Appellant raised some issues of violation of rights, namely regarding the existence of a warrant in his name in the file, regarding the configuration of the requirement of double criminality, regarding possible extradition for political reasons and to the Supreme Court of Justice's follow-up of its own jurisprudence on safeguards in cases of crimes for which, under the law of the Requesting State, a life sentence corresponds.



A – In relation to the warrant contained in the extradition process and which both the Appellant and the Public Prosecutor's Office insisted on drawing the attention of the Constitutional Court to, its relevance in this type of process is, for all intents and purposes, nil:

Because no rule was built that refers to the unconstitutionality of a rule that has as its object the regulation of the existence or not of a court order in the records, the question posed is, at best, a question of fact that can refer to a conduct of the appealed judicial body, but which, without the attribution of a normative character and without having been specifically challenged through the rule constructed by the Appellant, cannot be scrutinised in a process of specific inspection of constitutionality.

Furthermore, in this regard, the Supreme Court of Justice took a specific position that presupposed the existence of a court order in the file, insofar as, in answering the Appellant's question, it very clearly considers pages 20 of its decision that it would have been the Appellant himself to say in his opposition document that, quoting verbatim, the U.S. District Court for the Southern District of Florida issued an arrest warrant against the extraditee, the person whose extradition is sought, on 25th June 2019 for crimes of money laundering, which it will have been taken up in the Appeal allegations and corroborated, according to his assessment, by documents that instructed the extradition request. Since this formulation does not have a normative nature, and may at most be classified as conduct, it would not be up to the Constitutional Court to assess it in terms of specific inspection of constitutionality.

B – With regard to the issue of configuring the requirement of double criminality, it is also an issue that the Constitutional Court cannot hear and examine in this type of proceeding, since:

The segment where the question is raised has to do with a rule that the Court can hear and examine as to whether the *process of passive extradition does not impose that the Ruling in the Appeal, as a court of first instance and not a court of appeal, is made in a hearing, but in consultation, as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge.*



On the one hand, the aspects that, according to the Appellant's strategy, would be dealt with in the hearing, public or not, which did not take place, could not be scrutinised in principle as autonomous unconstitutionalities, since they, in this case, would be merely dependent unconstitutionalities. That is even if at the time of the opposition's proceedings, it had already asked this question and several others that it addressed to the trial court and the court of appeal, because unless they fall within the scope of the application of the norm, as it was constructed to strictly assess their constitutionality, it cannot be scrutinised by the Court in this type of process.

The fact is that the norm, as it was constructed "above", at no time does it encompass any part of the appealed or contested Ruling that possibly discussed the issue of double criminality. On the other hand, it appears to be the Appellant's allegation that the Supreme Court of Justice drew conclusions without duly considering the effects of the regime of regulation of conflict of criminal laws in the area, admitted without contesting that the U.S. law would apply to all acts imputed to the Appellant, including those constituting the prior crime of money laundering, a conclusion that he considers false, resulting in a violation of the Penal Code and of paragraph 4 under Article 32 of the Constitution and incurring the Supreme Court of Justice when considering that the assumption of double criminality had remained in a miscarriage of justice being fulfilled, condemning an innocent person. The entire argument seems to refer more to the attributions of conducts harmful to the Appellant's rights, than to the application of an unconstitutional rule, which, for obvious reasons and already mentioned, they are not subject to challenge through this kind of constitutional Appeal.

C - In turn, the issue of extradition for political reasons, despite having been invoked throughout the documents, is not at any time reduced to an autonomous norm subject to being scrutinised or arising from the scope of protection of any norm whose application was attributed to the Supreme Court of Justice's challenged Ruling, otherwise let's see:



87

The question is posed in the Appeal's petition filed by the Appellant with the Supreme Court of Justice in Q-10, simply saying that, in the present case, extradition for political reasons and a masked extradition and from a decision-making excerpt from the Supreme Court of Justice that says that "the grounds for the extradition request does not deal with facts related to the political persecution of the Venezuelan government (…) they refer to the extraditee, the person whose extradition is sought, for facts related to the practice of money laundering crimes", this being, in the its interpretation, the Supreme Court's plea to remove the political motivation for the Appellant's extradition. In the improvement document in the segment dedicated to the same issue, the same argument is reproduced, not being able to infer any specific rule built by the Appellant for the purpose of specific inspection of constitutionality and which has been applied by the Supreme Court of Justice in this regard.

In the allegations document, the question moves to item 9 referred to as violation of the principle of specialty and extradition for political reasons, but in terms of its content, it is not possible to see any standard that has this object and that has been applied by the appealed judicial body. In the next item on life imprisonment, what is done is to outline the approach followed by the Supreme Court of Justice to assess the allegation that extradition for political reasons was involved, but the excerpts of the Ruling cited above, lead to mere conduct without any resulting in a statement with normative content.

The way in which the challenge is built, what appears to be attacking are conducts perpetrated by the Supreme Court of Justice in the exercise of its jurisdictional function and not a rule that it has applied. Therefore, they are always unaffected by scrutiny in a specific inspection appeal.

D - In the same sense, the allegation that the Supreme Court of Justice will have adopted a different position in other similar cases in relation to guarantees of non-execution of the life sentence given by the United States of America, since, once again, this, at best, would lead to a conduct and not a rule that could be scrutinised by the Constitutional Court.



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

4. Thus, of the twelve items raised, the Constitutional Court considers admissible to scrutiny of constitutional non-compliance, eight of them, namely 2, the first part of 3, 4, 5, 6, both with the adjustments arising from the rule actually applied by the appealed judicial body, 8, the second part of 11 and 12. Therefore, as it seems more rational to the Court from the point of view of its logical sequence, it is preferable to order the scrutiny from the applied rules that focused on the arrest of the Appellant and his subjection to an extradition process, namely those identified by the Appellant with paragraphs 4, 5, 6, and 11, second segment; then, the way in which the decision to confirm the judicial authorisation for extradition with exemption from reciprocity was reached, 8; to then face those referring to the way the process was conducted, namely 2 and 3, first part; and, finally, the refusal to apply a decision of an ECOWAS judicial body potentially incident to the process, numbered by the Appellant as 12.

So ordered - based on the legal rule from which the Constitutional Court understood that the appealed judicial body inferred the normative interpretation applied and not those that the Appellant attributed to it, and considering the parameters that the Constitutional Court may use and the development made by the Appellant and its suitability for the resolution of the constitutional cause – in ways that allow ascertaining whether:

4.1. A hypothetical rule applied by the Supreme Court of Justice in the sense that *Recognition of special envoy status is only up to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status both by the sending State and by the State that was to receive him,* would be inconsistent with the Constitution, due to incompatibility with the principle of non-intervention/non-interference in the internal affairs of other States and with rules establishing the preferential application of International Law relating to inviolability and immunities of special envoys in Transit States in relation to ordinary law.

4.2. A hypothetical standard applied by the Supreme Court of Justice arising from (Article) 39 of the Law on International Judicial Cooperation in Criminal Matters, according to *which it is lawful for criminal police authorities to carry out, under the terms of the current procedural law,*



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

*the arrest and detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to that international organisation have not eventually been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use that is made of the information received via this system, stems from a national law*, is not compliant with the Constitution due to incompatibility with the rule of reception of conventional international standards, with the rule that establishes the effects of non-publication of this type of act and with certain principles inherent to the Rule of Law.

4.3. A hypothetical rule applied by the Supreme Court of Justice arising from Article 39 of the Law of International Judicial Cooperation on Criminal Matters, according to which *a person can be detained for the purpose of extradition, without requiring that there be a warrant, as long as he is in possession of information officers who legitimise their arrest and detention*, is inconsistent with the Constitution for incompatibility with the right to bodily freedom, with the principle of legality of police measures and with the principle of proportionality of police measures.

4.4. A hypothetical rule applied by the Supreme Court of Justice arising from Articles 39 of the Law of International Judicial Cooperation on Criminal Matters  and Article 269 of the Code of Criminal Procedure, according to which: *Information for a person's arrest and detention may come to the attention of the authorities by any means admitted by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunications, as follows from Article 269 of the CPP, followed by confirmation by a warrant,* is non-compliant with the Constitution due to incompatibility with the right to bodily freedom, with the principle of legality of police measures and with the principle of proportionality of police measures.

4.5. A hypothetical rule applied by the Supreme Court of Justice arising from the final segment under Article 6 paragraph 4, and Article 3 paragraph 3, of the Law of International Judicial Cooperation on Criminal Matters, according to which: *The reciprocity waiver is possible in any form of international judicial cooperation, including extradition,* is contrary to the Constitution for incompatibility with the principle of reciprocity of advantages inserted in paragraph 1 of its Article 11, the principle of assimilation of foreigners to nationals translated into paragraph 1 under Article 25 and the rule for the treatment of foreigners in transit provided for under Article 7 l).



4.6. A hypothetical rule applied by the Supreme Court of Justice arising from Article 55, second paragraph, and Article 46, third paragraph, last part, of the Law of International Judicial Cooperation on Criminal Matters, according to which: *The extraditee, the person whose extradition is sought, has the right to file opposition, but, even though there is a requirement for due diligence of testimonial evidence, it can only be based on the fact that he is not the person sought or that the assumptions of extradition are not met,* is inconsistent with the Constitution, due to incompatibility as the guarantee of effective defence in an extradition proceeding.

4.7. A hypothetical rule applied by the Supreme Court of Justice arising from Article 56, paragraph two, of the Law of International Judicial Cooperation on Criminal Matters, according to which: *The process of passive extradition does not impose that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, whether made in a hearing, but in consultation, as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge,* is not in conformity with the Constitution due to incompatibility with the guarantees defence and adversary proceedings arising from the principle of fair and equitable process and the principle of holding public hearings in courts.

4.8. A hypothetical rule arising from *Articles 15, paragraph 4, and Articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with the decision of the ECOWAS Court of Justice*, which the Supreme Court of Justice refused to apply, considering that for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and ratified, as Cape Verde has not signed the protocols that recognise the competence of the ECOWAS Court of Justice in terms of human rights and since it is not a supranational organisation for the purposes of paragraph 3 under Article 12 of the Constitution, does not comply with the Constitution for incompatibility with the principle of national sovereignty, of the constitutional rules on binding of the State of Cape Verde to treaties and the principle according to which the courts cannot be deprived of their jurisdiction.



These will be the questions to be considered on the merits below, in terms of knowing whether:

**5. The hypothetical rule applied by the Supreme Court of Justice in the sense that** *recognition of the status of special envoy is only up to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status both by the sending state and by the state that was to receive him***, is inconsistent with the Constitution, due to incompatibility with the principle of non-intervention / non-interference in internal affairs from other States and with rules that establish the preferential application of International Law relating to the inviolability and immunities of special envoys in Transit States in relation to ordinary law.**

5.1. Regarding the allegations, in the relevant part to analyse the admitted segment of the standard constructed by the Appellant,

5.1.1. The legal thesis put forward by him that the Supreme Court of Justice had to have recognised the inviolability and immunities of the Appellant is highlighted because he was recognised as a special envoy by the sending State and by the receiving State, insofar as the prior notification would be a purely formal condition and, in this case, Venezuela was not in a position to anticipate it given the unplanned and purely technical nature of the stopover in Cape Verde. Therefore, what would matter, in such a context, would be to know if this country was informed as soon as possible, a question that he claims should be answered positively. The other condition provided for by the applicable rule would not require that consent be expressed, another aspect that the Supreme Court, in its opinion, will have misinterpreted and unconstitutionally, since, in such cases, once informed what Cape Verde should do was to object, which he did not do, infringing Venezuela's rights. He adds that Cape Verde, having been notified, albeit belatedly, was responsible for expressing this objection through formal channels to Venezuela, which it did not do either. He concludes the point, summarising an important segment of his legal thesis saying that Cape Verde should be considered a transit State that having been notified of the passage through its territory of a special mission and not having objected,



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

it had an obligation, under international law, to respect the immunity and inviolability of the Applicant, and not subjecting him to arrest and detention and subjecting him to extradition proceedings. The State of Cape Verde still had the duty to try to diplomatically resolve the dispute and if it had opposed it, it should have acted differently, informing Venezuela of its disagreement or declaring the Appellant persona non grata, under penalty of generating the international responsibility of the State.

5.1.2. The Public Prosecutor's Office, for its part, centred its argument on considering that such recognition would not be up to the judicial power, but exclusively to the executive power, being a political act that cannot be considered by the courts. There would be no problem of separation of powers or any other, and the courts do not bind the State to international treaties or obligations, as this always depends on political will, having nothing to do with the exercise of jurisdiction, a power that is limited to applying the right resulting from these obligations assumed by other bodies. It concludes that it is an incorrectly posed question of constitutionality.

5.2. At least as far as the status of special envoy is concerned, the possibility of the Supreme having applied a rule that made its hearing and examining of a matter of jurisdictional immunities depend on a prior political assessment, in violation of the principle of the independence of the courts, had already been ruled out. Furthermore, he knew about the issue from the first moment it was put to him, developing an argument, anchored in paragraph 4 Article 42 of the 1969 New York Convention on Special Missions, to which he attributed an international customary character, in the sense that the Cape Verdeans courts can only recognise the inviolability and immunities deriving from a special envoy status when the latter has previously informed the State of Cape Verde as a State of Transit and the latter has not objected, and such recognition cannot be imposed by a mere unilateral act of the Sending State.

5.3. From the point of view of the scrutiny that this Court must promote to answer the question, two steps are necessary. First, to analyse whether there will be any discrepancy between the international standard applied by the Supreme Court of Justice to resolve the legal issue that was posed to it and the specific shape or form of the international standard that regulates this matter in Customary International Law, as the crux of interpretive divergence seems at this point to be rooted in the nature of the requirement of prior information,



to which the appealed body attributes a constitutive role of the Transit State's obligation to recognise inviolability and immunities from criminal jurisdiction to a special envoy, and which the Appellant understands to be a mere formality, since what would determine it would be information from the Sending Status as soon as possible of the status of the person involved in special mission. Second, to verify if there is a discrepancy between the rule, in this hypothetical case, as it does not exist in the international legal system, and the rule actually in force in this sphere and also under paragraph 1 under Article 12 of the Constitution in Cape Verdean law, it would be incompatible with the principle of non-interference provided for by paragraph 1 of Article 11 of the Constitution, with the principle of non-intervention provided for by the United Nations Charter and by General International Law, insofar as it does not recognise inviolability and immunities from criminal jurisdiction the person who enjoys them, the State of Cape Verde would be interfering in the relations between the Sending State and the Receiving State.

5.4. In relation to the first part of this development, it should be noted that the Supreme Court of Justice, while correctly and clearly emphasising Cape Verde's non-binding to the 1969 New York Convention on Special Missions (not on the list of States who are Parties, prepared by the Secretary-General of the United Nations: https://treaties.uNo.org/doc/Publication/MTDSG/Volume%20I/Chapter%20III/III-9.eNo.pdf , nor has it been incorporated into the Cape Verdean legal system under the terms of paragraph 2 under Article 12), considered its Article 42 (the treaty is published in the *United Nations Treaty Series*, v. 1400, 1985, p. 231 ff.), a standard of customary nature, applying its content to the specific situation, highlighting its two basic elements. In particular in the sense that a Transit State is bound by an obligation to recognise inviolability and immunities from criminal jurisdiction only if, first, it has been informed in advance of the State's representative's travel for the purpose of a special mission and, second, that this State has not objected. This thesis is opposed by the Appellant in the sense that it would suffice for the sending State, in the impossibility of doing so beforehand, given the urgency of the trip and for technical reasons of stopovers to supply fuel without permanence, to inform the transit State, even if after his arrival in the territory, his status as a special envoy and the mission he would carry out in another State, with its consent, so that he could enjoy this protection provided for under international law.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
R...7635166

5.4.1. Under the standard of customary procedure formatted from practice by the International Law Commission through the *Draft Conclusions on Identification of Customary International Law With Commentaries*, Conclusion 11.1 a), it does not seem to be concluded that the customary origin of that standard is evident when the issue began to be discussed within the International Law Commission in the decade of the late fifties of the last century. Moreover, what seemed to preside over initiatives to also address the issue of special missions, initially within the framework of projects for the regulation of diplomatic relations conducted by Special Rapporteur Sändstrom (*Yearbook of the International Law Commission 1959*, New York, United Nations, 1960, v II, pp. 122-123), more than the codification of a pre-existing norm, it was essentially to proceed with the progressive development of this area of International Law. The consolidation of the parallel customary regulation stems from a practice concurrent with the process (*Draft Conclusions on Identification of Customary International Law With Commentaries*, Conclusion 11.1 b) and c), and resulting from the 1969 Convention itself, and not strictly speaking from a pre-existing legal system that has been considered (Michael Ryan, "The Status of Agents on Special Mission in Customary International Law," *Canadian Yearbook of International Law,* v. 16, 1978, passim, p. 160, p. 186), that in the limit, can be accepted as having been constituted in relation to several norms regulated by it. Without the Constitutional Court having to rule on the customary status of all the Convention's rules, an aspect still in dispute, prevailing, in any case, the understanding that not all of them have acquired such a nature (to this day it cannot be argued that so There is broad equivalence between the rules laid down for the 1969 Convention and the parallel customary regime applicable, as the persuasive analyses of Andrew Sanger & Michael Wood, "Immunities of Members of Special Missions" in: Tom Ruys; Nicolas Angelet tell us & Luca Ferro (eds.), *The Cambridge Handbook of Immunities and International Law*, Cambridge, UK, CU P, 2019, pp. 452-480, and Al M El-Haj, "Special Missions" in: *Max Planck Encyclopaedia of Public International Public Law*, Oxford, OUP, 2019, para. 15).

5.4.2. Although the transit of people who are part of special missions may be relatively common given the intensity of current international relations, the tests to



Transit State obligations are relatively rare because, generally, the practice takes place in a way little exposed to the public eye, only coming to the fore in cases where an incident is generated, an indication of this is the relative absence of mention of this specific issue in the main study and instrument for collecting practice in the field recently promoted by the Council of Europe and carried out by the eminent internationalists and experts in this field, Michael Wood and Andrew Sanger entitled *Immunities of Special Missions*, Leiden, Boston, Brill, 2019, Part III.

Certain States, in relation to the second requirement, maintain a stricter requirement for prior consent, therefore express, and not only a non-objection that would lead to a tacit consent, as were the recent cases of Germany that defended that "if there is explicit consent to transit, customary law imposes the granting of the necessary privileges for transit" ("Replies by States – Germany" in: Ibid., p. 236) and Ukraine which emphasised that "in cases of explicit consent to transit, customary law also imposes the granting the necessary privileges for transit" ("Reply by States – Ukraine" in: Ibid., 335), to which the classic position of the United Kingdom is added based on the proposed amendment made before the 6th Committee of the United Nations General Assembly in the framework of the 1969 Convention's discussion of replacing the requirement of tacit consent resulting from the expression "has not raised any objection to it" by the requirement of explicit consent. this represented by an expression "have consented to it," which despite being defeated received thirty of the eighty-four votes of the States present and was rejected by thirty States, with the remaining twenty abstaining (v. *Draft Convention of Special Missions: Report of the 6th Committee*, Twenty-Four Session, Agenda Item 87, Rapporteur: Piet-Hein Huben, United Nations General Assembly, A/7799, 28 November 1969, para. 128-129), helping to explain the later reservations placed on it by some leading analysts by a "great number of States" (Nguyen Quoc Dihn; Patrick Daillier & Alain Pellet, *Droit International Public*, 7th ed., Paris, LGDJ , 2002, p. 748).

In turn, the practice arising from cases processed in domestic courts has also not allowed to verify, with any consistency, the conditions of obligation to recognise jurisdiction immunities by Transit States, as most of the cases known in that a duty of recognition of immunities has been affirmed are situations that exclusively involve Sending States

and Receiving States in which there is an official act accepting the special mission, the Tabatabai decisions being inscribed in this register (reproduced in English by the *International Law Reports [ILR],* v. 80, 1989, pp. 388-424, with the German originals of the decision of the Regional Court of Dusseldorf and the Federal Court of Justice available, respectively, in *Juristen Seitung*, v. 38, No. 15-16, 1983, pp. 625-629, and at https://research.wolterskluwer-online.de/document/1d1f4b19-8054-4459-b8cc-2d91b21f9bb2 ) of German courts, and the decisions of the English courts in *Regina (Freedom and Justice Party and Others) v. Secretary of State for Foreign and Commonwealth Affairs and Others,* England, Court of Appeals (Civil Division), 19 July 2018 (Arden, Sales and Irwin LJJ) reproduced in ILR, vol. 182, 2019, pp. 658-707), thus consolidating and densifying the ground of understanding already adopted by Judge Pratt in *Re Mofaz*, England, Bow Street Magistrates Court, 12 February 2004 reproduced in ILR, v. 128, 2006, pp. 709-712 and by Judge Workman in *Re Bo Xilai*, England, Bow Street Magistrates Court, 8th November 2005 reproduced in *ILR*, vol. 128, 2006, pp. 713-715, and, also despite having denied consent to visit as a special mission in the case, in *Khurts Bat v. Investigating Judge*, England, Queen's Bench Divisional Court (Moses LJ and Foskett J) reproduced in *ILR*, vol. 147, 2012, pp. 633-388.

And of some U.S. courts, within the framework of their very own system of recognition of diplomatic immunities, marked by their domestic legislation, their precedents and a tradition of court deference to the State Department's suggestions for immunities. That's what happened in *U.S.v. Sissoko* dated 3rd of September 1997, decided by the US District Court for the Southern District of Florida, available on the worldwide web page https://law.justia.com/cases/federal/district-courts/FSupp/995/1469 /1599122/ ), in which it was considered with unpersuasive reasoning in this segment, apparently establishing a relationship between what he understood to be the non-customary nature of the 1969 Convention, the fact that the United States and Gambia – the defendant's country of nationality – are not "signatories to the Convention" and the fact that no member of the Security Council is either. But, relevant even considering that the fact that the U.S. Embassy issued a diplomatic visa in his name did not mean the recognition of "full diplomatic immunities", which would depend on a State Department certification, which did not happen, unlike what has been shown in other cases in which these immunities were recognised for having occurred



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

confirmation, as in *Kilroy v. Windsor* (unpublished), *Weifun v. Xilai*, 1st October 2008, decided by the District Court for the District of Columbia (available in full on the worldwide web page https://www.leagle.com/decision/2008603568ffsupp2d351598) and *Abdelaziz v. Metropolitan Dade County*, decided on 18th September 1984, by the 11th Circuit of the United States Federal Court of Appeals (available at https://www.casemine.com/judgement/us/59148effadd7b0493455deb0).

However, these are cases that refer to a situation that does not involve a Third Party State and where the Receiving State recognises the special mission. With regard to the obligations of the Transit State and the conditions for exercising inviolability and immunities, the Constitutional Court has found very few cases of specific interest. One of them is *Regina v. the Governor of Pentonville Prison, Ex Parte Teja*, England, Queen's Bench Divisional Court, 19th January 1971 (Lord Parker C.J., Cairns L.J. and Melford Stevenson J.) reproduced in *ILR*, v. 52, 1979, pp. 368-381, in which it was considered that a person detained at Heathrow Airport and subject to extradition at the request of the Indian Union and who was carrying letters of credentials and a diplomatic passport to carry out official travel to various European countries on behalf of the Government of Costa Rica, would not enjoy them because, as has been said literally, the invocation of immunities as a diplomatic agent depends on the person having been somehow accepted or received by the country (pp. 372-373), which, at least, denotes that, in the understanding of this British Curia, the inviolability and immunities of such persons in States of Transit depend on some type of consent also of that State, the obligation not being imposed through a unilateral act of the Sending State, even if agreed with the Receiving State; the other is the Düsseldorf Provincial Court's own Ruling of 10th March 1983 in the *Tabatabai* case (available in English in: *ILR*, v. 80, 1989, pp. 403-411 and in full version in Juristen Seitung, v. 38 , No. 15-16, 1983, pp. 625-629), insofar as it was discussed in part, briefly and generically, as a possible case of transit, but, according to the account given, this possibility was discarded because it did not meet the necessary requirements for the recognition of immunities in such situations; and, finally, last of all, the case called *Syrian National Immunity* would have some relevance, as the Supreme Court of Austria will have set down under Articles a triangular hearing and examining perspective (Sending State, Receiving Entity and Transit State) of a special mission



to trigger inviolability and immunities. However, in an application context that involved not a receiving State, but an international organisation, leading to the application of a headquarters agreement with a State, which only by analogy could be considered as a Transit State, therefore not fully applicable to the present situation at hand (see Syrian National Immunity Case, Austria v. S, Annulment Decision, 12 OS 3/98, *International Law in Domestic Courts [ILDC]* (AT 1998), 127 ILR 88, 12th February 1998, Austria, Supreme Court of Justice).

5.4.3. This Court welcomes the idea that the majority of the member States of the International Community accept that the State of Transit is subject to a customary obligation, also represented by paragraph 4 under Article 42 of the New York Convention, of recognition of the inviolability and immunities of jurisdiction of a person who has been sent by a State to another that consents to deal with official affairs of that entity, if, cumulatively, a) it has been informed in advance and in an official manner, hence the reference to the convention on request for a visa or notification, of the transit of the person as a member of a special mission, and, thereafter, b) it has not objected to that transit.

5.5. It is the understanding of this Constitutional Court that these conclusions necessarily result from the development of international regulation in this area.

5.5.1. Deriving from the very general philosophy that the International Law Commission had to confront when it developed the regime from which these standards. If one pays attention to the general logic of the regime that begins, as far as it was possible to ascertain, to be discussed from the assumption of the Special Rapporteur by Professor Bartos and the adoption of a new perspective of approach (see the minutes of the 712th Meeting, held on 2nd of July 1963, reproduced in *Yearbook of the International Law Commission 1963*, New York, United Nations, 1964, pp. 261-267), it is framed in a philosophy of conciliation between the need for recognition of these inviolability and immunities by Transit States for to facilitate diplomatic relations between the Members of the International Community and the concern expressed by many to avoid creating excessive burdens for these States, summarised by Professor Ago's idea of finding a model that would harmonise States' reservations about a treatment equal to special missions in relation to permanent representations and the guarantee of a



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

minimum of privileges and immunities to perform their duties (Proceedings of the 724th Meeting, held May 14, 1964 reproduced in *Yearbook of the International Law Commission 1964*, New York, United Nations, 1964, v. I, pp. 9-15).

In this sense, although bringing together several regulatory perspectives on the issue, the evolution of the debate demonstrates that the demand for advance information about the special mission is constant and unquestioned throughout the process, with only debates on the need to inform the State of Transit not only of the mission but also of its purpose, which was in the first version of the project, but which later fell on the requirement of no objection, a solution that remained, and some discussion promoted by the United Kingdom regarding the form of consent, which was defeated, albeit by a slight margin, already in the Sixth Committee of the General Assembly, as previously stated.

Special Rapporteur Bartos, in particular, remained firm in relation to the model he designed in the sense that it would be necessary to have advance information, through a visa application or notification of people as members of special missions, triggering inviolability and immunities if the State did not object, which made it known several times whenever any of the elements of this arrangement were discussed, recalling, at the meeting of 23 June 1965, that the essential point of mentioning the visa and the notification would be to ensure that the State was informed in advance (*Yearbook of the International Law Commission 1965*, New York, United Nations, 1966, v. I, p. 236), emphasising at the meeting on 7 July of the same year that this would be precisely the specificity of this regime in relation to the contained in the Vienna Convention (Ibid., p. 304). In 1966, through the Third Report (published in the *Yearbook of the International Law Commission 1966,* New York, United Nations, 1967, v. II, pp. 125-166), responding to Belgium's suggestion, it positioned itself in the sense that it would not be enough to apply for a visa, the reason for being a special mission in transit had to be made clear, and in relation to one from Israel it reiterated that information about the transit depended on doing so either by official notification or through a visa application (pp. 149-150). The Fourth Report presented by the Special Rapporteur took a stand against the suppression of the classification of the forms of communication of information provided for in the Article and in favour of inserting the expression "in the visa application" instead of "by the visa application" so that it would be clear that what was intended was that the visa application should state that it was due to a



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

100

transit need of the special mission (*Yearbook of the International Law Commission 1967*, New York, United Nations, 1968, v. II, p. 102). At the Session of the International Law Commission No. 931, on 3 June, Rapporteur Bartos reiterated that the difference between Article 39 of the Draft and Article 40 of the Vienna Convention lay exclusively in paragraph 4, since it was necessary to specify the forms how the Transit State could be informed in advance and ensured that it would have the opportunity to object to the transit (*Yearbook of the International Law Commission 1967*, New York, United Nations, 1968, v. I, pp. 198-199).

In spite of these opinions, the Report presented by the body in 1967, together with the appendix with the Draft Convention which, keeping paragraph 4 of the now renumbered Article 43 concerning transit through Third State territory, commented on the provision reiterating that paragraphs 1, 2, 3 and 5 derived from Article 40 of the Vienna Convention, but paragraph 4 did not. In the view of the International Law Commission, the rule in question conditions the existence of obligations of Third Party States in relation to persons in transit, first, that the Third State has been informed in advance of the transit; second, that it did not raise any objection, adding that by including such a reference it was intended to show that the State of Transit was not subject to any obligation to permit the transit of special missions and their members through its territory (*Yearbook of the International Law Commission 1967*, New York, United Nations, 1968, v. II, p. 365).

5.5.2. The contemporary specialized doctrine that dealt with the issue was not very prodigal in commenting on this legal provision in particular, but even so, for what interests us, it emphasized the assumption inherent in the enjoyment of inviolability and immunities before the third State to the advance information made available in useful time. Thus, the aforementioned Professor MR Donnarumma ("La Convention sur les missions spéciales (8 December 1969)", Revue belge de droit international, No 8, 1972, pp. 34-79"), who points out that the regime subjects, as she says , legitimately, the obligations of Third States to have prior information and no objection and says that the advance information mentioned by number 4 of the 1969 Convention is that provided in good time (pp. 70-71), the same happening, in the Portuguese-speaking sphere , with Professor CD de Albuquerque Mello, Public International Law Course, 11th ed., Rio de Janeiro, 1997, v. II, p. 1218, in the sense that the protection afforded by this provision would be



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

conditional upon prior notification. The most recent commentators, in addition to not straying from this requirement of prior information, seem to be slipping into the traditional British position of the requirement of consent, although it is not made explicit whether it should be "expressed", as follows from the analysis of two of the most recognized world experts in the field, Andrew Sanger & Michael Wood, "Immunities of Members of Special Missions", op. cit., pp. 452-480, who continue to talk about the conditions of advance information, by means of a visa application or notification, but also in the State giving its consent ("has given its consent"), the same happens with the interpretation presented by Elizabeth Helen Franey, *Immunity, Individuals and International Law. Which Individuals are Immune from the Jurisdiction of National Courts under International Law?*, PhD Thesis, London, Department of Law-LSE, 2009, p. 118, and Nadia Kalb, "Immunities, Special Mission" in: *Max Planck Encyclopaedia of Public International Law*, Oxford, OUP, 2011, para. 8).

5.6. Therefore, this development is illustrative that the prior information that must be addressed to the Transit State for travel to its representative territory is the essential element on which its obligation to recognize the inviolability and immunities of criminal jurisdiction depends. A solution whose reasons are equally evident, as there is no customary rule that obliges a transit State to accept the transit of a special mission directed to another State in its territory, which is perfectly natural, considering that this presence may interfere with its own interests, namely those concerning its relations with other States, it should at least have the opportunity to oppose it. To this end, it must be informed in due time, through its bodies that conduct its foreign policy, about this displacement, in particular so that it can take a position on the matter, with a view to consenting, expressly or implicitly, or refusing it.

5.6.3. When informed in good time and in an official manner of the transit movement of a member of a special mission, the Transit State may object, expressly admit it or remain silent. Choosing one of the last two conducts, under the principle of good faith, there emerges an obligation to guarantee the inviolability and immunities that are necessary for its transit during the period indispensable for this purpose. Thus, if it is possible that someone who moves from one country to another with which he has agreed a special mission can invoke the status of envoy holder of special immunity before that State, it



CERTIFIED TRANSLATION LANGUAGE REACH
12/09/2021
PEG.07635166

will only be able to do so in respect of the Transit State if it has previously informed the competent authorities - that is to say those overseeing the State's external relations - of this transit, has sent the necessary information on the nature of the mission and the State has not objected to this, configuring in this case implicit consent. If you do otherwise, in relation to that person, no matter how much such status is recognized by a State of Sending and by a State of Receiving, there is no obligation on the State of Transit to recognize inviolability and immunities of jurisdiction. criminal, being dependent on there being a will and internal legal scope to extend them for reasons of international courtesy, but no longer due to the existence of a legal duty. It does not seem that the alleged unplanned nature of the displacement and the fact that it was made on a purely technical scale constituted exceptions to this rule under current international law.

5.6.4. Therefore, this Court cannot recognize in a norm according to which Cape Verdean courts may deny recognition to an extradited person as a special envoy after the recognition of that status by a Sending State and by a Receiving State does not comply with the international norm, conventional or customary, which binds the State of Cape Verde, an indirect constitutional non-conformity with the rule that establishes the preferential application of International Law over infra-constitutional domestic law, precisely because the international norm that was applied by the Supreme Court of Justice was not a hypothetical norm constructed by it, but exactly the customary norm that regulates the obligation of recognition of inviolability and immunities from criminal jurisdiction of persons on special missions by Transit States in the precise terms deriving from international law.

5.7. If the non-compliance of the rule applied by the *a quo* judicial body with these rules that regulate the immunities of special envoys in Transit States with the use of consistent reasoning since it was confronted with the issue, it seems very difficult for any non-compliance, either with international norms that enshrine the principle of non-intervention, or with the constitutional norm that recognizes the principle of non-interference in internal affairs.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG:07635166

This is an important principle of International Law arising from the principle of sovereignty recognized by number 1 of article 2 of the United Nations Charter and by Customary International Law. Although the scope of this concept seems to diminish each time due to the internationalization of several issues that refer to traditionally internal domains in the light of the Westphalian system, namely those relating to human rights and the political regime, and by the practice of States, it translates into a prohibition of States to meddle in matters that are considered at each historical moment as part of the reserved domain of their counterparts, a concept that should also feed the constitutional principle of non-interference in the internal affairs of other States.

In the specific case, it is evident that Cape Verde in no way intruded into Venezuela's internal affairs, and it is not known that it has commented on its regime or on the internal divergences between political actors, so that the only dimension that could theoretically be at issue in the present situation would be an interference in their diplomatic relations, which are in themselves already internationalized.

5.7.1. As the hypothetical rule is limited to condition the recognition of inviolability and jurisdiction immunities in the territory of Cape Verde to a person in transit who would integrate a special mission sent by one country to another without having been sent to the State of Cape Green an advance information from which, in the absence of objection, would result an implicit consent to transit and the consequent duty to recognize inviolability and immunities, the fact is that there is no obvious incompatibility with these principles.

Firstly, because the person concerned in such a circumstance will be in the territory of Cape Verde without being informed in advance. In such a context, the relationship that would normally be processed between two countries, without Cape Verde being able to interfere with it outside of the current international understanding on non-intervention and constitutional on non-interference, imposes itself on the State of Cape Verde, against their will. This insofar as it connects its territory without its consent, even if implicit, associating the country with a relationship that may be indifferent to it or that may even interfere with the relationships it maintains with other counterparts, namely when people



who make these missions are sought by them, and without them being able to oppose this, thereby avoiding its materialisation. Therefore, the transit country is placed, against its will and without having the opportunity to take a position, as a participant in a relationship in which it is not involved between other States at the initiative of at least one of them.

5.7.2. In this sense, within the limits in which it is processed and connected to its territory, such a rule that conditions the recognition of inviolability and immunities of a person who is part of a special mission sent by a Sending State to another State that consents to it in Cape Verde to advance information, through visa or notification, insofar as this State does not object, does not violate the international legal principle of non-intervention or the constitutional principle of non-interference, and no unconstitutionality can be declared in this regard.

5.8. From the foregoing, it does not seem to this Constitutional Court that the rule applied by the Supreme Court of Justice according to which *the recognition of special envoy status only belongs to the State of Cape Verde, without which Cape Verdean courts cannot recognize this quality, allowing a Cape Verdean court to deny recognition of an extradited person as a special envoy, after recognition of his or her status both by the sending State and by the receiving State*, is not compliant with the Constitution due to incompatibility with the principle of non-intervention/non-interference in the internal affairs of other States and with rules that establish the preferential application of International Law relating to the inviolability and immunities of special envoys in Transit States in relation to ordinary law.

**6. Hypothetical rule arising from 39 of the Law on International Judicial Cooperation in Criminal Matters, according to which** *It is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to this international organization have not possibly been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal order, as the use made of the information received through this system results from a national law*, **is not compliant with the Constitution due to incompatibility with the law on reception**

of international conventional norms, with the rule that establishes the effects of non-publication of this type of act and with certain principles inherent to the rule of law.

6.1.  In relation to the legal claims and theses regarding the issues of unconstitutionality of this rule:

6.1.1. The appellant considers, at a point in which he explains his fundamental thesis, that the Republic of Cape Verde could not integrate, invoke or apply in its legal system, through an internal law or other legislative instrument, acts or constitutive instruments of an international body (or instrument of international cooperation), even if it were in simplified form without its reception respecting the organic and formal presuppositions provided for in a higher legal norm for violating several fundamental principles inherent to the principle of the rule of law and that, in addition, INTERPOL's Constitution and other cited texts are treaties that address the issue of ratification, a matter of domestic law regulated among others by paragraph 2 of article 12 of the Constitution. Furthermore, he considers that the country is part of the organization, but the text of INTERPOL would require approval by the National Assembly, despite being, in his opinion, an agreement in a simplified form. However, it was not published, despite the constitutional legal regime in force at the time so requiring it, which would determine its ineffectiveness, the same happening with its approval by that same sovereign body.

Without this, the Judiciary Police could not rely on INTERPOL's precepts, norms, segments or philosophy to detain a person or perform any procedural act that results in the restriction of a person's right to freedom and security because the instruments of that organization do not have legal effectiveness in the Cape Verdean legal system, not least because the unconstitutionality of this instrument was never declared by the Constitutional Court and was never confirmed by the Government and the signature is not sufficient to subject the State to all obligations arising from a treaty.

6.1.2. The Public Prosecutor's Office says that this is an irrelevant rule for the decision of the case, as the contested provision, Article 39, provides that it is the criminal police and not the INTERPOL National Office that can make an arrest.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
LRC-07635166

Therefore, irrespective of membership in that organization, the national criminal police can detain under that provision, as was effectively the case in this case. Thus, there would be no violation of any provision or constitutional principle as the Public Ministry, as it asserts, had been saying and, apparently, would result from an opinion that it put together.

6.2. The Supreme Court of Justice applied the described rule but did not expressly rule on its compatibility with the Constitution, because, until then, the question was more to know whether rules of the legal regime of INTERPOL could be applied in the order Cape Verdean legal.

6.3. Article 39, under the heading of detention not directly requested, provides that it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities for the purposes of proceeding or serving a sentence for facts that notoriously justify extradition. Here, the rule challenged by the appellant is not fully identical to the rule itself resulting from this legal provision, insofar as it is complemented by a hypothetical segment resulting from a normative interpretation according to which it would not be relevant that the acts referring to this organization have not been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal order, as the use that is made of information received via this system, stems from a national law, is non-compliant with the Constitution due to incompatibility with the rule of receipt of conventional international norms and with the rule that establishes the effects of its non-publication. It seems to us that this is the nodal part of the norm that is challenged by the appellant based on the argument that it would not be constitutionally in accordance with a deontic statement, even if hypothetical, to enable national authorities to use information resulting from the police and criminal communication system of an international organization whose acts have not been ratified by the Republic of Cape Verde or published in the Cape Verdean legal system for the purpose of detaining a person.

6.4. Naturally, the norm under consideration is not one according to which a norm of a treaty not ratified by the State and published in the official journal of the Republic can be applied, namely because, as is clear from the considerations made by all, it is a



109

question whose interest here is limited, because it is evident that in accordance with what if applied, it was not this one, but rather a result of article 39 in the sense that, independently of Cape Verde having ratified the Constitution of INTERPOL and other instruments of this organization, national authorities could use official information transmitted through the communication system from the organization to respect persons who are being sought by foreign competent authorities for the purpose of detecting because this serious permits for an internal her. This is because, on the interesting understanding exposed by the appellant, this would generate an incompatibility with the rule of reception of conventional international standards, namely inserted in article 12, second paragraph of the Constitution and with the rule that establishes the effects of its non-publication in the official newspaper, paragraph c) of number 1 of article 269, and with principles inherent to the rule of law. It is so important to discuss in this resource in light of the parameters indicated, first evaluating possible direct non-conformity with paragraph 2 of article 12 and subparagraph c) of paragraph 1 of article 269 of the Constitution, and, second, with principles of the rule of law that are listed by Appellant.

6.5. Before dealing with these two dimensions of the problem raised in relation to the organization in question, it is important to remember that:

6.5.1. INTERPOL, as is known, is an organization whose nature has always generated some doctrinal controversy. However, currently it seems to be peaceful that, despite its particularities, the States that are part of it recognize its nature as an intergovernmental organization of a technical nature, and the fact that it was renamed in 1956, through the new Constitution, is not unimportant. with the current name of "International Organization" and not "International Commission." And of having been recognized as such by international legal acts that it signed with States, namely the headquarters agreement with the French Republic (published in the Journal Officiel de la Republique Française, of September 9, 2009, available at https://www.legifrance.gouv.fr/download/pdf?id=wPK_3Z36qKi471bVif9E56X6RWgPfNc5ur aO64WTc6E=) and through acts of domestic law such as Executive Order 12425 of June 16, 1983, signed to recognize the character of an international organization to INTERPOL for usufruct purposes of immunities in the United States of America (available on the web page where some        documents        of        the        administrations        of        the        United



States of America, namely Reagan which adopted its original version: https://www.presidency.ucsb.edu/documents/executive-order12425-international-criminal-police-organizations). The State of Cape Verde itself recognized this when it signed an agreement with it which, moreover, in the preambular part contains the expression "recognizing that INTERPOL is an intergovernmental organization" (Agreement between the Government of the Republic of Cape Verde and the International Organization of Criminal Police (INTERPOL) Concerning the Implementation of the West African Information System in Cape Verde" of April 14, 2020, approved by Resolution No. 179/IX/2020, of 4 November, published in the Official Gazette, Series I, No. 133, of November 24, 2020, pp. 2954-1958).

6.5.2. However, it is an international entity that, due to its course, has its particularities, namely the fact that it was not created by an international treaty, but through an act approved by its General Assembly, with its structure in that instrument, the Constitution, which does not provide for any form of expression of consent and subsequent entry into force, which is fixed by a date determined by article 50.

6.5.3. This, however, does not result in any insurmountable problem for its Member States because the organization's main mission is to promote mutual assistance between States, "within the limits of their right" (Article 2, paragraph 1Q) and to "establish and develop all institutions that can effectively contribute to the prevention and suppression of common crimes" (Article 2, paragraph 2), in practice leading to an intervention based on the facilitation and intermediation of cooperation between States through mechanisms of processing, storage and dissemination of data, especially through its wanted persons alert system, which is materialized through the connection resulting from the I-24/7 communication system established between the General Secretariat and the National Central Offices and between them, aimed at facilitating the communication between the national police authorities of all its members.

6.5.4. In this sense, the domestication of INTERPOL's Constitution is not imperative, namely because most of the norms are intended to proceed with the structuring of the organization, and the few that refer to some commitment of the State, namely those



arising from article 9, on the duty of the members to do what is within their power, insofar as they are compatible with their obligations, to carry out the decisions of the General Assembly, and those arising from articles 31 to 33 on the National Central Offices, in addition to refer to domestic legislation, depend on typical acts of domestic law to materialize, such as the creation of these structures and the definition of their powers, as follows from the current article 38 (former article 31) of the Organic Law of the Judiciary Police, resulting from the changes made by Legislative Decree 4/2020, of July 2, published in the *Official Gazette*, Series I, No. 76, of July 2, pp. 1542-1533 which made the first amendment to the Organic Law of the Judiciary Police (Legislative Decree 1/2008, of 18 August).

6.5.5. It remains incumbent upon Member State to verify whether, for the purposes of complying with the international obligations it assumes within the framework of an intergovernmental organization, it is or is not necessary to adopt procedures to ensure its applicability in the domestic legal order, which will always depend on whether these norms are intended. directly and without any legislative intermediation to produce domestic legal effects. Even a country like Cape Verde that adopts a monist conception of the relations between the international order and the internal order and, as such, embraces formulas for receiving International Law in the legal system of this Republic, from an international point of view what it has to guarantee is that obligations imposed conventionally are capable of being fulfilled. If necessary, promoting the necessary acts to allow for the incorporation of the standard, namely its publication; if necessary, adopting domestic legislation that guarantees its execution in the national legal order, being certain that there will always be certain treaties or rules of treaties that do not project on the internal legal order of the States. In relation to these, as their compliance depends exclusively on conducts at the international level, their publication and domestic execution are completely innocuous.

6.6. Thus, in relation to possible non-conformities of the contested rule with the first group of articles alluding to the incorporation of conventional international acts in the Cape Verdean legal system, it is the understanding of the Constitutional Court that:



6.6.1. As part of the same constitutional regime for the adoption of applicable laws, they can be analysed together, insofar as article 12, second paragraph of the Constitution, establishes the regime for the incorporation of conventional norms into the Cape Verdean legal system, accepting a conditional reception model. Referring, under the terms that this Court had been accepting and developing, namely of the *Ruling 01/2017, of January 12, referring to the constitutionality of article 13 of the Ecological Tax Law, which establishes the Regime for the Management, Consignment and Use of Collected Revenue*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, No. 10, 27 of February 2017, pp. 218-260, 4.4.1; of *Judgment 06/2018, of March 22, Adilson Danielson Barbosa v. STJ, on the violation of the right not to be discriminated against, to freedom of the body and the presumption of innocence*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, N° 21, of 11 April 2018, pp. 495-505, 5.1.1, and of *Ruling 30/2019, of 30 de August (AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights of defence, the adversary system and access to the evidence of the prosecution)*, Rapporteur: JC Pina Delgado, 6.5.1, to the need for a treaty, first, to bind the State of Cape Verde in the international order; second, that this binding has been regular, both from the point of view of International Law, therefore without any defect in the expression of consent, and of Constitutional Law, made by the competent entities and in accordance with the procedures provided for by the Fundamental Law; third, of having entered into force in the international order; and, finally, fourth, of having been published in the official journal of the Republic, the Official Gazette, thus providing for article 269, paragraph 1, paragraph c), that if publication does not occur, the treaty would be ineffective and cannot, as rule, be applied as arising from the *Judgment 01/2017, of January 12, referring to the constitutionality of article 13 of the Ecological Tax Law, which establishes the Regime for the Management, Consignment and Use of Collected Revenue*, Rapporteur: JC Pina Delgado, 2.4.2, and of *Judgment 06/2018, of March 22, Adilson Danielson Barbosa v. STJ, on the violation of the right not to be discriminated against, to freedom over the body and the presumption of innocence*, Rapporteur: JC Pina Delgado, 5.1.1. For its part, article 14 establishes a different regime for what is constitutionally designated as an agreement in simplified form, a kind of executive treaty in the light of international conventional practice, which, as such, is exclusively incumbent upon the body exercising executive powers to celebrate without the need for parliamentary authorization or presidential ratification, with no need for publication, however, with the limitation of only being



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

113

able to deal with matters included in its administrative competence, and cannot bind outside this scope, as it had already been enshrined in the *Judgment No. 1/2017, of January 12, successive abstract inspection of the constitutionality of article 13 of the Ecological Tax Law, which establishes the Regime for the Management, Consignment and Destination of Collected Revenue*, Rapporteur: JC Pina Delgado, 4.4.1.

6.6.2. Insofar as the rule that was applied by the Supreme Court of Justice and that was challenged by the appellant, it moved away from any direct application in the domestic legal order of an international rule that is part of INTERPOL's legal regime, the promotion of an autonomous discussion on its reception in the Cape Verdean legal system would be innocuous, making no sense, at this time, the abstract questioning of any formal and/or organic unconstitutionality of Cape Verde's adhesion to this organization under the 1980 Constitution, insofar as which took place on November 27, 1989, therefore, before the current Constitution of 1992 came into effect, which establishes a stricter regime of international binding that this Court must control in relation to those promoted after that moment. On the other hand, although these legal instruments have not been incorporated, this becomes irrelevant, because no international standard is being received in the domestic legal system, either as an international treaty or agreement in light of paragraph 2 of article 12, or as an agreement in simplified form in the light of article 14 of the Constitution, based on any reflection that could be made on the nature of a treaty, international agreement or agreement in simplified form of the INTERPOL Constitution.

6.6.3. Therefore, in relation to these constitutional norms, a situation of constitutional non-compliance is not generated.

6.7. If the problem of the law effectively applied by the decision placed in crisis has to do with a constitutional doubt based on knowing whether an internal rule can refer to the use of official information transmitted through a communication mechanism of an organization of which the State is part , but whose legal instruments are not published in the official gazette of the Republic, only the investigation of constitutional non-compliance with the aforementioned principle of hierarchy of sources, the principle of competence, the principle of typicality of laws, the principle of legality of administration and the principle



114

that the appellant considers the key to the binding of the legislator in respect of the normative production, would still be able to lead to the determination of unconstitutionality. This is in the sense that such guidelines would establish a limitation directed at the legislative power to, through law, authorize the use of official information from INTERPOL as a legal basis for detaining a person, insofar as the legal acts of that organization would not have been ratified and published.

6.7.1. The norm itself, as can be seen, refers not only to official information transmitted by or through INTERPOL, but also from any external entity, as long as it is official. In this sense, they would not only cover this international organization of police cooperation, but any other entity in the international sphere, namely other States. In this sense, it would always be possible for the official information to come from a similar entity directly and not from the international one referred to by the precept. This alone suggests the difficulty of accepting the allegation of unconstitutionality specifically regarding INTERPOL because if the State of Cape Verde can cooperate with other States without any mediation on the part of this organization, it would be difficult to see the concrete problem of INTERPOL, not least because the other States would also have no logical way of incorporating their domestic legal instruments. Therefore, the fundamental problem would refer, in practice, to a material unconstitutionality of any rule that provided for the possibility of using official information from an external entity for the purposes provided for by the rule.

6.7.2. But, even if this is the consequence, it does not seem to us that it generates any disagreement with the listed principles. The norm in question was sovereignly approved by a Law of the Parliament of which it forms part, in the use of powers attributed to that constitutional body; was promulgated by the President of the Republic; and was published in the official newspaper of the Republic. Therefore, through a normative act provided for by the Constitution, by the constitutionally qualified body and through the procedures imposed by the Fundamental Law to ensure its validity and effectiveness. It came to occupy the normal position for this type of internal legal act within the national legal system, in accordance with the hierarchical position provided, at no time becoming an international norm, with the purpose of being applied by a criminal police agency under its terms . Therefore, it is not possible to see, in a basic sense, any non-conformity with the rules regarding the hierarchy



of sources, with the principle of competence, with the principle of typicality of laws or with the principle of legality of administration.

6.7.3. Therefore, the only viable basis would be to consider that the principle that the appellant builds that there would be a link between the legislator and the normative production would inhibit him from approving a norm that refers to a mechanism for dissemination and communication of information instituted and operated by an international organization whose constitutive instrument has not been incorporated. However, this possibility does not seem to be confirmed for this Constitutional Court. As has been mentioned several times, namely in the *leading Judgement 24/2016, of 20 October, Concerning the Revocatory Rule of the Law for the Approval of the Statute of the Public Prosecutor's Office in the part in which it has the effect of Recognizing the Possibility of Ascension to the Top of the Career of Public Prosecutors who have performed functions as Attorney General and Deputy Attorneys General*, Rapporteur: JC Pina Delgado, published in the *Official gazette*, I Series, No. 61, of 2 November 2016, pp. 2033-2054, 1.5, the democratic principle guarantees the legislator a very wide latitude to regulate issues that it deems important as long as it does so considering the Basic Law, in accordance with its procedures and limits, preserving the legitimate expectations that people have and not incurring in material non-conformities with the constitutional norms.

This space also extends to the way in which legislation is produced, in the sense of being able to draw up from endogenous elements, but also from exogenous elements or establishing external bridges. It has done this not only in relation to international developments, but extensively, for better and for worse, but within its regulatory freedom, drawing inspiration from foreign developments. It does not seem to this Court that the Constitution has any rule that inhibits the legislator from referring to an international entity, of which the State is a member, in accordance with the rules of International Law, even though its legal instruments have not been incorporated into the legal system, since the limitation resulting from this path would be based exclusively on the insusceptibility of invoking the specific rule of the treaty internally, especially for the purposes of creating obligations for individuals.

Nothing prevents a legislative body par excellence, the Parliament of the Republic, with primacy in this matter as highlighted by the *Opinion 2/2018, of 27 June, Preventive*



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

116

*Inspection of June, of the Legislative Authorization Law for the Amendment of the Commercial Companies Code and Autonomization of a Commercial Companies Code*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, I Series, No. 44, 2 of July 2018, pp. 1141-1156, 5, endowed with a direct democratic legitimacy, in the use of its constitutional powers, edits a rule in a legislative act that approves, refers to a mechanism of such an international organization, whose object is to merely facilitate the dissemination of criminal information by the States , as an alternative means for Cape Verdean authorities to obtain information about wanted persons and thus provide the international cooperation that the country has committed itself externally or understand that, within the limits of the law, it should offer. In fact, since article 31 of the INTERPOL Constitution is not self-executable, as it is subject to State legislation, the only way to apply its content and guarantee the legality of an arrest made in Cape Verde through information disseminated by this mechanism would be precisely the approval of a legal norm that allowed it, as the National Assembly diligently did. Therefore, nothing prevents a legislative act approved by a competent constitutional body, following procedures and in accordance with the majority provided for by the Basic Law, with the participation in the legislative process of all sovereign political bodies - precisely the same ones that participate of the internal approval process of treaties - the Government, the National Assembly and the President of the Republic, in this case proposing, approving and promulgating, not generating any fraud or subversion of the Constitution or its regime of incorporation of treaty norms.

6.7.4. Especially when, from a material point of view, the reference to the mechanism in question is, from an abstract point of view and independently of any specific problems in its application, framed by instruments that apply to the organization in question. In particular, by the INTERPOL Data Processing Regulation, which, containing rules and procedures relating to the publication of broadcasts and news, especially red news/alerts, associated with arrests for extradition purposes, by the organization's information system, also establishes the conditions for its use and an internal control mechanism that must be ensured by the General Secretariat, which is also associated with an independent external control system guaranteed by the organization's File Control Committee, through its Supervisory and Advisory Board and its Requests Chamber, to which requests for access, rectification and deletion of data processed by INTERPOL's information system can be addressed.



And also, because, in light of Cape Verdean law, namely the Law on International Judicial Cooperation in Criminal Matters, pursuant to article 64, it is guaranteed that, in cases where the person is detained following official information transmitted through the information systems recognized by article 39, it is quickly presented by the police authority that makes the arrest to the competent Public Prosecutor's Office to promote a judicial hearing. And, in case it is confirmed, this must be communicated immediately, by the quickest way, to the foreign authority of which it is interested, so that it informs in the same way whether it is going to make an extradition request, further limiting the period of detention of the person if the information does not arrive within eighteen days or if, having positive information, the extradition request is not received within forty days.

Therefore, in the opinion of this Constitutional Court, the reference made by a law approved by the competent legislative body in the course of a process provided for by the Constitution, duly promulgated and published in the official gazette of the Republic, to a mechanism to facilitate the communication of information between States that works through a credible international organization, INTERPOL, of which Cape Verde is part and recognises, but whose legal instruments have not been ratified or published in the official gazette of the Republic, in a context in which the international organization ensures all internal guarantees to the targets and the same are reinforced by Cape Verdean law, it is not inconsistent with the Constitution.

6.8. For these reasons, the Court cannot declare the unconstitutionality of the hypothetical rule inferred from article 39 of the Law on International Judicial Cooperation in Criminal Matters, according to which *It is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to this international organization do not have, eventually, been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal order, since the use that is made of the information received via this system, derives from a national law.*


CERTIFIED TRANSLATION
12/09/2021
REG:07635166
LANGUAGE REACH

**7. Hypothetical rule arising from article 39 of the LCJ, according to which a person can be detained for the purposes of extradition, without requiring that a warrant exists, as long as one is in possession of official information that legitimizes his detention, it is inconsistent with the Constitution due to incompatibility with the right to freedom over the body, with the principle of legality of police measures and with the principle of proportionality of police measures.**

7.1. In terms of argumentation,

7.1.1. As for the issue regarding the illegality of detention owing to the lack of an arrest warrant, it addresses this from the right to freedom over the body, considering that the detention of an individual which may result in his constitution as a defendant depends on a warrant, not the idea that the police may deprive an individual of their liberty on the basis of an informal request from a foreign police agency is compatible with the principle of legality. For this reason, the interpretation of the appealed judicial body is unconstitutional, being even more pernicious in that it deprives the appellant of having an effective knowledge of the charges that fall on him and without being able to exercise an active role in its defence, this understanding being excessive. It adds that the judgment under appeal goes so far as to consider that the arrest may not be accompanied by an arrest warrant, forgetting that it has to be processed in accordance with the current procedural law, that the red alert was issued in contravention of the rules about INTERPOL's data processing and that it seems to result that the legislator has the understanding that the provisional detention in the extradition process is a preventive detention, being illegal the intervention of this body, the entire detention process is null and without any legal effect. Hence, require the declaration of unconstitutionality of the rule.

7.1.2. The Public Prosecutor's Office, with regard to illegality due to the lack of an arrest warrant, argues that this issue does not generate any unconstitutionality either. Presenting the position that the only difference between a request for prior detention and detention not directly requested is that, in the latter case, the State of origin is not aware of the person's presence in the country. In such cases, the basis of detention would be the information existing in the criminal police authorities that a certain foreign citizen is wanted, information that       may       or       may       not       be       accompanied       by



the existence of international arrest warrants. In this context, if the country of origin disseminates such information, it would take steps to make a request for the extradition of that citizen if it knew his whereabouts. It also informs that the placement of red news is carried out by the national offices of Interpol, and that they must meet certain requirements, including the delivery of an international arrest warrant, passing through the screening of the commission of *experts*.

7.2. The Appellate Court, regarding the specific question of constitutionality, the only one that matters for the purposes of this specific appeal as it was placed, reasoned that detention not directly requested can take place even if the Cape Verdean judicial authority is not yet equipped with a formal warrant, as long as you are in possession of official information that legitimizes the detention, referring to its *Ruling 28/2020*, where it had considered in discussion with Portuguese jurisprudence that this mode of detention is justified because, by disseminating official information that the person was being sought, the State responsible for its dissemination would file a request for extradition if it knew his whereabouts.

7.3. The parameters already defined by the Court to assess the possible unconstitutionality of this rule would be, therefore, the right to freedom over the body recognized by article 30 and the principles of legality and proportionality of police measures recognized by number 2 of article 244, all of the Constitution.

7.3.1. The first, as already touched upon by this Court in the *Judgment 8/2018, of 25 April, Arlindo Teixeira v. STJ , on violation of the right to trial in the shortest period of time, guarantees associated with freedom over the body and the constitutional right to legitimate defence*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, Series, No. 25, of 2 May 2018, pp. 574-596, 13, is housed in a central provision of the Cape Verdean system of fundamental rights, Article 30, which declares the natural freedom of the individual over his body and the right to personal security. It has the effect of prohibiting any total or partial deprivation of liberty that does not result from a cause established by the law and in accordance with the parameters set by the law, which result from the exceptions established by the Constitution, and which allow it among which it is found, as noted, situation such as



118

those arising from a court ruling for the practice of acts punishable by law with the penalty of imprisonment, preventive detention or subjection to extradition proceedings.

7.3.2. The principles that refer to police measures are enshrined in number 2 of article 244. Applying to any activity that materially can be considered police, it refers to its subordination to the principle of legality, which imposes that any action in this scope are substantiated and specified by law that establishes the conditions under which they can be undertaken by the authorized authority, and the principle of proportionality, which imposes that the law establishes balanced goals, limiting its intensity to what is strictly necessary for the purposes that justify it to be carried out.

7.4. The constitutional problem attributed to article 39 of the Law on Judicial Cooperation, in the contested part that the Constitutional Court can scrutinize, as it follows, as it has already decided, from the rule effectively applied by the Supreme Court of Justice that allows the detention of a person sought by competent foreign authorities for the purposes of criminal prosecution or the fulfilment of criminal sanctions without having to present a court order at the time of arrest, it being sufficient that the Cape Verdean authorities receive official information about this.

7.5. Article 39 contains a figure entitled "detention not directly requested", inserted in the Cape Verdean legal system by the diploma itself, configured from a normative formula according to which "it is lawful for criminal police authorities to carry out under the law criminal procedure in force, the detention of individuals" in cases where, "according to official information, they are sought by competent foreign authorities for the purpose of proceeding or serving the sentence for facts that notoriously justify extradition". It is presented following another modality of early detention - in relation to the request for extradition - that the law provides: one that is requested by a State that intends to request the extradition of a person who knows to be in Cape Verde, under the terms of the number 1 of article 38.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

7.5.1. It is clear that, in the latter case, once the person's whereabouts are known and the formal request for extradition is being prepared, the interested State must accompany the request with a set of elements referred to in the second paragraph of the same provision, including the warrant or order of provisional detention or equivalent document against the requested person and several others who, due to the predictability of the detention and the imminent extradition request, would already be in their possession and organized in accordance with the requirements of such request. In the case of a detention not directly requested, the legal element that legitimizes the detention is not the existence of a warrant or the others provided for by paragraph 2 of article 38, but, rather, official information, which, by law, and even without the Court pronounces on its constitutionality at this very moment, they are considered sufficient.

7.5.2. In a context, in which there was an evident internationalization of crime and there was an unprecedented growing capacity for movement around the planet, the solution adopted by the legislator and applied by the appealed judicial body is perfectly natural. In fact, it intersects directly with the very nature of non-directly requested detention, intended to cover various situations in which the interested State does not know with sufficient advance notice to allow it to prepare an extradition request and request provisional detention if a person you are looking for is in Cape Verde or in another identified country. Therefore, it disseminates information to several countries simultaneously, directly or through the INTERPOL communications system.

7.5.3. In such cases, it is assumed that the interested State may, without prejudice to having, directly or indirectly, disseminate official information that it is looking for a particular person, not to have sent a copy of the arrest warrant at the same time, namely because, not knowing the person's whereabouts, will only become aware of their presence in a certain State when they are informed of it, enabling them to request their extradition. In this context, the system is marked by the same bases that govern cooperation relations between States, mutual trust and the possibility of reciprocity, which ensure the necessary trust so that, first, the State of Cape Verde is assured that the person it is effectively being sought by the judicial authorities of another State, not least because in this type of relationship, the tendency to maintain the veracity of information is imposed by the continuous need for States to obtain judicial cooperation in criminal



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

120

matters and the awareness that any deviation in this matter may imply non-cooperation by the Respondent State in the future; and, second, that by disseminating this official information you are effectively interested in obtaining custody of that person by submitting an extradition request within the legal time limit.

Furthermore, the rule must be understood within the framework of a regime that already includes certain guarantees aimed at controlling its misuse. First, because the basis for legitimizing detention is not based on any information, but only on official information, endowed, for the reasons invoked, with its own faith resulting from the way in which the States conduct international relations; second, because, in the heart of the norm and the concept of official information that can be extracted from article 39, it is implicit that they must be accompanied, a) by sufficient elements to allow the identification of the person, because only in this way is it possible to attest that the individual concerned is what is being sought; and, b) elements that allow certifying that the facts for which he is sought notoriously justify extradition; second, because the regime of non-directly requested detention is composed not only of article 39, but also of the already mentioned article 64, which, not leaving the maintenance of early detention not directly requested to the free discretion of the police authority, imposes intervention of the Public Prosecutor's Office to promote the judicial hearing, referring to the period of forty-eight hours of number 2 of article 62, also limits it in time, since the Attorney General's Office must inform the foreign authority to whom it is interested. by the fastest route, if the latter is going to make the extradition request, imposing a period of eighteen days to provide this information and a maximum period of forty days to request extradition, leading to the non-compliance with these deadlines to the release of the detainee.

7.5.4. This regime, as already pointed out, focuses, in the relevant part, on INTERPOL's communications system, which presupposes the possibility for States to transmit and disseminate information about people seeking or requesting the issuance of red news. There will be no doubt that any rule allowing a person to be detained has an impact on his freedom over the body. However, this does not always result in a non-conformity between this rule and paragraph 1 of article 30 of the Constitution, as this provision also includes several situations in              which              the              competent              public              authorities              are



allowed to deprive a person of their freedom to move around including situations that refer to the extradition process - provided that the provision of the rule, insofar as it assumes a restrictive content of this right, adjusts to the conditions provided by law for limiting rights in this way, which presupposes the intervention of the ordinary legislator, namely those that the Constitutional Court has used for this type of inquiry as drawn up in the *Judgment 7/2016, of 21 April*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, No. 35, 10 May 2016, 4.3.2.

7.5.5. If this could happen if there is a legitimate purpose, it would refer to the conditions for legitimizing restrictions provided for in numbers 4 and 5 of article 17 of the Constitution. The general purpose of the legislative solution is to allow Cape Verde to provide international judicial cooperation to a similar State that seeks a particular person for the purposes of criminal prosecution and subjection to criminal proceedings or execution of criminal sanctions, which does not fail to have the due to the principle of cooperation and the duty to participate in the fight against terrorism and transnational organized crime, provided for by paragraphs 1 and 2 of article 11 of the Basic Law, as, in the latter case, recognized by this Court through the *Judgment No. 30/2019, of 30 August, AGAM. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights to defence, the adversary system and access to the evidence of the prosecution*, Rapporteur: JC Pina Delgado, 6.5.1, and specifically to be able to do so in cases where the exact location of the person sought is not known in advance. Going beyond the issue of legal authorization to restrict, it is evident that from paragraph f) of number 3 of article 30 there is permission to affect.

If at this stage of the existence of the legislative act and its content, there is no question of retroactivity of the normative solution and the absence of generality and abstraction, the main issue would always be to verify whether such a legislative solution would be incompatible with the essential core of the law or with the duty to respect the principle of proportionality in the operation of restriction of rights. The Constitutional Court does not consider that the essential core of the law is affected by the possibility of detention without a court order, as the norm does not allow a detention to occur without any basis of legitimacy or by mere whim of the police authorities but based on in official information communicated directly by a State or through INTERPOL, which cannot be traced back to a clearly arbitrary deprivation of freedom over the body.



Even so, it could, in the abstract, prove to be an unbalanced solution if it does not adjust to the principles of adequacy, necessity and fair measure inherent to the principle of proportionality that governs the restriction of rights. It is the understanding of the Constitutional Court that, in order to achieve the legitimate purpose that the government intends to achieve, that is, the provision of international judicial cooperation in criminal matters and participate in the fight against transnational organized crime through the institution of a legal mechanism that legitimizes the detention of person, even in cases where it has not been directly requested, namely when the State concerned is not able to determine with certainty its location, one cannot but consider that the legal means that allow it when the criminal police authorities have information in their possession. officers who are wanted for facts that notoriously justify extradition is suitable. In the same sense, the Constitutional Court considers that the provision intended to cover various possible situations in which neither the authorities of the interested foreign country nor the national authorities know in advance the location of the wanted person in Cape Verde, the least restrictive means that nevertheless would allow the purpose of the rule to be achieved would be to allow, without the imperative need to present a copy of a court order of arrest or equivalent, to proceed with the arrest of the wanted person based on official information provided by a State directly or through the communications system of the INTERPOL provided that they contain sufficient elements to verify their identity and that the facts attributed to them clearly justify extradition. In the same sense, for the Constitutional Court, the measure does not excessively sacrifice the rights of an individual because, on the one hand, there is an interest of the State imposed by the Constitution in cooperating with the arrest of wanted persons who are in the territory of Cape Verde and, on the other hand, the law imposes clear limits on the conditions that enable authorities to use this possibility of early detention, establishes short terms for maintaining the deprivation of liberty in such situations, and subject it to judicial review. Therefore, it is proportional measure.

7.6. The same is true for the principle of legality of police measures and the principle of proportionality of police means.

7.6.1. In the case, because the detention does not result properly from a free decision of the authority of the national who carries out the arrest, nor from any informal means, it



12/09/2021
123

it is not a norm that allows any discretion to these authorities, namely, to detain the person for having a determined appearance or for it to appear to them that because of the way they live, behave or move, they could only be a wanted criminal, or because they saw them a particular foreign news service or why your name is mentioned informally by a friend. It does not authorize the police authorities to act voluntarily and arbitrarily without any basis of legal legitimacy, but always based on sufficient official information disseminated or provided by a similar State, namely through the communications mechanism of INTERPOL, which, in the world of relations between States shall, until evidence and history to the contrary, be considered to be proper and correct. Therefore, the norm itself already establishes the legal basis for legitimizing this police action, authorizing it to receive official information in this way as the typified circumstances materialize.

7.6.2. In this line of reasoning, the very balance from which the rule stems, by delimiting the specific situations in which the police can act, already considers the principle of proportionality, establishing clear guidelines for its action, namely by providing that it can only make this arrest if: a) it has official information transmitted by a State or by INTERPOL that the person is wanted by competent foreign authorities for the purposes of prosecution or serving a sentence; and, b) for facts that notoriously justify the extradition; c) imposing the immediate intervention of the Public Ministry in order to present the person detained by the police authorities to the judiciary for the purpose of hearing and validating the detention.

7.6.3. In short, the Constitutional Court understands that the contested rule is also not inconsistent with the principle of legality and the principle of proportionality of police measures arising from paragraph 2 of article 244.

7.7. And, therefore, it concludes that the hypothetical rule arising from article 39 of the LCJ, according to which *a person can be detained for the purpose of extradition, without requiring a warrant, as long as they are in possession of official information that legitimizes their detention* is not in violation of the Constitution.



124

**8. Hypothetical rule arising from articles 39 of the Law on Judicial Cooperation and article 269 of the Code of Criminal Procedure, according to which** *information for the detention of a person can reach the authorities by any means allowed by Cape Verdean law, in case of urgency and danger in delay by any means of telecommunications, as follows from article 269 of the CPP, followed by confirmation by warrant* **, is non-compliant with the Constitution due to incompatibility with the right to freedom over the body, with the principle of legality of police measures and with the principle of proportionality of police measures.**

8.1. In terms of argumentation,

8.1.1. The appellant, in this regard, for what matters in relation to the excerpt of the rule that the Court may know, expresses the understanding that there was an excessive restriction of his fundamental rights, as the rules on communication of acts of the Code of Criminal Procedure did not apply, namely because it considers that those that lead to the detention of a person based on a letter rogatory or execution of foreign criminal sentences, fundamental duties cannot be prevailed over a fundamental right, simply based on the principle of international cooperation between States. Hence the conclusion that the detention of the extradited person is arbitrary and violates several norms.

8.1.2. In this regard, the Public Prosecutor's Office presents the thesis that the appellant's detention not directly requested would not violate the principle of proportionality, describes the legal regime and says that the detention in question and the legal regime do not deserve any reservations considering what the restrictions should be of rights, namely the principle of proportionality, and this possibility should not be considered unconstitutional, as, by way of comparison, it says that the Constitutional Court of the Portuguese Republic had already rejected.

8.2. The defendant judicial body's understanding was based on its finding that the Law's requirement for the transmission of official information intended for the detention of a person for information purposes would not take the form of a request, much less a warrant, but only official information, which could come to the knowledge of the Cape Verdean authorities by any means admitted by the law, in case there was urgency and



CERTIFIED TRANSLATION
LANGUAGE REACH
125
12/09/2021
REG:07635166

and danger in the delay, by any means of communication, as would follow from number 3 of article 269, followed by confirmation by warrant, to refer to the position it had set out in Judgment 28/2020 regarding references to comparative constitutional jurisprudence and doctrine pertinent.

In this regard, it appears that the Supreme Court of Justice discusses this issue at length on pages 29 and ff, when, by denying the relevance of an allegation of annulment of a red alert, it considers the figure of not directly requested detention provided for in article 39 of the Law on International Judicial Cooperation in Criminal Matters, referring to Portuguese jurisprudence, in which there is an understanding that this type of detention would be justified by the idea that, when disseminating official information that the person was being wanted, the interested State would make an extradition request if it knew her whereabouts.

8.3. The parameters for measuring the alleged unconstitutionality here are also the right to freedom over the body, the principle of legality of police measures and the principle of proportionality of police measures, carrying the basic configurations mentioned in the previous item (7).

8.4. The verification of the compatibility of a hypothetical rule that allows the transmission of official information leading to the detention of a person for the purposes of extradition through any means of telecommunications allowed by Cape Verdean Law, including, in cases where there is urgency and danger in the delay, by any means of telecommunication, with the right to freedom over the body and with the principles of legality and proportionality of police measures depend, at first, on fitting this norm within the framework of the Law on International Judicial Cooperation in criminal matter.

8.4.1. This effectively provides, as already described in 7, to which it refers, a regime of early detention entitled non-directly requested detention, distinct from the provisional detention provided for in article 38.

8.4.2. In the case of a detention not directly requested, inherently marked, at least in relation to part of the differentiated situations that may justify, owing to great



126

urgency, in principle, any suitable means provided for by law may be used to transmit, in this case, official information that an individual is sought for the purposes of proceedings or serving a sentence for facts that notoriously justify his extradition. In this sense, which seems to follow from the learned reasoning expressed by the Supreme Court of Justice and from the rule that it applied to decide the matter, the reference to number 3 of article 269, according to which in case of urgency and danger in the delay it will be admissible the request for detention by any means of telecommunications, followed immediately by confirmation by warrant, which did not immediately retain the expression, may reveal the understanding, correct for this Court, that such submission to procedural law was only justified in relation the means of transmission of information and not in relation to the temporal conditions of its legitimation. In these cases, in contrast to a situation in which it has been requested by the State that intends to request extradition, the legitimacy of the act being guaranteed, as official information is received, the presentation of the warrant could take place later, namely at the time when the extradition request is received.

8.5. It is easy to intuit the reason that justifies allowing, among other modalities provided for by the applicable legislation, it to be done by means of communication that are faster and with instant reception. Because in such cases situations of urgency and danger of flight may be covered, in which the interested State becomes aware that a certain person may travel to an undetermined set of States, including ours, officially informing him of this, namely through mechanism of information dissemination mechanisms or the INTERPOL alert system, so that it can carry out the arrest. The reason for this prediction is perfectly natural, since in a situation marked by great dynamism and in which the people sought are not static, being able to move to various internal and external spaces, the only way to guarantee their detention is through of a communications system that uses rapid means of transmitting official information. In this sense, perfectly adjusted to a type of process, that of extradition, marked by great speed aimed at both safeguarding the rights of the extradited person, as well as fulfilling the public interest in the provision of international cooperation, and the legislative indications inherent to the regime constructed, bearing in mind that article 64 maintains this line of use of rapid means of communication when it orders the Public



127

Prosecutor's Office to notify the arrest of the wanted person "by the quickest route possible" and to inform the interested State "by the same route" whether it is going to make an extradition request.

8.6. Under the terms of the test that is promoted in circumstances of restriction of rights, as initially outlined by the aforementioned *Judgment 7/2016, of 21 April*, Rapporteur: JC Pina Delgado, 4.3.2, per se, such provision does not appear to be constitutionally illegitimate, insofar as such objectives of the norm are only fulfilled, at least in certain circumstances, if it proves possible to quickly transmit information that leads to the arrest of a wanted person by a State pending submission of a possible extradition request - which this State already indicates it wants to materialize insofar as it circulates official information about the person - corresponding, for the reasons invoked, to public interests that the State may pursue, and whose effectiveness often depends on exploitation , within constitutional limits and in a balanced way, of means and solutions that dynamically adjust to the ways in which criminality manifests itself (*Opinion 1/2019, of 17 April, Preventive Inspection of Article 2 of the Legislative Act for the Revision of the Criminal Investigation Law in the Part in which it Changes its Article 14*, Rapporteur. JC Pina Delgado, published in the *Official Gazette* Series I, No. 44, 18 April 2019, pp. 763-789, 7.5).

8.6.1. If there is authorization to restrict and there is no possible discussion regarding the generality and abstraction of the hypothetical rule, of restrictive effect and of reaching the essential core of this right, the only possibility of considering the rule unconstitutional would result from any disproportionality of the restriction that imposes.

8.6.2. In this regard, the Court finds that, first, from the point of view of the suitability of the measure, because the purpose of the rule is only fulfilled if it is possible, in the light of official information, to effectively detain a person, it is necessary that the means of transmission to be used can be fast, swift and effective, therefore being an adequate measure to fulfil the public interest in question of providing international judicial cooperation and helping the country to fight crime; second, from the point of view of necessity, no alternative would be equally effective and less affecting in cases of urgency and danger, namely escape; third, it doesn't seem to be a unbalanced or excessive



measures considering the intensity of the public interest in granting tools to police authorities to quickly receive, provided that through reliable mechanisms, official information that may lead to the arrest of a wanted person in another country for the purposes of submission to criminal proceedings or execution of criminal sanction and situation that, due to not having its presence in a specific country, the country that seeks it does not have other effective means of making the information reach another State in which it is located or to which it travels. Thus, not being disproportionate, it does not seem that the means of transmission of information can itself generate any incompatibility with the right to freedom over the body, and the rule in question is not incompatible with the constitutional precept that recognizes it.

8.7. In the same sense, it does not lead to any arbitrary action on the part of the police authority, as the rule itself ensures the legal basis for receiving official information by these more rapid means in such urgent and dangerous situations that are transmitted by the authorities of these States to a number of other States or through the INTERPOL communications system. Therefore, this would not result in any non-compliance with the principle of legality of police action. In fact, the standard allows the use of these means, following official information, under the terms already discussed and with all the care provided for by the law, namely the limitation of the time that the detention situation is maintained and judicial control , ensures the legality of the police intervention made from official information communicated in this way, as well as the proportionality of this action, as applicable in situations of urgency and flight in which the public interest in detaining the person for the purpose of providing cooperation international criminal law justifies a faster and more effective form of transmission.

8.8. Therefore, there are no grounds to the allegation that a rule arising from articles 39 of the Law on Judicial Cooperation and article 269 of the Code of Criminal Procedure, according to which *Information for the detention of a person may reach the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunications, as follows from article 269 of the CPP, followed by confirmation by warrant*, does not comply with the Constitution due to incompatibility with the right to freedom over the body, with the principle of legality of police measures or with the principle of proportionality of police measures.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

**9. Hypothetical rule arising from number 4 of article 6, final segment, and number 3 of article 3, according to which** *exemption from reciprocity is possible in any form of international judicial cooperation, including extradition***, is inconsistent with the Constitution due to incompatibility with the principle of reciprocity of benefits inserted in number 1 of its article 11, of the principle of equivalence of foreigners to nationals translated into number 1 of article 25 and of the rule for the treatment of foreigners in transit provided for in article 7 l).**

9.1. In terms of claims,

9.1.1. The appellant argues, in essence, that extradition is a matter of international relations, and the reciprocity of benefits is one of the principles that govern the State's international relations under the terms of number 1 of article 11 of the Constitution, which cannot be excluded from this fundamental guideline. Hence his most important legal thesis in this segment that ordinary law cannot rule out reciprocity in relations between the country and a foreign country, in this case the United States of America. It also adds the argument that it would have to do with the treatment of foreigners temporarily in Cape Verde, insofar as it would require them to be accorded treatment compatible with the norms of international law, and with the rule on the extension of rights to foreigners in the article 25, which, as he understands, only excludes political rights. These constitutional rules would prevent the reciprocity of benefits from being dispensed with in the extradition process. In the specific case, the Minister of Justice should have demanded reciprocity from the requesting State, especially since it is a foreigner in transit with limited connections to Cape Verde.

9.1.2. In turn, the Public Prosecutor's Office on the issue discusses the legal regime and essentially adheres to facts that mark the present situation, considering that the United States does not refuse to extradite in an identical situation, which they cannot do is provide an absolute guarantee in this regard. It adds that the legal basis for the appellant's extradition is the Palermo Convention, which the country undertook to comply with and, finally, that there is no obligation to refuse an extradition request for lack of reciprocity. It promotes the interpretation of number 3 of article 3 of the Law on Judicial Cooperation in the sense that the specific situation is part of a circumstance that justifies extradition, since the crime of money laundering is a form of serious criminality



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

that the country is committed to fighting. In addition, it says that it is a purely political decision that is not subject to the review of the judiciary, therefore a valid and effective political act of exclusive competence of the executive power and not subject to judicial review. Therefore, even if, hypothetically, it was considered that there was an absence of reciprocity in the case, not only is this absence not a reason for mandatory refusal, as the assessment of the matter is excluded from the judiciary by virtue of the decision of the Minister of Justice.

9.2. The scholarly understanding of the decision under appeal to justify the rejection of the constitutional issue raised by the appellant is inspired by a position adopted in Portugal, where, in the eyes of the Supreme Court of Justice, despite the fact that there is a much less flexible principle of reciprocity was never considered the possibility of an unconstitutional waiver. In Cape Verde, where the principle would take the form of reciprocity of benefits, there is greater freedom of political judgment of the circumstances.

9.3. According to the regime established by article 6, paragraph 4, last segment, and article 3, paragraph third, interpreted - under the terms promoted by the Supreme Court of Justice - this Court does not raise the slightest doubt that the best possible interpretation in legal terms , namely, because, in order to recover and endorse the learned argument used, by the language used, "cooperation", and by the systematic location in the general part of the law, the ordinary legislator intended to allow the waiver of reciprocity in any form of international judicial cooperation in criminal matter regulated by the Law. Basically, the hypothetical interpretation indicated corresponds in its entirety to the rule itself inserted in these precepts. It follows that, as long as, among other grounds, the non-requirement of reciprocity is advisable due to the nature of the fact or the need to fight certain forms of criminality, the competent authority, in this case the Minister of Justice, would be authorized to dispense reciprocity in a passive extradition request.

9.4. The fact that the Venerable Court of Appeal has given the rule its most evident meaning through a legal hermeneutics that objectively does not raise any objection, does not necessarily mean that this rule cannot suffer from a defect of unconstitutionality. In fact, as the appellant indicates, it can, in the abstract, in a first line be non-conforming to



131

principle of reciprocity of benefits inserted in article 11, paragraph one, of the Constitution, the parameter that fits this question. A question that is the object of this concrete review of constitutionality and that naturally does not have to do with the investigation of the concrete act of the Minister of Justice to grant it, which is irrelevant for the purposes of this process, but if a rule could, In light of the Basic Law, allow reciprocity to be waived in certain situations.

9.5. The issue was not the subject of a decision by the Court, but the content of the principle has already been discussed in the context of the Successive Inspection of Constitutionality that led to the issuance of the SOFA ruling (see *Judgment 10/2020, March 20 [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rapporteur: JC Aristides R. Lima, pp. 1710-1753, and concurrent vote of JC Pina Delgado, p. 1743.

9.5.1. There would be no doubt that, in the abstract, there may be a relationship between an ordinary rule that allows for the waiver of reciprocity in a given dimension of the State's external action, such as extradition undoubtedly, and the principle of reciprocity of benefits.

9.5.2. Being integrated to number 1 of article 11, the principle of reciprocity of benefits is, for constitutional purposes, a principle imposed by the constituent legislator on the formulator of foreign policy, including the ordinary legislator if this is the case, and on the conductor of the same in the in the sense that, in an international order realistically characterized by national interests, care should be taken that Cape Verde's foreign policy is also marked by the production of benefits not only for its partners, but also for the State itself. It is an old solution of the national constitutionalism, as recalled by the *Judgment 10/2020, of March 20, (Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rapporteur: JC Aristides R. Lima, 5), particularly appealing to newly independent states created after a process of struggle for political self-determination and which intended to guard against any possibility of emergence of relations of economic dependence or



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

neo-colonial nature in which, despite being formally independent, continued to serve the interests of former colonial powers and hegemonic states.

9.5.3. Due to the nature of international relations, such reciprocity of benefits is not intended to be applied on a case-by-case basis but considering the integrality of the relations that Cape Verde maintains with a specific country, international organization, non-governmental organization or any legitimate international actor that cannot be contained from a temporal and material point of view. Temporal, because for the evaluation of the reciprocity of benefits, not only are current relations relevant, but also those that have occurred in the past and those that look forward to the future. received in the past from the entity concerned, as with investment, that is, what the country plans to achieve in terms of foreign policy in terms of a future bilateral or multilateral relationship; material, because it does not refer to the measurement of a specific relationship in a given segment of the panoply of interactions that take place between two entities, namely States, but allows a cross-assessment of the entire spectrum of these relationships in all areas in which they manifest themselves.

9.5.4. For obvious reasons, as it is a question of establishing guidelines for conducting a dynamic dimension of relations between States that cannot be fully controlled by the country, especially considering the difficulties that Microstates have in trying to preserve their own interests in an international context. hostile and unpredictable are not all-or-nothing rules. In fact, such precepts of article 11, on the one hand, have a low normativity and extreme ductility, as they must be weighed against several other principles in the field of foreign policy, often in opposition in specific situations, the which is evident in this case in relation to the determination of the final part of number 2 of the same provision that Cape Verde participates in the international fight against terrorism and transnational organized crime.

9.5.5. Notwithstanding the constitutional inquiry that they may be subject to, such arbitration is carried out by the political entities that conduct foreign policy, and they are responsible for carrying out the necessary consideration in each situation to establish the course of action that the State must follow.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
LR-07635166

9.6. This is particularly important because one of the reasons relating to extradition that justifies paragraph 3 of article 3 in the meaning that is the object of this concrete review of constitutionality is precisely not to condition the satisfaction of a request for cooperation on the lack of reciprocity as long as it is shown advisable because of the nature of the fact or the need to fight certain serious forms of crime.

9.6.1. First, such a solution, in a manner convergent with the Basic Law, attributes such assessment to a political authority, the Minister of Justice, who, even in the administrative phase of the process of passive extradition, in which he can make judgments of opportunity and political convenience when considers the satisfaction of an extradition request, can and should balance the various foreign policy objectives that may or may not recommend the continuation of extradition, namely all those arising from article 11.

9.6.2. Second, that same entity is allowed to satisfy the request without requesting reciprocity if, among other circumstances, this proves advisable due to the nature of the fact or the need to fight certain serious forms of criminality, something that, on a case-by-case basis, , and in accordance with these beacons, it determines, thus not applying the rule of number 4 of article 6, first segment, which subjects judicial cooperation to reciprocity, insofar as the provisions in the final part of the same precept and in the number 3 of article 3 constitutes an exception to this rule.

9.7. The Constitutional Court considers that this rule, which allows that the absence of reciprocity does not prevent the granting of extradition, given certain circumstances, is not inconsistent with the principle of reciprocity of benefits.

9.7.1. It is possible, in the abstract, that, in a long-term scenario, the systematic refusal to provide judicial cooperation in criminal matters, namely extradition by a State under equal circumstances could lead to unconstitutionality, although not necessarily normative, in the current context nothing authorizes the Court to reach this conclusion.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
07635166

134

9.7.2. Regarding the rule arising from number 4 of article 6 and number 3 of article 3 of the Law on International Judicial Cooperation in Criminal Matters, there will be no doubts that there is a public interest on a constitutional basis that justifies the measure, as it allows a political entity to weigh up various constitutional principles for conducting foreign policy and determine that, in a specific case, despite no guarantees of reciprocity, it is justified to satisfy an extradition request that enhances Cape Verde's participation in the fight against transnational organized crime.

9.8.  Regarding the possible non-compliance of this standard with the principle of equality of rights between foreigners and nationals,

9.8.1. In addition to the fact that this rule has different effects according to the nature of the relationship of the foreigner or stateless person with the national territory, being stronger in the case of foreigners residing legally in the national territory than in relation to foreigners in transit or in an irregular situation, the fact is that any distinction between the non-national and the national that arises from the contested legal provision in the part that applies to extradition, arises, as already discussed in relation to the crimes that correspond in the requesting State to the penalty of character. perpetual term referred to by number 2 of article 38, of guarantee that the constituent legislator chose to limit the national, since, by virtue of number 3 of the same provision, the condition of extradition to the requesting State also admits the extradition of its nationals to the State of Cape Verde, generates an exclusive guarantee of ownership of the national, not being extended to foreigners or stateless persons, due to the express will of the constituent legislator, as was already evident in the discussion promoted within the scope of the *Successive Abstract Inspection Records of Constitutionality 3//2018*, with convergent positions adopted by all judges in relation to the issue (*Official Gazette*, Series I, No. 86, of 23 July 2021, p. 1731 et seq.).

9.8.2. The provisions in article 25 and also in articles 23 and 24, having a principled dimension, are projected on the ordinary public power that should consider them in their respective areas of action. However, it is not imposed on the constituent power of review. Even though this is a reform, the only possible constraints that may limit your freedom to change the Basic Law arise from the limits namely material, which are imposed on the



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

constitutional review and, eventually, the insertion of norms contrary to the identity of the Cape Verdean Constitution, namely the values that it embraces. Even because article 25 expressly refers to other rights reserved constitutionally or legally to national citizens, nothing prevents the constituent legislator from establishing the distinctions it deems between nationals and non-nationals, especially in an area in which it has traditionally to guarantee the maintenance of the national in Cape Verdean territory, establishing rights of belonging and guarantees of exclusive entitlement of the national against his compulsory removal, either by limiting his extradition, or by prohibiting the loss of his Cape Verdean nationality, or by prohibiting his expulsion from the national territory, as the jurisprudence of the Court had already stated in the *Judgment No. 20/2018, of 16 October*, *Uchechukwu Ezeonwu and Chijioke Duru v. SCJ*, *on breach of guarantee of presumption of innocence in its dimension of in dubio pro reo*, 1639-1648, 1.3, and until the ordinary legislator, within the limits of restriction, does so. In this sense, since there is no constitutional protection based on this parameter, the freedom of the ordinary legislative power to approve a law that allows the satisfaction of an extradition request without ensuring reciprocity is not constrained for this reason.

9.8.3. There is, therefore, no inconsistency between the contested rule and the principle of equality between nationals and non-nationals.

9.9. In relation to possible non-compliance with paragraph l of article 7 of the Constitution, which prescribes, with the relevant segmentations, that it is the fundamental task of the State to guarantee foreigners who are in transit through the national territory, a treatment compatible with international human rights standards,

9.9.1. It can easily be seen that, in order to constitute an enforceable norm in the specific case, this norm depends on the existence of an international norm for the protection of human rights that binds the State of Cape Verde which, preventing the extradition of a person without the State demanding reciprocity from the State appellant, would lead to the non-assurance of this minimum treatment.

9.9.2. The problem is that it is not possible to identify any international norm that could have an effect on a sovereign state of not being able to extradite a person who is



136

detained in its territory in circumstances where it does not require reciprocity, for internal reasons and in accordance with applicable law.

9.9.3. The fact that there is a reduced connection between the foreigner in transit and the State of Cape Verde is also not the cause of this, as no parameter arising from the Constitution emerges, especially from paragraph l) of article 7 or any other constitutional or international provision that prohibits the law from allowing the extradition of a foreigner in transit detained in national territory without requiring reciprocity, in these cases essentially applying the principle of territoriality.

9.10. Therefore, the Constitutional Court cannot conclude that hypothetical rule arising from article 6, paragraph 4, last segment, and articles 3, paragraph 3, of the Law on Judicial Cooperation, according to which *Waiver of reciprocity is possible in any form of international judicial cooperation, including extradition*, does not comply with the Constitution, due to incompatibility with the principle of reciprocity of benefits, with the principle of equating foreigners and stateless persons with nationals and with the duty to treat foreigners in transit in a manner compatible with international human rights standards.

**10. Hypothetical rule arising from article 55, paragraph 2, and 46, paragraph third, last segment, of the Law on Judicial Cooperation in Criminal Matters, according to which *The extradited person has the right to lodge an opposition, but, despite the requirement for due diligence of testimonial evidence, he can only base this on the fact that he is not the person claimed or that the assumptions of extradition are not met,* does not comply with the Constitution, due to incompatibility with the defence guarantee.**

10.1. In terms of argument,

10.1.1. In relation to this item, which deals with the limitations that were imposed on the opposition that he lodged and the steps of evidence that he requested, the appellant says that they did not allow him to demonstrate that the facts that constitute the predicate crime of money laundering occurred in Venezuela. Therefore, according to Cape Verde's conflict resolution rules on the application of the country's criminal law in space, the



criminal relevance of these facts should be investigated in accordance with the law of the South American country and not of the USA, which is essential to ascertain the appellant's effective involvement in the alleged illegal behaviour. And that, in addition to that, it also did not allow him to produce evidence on other aspects, namely on his health status, on the payment of the visa, mission documents, and several others about which he could provide evidence, as he could do it in relation to the worsening of his procedural situation, the validity of his detention and the political context of his detention.

10.1.2. The Public Ministry's claims are directed towards the fact that the failure to carry out evidentiary steps does not generate any constitutional inconsistency, since even in the scope of criminal proceedings, the law attributed the power of direction to the judge, allowing it to reject useless investigations. Furthermore, it understands that the jurisprudence of Portuguese courts, other countries and Cape Verde has considered that it is not appropriate for the defendant to defend the crimes of which he is accused by the requesting State, since he will have the opportunity to do so before the courts of this country. It also considers that the appellant refers to international instruments that do not contain any provision relating to extradition, are not applicable and that he understands that he should have been authorized to present evidence to defend his procedural position, based on a wrong assumption that they are the processes of extradition trials. But that these are not intended to assess the presuppositions for the imputation of crimes to the target agent of the extradition process, but simply to ensure the existence of different evidence to allow the delivery of the extradited person to the Requesting State so that it can judge him for the facts of who is accused and assesses his guilt or innocence.

In his view, such a solution has diverse and valid foundations at its base, since the assessment of this issue would lead to: a) the sovereignty of the Requesting State being in question or restricted; b) as the assessment of the assumptions of imputation requires an understanding of the criminal law of the requesting State, its interpretation by the requested State would always be risky, as it is a foreign law, with its particularities; c) the fact that the requests do not, as a rule, specify all the grounds underlying the indictment directed at the extradited person, would lead the requested State to try to assess the guilt based on an incomplete record, thus generating a series of inconveniences; d) the



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

reassessment of the assumptions of the charges against the accused would place a significant burden on the requested State, implying a thorough analysis of all evidence presented by both parties insofar as the violation of the law of the requested State would not be involved. Therefore, the segment concludes by stressing the inability of the defendant to produce evidence to support his position, but that does not result in the limitation of his defence, as he may do so before the requesting State, under the terms established by its procedural law. This would be an understanding supported by Portuguese jurisprudence that would serve as a reference to the Cape Verdean one, given the similarity between the laws and it would not be understood how these provisions could undergo such different interpretations, not constituting in Portugal the prohibition of the extradited person to present their criminal defence constitutional violation. He also says that the allegations about the fact that this prevented him from presenting objections to the principle of specialty and the prohibition of double criminality, which are pillars of the extradition process, is unfounded because these principles do not imply an analysis of evidence relating to the facts that support the accusation in the requesting State, but only of the facts on which the extradition request is based. Finally, on this first segment he says that the case law of the United States goes in the opposite direction of what is alleged by the appellant, as it would also be in line with the model adopted by the Law on International Judicial Cooperation in Criminal Matters, in the sense that both contain limitations on the presentation of evidence of defence in criminal proceedings during the extradition process. Even when this legal system allows the defendant, at the judge's discretion to present, limited evidence that aims to explain the charges against him, considering that, in the specific case, what is wanted is to directly oppose the facts that support the prosecution, this objective is in direct contravention of American and Cape Verdean jurisprudence. It concludes that the procedural regime of extradition ensures constitutionally protected guarantees of defence, namely the right to a double degree of jurisdiction, not reaching the extent to which the measure may be a violation of the principle of *ne bis in idem*.

10.2. Regarding the issue that matters for the resolution of this incident, the Supreme Court of Justice argued in the Appellate Decision that the thematic limitation of the evidence that the extradited person can do, typical of the limited litigation model, does not result in any unconstitutionality, since it is not before a pure criminal process. In this case, in its understanding, the Respondent State is not making any attribution of



crime to the extraditee, nor is it a judge, in respect of his person.

The way the Constitutional Court interprets the understanding of the top body of the judicial courts based on the position it expresses on paragraph 2 of article 55 and paragraph 3 of article 46 of the Law on International Judicial Cooperation in Criminal Matters, in insofar as the first rule is limited to establishing the challenge that must be included in the opposition paper and considering that the limitation of the second applies only to the proof of facts imputed to the person extradited by the Requesting State, the allegation of facts on the other issues that do not fall under the concept of "imputed facts" it is imperative that the production of proof be admitted.

10.3.  The parameters indicated by the appellant regarding this issue refer once again to article 35 of the Constitution, namely its numbers 6, 7 and 9, and to number 1 of article 22. As discussed above, the Constitutional Court does not consider that the guarantees reserved for defendants in Article 35 of the Constitution are formally applicable to the extradited person, who is constitutionally and legally, regardless of a common core of protection, subject to a different and proper regime. In this sense, what may be at issue is the other constitutional provision that the appellant himself indicates, paragraph 1 of article 22 of the Constitution, which, insofar as it includes a principle of fair process, is projected on any form of process, imposing, given the nature of each one and the stage where it is to be applied, the guarantees that refer to this conception of justice of the process, where the right of defence is clearly housed, including, in this case, also the guarantee to the adversary system. However, as mentioned above, in the understanding of the Constitutional Court, given that it is not a situation in which the State of Cape Verde itself imputes a crime to a person, the defence does not have to be conceived as broad, but as an effective and adequate defence to a type of process that, which may lead to a criminal conviction or criminal execution and consequent loss of freedom of a person, in the requested country is intended only to verify whether the positive and negative conditions of form and substance, provided for by the Constitution and by the Law to grant extradition are fulfilled, before authorizing it.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

10.4. There is no doubt that a rule that prevents an extradited person from proving certain facts affects his guarantee of effective defence. However, this does not necessarily result from the unconstitutionality of such a legislative measure, considering that practically all rights, namely those that assume the nature of procedural guarantees, are subject to limitation or deviations as long as there is a legitimate purpose for such and as long as they comply with the essential conditions that justify its assignment (*Judgment 29/2019, of August 16, Arlindo Teixeira v. STJ, referring to the rule provided for by number 1 of article 2 of Law No. 84/VI/2005, referring to the principle of holding public hearings in the courts, and the guarantee of public hearing in criminal proceedings, as well as guarantees to a due process, adversarial principle and full defence*, 7.2).

10.4.1. In this case, we are faced with a traditional norm of the legal regime of extradition, which, ultimately, derives from the extradition process model that the legislator adopted in Cape Verde and which the Supreme Court of Justice has sagely designated as limited or of Belgian model. In its terms, anchoring on the premise that a criminal proceeding is not being promoted in the Respondent State to determine the guilt of a person, but merely a judgment to verify the conditions that enable the provision of international judicial cooperation through extradition are present, it would not even be up to investigate the criminally relevant facts that are imputed to the extradited. Even because these, if extradition is granted, will be subject to consideration in the competent courts of the Requesting State.

10.4.2. The legislator's options for such a model can be easily inventoried from a structural point of view once it is considered that its adoption is common in countries with a Roman-Germanic legal tradition, such as ours. But also arising from more systemic reasons to avoid proceeding with a mini-trial of the case pending in the Court of the Requesting State for preliminary determination of evidence of the guilt of an extradited person based on the analysis of facts that occurred in that country or about which has jurisdiction, whose typification would also require an in-depth analysis of a legal system with which it is not familiar, and which could, ultimately, lead to a violation of the principle of *ne bis in idem*. And also, for pragmatic reasons, to favour a speedy extradition process



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

that allows the State to provide effective international judicial cooperation in criminal matters; In this sense, the legislative option in question is so radically linked to the model that it would probably be necessary to change the entire process to accommodate any solution that would allow the direct discussion of these facts, namely regarding the entities authorized to intervene in the process, at the time of the process and consequently the term of provisional detention, and eventually adopt another model of extradition process.

10.4.3. When verifying these reasons justifying the legislative solution in question, there will be no doubt that the legislator could invoke a legitimate interest in limiting the guarantee of defence in extradition proceedings. However, this would certainly not be enough, considering that the constitutional compliance of such a measure would depend on being able to adapt it to the criteria of restriction of rights provided for in paragraphs 4 and 5 of article 17 of the Constitution of the Republic.

10.5. In this regard, the Constitutional Court understands that since the rule in question has a general and abstract character and does not produce any retroactive effect, the fundamental question is whether it reduces the extent of the essential core of the law or, alternatively, it is disproportionate.

10.5.1. Regarding the first item, noting that the purpose of the extradition process, as clearly prescribed by number 3 of article 46 of the Law on International Judicial Cooperation in Criminal Matters, is to decide on the granting of extradition based on its conditions in substance and in form and not exactly to determine the guilt of the extradited person. Allowing the extradited person to claim and provide evidence on any issue that does not refer to the concept of facts imputed by the Requesting State, is far from reaching the essential core of its right to defence, since it can do so in relation to anyone that refers to the discussion on the origin of the background conditions and form of granting the extradition.

10.5.2. For the same reasons, it would hardly be promising to verify the fulfilment of the proportionality requirement, since, according to the test that the Constitutional Court of Cape Verde has been applying since the aforementioned



*Judgment 7/2016 of 21 April 21*, Rapporteur: JC Pina Delgado, 4.3.2, the legislative measure is suitable, as it allows to achieve the objective that comes with it of not discussing the facts that are imputed to the appellant because they demand more procedural time, as they lead the courts to consider aspects of foreign law that naturally do not dominate and by anticipating a determination which will in any case be made by the Requesting State; it is, moreover, necessary because there would be no less restrictive means that would allow this precise end to be adequately achieved; finally, it is balanced, considering that being available to the extradited person to provide evidence on any other issue involving the extradition process, in relation to the facts attributed to him/her, he will still be able to provide evidence in the courts of the Requesting State in accordance with the procedural rules applicable, which, in any case, must correspond to the requirements of due legal process under the terms of paragraph a) number 1 of article 6 of the Law on International Judicial Cooperation in Criminal Matters.

10.6. For these reasons, the rule arising from number 2 of article 55 and the final part of number 3 of article 46 of the Law on International Judicial Cooperation in Criminal Matters, according to which *The extradited person has the right to file an opposition, but, despite the requirement for due diligence of testimonial evidence, he can only base this on the fact that he is not the person claimed or that the assumptions of extradition are not met,* is not inconsistent with the Constitution, and should not be declared as such.

**11. Hypothetical rule arising from article 56, second paragraph, of the Law on Judicial Cooperation, according to which the** *processing of the passive extradition process does not require that the judgment in the Appeal, as a court of first instance and not a court of appeal, be made at a hearing, but in chambers, as the law does not determine, either directly or indirectly, that the extradited person be heard at a second hearing before the judge***, does not comply with the Constitution due to incompatibility with the principle of holding public hearings in courts and with the principle of fair and equitable process.**

11.1. The appellant raised this issue, namely, in his appeal to the Supreme Court of Justice against Judgment No. 48/20-21, of January 4, handed down by the Barlavento Court of Appeal of Barlavento. There it states in the conclusion kk) that "*In relation to the*

*hearing provided for in article 56 of the LCJ, the hearing of the extradited person was not held, which is mandatory and essential in the judicial process of extradition".* Previously, at the conclusion point designated as ii) it also indicates that *"the violation of the rules on the hearing and personal notification of the Appellant provided for in articles 54, 55 and 56 of the LCJ as practiced by the Appellate Court violates the constitutional and legal principle of the adversary system…".*

12/09/2021
DOC-07635166

144

11.2. Cutting out what is relevant for the purposes of this measurement of non-compliance with standards, the appellant focuses on considerations about the right of an accused to be heard, as currently, as he reports, has happened in Portugal, when due diligence is required, also within the spirit of the CPP. In this case, the appellant requested evidence and requested the addition of a document, making it necessary, therefore, for a public hearing to be held, which was not carried out by the Court. He also discusses the extradition process and its phases, and in the judicial phase, the appellant's hearing would take place. Denying evidence, namely the hearing, after the promotion of the judicial phase of the process, based on a previous hearing in the administrative phase, would violate paragraphs a) and b) of paragraph 1 of article 77 of the Code of Criminal Procedure, which would implement norms of constitutional law and international human rights law. He cites jurisprudence of the Constitutional Court regarding the right to be heard and for a hearing provided for by Article 35, and also national doctrine. The non-hearing of the extradited person, especially considering his request to give evidence, based on the urgency of delivering the extradited person to the requesting State would be a violation of several of the rights he holds.

11.3. The Public Prosecutor's Office, in its counter-claim, argues that it is wrong to extradite him, since *"the rule under scrutiny is clear in not requiring the hearing of the extradited person in a hearing, for the second time, and that such interpretation does not violate any constitutional rule or principle."* To support his thesis, the Honourable Attorney General of the Republic decided to cite an example of the Portuguese jurisprudence of the Constitutional Court regarding the extradition process whose normative regime inspired Cape Verdean legislation. Thus, he cited Judgment No. 192/1985, in which it is clearly stated that: *" In the extradition process, there is no place for discussion and a trial hearing: the evidence, although produced with the intervention of the extradited person, his lawyer or*



*defender, and the Public Prosecutor's Office – therefore in compliance with the adversarial rule,
is not at a hearing; the decision is taken in chambers -, as it happened, whenever this falls to a
collective court."*

11.4. The Supreme Court of Justice, through Judgment 28/2021, of 16 March, regarding
the alleged omission of a hearing, considered that the matter had been the object of consideration
and decision previously by the same jurisdictional body and that, for reasons of economy
procedural, would limit itself to referring to its position contained in Judgment No. 57/2020. The
content of the considerations then made is literally as follows: "*for what has already been said,
the first reason invoked to support the violation of the adversarial principle - the decision-making
without hearing the Appellant - does not appear to be well founded. It is effectively an
uncontroversial fact that the Appellant was heard, under the terms established by law, and had
the opportunity to present his opposition to the extradition request in writing."* He concluded by
saying that "*the law neither directly nor indirectly imposes that the extradited person be heard in
person."*

11.5. The appellant presented articles 32, No, 4, 35, Nos. 6, 7 and 9, 211, No. 4, of the
Constitution as constitutional precepts where the normative parameters to assess the
constitutionality of the hypothetical rule that he constructed would be housed. For the petitioner,
the extradition process is a kind of criminal procedure to which all the principles provided for in
the Criminal Procedure Constitution and the Code of Criminal Procedure should be applied.

However, the understanding of this Court is that not all criminal procedural principles are
applicable to the extradition process, since, starting partially from the same basis, these two types
of process are considered different processes and that also denote different regimes. Therefore, it
is considered that the guarantees arising from article 22 of the Constitution on access to justice
should be applied to the extradition process, especially the guarantee of a fair and equitable process
that covers several important procedural rights, including defence, to the adversary and to the
audience.



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

145

The present case calls for the following question to be asked: is it possible to restrict the rights, freedoms and guarantees that have been recognized as applicable to the extradition process?

The answer is, in general, in the affirmative, as the following guidelines contained in Judgment No. 29/2019, 30 July, 2019 must be invoked:

"*7.2. Before proceeding with the analysis of the concrete case sub judice, in order to ascertain whether the rule applied by the egregious praetorium defendant is incompatible with the Constitution, one more essential element must be brought to the fore. This is an issue that the Court has always discussed and that revolves around the possibility or not of limiting rights, freedoms and guarantees. The Constitutional Court has considered that situations in which a right, freedom and guarantee could not be affected would be very rare, thus leaning towards accepting the idea that these legal positions would have a relative character and could be limited, especially through of the restriction, when certain conditions are met, principally those provided for in paragraphs 4 and 5 of article 17 of the Constitution of the Republic.*"

The same decision deepened the reasoning in the sense of being able to limit these rights, freedoms and guarantees, since there is a constitutional provision for the restriction, as article 22 refers the regulation of rights derived from the principle of access to justice to the Law. However, even if that were not the case, by their nature, they are relative rights that would always have to be limited in some way, with a view to ensuring the exercise of other fundamental rights.

11.6. If in general it is recognized that there is enough constitutional credential to operate restrictions to rights, freedoms and guarantees such as those attributed to the extradited person, in this specific case, there are specific reasons to defend that Law No. 6/VIII/2011 of 29 of August, which establishes the principles governing International Judicial Cooperation in Criminal Matters, restricted certain rights, freedoms and guarantees applicable to the extradition process.



146

A The rule applied by the Supreme Court of Justice from which the hypothetical rule under examination was constructed follows from the provisions of article 56 (**Production of evidence**) of Law No. 6/VIII/2011 of 29 August:

*1. The steps that have been requested and those that the reporting judge deems necessary, namely, to decide on the fate of the seized items, must be carried out within a maximum period of 15 days, with the presence of the extradited person, the lawyer or lawyer appointed, and the interpreter, if necessary, as well as the Public Prosecutor's Office.*

*2. Once the production of evidence is finished, the Public Prosecutor's Office, the defender or the lawyer of the extradited person will, in turn, view the process for five days, for pleadings.*

If one interprets the norms provided for in article 56 of the Law on International Cooperation in Criminal Matters, starting, as it should, from the text, one cannot fail to agree with the Supreme Court of Justice when it asserts that "the law does not impose either directly or indirectly that the extradited person be *heard at a second hearing before the judge"*.

11.7. However, the rule applied by the Supreme Court of Justice and the hypothetical rule constructed by the appellant cannot be evaluated outside the specific context of the extradition process, and without taking into account, in particular, the right to fair and fair trial, the rights of defence , the contradictory and the audience.

In this sense, the hypothetical rule in question must be analysed in the specific context of an extradition procedure that was considered, first, by the Court of Appeal as a Court of First Instance; second, by the Supreme Court of Justice as a Court of Appeal whose cognitive power is limited by the conclusions of the appeal and by the Constitutional Court, which, as a court of appeal restricted to the question of unconstitutionality, also cannot distance itself from the pretext process in which the standard was applied.

The hypothetical norm according to which *the processing of the passive extradition process does not require the judgment in the Court of Appeal, as a court of*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

*first instance and not court of appeal to be done in a hearing, but in chambers, as the law does not determine, either directly or indirectly, that the extradited person be heard in a second hearing before the judge,* this is associated with the previous question in relation to which the Constitutional Court took a position in the sense that the option for the model in which the production of evidence is not admitted except in relation to the identity of the extradited person and the assumptions of extradition is not unconstitutional. Therefore, the non-acceptance of the production of evidence regarding the facts that the Requesting State imputes to the extradited person, according to the so-called Belgian model, does not violate the Constitution, since it is a legitimate, adequate and proportional restriction.

The decision that decreed the extradition was not preceded by a second hearing or, from the appellant's perspective, it was not preceded by a hearing that should be public, because, according to the Court of Appeal of Barlavento, Judgment No. 57/2020, issued by the Supreme Court of Justice, which recognized that there had been an omission of pronouncement attributable to the Court of Second Instance with jurisdiction over the Barlavento area, as it did not rule on the request to hear the witnesses, did not constitute any nullity, having qualified the aforementioned omission as a mere irregularity that should be challenged within three days from the date on which the first Judgment was notified. And that having raised the issue only at the time he filed an appeal, he considered that the extradited person had allowed the right to do so forfeited. The Court of Appeal of Barlavento understood that if it had carried out the questioning of those witnesses, after the Supreme Court of Justice had ruled definitively on this matter, it would be violating the principle of intangibility of res judicata.

Therefore, the rule of paragraph 2 of article 56 of the Law on International Judicial Cooperation in Criminal Matters that the Supreme Court applied was based on the fact that no evidence had been produced, for reasons attributable to the appellant. Therefore, a second hearing was not warranted.

Based on this understanding, it is inferred that in cases where there is production of evidence on the identity of the extradited person and/or on the assumptions of extradition, the hearing of the extradited person for the second time and in a hearing is not excluded.



148

The holding of the hearing, which translates into the hearing of the extradited person for the second time, only occurs when the evidence required by the extradited person and authorized by the judge is carried out.

In a swift process, in which it is not disputed whether the extradited person committed or not the crime for which he is sought by the Requesting State, in a model in which it was expressly established that the production of evidence has a restricted scope, it is clear that the performance is not justified. of audience in the void.

11.8 It is now important to verify whether the hypothetical norm constructed by the appellant, according to which it is now important to verify whether the hypothetical norm constructed by the appellant, according to which *the processing of the passive extradition process does not require the judgment in the Court of Appeal, as a court of first instance and not court of appeal to be done in a hearing, but in chambers, as the law does not determine, either directly or indirectly, that the extradited person be heard in a second hearing before the judge,* would be inconsistent with the Constitution, for violating the principle of fair and equitable process.

Regarding the right to a fair trial, the Constitutional Court, through Judgment 15/2017, of July 26, Rapporteur: JC Pina Delgado, published in the Official Gazette, Series I, No. 35, 6 June, 2018, pp. 844-856 and in the Collection of Decisions of the Constitutional Court of Cape Verde, Praia, INCV, 2018 (2017), v. IV, pp. 137-176, considered that *the right to a fair trial is associated with the effectiveness of the means of defence of rights, with a concrete projection on (..) the time reserved for it, in addition to other dimensions such as equality of arms, the recognition of prerogative to exercise the adversary system, as well as to obtain a duly substantiated decision by judicial bodies composed of impartial judges. If such dimensions are inherent to it, it cannot be forgotten that this is a right that is already rationalized by the constituent legislator, precisely because it foresees the need to keep it balanced against opposing rights and the legitimate interests of the State in the matter. administration of justice. That is why the expression "equitable" is used, in the right proportion, equivalent, already including a clear nature of measurement.*

*[..]*



*As a similar right, freedom and guarantee, the structure of the right to a fair trial has implications for how it can be legally complied with, namely in the context of restrictions imposed by the legislature."*

It is now recognized by the doctrine that the constitutional guarantee of a fair process does not eliminate or remove the legislator's freedom to conform the process, imposing, however, that the regulatory framework of the process assures interested parties effective means of defending their rights or legally protected interests and parity between the parties in a lawsuit. Thus, a fair process must be understood as postulating the effectiveness of the right of defence in the process, the observance of the adversarial principle and the equality of arms, as well as the equality of arms referred to above.

11.9.  As for the right to an adversary proceeding, which, as stated, is a natural consequence of the right to a fair trial, since the process will never be fair, in criminal proceedings, if the defendant is not recognized the procedural opportunity to counter-claim, if so understand, and by the means it deems pertinent, the accusation against him in its various dimensions, the Court, in the context of the Alexandre Borges v. SCJ, Judgment No. 24/2018, of 13 November, Rapporteur: JC Pina Delgado, understood that "*the opportunities to exercise it derive, as already pointed out, from the Constitution of the Republic, as a subjective right emerging from the right to a fair trial provided for in its number 1 of article 22, are further increased in the case of sanctioning processes - in light of the number 6 of article 35, which provides that "The criminal procedure has a basically accusatory structure, with the instructive acts determined by the law, the indictment, the trial hearing and the appeal being submitted to the adversarial principle*".

The adversarial principle, when applied to the extradition process, thus has an instrumental vocation for the realization of the right of defence and the principle of equality of arms: from a procedural perspective, it means that no decision can be taken that affects the extradited person without be given the opportunity to speak out; in terms of equality of arms in the administration of evidence, it means that any of the interested procedural subjects, namely the one sought by the Requiring State,



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

150

must be able to summon and question witnesses about their identity and the requirements of extradition.

Reverting to the case before us, the principle of adversary proceedings is fulfilled, and the extradited person was heard at the time the law imposes it, filed opposition to the extradition request, presented documents, requested the hearing of witnesses, which was not carried out by reasons that, under the terms of the decisions of the competent courts, are attributable to it. In other words, it was always granted the right to exercise an adversarial position on the position of the Public Prosecutor's Office, having made its pronouncement after the interventions of the interested party. Therefore, the adversarial principle proves to be duly assured.

11.10. It is now necessary to verify whether the rule applied by the Supreme Court of Justice violates the principle of public hearing.

First of all, it must be said that the idea of public judgment corresponds to a democratic principle and transparency of justice that strengthens the trust that citizens have in judicial institutions. But this principle must be put into perspective when it comes to the extradition process.

Judgment No. 29/2019, of 30 July, established the following guidance on the hearing in the courts:

*"The first constitutional provision, contained in title V of Part IV, relating to the judiciary, has the stipulation that "4. Court hearings are public, unless otherwise decided by the Court, duly substantiated and issued under the law of procedure, to safeguard the dignity of people, the privacy of private life and public morals, as well as to guarantee its normal functioning" Its essential nature is not a fundamental right in kind that can be appropriated individually by the person who becomes its holder. It is, in fact, an objective principle arising from the constitutional concept of the rule of law, and which integrates the country's Judicial Constitution, embracing one of the main dimensions of publicity in criminal proceedings, according to which criminal proceedings must, on the one side, be*



*transparent, and on the other, allow the participation and monitoring of interested parties and the general public*"

It should be noted that the Constitutional Court did not hesitate to consider that this is an objective principle arising from the constitutional concept of the Rule of Law.

The same decision, in relation to the rule contained in no. 9 of article 35 of the Constitution, considered that the holding of a trial in a public hearing in criminal proceedings is a subjective right of the accused, *to the extent that the constitutional legislator enshrined it alongside other important criminal procedural guarantees, precisely because it wanted to strengthen the defendant's defence guarantees and ensure that the trial in criminal proceedings can be publicly controlled by all who - in theory can always attend it and make the assessments they understand about it – in order to check whether it was carried out with transparency and impartiality. Here, not because of social and popular interest in the monitoring of justice, but as a presupposition of guarantee of fair process and impartial performance of the Court and the precaution against any inadequate handling of the judicial system that could affect the rights and interests of any defendant.*

The decision, after having recognized that the defendant has the right to have his case tried at a public hearing, did not fail to recognize that, by its nature, the right to a public hearing is not absolute.

11.11.  However, since the person being extradited is not an accused, it is doubtful that the rights, freedoms and guarantees reserved to the accused can be fully applied to him.

In the present case, similarly to the exercise carried out in relation to other rules whose unconstitutionality was raised, there are reasons to believe that the law that regulates the extradition process has restricted certain rights as they are incompatible with the nature of this procedural type.

It is understood, therefore, that the Law on International Judicial Cooperation in Criminal Matters does not provide that the decision on extradition has to be taken at a public hearing when there is no place for the production of evidence.



The extradition process is marked by special speed aimed both at safeguarding the rights of the extradited person and at realizing the public interest in providing international cooperation.

There is authorization to restrict and there is no discussion on the general and abstract nature of the applied rule, not being able to attribute retroactive effects to it, not reaching the essential core of the right of hearing, which is safeguarded in cases where there is authorization for the production of the evidence, showing the measure as suitable and adequate to satisfy the public interest of providing international judicial cooperation, being a necessary and balanced measure, it cannot be considered disproportionate and incompatible with the principle of hearing. On the other hand, it does not follow from the Constitution, the Law on International Judicial Cooperation in Criminal Matters or the Code of Criminal Procedure that the decision itself, that is, the deliberation on extradition, has to be taken in a hearing and not in a conference, as the applicant seems to suggest.

This is the guidance that is extracted from the following excerpt of Judgment No. 29/2019, of July 30: "*For in relation to this, the applicable legislation, in addition to providing that it takes place in a conference, does not oblige the Court to present the result thereof - the judgment, therefore, in the strict sense - in a public manner.*"

11.12.   In these terms, the hypothetical rule arising from paragraph 2 of article 56 of the Law on Judicial Cooperation, according to which the procedure for passive extradition *does not impose that the Judgment on the Relationship*, as a court of first instance and not a court of appeal, *be done in hearing*, but as a full-bench, insofar as the law neither directly nor indirectly determines that the extradited person be heard in a second hearing before the judge, it is not inconsistent with the Constitution, as it does not violate the principle of fair and equitable process, of adversarial proceedings, nor the holding of a hearing in an extradition process, when there is no place for the production of evidence.

**12. Hypothetical norm arising from *articles 15, number 4, and articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with a decision of the ECWA-TJ*, that the Supreme Court of Justice refused to apply, considering**



that for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and ratified, Cape Verde not having signed the protocols that recognize the competence of the ECOWAS Court of Justice in terms of human rights and since it is not a supranational organization for the purposes of paragraph 3 of article 12 of the Constitution, it does not comply with the Constitution for violating the principle of sovereignty, constitutional rules on the binding of the State of Cape Verde to treaties and the principle according to which it is not may deprive the courts of their jurisdiction.

12.1.  Regarding the substance, the allegations presented,

12.1.1.  On the part of the appellant, it is pointed out that the appealed judicial body did not apply a rule resulting from articles 15, number 4, and articles 34, 89 and 90 of the Constitutive Treaty of ECOWAS and the Protocols referring to the Court of Justice of 1991 and 2005, which, binding Cape Verde, would oblige the country to comply with the decisions taken by the body of that community, using the argument that for a treaty to have full effectiveness it must be signed and ratified and, not being that supranational organization, they could not be incorporated from number 3 of the article 12, and because it would not comply with the national sovereignty clause of Cape Verde's Basic Law.

But, as the appellant argues, such an understanding would suffer from some problems, as, in its reading, above all, ECOWAS, having a parliament, an executive body and a court would be a supranational organization, hence its legal acts , namely the decisions of the Conference, would be incorporated directly through the mechanism established by paragraph 3 of article 12 of the Constitution. In addition, according to him, Cape Verde's position is dubious, as it appoints judges to the Court and participates in proceedings, but after being defeated, he alleges lack of jurisdiction. Furthermore, he understands that the decisions of the ECOWAS Court of Justice are binding and must be complied with by the Member States without these being able to appeal to the argument of non-domestication of its rules to avoid its execution, as, moreover, it has understood its  jurisprudence of the Regional Praetorium.



Assuming that ratification would be necessary, the fact that the Protocol enters into force provisionally under the terms of number 1 of article 11, would lead to the irrelevance of that other binding act. Finally, it would be justified to apply the decision as a matter of human rights, by the imposition of compliance resulting from the 1991 Protocol, by the effects of ratification and signature ignored by the appealed judicial body and the form of binding to the ECOWAS treaties concerned, by the vast jurisprudence of the ECW-JWT on these issues and by principles of international law that would impose their observance, namely the primacy of international law over domestic law, the essentiality of signature and ratification, and the extensive application the principle of good faith and the extensive application of the *pacta sunt servanda* principle. I should also add that the State disregards the principle of *estoppel* and the jurisdiction arising from the situation of *forum prorogatum* that it describes.

12.1.2.  In turn, the Public Prosecutor's Office considered that the issue had been misplaced, not least because the Cape Verdean system would not be able to scrutinize the constitutionality of international norms relating to this organization, as the unconstitutionality of norms of domestic law and non-standards arising from the interpretation and application of Public International Law.

12.2.  In the part that includes the contested segment of this part, the Supreme Court of Justice develops an articulated guideline, according to which, as this Constitutional Court understood it, the fundamental reason that determines its conclusion of unconstitutionality due to non-compliance between the constructed hypothetical rule by the appellant and the constitutional principle of national sovereignty would result from the fact that it is intended that the State of Cape Verde, and, therefore, its courts, are bound to comply with an international norm attributing jurisdiction to a regional court to which the State did not consent and consequently, was not incorporated into the domestic legal system, because neither the State signed the Protocol that provides for it, nor is ECOWAS a supranational organization.

12.3.  The question that the Public Prosecutor's Office brings to judgment makes some sense, since the hypothetical rule that the Supreme Court of Justice refused to apply for reasons of unconstitutionality is elaborated by the appellant partially from rules whose construction depends on two treaties on which they hang doubts bine Cape Verde



internationally and whether they have been incorporated into domestic law, namely the 1991 and 2005 Protocols relating to the ECOWAS Court of Justice. And this is the primary issue that precedes the determination of the unconstitutionality raised, as it is necessary to verify whether the hypothetical rule constructed depends on the application of treaties that are not incorporated into the internal law of the Republic of Cape Verde. And this issue is essential even to know the problem raised by material unconstitutionality due to non- compliance with a rule that the Supreme Court of Justice has defied with the principle of national sovereignty.

12.3.1. From an analysis of the treaties in question, it is easily demonstrated that the ECOWAS Revised Treaty of 1993 binds Cape Verde – which had already become a member of the organization in 1979 – as it was duly ratified by the authorities of the Republic, in accordance with the procedures established by the Constitution. of Cape Verde 1992, published in the *Official Gazette* (Series I, No. 37, Sup., of 3 November, 1995, pp. 2-47), being also in force in the international sphere. Therefore, in this sense, the invoked article 15, number 4 - which defines the obligation to comply with the decisions of the ECOWAS Court of Justice, by the Member States, by the Community Institutions and by natural and legal persons - article 34 - which regulates the Community tourism policy, brought up here perhaps by mistake – article 89 – according to which the revised treaty and the protocols which form part of it will enter into force after its ratification by at least nine Member States in accordance with the norms constitutional provisions of each signatory State - and, finally, article 90 - under which any State may submit proposals for the purpose of amending or revising the "present treaty", establishing the competences and procedures in this matter - considered in itself , bind the State of Cape Verde and were duly domesticated under the terms of number 2 of article 12 of the Basic Law of the Republic.

12.3.2. The 1991 Protocol on the ECOWAS Court of Justice, which gave it certain powers in matters of interpretation of the Treaty or the resolution of disputes between Member States, including those involving their nationals, provided that the State takes action, or between these and the institutions of the Community, also recognizing the procedural legitimacy of the Conference, it was signed by the then Prime Minister Carlos Veiga, but it was not ratified or published in the *Official Gazette*,



its official edition in a foreign language can only be found in the official journal of the Community (see 19, July 1991, p. 4 ff.). From an International Law point of view, foreseeing this treaty in article 34 that it would enter into force provisionally when signed by the signatory Member States, there will be no doubt that, from an international point of view, it binds Cape Verde. Although the issue of non-publication may be transferred to the new constitutional order erected from 1992 onwards as a presupposition for the internal incorporation of the rules of this Protocol, which can be assessed on a case-by-case basis, and that any material unconstitutionalities that the treaty may always carry be measured for the strict purposes of assessing the conformity of international binding, it is not relevant to analyse whether the signature was promoted by a constitutionally competent authority in light of the 1980 Constitution or not and in accordance with the procedures provided for therein.

12.3.3.  Unlike the case of the 2005 Protocol, which, due to its date, falls under the regime of binding the State of Cape Verde to treaties enshrined in the 1992 Constitution. ECOWAS Official Journal, v. 46, January 2005, p. 3 et seq., although not translated into Portuguese. As can be seen from this publication, and from information provided by the Cape Verdean chancellery, this country never signed and, for obvious reasons, ratified this treaty. From the analysis of the official newspaper of this Republic, namely the I Series of the Official Gazette, neither can the parliamentary approval to ratify nor the publication of its text can be identified. However, the appellant considers that ratification in this case, on the one hand, would not be necessary, since the treaty began to be applied provisionally between the Member States in its terms, and, on the other, because Cape Verde through its subsequent conduct was linked to it by virtue of the *estoppel*, issues that will be addressed further on.

12.3.4. It is both the individual effects of these precepts and protocols, as well as their conjugation, that the necessarily hypothetical norm is inferred that the appellant proposed to the appealed court, as in their construction they would determine the binding of Cape Verde to a duty to compliance with decisions of the ECOWAS Court of Justice, which corresponds to the hypothetical norm disapplied by the Supreme Court of Justice for reasons of unconstitutionality. Therefore, determining that this Constitutional Court verify that, first,



Cape Verde is bound by the Protocol of 2005 concerning the ECOWAS Court of Justice, despite not having expressly signed or ratified it, either because an implicit signature situation occurred, or because it was bound to its provisional application under the terms of the treaty itself, or because it is bound by reason for the application of the estoppel institute, or because this would result from the situation of forum prorogatum in which it will have been placed. And, second, if it is not possible to conclude that it is bound tout court to the 2005 Protocol, whether it would not result from the combined application of the 1993 Revised Treaty and the 1991 Protocol, which would bind the State of Cape Verde.

12.4. Before going into this specific discussion, it should be said that for the Constitutional Court, the central issue to be discussed from the point of view of the internal mechanism of incorporation of these norms does not have to do directly with number 3 of article 12, but essentially with its number 2.

12.4.1. As a whole, article 12 must be analysed in accordance with the purposes collimated by the constituent legislator to establish mechanisms for the incorporation of international norms from various sources of International Law, namely the two main ones, customary (number 1) and conventional (number 2). Therefore, when number 3 is interpreted, it is also in the sense that it is providing for a mechanism for incorporation, this time of normative acts of international organizations (*Judgment 30/2019, of 30 August (AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights of defence, the adversary system and access to the evidence of the prosecution)*, Rep: JC Pina Delgado, 6.5.1). Therefore, the term 'legal act' must, from the reading that is imposed due to the purposes of the provision, be read as a normative act.

12.4.2. Regarding Cape Verde's link in this way, not even the issue of supranationality seems decisive, but rather, it is more decisive to verify whether the 2005 Protocol is a normative act and whether it is expected to have a direct effect on the legal order of the States. It is not understood that any of these requirements are present, as a glance at the 2005 Protocol is enough to reach the conclusion that you are faced with a conventional instrument approved not on behalf of the Conference as a normative act of its collective competence as an International Integration Organization, but by the "High



Contracting Parties" gathered together and that they have agreed to amend a treaty, with specific treaty language, namely modifying and amending, depositing, registering with the African Union, the United Nations and such other Organizations as the Council determines. As such duly distinguished by the ECOWAS official journal itself as a protocol and not a decision of the Conference. It does not seem, therefore, to this Court that it is relevant to ask any question about the possible application of number 3 of article 12 of the Constitution, which establishes the constitutional mechanism for the incorporation of normative acts of international organizations. On the contrary, the issue must be seen in the light of number 2 of article 12 of the Constitution of the Republic, modelled to regulate the conditions for receiving conventional norms in the domestic legal system.

12.4.3. On the other hand, the Constitutional Court does not consider that the Economic Community of West African States can automatically be classified as a supranational organization because it has, as the appellant develops, a parliament, a legislative body, a Government, executive bodies, and an organ of the judiciary, the Court of Justice itself. There are several other international organizations that have all these bodies, and it would be inappropriate to classify them as supranational organizations, first of all the African Union itself and other subregional projects. At most, it would follow that they would be regional integration organizations, with no inseparable relationship between a regional integration organization and a supranational organization, and the former may perfectly give that it is marked, as it is, by an implementation project and associated with the principle of gradualism and verticalization of integration, not immediately reaching the stage of supranationality – which is more likely – or never reaching it due to the lack of will of the States or material difficulties in its implementation.

In fact, by the nature of things, if one can even consider that a supranational organization emerges from a regional integration project, it will always be the last stage of a consolidated and successful regional integration project, which we have to find out if a case, through the analysis of its norms and institutional practices that characterize it. Although in this process of densification of regional integration, entities may gradually reveal certain elements of supranationality, their classification as a supranational organization depends on cumulatively presenting characteristics such as a) recognition by Member States of the primacy



of community law created by the entity's bodies over domestic law; b) the clear definition of the competences that the Community and its institutions exercise on behalf of and by delegation of States; c) the direct effect of its normative acts on these matters within the legal order of each of these Member States. The issue of institutional structure seems to this Court to be only complementary and instrumental to these characteristics, but, in any relevant case, in the strict perspective of reflecting them formally and materially, as the executive bodies have specific decision-making powers on community matters, the parliament has effective legislative powers, and the judicial body receives jurisdiction over the bulk of matters that fall within ECOWAS competences.

Given these criteria, it is very difficult, at the present stage of development, to consider ECOWAS to be a supranational organization, an epithet which, at this moment, seems, at this stage of comparative regional institutional evolution, to apply only to the European Union. The West African entity will aim, like any regional integration organization, to reach such a stage, but it is still far from achieving it, with Member States still almost as entrenched in essential aspects of their sovereignty as before, already in the framework normative and even more in its concrete practices. As, moreover, they accept authors sympathetic to the regional integration project as Jerry Ukaigwe, *ECOWAS Law*, Berlin, Springer, 2016, pp. 14-20.

12.4.4.   Even if, by mere hypothesis, ECOWAS were a supranational organization, it would pose the same problem highlighted by the Illustrious Supreme Court of Justice. For the concrete purposes of Cape Verde, which is of interest in this case, there has always been a posture of rejection of linking to any regional integration initiative that reveals a transfer of classic sovereign powers, whether that of maintaining intra-regional order by not linking to the Protocol establishing the ECOWAS Mechanism for the Prevention, Management, Resolution of Conflicts, Maintenance of Peace and Security (published in the *Official Journal of the ECOWAS*, v. 37, December 1999, p. 12 and ff.), either that which, in addition to this, adopted certain substantive community values in matters of democracy and good governance (it does not appear to be published in the official ECOWAS journal), or that which changed the regime of acts provided for in the Constitutive Treaty ( published in the *Official Journal of the ECOWAS*, v. 49, June 2006, p. 21 et seq.,) or what expanded the powers of the Court of Justice in



2005, particularly relevant in this case, as already discussed. Moreover, if one checks correctly, from the list of ECOWAS instruments to which the country is bound, regardless of political speeches, it is easy to conclude that they focus essentially on economic integration and are directly related.

12.4.5. Be that as it may, even if it were a normative act of an international organization in the broad sense, the incorporation of this type of standard through number 3 would depend, more than on the nature of the organization, especially on what is provided for in its constitutive convention, to which Cape Verde is bound, that it has the power to issue normative acts, which is attributed direct effect in the domestic legal order, in addition to the need arising from the constitutional principle of publicity of normative acts that are published in Portuguese in the official journal of the organization and/in the Cape Verde Official Gazette (*Judgment 30/2019, of 30 August, AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights of defence, the adversary system and access to the evidence of the prosecution*), Judge: JC Pina Delgado, 6.5.1). In this specific case, Cape Verde, as already mentioned, did not commit to the 2006 Protocol that amended the Revised Treaty, namely its article 9 on the normative acts of the community. Again, it neither signed nor ratified it. Therefore, the only normative acts to which this country would be bound would be those taken by the Conference in light of the original version of that same article 9, which by virtue of the powers provided for in paragraph 1 of article 7, is limited to issuance directives on economic, scientific, technical, cultural and social harmonisation. This is obviously not the case.

12.4.6. Therefore, in the understanding of the Constitutional Court, the discussion promoted regarding the possibility of incorporating the Protocols through number 3 is not relevant, since what is at issue are conventions approved within ECOWAS and not normative acts of bodies of that organization, therefore, as previously considered, referring to number 2 of the same article 12.

12.5. And it involves addressing the elaborate legal theses put forward by the appellant, who, first, seems to extract this linkage from article 15, number 4, of the Revised Treaty, then from article 11 of the 1991 Protocol and, finally, from the direct link to the Protocol of 2005 because it is being applied provisionally, because of the



*estoppel*, in accordance with the application of principles of the International Law of Treaties and by virtue of the *forum prorogatum*.

12.5.1.   The thesis that article 15 of the Revised Treaty would also entail an obligation to comply with judicial decisions does not seem to be supported by reading and analysing the provisions and practices of ECOWAS. First and decisively because its number 2 refers to a protocol - in itself a legal act to which the States should be autonomously bound - the determination of the statute, the process, other  matters relating to the Court, and, above all, the definition of its competences, establishing its jurisdiction, the active and passive procedural legitimacy and other determining issues. Since the Protocol is conceptualized by article 1 as an instrument of application of the Revised Treaty, which has the same legal force as it, the way of approving them  has been strictly the same as that used to approve amendments to the treaty pursuant to article 90, that is, submitting them to the States gathered in a Conference that, as High Contracting Parties, discuss and eventually approve them, following the necessary internal constitutional procedures and the binding by ratification, if they so choose.

Therefore, without it having been the revised treaty to which Cape Verde is a party to define jurisdiction, questions of procedural legitimacy and others, referring to a protocol any obligation to comply with a decision of the Court would always depend on the State's consent to such competences being linked to this protocol that would define them. Accordingly, when paragraph 4 of article 15 provides that such decisions are binding, they are binding on Member States that, through specific binding to a Protocol, chose to submit to the jurisdiction of the Court of Justice and accept the exercise of the powers provided for therein.

Furthermore, as you rightly pointed out, the Supreme Court of Justice, even if such an effect was effectively produced from the Revised Treaty itself, thus granting a blank check so that any changes to the competences of the Court of Justice of the Community could pass to automatically bind the ECOWAS Member State, allowing it, for example, to exercise criminal jurisdiction, would inevitably lead, in the case of Cape Verde, to non- compliance with this normative interpretation of article 15 of the revised treaty with the principle of national sovereignty.



12.5.2. The same is true of the segment of number 2 of article 19 of the 1991 Protocol, which says that the decisions of the Court are immediately enforceable, because, for obvious reasons, according to this norm, they are. However, this does not answer the question of who and what, as it is not intended to define the jurisdiction or jurisdiction of the Court. Thus, when it is said that decisions are immediately enforceable, it is assumed that they are rendered in a situation in which the Court of Justice has jurisdiction over a State and competence in a certain matter in relation to that State. By itself, paragraph 2 of article 19 and the other provisions of the 1991 Protocol do not allow to infer any obligation of compliance by the States that signed it from a decision rendered by the Court of Justice in the framework of an individual complaint for violation of human rights, but only those arising from the powers originally provided for that did not include this matter, extending this duty in the domain under discussion in this process only to the States that also signed the 2005 Protocol.

12.5.3. Thus, from the point of view of International Law, the question refers exclusively to Cape Verde's commitment to the 2005 Protocol, which, according to the thesis put forward by the appellant, would result both from the fact that it is being applied provisionally, and from a situation of estoppel has been generated, as because this would result from certain principles of the International Law of Treaties and because we are facing a situation of *forum prorogatum*.

12.6. The forms of binding a treaty result from what is expressed in the treaty itself as a form of expression of consent, the same occurring with the terms for its entry into force. However, there may be situations in which a treaty may generate obligations and/or begin to apply even before its entry into force. Respective of the duty to refrain from undertaking acts that deprive a treaty of its object or purpose in accordance with the norm recognized by article 18 of the Vienna Convention on the Rights of Treaties between States of 1969 (text published in *United Nations Treaty Series*, v. 1155, 1980, p. 331 et seq.,), and of having to provisionally apply a treaty, as regulated by article 25 of this same legal instrument.



12.6.1. Article 11(2) of the 2005 Protocol on the Court of Justice provides that the manifestation of consent should be made by ratification, thus imposing a more solemn procedure, insofar as it comprises an initial signature in which the State would signal that it would be considering ratification, followed by a later moment in which it would materialize that intention by binding himself to it through this type of act. There will be no doubt that Cape Verde has not ratified this treaty, according to information provided by the national chancellery. Starting from the premise that there was no ratification, nor, at least, what will be consensual, signature, let us say expressly, the binding of Cape Verde would be based on other institutes of International Law.

12.6.2. Because, as the appellant points out, if a treaty provides for its provisional application, it may begin to take effect before it enters into force, in accordance with its terms and the consent of the contracting States. It is indisputable that number 1 of article 11 of the 2005 Protocol provides for its provisional application by stating that it would enter into force provisionally after being signed by the Heads of State and Government.

12.6.3. Even for States that are not party to this instrument, such as the Republic of Cape Verde (see register of States that are bound by this treaty on the page of its depositary, the Secretary-General of the United Nations https://treaties.un.org/doc/Publication/MTDSG/Volume%20II/Chapter%20XXIII/XXII I - 1.en.pdf, without the name of this State), any discussion of provisional application would inevitably depart from Article 25 of the Vienna Convention. First, because it is a rule of customary origin that binds our country regardless of formal binding to the treaty on the reference treaties; second, because it is a fact that Cape Verde at least conducts itself in matters of conventional relations as if most of the norms of the Vienna Convention were mandatory, legitimizing the understanding of the existence of a specific practice and of a conviction that it is mandatory; third, relevant to this acceptance is the reference made in the Revised Treaty to the role of the 1969 Vienna Convention on the Rights of Treaties in determining rights and obligations arising from the ECOWAS Treaty and the Revised Treaty.



12.6.4.   Article 25 of the Vienna Convention which considers the possibility of a treaty being applied provisionally before its entry into force provided the treaty so provides (paragraph a)) or if the States that have participated in the negotiation have otherwise agreed (paragraph b)). Regardless of any theoretical question that may arise regarding the basis of the obligation to comply with a treaty that has not formally entered into force, if the State expressly agrees to apply it even before it enters into force by unequivocally indicating to the others its intention allows such a relationship to be covered by the principle of good faith, insofar as the State that signs a treaty, signalling its intention to become a party. If so, from the point of view of International Law, it would not only be obliged to accept the application of the treaty in accordance with the principle of good faith, but also the customary principle (no longer the conventional one of article 26 of the CVDTE) of *pacta sunt servanda*. Therefore, in principle, nothing prevents a treaty from being provisionally applied to a State that has consented to its application. However, for these same reasons the consent must be unequivocal.

12.6.5.   In relation to the ECOWAS Protocol under discussion, the fact is that Article 11, according to which it enters provisionally into force after being signed by the Heads of State and Government, also includes a rule, according to which the signatory Member States, and ECOWAS commit to start implementing its provisions. Therefore, it is the protocol itself that, at the very least, condition any provisional application to the signing of the agreement by the Heads of State and Government, on the one hand, and the application to the signatory States on the other, when it says, unambiguously, that the "signatory States' Members" undertake to start the implementation of its provisions, showing a clear limitation in relation to the recipient of the norm, as the drafter of the 2005 Protocol instead of using the expression "Member State" deliberately opted for the term "signatory Member State", which can only designate the Member State that has participated, as is its right, in the negotiation of the proposed amendments, and has subsequently signed the Protocol, which was not the case with Cape Verde. Therefore, there is not the slightest basis for interpreting the norm in paragraph 1 of article 11 of the Protocol as imposing an obligation on a Member State that, like this Republic, has not signed it, since it will not have wanted to assume such an obligation. and because the Prime Minister lacks constitutional powers to bind the State of Cape Verde to the provisional application of treaties in this matter.



CERTIFIED TRANSLATION   LANGUAGE REACH
12/09/2021
LRG.07635166

The idea that the provisional application of a treaty would be imposed on a State without an unequivocal expression of will would not be covered by any standard of Conventional or Customary International Law. There is no jurisprudence to support this legal thesis, nor eminent internationalists (see especially Danai Azaria, "Provisional Application of Treaties" in: Duncan Hollis (ed.), *The Oxford Guide to Treaties*, 2. ed., Oxford, OUP, 2020, p. 229 et seq., 233), who dealt with the issue recently considered the possibility that an obligation of provisional application of a treaty could emerge from a situation in which the State does not consent to it, freely expressing its will, being, as stated in one of the main representations of the state of international law in this matter (*Guide to Provisional Application of Treaties. General Commentary* reproduced in *Report of the International Commission*, General Assembly Official Records, Seventieth Session (30 April–1 June and 2 July–10 August 2018), New York, United Nations, 2018, p. 201 et seq.,), a mechanism that States are free to use or not (para. 3) marked by an essentially voluntary nature (para. 5).

The situations in which this question arose, namely in the *Arbitragem sobre a Linha de Ferro do Reno*, Belgium v. Netherlands, of 24 May 2005 decided by the Permanent Court of Arbitration (arbitration report reproduced in *Reports of International Arbitral Awards/Recueil des Sentences Arbitrales*, v. XXVII, New York, United Nations, 2008, pp. 35-125), para. 1, and in Arbitration *Kardassoopoulos v. Georgia*, Case ICSID N. ARB/05/18, *Decision of Jurisdiction* 6 July, para. 83 (*Kardassoopoulos v Georgia*, Decision on jurisdiction, ICSID Case No ARB/05/18, IIC 294 (2007), 6th July 2007, United Nations [UN]; World Bank; International Centre for Settlement of Investment Disputes [ICSID]), these arbitration bodies only exercised jurisdiction arising from a jurisdictional clause because they expressed their consent through a diplomatic note or signature in relation to the provisional application of treaties that provided for it. In fact, in the last report listed, the interpretation of the International Centre for the Settlement of Disputes in Investment Matters of the World Bank regarding the provisional application of treaties was in the sense that the only guideline arising from article 25 of the Vienna Convention is that the States may agree to the provisional application of treaties if they so wished, subject to the conditions they agreed upon, as a general rule of Customary International Law permissive of the

CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

LGG-07635166

166

provisional application without the consent of the States concerned (para. 216).

Even the cited precedent of provisional application of treaties, the arbitral awards roughly referring to the *Yukos* issue heard by the Permanent Court of Arbitration (available as *Yukos Universal Limited v Russian Federation*, Interim Award on Jurisdiction and Admissibility, PCA Case No AA 227, International Investment Claims [IIC] 416 (2009), 30th November 2009, Permanent Court of Arbitration [PCA]); *Veteran Petroleum Limited v Russian Federation*, Interim Award on Jurisdiction and Admissibility, PCA Case No AA 228, IIC 417 (2009), 30th November 2009, Permanent Court of Arbitration [PCA]; *Hulley Enterprises Ltd v Russian Federation*, Interim Award on Jurisdiction and Admissibility, PCA Case No AA 226, IIC 417 (2009), 30th November 2009, Permanent Court of Arbitration [PCA]), based their conclusions that there was jurisdiction in light of the European Energy Charter and in the strict terms of the language used by its article 45 on the fact that Russia had voluntarily signed the treaty and was therefore bound by it for the period between that act and the subsequent notification to the depositary, the Portuguese Republic, that it did not intend to ratify it, which was even challenged by a District Court of the Netherlands, which annulled the awards. (*Russian Federation v Veteran Petroleum Limited and others*, Judgment, Case Nos C/09/477160/HA ZA 15-1, IIC 773 (2016), C/09/447162/HA ZA 15-2, C/09/481619/HA ZA 15-112, 20th April 2016, Netherlands; The Hague; District Court). Although this decision was reversed by the Court of Appeals in The Hague by judgment of 10 February 2020 (decision available in Dutch language on the jurisprudence page of the Kingdom of the Netherlands maintained by the judiciary of that country: https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:GHDHA:2020:234), the fact is that the basis for recognition of jurisdiction continued to be the fact that the Russian Federation signed the European Energy Charter (para. 4.3).

The Constitutional Court does not dispute that the provisional application of a treaty, under international law, may also include provisions for the settlement of disputes and assignment to international judicial, arbitration or judicial bodies. However, as the arbitration awards cited and subsequent decisions taken by Dutch courts make clear, the application of these clauses depends on whether the State has signed or otherwise



consented to with its application, which the Russian Federation did, and Cape Verde didnot.

12.6.6.  Moreover, even if the Protocol provides for the provisional application to a State that has not signed it or has otherwise demonstrated its consent, there would be an illegality in relation to the International Law of Treaties, insofar as this would amount to creating an obligation to a third State in relation to the specific treaty in violation of the principle of *pacta tertiis nec nocent nec prosunt* represented by Articles 34 and 35 of the Vienna Convention which presupposes that he accepts it expressly and in writing.

12.6.7.  In addition to generating insurmountable constitutional problems, since in the Cape Verdean constitutional system founded in 1992, the Government cannot bind the State to treaties related to participation in an international organization and in a domain alluding to the jurisdiction of the courts, therefore with a sovereign nature, even if for the purpose of provisional application, without due approval by the National Assembly, insofar as the matter listed in paragraphs a) and b) of article 179 of the Constitution can be repeated, namely by referring under the terms of the first segment of paragraph d) of article 176 of the jurisdiction of the courts, a matter absolutely reserved to Parliament, a solution expressly established to prevent the Government from having a way of bypassing the Assembly by entering into international agreements on matters within its competence which, later, by virtue of the superior hierarchical position of international standards, as established by number 4 of article 12, would derogate from the rules that in name of the people approved. In this sense, even if Cape Verde had signed an agreement that contains a rule providing for its provisional application, it would, in light of the legal-constitutional system, be null and void for not complying with the rule of the Fundamental Law that subjects these international agreements to parliamentary approval.

Not to mention the complete removal of presidential intervention which, in clear violation of the role reserved for him in this matter as the external representative of the Republic of Cape Verde with express powers to ratify after validly approved international treaties and agreements, would result from such a procedure, resulting from the idea that Cape Verde, in light of its Constitutional Law, could consent to provisional application with a mere act of acceptance promoted by the Government of the Republic. Which, for



for natural reasons, it would not be compatible with the established constitutional procedure of binding a treaty. Because these norms, namely paragraph a) of article 176 of the Magna Carta, would forcefully impose the intervention of the President, who has the free power to consider the international binding of the State and, deciding in this sense, promote it by ratifying or practicing any act accepted by Cape Verdean Constitutional Law and by International Law of externalization of the State's will within the scope of its competences. It is not insignificant, given the circumstances of this challenge of constitutionality, to note that the very possibility of the Constitutional Court being called to pre-emptively inspect a Protocol, even if it depends on an act of the President of the Republic pursuant to paragraph a) of article 278 of the Basic Law, it would be concerned with this procedure, which has the power to remove, with a single act, two political bodies whose participation in the process of binding this type of treaty is unavoidable and even prevent the placement of constitutional doubts that the Head of State may eventually have before allowing it to produce any effect.

What matters is that the legal system has the necessary antidotes to prevent the entry and applicability of rules arising from treaties entered into without the procedural solemnities provided for in the Constitution, precisely because, unlike the others, which, binding the State, are incorporated , these others, insofar as they were not validly approved or ratified, even if hypothetically, would bind the State internationally, are kept outside the Cape Verdean legal system and are inapplicable by the Courts.

Therefore, with the exception of very specific situations, the possibility opened by International Law for States to agree on the provisional application of treaties would hardly be compatible with our constitutional system of international binding of the State. Hence, number 2 of article 12 conditions the incorporation of such acts to: a) the validity of the binding, leading to the imperative need to observe the process provided for by the 1992 Constitution and to ensure the necessary intervention of the competent constitutional bodies; and, b) the entry into force in the domestic order to the entry into force in the international order.

12.6.8.  It is concluded that not only the provisional application of the 2005 Protocol to Cape Verde has no basis in International Law, as it is not possible to identify any time when that State has consented to such application, but also because, even if so were it, due to the organic and formal unconstitutionality that it would generate, it would be inapplicable internally by Cape Verdean courts, especially by the Supreme Court of Justice, as the latter also considered.

12.7.  In turn, regarding the argument that such link would result from the *estoppel* that was generated by the subsequent conduct of the State of Cape Verde, the Constitutional Court considers the following:

12.7.1.   The *estoppel* is a concept developed by common law with some resemblance to the preclusion of continental law, which results in a State being unable to deny the effects of conduct that it undertakes for its benefit and that, generating some expectation in another, induces certain behaviours and causes it harm. It can be accepted that the updated version of the influential Manual of Professor Brownlie (*Brownie's Principles of International Law*, 9th. Ed. Oxford, OUP, 2019, p. 408 by referring to the constituent elements of estoppel to demand a) a clear and unambiguous statement of fact; b) voluntary, unconditional and authorized and that, moreover, c) is considered in good faith to the detriment of the other party or for the benefit of the person making the declaration - inspired by the doctrine of Professor Bowett, "Estoppel Before International Tribunals and Its Relation to Acquiescence", *British Yearbook of International Law*, v. 33, 1957, pp. 176-202, in the sense that a statement of fact must be a) clear and unambiguous, and b) voluntary, unconditional and authoritative, and there must be c) good faith reliance on the statement or to the detriment of another party that relied on it or for the benefit of who pronounced it (pp. 188-197, 202) – still reflects the understanding that States have at this moment. Also because it is very close to one of the most refined manifestations of this concept of Judge Percy Spencer in his explanation of his vote in the *Case Concerning the Temple of Preah Vihear* de 1959 in which he highlighted that the principle operates to prevent a State from challenging before a court a situation contrary to a clear and unequivocal representation it made to another State, expressly or implicitly, in which the other State was, in those circumstances, authorized to count and in fact it counted, and so they were harmed or the State that made it withdrew some benefit or advantage for itself (*Case Concerning the Temple of Preah Vihear* (Cambodia v. Thailand) in: *International*



170

*Court of Justice Reports of Judgments, Advisory Opinions and Orders*, The Hague, ICJ,1962, pp. 141-142).

    12.7.2.   The same International Court of Justice in the decision of *North Sea Continental Shelf Cases* taken on 20 February, 1969, it had already shown the difficulties that exist in claiming that a State can be bound by a treaty through its conduct and not through express acts of expression of consent such as ratification would be. "lightly assume that a State that did not carry out these formalities, which always could and would have the right, in the end became bound in another way" (*North Sea Continental Shelf Cases* (RFA

v. Denmark; RFA v. The Netherlands) in:   *International Court of Justice Reports of Judgments, Advisory Opinions and Orders*, The Hague, ICJ, 1969, para. 28). Therefore, the application of *estoppel* in such circumstances could only result from situations in which the State has clearly and consistently expressed its acceptance of the emerging treaty regime and at the same time other States have suffered some damage from having relied on this conduct. (*Id*., para. 30).

    Therefore, it consolidated a very restrictive view of estoppel, applying it to several cases that it had to consider and decide cases in which it was alleged, namely in *Delimitation of the Maritime Boundary in the Gulf of Maine Zone (Canada v USA)*, of 12 October, 1984, para. 130; in *Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. USA)*, of 26 November 1984, para. 45; in *ELSI (United States v. Italy)*, 20 on June 1989, para. 53-54; in *Land and Maritime Borders between Cameroon and Nigeria (Cameroon v. Nigeria)*, de 11 June 2008, para. 57, again denying the *estoppel* configuration, with the exception of the situation evidenced by the Advisory Opinion of 21 June, 1971 on *The Legal Consequences for States of South Africa's Continued Presence in Namibia (South-West Africa) Notwithstanding the Security Council Resolution No. 276*, para. 25 (all these decisions are available at Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*,Leiden/Boston, Brill, 2012, *passim*).

    Above all, it could be said, a treaty that subjects a State to the jurisdiction of a court not only international, therefore by itself, with the potential to limit the domestic



independence which cannot be presumed, as a competence in matters of human rights that has the potential to interfere directly in the relations between the State, its own courts and the individuals subject to its jurisdiction, as, moreover, it is an understanding based on the international justice system since the Permanent Court of International Justice issued the iconic thesis that in international law no State may, without its consent, be compelled to submit its disputes with other States whether through mediation, arbitration or any form of amicable settlement of disputes (*Advisory Opinion on the Status of East Karelia*, P.C.I.J., Series B, No. 5, 23 of July 1923, para. 33).

12.7.3.  Therefore, accepting the possibility, from the outset, it is noted that, for reasons of logic at any time, the institute is able to support the radical conclusion that Cape Verde would be bound by the 2005 Protocol, because in its terms, it is not possible identify any statement that is clear, unambiguous and much less unconditional acceptance of the jurisdiction. First, there is no clear and unambiguous statement attributable to any authority that may bind the State of Cape Verde, nor evident conducts of assent as would be the previous acceptance of the Court's jurisdiction without reservations or conditioning, since what is argued are either negative facts – did not vote against, did not raise any objections – or else positive facts of nominating persons to occupy positions at the ECOWAS Court of Justice; second, none of these conducts even remotely correspond to a concept of clarity, unequivocal and unconditional nature, precisely because they are exercised under the permissive normative framework of International Law and Community Law.

12.7.4.  The basis for such a conclusion would essentially lie in the following factual assumptions that the Prime Minister of Cape Verde attended and participated in the session of the Conference of Heads of State and Government that approved the Protocol; in addition, the country proposed the candidacy of judges for positions in the ECOWAS Court of Justice that they were entitled to, resulting in the election of the Venerable Judges Advisers Benfeito Mosso Ramos, later Vice-President of the Court, and Januária Moreira Costa, still in office. functions, and, finally, that the Chief Justice of the Supreme Court of Justice has served as a Member of the ECOWAS Judicial Council,



formerly by the Previous Honourable Presiding Judge Fátima Coronel and currently by the Honourable Presiding Benfeito Mosso Ramos.

It turns out that all these conducts attributed to the State of Cape Verde are legitimate in the framework of the exercise of its rights, precisely because, first, the country is a full Member of ECOWAS, having the right to participate in any negotiation in which it proposes the adoption of a protocol to develop the Law of the Community, being able in relation to it, depending on the rules that have been agreed to proceed with it, to vote in favour, to vote negatively or to abstain, in the first instance, without any link to this specific conventional act, consider whether to sign it and later whether to ratify it. This is reinforced by the fact that Cape Verde is bound by the Protocol that developed the 1991 Statute of the Court of Justice of the Community. of ECOWAS and the homologous norms of customary basis, it is guaranteed this right, considering that in number 2 of this treaty on treaties it is established that "all proposals of revision of a multilateral treaty regarding the relations between all the Parties must be notified, unless otherwise provided in the treaty, all Contracting States and each of them have the right to participate: a) In deciding on the action to be taken on the proposal; b) In the negotiation and conclusion of any agreement that has as its object the revision of the treaty". And the Revised Treaty is clear in the sense that proposals are communicated to Member States who meet to consider them in conference (Article 90, second paragraph). Therefore, it is not possible to withdraw from this participation or even from the positions that the State has assumed anything that could legitimize the understanding that, through them, Cape Verde will have transmitted to third parties that it considered itself bound by the 2005 Protocol.

The same can be said of the presence of Cape Verdean magistrates as judges of the ECOWAS Court of Justice proposed by Cape Verde, which is a fact. First, because it assumes that the country signed the 1991 Protocol, which developed the Court's legal regime and thus became internationally bound to it, insofar as its entry into force provisionally was foreseen. Article 3 of the 1991 Protocol establishes that the Court is composed of independent judges chosen and appointed by the Conference from among nationals of the member states, with no limitation on the signatory States of the 2005



Protocol, so that this is possible. It may even be discussed whether it is a good solution to allow, strictly speaking, nationals of States who are not fully subject to the jurisdiction of the Court or who are not part of any protocol that creates a community body to apply for these positions, but the fact is that this corresponds to the sovereign will of the States when they drafted the 1991 Protocol. As the Supreme Court of Justice has rightly pointed out, such a possibility is not exactly an unprecedented solution, considering, for example, what the Statutes provide of the International Court of Justice (Articles 2 and 4), illustrated by the fact that it has on its list judges from the United States, Russia, China, France, Jamaica who, despite being members of the United Nations, chose not to award compulsory jurisdiction to that judicial body; or even the case of the African Court on Human and Peoples' Rights, which also does not condition, through article 11 et seq. of the Protocol that established it, the bringing of candidates for judge to the recognition of jurisdiction to hear individual complaints for violation of human rights provided for by number 6 of article 34.

Accordingly, nationals of the country are entitled to apply for such positions or to perform such functions insofar as they are citizens of an ECOWAS member country under the terms of the Protocol, and the country may, legitimately, in light of its own Community Law and the International Law of Treaties, participate in any initiative to amend a treaty to which it is a party, it does not seem to us that the exercise of such rights would allow an inference that it would consent to the exercise of ECOWAS human rights jurisdiction against you following complaints filed by individuals. Therefore, not exercising rights conditional on States that had recognized the competence of the ECOWAS Court of Justice to receive individual complaints in the field of human rights, this does not result in any conduct that could arouse any legitimate expectation to other Member States of the Community, to the bodies community members or persons subject to its jurisdiction who considered themselves subject to the jurisdiction of that Court.

The same can be said of the participation of the Venerable Presidents of the Supreme Court of Justice in the Judicial Council of the Community created by Decision A/DEC. 2706/06, of the Conference of Heads of State and Government, published in the *ECOWAS Official Journal*, v. 49, 2006, pp. 40-42, in the exercise of recruitment activities for judges of the Court and disciplinary functions, insofar as the criterion used by article



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

2 and that they are President of the Supreme Courts of Justice of the Member States of the Community or their representatives and not that they are Presidents of the Supreme Courts of Justice of the Member States that are signatories to the 2005 Protocol.

Therefore, through the conduct described, undertaken within the framework of legitimate rights exercised by the State, it does not seem to this Court that any type of *estoppel* could be configured which would result in the State of Cape Verde's binding to the 2005 Protocol referring to the Court of Justice of ECOWAS. And the absence of this determining criterion in accordance with international practice is enough to not be able to generate any preclusion in relation to the State of Cape Verde.

In addition, to the extent that the State's behaviour should be done to the detriment of another party, which, by relying on its indications, is harmed, it does not claim which entity, relying on any representations or conduct of Cape Verde , will have been prejudiced for having conducted itself on the basis of it, as required by the International Court of Justice, namely in the decision taken at the *Sovereign Case on Pedra Branca/Pular Batu Puteh, Middle Rocks* and *South Ledge (Malaysia v. Singapore)*, 23 May, 2008, available at Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, pp 1445-1473, para. 228), wondering if it would be the other ECOWAS Member States, the Community Court of Justice itself or, at the limit, the individuals subject to its jurisdiction.

12.8.   Associated with this, the appellant seems to propose to this Court that it consider that such binding resulted from some principles of the International Law of Treaties, which it considers and construes interpretively: the primacy of International Law over Domestic Law, the essentiality of signature and ratification, the extensive application of the principle of good faith and the extensive application of the principle of *pacta sunt servanda*.

12.8.1.   In general, the application of these principles is hampered by the same problem that prevents the acceptance that Cape Verde is bound by the 2005 Protocol, the absence of expression of consent by this Republic in relation to the aforementioned treaty. Even if from the point of view of International Law – but not from the Cape Verdean



Constitution, as will be discussed below - it is possible to infer a principle of the primacy of International Law over Domestic Law, namely in light of the guidelines issued by article 27 of the 1969 Vienna Convention, such prevalence will only manifest itself when the State it assumes, within the framework of conventional freedom, that it has an obligation provided for by a treaty and not outside of it; even if it is accepted that there is a principle of good faith and a principle of mandatory compliance without the turbine of extensive application, the fact is that both, of course, impose a duty to comply with a treaty in good faith when the State has, freely and without any defect in the manifested consent, its will to be a party to it; and, finally, if the idea of the essentiality of signature and ratification is that a State can be bound by a treaty without such specific acts, as a general statement, it would not contend with any notion that the Constitutional Court might adopt, as the manifestation of consent can occur according to the terms adopted by the States that participated in the negotiation, which are free to establish other ways of showing consent, including one that is not listed in the example of article 11 of the Vienna Convention. However, this would not result in any binding effect because the forms of expression of consent to a treaty are defined by these same States at the time they negotiate it - among which the most common are signature, ratification, accession and the exchange of constitutive instruments of the treaty – whichever particular agreement they reach. Therefore, in a case where it is established that it is made through ratification, corresponding to the situation in question, it can only be made through ratification and in this case by the only type of ratification that is recognized by international law, necessarily expressed and promoted by the own state.

12.8.2.  Moreover, even if from the point of view of International Law there were some binding effect of these principles, they would not have the power to determine the internal application of the 2005 Protocol. In the first place, because, from the perspective of Cape Verdean Constitutional Law the primacy is of the Internal Law, specifically the Constitutional, by force of the principle of the supremacy of the Constitution proclaimed by its number 3 of the article 3Q; by the infra-constitutional hierarchical position that international norms occupy in the national legal system under the terms of this provision together with number 4 of article 12 of the Fundamental Law; and the fact that these rules are subject to review of constitutionality, and consequently the disapplication and declaration of non-compliance with

176



the Magna Carta, as this case also demonstrates and before it made *Judgement 10/2020, of 20 March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides

R. Lima, passim. The Constitutional Court states, without any ambiguity, that, regardless of international acts, of International Law or Community Law, to which the State is or will be bound, the values espoused by the Constitution will always be the ultimate and maximum gauge of validity of any of these standards (*Judgement 06/2018, of 22 March, Adilson Danielson Barbosa v. SCJ, about the violation of the right not to be discriminated, to the freedom of the body and the presumption of innocence*, Rep: JC Pina Delgado, para.

5.1.1) and this Constitutional Court is its guardian and defender of the identity of the Political Community par excellence, always being able to scrutinize its compliance with the elements that characterize the constitutional identity of human dignity, freedom, democracy, national independence, equality, solidarity, justice and peace; its compatibility with the essential core of national sovereignty and the regularity of the action of international entities (organizations or their executive, normative or judicial bodies) based on and within the limits of the powers transferred to it by the State under the terms of the Basic Law. Second, because, as the Venerable Supreme Court of Justice concluded, if international law were to impose an obligation to comply with a decision of a Regional Court to which the State did not attribute powers to exercise jurisdiction in a given matter, this would inevitably result in a violation of the principle of national sovereignty.

12.9. Finally, the question of the institute of forum prorogatum, corresponding to the punctual acceptance of jurisdiction by a court by express consent or by the conduct of a State, in itself could be relevant in the context of a discussion on a specific duty of the latter to comply with a court decision. taken in a case in which it had granted specific jurisdiction to an International Court, even if the latter did not have it initially, through express manifestation or, under certain circumstances, implicit conduct, but is no longer relevant for the purposes of determining the binding of the State to that treaty. In other words, even if you were facing a situation of timely acceptance of jurisdiction in a specific case, the effects of such acceptance they could never go beyond this case to determine the State's commitment to the Treaty establishing the Statute of an International Court, and/or fixing its composition, powers and jurisdiction and its rules of operating and process.



CERTIFIED TRANSLATION
12/09/2021
REG:07635166
LANGUAGE REACH

177

Even so, it is very doubtful that in this case there is a specific and specific attribution of jurisdiction by Cape Verde to the ECOWAS Court of Justice to judge the complaint filed by the appellant Mr Alex Saab in terms acceptable to international law, and, above all, to the Brazilian Constitutional Law.

12.9.1. The recognition of this form of attribution of exceptional jurisdiction is linked almost exclusively to the experience of the Permanent Court of International Justice, the judicial body associated with the League of Nations system, and to the work of the International Court of Justice. Although the Rules of Procedure of the International Court of the Law of the Sea (Article 54, paragraph 5) provide for it, any jurisprudence in this regard from courts other than those two is equally unknown. In relation to Human Rights courts, due to the level of interference they have in the sovereignty of States and in the relations they maintain with individuals in their territory, its application is at least unusual, and it does not seem to appear in procedural rules that are applicable to them. applicable. In fact, the only identification of discussion on the use of this basis for the assumption of jurisdiction by an international court for the protection of rights was promoted by a vote cast by a judge of the African Court of Human and Peoples' Rights without further consequences to date (*Yogogombaye v. Senegal, Jurisdiction*, Separate Opinion: Ouguergouz, Judgement of 15 December 2009 reproduced in *Reports of Judgments, Advisory Opinions, and Other Decisions of the African Court on Human and People' Rights – African Law Report*, Pretoria, PULP, 2019, p. 10 et seq.,) although also subject to the assumption of consent. (para. 21).

12.9.2. In this phase of the evolution of International Law, contrary to what initially happened with the Permanent Court of International Justice and the International Court of Justice, this possibility, if it exists, should in principle be included in a Statute or, at the very least, in a Procedural Regulation. where the conditions under which the international judiciary can assume jurisdiction in such circumstances are established, as is currently the case with the Grócio Palace Court and the Hamburg Court. It has not been possible to identify in any rule applicable to the ECOWAS Court of Justice that its Jurisdiction may be based on



CERTIFIED TRANSLATION
12/09/2021
PEG:07635166
LANGUAGE REACH

a *forum prorogatum* nor is it possible to conclude that at any time or in this specific case this regional judicial body has based its jurisdiction on such these bases.

12.9.3.  But, even if it is considered that this form of establishment of jurisdiction is currently the result of a customary rule - perhaps based on the practice of States of accepting opinions taken by those two courts in these circumstances, and dogmatically founded on the principle of good faith – there are two problems that would have to be overcome. First, it refers exclusively to disputes between States and not disputes between a person and a State; second, its evolution has increasingly emphasized the role of express State consent and increasingly limited the situations in which consent for conduct is acceptable. If the first problem, in general, can be surmountable, the second does not seem so easy, given the elements that have evidenced the international jurisprudential practice in this matter and the reaction of the States.

12.9.4.  It should be noted that the relatively wide use of the institute in the period of operation of the Permanent Court of International Justice - although not exactly clear, since of the twelve judges, four diverged in the main case in which the issue mentioned below was discussed - that led this historic Court and predecessor of the Court of The Hague to assume jurisdiction for the mere conduct of a State to appear in court without raising preliminary objections to jurisdiction and only discussing the merits or only doing so late in the process after having consented to the exercise from this jurisdiction (*Minority Rights in Upper Silesia (Minority Schools)*, Germany v. Poland, of 26 April 1928, PC.I.J., Series A, No. 15, 1928 pp. 20-25), the reception of the figure was getting more and more narrow in the scope of the practice of these courts.

The International Court of Justice has always preferred to follow a more cautious line, as even the elements that stem from the decision taken in the *Corfu Channel Case* (United Kingdom v. Albania), of 25 March, 1948, reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, p. 49 et seq., required that consent be voluntary and unquestionable, deriving from a letter in which Albania said that it fully accepted the Security Council's recommendation to submit the litigation to be heard by the International Court of Justice



(p. 51), and, right after, in the case of *Anglo-Iranian Oil Company (United Kingdom v. Iran)*, of 22 July 1952, the criteria of the International Court of Justice became increasingly tighter in relation to jurisdiction based on *forum prorogatum* (decision reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, pp. pp. 162-163).

After that, this possibility was reduced to the regulatory norm, subjecting it to relatively strict criteria, which arise from number 5 of article 38 of its 1978 Procedural Regulation, which is still in force. In particular, when a State proposes that the Court establish its jurisdiction on consent yet to be given, it must transmit the petition to that State, and the case cannot be listed unless and until this State consents to the exercise of jurisdiction by the Court in this case. If this was already the case from a normative point of view, its jurisprudence ended up consolidating this very limited and responsible acceptance of the forum prorogatum, especially in relation to situations of implicitconsent.

So, in the *Case on the Application of the Convention for the Prevention and Punishment of the Crime of Genocide* (Bosnia and Herzegovina v. Yugoslavia (Serbia and Montenegro), of 11 of July 1996 (also reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946- 2012*, para. 40, asserted that the fact that the Respondent State had also requested the adoption of provisional measures that transcended the treaty on which the exercise of jurisdiction depended, but subsequently unequivocally denied the jurisdiction of the Court would lead to it not being able to conclude that it gave its consent voluntarily and without dispute (para. 40). And, above all, leaving an understanding that it did not constitute *forum prorogatum* to participate in proceedings when the State expressly and repeatedly objects to the assumption of jurisdiction in all its stages (*Case on Military and Paramilitary Activities in Congo Territory*, (RDC v. Ruanda), of 3 of February 2006, reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, para. 22). Therefore, it does not follow from the mere fact that the State appears at the Court that it has agreed to submit to its jurisdiction (idem). As it finally concluded, in one of the few cases in which it decided on the merits following the



CERTIFIED TRANSLATION

LANGUAGE REACH

12/09/2021

PEG.07635166

assumption of jurisdiction by *forum prorogatum* following the express consent of the Respondent State, synthesized that the consent that allows the Court to assume jurisdiction must be certain and the consent must either be explicit or clearly inferred from the relevant conduct of a State. (*Certain Questions About Mutual Assistance in Criminal Matters*, Djibouti v. France, 4 June 2008, also available in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, para. 62).

12.9.5. What this development reveals is that a) the existence of *forum prorogatum* situation is determined on a case-by-case basis, evaluating evidence of acceptance of jurisdiction by a State, and the court should only be satisfied when there are clear and unambiguous indications of such consent; b) the normal form of recognition of *forum prorogatum* is through the express consent of a respondent State and on its terms; c) the implicit consent arising from the conduct of participation in the process is exceptional; d) and accepted by the courts and the States only in circumstances in which they do not raise any objection to the jurisdiction of the Court until the decision on the merits.

12.9.6. Even if the application of this legal principle were accepted in the context of a dispute between a State and the individual under the rules applicable to the ECOWAS Court of Justice, the reality is that the criteria themselves are defeated by the claims of the appellant who recognizes that the "question of incompetence was raised by the Republic of Cape Verde in its defence of the request for provisional measures" and that in "its defence in the substantive process it also challenged the jurisdiction of the ECOWAS Court of Justice" and that "after the dismissal of these preliminary objections (. ..) renounced its sovereign immunity and submitted to the jurisdiction of the ECOWAS Court of Justice". If what matters for the constitution of the basis of jurisdiction based on *forum prorogatum* is not the reaction of the Court, but the raising of the jurisdictional issue by the State, the country will have consistently and in a timely manner raised objections in relation to its material jurisdiction in relation to individual complaints for violation of human rights. Thus, it is not the fact that participation in the process would trigger the acceptance of the Court's jurisdiction, but, moreover, that such participation indicates, by the Conduct of the State, that the latter, voluntarily and unequivocally, considered the



181

jurisdictional issues to be overcome by discussing only the merits of the allegations.

In the specific case, participation in the proceedings until the end would always be justified because Cape Verde, in light of the 1991 Protocol, which it signed, is, for the reasons mentioned, part of the Court of Justice, therefore, a continuous stance of refusal to participate, even if possible, would not be required, as if it were a completely foreign institution. While it is true that the State of Cape Verde did not always raise the issue of the Court's incompetence, it did so most of the times when this was possible, namely in a response filed on 24 November, 2020 at the Registry of the Court of Abuja , in which, after developing arguments, concluded that this court would be incompetent to hear the plaintiff's request by the State of Cape Verde, as it understood, not being a member of the Court and as it had not adhered to the 2005 Protocol (Conclusion a), p. 14), even during the oral hearing held on 5 February, the Cape Verdean Lawyer conveyed to the Court his position that it did not have jurisdiction for this case, a position which, according to the Procedural Regulation of the Court, was still going to time to be considered, then in a document on 10 March, alerting the Court that in the decision of 2 December, 2020, in which it determined that the State adopt provisional measures established therein, it had not ruled on the exception of jurisdiction raised, since, in his opinion, the lack of jurisdiction of the court over the Defendant with regard to the Plaintiff and the lack of jurisdiction of the Court with regard to the request presented by the Plaintiff should be considered, essentially because, in his opinion, the Republic of Cape Verde was neither a signatory nor a party to the 2005 Complementary Protocol (p. 1); even after the decision on the merits had been taken, being less relevant, he insisted on the issue, claiming the nullity of Judgment TJ-ECOWAS 07/2021, of 15 March. Given this scenario, the Constitutional Court finds it difficult to consider that there has been conduct of unequivocal acceptance of the Court's jurisdiction regarding the decision on the merits, conveying the idea that it consented to the ECOWAS Court of Justice hearing the complaint filed by the Sir Alex Saab on the merits.

The ECOWAS Court of Justice, unlike all cases where an international judicial body has agreed to assume jurisdiction based on the doctrine of *forum prorogatum*, at no



182

time did it base it on these terms, even when it had the opportunity to decide the nullity of its Judgment 07/2021, of 15 March, through Decision (Ruling) 05/2021, of 24 June, when it reiterated its traditional understanding that its jurisdiction follows from paragraph 4 of article 9 of the 2005 Protocol, which simply means that there is an allegation of violation of human rights and that it is imputed to a Member State (para. 91-93), it is assumed that regardless of its being signatory or not of this legal act. Therefore, for the Constitutional Court itself, from the point of view of International Law, the conclusion that this is a situation of assumption of jurisdiction through *forum prorogatum* is a conclusion that it cannot endorse, because neither the court that rendered the decision supported itself on such a basis, nor could it do so, considering the rules applicable to it.

But, this is not even the fundamental issue that would make it impossible to apply the decisions taken by the ECOWAS Court of Justice in Cape Verde, as even if it resulted from the course of the process and the behaviour of the State that, by its conduct, accepted the given With regard to the jurisdiction of the ECOWAS Court of Justice in relation to the specific complaint addressed to it by Mr Alex Saab, the question arises whether, from a constitutional point of view: a) can the Government, through international conduct that takes the form of a unilateral legal act or not, bind the State in a matter that involves the jurisdiction of the courts constitutionally assigned to the Assembly?; b) could such international conduct constitute a rule of acceptance of jurisdiction capable of being internalized?; c) Are Cape Verdean courts obliged to apply them?

The answer to these questions is all negative because, first of all, the Government does not have any competence to accept, expressly or by conduct, the jurisdiction of an international court whose decision will have repercussions on Cape Verdean domestic law unless it is entitled to do so by the existence of a treaty to which the State is regularly bound, pursuant to paragraph 2 of article 12, namely with the due approval of the National Assembly, or alternatively by a general or special law necessarily approved by the Parliament, since it would deal with matters within the jurisdiction of the courts; second, in the absence of such conditions, no judicial body has any obligation to comply with or



12/09/2021

PEG:07635166

183

execute an international court's decision to which the Government, through its conduct, had given jurisdiction to hear a particular case. As the Supreme Court of Justice says, this, at best, could generate a non-compliance with an obligation due in the international sphere and the international responsibility of the State, but not a duty of compliance by Cape Verdean courts.

12.10.  The thesis of the integration of the ECOWAS Treaty, the 1991 Protocol and the 2005 Protocol, in the opinion of this Court, is also not sufficiently convincing.

12.10.1.  The main reason is that we are facing a set of treaties that are being created from a changing and adjustable dynamics typical of a regional integration community. The bottom line is that until 2006, the ECOWAS legal system was developed in a classic way from a Revised Treaty of 1993 that refounded the Community and absorbed a set of Protocols approved under the Original Treaty. This basic legal instrument would classically serve as the Community's primary law, intended to be developed by other treaties called Protocols. All of them with the nature of a treaty, which meant that they only bound States that understood, according to the principle of conventional freedom, to be subordinate to them, in accordance with their interest in promoting regional integration in its most diverse axes, namely economic integration, institutional integration, defence and security integration and judicial integration and protection of rights. Therefore, the obligations provided for by the Protocols and their revisions do not automatically apply to all Member States, but only to the extent that they have consented to those obligations under the terms of a particular protocol.

This is neither more nor less what Article 89 of the Revised Treaty stipulates when they establish a mechanism for manifesting consent through a) ratification and, b) consequently, because it only makes sense to provide such a figure in such cases of internal consent to bind, is that this is done in accordance with the constitutional norms of each signatory State. Therefore, the norm itself establishes two regimes, which cannot be confused. The first, regarding entry into force, establishing that it and the protocols that are part of it enter into force with nine ratifications; the second, which defines the



form of manifestation of consent by ratification, by its express nature, recognizing the freedom of each State to consider whether or not it is bound by the Revised Treaty itself and any protocol associated with it. It is Article 90 that reinforces this idea by referring it to the consideration of all Member States for ratification, in accordance with their constitutional procedures. It would make no sense to have rules with such content if what is called ratification by sampling, automatic ratification or implicit ratification were possible, concepts that are, at the very least, very unusual in the International Law of Treaties, which the Court does not consider recognized in this sphere legal.

12.10.2. The change in this paradigm is only tested with the approval of a new regime of normative acts of the Community in 2006 through the Protocol that amended article 9 of the Revised Treaty, but this also does not bind the country, as previously verified by the Court. Therefore, even the idea that it would be facing a new regime of approval, which would make it possible to impose on a State new legal obligations through an unconventional act depends on, ultimately, having a treaty in which the State expresses its consent with this development and this is what did not exist until 2006, when all the development of the matters foreseen by the revised treaty and the densification of the community legal regime was done through protocols that presuppose the consent of the States, for the reasons explained and by application of the International Law of the Treaties. In this sense, the State's obligations will have to be evaluated in a segmented and autonomous way from the ECOWAS Revised Treaty, from the 1991 Protocol, for the States that have become party to it or that have consented to its provisional application, and also those who were bound to comply with the 2005 Protocol by having formally signed it, and not as if it were a normative block applicable to *erga omnes*. To the extent that the State of Cape Verde specifically did not do so, the Constitutional Court cannot conclude that the country is bound by this instrument at this time, as, moreover, in 2017, it had already considered laterally through an *obiter* formulated in the *Judgement 11/2017, on 22 June, Maria de Lurdes v. STJ, on violation of the right to found a family for non- recognition of de facto union*, Rep: JC Pina Delgado, published in the *Official Gazette*, Series I, No. 42, 21 July 2017, pp. 933-950, 1.1.



CERTIFIED TRANSLATION
12/09/2021
REG:07635166
LANGUAGE REACH

12.11.   Therefore, owing to all that has been set out, the Constitutional Court cannot fail to consider that the State of Cape Verde is not bound by the 2005 Protocol and its provisional application clause as it did not sign not ratify it, was not obliged to comply with a treaty to which it did not give its assent and to comply with a judicial decision of a regional court which did not recognize competence in matters of individual complaints for violation of human rights, in general or in the specific case, and as it had not behaved in such a way as give reason to imply such recognition of jurisdiction and the consequent duty of compliance.

12.11.1.   Thus, it endorses the understanding already drawn up by the Supreme Court of Justice that in cases in which the State of Cape Verde has not expressed consent to be bound by a treaty and does not attribute specific jurisdiction to an international court for the fulfilment of that treaty and the domestic execution of that decision would have great potential to unconstitutionally affect the principle of national sovereignty, enshrined in number 1 of article 1 of the Constitution of the Republic, with corollaries in number 1 of article 11 of the Magna Carta and reflected in article 119 which enshrines the courts as organs of sovereignty.

12.11.2.   This principle, which has already been analysed by this Court, which has ruled on it in the *Judgment 10/2020, of 20 of March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides R. Lima, B, in the sense of being a very important value of our Republic, umbilically linked to the principle of national independence, representing a decisive moment for the existence of the Political Community. Therefore, one of the mainstays of the Constitution's identity under the terms of the Preamble, article 1, paragraph 1 of article 11, whose protection is expressly and primarily entrusted to the State as a fundamental task by article 7 and protected as a material limit to the constitutional revision by paragraph a) of number 1 of article 290 of the Constitution.

According to this principle, within the territory that, in light of article 6 of the Constitution and International Law, belongs to the Republic, which as an independent entity, exercises sovereign powers to the exclusion of all other entities, not allowing them to interfere here (See the arbitration report written by internationalist Max Huber in the



arbitration on the Island of Palma (Netherlands and United States of 4 April 1928, reproduced in *Reports of International Arbitral Awards/Recueil des Sentences Arbitrales*, v. XXVII, New York, United Nations, 2006, v. II, pp. 829-871, 838), which according to this Court had already settled through *Ruling 10/2020, of 20 March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides R. Lima, B 1, embraces the exclusivity of the power to judge.

The principle of respect for International Law provided for in number 1 of article 11 of the Fundamental Law may contain a guideline for the State to always openly assess membership of initiatives leading to the strengthening of the *international rule of law*, arising from this same provision, the constitutional basis for the State reduces various dimensions of its international relations to internationally binding commitments, including with a view to engaging in regional integration processes, namely in Africa by virtue of number 7 of the same provision. Thus, the constitutional legitimacy of the delegation of some sovereign powers is assumed, as long as they are transferred reversibly, proportionally, taking into account the stage of the integration process in question and the consistency of the process, and the essential core of national sovereignty proclaimed by number 1 of article 1 is not affected. However, although the Constitution allows for such a possibility, it is evident that this can only happen in cases where: a) the State of Cape Verde voluntarily, freely - therefore, in the exercise of its conventional freedom and without any vice of consent - expresses, concludes agreements or undertakings which result in any limitation on their sovereignty; b) this is done by Organs constitutionally competent bodies and in accordance with the procedures prescribed by the Fundamental Law; c) this occurs in a materially compatible way with other constitutional norms, especially the values that structure the Republic, as provided for in the Fundamental Law. When a putative international obligation to bind Cape Verde to a treaty to which it did not consent or which imposes on it the execution of a decision of an international court that exercises a competence that the State has not attributed to it, the Supreme Court of Justice could not be more certain. by refusing to apply the rule for incompatibility with the principle of national sovereignty, especially because in this case judicial sovereignty is affected.



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

PEG:07635166

The basis for such a duty of compliance cannot be found in number 2 of article 210 of the Constitution. Since the State of Cape Verde has not been bound by the 2005 Protocol and has in no way consented to the jurisdiction of the ECOWAS Court of Justice to receive complaints from individuals for human rights violations under the constitutional rules in force to bind the State internationally in matters of jurisdiction of courts, there is no internal authority to enforce such decisions.

12.11.3. When, moreover, in addition to this non-compliance with the principle of national sovereignty that results from the fact that the intention is to enforce a decision in a framework in which the State has not consented, through signature and ratification, to the exercise of a power by an international judicial entity, under the terms of the Cape Verdean Constitution, even if that had happened, it would be, for reasons already advanced, facing an organic or formal unconstitutionality, precisely because in our constitutional system the Government does not have the power to bind the State to an international act that introduces significant changes in the structure and powers of the courts and the independence of the courts, hosting an international court, without parliamentary approval and without the consent of the President of the Republic.

To add to the constitutional problems generated by the understanding of the ECOWAS Court of Justice itself, based on a sustained interpretation of the 2005 Protocol that the admissibility of claims for violation of rights is not conditioned by the exhaustion of internal remedies (*Judgement 6/2008, of 27 October 2008*, *Koraou v. Niger*, reproduced in *Community Court of Justice of ECOWAS Law Report*, Abuja, CCJ, 2011, v. I (2004- 2009), p. 217 et seq., para. 48) and of having attributed to this judicial body competence concurrent with the courts of the States and prevailing in case of conflict (*Judgement 4/2009, Saydikhan v. Gambia*, of 30 June 2009, reproduced in *Community Court of Justice of ECOWAS Law Report*, Abuja, CCJ, 2011, v. II (2010), p. 139 et seq., para 49).

For obvious reasons, the manner in which the ECOWAS Court of Justice interprets, in general, its powers, its jurisdiction and the presuppositions for the admissibility of claims is totally alien to the Constitutional Court. However, in the case of a situation that refers to the execution of decisions based on such rules, real or



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG.07635166

188

hypothetical, Community Law in the Republic of Cape Verde, in order to impose a duty of compliance to an internal judicial body, cannot fail to consider that, at least in situations where such intervention takes place while the courts maintain their jurisdictional power in a matter so intrinsically linked to its basic function of protecting rights, according to article 209 of the Fundamental Law, as is the case in point, which focused on an issue still pending at the Barlavento Court of Appeal, it would generate problems of material unconstitutionality. From the outset with the core of the principle of national sovereignty in its dimension of judicial sovereignty.

Since this Court had already considered in *Judgement 10/2020, of 20 March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides R. Lima, B 15, that the removal of the jurisdiction of the national courts of judgment on certain fundamental issues, in this case, despite being before a community judicial body and not a foreign one, would generate a possible incompatibility with the principle, also linked to the principle of sovereignty and the principle of the independence of the courts, according to which a national court cannot be deprived of the powers established by the Constitution and the law. Because, after all, a judicial body that acts as the first instance is already imposed on, and then on, all ordinary and special courts that could intervene an obligation to execute a decision without even having the opportunity to consider the allegations of violation of rights. Therefore, even if the Protocol had been ratified by Cape Verde, its application in circumstances in which there was no exhaustion of available domestic remedies would generate the unconstitutionality of the rule that underlies it, in this particular case.

12.12.  For these reasons, the Constitutional Court confirms the unconstitutionality of a hypothetical rule arising from *articles 15, number 4, and articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with a decision by the ECOWAS*, that the Supreme Court of Justice refused to apply due to non-compliance with the principle of national sovereignty, considering that for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG:07635166

ratified with Cape Verde not having signed protocols that recognize the competence of the ECOWAS Court of Justice in terms of human rights and ECOWAS not being a supranational organization for the purposes of Article 12(3) of the Constitution. As it is incompatible with the principle of national sovereignty, the constitutional rules on the binding of the State of Cape Verde to treaties and the principle according to which the courts cannot be deprived of their jurisdiction, a duty declared unconstitutional with general mandatory force.

### III. Decision

For these reasons, the Constitutional Court, meeting in Plenary, decides,

1. Regarding the admissibility of the questions,

a) Unanimously, dismissed the second segment of the 3rd question posed by the appellant, considering that article 155 of the CPP will have been interpreted in the sense that *it was up to an extradited person to proceed by complaint and not by appeal to react procedurally to a decision that rejects a request for questioning of witnesses*, for alleged non-compliance with the Constitution;

b) Unanimously, dismissed the 7th question posed by the appellant arising from the interpretation that will have been given to articles 269, paragraphs one and four of the Code of Criminal Procedure, and articles 31, paragraph three, and 39 of the LCJ, in violation of the imposition of immediate communication to the detainee of the reasons for his detention, for alleged non-compliance with the Constitution;

c) Unanimously, dismissed the 9th question posed by the appellant arising from the interpretation that will have been given to article 17 of the LCJ, according to which the extradition that is authorized is for the extradited person to be subject to criminal proceedings for one of the crimes that it is charged, in accordance with the guarantee offered by the requesting State, for alleged non-compliance with the Constitution;

d) Unanimously, dismissed the first segment of the 10th question posed by the appellant arising from the interpretation given to articles 6, No. 2, paragraph b) of the Law on Judicial Cooperation and 45, paragraph one of the Criminal Code, according to which extradition is

granted to a Requesting State where the death penalty and life imprisonmentapply when the guarantee is given by its embassy and not by an irrevocable and binding act for its courts and others entities, for alleged non-compliance with the Constitution;

e)  Unanimously, dismissed the first segment of the 11th question posed by the appellant arising from the interpretation given to articles 156, paragraph 1, point b), 157 and 161 of the Code of Criminal Procedure, in the sense that the absolute incompetence of the courts Cape Verdeans to hear a matter related to the immunity of Public International Law results from a previous assessment or political position, due to allegednon-compliance with the Constitution.

2.  On the merits,

a) Unanimously, in a summary manner, does not declare as being unconstitutional a hypothetical rule inferred from article 55, paragraph one, of the Law on International Judicial Cooperation in Criminal Matters, in the sense that *The order of the Minister of Justice on the admissibility of the extradition request and the promotion of compliance with the request before a Court of Appeal do not have to be personally notified to the extradited person, it is sufficient that they are notified by the appointed lawyer.*.

b) Unanimously, do not declare as being unconstitutional the hypothetical rule applied by the Supreme Court of Court in the sense that *Recognition of the status of special envoy is solely incumbent upon the State of Cape Verde, without which Cape Verdean courts cannot recognize this quality, allowing a Cape Verdean court to deny recognition of an extradited person as a special envoy, after recognition of their status both by the sending State and by the receiving State*;

c) Unanimously, do not declare as being unconstitutional the hypothetical rule arising from article 39 of the Law on International Judicial Cooperation in Criminal Matters according to which *It is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign*



*authorities, and it is not relevant that the acts referring to this international organization have
not eventually been ratified by the Republic of Cape Verde or published in the Cape Verdean
internal legal order, since the use that is made of the information received via this system, stems
from a national law*.

d)  Unanimously, do not declare the hypothetical rule arising from article 39 of the Law
on International Judicial Cooperation in Criminal Matters according to which *a person can be
detained for the purpose of extradition, without requiring a warrant, as long as they are in
possession of official information that legitimizes their detention.*

e)  Unanimously, do not declare the hypothetical rule arising from article 39 of the Law
on International Judicial Cooperation in Criminal Matters and article 269 of the Code of
Criminal Proceedings, according to which *Information for the detention of a person may reach
the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in
delay by any means of telecommunications, as follows from article 269 of the CPP, followed by
confirmation by warrant*.

f)  Unanimously, do not declare the hypothetical rule arising from article 6, paragraph
4, final segment, and article 3, paragraph 3, of the Law on International Judicial Cooperation in
Criminal Matters according to which *Waiver of reciprocity is possible in any form of
international judicial cooperation, including extradition*.

g)  Unanimously, do not declare the rule arising from number 2 of article 55 and the
final part of number 3 of article 46 of the Law on International Judicial Cooperation in Criminal
Matters to be unconstitutional, according to which *The extradited person has the right to file an
opposition, but, despite the requirement for due diligence of testimonial evidence, this can only be
based on the fact that he is not the person claimed or that the requirements for extradition are
not met.*

h)  By majority, did not declare the hypothetical rule arising from article 56, para.



56, of the law on Judicial Cooperation to be unconstitutional, according to which *The course of the passive extradition process does not require that the judgment in the Appeal, as a court of first instance and not a court of appeal, be made at a hearing, but in chambers, as the law does not determine, either directly or indirectly, that the extradited person be heard at a second hearing before the judge*.

i) Unanimously, confirm and declare the unconstitutionality of a hypothetical rule arising from *articles 15, number 4, and articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with a decision of the ECWA-TJ*, that the Supreme Court of Justice refused to apply, due to non-compliance with the principle of national sovereignty, with the constitutional rules on the binding of the State of Cape Verde to treaties and with the principle according to which the courts cannot be deprived of their competence.

3. Dismiss the appeal lodged by Mr. Alex Saab.

To be registered, notified and published.

Praia, 30 August 2021

By the Court,

*José Pina Delgado*
*Aristides R. Lima*
*João Pinto Semedo*


**COMPLIANT**
Judicial Secretariat of the Constitutional Court, on 7 September 2021.
The Secretary,

*João Borges*



193



# CONSTITUTIONAL COURT

## VOTE DECLARATION BY JUDGE PINA DELGADO

Despite sharing all the other understandings that were collectively adopted, in relation to item 2h of the decision-making part, I think that the contested hypothetical rule should have been declared unconstitutional. In situations in which a person involved in extradition proceedings before a court that, despite being appealed, acts as a first instance, requires evidence to be taken, namely the examining of witnesses, aimed at corroborating any allegation made that does not fall under the concept of facts imputed by the Requesting State, and the judicial body in question does not expressly reject the request of its production under the law, a norm that does not impose the holding of a public and oral hearing, so that they can be heard or examined and so that each party can support its position, is incompatible with the right of defence of the extradited person who is extended the guarantee to fair process under paragraph 1 of article 22 of the Constitution and with the principle of publicity of court hearings provided for in paragraph 4 of article 211 also of the Fundamental Law, which applies broadly in cases where the judicial bodies function as the first instance.

Judge,

*José Pina Delgado*

**COMPLIANT**

Judicial Secretariat of the Constitutional Court, on 7 September 2021.
The Secretary,

*João Borges*



194