IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

ALEX NAIN SAAB MORAN, *et al.*,

Defendants.

Case No. 19-20450-CR-Scola

**DEFENDANT ALEX NAIN SAAB MORAN'S REPLY IN FURTHER SUPPORT OF HIS
<u>MOTION TO DISMISS THE INDICTMENT</u>**

**BAKER & HOSTETLER LLP**
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801

1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

45 Rockefeller Plaza
11th Floor
New York, New York 10111

## Table of Contents

Page

FACTUAL SUMMARY ............................................................................................1

ARGUMENT .........................................................................................................5

A.   *Abdulaziz v. Metropolitan Dade County* Controls this Case ...............................5

B.   The State Department's Policy on Immunities of U.S. Representatives and
     Establishments Abroad Does Not Deprive Mr. Saab of VCDR Immunity ........................7

C.   The UNCSM Does Not Displace Mr. Saab's Immunity Under the VCDR and DRA ........8

D.   Mr. Saab is Fully Entitled to *In Transitu* Immunity Under the VCDR and Customary
     International Law ....................................................................................9

E.   The Status of Nicolás Maduro Does Not Affect Mr. Saab's Immunity...........................12

F.   Mr. Saab's Status is Not Dependent on State Department Certification .........................15

G.   The Act of State and *Ker/Frisbie* Doctrines Continue to be Irrelevant ...........................16

CONCLUSION......................................................................................................17

## FACTUAL SUMMARY

As thoroughly explained in his Motion to Dismiss ("Mot." or "Motion"), and proven by numerous supporting documents, declarations, and other evidence, the Venezuelan government appointed Mr. Saab as a Special Envoy in 2018 and, during the pandemic, tasked him with missions to secure desperately needed food, medicine, gasoline, and humanitarian supplies. His status is clearly established by, among others, three irrefutable pieces of evidence: (1) the April 9, 2018 Diplomatic Appointment by the Venezuelan Minister of Foreign Affairs, *see* ECF No. 148-1 (Declaration of M. González and Exhibit A); (2) the official correspondence Mr. Saab carried on his third, interrupted mission, *see* ECF Nos. 149-4, 149-5; and (3) his actual conduct in making multiple successful trips to Iran on behalf of Venezuela to negotiate and conclude agreements between the two countries. *See, e.g.,* ECF No. 149-15, 149-16. In its Opposition, the government notably ignores these key documents and facts. Instead, it sets up a straw man argument and proffers wild conspiracy theories designed only to distract. But facts are stubborn things.

Mr. Saab's diplomatic accreditation began with his official appointment by then-Foreign Minister Arreaza. His appointment credential, which the Opposition completely ignores and does not contest, has been certified as an authentic government record by a Director in the Secretariat of the Ministry of Foreign Affairs, María González. ECF No. 148-1. Ms. González further confirms that all necessary procedures and regulations were followed with regard to the processing of correspondence and other official documents of the Ministry, *see id.* ¶ 4, including Mr. Saab's Special Envoy credential letter. *Id.* ¶¶ 8-10. On this, the government is tellingly silent.

Similarly, the government completely ignores other parts of the evidentiary record, including the diplomatic correspondence that Mr. Saab carried. *See* ECF No. 149-4, 149-5. These letters are from the *highest level* of government and invoke Iranian assistance to Venezuela regarding the supply of gasoline, and they also request further diplomatic meetings to consolidate relations, cooperation, and friendship between the countries. *Id.* This formal correspondence from President Maduro and Vice President Rodríguez was *carried by Mr. Saab* at the time of his arrest. *See* ECF No. 148-3 (Declaration of J. C. Arrieche); ECF No. 148-4 (Declaration of F. Mandl).

Finally, the government seeks to elide Mr. Saab's actual conduct as a diplomat and the purpose of his travels. By 2020, and exacerbated by the pandemic, Venezuela was reeling from economic hardship largely resulting from punitive sanctions on its economy. *See, e.g.,* GAO, *Venezuela: Additional Tracking Could Aid Treasury's Efforts to Mitigate Any Adverse Impacts*

*U.S. Sanctions Might Have on Humanitarian Assistance*, GAO-21-239 (Feb. 4, 2021). At the time of Mr. Saab's missions, Venezuela already had been largely cut off from international payment and supply chain systems, significantly hindering access to essential imports including medicine and food. *See* Mark Weisbrot and Jeffrey Sachs, *Economic Sanctions as Collective Punishment: The Case of Venezuela* (Apr. 2019).[1] The impact on Venezuelan human life and health was severe.

As a result of these harsh economic actions, Mr. Saab's government tasked him with traveling to Iran as a Special Envoy for high-level diplomatic humanitarian meetings, particularly to address an emergency shortage of gasoline, medicine, and foodstuffs. The United States, and in particular the State and Justice Departments, knew well, and in real time, of the "oil-for-gold" diplomatic exchanges and Mr. Saab's key role in negotiating with Iran. *See* Mot. at 13-15. Thus, the Opposition does not deny—because it cannot—that Mr. Saab traveled multiple times to Iran as a representative of Venezuela, the purposes of his travel, his high-level meetings, or the nature of the negotiations he conducted. *See* Opp'n at 1 (he was "at best, on a short-term mission to negotiate . . .); 18 ("he travelled on a temporary visit to Iran, in whatever role he travelled in for the Maduro regime . . ."); *id.* ("his travel from Venezuela to Iran was a short visit purportedly to meet with Iranian government officials to discuss the sale of oil and potential assistance . . ."); at 24 ("At best, he was on a short-term special mission."); at 32 (noting the "assertion that he had just traveled to Iran twice already in 2020 . . .").

Mr. Saab was, indeed, on a special mission[2] as a Special Envoy and head of mission, which the documents, correspondence (both pre-arrest and post), photographs, and testimony amply

---

[1] *Available at* https://cepr.net/images/stories/reports/venezuela-sanctions-2019-04.pdf

[2] The suggestion that a short trip should be treated differently can be rejected outright. The missions were of critical importance to Venezuela, and they were incredibly successful and significant, even if short. It was widely publicized that Mr. Saab successfully negotiated the purchase of gasoline, food, and medicine which the United States was following closely (even later seizing delivery tankers). *See, e.g.,* ECF No. 123-3 at 327, 332 (Excerpts from former-Secretary Esper's book describing Mr. Saab as an "important player" and "so important" to the Venezuelan government). *See also* DEUTSCHE WELLE, *Venezuela to escort fuel tankers from Iran* (May 21, 2020), FINANCIAL TIMES, *Iranian petrol taker arrives in Venezuela in defiance of US* (May 24, 2020), DEUTSCHE WELLE, *First Iranian oil tanker reaches Venezuela* (May 24, 2020), NEW YORK TIMES, *Oil-Starved Venezuela Celebrates Arrival of Tankers From Iran* (May 25, 2020). These articles describe the shipments negotiated by Mr. Saab and the crucial importance to the gasoline-starved nation (even warranting escort by the Venezuelan armed forces). Notable as well is the humanitarian and economic relief celebrated by the country's leaders and made possible through Mr. Saab's successful completion of these deals.

demonstrate. *See generally* Mot. at 2-15. Having been appointed by Venezuela, received by Iran, and actively traveling between the sending and receiving states, he was entitled to *in transitu* immunity. Nonetheless, he was seized, at the request of the United States, while refueling in Cape Verde and later extradited. *See* Opp'n at 3.

Instead of presenting any *evidence* of its own, the government resorts to generalized allegations that the government of Nicolás Maduro cannot be trusted and speculates that certain documents—without any expert opinion or evidentiary support—are alleged forgeries or otherwise fake. But the United States' long-held *criticisms* of the Maduro government are no substitute for actual *facts*. The government's contention that Venezuela "fabricated" Mr. Saab's diplomatic immunity *post hoc*, Opp'n at 7, is contradicted by the official government record of his appointment in 2018, contemporaneous State-to-State exchanges, the declarations of multiple witnesses, and Cape Verde counsel, and the documents Mr. Saab carried. Indeed, the government incorrectly posits that June 17, 2020, was "the first time that arguably the issue of diplomatic immunity had been raised." Opp'n at 6. However, the Judicial District of Sal, Cape Verde, observed at the first appearance on June 14, 2020, that Mr. Saab "came on a plane from Venezuela bound for Iran. He confirmed that he was in the country only in passing and that he was traveling as a ***diplomatic agent of the Bolivarian Republic of Venezuela***." *See* ECF No. 148-5 (J. Pinto Decl. Ex. A at 2 (emphasis added)). Mr. Saab invoked his diplomatic immunity immediately following his arrest. *See* Mot. at 7-8.

Further, the government completely ignores the pre-arrest correspondence, dated June 3 and June 8, 2020, between Iran and Venezuela arranging for Mr. Saab's travel later that month and setting up corresponding high-level meetings. *See* ECF Nos. 149-6, 149-7. Mr. Saab's immunity is not based on post-arrest Notes Verbale, which provide additional proof of his diplomatic status, but rather on his appointment on April 9, 2018, and other diplomatic correspondence and documents that pre-date his unlawful arrest in Cape Verde.

The hollowness of the government's claim of *post hoc* fabrication is demonstrated by its desperate attempt to denigrate the fact that Mr. Saab was issued a diplomatic passport by Venezuela in 2019. Based on mere conjecture, the government claims that Mr. Saab's "purported

Venezuelan diplomatic passport has indicia of forgery." Opp'n at 32. However, the Venezuelan Ministry of Foreign Affairs ("MFA") is certifying the authenticity of his diplomatic passport.[3]

The government's argument to the contrary not only lacks any evidentiary support but reflects a fundamental misunderstanding of the process for producing such passports by the relevant agency: Servicio Administrativo de Identificación, Migración y Extranjería (Administrative Service of Identification, Migration and Foreigners or "SAIME"). It also fails to appreciate that it is commonplace for government agencies to use electronic signatures and photographs. Consistent with the Venezuelan law for the Simplification of Administrative Procedures, which does not allow an agency to demand re-submission of previously accredited procedures, Mr. Saab understands that for passports, SAIME first confirms the identity and data of the passport recipient. It then proceeds to printing with either a new image being used at the request of the recipient or the existing image in the SAIME database being used (if it is sufficiently recent). Likewise, the signature is printed from registered SAIME data (not new data). Thus, data for Mr. Saab's diplomatic passport was taken from his pre-existing ordinary passport—information *already in* the identification system—and replicated on his diplomatic passport. Contrary to the government's position, it would be surprising if the information did *not* match.

The forgery claim is an act of desperation, created out of whole cloth, because the government knows that the passport is clear documentary evidence that Mr. Saab was appointed a Special Envoy prior to traveling to Cape Verde.[4]

Finally, the government seeks to sow confusion by setting up a straw man argument related to the Venezuelan *Gaceta*. Opp'n at 7, 32-33. This argument misses the mark. First, Mr. Saab is

---

[3] The government first raised this fanciful argument only one week ago. The MFA is progressing with necessary internal procedures forthwith, and a certification confirming the authenticity of the passport issued on March 21, 2019, and used for Mr. Saab's March 2020 trip to Iran will be presented at the Evidentiary Hearing. In April and June 2020, Mr. Saab traveled on his personal passport because he was awaiting receipt of his renewed diplomatic passport (which had been issued but not physically given to him due to COVID-19 restrictions and shutdowns). *See* Exhibit 1, attached.

[4] The government also suggests that Mr. Saab's travel without a diplomatic passport somehow defeats his entitlement to immunity. *See* Opp'n at 5-6, 13, 25, 32. However, as the government recognizes, the presence (or absence) of a diplomatic passport proves nothing. *See id.* at 6 n.5. As testimony will show, there are eminently valid reasons for a diplomat to travel on personal documents even while on mission. The fact that one is entitled to use a diplomatic passport, but does not, has no bearing on his or her status or *in transitu* immunity. *See* Opp'n at 32.

not arguing that the *Gaceta* publication is the basis for his diplomatic status. Indeed, the Motion does not even mention, let alone rely upon, the *Gaceta* because Mr. Saab knows that under Venezuelan law, it is not publication that effectuates his appointment as Special Envoy. The *Gaceta* is invoked solely by the government. Second, it is pure conjecture that the existence of a supposedly differing online copy of the *Gaceta* indicates that the Venezuelan government somehow created a "fabricated story." Opp'n at 7. Mr. Saab expects that testimony at the evidentiary hearing will demonstrate the irrelevancy of this argument, not only because the independent Servicio Autónomo Imprenta Nacional y Gaceta Oficial has the power to authorize the contents of the *Gaceta* and verify its authenticity, but also because publication in the *Gaceta* is not a prerequisite to validate an appointment such as Mr. Saab's. In fact, according to Article 9 of the Venezuelan Official Publications Law of 1941, it is permitted *but not required* to publish certain acts, such as in the case of diplomatic appointments other than ambassadors. There is flexibility. That the government presumes a requirement that does not exist is of no moment. The *Gaceta* is simply irrelevant in the face of Mr. Saab's diplomatic status.

Furthermore, it is not surprising that Mr. Saab's initial appointment was not contemporaneously publicized by the Venezuelan government given that his work was viewed by the United States as being in contravention of sanctions. The United States was already actively attempting to crush the Maduro administration, and thus the success of Mr. Saab's missions would have been jeopardized if his appointment was advertised.[5]

## ARGUMENT

### A.    *Abdulaziz v. Metropolitan Dade County* Controls this Case

The government's assertion that Mr. Saab is not a diplomatic agent entitled to immunity under the VCDR and DRA because that treaty purportedly applies only to "permanent" diplomatic missions, *see* Opp'n at 18-21, ignores the Eleventh Circuit's analysis and holding in *Abdulaziz* v. *Metro. Dade County*, 741 F.2d 1328 (11th Cir. 1984). That case, binding precedent in this Circuit,

---

[5] Obviously, by June 2020 the U.S. Government knew of Mr. Saab's activities, and travel, and arrested him before he could complete his diplomatic mission—demonstrating the clear risks to him. His missions were also dangerous, warranting secrecy, due to *inter alia* U.S. military activity towards Venezuela. *See, e.g.,* AP NEWS, *Trump: US to deploy anti-drug Navy ships near Venezuela* (Apr. 1, 2020) ("In January, another Navy vessel, the USS Detroit, conducted a freedom of navigation operation off the coast of Venezuela in a show of pressure against Maduro.").

involved a Saudi national—Prince Turki Bin Abdulaziz—who resided with his family in Dade County, Florida. *Id.* at 1330. "Prince Turki and his family did not have diplomatic status." *Id.*

Prince Turki sought diplomatic recognition after having brought a § 1983 suit against Dade County police officers who had executed a search warrant based on information that a domestic servant was being held against her will at his home. The officers counter-claimed, seeking damages for injuries they suffered at the hands of Prince Turki's personal bodyguards. It was only at this point that Saudi Arabia named Prince Turki "'special envoy' for matters concerning the Government of Saudi Arabia," and the State Department recognized this status. *Id.* at 1331. The question whether or not Prince Turki was attached to Saudi Arabia's permanent mission in Washington, D.C. did not figure into the Eleventh Circuit's analysis or ruling, which on all relevant points is indistinguishable from the instant case.

The *Abdulaziz* Court first concluded that the State Department's recognition of Prince Turki's diplomatic status in the U.S. was conclusive.[6] The police officers, however, argued that his status as a "special envoy" meant that he was not—as the government claims in this case— entitled to diplomatic status under the VCDR or DRA. *Id.* at 1331. The Eleventh Circuit rejected this argument based upon its independent construction of the VCDR and DRA's plain text. It noted that VCDR Art. 14 "classifies 'envoys' as Heads of Missions," and that "Heads of Missions are defined in § 254a of the [DRA] and are protected by the Act." *Id.* Accordingly, the court concluded that Prince Turki was a special envoy and head of mission entitled to VCDR immunity along with his family. *Id.* Indeed, the fact that the *Abdulaziz* Court's analysis was grounded in Prince Turki's status as a "Head of Mission" under the DRA and VCDR forecloses any argument that he was attached to Saudi Arabia's permanent mission in the United States as there can be only one head of mission, whether that mission is permanent or special.[7]

The *Abdulaziz* Court's approach is fully consistent with the VCDR's text and purpose and makes good sense. As the government concedes, the VCDR does not define "mission." Opp'n at 19. Even if the treaty generally focuses on permanent establishments in "brick and mortar" embassies, it does not state that it is limited to diplomats posted to permanent missions. Moreover,

---

[6] As Prince Turki was accredited to the United States and accepted as such by the Department of States this was clear.

[7] Consequently, the government's attempt to distinguish *Abdulaziz* on this basis fails. *See* Opp'n at 20 n.11.

the court's construction of the VCDR in concert with the DRA does not open the benefits of that instrument to all members of a special mission, but only to the principal diplomat at its head—who are among the oldest type of diplomatic agent. *See* Mot. at 22. As explained below, the U.N. Convention on Special Missions ("UNCSM"), primarily addresses the problems caused by providing diplomatic immunity to all members of such a mission and their families, which may number in the hundreds.

In short, *Abdulaziz* holds squarely that special envoys, who are also heads of mission, are entitled to the immunities available to diplomatic agents under the VCDR. Mr. Saab is a special envoy and head of mission and is therefore a diplomatic agent under the VCDR and entitled to immunity as such. The government's contrary assertion on this point does nothing less than invite this Court to defy controlling precedent.

### B.     The State Department's Policy on Immunities of U.S. Representatives and Establishments Abroad Does Not Deprive Mr. Saab of VCDR Immunity

Mr. Saab's status under the VCDR does not change because the government, with respect to most American diplomats, takes the position that the VCDR applies only to those posted to permanent missions around the world. Indeed, the State Department policy cited by the government, 2 Fam 220, Immunities of U.S. Representatives and Establishments Abroad, *see* Opp'n at 21, speaks broadly of the privileges and immunities of "diplomatic mission (*i.e.*, an Embassy or Embassy branch office) personnel," 2 Fam 220(a), but by its terms does not apply to the head or "chief" of a permanent mission. Thus, the policy describes the conditions under which the State Department will seek to accredit "U.S. government direct hire employee['s] *under Chief of Mission* authority," *See* 2 Fam 220(b), or serving *under Chief of Mission* control or jurisdiction. *See* 2 Fam 220(h)(5); 2 Fam 225.4(a) (emphasis added). The document does not speak to the status of officers of the United States who serve as "Head" or "Chief" of Mission.

But the government's narrow construction of the VCDR in this case clearly would put U.S. diplomats at risk. For example, John Kerry recently traveled as Special Presidential Envoy for Climate to Greece, Indonesia, and Vietnam, to discuss climate crises matters with foreign officials. Without VCDR protection, his diplomatic immunity is subject to each country's interpretation of customary international law, and its potential derogation from that law's requirements, leaving him at risk of arrest and detention. *Cf. 767 Third Ave. Assoc. v. Zaire*, 988 F.2d 295, 296 (2d Cir. 1993) ("[B]y upsetting existing treaty relationships [with a cramped VCDR interpretation]

American diplomats abroad may well be denied lawful protection of their lives and property to which they would otherwise be entitled.").

**C.      The UNCSM Does Not Displace Mr. Saab's Immunity Under the VCDR and DRA**

The UNCSM nowhere refers to special envoys and was primarily designed to address very different types of "special missions" than those involving a special envoy head of mission like Mr. Saab—although such an individual would clearly be entitled to immunity under those UNCSM provisions codifying customary international law. Thus, the UNCSM defines a "special mission" so that it may consist of a single individual, but the text generally assumes that a special mission will be composed of many individuals, including "diplomatic staff, administrative and technical staff and service staff." Art. 9.

The UNCSM guarantees a special mission's representatives and diplomatic staff the "core" diplomatic immunities enjoyed by diplomats under the VCDR and customary international law, *i.e.*, personal inviolability and immunity from criminal (and most civil) proceedings. Arts. 29, 31. *See also, Regina (Freedom and Justice Party and Others) v. Secretary of State for Foreign and Commonwealth Affairs and Another*, [2018] EWCA Civ 1719 (Jul. 19, 2018), at ¶¶ 5, 79 ("*Freedom and Justice Party*"). But it also grants all special missions most of the immunities available to permanent missions. Thus, the treaty provides that "[a] special mission shall have its seat in the locality agreed by the States concerned," and that if the special mission "performs its functions in different locations, the States concerned may agree that it shall have more than one seat from among which they may choose one as the principal seat." Art. 17.

Like permanent missions, the special mission would enjoy inviolability of its premises, archives, and documents, as well as the "private accommodation" of its representatives and diplomatic staff. Arts. 25, 26, 30. Special missions would also "have the right to use the flag and emblem of the sending State on the premises occupied by the mission, and on its means of transport . . . ." Art. 19. Special mission representatives and staff are exempt from local dues and taxes, *see* Art. 33, among other rights and privileges. In short, the UNCSM contemplates that a special mission will resemble a roving permanent mission of perhaps hundreds of individuals. This would go far beyond the limits of customary international law, and likely explains why so few countries have acceded to the treaty. *See, e.g.*, *Freedom and Justice Party*, at ¶ 6.

At the same time, although there is nothing in the UNCSM that would prevent a sending state from appointing a special envoy as head of a special mission, the treaty's text does not require this. Indeed, the UNCSM does not require that the sending state appoint a special mission head at all. *See* Arts. 9, 14 (indicating that where there is no head of a special mission, the sending state may designate one of its special mission representatives to fulfil those functions), Art. 11(1)(e). If the sending state chooses, its head of state can serve as the head of a special mission. Art. 21.

Thus, there is no doubt that customary international law affords a special envoy, whether serving as the head of his own mission or of a special mission as contemplated in the UNCSM, the critical core immunities of personal inviolability and immunity from local criminal and civil jurisdiction. The government concedes as much. *See* Opp'n at 11 ("customary international law does provide certain immunities for high-level officials traveling on a special mission in the receiving state, so long as the receiving state consents to the special mission."). *See also Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio 1978) (dismissing suit against Britain's Prince (now King) Charles based on the State Department's conclusion that he was on "a special diplomatic mission" and was "an official diplomatic envoy while present in the United States on that special mission" entitled to immunity). But nothing in the UNCSM's text or purpose excludes a special envoy head of mission like Mr. Saab from the status of diplomatic agent under the VCDR.

*United States v. Sissoko*, 995 F. Supp. 1469 (S.D. Fla. 1997) is wholly inapposite. In *Sissoko*, the diplomat claiming immunity was not a special envoy head of mission, but a "Special Advisor on a Special Mission to the United States." *Id.* at 1470. Moreover, unlike Mr. Saab, he was claiming immunity as a diplomat accredited to the United States, immunity the State Department refused to recognize. Immunity for all diplomats, whether special envoys or those serving in a permanent mission, is dependent upon having been recognized as such by the receiving state. *See United States v. Lumumba,* 741 F.2d 12, 15 (2d Cir. 1984); *Ali v. Dist. Director*, 209 F. Supp. 3d 1268, 1273 (S.D. Fla. 2016). As a result, Sissoko's immunity never materialized. Mr. Saab, by contrast, has been accepted by the receiving state, Iran, and enjoys immunity.

### D. Mr. Saab is Fully Entitled to *In Transitu* Immunity Under the VCDR and Customary International Law

Significantly, the core immunities guaranteed by the VCDR and customary international law are those functionally necessary for the diplomat to perform his or her mission. *See Freedom and Justice Party* at ¶ 79 (holding that special missions 'cannot be expected to perform their role

9

without the functional protection afforded by the core immunities"). This necessarily includes *in transitu* immunity. *See Bergman v. De Sieyes*, 170 F.2d 360, 362-363 (2d Cir. 1948) (Judge Hand holding that a diplomat in transit had immunity from criminal and civil jurisdiction, and noting that this immunity is, as a functional matter, more important for diplomats *in transitu* than for those *in situ*).

The government's assertion that Mr. Saab is not entitled to *in transitu* immunity under either the VCDR, UNCSM, or customary international law is without merit. First, the government claims that Mr. Saab has no *in transitu* immunity in the United States because he is not "passing through the United States while proceeding to take up a purported diplomatic post in Iran." Opp'n at 22. In fact, as the government well knows, Mr. Saab left Venezuela on his mission to Iran and has yet to complete that journey—not because of his own choice but because he was waylaid and brought to the United States by force. His mission has not been completed and neither Mr. Saab nor his government have purported to abandon that mission. He remains *in transitu*.

With respect to customary international law, the government necessarily concedes that it includes some form of *in transitu* immunity, if not well defined. *See* Opp'n at 11-12. In fact, however, customary *in transitu* immunity is at least as broad as that codified in Art. 40 of the VCDR, which is a far more reliable statement of customary international law on this point than the comparable UNCSM provision. *See* Art. 42. The government makes much of Art. 42 having a more rigorous consent requirement compared to the VCDR, *see* Opp'n at 12, but this is likely due to the UNCSM's broader scope—permitting many more individuals to qualify for immunity, *in transitu* or otherwise.

In fact, it is not clear that customary international law includes an essential pre-notification and consent requirement, as the early cases recognizing *in transitu* immunity do not identify one. *See Bergman,* 170 F.2d at 362-363; *Wilson v. Blanco*, 56 N.Y. Super. Ct. 582 (1889), *Carbone v. Carbone*, 123 Misc. 656 (1924). Indeed, in *Bergman* the Second Circuit noted on an analogous point that "[i]t is scarcely necessary to add that that immunity would be altogether frustrated, in the case of all diplomats seeking their post for the first time, if it were limited to those already accepted by the sovereign to whom they are accredited." 170 F.2d at 363.[8]

---

[8] Indeed, a number of countries have provided for *in transitu* immunity for special missions without notification by statute. *See* Andrew Sanger & Michael Wood, "Immunities of Members of Special Missions" in: Tom Ruys; Nicolas Angelet & Luca Ferro (eds.), *The Cambridge Handbook of*

In any case, under the VCDR[9] the United States cannot deny Mr. Saab's *in transitu* immunity under customary international law. The government consented to his presence here by engineering Mr. Saab's transport to this country despite knowing of his mission, his status, and that both he and his sending state have vigorously asserted his diplomatic immunity. The United States must take Mr. Saab as it finds him, fully clothed in the diplomatic immunity afforded by both treaty and customary international law.

The government's reliance on *R v. Governor of Pentonville Prison, Ex parte Teja*, [1971] 2 QB 274 (U.K.), is unavailing. That case involved prosecution of an Indian national, Teja, who absconded to Costa Rica, where he was appointed as an economic adviser and dispatched on a special mission to "establish himself in Switzerland where he shall soon be accredited as economic advisor for the Costa Rican Embassy" in that country. *Id.* at 279. After visiting a number of countries in Europe, he passed through London Heathrow and was arrested on an Indian warrant. *Id.* at 280. The court rejected Teja's claim to *in transitu* immunity because he was not in transit to or from his sending state (Costa Rica) to a receiving state which had accepted his accreditation. Although Teja's counsel indicated that he was traveling to take up a post at the Costa Rican Embassy in Switzerland, the court remarked that Costa Rica had no Embassy in that country. *Id.* at 285. By contrast, Mr. Saab was traveling from his sending State to a receiving State that had confirmed his status. The case is, therefore, entirely inapposite.

The government's effort to avoid Mr. Saab's *in transitu* immunity in the United States based on *force majeure* also cannot stand. The term is broader than the government suggests, *see* Mot. at 30-31 (*force majeure* includes acts of irresistible force or overwhelming power),[10] but even using its own definition his seizure and transport to the United States in violation of treaty and customary international law could neither have been anticipated nor controlled when he set out

---

*Immunities and International Law* 66-68 (CUP 2019) (listing examples of national legislation providing *in transitu* immunities without prior notification requirements).

[9] As to the condition under VCDR Art. 40.1 that he secure a visa, "if required," he was brought to the United States by its government which, if nothing else, has *consented* to his presence knowing both that he had no U.S. visa and of his diplomatic status. In such circumstances no visa can be said to have been required.

[10] Diplomatic usage of the term to reference main force was common in the mid-20th Century, when the VCDR was drafted. For one example *see* Mem. from Dept. of State to Chinese Embassy, May 6, 1942, *reprinted in Foreign Relations of the United States: Diplomatic Papers 1942 China* (1956) (noting that "it is doubtful whether it is desirable to stress too strongly that the Thai Government yielded to *force majeure* in signing a treaty of alliance with Japan").

from Venezuela to Iran—his diplomatic status fully recognized by both states. This is true even if his fueling stop was a foreseeable necessity. His extradition, arrest, and detention by the United States was unprecedented. The fact that Mr. Saab was under indictment, *see* Opp'n at 26, did not provide notice that he might, despite his diplomatic status and the nature of his mission, be seized and brought to the United States. The question is whether he could anticipate an interruption of that mission, not whether he could foresee arrest and detention by the United States at some point in the future.

### E.     The Status of Nicolás Maduro Does Not Affect Mr. Saab's Immunity[11]

The government cannot deny Mr. Saab immunity because it does not recognize the "Maduro regime," *see* Opp'n at 14, which it still does not define. As explained in the Motion, at 23-24, in January 2019, President Trump recognized Juan Guaidó as Interim President of Venezuela because he concluded that Nicolás Maduro had lost Venezuela's 2018 elections, ending his term of office. Neither President Trump nor Biden have suggested that the recognition of Mr. Guaidó automatically resulted in the "de-recognition" of every other part of the Venezuelan government, including the MFA. Notably, as President Trump said in his January 2019 statement, the United States recognized the Venezuelan National Assembly as the "the only legitimate branch of government *duly elected* by the Venezuelan people." *Id.* at 24-26 (emphasis added). And, of course, Mr. Saab was appointed as Venezuela's Special Envoy by the Foreign Minister in April 2018, during the time the United States recognized Mr. Maduro as President. *See* ECF No. 148-1.

For its part, the State Department continues to deal with the MFA in Caracas, *i.e.*, subject to Mr. Maduro's authority rather than that of Mr. Guaidó, with respect to treaty matters. *See* Mot. at 24-26. The government dismisses this fundamental disconnect between its litigating position and the State Department's clear policy in a footnote, *see* Opp'n at 15 n.10, but actions always speak louder than words. In particular, as noted in the Motion, the State Department continues to

---

[11] Mr. Saab replies on this issue noting that, under Eleventh Circuit precedent, issues not raised in an opening appellate brief are forfeited and thereafter may be considered only "in extraordinary circumstances." *See United States v. Campbell*, 26 F.4th 860, 870-73 (11th Cir. 2022). In its opening brief before the Eleventh Circuit, the government argued that Mr. Saab was not entitled to diplomatic immunity because (1) he had not been recognized as a diplomat by the State Department, and (2) he was not covered by the VCDR. It did not suggest that the United States' position vis-à-vis Mr. Maduro had any relevance to Mr. Saab's immunity. *See United States v. Saab*, No. 21-11083-JJ, Answering Brief for the United Sates, at 36-40 (11th Cir. Oct. 14, 2021). The issue was, therefore, forfeited. *See Campbell*, 26 F.4th 873.

work with the MFA on matters arising under the multilateral Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), regardless of the United States' position vis-à-vis President Maduro. For example, one State Department official recently thanked his MFA counterpart for assisting in the return of a child to the United States and stated that "I have eight incoming cases from Venezuela . . . I will try to be as diligent and helpful with these cases as you have been with this case and my two other outgoing cases to Venezuela." *See* Exhibit 2, attached.[12]

In any case, U.S. recognition of Mr. Guaidó does not relieve it of its statutory, treaty, or customary international law obligations. *See, e.g., The Sapphire,* 78 U.S. (11 Wall.) 164, 168 (1870). *See also* Mot. at 21-22. The government seeks to avoid this established rule by claiming that it "does not argue that it has no obligations under the VCDR generally or that it no longer has diplomatic relations with Venezuela." Opp'n at 15. But this begs the question. Whether the United States recognizes President Maduro or not, Iran accepted Mr. Saab as the diplomatic agent of Venezuela. Both Venezuela and Iran are parties to the VCDR, and so the United States has legal obligations to those states not to interfere with *their* diplomatic interactions, including their diplomats *in transitu*.

The government's reliance on *Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F. Supp. 3d 257 (S.D.N.Y. 2020), Opp'n at 14, is misplaced. That case involved an effort by Venezuela's national oil company, PDVSA (as operated by Mr. Guaidó's board of directors, *id*. at 266-267), to dishonor bonds due in 2020 and secured by a controlling interest in its ultimate subsidiary, CITGO. PDVSA defaulted on its bond payments and brought a declaratory action against the bond trustee and the collateral agent in New York, arguing that the 2020 bonds were void *ab initio* because Venezuela's National Assembly had taken (before and after Mr. Guaidó was recognized as Interim President) various actions to invalidate their issue.

PDVSA focused particularly on three National Assembly resolutions (two from 2016 and one from 2019) purporting to reject use of the CITGO shares as collateral and invalidate the bonds. *Id.* at 267. The company then argued that invalidation of the bonds worked a taking of the bondholders' interest *in Venezuela* and invoked mandatory application of the act of state doctrine so that the court could not question the action, leaving the bondholders no recourse. The defendants

---

[12] The case included nearly 50 emails reflecting MFA/State Department cooperation that have been certified. Given the prevalence of details regarding the minor, extraneous emails are not filed here.

argued that the 2016 resolutions were not acts of state, but the court concluded that the resolutions were "sufficiently formal to qualify" as official acts carrying the force of law pursuant to U.S. recognition of the National Assembly in 2019. *Id.* at 271-272. In reaching this conclusion, the court treated U.S. recognition of the National Assembly as retroactive to 2015, when it had last been elected, *id.* at 273. It relied on cases dealing with U.S. recognition of the Soviet Union in the 1930s, which validated all of that government's actions back to its establishment in 1918. *Id.* at 272.[13]

But, the court did not decide the act of state doctrine's applicability based on the status of the 2016 resolutions. First, it found the text of those resolutions insufficient to void the bonds *ab initio*, as PDVSA claimed, and that only the 2019 resolution potentially had that effect. *Id.* at 276-278. Second, it concluded that any taking, if there was one, took place in New York (where the principal aspects of the bond transactions occurred), rendering its discussion of the 2016 resolutions dicta. *See id.* at 280-81. The court went on to reject discretionary application of the act of state doctrine and applied New York law "to the exclusion of Venezuelan law, vitiat[ing]" PDVSA's claim and ruling that the bondholders could pursue the CITGO shares as collateral. *Id.* at 292-93. In addition, of course, the facts of this case are very far afield of the question whether the United States remains bound by its treaty obligations to Venezuela.[14]

Also, as explained in *Bank of China v. Wells Fargo Bank & Union Trust*, 104 F. Supp. 59, 64 (N.D. Cal. 1952), "[t]he decisions [of other courts] reveal no rule of law obliging the courts to give conclusive effect to the acts of a recognized government to the exclusion of all consideration of the acts of an opposing unrecognized government. Nor does it appear that such a sweeping rule would be a sound one." That case involved a U.S. deposit claimed by two Banks of China, one controlled by the Nationalist Chinese government in Taiwan and the other by the unrecognized communist mainland government. The court found for Taiwan, but noted that "[r]ecognition is not

---

[13] The court rejected the defendants' argument that this rule applied only to cases of "civil war or revolution" without considering the implications its application would have—invalidation of *all* official acts of Venezuela's executive branch between 2015 and 2019 regardless of the consequences.

[14] *United States v. Cordones*, No. 11 Cr. 205 (AKH), 2022 WL 815229 (S.D.N.Y. Mar. 17, 2022) involved "official conduct" immunity rather than the status-based immunity to which Mr. Saab is entitled. There, defendant argued that he took the alleged criminal actions in his capacity as a Venezuelan military officer. The court rejected this claim based on Circuit precedent on sovereign immunity and, because the alleged conduct violated Venezuelan law, it was not official. *Id.* at *7. The case has no application here.

14

intended to sanctify every act, past and future, of a foreign government. . . . it does not necessarily stamp all of its acts with disapproval or brand them unworthy of judicial notice. Our executive, on occasion, has even entered a treaty with an unrecognized government." *Id.*

The question before this Court is not whether the United States recognizes Mr. Maduro as Venezuela's president, but whether it must honor its treaty obligations, and those under customary international law, to Venezuela and Iran as VCDR state parties and independent sovereigns recognized as such by the United States. Nothing in the treaty permits a state party to ignore its requirements simply because that country is at odds with other state parties or refuses to recognize their current governments. And, the United States entered no reservation or understanding claiming such an authority. The status of Mr. Maduro vis-à-vis the United States is irrelevant to the question of Mr. Saab's immunity.

### F. Mr. Saab's Status is Not Dependent on State Department Certification

The lack of State Department certification of Mr. Saab's immunity, *see* Opp'n at 16, is also irrelevant. Such certification is neither necessary nor possible as Mr. Saab's diplomatic status is based solely upon his recognition by Venezuela and Iran. The United States' obligation to accept and respect his status arises from its *indisputable* obligations under the VDCR and customary international law, either of which is fully sufficient to require dismissal of the indictment under the DRA. That statute requires such dismissal based upon the VCDR or "any other laws extending diplomatic privileges and immunities." 22 U.S.C. § 254d.

Consequently, the Court owes no deference to the government's position. The question of "fact" the government referencing in claiming otherwise, *see* Opp'n at 17, is *not* whether Mr. Saab is a diplomat accredited to or by the United States, but whether he is a duly accredited diplomat *from Venezuela to Iran*, which has accepted him as such, and he is exactly that. The U.S. treaty obligation to afford Mr. Saab diplomatic immunity arises from that status, not any diplomatic status granted by the United States. In other words, the United States is not "the state from which [Mr. Saab] seeks immunity," *id.*, his status as a diplomat from Venezuela to Iran establishes that immunity. Mr. Saab demands only that the U.S. comply with its treaty, statute, and customary international law obligations and respect the inviolability and immunity to which he is entitled.

Accordingly, the President's authority to determine who is entitled to diplomatic status based on accreditation to the United States is not at issue. Nor is his exclusive authority to recognize states, so that the government's reliance on *Zivotofsky v. Kerry*, 576 U.S. 1 (2015) is

unavailing. That case addressed an entirely different issue—whether the President or Congress had the authority to determine the territorial extent and capital of a foreign state (Israel) for purposes of U.S. law. At issue was a statute that allowed U.S. citizens born in Jerusalem to list their place of birth as "Israel," a statement inconsistent with U.S. policy. The government argued that the law impermissibly intruded on the President's exclusive recognition power which, at a minimum, permits the Executive to determine whether or not to recognize a state as independent and what borders were acceptable to the U.S. The Court agreed, ruling that the statute interfered with the President's exclusive recognition power. *Id.* at 32.

Significantly, while affirming the President's authority to recognize foreign states, the *Zivotofsky* Court finally rejected the Executive's claim to "'exclusive authority to conduct diplomatic relations,' along with 'the bulk of foreign-affairs powers." *Id.* at 19-20. In support of this extravagant claim, the government cited—as it always has—*United States v. Curtiss-Wright Export Corp.*, "which described the President as 'the sole organ of the federal government in the field of international relations.'" *Id.* (quoting *Curtiss-Wright Corp.*, 299 U.S. at 320). The Court made clear that the relevant language in that case was only dicta, and that "whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law." *Id.* at 21. Here, of course, Congress has enacted the DRA (and VCDR) into law, and it is now the courts that must construe that statute and convention.

### G.   The Act of State and *Ker/Frisbie* Doctrines Continue to be Irrelevant

Finally, having no answer to Mr. Saab's well-founded diplomatic immunity claims, the government yet again asserts that Cape Verde's decision to extradite Mr. Saab somehow resolved any such question. But the United States is not a dependency of Cape Verde, and the interpretation and performance of *its* treaty obligations are not subject to Cape Verde's government, law, or judiciary. The government has cited no authority to support such a claim, and none exists. Instead, it segues into its own well-trodden territory, arguing that the act of state doctrine and *Ker/Frisbie* are applicable here. *See* Opp'n at 13, 26-31. They are not.

The act of state doctrine is a comity rule that applies only where "the relief sought or the defense interposed would . . . require[] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co., Inc. v. Environ. Tectonics Corp.*, 493 U.S. 400, 405 (1990). Mr. Saab does not ask the Court to consider or resolve any issue of Cape Verdean law, or whether his extradition to the United States was

lawful from Cape Verde's perspective. His claim is that the government has violated its obligations under the laws and treaties of the United States, at a minimum by arresting and detaining him in contravention of his diplomatic immunity. Consequently, none of the cases cited by the government, *see* Opp'n at 28-29, are relevant. Tellingly, none involved a claim of diplomatic or other type of immunity.

Similarly, *Ker/Frisbie* applies where a defendant argues that he was brought before the court in violation of the Due Process Clause. *See United States v. Darby*, 744 F.2d 1508, 1530 (1984) (*Ker/Frisbie* "doctrine takes its name from two cases in which the Supreme Court rejected the due process claims of defendants who had been brought by force into the jurisdiction in which they were tried."). Mr. Saab has not asserted a due process claim based upon his extradition from Cape Verde. The Court cannot exercise jurisdiction over him because of his diplomatic immunity, and whether his arrest and incarceration violate the Due Process Clause is irrelevant.

Despite the government's determined effort to rewrite Mr. Saab's argument, from one based on the construction and application of independent U.S. legal obligations, to a challenge to Cape Verde's extradition decision, whatever the courts of Cape Verde did or did not decide, and whatever action Cape Verde's Executive Branch took, they did not and could not consider and rule upon the obligations of the United States under the VCDR, DRA, or customary international law.[15] Ultimately, it is this Court that must decide whether Mr. Saab is entitled to immunity under those instruments and authorities, and the law of this Circuit.[16] In so doing, it will in no way be "second guessing Ca[pe] Verde's own determinations about whether Ca[pe] Verde had any international obligations to afford immunity to SAAB MORAN." Opp'n at 23.

## CONCLUSION

The United States cannot, consistent with its own statutes, treaty obligations, and customary international law, ignore Alex Saab's immunity as a Venezuelan diplomat duly accredited to Iran and on mission to that country. By arresting and imprisoning him, the United States has violated his diplomatic immunity and made a mockery of its own international legal obligations.

---

[15] By not challenging Cape Verde's actions in his Motion or this Reply, Mr. Saab does not suggest that those actions were lawful under the law of Cape Verde or international law.

[16] Notably and unsurprisingly, all of the government's cases suggesting deference to the rulings of a foreign court, *see* Opp'n at 28-29, deal with questions of the law of the foreign state concerned, not the independent treaty, statutory, and customary law obligations of the United States.

Date: November 14, 2022

Respectfully submitted,

BAKER & HOSTETLER LLP

/s/ *Lindy K. Keown*
Lindy K. Keown (FL: 117888)
200 South Orange Avenue
Suite 2300
Orlando, Florida 32801
Tel: (407) 649-4000
lkeown@bakerlaw.com

/s/ *David B. Rivkin, Jr.*
David B. Rivkin, Jr. (*pro hac vice*)
Elizabeth Price Foley (FL: 92380)
Jonathan R. Barr (*pro hac vice*)
Lee A. Casey (*pro hac vice*)
Richard Raile (*pro hac vice*)
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
drivkin@bakerlaw.com
efoley@bakerlaw.com
jbarr@bakerlaw.com
lcasey@bakerlaw.com
rrraile@bakerlaw.com

Jonathan B. New (*pro hac vice*)
45 Rockefeller Plaza
11th Floor
New York, New York 10111
Tel: (212) 589-4200
jnew@bakerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 14, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/  Lindy K. Keown</u>
Lindy K. Keown
