

FILED BY _____ rrs _____ D.C.

Dec 16, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIA

## REPÚBLICA BOLIVARIANA DE VENEZUELA
## TRIBUNAL SUPREMO DE JUSTICIA
### Presidencia

Doral, Florida, 15 de diciembre de 2022

Oficio N°: TSJ/P-0044-2022

**Honorable Juez Robert Scola**

**Juez Federal Miami Florida**

En mi condición de presidente del Tribunal Supremo de Justicia Legítimo de la República Bolivariana de Venezuela, me dirijo a Usted muy respetuosamente, a los fines de informar sobre la situación jurídica del ciudadano Alex Saab en relación a los crímenes graves que le han sido imputado en perjuicio del Estado Venezolano por los cuales está siendo procesados en diferentes jurisdicciones judiciales internacionales, muy especialmente de américa. En virtud de ello paso hacer las siguientes consideraciones:

**Primero:** Es absolutamente incierto que se afirme que el ciudadano Alex Saab es un funcionario diplomático en comisión o, de carrera. En materia de Derecho Diplomático Comparado[1] un agente diplomático para ser reputado como tal, frente a un hecho que ponga en duda su legitimidad y pueda aplicarse el canon consagrado en la Convención de Viena sobre Relaciones Diplomáticas y la Convención de Viena sobre Relaciones Consulares, relativas a su inmunidad[2] debe haber sido designado con anterioridad de acuerdo a lo que consagre la Ley del Servicio Exterior del país acreditante y, que no contradiga lo dispuesto por las convenciones aludidas. Todo ello

---

[1] Para efectos de revision doctrinal, ver las obras de reconocidos autores en materia de Derecho Diplomático Comparado como : Cahier, Philipe. (1965). Derecho Diplomático. España. Ediciones Rialp, S.A / Nicolson, Harold. (1954). Derecho Diplomático. Tomo I. Madrid: Fondo de Cultura Económica/ Pérez de Cuellar, Javier. (1997). Manual de Derecho Diplomático. México. FCE. P. 13. / Moreno Pino, Ismael. (2001). La diplomacia: aspectos teóricos y prácticos de su ejercicio profesional. México. FCE. P 21/ Morales Lama, Manuel. (2000). Diplomacia contemporánea: teoría y práctica. República Dominicana. Fundación Antonio M. Lama. P. 62. / Puig Vilazar, Carlos. (1970). Derecho consular ecuatoriano. Quito. Prensa Actual. p. 9/ Remiro Brotons, Antonio. (1997). Derecho Internacional. Madrid. España-McGraw-Hill P. 1. Y al Tratado de uno de los miembros de nuestro tribunal, residente en Chile con asilo politico, titulado: Marcano Salazar, Luis Manuel (2022) Tratado Derecho Internacional Público. Editorial Ibanez, Bogotá Colombia.

[2] La inmunidad diplomática se refiere a los beneficios de inmunidad o inviolabilidad que goza un diplomático sobre su persona y el país en donde reside y se desempeña oficialmente, la exención de impuestos y de la jurisdicción civil y criminal respecto con los tribunales locales



debido a que es el Derecho Diplomático el que legitima la acción del Estado y la conducta del diplomático, como ejecutor de los altos fines del Estado e intereses de la política exterior. La diplomacia no es pues, una patente de corso[3] que sirva como otrora en la historia para dar legitimidad a actos que ofendan la nobleza de la diplomacia como función pública internacional. La diplomacia es una función de servicio nacional, cuando el diplomático ingresa a la carrera, lo hace con el rango de tercer secretario, pasa por el proceso de formación en las academias diplomáticas de los países miembros de la Convención y luego es acreditado, cuando es por comisión y designado por el ejecutivo a través del Ministerio de Relaciones Exteriores en algún destino, donde dichos privilegios cobran vida. No es verdad que un diplomático que cumple funciones en un Estado y comete un delito en otro, pueda ejercer y desarrollar dichas inmunidades. En todo caso, se pretende burlar el canon diplomático, haciendo ver a Alex Saab, quien tampoco es venezolano, como un funcionario diplomático o agente, para burlar la justicia. Bajo todo sentido lógico y de interpretación normativa, como lo consagran Ricardo Guastini y Robert Alexy, no es confiable ni posible ninguna interpretación que legitime la condición de Alex Saab como diplomático ni enviado especial por las razones copiosamente explicadas.

Todas las distinciones son interesantes y necesarias para comprender estos aspectos que se encadenan en la acción-ejecución, con todo el sistema normativo del Derecho Internacional Público, en donde el alegato de los representantes de Maduro es invalido: *"enviado especial venezolano, y tiene inmunidad diplomática"*, por ello, esta institución legítima de Venezuela **desconoce la pretendida imposición de inmunidad diplomática y de la nacionalidad venezolana de dicho ciudadano,** por no cumplir con el procedimiento legal establecido en la vigente Ley de Nacionalidad y Ciudadanía, al no existir Carta de Naturaleza publicada en la Gaceta Oficial de la República, ni su inscripción en el Registro Civil (artículo 11.3, 31 y 31); no haber tenido residencia ininterrumpida, de diez o cinco años, en su caso (artículo 21.1); y no haberse seguido el procedimiento de naturalización de un órgano competente en materia de nacionalidad y ciudadanía. (artículo 3). No siendo ciudadano venezolano, menos puede Alex Saab esperar reconocimiento de una condición de diplomático de la República Bolivariana de Venezuela.

**Segundo:** Las actuaciones del señor Nicolás Maduro Moros y representantes del régimen dictatorial son nulas, según, pues lo dispone el artículo 138 de la Constitución de la República Bolivariana de Venezuela, que prevé: "Toda autoridad usurpada es ineficaz y sus actos son nulos".

**La ilegitimidad de Nicolás Maduro Moros,** deriva de declaratorias de la vacante del órgano ejecutivo venezolano por parte de la Asamblea Nacional legítima de Venezuela y del proceso penal que siguió este Tribunal culminado con sentencia condenatoria de fecha 15 de agosto de 2018, publicado el fallo en extenso, el

---

[3] era un documento entregado por las autoridades de un territorio, por el cual el propietario de un navío tenía permiso de la autoridad para atacar barcos y poblaciones de naciones enemigas para causar destrozos de manera ah hoc, sin ser nacional del estado que lo designaba. De esta forma el propietario se convertía en parte de la marina del país o la ciudad expendedora.



29 de octubre de 2018, relacionado con las contrataciones de obras públicas con la Empresa Odebrecht. (Autorizado por la Asamblea Nacional Legítima mediante Acuerdo de fecha 17 de abril de 2018, con 105 votos a favor y 02 en contra; y la sentencia definitiva avalada por la misma Asamblea Nacional de acuerdo al plenario del 21 de agosto de 2018.

En el juicio penal realizado se declara a Nicolás Maduro Moros **culpable en la perpetración de los delitos de Corrupción Propia y Legitimación de Capitales**, previstos y sancionados en los artículos 64 y 35, de la Ley Contra la Corrupción y la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, **imponiéndose una pena de dieciocho (18) años y tres (3) meses de prisión.** Asimismo, se impuso sanción pecuniaria de Veinticinco Millones de dólares ($USA. 25,000,000) por el delito de Corrupción Propia y resarcir al patrimonio de la República de Venezuela la cantidad de Treinta y Cinco Mil Millones de dólares ($ USA. 35.000.000.000,00) por el delito de Legitimación de Capitales.

Se declaró la **Inhabilitación Política** por el tiempo que dure la pena, y se procede a la **DESTITUCIÓN de Nicolás Maduro Moros del cargo de presidente de la República,** activándose igualmente la Convención Internacional contra la Delincuencia Organizada Trasnacional, por haberse evidenciado de las pruebas los supuestos de un entramado criminal transnacional.

**Tercero:** Es incierto lo alegado por el ciudadano Alex Saab que la nacionalidad se la "otorgó Nicolás Maduro como recompensa por sus servicios", y que su trabajo en Venezuela ha sido "negociar con gobiernos extranjeros y empresas privadas la creación de nuevos canales para obtener y entregar los muy necesitados alimentos, medicinas básicas y recambios necesarios para la industria del petróleo".

La verdad es que el ciudadano Alex Saab **no ejerce cargo diplomático** según las leyes de Venezuela y las Convenciones Internacionales en materia consular, tratándose de un ciudadano colombiano que tiene contratos con Nicolás Maduro Moros y su familia.

En el marco de estos vínculos se ha delinquido en contra de la **Nación Venezolana**, y se sigue una investigación contra los asociados de Alex Saab, Nicolás Maduro Moros y un grupo de sus colaboradores políticos civiles y militares, por causa probable de **conexiones con el narcotráfico internacional, con grupos terroristas como las FARC, ELN y Hezbollah,** y **por el delito de lavado de dinero,** teniendo como base de operaciones el territorio venezolano y persiguiendo el objetivo de generar desestabilización en el hemisferio.

Aunado a ello, Alex Saab no puede ser considerado funcionario público por cuanto ha contratado con el régimen de Nicolás Maduro y en Venezuela existe la prohibición de que los funcionarios públicos puedan contratar con el Estado.

**Cuarto:** Venezuela vive la tragedia y catástrofe más grande de nuestra historia Republicana, al ser sometida por parte de régimen de Nicolás Maduro y su red criminal en la que se inserta Alex Saab, a la expoliación ilegítima y continuada de su erario. El saldo de lo anterior se mide en sufrimiento de nuestro pueblo, sometido a una grave emergencia humanitaria por falta de alimentos y medicinas, que, junto a violaciones sistemáticas y



generalizadas de los derechos humanos, ha provocado un desplazamiento forzado al exilio de más de siete millones de personas, según reconoce la Organización de las Naciones Unidas.

**Quinto:** Es evidente, que Alex Saab y los abogados contratados por el régimen de Maduro Moros, pretenden incorporar elementos de naturaleza política, además comprobadamente forjados para hacerle inmune al proceso judicial que usted dirige, cuando lo que procede en realidad, es la evaluación y sanción de los cargos criminales graves que pesan en su contra y que los fiscales del caso han instruido en plena conformidad con las normas judiciales de los Estados Unidos de América.

**Sexto:** Como legítimos representantes del poder judicial de Venezuela, cumpliendo con los principios y deberes de la Constitución política de nuestro País, le suministramos  elementos e información útil para el juicio que Usted dignamente dirige,  y así aclarar las pretendidas manipulaciones  hechas por **el régimen dictatorial  de Nicolas Maduro Moros y sus representantes en defensa de Alex Saab, quienes intentan lograr un salvoconducto político para un asunto que es competencia estricta de la justicia criminal.** Confiados estamos en su impecable labor de administrador de justicia. Su señoría, la sana doctrina desde Austin, Kelsen, Hart, Ross, han tenido a la justicia como un parámetro a ser desarrollado por el desecho y quienes lo aplican, en tal sentido reiteramos nuestra confianza en que ese arquetipo de justicia que ha bañando al Caribe desde estas tierras estadounidenses, continúe su brillo en la historia.

Reitero a usted las más altas consideraciones de mi estima y consideración.

**Magistrado Antonio José Marval Jiménez**
**Presidente**

**Magistrado Pedro Troconis Da Silva**
**Primer Vicepresidente**

Anexos:

1. Presentación del legitimo Tribunal Supremo de Justicia (reconocido por la Asamblea Nacional de Venezuela y la Organización de Estados Americanos).
2. Acto de designación de Magistrados por la Asamblea Nacional.
3. Resumen sentencia caso Nicolás Maduro Moros.

**Tribunal Supremo de Justicia de la República Bolivariana de Venezuela: 8300 NW 53rd St Suite 350. Doral Florida, 33166-7712.**
**Teléfono  305-742-2138. Estados Unidos de América.**

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

**MISIÓN**
*Liderar el Proceso de Institucionalización del Sistema de Justicia en Venezuela*

**VISION**
*Retorno del estado de Derecho en Venezuela y fortalecimiento del Sistema de Justicia como pilar de la democracia*

**VALORES**
*Justicia, Integridad, Libertad y Paz*

## I. DESIGNACIÓN Y JURAMENTACIÓN DE LOS MAGISTRADOS

La **Asamblea Nacional de la República Bolivariana de Venezuela,** con el voto favorable de más de las dos terceras partes de sus integrantes, previo concurso de credenciales y la participación de la sociedad civil organizada, selecciona y juramenta en sesión solemne celebrada el 21 de julio de 2017 a los nuevos magistrados del Tribunal Supremo de Justicia de Venezuela, cumpliendo las reglas previstas en la Constitución Nacional y en la Ley Orgánica del Tribunal Supremo de Justicia.

## II. PERSECUSIÓN DE MAGISTRADOS

Inmediatamente a la juramentación de los magistrados del máximo Tribunal de Justicia, el dictador Nicolás Maduro Moros, a través de los medios de comunicación, ordena su detención y juzgamiento ante tribunales militares, invocando los delitos de traición a la patria, usurpación de funciones y asociación para delinquir.

Asimismo, se ordena la congelación del patrimonio y cuentas bancarias de cada magistrado.

Se inicia la persecución por parte del Servicio Bolivariano de Inteligencia (SEBIN) y de la Dirección General de Contrainteligencia Militar (DGCIM), ambos cuerpos armados de represión y torturas usados por la dictadura.

En fecha 22 de julio de 2017, proceden a la detención ilegítima del magistrado Ángel Zerpa, integrante de la Sala Político-Administrativa y lo recluyen bajo condiciones inhumanas y degradantes.

El resto de los magistrados se ve en la obligación de pasar a la clandestinidad y salir furtivamente del país. Actualmente el tribunal se mantiene integrado con veinticinco (25) magistrados que permanecen exiliados en cinco (5) países: Estados Unidos de América (13), República de Colombia (3), Republica de Chile (4) República de Panamá (3), y Reino de España (2).

## III. RUPTURA DEL ORDEN CONSTITUCIONAL Y CESACION DE FUNCIONES DEL RESTO DE LOS MAGISTRADOS QUE INTEGRABAN EL TRIBUNAL SUPREMO.

Con la elección e instalación de la autodenominada **Asamblea Nacional Constituyente (ANC)** el 31 de julio de 2017, convocada de manera unilateral por el dictador Nicolás Maduro Moros en contra de las reglas establecidas en la vigente Constitución de la República, se produjo, una vez más, la ruptura del orden constitucional y democrático en Venezuela, afectándose el principio de separación y autonomía de los poderes públicos, consumándose la afrenta al sistema republicano y decretándose

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

con ello a Venezuela como un "Estado fallido", dirigido por un <u>cartel del crimen organizado trasnacional</u> y apoyado en plena complicidad por instituciones de poder del país.

Es así como en acto público el día 15 de agosto de 2017, el resto de los magistrados no sustituidos el 21 de julio de 2017 por la Asamblea Nacional, cesaron en sus cargos al poner sus posiciones a la orden ante la Asamblea Nacional Constituyente (ANC). Con ello se genera una falta absoluta en el alto gobierno judicial de la República, lo que justificó la integración de este órgano colegiado con la incorporación de los **magistrados principales** y **suplentes** recientemente juramentados para integrar las seis (6) Salas del Tribunal Supremo de Justicia, según las disposiciones constitucionales, asumiendo de esta manera el legítimo gobierno judicial de Venezuela.

## IV. INSTALACIÓN DEL TRIBUNAL SUPREMO DE JUSTICIA LEGÍTIMO E INICIO DE ACTIVIDADES

Se inician actividades en acto público, celebrado en la sede de la Organización de Estados Americanos (OEA), en Washington DC, Estados Unidos de América, el día 13 de octubre de 2017.

El Legítimo Tribunal Supremo de Justicia, es reconocido por la Asamblea Nacional de la República de Venezuela, la Fiscal General de la República de Venezuela, los Colegios de Abogados de Venezuela, la Asociación Mundial de Juristas, la Federación Interamericana de Abogados, entre otros.

Los Magistrados son recibidos por representantes de gobiernos, parlamentos y/o Cortes de Justicia de algunos países democráticos; entre otros: Estados Unidos de América, Colombia, Chile, Panamá, Perú. Brasil y España, así como por la Secretaria General de la Organización de Estados Americanos (OEA) y el Parlamento Europeo.

## V. OBJETIVO DE LA INSTALACIÓN DEL TRIBUNAL SUPREMO LEGÍTIMO

Recuperar la independencia y autonomía del sistema de justicia de Venezuela, como un pilar necesario en el proceso de institucionalización de los poderes públicos que integran un Estado democrático que se somete al imperio de la ley.

## VI. INTEGRACIÓN DEL TRIBUNAL SUPREMO DE JUSTICIA LEGÍTIMO
### Junta Directiva 2020-2022

| | |
|---|---|
| Magistrado Antonio Marval Jiménez | Presidente |
| Magistrado Pedro Troconis Da Silva | 1er Vicepresidente |
| Magistrado Domingo Salgado Rodríguez | 2do Vicepresidente |
| Magistrado Cioly Janette Zambrano Álvarez | Director |
| Magistrado Rubén Carrillo Romero | Director |
| Magistrado Luis María Ramos Reyes | Director |

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

### Conformación de las Salas del Tribunal Supremo de Justicia

| SALA CONSTITUCIONAL | SALA POLITICA ADMINISTRATIVA |
|---|---|
| Mag. Cioly Janette Zambrano Álvarez (Presidente)<br>Mag. Zuleima del Valle González (Vicepresidente)<br>Mag. Miguel Ángel Martin Tortabú<br>Mag. Elenis del Valle Rodríguez Martínez<br>Mag. Luis Manuel del Valle Marcano<br>Mag. Gabriel Ernesto Calleja Angulo<br>Mag. Gustavo José Sosa Izaguirre | Mag. Antonio Marval Jiménez (Presidente)<br>Mag. José Fernando Núñez Sifonte (Vicepresidente)<br>Mag. José Luis Rodríguez Piña<br>Mag. Ramsis Ghazzaoui Piña<br>Mag. Manuel Antonio Espinoza Melet |
| **SALA ELECTORAL** | **SALA DE CASACION PENAL** |
| Mag. Domingo Javier Salgado Rodríguez (Presidente)<br>Mag. Álvaro Fernando Marín Reverón (Vicepresidente)<br>Mag. Ildefonso Ifill Pino<br>Mag. Rommel Rafael Gil Pino | Mag. Pedro Troconis Da Silva (Presidente)<br>Mag. Beatriz J Ruiz Marín (Vicepresidente)<br>Mag. Milton Ramón Ladera Jiménez<br>Mag. Cruz A. Graterol Roque |
| **SALA DE CASACION CIVIL** | **SALA DE CASACION SOCIAL** |
| Mag. Luis María Ramos Reyes (Presidente)<br>Mag. Ramón Pérez Linares (Vicepresidente) | Mag. Rubén Carrillo Romero (Presidente)<br>Mag. Rafael Antonio Ortega Matos<br>Mag. José Sabino Zamora Zamora |

## VII.    DECISIONES MÁS RELEVANTES DICTADAS POR EL LEGÍTIMO TSJ

Desde el momento de su integración, el legítimo *Tribunal Supremo de Justicia*, como máxima instancia judicial de la República Bolivariana de Venezuela, ha venido dictando y publicando una serie de Sentencias, Resoluciones, Acuerdos, y Comunicados, los cuales constituyen la doctrina jurídica necesaria para el soporte del proceso de institucionalización y recuperación de la democracia en Venezuela, actuando bajo el amparo de la Constitución de la República, las normas del Derecho Internacional sobre Justicia Universal y de protección de los Derechos Humanos, los principios generales del derecho y la equidad, como fundamentos en la búsqueda y rescate de la Justicia. Se destacan como pronunciamientos medulares los siguientes:

**1. Nulidad de la Asamblea Nacional Constituyente (ANC).**

Fecha: 25 de octubre de 2017.
Sala Constitucional
**Ponente:** Magistrado Miguel Ángel Martín Tortabú

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

**Resumen:** Se declara la ineficacia de la Asamblea Nacional Constituyente y de todos los actos dictados por ella, por haber ocurrido un fraude constitucional. En consecuencia, se declaró DISUELTA la Asamblea Nacional Constituyente, que pretendió funcionar sin la decisión expresa del pueblo de convocarla, como lo exige el artículo 347 de la Constitución de la República Bolivariana de Venezuela. Igualmente se declaró la inmediata activación de la resistencia pacífica del pueblo venezolano, en el sentido de que todo ciudadano investido o no de autoridad, tiene el deber de colaborar en el restablecimiento de la efectiva vigencia de la Constitución, tal como lo ordena el artículo 333 constitucional; por lo tanto, los ciudadanos civiles y militares tienen el legítimo deber de desconocer, resistir y desobedecer toda actuación de la fraudulenta Asamblea Nacional Constituyente, conforme a lo previsto en el artículo 350 constitucional.

## 2. Nulidad contra el Decreto mediante el cual se creó la ZONA DE DESARROLLO ESTRATÉGICO NACIONAL "ARCO MINERO DEL ORINOCO".

Fecha: 14 de noviembre de 2017
Sala Político Administrativa.
**Ponente:** Magistrado José Luis Rodríguez Piña.

**Resumen:** Se ordena la suspensión de los efectos del Decreto (…) mediante el cual se crea la Zona de Desarrollo Estratégico Nacional "Arco Minero del Orinoco", (…) así como también se ordena a cualquier persona natural o jurídica, nacional o extranjera, so pretexto de incurrir en desacato, suspender y paralizar la ejecución de cualquier actividad de explotación, extracción, procesamiento, comercialización y aprovechamiento de los recursos minerales en el área determinada como Zona de Desarrollo Estratégico Nacional "Arco Minero del Orinoco". Todo ello en virtud a que tales actividades lesionan gravemente derechos ambientales, derechos de las comunidades indígenas y disposiciones constitucionales.

## 3. Apertura de un Canal Internacional de Ayuda Humanitaria para el pueblo de Venezuela.

Fecha: 15 de noviembre de 2017.
Sala Constitucional
**Ponente:** Magistrada Elenis del Valle Rodríguez Martínez

**Resumen:** Se declara la urgente la apertura de un canal internacional de ayuda humanitaria para el pueblo de Venezuela. En tal sentido, se decide la **Necesaria Intervención Humanitaria** de la Organización de las Naciones Unidas (ONU); la Organización de Estados Americanos (OEA); la Organización Mundial de la Salud (OMS); la Cruz Roja Internacional; el Parlamento Europeo; el Banco Mundial; del Fondo Monetario Internacional; del MERCOSUR; de la UNASUR; y al grupo de Cancilleres que firman la Declaración de Lima, de conformidad con lo previsto en los artículos 22, 23 y 31 del capítulo de los Derechos Humanos y Garantías previstos en la Constitución de la República Bolivariana de Venezuela y de las demás disposiciones aplicables y previstas en el Derecho Internacional Público y en los Tratados, Pactos y Convenios Internacionales suscritos y ratificados por la República Bolivariana de Venezuela.

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

**4. Aplicación del principio de complementariedad para los funcionarios responsables de violaciones a los Derechos Humanos en Venezuela.**

Fecha: 27 de noviembre de 2017.
Sala de Casación Penal
**Ponencia:** Conjunta de los magistrados que integran la Sala de Casación Penal

**Resumen:** El principio de complementariedad, compone un instrumento de procedimiento, que permite a la comunidad internacional, iniciar procesos contra aquellos autores de delitos mencionados en el artículo 7 del Estatuto de Roma de la Corte Penal Internacional, siempre y cuando, los Estados partes no puedan u omitan ejercer su jurisdicción –como ocurre en Venezuela–; por consiguiente, la Corte Penal Internacional ofrece una solución a la impunidad; tal y como ocurrió en casos como los de la República Democrática del Congo, Uganda y República Centroafricana; asuntos que fueron referidos directamente a la Corte Penal Internacional por los Estados, por considerar, que los juicios de esos criminales ante sus propios tribunales serían imposibles.

**5. Inconstitucionalidad sobre la Denuncia de la Convención Americana de Derechos Humanos y la Carta de la Organización de Estados Americanos.**

Fecha: 04 diciembre de 2017.
Sala Constitucional
**Ponente:** Magistrado Cioly Janette Coromoto Zambrano Álvarez

**Resumen:** Se declara la nulidad absoluta por inconstitucionalidad manifiesta, de los actos de "Denuncia" que contienen las "Notas" No. 000125 de fechas 6 de septiembre de 2012 y S/N fechada 27 de abril del 2017, presentada por Nicolás Maduro Moros, actuando como Canciller y posteriormente como Presidente de la República Bolivariana de Venezuela, al Secretario General de la OEA, en ambos casos, con el propósito de denunciar la Convención Americana de Derechos Humanos y la Carta de la OEA y dar inicio al retiro definitivo de Venezuela de dicha Organización, por ser actos dictados en ejercicio del Poder Público, que violan y menoscaban los derechos garantizados por la Constitución de la República a los Venezolanos.

**6. Venezuela asume el principio de la jurisdicción universal, contra los responsables de crímenes internacionales que vulneren los pactos, tratados y convenios suscritos por la República.**

Fecha: 15 de diciembre de 2017.
Sala Constitucional
**Ponente:** Magistrado Luis Manuel Del Valle Marcano Salazar

**Resumen:** Se declara resuelta la interpretación del artículo 29 de la Constitución de la República Bolivariana de Venezuela y se dispone – de manera vinculante – lo siguiente: 1. La acción en caso de crímenes de guerra o los crímenes de lesa humanidad, se podrá intentar en virtud del principio de complementariedad, por vía de carácter excepcional, al no poderse agotar la vía interna, directamente ante la Fiscalía de la Corte Penal Internacional, por ser crímenes dentro de su competencia, dejando a salvo las competencias constitucionales asignadas a este Tribunal Supremo de Justicia. 2. La acción



**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

en caso de violación grave de los Derechos Humanos, puede interponerse ante el Sistema Interamericano de Promoción y Protección de los Derechos Humanos, conforme a los procedimientos establecidos en el mismo, así como las acciones dentro de la competencia del Tribunal Europeo de Derechos Humanos, dejando a salvo las competencias constitucionales asignadas a este Tribunal Supremo de Justicia. 3. El Estado Venezolano, con fundamento en la Constitución, Pactos, Tratados y Convenios, ratificados por la República, asume el <u>Principio de la Jurisdicción Universal,</u> contra los responsables de crímenes internacionales, que vulneren los pactos, tratados y convenios suscritos por la República, extendiéndose inclusive para sancionar aquellos delitos de transcendencia internacional y, en consecuencia, todos los ciudadanos tienen el derecho de acudir directamente a este Tribunal Supremo de Justicia Legítimo para activar la justicia universal en todos sus ámbitos. (…) En razón de la coyuntura histórica que vive Venezuela, que se subsume en un Estado secuestrado, que lo convierte en un <u>Estado fallido,</u> en virtud de la situación de sumisión de los Tribunales de la República Bolivariana de Venezuela, así como la falta de autonomía e independencia de los Poderes del Estado, especialmente el Poder Judicial, siendo este el principio más importante para la configuración de una forma de gobierno democrática, propio del Estado de derecho, garante de los derechos y libertades, se hace necesaria la revisión de todo el sistema de justicia en el país, cuando retorne el Estado de Derecho.

**7. Interpretación, alcance y contenido del artículo 350 de la Constitución de la República Bolivariana de Venezuela. Alcance del Derecho a la Rebelión y a la Desobediencia Civil.**

Fecha: 20 de marzo de 2018
Sala Constitucional
**Ponente:** Magistrado Gabriel Ernesto Calleja Angulo

**Resumen:** Se declara resuelta la interpretación del artículo 350 de la Constitución de la República Bolivariana de Venezuela, según la cual se consagra un derecho universal, que pertenece al mundo de los derechos humanos y del derecho natural de los ciudadanos, el desconocer cualquier régimen, legislación o autoridad que contraríe los valores, principios y garantías democráticas o menoscabe los derechos humanos. Este derecho lo ejerce el pueblo por medio de la "<u>resistencia civil</u>", cuyo objeto es lograr la rectificación de la norma, actuación o decisión de cualquier régimen, legislación o autoridad para restablecer el imperio de la ley y rescatar los derechos humanos y constitucionales vulnerados, lo que se traduce en la defensa y protección de los principios fundamentales de nuestra existencia humana en sociedad, mediante acciones que se ordenan ejecutar en el artículo 333 de la Constitución, al imponer el deber a todo ciudadano investido o no de autoridad de realizar las acciones necesarias para restablecer el orden constitucional y el estado de derecho violentado en Venezuela.

En consecuencia, se exige a los jueces, fiscales, funcionarios policiales y a los militares integrantes de los componentes de la Fuerza Armada, como garantes de la soberanía nacional al servicio de la Nación, y en ningún caso al de persona o parcialidad política, realizar acciones contundentes y determinantes, para frenar la injusticia, la arbitrariedad, el abuso, la conculcación de derechos, la inconstitucionalidad, la ilegalidad y la fuerza como método de obediencia al acto de autoridad viciado del régimen totalitario como respuesta a la necesidad de democracia que el pueblo aspira, y procedan a desconocer y detener el régimen inconstitucional que se encuentra en poder del Ejecutivo Nacional,



**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

y en especial en la persona que ejerce en forma ilegítima la Presidencia de la República. Queda establecido que el ejercicio de este derecho y cumplimiento de este deber constitucional gozará del amparo y protección legal correspondiente, así como también les serán respetados o restituidos los cargos, méritos y honores que les hayan sido inconstitucionalmente despojados.

**8. Nulidad de la Moneda Virtual o Criptomoneda denominada "Petro".**

Fecha: 16 de marzo de 2018
Sala Político Administrativo
**Ponente:** Magistrado José Fernando Núñez Sifontes

**Resumen:** Se afirma que la moneda nacional de Venezuela es el bolívar, lo cual cierra la posibilidad del uso de cualquier otra denominación monetaria en el territorio nacional. (…) El artículo 318 constitucional, establece una competencia funcional en materia monetaria en el Banco Central de Venezuela, con exclusión de cualquier otra autoridad nacional. Aún más, el objeto de esto último es "lograr la estabilidad de precios y preservar el valor interno y externo de la unidad monetaria (…) lo que significa que, a objeto de evitar la emisión inorgánica de dinero, el Banco Central tendrá entre sus funciones *"las de formular y ejecutar la política monetaria, participar en el diseño y ejecutar la política cambiaria, regular la moneda, el crédito y las tasas de interés, administrar las reservas internacionales y todas aquellas que se establezcan".*

**9. Nulidad del Sistema Electoral de Venezuela y Condiciones Necesarias para la celebración de Elecciones Autenticas.**

Fecha: 13 de junio de 2018
Sala Electoral
**Ponente:** Magistrado Domingo Javier Salgado Rodríguez

**Resumen:** Se declara <u>nulo</u> e <u>inaplicable</u> el uso del <u>sistema automatizado de votación y escrutinio</u> para la elección de los cargos de representación popular de los Poderes Públicos, así como para la celebración de los referendos. Conforme a lo anterior, se ordenó al Consejo Nacional Electoral (CNE), que con la participación obligatoria de las universidades, de los partidos políticos, de los grupos de electores, de la Academia de Ciencias Políticas y Sociales y de los Colegios Profesionales, diseñe e implemente un sistema de votación y escrutinio, <u>fundamentalmente manual</u>, con preminencia del voto físico o papeleta electoral, en donde el uso de la tecnología e informática sea auxiliar y solo en beneficio de la celeridad, publicidad, transparencia y eficiencia del voto, escrutinio y totalización, con el objetivo de recuperar la confianza pública de los ciudadanos en el sufragio, como la forma legítima de participación democrática. Asimismo, se declara la inconsistencia del Registro Electoral y como consecuencia, se ordena se inicie un proceso de <u>depuración y actualización</u> del mismo con la veeduría de la sociedad civil, debiéndose efectuar las debidas correcciones sobre la identidad de cada ciudadano venezolano o extranjero habilitado para ejercer el voto; <u>verificándose las debidas actas de nacimiento</u>, actualizándose en la data su lugar de residencia; excluyéndose a los fallecidos e inhabilitados y generándose un archivo digitalizado confiable que contenga además de sus datos de identificación, los registros biométricos y las direcciones de cada elector, el cual debe estar a la disposición de las organizaciones políticas antes de la celebración de cada elección.



**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

10. **Enjuiciamiento y Condena a Nicolás Maduro Moros, por delitos de Corrupción y Legitimación de Capitales, cometidos en perjuicio del Estado venezolano.**

Fecha: 15 de agosto de 2018
Sala Plena
**Ponente:** Magistrado Rommel Rafael Gil Pino

**Resumen:** Se declara la culpabilidad y la responsabilidad penal de Nicolás Maduro Moros, en la perpetración de los delitos de Corrupción Propia y Legitimación de Capitales, previstos y sancionados en los artículos 64 y 35, de la Ley Contra la Corrupción y la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, respectivamente. Como consecuencia de lo anterior, se le condena a cumplir una pena de dieciocho (18) años y tres (3) meses de prisión. Asimismo, se le impone una multa Veinticinco Millones de dólares americanos (US$ 25,000,000) y resarcir al patrimonio de Venezuela la cantidad de Treinta y Cinco Mil Millones de dólares americanos ($ 35.000.000.000,00). De igual manera, se declara la inhabilitación política de Nicolás Maduro Moros y la destitución definitiva de Nicolás Maduro Moros del cargo de Presidente de la República Bolivariana de Venezuela. Conforme a lo anterior, Nicolás Maduro Moros está detentando ilegalmente la Presidencia del Estado Venezolano, en consecuencia, los tratados y contratos por él suscritos o por interpuestas personas, no serán legítimos, ni válidos legalmente y menos comprometen en modo alguno a la República, empresas y corporaciones propiedad de Estado Venezolano.

11. **Se exhorta la conformación de coalición militar internacional en misión de paz.**

Fecha: 08 de febrero de 2019
Sala Constitucional

**Resumen:** Fundado en principios de derecho internacional, la defensa de los derechos humanos, la prevención del genocidio y de crímenes de lesa humanidad, que impone un límite a la soberanía de los Estados, y un deber correlativo a la comunidad internacional para garantizar dichos derechos humanos, recogido bajo el principio de Responsabilidad de Proteger, reconocido en el Reporte de Responsabilidad de Proteger de diciembre de 2001 discutido por la Asamblea General de la ONU (A/57/303); por el Reporte del Panel de Alto Nivel, sobre Amenazas, Desafíos y Cambio, presentado a la Asamblea General en diciembre de 2004 (A/59/565); por el Reporte del Secretario General de la ONU "Mayor Libertad: hacia el desarrollo, seguridad y derechos humanos para todos" presentado a la Asamblea General en marzo de 2005 (A/59/2005).

Es así que en aplicación de los artículos 2, 3, 19, 22, 23 y 29 de la Constitución, relativos a la defensa y protección de derechos humanos y obligaciones internacionales de la Republica en dicha protección se RESUELVE a tales fines: 1) **Exhortar** al ciudadano Presidente (e) de la República Bolivariana de Venezuela Dip. Juan Gerardo Guaidó y a la Asamblea Nacional que realicen todas las acciones y utilicen los recursos materiales y humanos necesarios, en el cumplimiento cabal de la Constitución, los Tratados, Pactos y Convenios Internacionales, para instrumentar inmediatamente, sin dilación alguna y de forma prioritaria la apertura de un Canal Internacional de Ayuda Humanitaria para Venezuela. 2) **Ordenar** a la Fuerza Armada Nacional, a los Cuerpos de Seguridad de Estado y la



**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

Fiscalía General de la República, de conformidad el mandato que les impone el artículo 328 de la Constitución, coadyuven efectivamente en la materialización inmediata de la ayuda humanitaria internacional para el pueblo de Venezuela, incluida, entre otras, la apertura de un canal internacional, permitiendo el ingreso de medicinas, alimentos, víveres y personal técnico, médico y militar necesario para garantizar la efectiva provisión logística, de seguridad y distribución de dicha ayuda humanitaria. 3) **Solicitar** a los países miembros de la Comunidad Internacional apoyar la apertura de dicho canal internacional, **incluido una coalición militar en misión de paz** para ejecutar perentoriamente la Ayuda Humanitaria, a fin de cumplir con el mandato impuesto por esta medida cautelar urgente.

**12. Nicolás Maduro Moros y quienes siguen sus órdenes cometen delito de exterminio en contra del pueblo de Venezuela.**

Fecha: 21 de febrero de 2019
Sala Constitucional

**Resumen:** Se declara que frente a la amenazas proferidas principalmente por Nicolás Maduro Moros, de impedir que llegue la ayuda que clama el pueblo, el Tribunal Supremo de Justicia, en sus funciones de guardián de la constitucionalidad y con el fin de garantizar el cabal ejercicio del derecho de los ciudadanos a recibir alimentos y medicamentos que están implícitos en los artículos 83 y 84 de la Constitución, establece que cualquier acción que impida el ingreso pacifico de la ayuda humanitaria, ya preparada para el pueblo, está tipificado como un delito de lesa humanidad y grave violación a los derechos humanos, contemplados en nuestra Constitución y en Tratados Internacionales suscritos por la Republica. Se reafirma, que (…) Nicolás Maduro Moros y algunos personeros del Poder Ejecutivo, son responsables civil y penalmente de las amenazas de impedir la ayuda humanitaria, con las consecuencias legales que ello conlleva.

**13. Interpretación de la "extradición". Situación de las solicitudes de extradición activa, que están siendo tramitadas por quienes usurpan las funciones del Sistema de Justicia en Venezuela.**

Fecha: 24 de mayo de 2019
Sala Constitucional
**Ponente:** Magistrado Gustavo Sosa Izaguirre

**Resumen:** Se ordena que deberán ser reconocidas como autoridades legítimas de Cancillería y de Relaciones Exteriores, los funcionarios designados o ratificados por el Presidente Encargado de la República Bolivariana de Venezuela, Diputado Juan Gerardo Guaidó Márquez y los jefes de misiones diplomáticas permanentes de la República, designados o ratificadas por la soberana Asamblea Nacional de la República Bolivariana de Venezuela, de conformidad con el artículo 187.14 constitucional. Así mismo, que todo funcionario público en misión de relaciones exteriores, diplomáticas o consulares, está en el deber de rechazar por ser inadmisible cualquier pretendida orden relativa a los procedimientos de extradición, todo de conformidad con el artículo 25 de la Constitución Nacional; igualmente deben colaborar con la reversión de cualquier solicitud y procedimiento de extradición que se esté tramitando de forma inconstitucional y espuria, en salvaguarda de los

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

principios y garantías constitucionales y del respeto a los derechos humanos.

14. **Marco constitucional aplicable al financiamiento que el Banco Central de Venezuela podría otorgar a la República, para la ejecución de la Ley especial del fondo para la liberación de Venezuela y la atención de casos de riesgo vital.**

Fecha: 09 de marzo de 2020
Presidencia
Magistrado Antonio Marval Jiménez

**Resumen:** Resulta ajustado a derecho, que la Junta Administradora *ad-hoc* del Banco Central de Venezuela pueda otorgar un préstamo a la República, representada por el Gobierno del presidente encargado, siempre y cuando ello no implique el financiamiento de políticas deficitarias, al ser ello una exigencia de los artículos 318 y 320 de la Constitución.

15. **No es válida la designación de los Rectores del Consejo Nacional Electoral por parte del ilegitimo Tribunal Supremo de Justicia en Venezuela.**

Sala Electoral
Fecha: 14 de agosto 2020.
**Ponente:** Ildefonso Ifill Pino

**Resumen:** Se declara la invalidez de los documentos que emanen de las personas que usurpan en Caracas los cargos de magistrados del Tribunal Supremo de Justicia venezolano, lo cual comprende la decisión del 12 de julio de 2020 según la cual se intentó realizar designación de los rectores del Consejo Nacional Electoral, sobre la base de una supuesta omisión de su designación por parte de la Asamblea Nacional y todos los actos ejecutados por esos ciudadanos (…) en tanto y en cuanto dichos ciudadanos se arroguen la condición de rectores del Consejo Nacional Electoral, por aplicación del artículo 138 constitucional.

16. **No válida la convocatoria a elecciones parlamentarias del 6 de diciembre de 2020 y continuidad constitucional de la Asamblea Nacional electa el 6 de diciembre de 2015.**

Sala Electoral
Fecha: 03 de diciembre de 2020.
**Ponente:** Domingo Javier Salgado Rodríguez

**Resumen:** Se declara que carecen de validez, por ser irremediablemente nulos, ineficaces e inexistentes, los actos administrativos electorales, incluyendo la fraudulenta convocatoria a elecciones parlamentarias realizada el 01 de julio de 2020, de parte de quienes usurpan el Poder Electoral. **Se declara la <u>continuidad constitucional</u> de la representación parlamentaria de los diputados electos el 6 de diciembre de 2015**, por cuanto no ha existido una convocatoria legal para elegir a los diputados a la Asamblea Nacional para el período 2021-2026 y ante la ausencia de una reglamentación constitucional a la cual se pueda acudir para evitar que se vulnere la soberanía popular

**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

y el pueblo quede sin representación parlamentaria, en aplicación de la disposición contenida en el artículo 333 de la Carta Magna, se acuerda que se <u>mantengan como los únicos diputados legítimos a la Asamblea Nacional de la República Bolivariana de Venezuela, a partir del 6 de enero de 2021, a los parlamentarios legítimamente electos en los comicios celebrados el 6 de diciembre de 2015</u> y juramentados el 05 de enero de 2016, hasta que sean celebradas unas elecciones auténticas en plena garantía al derecho al sufragio consagrado en el artículo 63 constitucional.

Se declara (…) **la continuidad de *<u>la Junta Directiva presidida por el ciudadano Juan Gerardo Guaidó Márquez, quien además de presidente de la Asamblea Nacional ejerce las funciones de presidente interino de la República Bolivariana de Venezuela…</u>*",** hasta tanto la Asamblea Nacional decida lo conducente en los términos a que se refiere el artículo 194 de la Constitución de la República y el Reglamento de Interior y Debate de la Asamblea Nacional.

**17. Los ataques generalizados o sistemáticos ejecutados en Venezuela contra la población civil por la estructura criminal presidida por Nicolás Maduro Moros, deben ser considerados actos terroristas.**

Sala de Casación Penal
Fecha: 28 de septiembre de 2021.
**Ponente:** Pedro Troconis Da Silva

**Resumen:** Los ataques generalizados o sistemáticos ejecutados en Venezuela contra la población civil por parte de la estructura criminal presidida por Nicolás Maduro Moros, no solo deben ser considerados crímenes internacionales, sino que, igualmente, deben ser considerados actos terroristas, por ser ejecutados por agentes del Estado o grupos irregulares amparados por el Estado, (…) se considera posible la aplicación de normas propias del derecho internacional para determinar que existe terrorismo de Estado o terrorismo desde el Estado, a pesar de no estar conceptuado dentro del Derecho Internacional. Los actos de terror que se han ejecutado en Venezuela, pudieran alimentar la existencia de esta figura, máxime, cuando los ataques a la población civil no cuentan con instancias internas e independientes para hacer valer sus derechos.

## VIII.  CONTINUIDAD DEL TRABAJO DEL TRIBUNAL SUPREMO DE JUSTICIA

Los magistrados del legítimo Tribunal Supremo de Justicia de Venezuela, fueron designados por un periodo de 12 años, es decir, que su legitimidad se mantiene por lo menos hasta el mes de Julio de 2029, o hasta que se recupere la institucionalidad democrática en Venezuela y pueda efectuarse una nueva designación siguiendo los procedimientos establecidos en la Constitución de la Republica.

Es por ello que pese a la inusual situación de encontrarse integrados como máxima Corte de Justicia fuera del territorio venezolano, razón por la cual, por estado necesidad y ruptura del orden constitucional, no pueden sesionar en la ciudad de Caracas, se mantiene la estructura reglamentaria, haciendo uso de la tecnología digital para hacer las sesiones y votaciones, cumpliendo así el deber constitucional para lo que fueron electos y debidamente juramentados.

Se mantiene una sede física principal en el Estado de Florida, Estados Unidos de América, en donde quienes mantienen un interés de justicia y libertad de los pueblos de América, se dirigen a efectuar



**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**

solicitudes de pronunciamientos y gestión por parte de esta legítima institución, que trabaja solo teniendo como norte el retorno del estado de Derecho en Venezuela y fortalecimiento del Sistema de Justicia como pilar fundamental de la democracia, e inspirados en sus inquebrantables valores de justicia, integridad, libertad y paz.

Sin otro particular a que hacer referencia, me suscribo en nombre de los magistrados.

**Mag. Antonio José Marval Jiménez**
**Presidente del Tribunal Supremo de Justicia**



**ASAMBLEA NACIONAL
DE LA REPÚBLICA BOLIVARIANA DE VENEZUELA**
SESIÓN DEL DÍA VIERNES, 21 DE JULIO DE 2017
PRESIDENCIA DEL DIPUTADO **JULIO ANDRÉS BORGES JUNYENT**

**ACTA
ESPECIAL Nº 5-2017
12:00 PM**

Previo anuncio por Secretaría de la existencia del quórum reglamentario, **LA PRESIDENCIA** declaró abierta la sesión, con la asistencia del Primer Vicepresidente **FREDDY GUEVARA CORTÉZ**; del Secretario **JOSÉ IGNACIO GUÉDEZ** y del Subsecretario **JOSÉ LUIS CARTAYA PIÑANGO**, así como de los diputados que se indican en lista anexa.

Acto seguido, **LA PRESIDENCIA** ordenó a Secretaría dar lectura al Acta de la Sesión Ordinaria del día viernes 21 de julio de 2017, la cual resultó **APROBADA**.

A continuación, **LA PRESIDENCIA** le dio la bienvenida a los Magistrados y Magistradas del Tribunal Supremo de Justicia, recién electos, así como al Comité de Postulaciones Judiciales que ha tenido este trabajo junto con la Comisión de la Asamblea Nacional, indicándole a los Magistrados electos y diputados tomar asiento para proceder a la juramentación correspondiente.

A continuación **LA PRESIDENCIA**, ordenó a **Secretaría** dar lectura al Único punto del Orden, el cual una vez sometido a votación resultó **APROBADO**:

**ÚNICO PUNTO**

*"Juramentación de los Magistrados del Tribunal Supremo de Justicia designados por esta Asamblea Nacional."*

En este punto, **LA PRESIDENCIA** le concedió el derecho de palabra a la diputada **SONIA MEDINA**, quién dio lectura a los nombres de los ciudadanos magistrados designados en la sesión ordinaria, a los cuales se le solicitó ubicarse en el espacio reservado, para proceder a tomarles el juramento de ley respectivo; los cuidadanos Magistrados y Magistradas seleccionados fueron:

**SALA CONSTITUCIONAL**

**Principales**

MARTIN TORTABU MIGUEL ÁNGEL, C.I: 7.092.539

RODRÍGUEZ MARTINEZ ELENIS DEL VALLE, C.I: 8.365.055

ZAMBRANO ÁLVAREZ CIOLY JANETTE COROMOTO, C.I: 8.080.441

**Suplentes**

MARCANO SALAZAR LUIS MANUEL DEL VALLE, C.I: 6.916.267

GONZÁLEZ ZULEIMA DEL VALLE, C.I: 8.494.396

CALLEJA ANGULO GABRIEL ERNESTO, C.I: 9.959.820

SOSA IZAGUIRRE GUSTAVO JOSÉ, C.I 3.922.687

**SALA POLÍTICO ADMINISTRATIVA**

**Principales**

ZERPA APONTE ANGEL WLADIMIR, C.I: 6.525.457

MARVAL JIMENEZ ANTONIO JOSÉ, C.I: 7.154.319

*Asamblea Nacional / Año 2017*

2



**Suplentes**

RODRÍGUEZ PIÑA JOSÉ LUIS, C.I: 6.326.999

GHAZZAOUI PIÑA RAMSIS, C.I: 11.536.703

ESPINOZA MELET MANUEL ANTONIO, C.I: 12.642.529

NUÑEZ SIFONTE JOSÉ FERNANDO, C.I: 2.141.729

**SALA ELECTORAL**

**Principales**

ROJAS TORRES JESÚS ALFREDO, C.I: 8.466.894

MARIN RIVERON ALVARO FERNANDO RAFAEL, C.I:4.863.076

**Suplentes**

SALGADO RODRÍGUEZ DOMINGO JAVIER, C.I: 10.383.311

IFILL PINO ILDEFONSO, C.I:3.839.567

GIL PINO ROMMEL RAFAEL, C.I: 9.659.914

REYES PEÑA MANUEL ENRIQUE, C.I: 5.059.262

**SALA DE CASACIÓN CIVIL**

**Principales**

ALVAREZ DOMÍNGUEZ GONZALO ANTONIO, C.I: 3.176.818

D'APOLLO ABRAHAM EVELYNA DEL CARMEN, C.I: 7.348.293

PEREZ LINAREZ RAMÓN JOSÉ, C.I: 2.919.934

**Suplentes**

OLIVEROS NAVARRO GONZALO JOSÉ, C.I: 5.536.247

ALZURU ROJAS THOMAS DAVID, C.I: 13.226.245

RAMOS REYES LUIS MARÍA, C.I: 4.380.888

**SALA DE CASACIÓN PENAL**

**Principales**

TROCONIS DA SILVA PEDRO JOSÉ, C.I: 6.172.646

REBOLLEDO ALEJANDRO JESÚS, C.I: 6.248.019

**Suplentes**

LADERA JIMÉNEZ MILTON RAMÓN, C.I: 4.399.201 3

GRATEROL ROQUE CRUZ ALEJANDRO, C.I: 7.491.089

RUIZ MARÍN BEATRIZ JOSEFINA, C.I: 6.327.309

**SALA DE CASACIÓN SOCIAL**

**Principal**

ZAMORA ZAMORA JOSÉ SABINO, C.I: 6.382.753

**Suplentes**

ORTEGA MATOS RAFAEL ANTONIO, C.I: 6 914.428

CARRILLO ROMERO RUBEN, C.I: 3.838.238



*Asamblea Nacional / Año 2017*



3

Concluida la intervención correspondiente, **LA PRESIDENCIA**, procedió a tomar el juramento de ley a los Magistrados y Magistradas Principales y Suplentes del Tribunal Supremo de Justicia designados por la Asamblea Nacional, a lo que los Magistrados respondieron afirmativamente al Juramento.

Finalizadas las intervenciones, el Presidente, levantó la sesión.

Por ser esta Acta un registro sucinto de lo acontecido en Cámara, se ordena anexar a la misma la intervención de todos los diputados que participaron en esta Sesión, así como las propuestas aprobadas y rechazadas en el curso del debate.

(Acta leída en la Sesión del martes 01 de agosto de 2017).

JIGY/JLC/EM/MJAM/mcs



Quien suscribe, **JOSÉ IGNACIO GUÉDEZ YÉPEZ**, titular de la Cédula de Identidad Nº V- **13.566.537**, en mi carácter de Secretario de la Asamblea Nacional de la República Bolivariana de Venezuela, según consta en Acta de la Sesión de fecha 05 de enero de 2017, y en uso de la atribución que me confiere el artículo 33 numeral 12 del Reglamento Interior y de Debates de la Asamblea Nacional, publicado en la Gaceta Oficial de la República Bolivariana de Venezuela número 6.014 Extraordinaria de fecha 23 de diciembre de 2010, certifico que el documento que antecede, consta de tres (03) folios y es copia fiel y exacta de su original que reposa en el Archivo Legislativo de la Asamblea Nacional. En Caracas a los veinticinco días del mes de julio del 2017.

**JOSÉ IGNACIO GUÉDEZ**
Secretario de la Asamblea Nacional



*Asamblea Nacional / Año 2017*



**REPÚBLICA BOLIVARIANA DE VENEZUELA**
**TRIBUNAL SUPREMO DE JUSTICIA**
**SALA PLENA**

**Doral, diciembre, 2020**

**INFORME SOBRE SENTENCIA CONDENATORIA**

**A NICOLAS MADURO MOROS**

**ACUSADO**: **NICOLÁS MADURO MOROS**, mayor de edad, venezolano, titular de la cédula de identidad N° 5.892.464; domiciliado en la ciudad de Caracas, Distrito Capital; nacido en fecha 23 de noviembre de 1962; hijo de Nicolás Maduro García y Teresa de Jesús Moros.

**FISCAL: LUISA MARVELIA ORTEGA DÍAZ,** Fiscal General Legítima de la República Bolivariana de Venezuela.

**DEFENSA: ANDRES FELIPE LINDO OLANO**

**DELITOS IMPUTADOS:** Corrupción Propia, previsto y sancionado en el artículo 64 de la Ley Contra la Corrupción, y Legitimación de Capitales previsto y sancionado en el artículo 35 de la Ley Orgánica Contra la Delincuencia Organizada y Financiamiento al Terrorismo.

## ACUSACIÓN

En fecha 28 de junio de 2018 la Secretaría de la Sala Plena del Tribunal Supremo de Justicia en el exilio, recibió acusación presentado por la abogada Luisa Marvelia Ortega Díaz, en su

1

condición de Fiscal General de la República de Venezuela en el exilio, **en contra el ciudadano NICOLÁS MADURO MOROS**, por la comisión de los delitos de Corrupción Propia y Legitimación de Capitales, previstos en los artículos 64 de la Ley contra la Corrupción y el artículo 35 de la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, previstos en los artículos 64 y 35, respectivamente, cometido en perjuicio del Estado venezolano y el sistema financiero y económico de la República Bolivariana de Venezuela, argumentando:

Que entre la República Bolivariana de Venezuela y la República Federativa de Brasil se pusieron en vigencia multiplicidad de convenios básicos de cooperación que tenían como objetivos, entre otros, estimular la investigación científica y el desarrollo económico y social de ambos países. Que entre dichos convenios estuvo el suscrito en el año 1973 denominado **Convenio Básico de Cooperación Técnica entre los gobiernos de Venezuela y Brasil, publicado en la Gaceta Oficial** número 30.321 de fecha 4 de febrero de 1974 que, entre otras cosas, **establecía como objeto** implementar programas y proyectos de cooperación técnica y científica que **serían desarrollados a** través de acuerdos complementarios para establecer a través de éstos los **detalles y especificidades** de dichos objetivos, cronogramas de trabajo y obligaciones de cada una de las partes.

Continúa señalando que tal convenio procuraba la realización conjunta o coordinada de programas de investigación y/o desarrollo, creación y operación de instituciones de investigación o centros de perfeccionamiento y producción experimental, así como la organización de seminarios y conferencias, intercambio de informaciones y documentación y organización de los medios destinados a su difusión; que para el año 1995 fue suscrito el primer acuerdo complementario al Convenio Básico de Operación Técnica para la cooperación en la Región Amazónica y Orinoquense, contenido en la Resolución N° 274, publicado en la Gaceta Oficial N° 5.016 extraordinaria de fecha 11 de diciembre de 1995, con miras a desarrollar programas y proyectos conjuntos de cooperación, formación y capacitación de recursos humanos, propiciar el intercambio de investigados y técnicos, así como evaluación e intercambio de experiencias, entre otros.

Que el 5 de septiembre de 2005, bajo el mandato presidencial del hoy fallecido Hugo Rafael Chávez Frías, a través del Ministro de Relaciones Exteriores, Alí Rodríguez Araque, la República Bolivariana de Venezuela propuso la modificación del **acuerdo complementario N° 1** para incluir obras de infraestructura en la Región Amazónica Orinoquense, **modificando de forma**

2

radical la razón que sustento la creación del acuerdo entre ambos países, tratando de darle sustento jurídico a los contratos para el desarrollo de infraestructura infringiendo la legislación vigente en materia de contrataciones públicas, utilizando el acuerdo preexistente como base legal para adjudicar a la empresa de construcción brasilera de Norberto Odebrecht todas las obras de grandes estructuras en Venezuela.

Que tomando como base acuerdos anteriores, fueron introduciendo modificaciones que daban apariencia de marco jurídico válido a los contratos y para el 2007, suscribieron un memorándum de entendimiento para la cooperación en el área de infraestructura de fecha 23 de abril de 2017, publicada como Ley Aprobatoria en la Gaceta Oficial N° 38.697 de fecha 4 de junio de ese año, la cual fue suscrita por **NICOLÁS MADURO MOROS** como Ministro de Relaciones Exteriores y por Hugo Rafael Chávez Frías como Presidente de la República, en representación del Estado venezolano. Dicho convenio fue aprobado por la Asamblea Nacional bajo la presidencia de la ciudadana Cilia Flores (esposa de Nicolás Maduro Moros).

En el año 2009 fueron suscritos el segundo y tercer acuerdo complementario al Convenio Básico de Cooperación Técnica, el segundo en fecha 16 de enero, fundado en cooperación en el Sector Eléctrico y en materias Agraria e Industrial, el cual quedó recogido para el sector eléctrico en la ley aprobatoria publicada en la Gaceta Oficial N° 39.183 de fecha 21 de mayo de 2009 y para la materia Agraria e Industrial mediante ley aprobatoria publicada en la Gaceta Oficial 39.192 de fecha 2 de junio de 2009 y que a través de dichos acuerdos el gobierno quedó autorizado para celebrar contratos para la ejecución de obras, adquisición de bienes y prestación de servicios con empresas y organismos públicos o privados, de conformidad con sus ordenamientos jurídicos.

El 26 de mayo de 2009 fue suscrito el cuarto acuerdo para la cooperación en materia de Vivienda y Hábitat, cuyo objeto resultó en la celebración de contratos para la elaboración de planes urbanos y de construcción de viviendas, el cual fue publicado en la ley aprobatoria publicada en la Gaceta Oficial N° 39.276 de fecha 1 de octubre de 2009, firmado por Diosdado Cabello en representación de Venezuela, quien para entonces se desempeñaba como Ministro de Obras Públicas y Vivienda.

3

Se firmaron al menos 7 acuerdos más entre la República Bolivariana de Venezuela y la República Federativa de Brasil, entre los cuales se encuentran sendos memorandos de entendimiento, relacionados con programas de producción de soya y agricultura familiar, cuya ley aprobatoria fue publicada en la Gaceta Oficial N° 39.106 de fecha 26 de enero de 2009.

Añade de seguidas que el entonces presidente Hugo Rafael Chávez Frías generó las condiciones legales para que la empresa Odebrecht interviniera la totalidad de los proyectos de importancia y en diferentes áreas que comportaran grandes obras de infraestructura, todo lo cual se hizo por adjudicación directa, apoyado por la opinión emanada de la Procuraduría General de la República, quien previo análisis legal sobre el proyecto de contrato para la construcción del sistema vial del tercer puente sobre el río Orinoco, concluyó que no se podía dar la exclusión del artículo 4 de la Ley de Licitaciones vigente para la época, porque no se fundaba en el acuerdo de cooperación entre ambos países, lo cual motivó que para poder adjudicar de forma directa la obra debían realizarse cambios en el Convenio Básico de Cooperación Técnica de 1974, además de acoplar el régimen legal venezolano para lograrlo.

En fecha 28 de noviembre de 1991 la sociedad mercantil Constructora Norberto Odebrecht S.A., había fundado una sucursal en la ciudad de Caracas, con el nombre de Constructora Norberto Odebrecht de Venezuela C.A., que basados en las modificaciones sustanciales realizadas a los convenios iniciales de cooperación entre Brasil y Venezuela, se le adjudicó muchas obras las cuales no terminaron, entre ellas: La línea 5 del Metro de Caracas, el Sistema de Transporte Masivo Caracas – Guarenas – Guatire, el Metro Cable Mariche, el Cable tren Bolivariano, la Línea II Metro Los Teques, el Sistema Vial III Puente sobre el río Orinoco, el Puente Cacique Nigale, el Proyecto Aeropuerto Internacional de Maiquetía "Simón Bolívar", la Central Hidroeléctrica Tocoma, el Proyecto Agrario Integral Socialista José Inácio de Abreu de Lima, el Metro Cable La Dolorita, el Proyecto de implementación de los sistemas Metro Cable Petare Sur y Metro Cable Antímano y el Ferrocarril Caracas-La Guaira-Guatire.

En el año 2015 se inicia de una investigación por denuncia recibida en el Ministerio Público venezolano, referida a las irregularidades en ejecución de una obra en el estado Zulia, concretamente, la falta de terminación de obra de Infraestructura en el estado Zulia que habría sido inicialmente propuesta para la consideración, aprobación y ejecución al expresidente Hugo Rafael

4

Chávez Frías por parte del ciudadano José David Cabello Rondón, Ministerio de Infraestructura, con la denominación en el punto de cuenta era "Segundo Cruce sobre el Lago de Maracaibo"; que constató la asignación de recursos financieros por parte del ejecutivo, a través de diferentes puntos de cuenta, con la finalidad de pagar la deuda a la empresa Norberto Odebrecht, S.A., en el período agosto 2011 a marzo 2014 por un monto de **SEISCIENTOS QUINCE MILLONES SETENTA Y UN MIL QUINIENTOS NOVENTA Y SEIS DÓLARES AMERICANOS CON SESENTA CÉNTIMOS (US$ 615,071,596.60)** más **CUATRO MILLARDOS DOSCIENTOS NOVENTA MILLONES OCHENTA MIL SETENTA Y SEIS BOLÍVARES CON SESENTA Y UN CÉNTIMOS (Bs. 4,290,080,076.61)**, cuyos trámites de pagos parciales se hicieron a la indicada sociedad mercantil por concepto de anticipo y valuaciones por un monto de **CIENTO NOVENTA Y DOS MILLONES CUATROCIENTOS OCHENTA Y SIETE MIL SETECIENTOS SESENTA Y SIETE DÓLARES CON TREINTA Y OCHO CÉNTIMOS (US$ 192,487,767.38)** más **DOSCIENTOS VEINTICINCO MILLONES DOSCIENTOS VEINTIDÓS MIL TRESCIENTOS SESENTA Y NUEVE BOLÍVARES (Bs. 225,222,369.00)**.

La empresa Norberto Odebrecht, S.A., recibió solo por concepto de la obra del segundo puente sobre el lago de Maracaibo la cantidad de **CUATROCIENTOS SIETE MILLONES DOSCIENTOS SETENTA Y CUATRO MIL DÓLARES (US$ 407,274,000.00)**, de los cuales **SEISCIENTOS TREINTA Y SIETE MILLONES CUATROCIENTOS MIL DÓLARES (US$ 637,400,000.00)** correspondían al anticipo, según lo estipulado en el Cronograma de Pago del Anticipo correspondiente al complemento N° 2 del contrato para construcción del Segundo Cruce del Lago de Maracaibo, denominado Puente Nigale.

El Ministerio Público inició otra investigación preliminar vinculada con la indicada sociedad mercantil, mediante remisión de fecha 17 de enero de 2017, comunicación N° DCC-11-3561-2017, desde la Dirección Contra la Corrupción, a la Fiscalía 55 Nacional Plena, contentiva de escrito de denuncia suscrita por el ciudadano José Francisco Contreras Millán, titular de la Cédula de Identidad N° V-6.233.786, quien hace referencia a delitos de corrupción cometidos por la sociedad mercantil Norberto Odebrecht, S.A. o cualquiera de sus empresas, las cuales han llevado a cabo varias obras públicas en nuestro país, presumiéndose que la misma ha pagado cerca

5

de **NOVENTA Y OCHO MILLONES DE DÓLARES (98,000,000.00 US$)** en sobornos a funcionarios venezolanos; que de acuerdo al denunciante, tal información se desprende de una nota de prensa publicada por el diario El Nacional, en la página 6 del cuerpo 1, de fecha 11 de diciembre de 2016, titulada **" Constructora (sic) Odebrecht pagó cerca de 98 millones de Dólares en sobornos a Venezuela"**, en la cual se expone que un documento publicado por el Departamento de Justicia de los Estados Unidos reveló, que la empresa había realizado pagos a funcionarios gubernamentales y los intermediarios con el fin de obtener y mantener contratos de obras públicas en Venezuela. Que esa misma situación se repite en casi once países, donde la empresa ODEBRECHT ha pagado en sobornos un aproximado de **SETECIENTOS OCHENTA MILLONES DE DÓLARES ($ 780, 000,000.00 US)**.

El Ministerio Púbico venezolano, se solicitó a través de cooperación penal internacional a Brasil, información relacionada con los mecanismos utilizados por la empresa Odebrecht para la obtención de todos los contratos de infraestructura que logró suscribir en el país, a fin de procurar establecer la cancelación de dinero a funcionarios venezolanos para lograr no solo dichos contratos, sino la continuidad de otras obras que se encontraban en estado de abandono y que bien hubieran permitido al Estado reclamar judicialmente el cumplimiento de los mismos. Se le requirió también a las autoridades competentes de Brasil, de acuerdo con las normas de cooperación penal, se le permitiera realizar entrevistas a personas vinculadas con los hechos, algunos de ellos que ya habían rendido declaración en la causa llevada por la República Federativa de Brasil, incluso algunos de ellos condenados, luego de haberse acogido a la figura de colaboración eficaz ante la justicia de ese país. Que la respuesta al pedimento realizado en el mes de febrero de 2017, se recibió en el mes de julio del mismo año, a través de comunicación oficial, en la que se les informó la fecha para la comparecencia (02/08/2017) del Fiscal comisionado por el Ministerio Público venezolano, con el objeto de tomar entrevista a los ciudadanos Mónica Moura y Joao Santana, compareciendo a la investigación el Fiscal venezolano Pedro Alexander Lupera en su condición de Fiscal 55 Nacional, adscrito a la Dirección contra la Corrupción y Raiza M. Sifontes Gómez, Sub Directora contra la Corrupción del Ministerio Público.

Del contenido de dichas entrevistas y del resto de los actos de investigación desplegados por el Ministerio Público durante la fase preparatoria, se obtuvo información trascendental que involucra a **NICOLÁS MADURO MOROS** en una serie de hechos con relevancia jurídico penal.

En el mes de octubre del año 2011, se desarrollaba en Venezuela la campaña electoral en la que participaba el entonces Presidente de la República **HUGO RAFAEL CHÁVEZ FRÍAS** como candidato para la reelección. Durante el desarrollo de esa campaña, y con la intermediación de **MAXIMILIAN ARVELÁEZ,** quien fungía como Embajador de Venezuela en Brasil, se le solicitó al ex Presidente de Brasil **LUIS IGNACIO LULA DA SILVA**, recomendaciones para levantar las encuestas y obtener un triunfo electoral. Es así como el entonces presidente de Brasil, sugirió la intervención del ciudadano Joao Santana, quien para el momento, manejaba con una empresa de marketing político campañas presidenciales en diversos países y contaba con su confianza.

En ese sentido, para la materialización de la reunión de **JOAO SANTANA** y el presidente **HUGO CHÁVEZ**. Joao Santana se trasladó a la ciudad de Caracas Venezuela, y de esa forma establecieron las estrategias a seguir. Informaron, que el referido ciudadano se trasladó a Venezuela en un avión privado propiedad de **ANDRADE GUTIÉRREZ** (empresa constructora brasilera encargada de grandes obras de infraestructura en toda américa); en el cual lo acompañaban entre otros, **MAXIMILIAN ARVELÁEZ.**

Una vez en Venezuela, se entrevistó con el presidente tal como se encontraba pautado para coordinar lo que sería su campaña electoral. En este encuentro el Presidente Chávez, le manifestó a Santana, que el intermediario para encargarse de su campaña sería el ciudadano **NICOLAS MADURO MOROS**, actual presidente de la República Bolivariana de Venezuela, pero que en el momento se desempeñaba como Canciller de la República.

En el año 2012, la ciudadana **MÓNICA MOURA**, socia y esposa de **JOAO SANTANA**, se trasladó a Venezuela y se entrevistó con el mismo **NICOLÁS MADURO MOROS** en la Cancillería de Venezuela, lugar en el cual se definió el costo del trabajo a realizar en la campaña, y el financiamiento de ésta. El monto acordado por el trabajo a realizar, el cual fue estimado en

7

unos **TREINTA Y CINCO MILLONES DE DOLARES**, de los cuales, afirma en su declaración **MÓNICA MOURA**, solo fue entregada la cantidad de **DIECIOCHO MILLONES DE DOLARES**.

Los ciudadanos **MÓNICA MOURA** y **JOAO SANTANA**, utilizaban varias empresas fachada con sede en diversos países, y en el caso de la campaña presidencial venezolana, optaron por utilizar la empresa denominada POLICE CARIBE SRL, registrada en República Dominicana, encargada de marketing electoral, campaña televisiva, carteles, comerciales, fotos estrategia electoral entre otras actividades publicitarias.

Asimismo, ante el pedimento del presidente Hugo Chávez de evitar incluir a personas de habla portuguesa en la campaña, indicaron que cedieron ante dicha solicitud y contrataron a su vez a una empresa venezolana que serviría como intermediaria. Así a los ojos de los venezolanos, la campaña electoral estaba siendo manejada por una empresa denominada Contextus, luego identificada por el Ministerio Público como Contextus Comunicación Corporativa, propiedad de **MONICA ORTIGOZA**, quien en la investigación realizada resultó identificada como **MÓNICA VIRGINIA ORTIGOZA VILLASMIL**, venezolana, titular de la cédula de identidad N° 14.921.313 y representada por la ciudadana **MÓNICA MONTERO**. La totalidad de la estrategia de campaña se encontraba en manos de los brasileros, Contextus, se quedaba con al menos el 20% de los pagos, los cuales eran efectuados en efectivo por **MÓNICA MOURA**, de acuerdo con su propio testimonio.

La ciudadana **MONICA MOURA** de nacionalidad brasilera acudió en reiteradas oportunidades a Venezuela para sostener reuniones con el ciudadano **NICOLAS MADURO**, quien le entregó en cada visita, grandes cantidades de dólares en efectivo, que totalizaron un monto de **DIEZ MILLONES DE DOLARES**, los cuales sirvieron para financiar la campaña presidencial de **HUGO CHAVEZ**, en pagos fraccionados y muchos de ellos en la misma sede de la Cancillería venezolana, a la cual se trasladó en varias oportunidades en vehículos oficiales del enunciado organismo.

De acuerdo con la investigación, en algunas reuniones realizadas en Venezuela en diversos escenarios, participaron además los ciudadanos **JORGE RODRÍGUEZ, ELÍAS JAUA** y **JESSIE CHACÓN**, miembros del partido de gobierno PSUV y principales colaboradores de la campaña presidencial; quienes tenían conocimiento de los pormenores de los pagos realizados a **MÓNICA MOURA**.

En este sentido, **NICOLAS MADURO MOROS**, indicó a **MONICA MOURA**, que el resto de los pagos serían realizados por la empresa brasilera **ODEBRECHT**, quien se estaba encargando del financiamiento de la campaña, siendo designado para ello **EUZENANDO ACEVEDO**, representante de esta empresa en Venezuela, así como la empresa brasilera de nombre **ANDRADE GUTIERREZ**, C.A., propiedad del ciudadano del mismo nombre y apellido.

Los pagos fueron realizados por los mencionados ciudadanos a la cuenta de **JOAO SANTANA**, esposo de la ciudadana **MONICA MOURA**, en el Banco Heritache en cuenta off shore ubicada en Suiza, cuyos montos correspondían a la cantidad de **SEIS MILLONES DE DOLARES** pagados a través de la empresa **ODEBRECHT** por **EUZENANDO ACEVEDO** y por parte de la empresa de **ANDRADE GUTIÉRREZ**.

Está demostrado, que la empresa **ODEBRECHT** financió la campaña electoral del fallecido presidente **HUGO CHÁVEZ**, a cambio de la continuidad contractual a las obras inconclusas por parte de la empresa y el entonces canciller **NICOLÁS MADURO MOROS**, se encargó de los ilegales pagos a la empresa de marketing brasileña encargada de la campaña, para lo cual utilizó dinero en efectivo, con el objeto de evitar dejar traza monetaria en las ilegales operaciones.

Una vez fallecido el presidente Chávez, el país afrontó de nuevo otro proceso electoral, en donde **NICOLÁS MADURO MOROS** fungió como candidato presidencial por el partido oficialista. Una vez más, para el desarrollo de esta campaña electoral, NICOLÁS MADURO utilizó los mismos mecanismos corruptos de la campaña de su predecesor. Esta vez, a cambio de favorecer a Odebrecht con diversas contrataciones públicas de infraestructura del Estado venezolano, y en esta oportunidad  utilizó como intermediario a uno de sus jefes de campaña, **AMÉRICO ALEX MATA GARCIA** (quien para la fecha ocupaba el cargo de presidente del Instituto de Desarrollo

9

Rural INDER), para que se dirigiera a negociar con la referida empresa en la persona del ciudadano **EUZENANDO PRAZERES AZEVEDO**, una contribución de **CINCUENTA MILLONES DE DÓLARES.**

En investigación realizada en abril de 2013, **AMÉRICO ALEX MATA GARCIA**, sostuvo una reunión con el Presidente de Odebrecht en Venezuela **EUZENANDO PRAZERES AZEVEDO**. En esa reunión ofreció, que en el caso de que ellos apoyasen económicamente la campaña de MADURO, éste al llegar al poder daría trato preferencial a Odebrecht, permitiéndoles continuar con los contratos de obras inconclusas; les aprobarían  los pagos por conceptos de valuaciones y adelantos de las obras; permitirían la modificación de los contratos para hacerlos más beneficios, entre otras ventajas. Para obtener todas estas ventajas, violatorias del ordenamiento jurídico venezolano, **AMÉRICO MATA**, pidió que le giraran a **NICOLÁS MADURO** la suma de **CINCUENTA MILLONES DE DÓLARES** que serían utilizados en el financiamiento de la campaña (propaganda, movilización, etc.) La empresa Odebrecht a través de su presidente para Venezuela, convino en la ilegal solicitud e indicó que entregaría, como en efecto lo hizo, la cantidad de **TREINTA Y CINCO MILLONES DE DOLARES**, a cambio del favorecimiento convenido.

En su declaración ante las autoridades de Brasil, **EUZENANDO AZEVEDO,** dijo  que en el caso de que **NICOLÁS MADURO** obtuviera la victoria, garantizaría a favor de la empresa inversión por **DOS MIL QUINIENTOS MILLONES DE DOLARES** más algunos otros pagos pendientes. Aseguró a su vez, que el gobierno de **NICOLAS MADURO**, mantendría a la compañía como prioridad para la destinación de los recursos financieros extraordinarios.

El pago de esta ilícita operación se produjo mediante transferencias no contabilizadas, a empresas que le fueron indicadas por **AMÉRICO ALEX MATA GARCIA** y fueron realizadas por **HILBERTO SILVA, LUIS EDUARDO SOARES y FERNANDO MAGLIACCIO**, quienes eran los encargados de crear empresas off shore, realizar contratos ficticios y generar órdenes de pago a través de empresas creadas documentalmente por ellos, utilizando el Banco **Meinl Bank de Antigua**, entidad financiera perteneciente a Odebrecht. De este modo, los fondos

10

provenientes de la corrupción, ingresaron al sistema financiero con apariencia de licitud, tal como si fueran el producto de pagos por acuerdos de obras y servicios entre sociedades mercantiles.

En la acusación contra **NICOLAS MADURO MOROS** se hace un resumen de las obras y sus pagos, donde vale la pena destacar: Obras: Línea 5 Metro de Caracas, por $ 1.892.031.634,18; Sistema de Transporte Masivo Caracas – Guarenas – Guatire por $ 5.330.543.818,31; Metro Cable Mariche por $ 946.945.464,23; Cable tren Bolivariano (S/M), Línea II Metro Los Teques Por $ 2.627.599.078,83, Sistema Vial III Puente sobre el río Orinoco por $ 8.216.292.350,44; Puente Cacique Nigale por 7.381.656.256,97; Proyecto Aeropuerto Internacional de Maiquetía "Simón Bolívar" por 398.248.164,75, Central Hidroeléctrica Tocoma por Bs. 2.082.116.226.489,15; Proyecto Agrario Integral Socialista José Inácio de Abreu de Lima por $ 3.332.418.921,73; Metro Cable La Dolorita (S/M); Proyecto de implementación de los sistemas Metro Cable Petare Sur y Metro Cable Antímano por $ 358.000.000 y Ferrocarril Caracas-La Guaira-Guatire por $ 5.347.030.224,00.

## **FUNDAMENTOS**
## **DE HECHO Y DE DERECHO SOBRE LOS DELITOS IMPUTADOS POR EL MINISTERIO PUBLICO**

Correspondiendo este capítulo, a la determinación de los hechos y su adecuación al derecho, así como la participación del acusado en los mismo, ubicando el resultado del hecho punible y la conducta desplegada dentro de los preceptos jurídicos que quedaron determinados al momento de la admisión de la acusación y que se plasmaron en el auto de apertura al juicio oral y público, como expresión de la protección de garantías constitucionales y así como derechos consagrados dentro de esas garantías y en especial, el derecho a la defensa; esta Sala le procede de una manera clara y precisa, a exponer como ese hecho y la conducta desplegada por el acusado, se subsumen en los delitos de **corrupción propia,** previsto y sancionado en el artículo 64 de la Ley contra la Corrupción, y **legitimación de capitales,** previsto y sancionado en el artículo 35 de la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo.

En virtud de la existencia de estos hechos punibles, para una mejor compresión, consideramos necesario, proceder al análisis de cada probanza valorada por este Tribunal para hilar cada elemento exigido por los delitos que han sido debatidos por ante esta Sala, y a tal efecto, procedemos a realizar las siguientes consideraciones:

La Ley Contra la Corrupción, establece en su artículo 64 el delito de corrupción propia, que reza:

> *"El funcionario público que por retardar u omitir algún acto de sus funciones, o por efectuar uno que sea contrario al deber mismo que ellas impongan, reciba o se haga prometer dinero u otra utilidad, bien por sí mismo o mediante otra persona, para sí o para otro, será penado con prisión de tres (3) a siete (7) años y multa hasta el cincuenta por ciento (50%) del beneficio recibido o prometido."*

Por otra parte, la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, en el artículo 35 establece:

> *"Quien por sí o por interpuesta persona sea propietario o poseedor de capitales, bienes, fondos, haberes o beneficios, a sabiendas de que provienen directa o indirectamente de una actividad ilícita será castigado con prisión de diez a quince años y multa equivalente al valor del incremento patrimonial ilícitamente obtenido.*
>
> *La misma pena se aplicará a quien por sí o por interpuesta persona realice las actividades siguientes:*
>
> > *1. La conversión, transferencia o traslado por cualquier medio de bienes, capitales, haberes, beneficios o excedentes con el objeto de ocultar o encubrir el origen ilícito de los mismos o de ayudar a cualquier persona que participe en la comisión de tales delitos a eludir las consecuencias jurídicas de sus acciones.*
> >
> > *2. El ocultamiento, encubrimiento o simulación de la naturaleza, origen, ubicación, disposición, destino, movimiento o propiedad de bienes o del legítimo derecho*

12

*de éstos.*

3. *La adquisición, posesión o la utilización de bienes producto de algún delito.*

4. *El resguardo, inversión, transformación, custodia o administración de bienes o capitales provenientes de actividades ilícitas.*

*Los capitales, bienes o haberes objeto del delito de legitimación de capitales serán decomisados o confiscados."*

Ante hechos y preceptos jurídicos distintos, resulta forzoso para este tribunal, proceder a realizar el análisis de cada caso en particular, para hilar en perfecta armonía, el resultado producto de al actuar del acusado en el hecho imputado por el Ministerio Público, al momento de realizarse la audiencia en donde se determinó la procedencia de su enjuiciamiento; los cuales, fueron plasmados en la acusación presentada, la cual fue debidamente admitida por esta Sala y se encuentran contenidos dentro del auto de apertura a juicio oral y público; y a tal efecto, se procede a realizar el siguiente análisis normativo:

## DEL DELITO DE CORRUPCION PROPIA.

Es importante para una clara y precisa motivación del presente capítulo, proceder a realizar algunas precisiones de orden jurídico, necesarias, para determinar, como la Sala llega a la convicción de que la conducta del acusado, encuentra en el hecho imputado y se adecua al delito atribuido.

El delito de corrupción propia, es necesario acotar, que en el presente hecho, se encuentra la complicidad privada, quien aprovechándose de circunstancias que lo asocian a estrechas relaciones de distintas índoles con funcionarios públicos, proceden a ejecutar actos contrarios a la ley en provecho tanto del funcionario público como de la persona natural o jurídica de carácter

13

privado en detrimento del Estado, quien confía en la honorabilidad y honestidad de quien ha sido elegido o nombrado para el desempeño de la labor pública. Esta utilización de relaciones estrechas entre los investidos de función pública originada por elección, nombramiento o contrato, y particulares quienes consideran que ostentan un aparente poder producto de las relaciones de cualquier naturaleza, proceden en actuación conjunta con el funcionario investido de función pública, a utilizar esa supuesta autoridad en beneficio propio y del funcionario, constituyendo una asociación delictual para cometer delitos graves, sancionados no solo por la legislación interna, sino por convenios internacionales suscritos por Venezuela.

Así tenemos, que en la Convención de las Naciones Unidas contra la Delincuencia Organizada Transnacional suscrita en diciembre del año 2000 en la ciudad de Palermo (Italia), la corrupción trasnacional constituye un delito a combatir a nivel internacional, en donde se acuerda, sancionar no solo al funcionario investido de función pública, sino a los particulares que tienen presencia activa en el delito, debido a que han penetrado el poder político para obtener grandes beneficios indebidos e ilícitos, constituyendo verdaderas mafias o grupos estructurados para la comisión de delitos de corrupción.

Es así que el artículo 8 de la Convención contra la Delincuencia Organizada Transnacional establece:

"*Artículo 8. Penalización de la corrupción*

*1. Cada Estado Parte adoptará las medidas legislativas y de otra índole que sean necesarias para tipificar como delito, cuando se cometan intencionalmente:*

*a) La promesa, el ofrecimiento o la concesión a un funcionario público, directa o indirectamente, de un beneficio indebido que redunde en su propio provecho o en el de otra persona o entidad, con el fin de que dicho funcionario actúe o se abstenga de actuar en el cumplimiento de sus funciones oficiales;*

14

*b) La solicitud o aceptación por un funcionario público, directa o indirectamente, de un beneficio indebido que redunde en su propio provecho o en el de otra persona o entidad, con el fin de que dicho funcionario actúe o se abstenga de actuar en el cumplimiento de sus funciones oficiales.*

*2. Cada Estado Parte considerará la posibilidad de adoptar las medidas legislativas y de otra índole que sean necesarias para tipificar como delito los actos a que se refiere el párrafo 1 del presente artículo cuando esté involucrado en ellos un funcionario público extranjero o un funcionario internacional. Del mismo modo, cada Estado Parte considerará la posibilidad de tipificar como delito otras formas de corrupción.*

*3. Cada Estado Parte adoptará también las medidas que sean necesarias para tipificar como delito la participación como cómplice en un delito tipificado con arreglo al presente artículo.*

*4. A los efectos del párrafo 1 del presente artículo y del artículo 9 de la presente Convención, por "funcionario público" se entenderá todo funcionario público o persona que preste un servicio público conforme a la definición prevista en el derecho interno y a su aplicación con arreglo al derecho penal del Estado Parte en el que dicha persona desempeñe esa función."*

Como podemos apreciar, la norma determina las conductas sancionadas y considerada como actos de corrupción y entre ellas, siempre existirá como sujeto activo un funcionario público, pero también, en la participación de estos delitos, podemos encontrar directamente o complicidad de una persona natural o jurídica que no requiere de estar investida de función pública; a tal efecto, los sujetos activos del delito, pueden incurrir en la comisión del mismo, cuando reciban un beneficio indebido o provecho injusto, a cambio de actuar, retardar, o realizar acto contrario al deber mismo de sus funciones. Ese actuar contrario, debe consecuencialmente lesionar la

15

actividad funcionarial, existiendo una asociación delictual que se materializa a través de un acuerdo previamente celebrado entre el funcionario y el séptico, por la obtención de un beneficio indebido, recompensa o promesa de esta. Es de acotar, que el actuar de ambos sujetos, es intencional, dolosa.

El artículo 3 de la Ley Contra La Corrupción hace referencia a las personas que a los efectos la misma, deben ser considerados como funcionarios públicos.

> *"**Artículo 3.** Sin perjuicio de lo que disponga la Ley que establezca el Estatuto de la Función Pública, a los efectos de esta Ley se consideran funcionarios o empleados públicos a:*
>
>> 1. *Los que estén investidos de funciones públicas, permanentes o transitorias, remuneradas o gratuitas originadas por elección, por nombramiento o contrato otorgado por la autoridad competente, al servicio de la República, de los estados, de los territorios y dependencias federales, de los distritos, de los distritos metropolitanos o de los municipios, de los institutos autónomos nacionales, estadales, distritales y municipales, de las universidades públicas, del Banco Central de Venezuela o de cualesquiera de los órganos o entes que ejercen el Poder Público. "*

Con la transcripción parcial de la norma, consideramos la existencia de un requisito esencial que debe poseer el sujeto activo, como es, estar investido de funciones públicas, permanentes o transitorias, remuneradas o gratuitas, obtenidas por elección, nombramiento o contrato, y en el presente asunto sometido a conocimiento de esta Sala Plena del Tribunal Supremo de Justicia, en cuanto al hecho relacionado con el delito de corrupción y que este tribunal en capítulo anterior estima acreditado, damos por demostrado, que el acusado **NICOLAS MADURO MOROS,** se desempeñaba como Canciller de la República de Venezuela para la fecha del hecho, debido a que fue designado en fecha 7 de agosto de 2006, y cumplió con esa función hasta el mes de octubre del año 2012, fecha en la cual fue designado como Vicepresidente de la República, según consta en el Decreto 9.219 publicado en la Gaceta Oficial 40027 del jueves 11 de octubre

2012, lo que significa, que cumple con unos de los requisitos exigidos por la norma, a los efectos de ser considerado sujeto activo del delito.

Por otra parte, es importante recordar, que la intención del sujeto activo, es obtener una retribución u otra utilidad que no se le deba o aceptar promesa de entrega, para el funcionario mismo o para otro,  retribuciones u otra utilidad que no se le deben, o  aceptar la promesa de su entrega, que se obtienen por su condición de funcionario investido de función pública.

El Ministerio Público hace mención, que el acusado **NICOLÁS MADURO MOROS** es autor del delito de Corrupción Propia, de acuerdo con el aludido artículo 64 de la Ley Contra la Corrupción vigente, ya que solicitó a la empresa ODEBRECHT y recibió de esta, grandes cantidades de dinero, a cambio de actuar de forma contraria al deber, y favorecer a dicha empresa en diversos aspectos contractuales con el Estado; que esa petición fue a través de diversos actores que actuaron en conjunto para obtener el resulta injusto, con el beneficio indebido a favor del acusado, pero para determinar la existencia o no de este señalamiento, esta Sala pasará a valorar las pruebas que fueron admitidas y evacuadas en las distintas audiencias del juicio oral y público.

## DEL DELITO DE LEGITIMACIÓN DE CAPITALES

En relación al delito de legitimación de capitales, denominado en la Convención contra la Delincuencia Organizada Transnacional como blanqueo del producto del delito, es de acotar, que esta figura delictual es el mecanismo por excelencia para ocultar y dar imagen de licitud a los beneficios obtenidos a través de actividades ilícitas.

El artículo 35 de la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, establece lo siguiente:

> *"Artículo 35. Quien por sí o por interpuesta persona sea propietario o poseedor de capitales, bienes, fondos, haberes o beneficios, a sabiendas de que provienen directa o indirectamente de una actividad ilícita será castigado con prisión de diez a quince años y multa equivalente al valor del incremento patrimonial ilícitamente obtenido.*

17

*La misma pena se aplicará a quien por sí o por interpuesta persona realice las actividades siguientes:*

*1. La conversión, transferencia o traslado por cualquier medio de bienes, capitales, haberes, beneficios o excedentes con el objeto de ocultar o encubrir el origen ilícito de los mismos o de ayudar a cualquier persona que participe en la comisión de tales delitos a eludir las consecuencias jurídicas de sus acciones.*

*2. El ocultamiento, encubrimiento o simulación de la naturaleza, origen, ubicación, disposición, destino, movimiento o propiedad de bienes o del legítimo derecho de éstos.*

*3. La adquisición, posesión o la utilización de bienes producto de algún delito.*

*4. El resguardo, inversión, transformación, custodia o administración de bienes o capitales provenientes de actividades ilícitas.*

*Los capitales, bienes o haberes objeto del delito de legitimación de capitales serán decomisados o confiscados."*

En el artículo 4 de la ley, encontramos la definición de legitimación de capitales, que consiste:

*"Definiciones*

*Artículo 4. A los efectos de esta Ley, se entiende por:*

18

*15. Legitimación de capitales: es el proceso de esconder o dar apariencia de legalidad a capitales, bienes y haberes provenientes de actividades ilícitas".*

De acuerdo a las normas transcritas, comete el delito de legitimación de capitales, la persona que convierta, transfiera, adquiera, posea, tenga, utilice, oculte, encubra o impida la determinación real de bienes, a sabiendas de que tales bienes son producto de un delito.

La Convención de las Naciones Unidas contra la Delincuencia Organizada Transnacional, establece en su artículo 6, lo siguiente:

*"Artículo 6. Penalización del blanqueo del producto del delito*

*1. Cada Estado Parte adoptará, de conformidad con los principios fundamentales de su derecho interno, las medidas legislativas y de otra índole que sean necesarias para tipificar como delito, cuando se cometan intencionalmente:*

*a) i) La conversión o la transferencia de bienes, a sabiendas de que esos bienes son producto del delito, con el propósito de ocultar o disimular el origen ilícito de los bienes o ayudar a cualquier persona involucrada en la comisión del delito determinante a eludir las consecuencias jurídicas de sus actos; ii) La ocultación o disimulación de la verdadera naturaleza, origen, ubicación, disposición, movimiento o propiedad de bienes o del legítimo derecho a éstos, a sabiendas de que dichos bienes son producto del delito; b) Con sujeción a los conceptos básicos de su ordenamiento jurídico: i) La adquisición, posesión o utilización de bienes, a sabiendas, en el momento de su recepción, de que son producto del delito; ii) La participación en la comisión de cualesquiera de los delitos tipificados con arreglo al presente artículo, así como la asociación y la confabulación para cometerlos, el*

*intento de cometerlos, y la ayuda, la incitación, la facilitación y el asesoramiento en aras de su comisión."*

Precisado lo anterior, tenemos que para la comisión del delito de legitimación de capitales, se requiere de operaciones en las cuales el dinero o producto delictual de origen ilícito, es invertido, transferido, ocultado, trasladado, resguardado o trasformado y restituido a los circuitos económicos financieros legales, incorporándose a cualquier tipo de negocio, para obtener la apariencia de lícito.

Ahora bien, en los alegatos esgrimidos por el Ministerio Público en el curso del debate, manifiesta, que el acusado NICOLÁS MADURO MOROS, se puso al frente de los mecanismos ilegales utilizados para el financiamiento de la campaña de Hugo Rafael Chávez en el año 2012. Expresa, que consta que parte de los pagos que hizo de forma directa a la ciudadana Mónica Cunha Moura, los hizo en efectivo, sin justificar la procedencia de ese dinero, ni existir constancia de su origen, lo que hace presumir la procedencia ilícita del mismo.

Argumenta el Ministerio Público, que el acusado NICOLAS MADURO MOROS, tenía en su poder *"grandes cantidades de dinero en efectivo, lo cual es impropio en el manejo regular de partidas oficiales"*; que se hicieron pagos en dinero para ocultar el origen de dichos fondos.

Igualmente expone, que el acusado *"no sólo tenía en su poder dicho dinero y ocultó su ilícita procedencia, sino, además lo trasladó a manos de terceros, procurando saldar la ilegal obligación contraída por Hugo Chávez, quien vale decir, es copartícipe de este hecho. Constituye también delito de Legitimación de Capitales, el hecho de que MADURO haya generado instrucciones para que el resto del dinero cobrado por Mónica y Joao a cuenta de la campaña electoral, fueran pagados por la empresa ODEBRECHT, quienes igualmente simularon supuestas contrataciones, para justificar financieramente el pago, y así ocultar el origen ilícito del mismo. Vale recordar, que Marcelo ODEBRECHT, explicó en su delación premiada, que todos los montos pagados por la empresa para campañas electorales, provenían de un fondo especial (Caja II), el cual se alimentaba de sobreprecios, contratos ficticios y otras modalidades fraudulentas, de modo que siempre era dinero cuyo origen es ilícito"*.

20

Por último señala la titular de la acción penal, que *como parte de este iter críminis complejo que constituye la presente causa, está igualmente acreditado que para Abril de 2012, NICOLÁS MADURO solicitó a ODEBRECHT una cantidad de dinero para el financiamiento de su campaña, a cambio del favorecimiento de la empresa en futuros contratos y pagos. Consta que como producto de esa petición, recibió la cantidad de 35 millones de dólares, los cuales fueron depositados en cuentas en el extranjero, simulando ser el pago de acreencias producto de contratos ficticios entre sociedades mercantiles. Consta, el intercambio de e-mails entre los miembros del equipo de Hilberto Silva (miembro de ODEBRECHT) y la firma para pagarlas; las órdenes de pago de Meinl Bank de Antigua para dichas empresas; copia de contrato ficticio entre la empresa para justificar transferencias; todo esto con el propósito de simular supuestas transacciones para ocultar el origen y destino de los fondos"*.

## CONDENA IMPUESTA A NICOLAS MADURO MOROS

En razón de los argumentos de hecho y de derecho que se exponen, esta Sala Plena del Tribunal Supremo de Justicia, administrando justicia en nombre de la República Bolivariana de Venezuela y por autoridad de la ley, declara:

**PRIMERO**: **SE CONDENA** al acusado **NICOLÁS MADURO MOROS,** mayor de edad, titular de la cédula de identidad N° 5.892.464, casado, fecha de nacimiento 23 de noviembre de 1962, hijo de Teresa de Jesús Moros de Maduro y de Nicolás Maduro García, domiciliado en la ciudad de Caracas, distrito Capital, Venezuela; por encontrársele responsable en la comisión de los delitos de Corrupción Propia y Legitimación de Capitales, previstos y sancionados en los artículos 64 y 35, de la Ley Contra la Corrupción y la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, respectivamente.

**SEGUNDO**: En virtud de la condenatoria, se le impone a **NICOLÁS MADURO MOROS** por haberse hallado culpable de la comisión de los delitos Corrupción Propia y Legitimación de Capitales, previstos y sancionados en los artículos 64 y 35, de la Ley Contra la Corrupción y la Ley

21

Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, respectivamente; a **CUMPLIR** la pena de **DIECIOCHO (18) AÑOS Y TRES (3) MESES DE PRISIÓN**, fijándose como sitio de reclusión el Centro Nacional de Procesados Militares de Ramo Verde, ubicado en el Estado Miranda, República Bolivariana de Venezuela.

**TERCERO**: Se imponen a Nicolás Maduro Moros las penas pecuniarias por haber sido hallado culpable de la comisión del delito de Corrupción Propia una multa **Veinticinco Millones de dólares americanos ($ 25,000,000,00)** y, por haberse encontrado responsable de la comisión del delito de Legitimación de Capitales el de resarcir al patrimonio de la República Bolivariana de Venezuela la **cantidad de Treinta y Cinco Mil Millones de dólares americanos ($. 35.000.000.000,00)**, ello de conformidad con lo establecido en los artículos 64 de la Ley contra la Corrupción y 35 de la Ley Orgánica contra la Delincuencia Organizada y Financiamiento al Terrorismo, respectivamente.

Igualmente, se impone Medida de Apremio o de astricción en contra de los bienes y capitales objeto de los delitos cometidos, conforme a los artículos 87, 88 y 89 de la Ley Orgánica Contra la Delincuencia Organizada y Financiamiento al Terrorismo, las cual3es se acuerdan para asegurar y ejecutar los capitales objeto de los delitos a los cuales ha sido condenado Nicolás Maduro Moros.

**CUARTO**: Se impone a Nicolás Maduro Moros, las penas accesorias previstas en el artículo 16 del Código Penal, como lo es, la **Inhabilitación Política durante el tiempo de la condena y sujeción a la vigilancia de la autoridad or una quinta parte del tiempo de la condena, terminada ésta.** Se ordena la notificación correspondiente a la autoridad electoral.

### PETICIÓN DE INVESTIGACIÓN A OTRAS PERSONAS QUE FUERON SELADOS EN EL JUICIO CONTRA NICOLAS MADURO

Se solicitó al Ministerio Público a iniciar investigaciones en contra de las personas naturales y jurídicas vinculadas en la comisión de los hechos punibles, a los efectos de hacer efectiva la responsabilidad penal personal de quienes, además de Nicolás Maduro Moros, participaron en la comisión de los referidos hechos punibles, incluyendo personas naturales y/o jurídicas

22

intermediarias en la comisión de los mismos, destacando a los ciudadanos **Maximilien Sánchez Arveláiz, Temir Porras Ponceleón, José David Cabello Rondón, Mónica Ortigoza Villasnlil, Jorge Rodríguez Gómez, Elías Jaua Milano, Jesse Chacón, Américo Alex Mata García, Jorge Giordani, Nelson Merentes, Gnal. Rodolfo Clemente Marco Torres, Gnal. Juan de Jesús García Toussaintt, Haiman El Troudi, Gilberto Silva, Luis Eduardo Soares, Fernando Magliaccio, Cristóbal Jiménes, José Can, Henrique Capriles Radonski, Marcelo Bahía Odebrecht, Emilio Alves Odebrecht, Euzenando Prazeres de Azevedo, Mónica Regina Cunha Moura, Joao Cerqueira de Santana Filho, Roberto Texeira, Flavio Machado Filho y André De Angelo**, entre otros.

## SOLICITUD A INTERPOL PARA LA CAPURA DE NICOLAS MADURO MOROS

Se decidió, librar orden de captura a la International Criminal Police Organization (INTERPOL), con motivo de la sentencia condenatoria privativa de libertad en contra de Nicolás Maduro Moros, anexándole copia certificada de la referida sentencia y hasta el día de hoy no se ha dado cumplimiento a la petición librada por el Tribunal Supremo de Justicia de Venezuela en el exilio.

De esta manera concluimos el informe solicitado y sin más a que hacer referencia queda de usted.

Atentamente,

**Mgdo. Antonio Marval Jiménez**
**Presidente del Tribunal Supremo de Justicia de Venezuela**

23