**DEFENDANT EXHIBIT**

CASE NO. **19-20450-CR-Scola**

EXHIBIT NO. **X**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 82-0422-CIV-JWK

FILED BY _____

'82 JUN 14 PM 1 31

JOSEPH I BOGART
CLERK US DIST. CT.
SD OF FLA.-MIAMI

H.R.H. PRINCE TURKI BEN
ABDULAZIZ, PRINCESS HEND
AL-FASSI, his wife, and
SHEIKHA FAIZA ALI HELM,

        Plaintiffs,

vs.

METROPOLITAN DADE COUNTY,
a political subdivision
of the State of Florida,
TOM PETERSON, et al.,

        Defendants,

        JOINT RESPONSE TO
MOTION TO DISMISS FILED BY
PLAINTIFFS/COUNTERDEFENDANTS

---

    The Defendants/Counterplaintiffs KUBIK, PITTS, SOMMERHOFF, FALCON, FISTEN, FANDREY, JANSEN and MURRAY hereby jointly respond to the Motion to Dismiss filed in this action on June 4, 1982.

    The Motion seeks dismissal of the _entire_ action: while no objection is hereby interposed to the Plaintiffs' attempt to dismiss their own Complaint, by separate document filed simultaneously herewith the abovenoted parties have, pursuant to Federal Rules of Civil Procedure 41, objected to dismissal of their counterclaims.

    The grounds on which the Plaintiffs request this Court to terminate all litigation is, from examination of the motion papers (referring to Paragraph 5 of the Motion) based on two (2) grounds: (a) an assertion of diplomatic immunity from civil claims, and (b) vindication of the Plaintiffs by an article in the Miami Herald. The second point mentioned has about as much legal merit as the first: since it is capable of briefer response, it will be dealt with first.

    The Affidavit filed by counsel in support of this Motion incredibly enough, and apparently wholly ignorant of the requirements for sufficiency of affidavits (_e.g._, Federal Rules

516

CASE No. 82-0422-CIV-JWK

of Civil Procedure 56(e)) refers to a newspaper article (Miami Herald, Tropic Magazine, May 30, 1982) for the proposition that the Plaintiffs' position in these proceedings has been vindicated, the "Affidavit" then concluding that no further litigation is therefore necessary. Mr. Rubin must believe that his Affidavit possesses the properties of a magic wand: his clients think they have made their point and now wish the lawsuit would disappear. To adopt Mr. Rubin's proposition could well solve the Court's problem with overcrowded dockets: a party could declare himself the winner of a lawsuit by filing an affidavit to that effect. Fortunately, neither the document nor a newspaper/magazine article can serve to supplant the fact-finding and adjudicatory powers of the Federal District Court. Accordingly, these Defendant/Counterplaintiff's move this Court to strike said Affidavit as being incompetent, immaterial and irrelevant to the issues subjudice. See also Local Rule 16(f)(7) Federal Rules of Civil Procedure.

The Motion to Dismiss travels principally on the theory that the Plaintiffs are beyond the jurisdiction of this Court by virtue of a grant of diplomatic immunity. To this assertion there are two (2) responses:

> A) The face of the statutes and documents relied on indicate that no such immunity exists; and
>
> B) The protection of diplomatic immunity rests on a _factual_ finding of entitlement to such immunity, a finding which this Court has not made.

This Court most assuredly has the right, and the duty to inquire into the granting of diplomatic status to the Plaintiffs - this defense has traditionally been scrutinized by the Courts and rejected when found improper. See National City Bank of New York v. Republic of China, 348 U.S. 356 (1955); In Re Baiz, 135 U.S. 403 (1890); Vulcan Iron Works, Inc. v. Polish American Machinery

- 2 -

517

CASE No. 82-0422-CIV-JWK


 Corporation 479 F.Supp 1060 (S.D.N.Y. 1979).

The document filed in this action and relied on by the
Plaintiffs to establish diplomatic immunity states that

> His Royal Highness Prince Turki Bin Abdulaziz
> was duly notified to the Department of State
> as Special Envoy for matters concerning
> the Government of Saudi Arabia.
> (emphasis added)

The State Department document then follows with the legal
conclusion that, pursuant to applicable statutes,

> His Royal Highness Prince Turki Bin Abdulaziz
> is entitled to diplomatic immunity as defined
> by Article 31 of the Vienna Convention on
> Diplomatic Relations.

Plainly, the State Department conclusion of law is incorrect
notwithstanding the Department's invasion of a province
exclusively that of the judiciary. U.S. v. Enger, 472 F.Supp
490,501,503,506,545 (D.N.J. 1978). Article 31 of the Vienna
Convention describes immunity from civil jurisdiction afforded
"diplomatic agents", and goes on to state exceptions to that
immunity, including excepting the grant of immunity in

> an action relating to any professional or
> commerical activity exercised by the
> diplomatic agent in the receiving State
> outside his official functions.
> Vienna Convention on Diplomatic Relations,
> Article 31(1)(c) (emphasis added).

The subject matter of this litigation, abuse of process and
assault and battery, cannot be said to be within anyone's
diplomatic functions.

Further, the Act protects "diplomatic agents", defined in
Article 1(e) as "... the head of the mission or a member of the
diplomatic staff of the mission." The Plaintiff, on the other
hand is characterized as a "Special Envoy", with no mission or
function being defined. The Act does not, therefore, apply to
the Plaintiffs. (Historically, the Vienna Convention was meant
to exclude envoys from its operation. See II Yearbook of the

CASE No. 82-0422-CIV-JWK

International Law Commission (1957), 131-133.)  Thus, on its face

the Plaintiffs' claim to immunity must fail.  U.S. v. Melekh, 190

F.Supp 67, 77, 85, 87 fn.2, 88 (S.D.N.Y. 1960).

Moreover as a matter of law as well, the Plaintiffs cannot

claim the benefit of diplomatic immunity, having expressly waived

that right by filing this lawsuit.  The Supreme Court of the

United States (somewhat sarcastically) rejected a claimant's

assertion of immunity from counterclaims in National City Bank of

New York v. Republic of China, supra, stating at pages 361-362:

> We have a foreign government invoking our
> law, but resisting a claim against it which
> fairly would curtail its recovery.  It wants
> our law, like any other litigant, but it wants
> our law free from the claims of justice.

The Court proceeds, in a subsequent part of this opinion, (page

364) to express the following maxim, directly applicable to the

instant action:

> It is recognized that a counterclaim based
> on the subject matter of a sovereign's
> suit is allowed to cut into the doctrine
> of immunity.

This decision is parallelled in the Vienna Convention, at

Article 32(3), enacted into law in 1977, some twenty (20) years

after the National City Bank case (Diplomatic Relations Act of

1977, 22 U.S.C. Section 254b):

> The initiation of proceedings by a
> diplomatic agent or by a person enjoying
> immunity from jurisdiction under Article
> 37 shall preclude him from invoking immunity
> from jurisdiction in respect of any counterclaim
> directly connected with the principal claim

In all events, this Court is requested by the Plaintiffs to

accept the State Department's document and its conclusions

promulgated by an individual in charge of maintaining records,

the Affidavit of its lawyer, and thereon to dismiss all pending

proceedings.  The duty of the Court to satisfy itself as to the

validity of the diplomatic immunity claim is not mentioned.

- 4 -

CASE No. 82-0422-CIV-JWK

Without belaboring the issue, comprehensive factual development must take place before this issue can be disposed of - it may well be likened to an affirmative defense of estoppel.  The factual matters are presented in a variety of issues, among them:

> A)  The correctness of action taken by the State Department.  The Plaintiffs cannot claim that the document furnished by the state department is beyond judicial scrutiny. This court must make a determination as to whether the claimed immunity was requested and conferred in accordance with the appropriate statutes.  Vulcan Iron Works, Inc. v. Polish American Machinery Corp., 479 F.Supp 1060 (S.D.N.Y. 1979).
>
> B)  Whether a "diplomatic mission" exists at the Cricket Club, Miami, Florida. The Vienna Convention protects foreign government functions at its place of business - the existence of such an official place of business requires judicial determination. U.S. v. Rosal, 191 F.Supp. 613, 664 (S.D.N.Y. 1960)
>
> C)  Whether the Plaintiffs are "diplomatic agents" or family members of "diplomatic agents".  The existence of an official function is a sine qua non of diplomatic immunity.  On the face of the papers submitted the Plaintiffs do not qualify as "agents" and family.  The Counterdefendants submit they are hiding behind this alleged "diplomatic status" for the purposes of conducting non-immune commercial activities and to protect themselves from criminal prosecution. (See letter from Janet Reno to State Department, Exhibit "A" hereto, especially page 4).  This requires judicial examination.

This list is by no means comprehensive.

It does illustrate, however, the necessity for greater development of the factual issues relating to the claim of diplomatic immunity.  For this reason, if the Court should choose to look beyond the obvious facial defects of the claimed diplomatic immunity, and the clearwaiver of the alleged immunity under Article 32(3) Diplomatic Relations Act, discovery should be allowed to proceed for the purpose of presenting evidence as to the merit of this defense.

- 5 -

CASE No. 82-0422-CIV-JWK

 

 

 

     I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed on this \_\_\_\_ day of _____, 1982 to the addressees noted below:

                                 LAW OFFICES OF STEVEN D. GINSBURG, P.A.
                                 1501 N.W. 14th Street
                                 Suite 100
                                 Miami, Florida 33125

By:_____
                                 STEVEN D. GINSBURG

                                 JERRY B. KATZEN, ESQUIRE
                                 RASH, KATZEN, KEY & PINTADO
                                 7900 Red Road
                                 Suite 25
                                 South Miami, Florida 33143

By:_____
                                 JERRY B. KATZEN

                                 LAW OFFICES OF NORMAN MALINSKI, P.A.
                                 933 City National Bank Building
                                 25 West Flagler Street
                                 Miami, Florida 33130
                                 Telephone: (305) 371-6060

By:_____
                                 NORMAN MALINSKI

Thomas E. Lee, Esquire
Lee, Shulte, Murphy & Coe, P.A.
800 Peninsula Federal Building
200 Southeast First Street
Miami, Florida  33131

Allan M. Rubin, Esquire
Rubin and Rubinchik, P.A.
500 Center Court Building
2450 Hollywood Boulevard
Hollywood, Florida  33020

Richard Ben-Veniste, Esquire
Ben-Veniste & Shernoff
4801 Massachusetts Avenue  N.W.
Washington, D.C.  20016

Ellis Rubin, Esquire
265 Northeast 26th Terrace
Miami, Florida  33137

- 6 -

CASE No. 82-0422-CIV-JWK


Tom Peterson
Chief Assistant State Attorney
1351 N.W. 12th Street
Miami, Florida  33125


Ralph C. Rocheteau, Esquire
Assistant County Attorney
73 West Flagler Street
Miami, Florida  33130


Kent A. Zaiser
Assistant Attorney General
Department of Legal Affiars
Civil Division
The Capitol
Suite 1501
Tallahassee, Florida 32301

- 7 -

522



# STATE ATTORNEY
METROPOLITAN JUSTICE BUILDING
MIAMI, FLORIDA 33125

JANET RENO
STATE ATTORNEY

May 26, 1982

TELEPHONE (305) 547-5200

Ambassador Joseph W. Twinam
Deputy Assistant Secretary
   of State for Near Eastern
   and Southeast Asian Affairs
Department of State
2201 C Street, N.W.
Washington, D.C.  20520



Dear Ambassador Twinam

       We have reviewed your letter of April 19, 1982,
the Diplomatic Relations Act of 1978, and applicable law.
We find no basis for the State Department conferring
diplomatic immunity on His Royal Highness Prince Turki Biu
Abdul-Aziz.

       I set forth the history of this matter as we know
it so that you will understand our position.

       In January, 1982, Commander Arthur Nehrbass of the
Organized Crime Bureau of the Metro Dade County Police
Department made inquiry through the Bureau of Alcohol
Tobacco and Firearms as to whether the Prince enjoyed
diplomatic immunity.  The Bureau has confirmed that it was
advised by the State Department, and that the Bureau in turn
advised Commander Nehrbass that the Prince did not enjoy
diplomatic immunity.

       Chief Assistant State Attorney Thomas K. Petersen
confirmed this information by inquiry to Mr. David Patterson
of the State Department in February, 1982.  Mr. Patterson
advised Mr. Petersen that the Prince did not enjoy
diplomatic immunity and there was no reason why a search
warrant could not be executed on the residence of the Prince
here in Miami.

       On February 26, 1982, the Prince was living with
his family in an apartment in the Cricket Club here in
Miami.  We understand that he was engaged in private
investment enterprises in the United States, particularly
with one Alvin Malnik.  We refer you to the Department of
Justice for information concerning Mr. Malnik's enterprises.

EXHIBIT "A"

Ambassador Joseph W. Twinam
May 26, 1982
Page 2

There is no evidence whatsoever that the Cricket Club or any
part of it has been a diplomatic mission or that the Prince
has or is engaged in any diplomatic activity here in Dade
County.

        A search warrant was executed against the
residence of the Prince on February 26, 1982.  The Prince,
his family, and his servants or employees interferred with
the execution of the warrant.

        On March 2, 1982, the Prince filed suit here in
Dade County against the police officers who attempted to
serve this warrant; my Chief Assistant, Tom Petersen, who
directed its preparation; and Dade County.  The filing of
his lawsuit which is still pending contradicts any claim the
Prince might now want to make to diplomatic immunity.  He
did not proceed through diplomatic channels, but through a
private lawyer seeking money damages in a spurious claim
against the defendants including a county government.

        The State Department was aware of these
circumstances and even after this incident confirmed that
the Prince did not enjoy diplomatic immunity.

        From February 26th to March 17th the State
Department engaged in many discussions with the government
of Saudi Arabia concerning the attempted execution of the
search warrant and the fact that criminal charges might be
filed against the Prince.  At no time during this period
were we advised of any conversation between the two
governments concerning the fact that the Prince might be
appointed a special envoy.

        Additional time elasped until you advised me by
telephone on April 2, 1982, that the Prince was considered
to have diplomatic immunity.  You then asked me to stop any
criminal proceedings against the Prince or his family and
treat him as a diplomatic representative and deal with him
and his family as one would deal with diplomats.  You
referred me to Philip Shamwell of the State Department for
further information.  When I asked on what basis immunity
was conferred, Mr. Shamwell verbally advised me that
immunity was based on a letter of March 17, 1982, from the
Saudi Government plus oral assurances made on April 1st,

Ambassador Joseph W. Twinam
May 26, 1982
Page 3


that the Prince was appointed special envoy with economic
advisory responsibilities. Yet, according to Mr. Shamwell,
as of April 14th, no forms had been filled out.  To
implement this assurance and the State Department had
received no written confirmation from the Saudi Ambassador.
Mr. Shamwell, at first told me that I might have a copy of
the March 17th letter and later said it might be privileged
but he would check to see if that were so.  I have heard
nothing further from him.

On April 22, 1982, we received your letter of
April 19th, in which you state:

"On March 17, 1982, the Embassy of
Saudi Arabia formally notified the
Department of State that Prince Turki is
entitled to be accorded diplomatic
immunity based upon his position as a
senior member of the ruling family Saudi
Arabia.  The Department was subsequently
advised that Prince Turki had been
vested with specific diplomatic
functions in the United States and that
he had been accorded the title of
Special Envoy for matters of interest to
the Government of Saudi Arabia.  In
addition to having a diplomatic title,
the Prince also meets the requirement
that he possess a diplomatic passport
from the sending State (Saudi Arabia)
and a diplomatic ("A-1") visa from the
United States.  Therefore, the
Department, in accordance with standard
procedures, accorded Prince Turki
diplomatic status and attendant
privileges and immunites."

At the time the State Department advised us that the
Prince did not have diplomatic immunity, you knew he was a senior
member of the Royal Family, and that he possessed a diplomatic
passport from Saudi Arabia and a diplomatic visa from the United
States.  The only fact that changed before you conferred
diplomatic immunity was some designation by the Saudi Government
that he was a special envoy of some kind.

Ambassador Joseph W. Twinam
May 26, 1982
Page 4


We cannot believe the State Department would suddenly accept a special diplmatic envoy, expect him to form legitimate diplomatic missions and confer diplomatic immunity, knowing that local law enforcement officials were prepared to charge him with a crime.

In short, all the evidence indicates the State Department conferred diplomatic immunity on Prince Turki solely to prevent him from being charged by this office and not because he was on any special diplomatic mission. All the evidence indicates that the State Department took that action in response to pressure from the Saudi Government who wanted to keep one of the members of the Royal Family of Saudi Arabi from being embarrassed.

I understand that the State Department may be concerned about serious diplomatic implications if charges were filed against Prince Turki. I understand that the State Department may conclude that the consequences of filing charges might have such a serious international impact that it would be better that charges not be filed, but that is not what Mr. Shamwell told me or what you are telling me in your letter of April 19, 1982. Instead, we are being told that the Prince is on some special diplomatic mission for which he has been given diplomatic immunity. That story does not appear to be true.

Diplomatic immunity was not meant to be used to protect individual foreigners from embarrassment. The Preamble to the Vienna Convention provides that the purpose of diplomatic immunity is "not to benefit individuals, but to ensure the efficient performance of the diplomatic missions as representing States." The Diplomatic Relations Act of 1978 which incorporates the Convention appears to base diplomatic immunity on the theory of "functional necessity." As we understand it, this theory is based on the proposition that the diplomat must be shielded from the receiving State in order to permit him to function effectively as a diplomat.

We respectfully submit that the Prince has not and is not functioning as a diplomat and there is no need to shield him. The Prince may claim he is a special economic envoy on a diplomatic mission because he is "promoting friendly relations between the sending State and the receiving State, and developing

Ambassador Joseph W. Twinam
May 26, 1982
Page 5


their economic cultural and scientific relations." (Article 3 (1)(e) of the Vienna Convention). We suggest that possibility because we note from the Miami Herald that since receiving diplomatic immunity, the Prince has retained a public relations counselor to advise him on the charitable donations he should make to improve his image in Dade County. We regularly pick up the papers to read of some new contribution the Prince or his family has made. We trust the State Department has not and will not permit the Prince to buy his immunity. We also trust the State Department is not so gullible as to accept the fact that after all that happened that the Prince is suddenly in Dade County on a diplomatic mission to promote friendly relations.

We respectfully submit that the State Department erred in conferring diplomatic immunity on the Prince. It placed us all in an untenable position for the future.

We do not wish to meddle in international affairs or second-guess your diplomatic decisions. If international considerations outweigh the local interest in filing charges then tell us so and get the Prince and his family out of the country. You should not solve the problem by conferring diplomatic immunity on the basis of an elaborate sham and, in so doing, permit the Prince to remain in the country and to act with immunity. To confer immunity in this manner and in this case impairs public confidence in our government, creates an unhealthy situation in Dade County and strikes a serious blow at federalism.

The implications are great. The position taken by the State Department would permit someone of tremendous wealth to pressure his way to a status of immunity, invest and act as he wants without check by law enforcement authorities and, in effect, place himself above the law. He could use that wealth for corrupt purposes knowing that law enforcement officials stand helpless.

We would ask the State Department to review the immunity conferred upon the Prince and reconsider its position and its ultimate implications.

Sincerely,

JANET RENO
State Attorney

JR/mb
cc:  Director Arthur Nehrbass
     Steven D. Ginsburg, Esquire
     Bruce Zagaris, Esquire