

12th September 2021

Dear Sirs,

**Re: Portuguese into English (UK) Certified Translation**

Language Reach Limited is a UK-registered professional translation and interpreting company and a fully qualified registered member of The Association of Translation Companies (Member No. 2018ATCR1238). We hereby confirm that we have translated the enclosed document(s) from Portuguese into English (UK).

As a responsible translation agency we only employ certified linguists to work with us. We are satisfied with the linguistic accuracy and hereby confirm that the English (UK) written translation of the Portuguese document(s) represents its fair and accurate linguistic message as intended in the original file(s).

We hereby confirm that this is a true and correct translation and certify the linguistic accuracy.

For more information, please contact Language Reach Limited on +44 (0) 208 677 3775.

Yours sincerely,

**Lucia Petrulli**
Project Manager






GOVERNMENT
EXHIBIT
Case No.: 19-20450-CR-RNS

2

CERTIFIED TRANSLATION
12/09/2021
REG:07635166
LANGUAGE REACH

Registered in England & Wales 07635166 Tel: +44 (0) 208 677 3775 Email: info@languagereach.com
Address: Unit F11B, Parkhall Business Centre, London, SE21 8EN



**Copy:**

Of the Ruling handed down in the case records of Appeal for Specific Inspection of Constitutionality No. 2/2021, in which **Alex Nain Saab Moran** is the Appellant and the **Supreme Court of Justice** is the Defendant

## CONSTITUTIONAL COURT

## RULING No. 39/2021

**(Alex Saab v. STJ – Supreme Court of Justice, referring to the application of unconstitutional rules in the Ruling on the arrest and detention of a person, in the Ruling on the extradition process and in the extradition authorisation and refusal to apply a hypothetical rule arising from regional instruments due to unconstitutionality).**

**I. Report**

1. Mr. **Alex Nain Saab Moran**, a Venezuelan and Colombian citizen, with other identification in the file, appeals to this Court, alleging that, in the extradition process that took place in the Barlavento Court of Appeal and the Supreme Court of Justice, conducting the extradition authorisation and its confirmation, unconstitutional rules were applied or alternatively there was a refusal to apply infra-constitutional rules for reasons of unconstitutionality.

1.1. The Appeal was filed at the secretary of the appealed body, which issued the challenged decision, *Ruling 28/2021, dated 16th March*, on 25th March of the same year.

1.2. Through it:

1.2.1. He indicated that the Appeal is filed under sub-sections a) and b) of Article 77, as inferred from the passage in which it says that it "hereby comes, under (…) 77.1.a and b) (…)" "to file an Appeal for specific review of constitutionality (…) of Ruling 28/2021, dated 16th March, taken by the Honourable Supreme Court of Justice in the Appeal Crime Records – Extradition Records No. 42/2020";



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 07635166

1

1.2.2. In relation to decision-making segments to which he imputes defects of unconstitutionality or incompatibility with international norms (customary or conventional), therefore potentially revealing an indirect unconstitutionality, the document points to what he calls "previous questions" that were not admitted by the Supreme Court of Justice, a refusal of admission confirmed by the Constitutional Court following a Complaint, as "*Thema decidendum*", a) "Primum", "Secundium" and "Tertium" – First, second and third subjects to be decided and adjudicated on; b) "new questions" in paragraph nine (4 to 11) and, c) "complements to the previous questions", adding that these would have been taken up by the STJ, which, in their respect, will have promoted new arguments.

1.2.3. Whereas he says that the Appeal is also filed under sub-section b) of paragraph 1 of Article 77 of the Law on the Organisation, Functioning and Process of the Constitutional Court, indicates, at times, the specific rules and principles, at times the precepts where they would be accommodated, and which he considers to have been affected by decision-making segments of the Ruling under appeal taken by the Supreme Court of Justice, which allegedly applied and enforced standards or refused to apply and enforce standards.

1.2.4. He indicated documents in which he raised questions of constitutionality.

1.3. It was admitted by the appealed body through Ruling 35/2021, dated 31st of March.

2. Referred by this highest court and received at the Constitutional Court on the 8th April, the Rapporteur to whom Advisory Judge Pina Delgado was assigned for certainty, following the preliminary assessment imposed on him, under paragraph 1 of Article 86 of the Law of the Constitutional Law Court, recognised that:

2.1. The pleading of the Appeal's filing, despite mentioning that it was being filed under sub-sections a) and b) of Article 77, did not expressly indicate when it was dealing with one case and when it was dealing with the other in relation to the various contested items, especially cases of refusal of application due to unconstitutionality; all the constitutional or international legal parameters indicated were not sufficiently precise, that in relation to Question 5-B and, partially, in relation to Question 10-G, the pleading had not been indicated where the question of constitutionality had been raised,



and, above all, that in relation to several items, despite the imputation of defects of unconstitutionality or of incompatibility with international norms (customary or conventional), and, with the Appellant having the burden of marking and defining them, they were minimally specified in relation to Q -6, Q-11, Q-12, imprecisely formulated in relation to C, Q-8, Q-9 and Q-10, invalidly identified in relation to Q-4, Q-5 and Q-8, without the demonstration of any normative content in relation to Q-7, and without clearly explaining his intentions in relation to the complements of previous questions.

2.2. For these reasons, the Rapporteur invited the Appellant to: a) identify the situation in which he was appealing the refusal to apply a rule by the appealed judicial body on the grounds of unconstitutionality; b) in relation to the parameters indicated to clearly explain the constitutional norm or norms that he considers violated and which result from the precepts he identifies, especially in cases where the same normative provision accommodates at the same time several different norms, such as Articles 1, 11 paragraph 1; 12, 15, 17 paragraphs 4 and 5, and Articles 18 and 22 paragraph 3, of the Fundamental Law of the Republic; c) point out the documents in which he raised the issues of unconstitutionality referred to as Q. 5-B and in the third segment of Q.10 – G; d) within the strict framework of the questions that he has already presented, clearly indicate all the norms that he seeks that the Court explores, namely, in the case of interpretative norms, to construct them as precisely as possible.

2.3. Hence, it issued an improvement order on 26 April 2021, of which the Appellant was notified on 27 April.

3. In the improvement document submitted to this Court on 3 May, therefore within the five-day period available for that purpose, the Appellant:

3.1. Presented, according to his own numbering and nomenclature, twelve questions of constitutionality, numbered from Q1-A to Q3-C and Q4-C to Q12-I.

3.1.1. In relation to Q1-A, he raises a question that he claims to have raised in his Appeal in points k) a m) of Appeal 44/2020, in points 94 to 101 o) and p) of the conclusions of Appeal 07/2021 to Ruling 28/2021 and in a response to the ATTORNEY GENERAL'S OFFICE, he says that it refers to the personal notification of the extraditee, the person whose extradition is sought, of the extradition request and the order that admits it,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 07635166

3

considering that the decision applied the rules under Articles 5, 24 paragraph 1, Article 141, paragraphs 1 and 2, last part, Article 151, sub-section a), and 55 of the Law of International Judicial Cooperation on Criminal Matters with the meaning that of the order of the Minister of Justice on the admissibility of the request for extradition requested by the United States of America does not have to be notified to the Appellant of the fulfilment of the request with the TRB – Barlavento Court of Appeal, and that, within the scope of the extradition process, the notification of the same is not personal or / and, that notification of the request for extradition from the requesting State made only to the appointed lawyer is sufficient. This is in violation of several constitutional and international norms that identify, namely Articles 1, 3 paragraphs 2 and 3, Articles 15, 17 paragraphs 1, 2, 4 and 5, Article 18, paragraphs 6 and 7, Article 245, sub-section c ), all from CRCV; Article 14, paragraph 3, sub-section a) of the International Covenant on Civil and Political Rights, Articles 10 and 11, paragraph 1 of the Universal Declaration of Human Rights and Article 9 of the African Charter of Human Rights and Peoples.

3.1.2. He points out and clarifies that in relation to Q2-B, which designates that: "No trial in person (b) with the hearing of the extraditee, the person whose extradition is sought, (a), despite the extraditee, the person whose extradition is sought, having required steps and production of evidence" issues of unconstitutionality that would have been raised under points ff), gg ), ii), ll) of Appeal 44/2020, in points ii), kk) of the conclusions and points 7 to 15, 18 to 25, 94 to 101 of Titles I, II and VI of Appeal 28/2021 and in points 36 to 41 of the Response to the ATTORNEY GENERAL'S OFFICE, and that they attach to the application of the rule under Articles 56, paragraph 2, of the Law of Judicial Cooperation, and under Articles 151, subsection d), g), i), 349, apply 350, 378 and 363 of the CPP, with the interpretative sense that in the course of the passive extradition process it does not require that the Ruling in the TRB, as a court of first instance and not of Appeal, be made in a hearing but rather in a conference, stating that the law does not impose, neither directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge, which would violate the constitutional provisions contained under Article 32 paragraph 4, Article 35 paragraphs 6, 7 and 9, Article 211 paragraph 4, of the CRCV and Article 14 paragraph 2, sub-section d) of the International Covenant on Civil and Political Rights. In his assessment, this was one of the most serious unconstitutionalities that the case records suffer, as the Appellant was prevented from demonstrating that the facts imputed do not constitute a crime before the Cape Verdean legal system, in violation of the principle of double criminality, and that the STJ Ruling admits, without contesting and in violation of the rules of application of the criminal law in the section, in his opinion, that the U.S. law would be applicable to all acts imputed to the Applicant, including those that would constitute a predicate offense for the crime of money laundering.



3.1.3. In relation to Q3-C, which the Appellant designates as: "a) Failure to carry out the steps of evidence required by the extraditee, the person whose extradition is sought; b) the interpretation of the rule contained under Article 155 of the CPP in the sense that it was up to the extraditee, the person whose extradition is sought, to proceed by complaint and not by Appeal, that is, he did not use the appropriate means in view of the failure to carry out the diligence required by the Lower Court, said in another way as to demand the examination of evidence after the decision that there is an ordinary appeal to the STJ", a question that would have been raised under points nn), oo), eee, and fff) of the conclusion of Appeal 44/2020, in sub- sections ll, mm), nn), oo), pp) and points 42 to 55 of Title IV of the Opinion of Appeal 07/2021 of Ruling 28/2021 and 42 to 55 of Title VIII of the Reply to the ATTORNEY GENERAL'S OFFICE. This is because, in his opinion, the Court applied the rules under Articles 3, 5, 173, 355 of the CPP, Articles 55 paragraphs 1 and 2 (2nd Part), 46 paragraph 3, and 56 of the Law of Judicial Cooperation and also Articles 454 and 579 of the Code of Civil Procedure with the sense and meaning of the rule under Article 55, paragraph 2, of the Law of Judicial Cooperation that the extraditee, the person whose extradition is sought, has the right to file opposition, but it can only be centred on two sets of arguments tending to demonstrate that he is not the person sought or that there are no presuppositions of extradition verified, since, despite the existence of a certain overlapping in the contiguous zone, in the courts of the requested State it is not possible to produce evidence on the facts that the requesting State imputes to the extraditee, the person whose extradition is sought, not constituting any unconstitutionality because there is no imputation of crime being imputed on the extraditee, the person whose extradition is sought, much less to formulate a juridical-criminally relevant suspicioNo. Quoting a long passage of the Ruling of the STJ, he says that in the application of legal norms there was a violation of the constitutional norms under Articles 35 paragraphs 6 and 7, 22, paragraph 1, of the CRCV because the controversy is limited to only two themes and to not consider the defence in relation to other aspects of the extradition process, when, in this case, it would be imperative to question the law applicable to the relevant alleged facts to attest the fulfilment of the double criminality requirement established under Article 31 paragraph 2, of the Law of Judicial Cooperation - which would, in turn, be the interpretative norm of paragraph 4 under Article 32 of the Constitution - and the rules under Articles 3 and 4 of the Criminal Code on the application of criminal law in the section, also refraction of the same criminal constitutional guarantee with a traditional place in Cape Verdean constitutionalism.



3.1.4. With regard to Q4-A referred to as: "The illegality of the arrest and detention of the extraditee, the person whose extradition is sought, based on an informal request by a police body of conventional origin, without due ratification, promulgation and publication", duly raised in his opinion by points f) and cc) of the conclusion of the Appeal and Articles 42 to 48 of point V of Appeal No. 7/2021 to Ruling 28/2021 and point VII of the Reply to the opinion of the ATTORNEY GENERAL'S OFFICE, states that the rules under Articles 4 and 39 of the Law on Judicial Cooperation were applied in the sense that it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the arrest and detention of individuals based on official information, namely from INTERPOL, with it being legally irrelevant that the acts relating to INTERPOL have not, eventually, been ratified by the Republic of Cape Verde, nor published in the domestic legal system insofar as the use made of the information received through this system is a national law. Such a normative sense would be inconsistent with Article 12 paragraph 4, 14, 262 and 269 of the Fundamental Law, as Cape Verde could not integrate (invoke or apply) in its legal system, through a third law or other legislative instrument, acts or constitutive instruments of an international organisation (or instrument of international cooperation), even if it were in the simplified form, without its reception in the internal domestic system following, with respect to the organic and formal presuppositions provided for in a higher legal norm, violating, in his opinion, fundamental principles inherent to the Democratic Rule of Law, namely the principle of hierarchy of sources, the principle of competence, the principle of typicality of laws and the principle of legality of administration and what he calls the key principle of the constitutional binding of the legislator regarding the production normative that he infers from some constitutional norms that he identifies.

3.1.5. He would mark Q5-B called: "On the illegality of the Appellant's arrest and detention (of the arrest and detention not directly requested in violation of the principle of proportionality)", which he says is a new question, advanced in the Ruling of the STJ 28/2021 rendered in the records of the Appeal crime 07/2021, the fact that the Supreme Court of Justice, despite having invoked the rule inserted under Article 269, paragraph 3, when stating that information may come to its knowledge by any means allowed by Cape Verdean law, including, in the event that any emergency and danger in delay, by any means of communication, as follows from Article 269, paragraph 3, followed by confirmation by warrant, neither invokes nor fully applies it, thus constituting the refusal to apply a rule. In doing so, the STJ depletes an essential part of the aforementioned legal precept,


CERTIFIED TRANSLATION
12/09/2021
REF: 07635166
LANGUAGE REACH

6

rendering it void and violating constitutional rights, freedoms and guarantees, indicating Article 17, paragraph 2, 244 paragraph 2, and Article 9 paragraph 2, as well as Article 9 paragraph 2, of the International Covenant on Civil Rights and Politicians, and Article 9 of the Universal Declaration of Human Rights. He substantiates his position saying that the conditions of detention, namely out of flagrante delicto, can only happen under the terms of the law, which did not happen, because any arrest warrant for the extraditee, the person whose extradition is sought, is unknown. In this case, the arrest and detention of the extraditee, the person whose extradition is sought, restricts his fundamental rights, going beyond the balance between the forms of cooperation between the States and the rights, namely the freedom of the extraditee, the person whose extradition is sought, the principle of proportionality provided for under Article 244 paragraph 2, and an arbitrariness forbidden under Article 9 of the UDHR and Article 9 paragraph 2, of the ICCPR - The International Covenant on Civil and Political Rights.

3.1.6. In relation to Q 6-C entitled: "On the Illegality of the arrest and detention of the Extraditee, the person whose extradition is sought, (Lack of arrest warrant)", which, according to him, had been raised under point c) and point V of the conclusion of the Appeal to Ruling 28/2021 and point VII of the Response to the ATTORNEY GENERAL'S OFFICE, the rules under Article 39 of the LCJ would have been applied in the sense that an individual can be detained without a court order, without issuing a red alert from INTERPOL and without knowing any fact that clearly justifies his arrest and detention, as it would constitute a violation of the norms he says indicated and of the principle of proportionality, citing in addition Articles 17 paragraphs 1 and 2, 30, No. 4, and 244, paragraphs 2 and 7, sub-sections b) and d) of the Fundamental Law, Article 6 of the African Charter of Human Rights and Peoples, Article 9 paragraph 2, of the International Covenant on Civil and Political Rights and Article 9 of the Universal Declaration of Human Rights.

3.1.7. Regarding the Q7-D presented as: "On the illegality of the arrest and detention of the extraditee, the person whose extradition is sought, (Non-communication of the reasons for the arrest and detention" and which will have been placed in the process through sub-section c) of the conclusion and under point V of the Appeal, as well as under point VII of the Reply to the ATTORNEY GENERAL'S OFFICE, he maintains that the rules under Articles 269 paragraphs 1 and 4, of the CPP and Article 31 paragraph 1, and 39 of the LCJ were applied in the sense that in the alleged illegality of his arrest and detention, the Appellant argues that the Ruling violated Article 4 paragraph 4, of the Constitution of the Republic in the part in which it requires immediate communication to the detainee of the reasons for his arrest and detention. Citing the prescription under Article 30, paragraph 4, of the Constitution, he presents a jurisprudence based on a doctrinal work that



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
Ref. 07635166

assigns to the Constitutional Court of the Portuguese Republic and Article 269, paragraph 1, of the CPP, to conclude that in the application of the aforementioned legal rules there was a violation of the rules contained under Article 17, paragraphs 1 and 2, Article 12, and Article 30 paragraphs 1 and 4, all of the Constitution, Article 6 of the African Charter of Human Rights and Peoples, Article 9, paragraph 2, Article 14, paragraph 3, sub-section a) of the International Covenant on Civil and Political Rights and Article 9 of the Universal Declaration of Human Rights. He concludes by saying that by admitting that it is enough to inform the formal suspect that he is being extradited without indicating the different facts, each of which is punishable by the law of the requesting State and that the lawyers of the extraditee, the person whose extradition is sought, became aware of the charges made against him fifteen days after the arrest of the extraditee, the person whose extradition is sought, and that in the event of a warrant existing, which is not verified in this case, all the information provided for by law should be included in the warrant that would be delivered to the extraditee, the person whose extradition is sought, as well as the eight counts that would support the request.

3.1.8. With regard to Q8-E, which denominates violation of the principle of reciprocity, he asserts that the rules under Articles 3, paragraph 3, and 6, paragraph 3 of the Law of Judicial Cooperation were applied in the sense that the waiver of reciprocity is possible in any form of international judicial cooperation, including, therefore, extradition, in violation under Articles 7, sub-section l), 11, paragraph 1, and Article 25, paragraph 1, of the CRCV, unconstitutionality that had been raised in points qq ) to vv) and points 236 to 277 of Appeal 07/2021 of the decision of Ruling 28/2021 and in the Reply to the Opinion of the ATTORNEY GENERAL'S OFFICE, 1-5, 13-17, 36-37.

3.1.9. Then Q9-F, which designates violation of the principle of specialty and extradition for political reasons, raised, according to information provided, under points ww) and set down under Articles 303 to 309 of Appeal 07/2021 of the decision of Ruling 28/2021 and in Response to the Opinion of the ATTORNEY GENERAL'S OFFICE, 29-41, in which he alleges that a rule arising from Article 17 of the LCJ was applied according to which the authorised extradition is so that the extraditee, the person whose extradition is sought, is subject to criminal proceedings for only one of the crimes that he is charged with in accordance with the guarantee offered by the requesting State. Because, in his opinion, this decision does not correspond to the guarantee given in diplomatic note No. 103 from the USA, in which this country proposes to abandon all charges and seek extradition only on the basis of element 1 of the indictment, nor does it correspond to the need to intervention of a judicial body in cases of offering guarantees of effective reduction of the prosecuting items,



allowing criminal prosecution beyond the precise legal limits (2 alternatives so as to choose one) and beyond the two specifically predefined crimes and not any of the remaining 6 others. Therefore, it violates Articles 11 paragraph 1, Articles 15, 17 paragraphs 4 and 5, and Article 18 of the CRCV – Cape Verde Constitution, as these would require that the guarantees be provided by the judiciary and not by administrative bodies of the requesting State that are not binding on the courts, which are free to judge the Appellant for the entirety of what is contained in the indictment.

3.1.10. Regarding the following question (10-G), identified as: "Perpetual nature of the penalty" and which will have been raised in points h) to j) and set down under Articles 727 to 759 of the Appeal of the decision of Ruling 28/2021 and in the Response to the Opinion of the ATTORNEY GENERAL'S OFFICE, Tit. V, 10-46, he considers that Article 6, paragraph 2, sub-section a) has been applied in the sense that a valid and sufficient guarantee given by an Embassy of the requesting State permits extradition to a country that applies the death penalty or life imprisonment would be a misinterpretation of this rule, insofar as it requires that the request be made by an irrevocable and binding act on its courts and other entities. In his perspective, such understanding would be inconsistent with Articles 1, paragraphs 1 and 2, Articles 24, 38 paragraph 2 of the CRCV – Cape Verde Constitution. In this case, the requirement that the requesting State offer guarantees that such penalty or security measure will not be executed. He further argues that in a similar situation the Supreme Court of Justice had not accepted that a similar diplomatic note from the same requesting State would constitute an adequate guarantee, which would specifically violate Article 1 paragraph 1 and 2, and Article 24, and that he would be faced with a typical masked extradition that would have political motivation in its wake due to the association that the requesting State established between the extraditee, the person whose extradition is sought, and Venezuela, something that would not be admitted even under Article 38 paragraph 1, sub-section a) of the CRCV, nor by the jurisprudence, namely that of the USA.

3.1.11. In the following item that he calls "immunity", he indicates that the decision applied the rules under Articles 156 paragraph No. 1, sub-section b), and Articles 157 and 161 of the CPP with the sense that the absolute incompetence of the Cape Verdean courts to hear and examine a matter relating to immunity under International Public Law arises from a prior assessment or political position, leading to the denial of recognition of the extraditee, the person whose extradition is sought, as a special envoy, after the official recognition of his status by the sending State and by the State that was going to receive him.



Thus, in violation under Article 2 paragraph 2, Articles 7 and 11 paragraph 1, Article 12 paragraphs 1 and 2, 211, No. 1, and Articles 2, paragraph 1, and 103 of the United Nations Charter, which had already been raised through sub-sections s), t), u), v), w), x), y), s), aa), bb) of the conclusions and points 104 to 277 of Appeal 07/2021 to Ruling 28/2021 and points 1 to 108 of the Reply to the ATTORNEY GENERAL'S OFFICE.

3.1.12. With regard to Q 12-I, as he says, raised in the conclusion of point xx and Articles 525 to 647 of title XV of Appeal 07/2021 of the decision of Ruling 28/2021, he alleges that the STJ refused to apply the rules under Articles 15, paragraph No. 4, of the Constitutive Treaty and Articles 34, 89 and 90 of the Protocols of 1991 and 2005 on the ECOWAS Court of Justice, insofar as he will have understood that a treaty enters the Cape Verdean legal system, and has full effectiveness, in accordance with the Constitution, must be signed and ratified and that Cape Verde has not signed the additional protocols that recognise the competence of the ECOWAS Court of Justice in matters of human rights and that ECOWAS is not a supranational organisation for the purposes of paragraph 3 under Article 12 of the CRCV, which contradicts the provisions of paragraphs 1 to 3 under Article 12 of the Fundamental Law, the court not recognising the supranational nature of ECOWAS, the fact that Cape Verde signed the Protocol establishing the ECOWAS Court of Justice and the Treaty Constitutive of this organisation has been ratified and published in the *Cape Verde Official Gazette* and also the rule in paragraph 2 under Article 210 of the CRCV – Cape Verde Constitution.

3.2. He concludes by considering having carried out the improvement, presenting the requirements presented by the law through this document, referring, however, in the relevant part to the request already formulated in the application for filing the Appeal.

3.3. Upon receipt of the improvement document, surpassing the issue of paragraph 1 under Article 86, on 5 May 2021, the Rapporteur complied with the provisions of paragraph 4 of the same provision, sending notification to the Appellant to present final arguments. As this is a process that by law is considered urgent, he decided to set the period provided for under paragraph 2 under Article 88 to fifteen days.

4. Finally, on 28 May 2021, he submitted the final version of his document of closing arguments set out in 122 pages and marked by an introductory part in which the Appellant introduces and presents himself in person and characterises the special context of the extradition process in which he is involved, discusses the role of the Constitutional Court and the



approach that he understands that its judges should take in relation to the constitutional issues that they consider in these records and, finally, pronounces on the fulfilment of the conditions for the issues that he brings to the Court to be admitted.

4.1. He then discusses his first question of constitutionality regarding his entitlement to personal notification of an extradition request and the request that admits it, presenting a set of information imposed by the law that will be resumed later, some decisive arguments to leverage his allegations that this duty of personal notification was disregarded through contrary normative understanding and that, for him, they would be in non-compliance of various constitutional precepts. From the premise that the extradition process has effects on personal freedom would have a criminal nature, which would result in the application of basic principles and constitutional and legal guarantees on this matter. As a result, only with personal notification, the formal suspect, the main interested party in the process, could fully exercise his defence, and the simple notification of his agents is not enough. Moreover, as, in his understanding, this Court has stated in several Rulings, from this would derive the legitimacy of this body, through this type of process, to repair the unconstitutionality of the interpretation made by the Ruling or resolve the legal-normative issue.

4.2. Regarding the second question of constitutionality associated with the not in person trial with hearing of the extraditee, the person whose extradition is sought, despite the fact that he requested evidence, a segment in which he promotes legal theses according to which this would be one of the most serious unconstitutionalities suffered, the case file prevented the extraditee, the person whose extradition is sought, from demonstrating before the Cape Verdean legal system, that the facts attributed to him, do not constitute a crime, which would be contrary to the principle of double criminality and the principle of legality. He then discusses this issue, adducing arguments to support his thesis, and then goes on to discuss the lack of territorial connection in the case. And it focuses on considerations about the right of a formal suspect to be heard, as currently, as he informs, has happened in Portugal, when due diligence is required, also within the spirit of the CPP. In this case, the Appellant requested due diligence and asked for the document to be attached, thus requiring a public hearing, which was not held by the Court. He also discusses the extradition process and its phases, and in the judicial phase, the Appellant's hearing would take place. Denying due diligence and investigation of evidence,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF07635166
11

specifically the hearing, after the promotion of the judicial phase of the process, based on a previous hearing in the administrative phase, would violate sub-sections a) and b) of paragraph 1 under Article 77 of the Code of Criminal Procedure, which would materialise rules of Constitutional Law and International Human Rights Law. He cites jurisprudence of the Constitutional Court referring to the right to be heard and to be heard provided for under Article 35, as well as national doctrine. Failure to hear the extraditee, the person whose extradition is sought, on the grounds of urgency to hand him over to the requesting State is a violation of several of his rights.

He also adds that the position of the judicial body would be even more violating because there was a requirement for steps to take evidence that, if they were carried out, they would know that he was charged with eight crimes and not seven, thus without being able to better prepare his defence in opposition, and also because it confirmed the decision on the basis of facts in relation to which he was not heard. In a context in which this was a case with enormous potential for media contamination and global dissemination, considering the inherent geopolitical links, which can undermine the systemic and organisational balance of the Cape Verdean legal system itself.

He further alleges that it was understood that it was not necessary to carry out the evidence without the court having justified it as it should and based on the existing legal network and mentioned its position, in violation of general principles of process, the adversarial system and the due legal process that imposes the prior submission to debate by the parties, violating Article 35, paragraph 6 of the Constitution and leading to irremediable annulment pursuant to the terms under Article 155, g) of the CPP.

And, finally, that the limitations that were placed on the production of evidence prevented him from demonstrating that the accusation brought against him could not be met by the Cape Verdean legal system due to incompatibility with the principle of double criminality, namely from the statement of arguments which he presents to conclude that the facts that the Appellant has been accused of before the Florida Court do not fulfil any penal type under the Cape Verdean legal system, so that the Appellant could not be extradited to the U.S.A. based on them, due to the lack of double criminality requirement. In this sense, the Supreme Court of Justice did not address the issue in the slightest, starting from false considerations and not considering the rules of law enforcement in the area.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
RE 7635166
12

Thus, violating the principle of *nullum crimen sine lege*, that a person may only be found guilty of a crime in respect of acts which constituted a crime at the time of their commission, recognised by the Constitution and by International Law, also applicable in cases where the handing over of a person who is in Cape Verdean territory is requested. In addition to this, it would translate into the principle of double criminality, which, therefore, finds its constitutional position under paragraph 4 under Article 32 of the Constitution, which is included in an interpretative rule inserted under paragraph 2 under Article 31 of the Law of International Judicial Cooperation on Criminal Matters. The decision of the Supreme Court of Justice, on considering that the principle of double criminality was fulfilled, convicted an innocent person, because it is not enough for the requesting country to qualify the fact as a crime of money laundering, it would also be necessary for it to constitute a crime of money laundering before the Cape Verdean legal system. In the specific case, in his diction and phrasing, as the facts occurred abroad and in contact with a legal system different from the one that requested the extradition, there is a conflict of criminal laws in the section in which Cape Verdean law requires the application of the law of the place where the facts occurred, in this case the Law of Venezuela, to the exclusion of any other and that of the USA. Even if considering that this assessment should be made not specifically, but in principle, the revenues from a contract for the construction of social housing cannot, under Cape Verdean law, generate funds of criminal origin, susceptible to being the object of money laundering, because in this case, the State of Venezuela would be considered to have committed a crime, which would give the matter a political rather than a legal nature. The facts in question have no criminal relevance in the Cape Verdean legal system for lack of a prior crime. Such procedure is followed by American courts, which also do not recognise jurisdiction to their courts in cases similar to that of the Appellant. Hence the violation of the principle of double criminality and claim the violation by this rule of the constitutional principle of publicity and orality.

4.3. In relation to the third item, which deals with the limitations that were imposed on the opposition that it deduced and the steps of evidence that he requested, he says that they did not allow him to demonstrate that the facts that constitute the prior crime of money laundering occurred in Venezuela, therefore, according to Cape Verde's conflict resolution rules on the application of the country's criminal law in the area, the criminal relevance of these facts should be verified in accordance with the law of the South American country and not in the light of that of the United States of America and were essential for to determine the Appellant's effective participation in the alleged unlawful behaviour, and other



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 7635166

13

aspects that he could produce evidence, namely about his health status, about the payment of the visa, mission documents, and several others, aspects about which he could provide evidence, how he was able to do it in relation to other aspects such as the aggravation of his procedural situation, the validity of his arrest and detention and also the political context of his arrest and detention. He also considers that the rejection of carrying out the investigation of the required evidence, which would constitute omission of the necessary steps, was treated by the Supreme Court as a mere irregularity; the alleged annulment is covered by a decision of this judicial body, and this is only admitted separately when the procedural violation is not, even indirectly or implicitly, covered by a court order. If there is a court decision that presupposes the act as defective or vitiated, the proper way to react against the illegality is not the plea or claim for annulment, but the challenge of the respective court decision through the filing of the competent Appeal. On the other hand, the allegation of irregularity in the omission of a pronouncement and the decision taken on it does not allow an Appeal, since the only Appeal that would be admissible would be the final decision, pursuant to Article 49, paragraph two, of the Law of Judicial Cooperation, so that the imposition of the prior complaint of irregularity, without being in the case of an Appeal, would result in a legal impossibility. Therefore, the Ruling would be illegal and null in the segment in which it rejected the carrying out of due diligence, and the interpretation made under Article 155 is unconstitutional.

4.4. The Applicant then considers, in a point where he explains his fundamental thesis that the Republic of Cape Verde could not integrate, invoke or apply in its legal system through an internal law or other legislative instrument, acts or instruments constituting an international organisation (or instrument of international cooperation), even be it in simplified form without its reception respecting the organic and formal presuppositions set forth in a superior legal norm for violating several fundamental principles inherent to the Rule of Law and that, in addition, the Constitution of INTERPOL and other cited texts are treaties that refer to the ratification, a matter of domestic law regulated among others by paragraph 2 under Article 12 of the Constitution. He considers that the country is part of the organisation, but the Interpol texts would require approval by the National Assembly, despite being, in his opinion, an agreement in a simplified form. However, it was not published, despite the constitutional legal regime in force at the time demanding it, determining its ineffectiveness, the same happening with its approval that belonged to that same sovereign body.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166
14

Without this, the Judiciary Police could not rely on INTERPOL's precepts, standards or philosophy to arrest and detain a person or perform any procedural act that results in the restriction of the right to freedom and security of a person because the instruments of this organisation do not have legal effectiveness in the Cape Verdean legal system, not least because the unconstitutionality of this instrument was never declared by the Constitutional Court and was never confirmed by the Government, and the signature is not sufficient to subject the State to all the obligations arising from a treaty.

4.5. He dedicates the following part to the illegality of the Appellant's unsolicited detention in a context in which the Appellate Court did not justify the fulfilment of the requirements under Article 269, third paragraph, of the CPP, which he invokes, but does not apply, emptying an essential part of the legal precept on omitting the requirement of immediacy, still disregarding Article 268 of the same statute. He fights for the application of the CPP rules on coercive measures and on communication of acts between judicial authorities and police bodies for the purpose of detaining a person, in the sense that it can only be carried out on the basis of a letter rogatory or execution of foreign criminal sentences. He adds that so far, there is no warrant in the process, restricting his fundamental rights, which are excessively limited, without a fundamental duty being able to prevail over a fundamental right, based on the principle of international cooperation between States to achieve the right to freedom in a disproportionate way and other principles of the rule of law, also violated in the case. He concludes that the detention of the extraditee, the person whose extradition is sought, is arbitrary and violates several norms.

4.6. As for the sixth question regarding the illegality of the arrest and detention for lack of an arrest warrant, which addresses the right to bodily freedom, considering that the detention of an individual which may result in his constitution as a formal suspect depends on a warrant. The idea that a police may deprive an individual of their freedom on the basis of an informal request from a foreign police agency is not compatible with the principle of legality. In this specific case, the arrest warrant is in the name of Álvaro Enrique Pulido Vargas and not the Appellant, so the red alert would be null and void. Therefore, the interpretation of the appealed judicial body is unconstitutional,



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

it being even more pernicious for depriving the Appellant of having an effective knowledge of the charges on him and without being able to exercise an active role in his defence, this understanding being excessive. He adds that the appealed or contested Ruling goes so far as to consider that the arrest may not be accompanied by an arrest warrant, forgetting that it has to be processed in accordance with the current procedural law, that the red alert was issued in contravention of the rules of INTERPOL data processing and that it seems to result that the legislator has the understanding that the temporary custody in the extradition process is about protective custody. Thus, since the intervention of this body is illegal, the entire detention process is null and void and without any legal effect. Hence, he requires the declaration of unconstitutionality of a norm for violation of a set of constitutional and international provisions.

4.7. In a similar sense, he discusses the illegality of the detention of the extraditee, the person whose extradition is sought, for his not having been communicated the reasons for his detention to him, because, in light of the applicable legal and constitutional rules, he disagrees with the interpretation according to which it is sufficient to inform the Appellant that he is being extradited without stating the exact distinct facts. Even so, the arrest and detention would still be valid. In his specific case, the lawyers only learned of the charge made against him fifteen days after his arrest, and he was not informed of the reasons for the mobilisation of that instrument of extradition and of his rights as a formal suspect. In the warrant, according to him, non-existent, it should contain this information and the eight counts that substantiate the request of extradition. Basically, he will only be able to organise his defence if elements are communicated to him that allow him to understand the specific facts that are imputed to him, resulting from guarantees provided for under International Law and by the Internal System for the Protection of Rights to guarantee an open and transparent process, in accordance with the principle of good faith, especially in its dimension of loyalty, already dealt with by this Court. On the contrary, the decision, in order to comply with the Constitution, should be constructed in the sense that every person detained or imprisoned must be immediately informed, in a clear, detailed, objective and understandable manner, of the reasons for their arrest or imprisonment and of their constitutional rights, through a warrant to be delivered on the spot.

4.8. In the next segment, he discusses the violation of the principle of reciprocity, professing the understanding that extradition is a matter of international relations and the reciprocity of advantages is one of the principles that govern the international relations of the State pursuant to paragraph 1 under Article 11 of the Constitution, and cannot be excluded from this fundamental guideline.



Hence, we come to his most important legal thesis in this segment, that the ordinary law cannot rule out reciprocity in relations between the country and a foreign country, in this case the United States of America. He also adds the argument that it would have to do with the treatment of foreigners temporarily in Cape Verde, insofar as it would require them to be accorded treatment compatible with the rules of International Law, and with the rule on the extension of rights to foreigners under Article 25, which, as he understands, only excludes political rights. These constitutional rules would prevent the reciprocity of advantages from being dispensed with in the extradition process. In the specific case, the Minister of Justice should have demanded reciprocity from the requesting State, especially since it is a foreigner in transit with limited connections to the State of Cape Verde.

4.9. Regarding the violation of the principle of specialty and extradition for political reasons, he voices the thesis that the decision to confirm the Appellant's extradition violated the principle of specialty which, in his opinion, is safeguarded by constitutional norms and laws. This principle arises from the constitutionality and the fact that the principle of specialty is a principle of International Law of direct application in our legal system, which would also have a subjective dimension. In the specific case, he points out that the court decisions do not correspond to the guarantee given in the diplomatic note 103 of the USA - which he quotes - nor do the guarantees correspond to the need for intervention of a judicial court of the Requesting State regarding the offer of the guarantee of effective reduction of counts of the indictment in relation to the Appellant, especially considering what peers would refer to as the effectiveness of this commitment and the possibility of the Appellant not receiving a fair trial. In the absence of an extradition treaty between the two countries, neither the extraditee, the person whose extradition is sought, nor Cape Verde will be able to contest any violation of these guarantees, nor may this result from the Convention to Combat Transnational Organised Crime. In this sense, Cape Verde cannot shirk its duty to ensure the application of the guarantees given by the Requesting State in this matter. In addition to this, the direction given to the matter, by not choosing the alternatives presented by the Requesting State, makes it difficult for the Appellant to defend, as the lawyer will have to prepare the defence in relation to all crimes, also verifying that the State guarantee was provided by the Ambassador, which does not bind the judicial courts and that the judicial body under appeal did not analyse the guarantees provided, contrary to the duties of the requested States to ensure that they meet the legal requirements.


CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 7635166
17

4.10. Regarding the issue of life imprisonment, the insufficiency of the guarantee of non-application given is pointed to because it is provided by an Embassy, which violates Article 38, paragraph 2, final part, the principle of human dignity, the principle of equality and the principle of protection of trust. He also points out that in another case the STJ – Supreme Court of Justice, considered that this type of guarantee would not be adequate and that what is at stake is an extradition for political reasons, considering the tense relationship between the two countries and the role attributed to the Appellant in the public affairs of his country, and that is why he has been claiming that it is masked extradition, which the Constitution would reject. He argues about the first of the points that debated the issue of extradition in cases of application of the sentence of life imprisonment with the intervention of several jurists, including current judges of the Court. Therefore, he challenges the Court to also apply this brake to foreign citizens, as it generates an insurmountable contradiction that started to be allowed after the constitutional revision, hurting the essence of the Cape Verdean citizen and his sense of equality and recognition of the dignity of the human being and other principles of treatment of foreigners.

In his opinion, since there is some oscillation between the thinking expressed by the Court and its judges, it would be considered that equal treatment should be guaranteed to all with regard to penalties, otherwise, and outside the realm of political rights, nationals and non-nationals would be treated differently, contrary to the principle of equality. In addition, the principle of protection of trust would be at stake because the Supreme Court reversed the orientation that it had already accepted in a similar situation without any justification or explanation of public interest and frustrating the Appellant's expectations in the decision itself and in the conduct of the process. Furthermore, he adds that in this case, the Appellant is being required by another State and not by the International Criminal Court. That is why the decision is unconstitutional because it grants extradition to a country that applies life imprisonment and because in that country, he would run the risk of irreversible damage to his physical integrity.

4.11. Regarding the issue of immunities, in addition to indicating information regarding the formal requirements prescribed by law, he says that without violating the principle of separation of powers, national courts have


CERTIFIED TRANSLATION
12/09/2021
REF: 7635166
LANGUAGE REACH

18

constitutional powers to not deny immunities and transfer this competence to the political power and, in so doing, in the case that would result from him being special envoy, violate constitutional and international norms, imputing the requesting State to have tried to restrict the decision-making freedom of the courts that intervened in the process. This is because the Appellant is a special envoy from Venezuela, having invoked that status in the first hours of his detention. Therefore, it being incumbent on the Appellate Court to hear the matter, it should do so, namely by taking the initiative to interact with the Government or vice versa. Going on to discuss applicable international law, he says that it would result from the 1969 New York Convention, and asserts that, being indisputable that the Appellant would qualify as a special envoy, the Supreme Court of Justice could not have considered that he would not be protected by inviolability and immunities, which he considers a misinterpretation of International Law because prior notification would be a merely formal condition and, in this case, Venezuela was not in a position to anticipate it given the unplanned and purely technical nature of the stopover in Cape Verde. Therefore, what would matter, in such a context, would be to know if this country was informed as soon as possible, a question that he claims, should be answered positively. The other condition provided for by the applicable rule would not require that consent be expressed, another aspect that the Supreme Court misinterprets and unconstitutionally, since, in such cases, once informed what Cape Verde should do was to object, which it did not do, violating Venezuela's rights. Even though Cape Verde was notified, albeit belatedly, it was up to it to express this objection to Venezuela, which it did not. It concludes the point by summarising an important segment of its legal thesis by saying that Cape Verde should be considered a transit State which, having been notified of the passage through its territory of a special mission and having raised no objections, had an obligation under international law, to respect the immunity and impunity of the Claimant. And not subjecting him to detention and subjecting him to extradition proceedings. The State of Cape Verde still had the duty to try to diplomatically resolve the dispute and if it had opposed the transit and recognition of immunities, it should have acted differently, informing Venezuela of its disagreement or declaring the Appellant persona non grata, under penalty to generate the international responsibility of the State.

He also says that the Supreme Court of Justice has failed to recognise that as of 24th December, the Appellant was Venezuela's Alternate Permanent Representative to the African Union,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

19

thus generating a double accreditation, which would be governed by contemporary and conventional International Law, according to the jurisprudence of the ICJ. In this case, Cape Verde should have immediately recognised this statute and, in case of disagreement, to have formally expressed an objection to Venezuela, which, once again, it did not do. Nor did it try to peacefully resolve this dispute. In these cases, it would be obliged by international custom to allow the passage of that representative, provided he is innocent. In the event the country did not consider it so, it had an obligation to claim it before the entities involved. He introduces a point according to which when someone is appointed as a representative to an international organisation or State, this act takes effect immediately, resulting in a duty to suspend any ongoing judicial or administrative proceedings inconsistent with this immunity and inviolability. It arises in relation to the court's finding that the appointment had been opportunistic and abusive, which would be a serious allegation and not materially demonstrated in a framework where a presumption of good faith prevails in favour of the sending State, concluding that even were this to be proven, the only applicable sanction would be to declare the beneficiary *persona non grata*. Finally, the Convention on Diplomatic Relations, U.S. law, and U.S. jurisprudence recognise retroactive diplomatic immunity. For all these reasons, he concludes, proclaiming that depriving a person of his freedom when he has two mandates to represent the State, which was not duly evaluated by the Court, would be a serious violation of many rules of diplomatic law.

4.12. After transmitting the formal information relevant for the purposes of the law, he discusses the matter referring to an opinion by Professor Wladimir Brito which is in the records, and pointing out that Cape Verde is part of the original and revised treaties of the regional organisation, of the 1991 Protocol, being linked in particular to its Article 11, paragraph 1, it being irrelevant whether or not it has ratified the 2005 one, since it is being applied provisionally and is not an ordinary treaty. Such an organisation would be supranational depending on its characteristics. Also because being an integral part of the ECOWAS Revised Protocol, even a State that has not ratified the protocol is obliged to apply all its decisions under the aforementioned 1991 Protocol and because the country did not diverge from it when it was adopted by the Conference of Heads of State and Government, for having appointed judges to integrate it and to be part of its Judicial Council, intervening in the process resulting from the State's complaint to that judicial body.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

20

These behaviours would therefore prevent the country from denying its jurisdiction and in light of the rules of the organisation and the interpretation that the Court of ECOWAS makes of them, it has the duty to comply with its decisions that are enforceable in Cape Verde and in full.

He added the thesis that such obligation would result from the fact that the Protocol is being provisionally applied, a situation regulated by International Law, with the States intending to include the provision that attributes competence to the ECOWAS Judicial Tribunal to judge on matters of human rights. In addition, there would always be a material and substantial duty to accept the decision of ECOWAS and that would be able to address any formal issue. This is namely because it is a human rights issue, due to the effects of the ECOWAS legal network composed of treaties, protocols and bylaws, as it was not recognised that there was implicit ratification, according to the methodology adopted by the Protocol and without an integrated reading of the provisions of the instruments mentioned, due to the primacy of International Law and the jurisprudence of the ECOWAS JUDICIAL TRIBUNAL, also referring to the principle of essentiality in signature and ratification, the extensive application of the principle of good faith in its positive and negative aspects and the extensive application of the principle of *pacta sunt servanda*. He ends by bringing up the *estoppel* doctrine, designated as limitation, applicable insofar as the Prime Minister attended the Conference where this instrument was negotiated, which would be equivalent to acceptance and approval of the Complementary Protocol. And the fact that the country participated in the process, which would also refer to the doctrine of *forum prorogatum*, which would oblige it, since, after having objected to the jurisdiction of the Court and had rejected it, rejecting the preliminary objections, having submitted to the jurisdiction of the Court. Therefore, the fact that Cape Verde has not signed the Complementary Protocol does not mean that it has not ratified it by conduct.

4.13. That said, he presents conclusions, referring to the twelve questions of constitutionality that he raised, he refers to the violated parameters and asks that its unconstitutionality be declared by joint violation or, if so understood, subsidiary, and consequently ordering the courts to his immediate release.

4.14. The final allegations were accompanied by five opinions, some of which with attached documents, whose merger and attachment was authorised by the Advisory Judge Rapporteur.



5. In turn, the Public Prosecutor's Office, when it had the opportunity to counter-claim, submitted a 29 page document, which also begins with general considerations that the Appellant argued the unconstitutionality of practically all LCJ rules, some of which, in the its opinion, irrelevant to the decision of the case and that which puts itself in crisis more than norms are the decisions on the merits taken by the Appellate Court. Therefore, it built its answer not only to discuss the issues of constitutionality, but also to refute these other allegations of the Appellant, insofar as he wants the Court to rule on the merits. Recalling that the Appeal for constitutionality does not have as its object the decision itself, but only the part in which it applies an unconstitutional rule or refuses its application for reasons of unconstitutionality, which also limits the cognitive power of the Court, which cannot replace the ordinary court, limited to dealing with the question of unconstitutionality. It also chooses to discuss the difference between the extradition process and the criminal process, which, in its opinion, cannot be confused, as one refers to a procedure instituted by the State against a person and the other to the fulfilment of a duty within the scope of international judicial cooperation. As a result of this distinction, the CPP is always applied with the necessary adaptations, and it is not possible to intend its application to extradition as if it were a criminal case. It then refers to issues of unconstitutionality.

5.1. As for the requirement of personal notification of the extraditee, the person whose extradition is sought, it points out that there are applicable rules of their own, and this issue cannot be given any relevance unless it was in situations of trial in the absence or without representation by a lawyer. In this specific case, the extraditee, the person whose extradition is sought, even acknowledges that he became aware of the promotion through his lawyers. In addition, the Appeal is not justified because it is an irrelevant rule for the specific case, considering that the extraditee, the person whose extradition is sought, was aware of everything he alleges that he was not personally notified through his lawyer, exercised his right of defence, presenting all the legally admissible means of evidence during all procedural stages. It concludes that no constitutional norm or principles were violated with the interpretation and application of the LCJ.

5.2. With regard to the trial in person, with the hearing of the extraditee, the person whose extradition is sought, it says that despite the fact that he required evidence, the Appellant is also not correct because the rule that does not require the hearing of the extraditee, the person whose extradition is sought, in a hearing does not violate any



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

22

constitutional norm or principle as, in its understanding, it has been the orientation of the Constitutional Court of the Portuguese Republic, with no reservation being placed on the fact that the decision is taken in consultation. Therefore, literally, there would be no obstacle to not holding a trial in person and not hearing the extraditee, the person whose extradition is sought, as has also been the position of the STJ.

5.3. Regarding the absence or not carrying out investigation of evidence and the interpretation given to Article 155 of the Code of Criminal Procedure, it also says that there is no constitutional inconsistency, as even in the scope of criminal procedure, the law assigned the power of direction to the judge, allowing him to reject useless proceedings and investigative measures. Furthermore, the jurisprudence of the Portuguese courts, of other countries and of Cape Verde have considered that it is not appropriate for the formal suspect to defend the crimes of which he is accused by the requesting State, since he will have the opportunity to do so before the courts of this country. It also considers that the Appellant refers to international instruments that do not contain any provision relating to extradition, and are therefore not applicable, and that he understands that he should have been authorised to present evidence to defend his procedural position, based on a wrong assumption of that the extradition processes are small point trials, but that they are not intended to assess the assumptions of the imputation of crimes to the agent who is the target of the extradition process, but simply to ensure the existence of sufficient evidence, in light of the law of the Requesting State or of a treaty, to allow the handing over of the extraditee, the person whose extradition is sought, to the Requesting State so that the latter can judge him for the facts of which he is accused and assess his guilt or innocence. In his view, such a solution is based on diverse and valid foundations, since the assessment of this issue would lead to the sovereignty of the Requesting State being in question or restricted, the assessment of the assumptions of imputation requires an understanding of the criminal law of the Requesting State whose interpretation by the Respondent State, would always be risky, insofar as it is a foreign law, with its particularities, the fact that the requests do not, as a rule, specify the totality of the grounds underlying the accusation directed at the extraditee, the person whose extradition is sought, leading to the requested State tried to assess the guilt from an incomplete record, thus generating a series of inconveniences; the reassessment of the assumptions for attributing the facts to the accused would place a significant burden on the Respondent State. This implies a thorough analysis of all the evidence presented by both parties insofar as the violation of the law of the requested State would not be at stake.



Therefore, it concludes that the formal suspect is unable to produce evidence to support or sustain his position, without this resulting, always in his diction, the limitation of his defence, as he may do so before the Requesting State, under the terms established by the procedural law of the latter. This would be an understanding supported by Portuguese jurisprudence that serves as a reference to the Cape Verdean one, given the similarity between the laws and it is not understood how these provisions could undergo such different interpretations, as in Portugal the prohibition of the extraditee, the person whose extradition is sought, to present his criminal defence does not constitute a constitutional violation. He says that the allegations about the fact that this prevented him from raising objections to the principle of specialty and the prohibition of double criminality which are pillars of the extradition process. However, these principles do not imply an analysis of the evidence relating to the facts that support the accusation in the requesting State, but only of the facts on which the extradition request is based. Finally, on this first segment, it says that the case law of the United States goes in the opposite direction of what is alleged by the Appellant, as it is also in line with the model adopted by the LCJ, in the sense of containing limitations to the presentation of evidence of defence in the process criminal during the extradition process. Even when they admit that the formal suspect presents, at the judge's discretion, and in a limited way, evidence to explain the accusations against him, in the specific case, he wants to directly oppose the facts that support the accusation, which is directly contrary to the American and Cape Verdean jurisprudence. Furthermore, it is argued that even if he could present contradictory evidence, it is not clear that it would help him. It concludes that the procedural regime of extradition ensures constitutionally protected defence guarantees, namely the right to a double degree of jurisdiction, not reaching the extent to which violation of the principle of *ne bis in idem*, or principle against double jeopardy, may be at stake. On the other hand, as to the means of reaction of evidence proceedings (by complaint or by Appeal), there is no constitutional problem, namely the lack of effective judicial protection, as there is an adequate procedural means to react to a given court decision, which the extraditee, the person whose extradition is sought, did not use

5.4. Regarding the illegality of the arrest and detention of the extraditee, the person whose extradition is sought, based on an informal request by a police agency of conventional origin (INTERPOL), without the due ratification, promulgation and publication, it says that this is an irrelevant rule for the decision of the case, insofar as the contested provision, Article 39, provides that it is the criminal police and not the INTERPOL National Office that can make an arrest.



12/09/2021

24

Therefore, regardless of membership of that organisation, the criminal police can arrest and detain under that provision, as effectively happened in this case. Thus, there is no violation of any provision or constitutional principle as the Public Prosecutor's Office, as it asserts, had been saying and, apparently, would result from an opinion that it put together.

5.5. In relation to the illegality of the Appellant's arrest and detention not being directly requested in violation of the principle of proportionality, he describes the legal system and says that the detention in question and the legal system do not deserve any reservations considering what the restrictions of rights should be, namely the principle of proportionality, and this possibility should not be considered unconstitutional, as, by way of comparison, the Portuguese Constitutional Court had already concluded.

5.6. With regard to the illegality due to the lack of an arrest warrant, it argues that this issue does not generate any unconstitutionality either. The only difference between a request for prior arrest and detention and arrest and detention not directly requested is that, in the latter case, the person's State of origin is unaware of their presence in the country. In such cases, the basis for detention is information from the criminal police authorities that a certain foreign citizen is wanted, information that may or may not be accompanied by the existence of international arrest warrants. In this context, if the country of origin disseminates such information, it would take steps to make a request for the extradition of that citizen if it knew of his whereabouts. It also informs that the placement of the Red Notice is done by INTERPOL's national offices, which must meet certain requirements, including the delivery of an international arrest warrant, passing through the scrutiny of a commission of experts. It also says that the case records contain an international arrest warrant against the Appellant issued by the judicial authorities of the United States about which there is a manifest lapse which consisted in the addition of the arrest warrant records with the name of another person, and there is, as it says, no doubt of that there is a court order against the Appellant, since only on that basis would a Red Notice be issued, which, in its understanding, would contain the photograph and data of Alex Saab. It says that for the Court's knowledge a copy of the correct warrant is attached. Therefore, from what is above, it considers that Article 39 LCJ does not violate any constitutional provision or principle.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166
25

5.7. In relation to raising the illegality of the arrest and detention of the extraditee, the person whose extradition is sought, for not communicating the reasons for this, it says that this issue of unconstitutionality is not autonomous. This type of arrest and detention not directly requested can occur without the existence of any arrest warrant, so it is natural that the accusations that justify the arrest and detention are not communicated in complete and absolutely rigorous terms, it being sufficient that the potential extraditee, the person whose extradition is sought, is informed at that time that it is an arrest for extradition purposes.

5.8. With regard to reciprocity, it discusses the legal regime and essentially adheres to facts that mark the present situation, considering that the United States does not refuse to extradite in identical situations. What they cannot do is grant an absolute guarantee in this regard, that the legal basis for the Appellant's extradition is the Palermo Convention that the country was obliged to comply with. Finally, there is no obligation to refuse an extradition request for lack of reciprocity. It promotes an interpretation of paragraph 3 under Article 3 in the sense that the specific situation is part of a circumstance that justifies extradition, since the crime of money laundering is a form of serious crime that the country is committed to fighting. Furthermore, it says that it is a purely political decision that is not subject to the appreciation of the courts, therefore a valid and effective political act of exclusive competence of the executive power and indisputable by the courts. Therefore, even if, hypothetically, it was considered that there was an absence of reciprocity in the case, not only is this absence not a reason for mandatory refusal, but the assessment of the matter is excluded from the Cape Verdean courts by virtue of the decision of the Minister of Justice.

5.9. It says that under the segment entitled specialty/extradition for political reasons, the Appellant only invokes the unconstitutionality of the interpretation of the principle of specialty, which demonstrates that political reasons are not the basis of the extradition request. And it verbalises the understanding that it attacks the decision on the merits itself and not the interpretation given to the legal provisions applied. It further argues that there is an express guarantee in the records of compliance with the principle of specialty, an institute that emerges from the trust between the States. In this regard, the competent authority over the sufficiency or insufficiency of this guarantee is the court of law, as the Constitutional Court limits itself to analysing the conformity of the rule applied with the Fundamental Law.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 7635166

The guaranties regarding the penalty and specialty would suffice, and the defence does not dispute that they bind the entire U.S. executive, including the Department of State and the Department of Justice. There is no reason to believe that they will not be complied with, especially so that the State can obtain the cooperation of other States. In addition, when the defence argues that the diplomatic notes do not determine that the American courts would or would not be bound by the guarantees provided, it demonstrates incomprehension about the role of the American courts in the extradition process, as this can only consider accusations brought to it by the Public Prosecutor's Office, that is, the Ministry of Justice. Furthermore, the punitive power would be limited in several ways. The allegation that the guarantees should have been verified is unfounded because the notes attest that the Department of Justice is bound by the guarantees provided, confirming that they will only bring charges for one of the charges, which would limit the scope of the court's intervention. Such conclusions would not be altered by the LCJ and the Portuguese jurisprudence cited by the Applicant. Therefore, there would be no disagreement in the interpretation of the standard with the CRCV – Constitution of Cape Verde.

5.10. Under the title of perpetual character of the penalty, a lifetime sentence, it begins by not saying that the Appellant is not correct because even when the crime is punished with such a penalty, he could still be extradited if the requesting State formulates a valid guarantee of non-application or execution. This can be done in different ways, as long as it is legally binding, as is the case. In addition, the crimes for which the Appellant was accused are not of a perpetual nature and the United States has given guarantees that it will only prosecute for one crime and has experience of commutation of sentences in the context of international judicial cooperation, which was accepted by the court. This, in its final conclusion, would not violate the Constitution.

5.11. Regarding the issue of immunities, it considers that the competence to recognise the status of special envoy belongs to the executive branch and not to the judiciary, being a political act that cannot be indicated by the courts, as demonstrated by the various requests made by Venezuela to the Government. This, once again, what the Appellant is doing is attacking the decision on the merits and not a matter of constitutional non-compliance. In this case, there is no problem of separation of powers or any other, and the courts do not bind the State to international treaties or obligations, as this always depends on political will, having nothing to do with the exercise of jurisdiction, power which is limited to applying the right resulting from those obligations assumed by other powers.



It concludes that it is an incorrectly posed question of constitutionality.

5.12. In the item on ECOWAS it says that the question of constitutionality is not correctly formulated. The Appeal seems to place the assessment of constitutionality on the rules of the Treaty of that organisation, which does not seem to make sense, as, in principle, the constitutionality of rules of domestic law can only be assessed. The question raised has nothing to do with constitutionality, but with the interpretation and application of International Public Law , which, in its view, is beyond the competence of the Constitutional Court.

5.13. Therefore, it concludes that the Appeal for specific review of constitutionality is unfounded, considering that no rule was applied or interpreted in violation of any rule or constitutional principle.

5.14. With the allegations, an opinion and documents were also presented, which were attached, preceding authorisation given by order of the Rapporteur.

6. However, still in the instructional phase of the process,

6.1. The Rapporteur, pursuant to paragraph 1 under Article 62 of the Constitutional Court Law, issued an order requesting elements he deemed important to the National Assembly, the Prime Minister's Office, the Ministry of Foreign Affairs, Cooperation and Regional Integration, the Ministry of Justice, the Supreme Court of Justice, the Sotavento Court of Appeal and the Barlavento Court of Appeal.

6.2. With the exception of those addressed to the Barlavento Court of Appeal and the Prime Minister's Office, all requests were satisfied, and all these elements were transferred to the file so that, if necessary, they could be consulted by the advisory judges and procedural interveners.

7. The following incidents result from those processed:



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166
28

7.1. On 9 June 2021, the Appellant filed a request with the Secretariat of the Constitutional Court requesting the adoption of provisional measures that would result from a decision of the United Nations Human Rights Committee, in view of the suspension of the extradition process filed by the State of Cape Verde against the Appellant, until that body decided to communicate on the merits, a request that was rejected by this Court through the decision taken in these records on the 29th of the same month and year (Ruling 30/2021), also rejecting, through Ruling 36/2021, dated 30th of July (unpublished), plea for annulment of this Ruling raised by the Appellant.

7.2. On 28 June 2021, even before the assessment of the counter-claims presented by the counter-interested party, the Public Prosecutor's Office, the Appellant presented two documents requesting copies, since the secretariat would have refused to provide them. After it was fined, the Rapporteur granted one of the requests and rejected another with the same content.

7.3. Subsequently, on 2 August 2021, the Appellant requested, through an application, the addition to the records of three decisions of the ECOWAS Court of Justice, a request that was granted by order of the Advisory Judge Rapporteur dated 3 August 2021.

8. However, taking into account the preparation of the Ruling in this case, the following acts were performed:

8.1. By means of orders dated 9th and 16th of July 2021, the Advisory Judge Rapporteur opened visits to the 1st Deputy, Presiding Advisory Judge of the Constitutional Court, Pinto Semedo and the 2nd Deputy, Advisory Judge Aristides Lima, respectively.

8.2. After the viewing, on 28 July 2021, the Rapporteur ordered the distribution of the memorandum and requested the corresponding registration of the case in a table for the purposes of Ruling, with the Presiding Advisory Judge having scheduled the session for 13 August of the same year, as per order of August 3rd.

8.3. Both the Public Prosecutor's Office and the Appellant, although for different reasons, requested the adjournment of the hearing, and the Honourable Presiding Advisory Judge, in the use of his powers, dismissed both for lack of sufficient grounds. The request made by the Appellant to allow his presence and participation in the hearing and



CERTIFIED TRANSLATION
12/09/2021
REF: 7635166
LANGUAGE REACH

29

granting his agents at least one hour to present oral allegations was not considered because it entered at a time close to the hearing and it was not possible to give the Public Prosecutor's Office, as a counter-interested party, an opportunity to respond and the Court to meet to consider the matter, in addition to appearing, *prima facie*, not to rely on any procedural rule applicable by this Court in terms of specific inspection of an Appellant and recognised by the Law of the Constitutional Court or by the Code of Civil Procedure.

8.4. As previously scheduled, from 9:00 am on 13th August, the public hearing was held, with the presence of the Advisory Judges, the representative of the Public Prosecutor's Office, the Appellant's team of lawyers, the secretary of the Constitutional Court and citizens who attended, having followed the formalities provided for by the Law.

8.5. At the public hearing, considering the requests made by the Appellant to extend the period of closing arguments, presence and participation, the Presiding Advisory Judge informed everyone about the rite to be followed under the law, commenting on the request to speak by the Appellant's representative and reiteration of the request for adjournment, rejecting them; he then gave the floor to the Advisory Judge Rapporteur, who briefly presented the object of the Appeal and read the draft memorandum he had prepared based on the requests for inspection made by the Appellant.

8.6. Subsequently, the Presiding Advisory Judge gave the Appellant's representative team the opportunity to speak for a period of fifteen minutes, which were divided by two of its members. The first, commenting on points in the memorandum, drew attention to the fact that he had inventoried several aspects in the documents that were not considered by him and that he believed to be relevant, namely the issue of double criminality and its relationship with the principle of legality, insofar as in which the issue was not well dealt with by the Public Prosecutor's Office, which confused it with the principle of *ne bin in idem*, as well as a second issue, that of the political motivation for extradition which, contrary to what the Public Prosecutor's Office had said, in its opinion would be broadly mirrored in the final allegations document, arguing that this aspect, given the constitutional treatment reserved to it, is essential, especially because in its understanding, the accusation would, in fact, be against the State of Venezuela and public entities of that country and not against the Appellant;



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

30

the second representative to intervene focused on question 12 regarding the ECOWAS Court of Justice, promoting a discussion on the issue of sovereignty in light of the protection of human rights, referring to the idea that, in view of the rights of people, the State loses its prerogative to do what it wants, an aspect that relates both to the United Nations Human Rights Committee and to the ECOWAS Court of Justice, whose pronouncements must be observed, and in question 1, since it would be necessary to notify the person who is the main interested party in the process, the extraditee, the person whose extradition is sought.

8.7. The Public Prosecutor's Office, in turn, in its fifteen-minute intervention as a counter-interested party, stated that, through its Appeal, the Appellant is not challenging rules, but attacking the appealed body's own decision on the merits, rather than limiting himself to questions of constitutionality, that the law nowhere is obliged to notify the extraditee, the person whose extradition is sought, as long as he is assured of the possibility of organising his defence and that that does not result in any unconstitutionality; jurisprudence shows that not holding a public hearing does not violate the Constitution; with the evidence that it intended to produce what the Appellant wanted to call into question, the sovereignty of the Requesting State; despite saying there was political motivation, they did not put it; in relation to the complaint, they were mistaken in using the appropriate means of reaction, not being situations that violate the aforementioned conventions, which, in its opinion, do not regulate extradition; steps of evidence can be refused by the courts; they say there was no order, but there was; INTERPOL was formed without having a formal treaty because its members are not States but criminal police bodies; the CPP is applied to extradition proceedings only as a last resort; there is no political reason to allow criminals to go unpunished; the ECOWAS Court of Justice has no jurisdiction over Cape Verde and the Human Rights Committee can only make recommendations.

8.8. In the end, the Advisory Judge Rapporteur made considerations that he deemed pertinent regarding the expectation of having issues raised in the documents known to the Court, stating that his knowledge was conditioned to its challenge in the application of the Appeal, as improved, as norms applied by the appealed judicial body, the only ones scrutinised in the context of specific inspection of constitutionality. The Presiding Advisory Judge declared the hearing closed.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 07635166

31

9. However, on 19 August an allegation of annulment of Ruling 37/2021, dated 9th of August was filed, which had confirmed orders from the Advisory Judge Rapporteur and rejected the request for removal of parts from the records filed by the Public Prosecutor's Office; was rejected by Ruling 38/2021, dated 27th of August.

10. On 13th August, as previously scheduled,

10.1. The Court began the process of deliberation in consultation, starting with a presentation by the Appellant on the issues they had to decide as to the ability to know and the extent to which it can be known of the twelve questions asked, answering some questions and requests for information made by the Advisory Judges;

10.2. Suspended, it was continued on the 16th, 17th, 19th, 27th and 30th of August, to discuss the admissibility and merits, with all issues having been decided.

10.3. Once the votes had been counted and the Advisory Judge Rapporteur being in the minority in relation to a single issue, the Court opted for a shared wording of the Ruling with the contribution of all judges in the elaboration and preparation of its segments that deserved unanimity and with the writing of the two judges that formed the majority in relation to the point that generated divergence. This is what will be explained below.

**II. Rationale**

1. The Appellant, in general and regardless of his ability to know, brings to the attention of this Court issues of clearly constitutional relevance arising from the possible application of norms of infra-constitutional value or judicial interpretation in the context of an extradition process that ran its course with the common courts, pointing out, namely, to the possibility of there being constitutional non-conformity between norms applied in the process and constitutional or international norms; of having applied unconstitutional rules in the process and of having refused the application of rules for reasons of unconstitutionality, in a context in which some may, in principle, be viable in the sense of leading to Rulings of unconstitutionality.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

32

1.1. For the purpose of delimiting the object of this Appeal for the specific inspection of constitutionality, the Constitutional Court intends to make the following considerations:

1.1.1. The definition of the object and the approach to follow result from the powers it can assume in this type of process due to the limits imposed on it by the Constitution and by the law that adopts and establishes the regime that limits the object of this Appeal to a verification of conformity between norms, even if hypothetical, of infra-constitutional value and norms of constitutional standard that can be traced back to a situation of direct or indirect unconstitutionality. It is prohibited from discussing the merits of the appealed judicial decision, considered by itself, as well as the conduct and assessment of facts that can be attributed to the appealed judicial power and, for a majority of reasons, matters that are merely ordinary in nature, even if normative.

1.1.2. In this case, a lot of arguments were reserved for factual issues, which it was sought to prove and document, attributing harmful conduct to the Appellate Court's rights, but, in this case, they are of little importance for the analysis of the merits of issues of normative unconstitutionality. These are mere elements that the Court receives, but whose potential impact on this type of process is potentially very limited. When the Court, in accordance with a practice adjusted to a system that has another constitutional Appeal to challenge conduct that harms rights, even when it assesses the constitutionality applied to a specific case, it limits itself to doing so from an exclusively perspective normative, without entering into questions of application of interpretations or other conducts that escape this nature. Therefore, the only direct outcome of a request for specific review of constitutionality is, according to Article 93 of the Constitutional Court Law, the declaration of unconstitutionality of the rule, leading to a duty of reform of the Ruling by the Appellate Court, which shall comply the part of its decision that is the subject of the Appeal, to that Ruling.

1.1.3. And it does so only as a judicial body with powers to protect the Constitution, the Mother Law of the Republic, without intruding on the powers of the powers that conduct the State's foreign policy or that of the judicial courts, sovereign to interpret the ordinary law without constitutional connection, outside this normative benchmarking framework,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

33

and limiting itself to assuming its role as protector of the Constitution. Any effect arising from its decisions and reflecting on the positive or negative reputation of the State does not result from any assumption of a role in preserving the country's external image or in controlling the conduct of foreign policy, in this dimension outside the Court (*Ruling 10/2020, dated 20 March [Referring to the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America*], Rapporteur: Advisory Judge Aristides R. Lima, published in the *Official Gazette*, 1st Series, No. 86 dated 23rd of July 2021, p. 1731 ff., B 5), but simply to keep the Constitution of the Republic and all that it entails in terms of values, principles and rules, including the precepts concerning foreign policy and International Law.

1.2. The Constitutional Court also observes that the basis for many allegations of unconstitutionality stems from different perspectives of the Appellant, on the one hand, and of the Public Prosecutor's Office, on the other, on the nature of the extradition process.

1.2.1. The first apparently considers that this will be a kind of criminal procedure to which the main principles and solutions of the Criminal Procedure Constitution and the Code of Criminal Procedure apply, and the second rationalises a sharper distinction between the two forms of procedure.

1.2.2. In this matter, the Constitutional Court is convinced that the extradition process and the criminal process concur in the sense that they can ultimately lead to the allocation of the same right: freedom of movement recognised under Article 30 of the Constitution of the Republic. However, they have different purposes and their own legitimation bases. As such, consolidated through different constitutional regimes.

1.2.3. Extradition, as a kind of international judicial cooperation in criminal matters, is registered in a register in which a State assists a counterpart in obtaining custody of a person who is criminally prosecuted or serving a sentence, and which is justified by the State's foreign policy interests of also being able to access other people it is interested in prosecuting criminally in similar situations for the good administration of justice, of preventing it from being seen internationally as a State that is associated with the commission of crimes,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

34

to prevent a crime from going unpunished and to participate in the fight against transnational crimes that it deems serious, as the final part of paragraph 2 under Article 11 of the Fundamental Law tells us specifically, which directs the State to participate in the international fight against terrorism and transnational organised crime, establishing here a public interest that the government must pursue under the terms of *Ruling 30/2019, dated 30th of August 30 (AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the initiative private and the rights of defence, the adversarial system and access to the prosecution's evidence*), Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, No. 110, 29th October 2019, pp. 1766-1789, 6.5.1.


1.2.4. On the other hand, the criminal procedure, the chain of acts from which a person is subjected to a trial aimed at determining the commission of a crime and its legal consequences, is justified by the need for the State to criminally hold a person subject to its jurisdiction for purposes of protecting legal assets, ultimately constitutional, and thus to do justice, ensure the preservation of social order and protect the individual rights of other parties.

The constitutional indications regarding the extradition process and the criminal procedure demonstrate the development of regimes that, starting partially from the same basis, are considered as situations that can justify the deprivation of the natural freedom of the person recognised under Article 30: the sentence condemning by the commission of acts punishable by imprisonment (para. 2), on the one hand, or the course of an extradition request (paragraph three, sub-section f)), on the other.

In this sense, they have a common regime established by the same Article 30, namely the rights provided for under paragraphs 4, 5 and 6, namely that the person be informed, in a clear or understandable way, of the reasons for his arrest and detention and of his constitutional or legal rights, to be authorised to contact a lawyer directly or through their family or trusted person; to the identification of those responsible for their detention or imprisonment and for their interrogation, and to immediately inform their family or person indicated by them of the deprivation of freedom from which they suffer, with a brief description of the reasons that motivated it. In the same sense, the Constitutional Court understands that any person detained, regardless of the reason, is referred to any of the items of paragraph 3 under Article 30 of the Constitution in the event of being subject to protective custody or similar,



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

have the rights provided for under Article 31. And, finally, returning to the generic formulations with Article 36, on habeas corpus, to make use of this constitutional remedy to protect their right to bodily freedom. Among these norms, however, there is a regulatory split between situations that potentiate the deprivation of freedom by the commission of a crime conducted by Cape Verdean authorities for the purposes of internal Ruling and execution, to which Articles 32 to 35 apply to matters of deprivation of freedom, and those in which the State acts as a mere collaborator in initiatives of criminal prosecution of another similar entity, regulated under Article 38. Several principles adopted and established in these norms are regulated or applied with content different from that accepted by the provision on extradition, namely Article 33 which prohibits the application of a perpetual deprivation of freedom or unlimited or indefinite duration, guaranteeing that, pursuant to paragraph 2 under Article 38, it is verbatim limited to the Cape Verdean citizen, or, for example, the one who welcomes the principle of presumption of innocence, which cannot be considered extensively in extradition, under penalty of not being able to extradite those who have not yet been convicted by a final and unappealable decision in a foreign country.

From this, however, it does not follow that the constitutional rights of an extraditee, the person whom extradition is sought, are limited to Articles 30, 31 or 36. Not carrying the guarantees contained in Article 38 of the Constitution, in general, procedural in nature, they are applied to this type of process, such as any other, those arising from paragraph 1 under Article 22 on access to justice, especially the guarantee of a fair process, which, in the broad terms accepted by this Court in *Ruling 15/2017, dated 26 July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings,* Rapporteur: JC Pina Delgado, published in the *Official Gazette*, 1st Series, No. 35, 6th June 2018, pp. 844-856, 3.2.1 and then in *Ruling 24/2018, dated 13th of November, Alexandre Borges v. STJ, on violation of the rights to the adversarial system, hearing and defence in criminal proceedings, fair and equitable process, bodily freedom and the guarantee of presumption of innocence and the right not to be discriminated against*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 88, 28th December 2018, pp. 2132-2152, 2.1; *Opinion 1/2021, dated 15th of February Relating to the Third Amendment to the Code of Criminal Procedure*, Rapporteur: Advisory Judge Pinto Semedo, published in the *Official Gazette*, 1st Series, No. 25, dated 8th March 2021, pp. 814-831, 7) ), is, in its terms, applicable to any type of proceeding (see also, being associated, among other effects, with the effectiveness of the means of defence and to the recognition of the prerogative of exercising the contradictory).



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

36

It can be considered here that a proper extradition process also emerges from it, covering several important procedural rights, namely to the defence, the adversarial system and the hearing, adapted to the nature of the extradition process both from the perspective of considering its particularities as an international cooperation mechanism that is intended to be swift, as well as to recognise effective guarantees arising from the general guarantee to the fair process in a context in which, ultimately, the right to bodily freedom is affected in the terms suggested by these decisions.

In this regard, the legislator, as long as it manages to achieve a harmonisation between the constitutionally legitimate public interest of providing international cooperation in criminal matters, especially in the field of combating terrorism and transnational organised crime, and the effective protection of the basic rights of the extraditee, the person whose extradition is sought, that arises from these constitutional indications, it may adopt the procedural model of extradition that it deems most appropriate, namely reserving its own procedural regime, complete or not, and submitting or not the filling in of any regulatory omissions to the Code of Criminal Procedure. In this sense, the aforementioned Ruling had already been stated in the sense that the structure of a fair and equitable process does not have implications for how it can be legally conformed, depending ultimately on the type of relationship to which each type of mechanism in which it will be applied, taking into account the substantive values that each one of them intends to protect, including considering its prospective interveners (*Ruling 15/2017, dated 26th of July 26, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 3.2.1).

Although this is not decisive for the definition of the specific rules that will constitute the object of this appeal, even when the Court analyses the legal precept(s) where they would be housed, under penalty of tampering with the intention of the appealed body itself, it will have to verify when the contested decision actually applied a rule arising from the Code of Criminal Procedure and when it simply applied the rules of the Law on International Judicial Cooperation in Criminal Matters - as, as a general rule, it sought to do so, embodying its own understanding that the point from a legal point of view, these would be processes with different legal regimes, although they may be connected in cases of regulatory omission of the last statute – but the Appellant understood that he should have applied these other rules of the Code of Criminal Procedure.



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

37

2. Having made this framework regarding the approach of this Constitutional Court, before analysing the merits of the appeal, it is absolutely necessary to verify the presence of the necessary conditions to examine the questions of constitutionality raised, which passes, first, for assessing whether the appeal assumptions, general and special, for the admissibility of the appeal are met, and, secondly, whether the presuppositions and requirements for the ability to examine each question of constitutionality are present.

In this matter, it reports to the jurisprudence that has built in relation to the admissibility of appeals for specific inspection of constitutionality that have risen (*Ruling 8/2017, dated 29th of June 29, Sal Hotéis v. STJ*, Rapporteur: Advisory Judge Aristides R. Lima, published in the *Official Gazette*, 1st Series, No. 42, 21st July, 2017, pp. 903-910; *Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, pp. 844 -856; *Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, referring to the rule provided for under paragraph 1 of Article 2 of Law No. 84/VI/2005, regarding the principle of holding public hearings in the courts, and the guarantee of a public hearing in criminal proceedings, as well as guarantees of a fair trial, the adversarial system and the broad defence,* Rapporteur Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 100, 24th September 2019, pp . 1618-1653), including those relating to claims for non-admission of the same (*Ruling 4/2017, dated 13th of April 13, Vanda Oliveira v. STJ, [on dismissal of a specific inspection appeal due to untimeliness]*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series No. 27, 16th May 2017, pp. 650-659; *Ruling 20/2019, dated 30th of May, Edílio Ribeiro da Cruz v. TRS, on dismissal of a specific inspection appeal due to untimeliness*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 79, 22nd July 2019, pp. 1214-1223; *Ruling 35/2019, dated 18th of October, Alírio Vieira Barros and Others v. TRS, on the rejection of a specific inspection appeal for non-application of the contested rule,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 110, 29th October 2019, pp. 1813-1824; *Ruling 12/2020, dated 16th of April, Ana Brazão Gocht v. STJ [on the rejection of an appeal for a specific inspection of constitutionality for not raising a question of unconstitutionality in an appropriate procedural way*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

38

Rapporteur: Presiding Judge Pinto Semedo, published in the *Official Gazette*, 1st Series, No. 86, 23rd July 2020, pp. 1786-1792; *Ruling 01/2021, dated 12th of January, Alex Saab v. STJ, on the rejection of a specific inspection appeal [for not exhausting the ordinary remedies]*, Rapporteur: Advisory Judge Aristides R. Lima, published in the *Official Gazette*, 1st Series, No. 25, 8th March 2021, pp. 832-836; *Ruling No. 26/2021, dated 25th of May, Okechwkwu Onuzuruibgo et al. President of the TRS, for non-admissibility of an appeal for a specific inspection of constitutionality for non-application of a contested rule*, Rapporteur: Advisory Judge Pina Delgado, still pending publication, available at https://www.tribunalconstitucional.cv/index.php/acordaos/ ; *Ruling No. 27/2021, dated 25th of May, Adilson Staline v. President of the TRS, for inadmissibility of an appeal for a specific inspection of constitutionality for non-application of a contested rule,* Rapporteur: Advisory Judge Pina Delgado, at this time still pending publication, available at https://www.tribunalconstitucional.cv/index.php/acordadaos/ ), almost all rejected.

2.1. The appeal for specific review of constitutionality was admitted by the Honourable Supreme Court of Justice through *Ruling 35/2021, dated 31st of March,* unpublished, as, in its understanding, the assumptions of timeliness, legitimacy of the Appellant and the appealability of the decision and the fact that the various issues of constitutionality were raised by the Appellant from the moment of his provisional detention, maintaining them consistently throughout the entire process until the moment in which his extradition was confirmed. However, it is clear from paragraph 4 under Article 83 of the Law of the Constitutional Court that the positive decision of admissibility of the appealed judicial body does not bind the Constitutional Court, which must re-evaluate them if doubts remain about their adequate fulfilment (*Ruling 4/2017, dated 13th of April, Vanda Oliveira v. STJ, [on dismissal of a specific inspection appeal due to untimeliness],* Rapporteur: Advisory Judge Pina Delgado, 2.1.1), even because, in this case, it is true that the Supreme Court of Justice analysed the presence of all the general presuppositions, in relation to the special ones and the requirements of ability to know and examine, limited its assessment to a general finding that the issues had been raised throughout the process.

2.2. In relation to the general assumptions, it is necessary, by their nature and by the fact that the appealed judicial body has already done so, a perfunctory and general analysis, covering all its items, to verify whether the Court is competent, if the Claimant has legitimacy, if it was filed in a timely manner and if all the ordinary means of appeal have been exhausted.



2.2.1. Insofar as the Constitution attributes powers to this Court to oversee the constitutionality and legality (Article 215, paragraph 1, sub-section a)) and adopts and establishes under paragraph 1 of Article 281 that it is possible to appeal against decisions of the courts that refuse the application, with grounds in unconstitutionality, of any rule or that apply rules whose unconstitutionality has been raised in the process, taken up by sub-section c) under Article 11 of the Law of the Constitutional Court, which develops its procedural regime in Chapter II of Title II of Part II, would not be a point of contention that the assumption of competence is fulfilled.

2.2.2. As the Appellant extraditee, the person whose extradition is sought, in the main proceedings, who extradition was confirmed by the appealed judicial body following the appeal he filed, there is no doubt that, in light of sub-section b) of paragraph 1 under Article 76 of the Law of the Constitutional Court, he is a person who, in accordance with the law regulating the process in which the decision was rendered – Article 58, first paragraph, of the Law on International Judicial Cooperation in Criminal Matters – has standing to file an appeal for specific inspection of constitutionality.

2.2.3. The appeal was filed at the secretariat of the Supreme Court of Justice on 25 March 2021, a decision dated 16 March of the same month. According to Article 81 of the Law of this Court and the firm jurisprudence of this Court regarding the counting system (*Ruling 4/2017, dated 13th of April, Vanda Oliveira v. STJ, [on dismissal of a specific inspection appeal due to untimeliness*], Rapporteur: Advisory Judge Pina Delgado, 2.3.4; *Ruling 20/2019, dated 30th of May, Edílio Ribeiro da Cruz v. TRS, on dismissal of a specific inspection appeal due to untimeliness*, Rapporteur: Advisory Judge Pina Delgado, 2), the Appellant had a procedural period of ten days to file this constitutional appeal. Therefore, regardless of the date on which the person was notified, no other conclusion can be reached unless it was filed in due course.

2.2.4. Finally, since there has been no waiver of the right to appeal or any period has elapsed from its filing or situation in which the appeal cannot proceed for procedural reasons referred to in paragraph 4 under Article 77 of the Law of the Constitutional Court,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 7635166
40

it would be necessary to ensure the exhaustion of the ordinary means of appeal established in the procedural law in which the decision was rendered pursuant to paragraph 2 of that same legal provision. It will be prosaic given that which was reported to consider that one is facing an appeal against a decision of the Supreme Court of Justice that upheld a decision by the Court of Appeal of Barlavento to authorise the Appellant's extradition. Under the terms of the applicable procedural regime arising from the Law on International Judicial Cooperation in Criminal Matters, namely the aforementioned Article 58, there was no other ordinary remedy to be exhausted, also complying with this important assumption (*Ruling 01/2021, dated 12th of January, Alex Saab v. STJ, on dismissal of a specific inspection appeal [for non-exhaustion of ordinary remedies],* Rapporteur: Advisory Judge Aristides R. Lima, 9).

2.2.5. Given, for these reasons, all general and special requirements for the admissibility of the appeal have been fulfilled.

3. Allowing, in this way, to analyse whether the special presuppositions and requirements of ability to examine are present, which should require special attention precisely because, understandably, given their extent and complexity, they do not seem to have been exhaustively considered by the appealed judicial body.

3.1. It therefore requires the autonomous analysis of all constitutionality issues raised in order to verify that,

3.1.1. First, a rule was indicated that the Appellant intends to challenge, a requirement that stems from the nature of the appeal for the specific inspection of constitutionality, whose object is strictly a normative control, and from the references in Article 77 that fully reflect situations of unconstitutionality that revolve around application, and of paragraph 1 under Article 82, which impose on the Appellant the indication of the norm whose unconstitutionality the Court is intended to assess. Standard understood in a broad sense as any deontic statement, real or hypothetical, expressed or implied in a specific precept or inferred from a set of precepts, which prescribe or describe conducts or behaviours, prohibiting or permitting them, or conferring a power or a right.


CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
RE07635166

Although it is possible to discuss the need to extend this concept beyond the norm in its most evident meaning, which arises from the guidelines of the emerging meaning of its normal interpretation to encompass any normative basis effectively applied by a court - insofar as they are subject to scrutiny by means of appeal for protection – the fact is that not only the Constitutional Court Law when mentioning in paragraph 2 under Article 93 the possibility of the rule in question being based on a certain interpretation of this same rule, but also the practice of the Cape Verdean constitutional jurisdiction since the moment it was assumed by the Supreme Court of Justice as the Constitutional Court, it had recognised it (by *Ruling No. 15/04, dated 28th of May, MpD v. Court of the District of Praia* Rapporteur: Presiding Judge Benfeito Mosso Ramos; *Ruling 17/04, dated 11th of November, Joaquim Jaime Monteiro v. Court of Auditors*, Rapporteur: Presiding Judge Benfeito Mosso Ramos; Ruling 09/09, dated 29th of May, *Manuel Evangelista Évora v. Supreme Court of Justice*, Rapporteur: (ile.), unpublished) and the Constitutional Court has consistently maintained since the beginning of its activities (*Ruling 8/2017, dated 29th of June, Sal Hotéis v. STJ,* Rapporteur: Advisory Judge Aristides R. Lima, 16; *Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 2.2.1), adhering to this tradition.

But, therefore, the Court pays particular attention to the fulfilment of this requirement to remove any temptation to use this type of process for the purposes of reviewing constitutionality arising from the conduct of judicial courts without a normative nature, which, in our constitutional system, may be challenged through the filing of appeals for protection, at least in cases where they relate to the violation of rights, freedoms and guarantees (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour process*, Rapporteur: Advisory Judge Pina Delgado, 2.2.1), the indistinct use of the same resource being unsuitable to raise both questions of normative unconstitutionality and unconstitutionality of conduct (*Ruling 15/2017, dated 26th of July, INPS v. STJ , on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 2.2.1; *Ruling 9/2018, dated 23rd of May, INPS v. STJ: Request of Clarification and Reform of the Ruling*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 35, 6th June, 2018, pp. 4.5; *Ruling 35/2019, dated 18th of October, Alírio Vieira Barros and Others v. TRS, on the rejection of a specific inspection appeal for non-application of the contested rule,* Rapporteur: Advisory Judge Pina Delgado, 2; *Ruling 12/2020, dated 16th of April,*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 7635166

42

*Ana Brazão Gocht v. STJ [on the rejection of an appeal for a specific inspection of constitutionality for not raising a question of unconstitutionality in a procedurally adequate manner]*, Rapporteur: Advisory Judge Pinto Semedo, 5.3). Or also for the purpose of reviewing questions of fact appreciated by the ordinary courts in accordance with their respective competences, removed from this jurisdiction as had already been understood in previous cases (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings*, Rapporteur: Advisory Judge Pina Delgado, 1). Thus, the identification of the norm that this Court is intended to scrutinise is essential both in cases where the Appellant alleges that an unconstitutional norm in its essential meaning was applied during the process, as it is aggravated in cases in which imputation is brought to the attention of the Court of use of unconstitutional normative meaning to decide an ordinary question. Thus, it is up to the Appellant to cut as precisely as possible, this hypothetical rule that guarantees the viability of the assessment itself, and the investigation of any of them that have not been sufficiently defined, must be refused.

Therefore, the satisfaction of the first admissibility requirement is guaranteed insofar as the Appellant indicates a rule that was applied by the appealed judicial body to substantiate a decision taken in the context of a proceeding in which he was a procedural intervener, being a requirement of the same that if it is a rule, in the strict sense of the word, even if it does not refer to any precept or set of precepts. That is, that it contains a statute and a prescription potentially remissible to a general and abstract nature, albeit imagined, as if it had been constructed by a legislator. In cases where it arises from a mere interpretative acceptance resulting from a precept or a set of precepts, it is the Appellant's responsibility to delimit it, and the Court is not responsible for doing so on his behalf.

3.1.2. Second, if it is actually a question of constitutionality. This depends on whether there is a parameter of the Fundamental Law with which the contested rule is incompatible, and, for obvious reasons, the Court cannot consider any matter of ordinary legality that does not have any direct or indirect connection of constitutionality, as this is sovereign territory of the judicial courts (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the constitutionality of the appeal period of five days in labour proceedings,* Rapporteur: Advisory Judge Pina Delgado, 1;



*Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, referring to the rule set forth under paragraph number 1 of Article 2 of Law No. 84/VI/2005, referring to the principle of holding public hearings in the courts, and the guarantee of public hearing in criminal proceedings, as well as guarantees of a fair trial, to the adversarial system and to the broad defence*, Rapporteur Advisory Judge Pina Delgado, 4.2.), according to its organisation and competences, which must be respected so that the Constitutional Court remains within the scope under Article 78 and within the limits of its constitutional function and does not become a new ordinary instance of nullification or cassation.

3.1.3. Third, if there has been such indication of a rule and it addresses the issue of unconstitutionality, directly or indirectly, it must be certified whether its unconstitutionality was clearly raised during the process as follows from paragraph 2 under Article 76 and in the final part of sub-section b) of paragraph 1 under Article 77 of the Law of the Constitutional Court, which means, in the sense adopted by the Ruling of admission of the Supreme Court of Justice, that it must be invoked at the first procedural opportunity presented to the Appellant (*Ruling 35/2019, dated 18th of October, Alírio Vieira Barros et al. v. TRS, on the rejection of a specific inspection appeal for non-application of a contested rule,* Rapporteur: Advisory Judge Pina Delgado, 1.7; *Ruling 12/2020, dated 16th of April, Ana Brasão Gocht v. STJ [on the rejection of an Appeal for a specific review of constitutionality for not raising a question of unconstitutionality in a procedurally adequate manner*], Rapporteur: Presiding Judge Pinto Semedo, 8), that he has done it consistently, not abandoning its constitutionality issues or hesitating in relation to them and, finally, has raised the issue of constitutionality or non-compliance with International Law in an express way so that the Appellate Court could recognise it and appreciate it.

Therefore, it is required that it is done as clearly as possible and that it is procedurally appropriate. Thus, ensuring that the constitutionality issues are legitimate and not a last minute procrastination Appeal to postpone the production of effects of the judicial decision, and that, unless it proves impossible from a procedural point of view, the judicial courts, that are also bodies charged with protecting the Constitution in a diffuse way, must refuse the application of unconstitutional rules, having the opportunity to consider such questions of constitutionality before appealing to the Constitutional Court (*Ruling 15/2017, dated 26th of July, INPS v . STJ, on* the constitutionality of the appeal period of five days in labour proceedings,



CERTIFIED TRANSLATION
12/09/2021
REF 7635166

44

Rapporteur: Advisory Judge Pina Delgado, 2.1.6; *Ruling 35/2019, dated 18th of October, Alírio Vieira Barros and Others v. TRS, on the rejection of a specific inspection appeal for non-application of the contested rule,* Rapporteur: Advisory Judge Pina Delgado, 1.7; *Ruling 12/2020, of April 16, Ana Brasão Gocht v. STJ [on the rejection of an Appeal for a specific review of constitutionality for not raising a question of unconstitutionality in a procedurally adequate manner]*, Rapporteur: Presiding Judge Pinto Semedo, 5.3).

  3.1.4. Fourth, whether the contested provision was actually applied by the Court as a basis for deciding a question put to it by the Appellant. Within the framework of the organisation and economy of the Cape Verdean constitutional system, it is not, on the one hand, legitimate for the Constitutional Court to act as a general reviewer of the constitutionality of the rules and interpretations promoted by judicial bodies in the framework of the exercise of their functions, nor on the other hand, would it be in a position to do so within the time allowed to decide these issues and innumerable equally urgent processes that are being processed therein. The object of the Appeal for specific review of constitutionality is, primarily, to prevent an entity, especially an individual, from being harmed by the application of an unconstitutional rule or by the refusal to apply a rule based on unconstitutionality, and, only as an accessory, the defence of the Constitution of the Republic. Therefore, what matters in these cases are simply the situations in which the rule in question is actually used by the Appellate Court as a *ratio decidendi,* that substantiates the specific decision that it rendered, being out of any assessment situations in which, as an *obiter dicta*, other things said, it is limited to refer to a rule as a side argument inserted in its reasoning or resort to mere rhetorical arguments or *ad ostentationem*, and even less to situations in which an Appellant imputes to the courts the application of fictitious rules or resulting from undue extrapolations on what was actually applied (see. *Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, regarding the rule provided for under paragraph 1 of Article 2 of Law No. 84/VI/2005, regarding the principle of holding public hearings in the courts, and the guarantee of a public hearing in criminal proceedings, as well as guarantees of a fair trial, the adversarial system and ample defence*, Rapporteur: Advisory Judge Pina Delgado, 3.2).



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

45

3.1.5. Finally, arising from paragraph 2 under Article 86 of the Constitutional Court Law, it is assessed whether the issue to be decided is simple, namely because it has already been the subject of a previous decision of the Court, if it is manifestly unfounded or if, considering the incidental nature of the Appeal for specific review of constitutionality, a possible decision of unconstitutionality cannot affect the appealed decision in terms of its reform in a sense favourable to the Appellant. In such cases, the Constitutional Court may, as to the first hypothesis, know it summarily, even in the initial phase, without subjecting it to a lengthy inquiry, or, as to the second and third hypotheses, refuse to examine them.

3.1.6. With regard to the refusal to apply a rule due to unconstitutionality, for obvious reasons, the ability to know and examine the issues depends essentially on: firstly, there has been a refusal to apply a rule by the Appellate Court, even if it is a hypothetical deontic or ethical statement constructed by any procedural intervener; secondly, that the basis for this non-application of this norm was its unconstitutionality; thirdly, that the Court has not yet ruled on the constitutionality of this rule; fourthly, that a decision not declaring it to be unconstitutional may have repercussions in the main proceedings.

3.1.7. Based on these criteria which, with the exception of the latter - since it is the first time that an allegation of refusal to apply a rule is dealt with due to unconstitutionality - the Court has systematically applied based on strict scrutiny - insofar as in the Cape Verdean constitutional system, there is already a means of protection of rights violations, the Appeal for protection – it is that wherein it will be verified whether the questions raised can be investigated and explored on the merits.

3.2. Thus, it can be assessed whether effectively the constitutionality issues that were challenged by the Appellant in the file meet all these conditions, specifically considering the normative construction presented by the Appellant in his filing the Appeal in the improved version, insofar as it is this that defines the object of the Appeal and not the final pleadings document, in which the Appellant must present the arguments and legal grounds intended to substantiate what he challenges through that exordial pleading, in such a way that they can be considered by the appellate body itself and, subsequently, by the rapporteur, for the purposes of



first decision of admissibility or appraisal for the purposes of paragraphs 1 and 2 under Article 86 of
the Law of the Constitutional Court, respectively, not allowing any extension of the object of the Appeal
by expanding the incidence of the contested rule by amending its terms, namely if it is merely
hypothetical, let alone the requests (*Ruling 15/2017, dated 26th of July, INPS v. STJ, on the
constitutionality of the five-day appeal period in labour proceedings*, Rapporteur: Advisory Judge Pina
Delgado, 2.1.5).

3.2.1. **If the interpretation that will have been given to Articles 5, 24, first paragraph, 141,
paragraphs 1 and 2, 142, second paragraph, last part, 151, subsection h) of the Code of Criminal
Procedure and Article 55, first paragraph, of the Law of International Judicial Cooperation on
Criminal Matters , in the sense that the order of the Minister of Justice on the admissibility of the
extradition request and the promotion of the fulfilment of the request before a Court of Appeal
do not have to be personally notified to the extraditee, the person whose extradition is sought, it
being sufficient that if they are to the constituted lawyer, it would be contrary to the Constitution,
due to incompatibility with the guarantees of broad defence, the adversarial system and to the
Appeal in sanctioning procedures.**

A - In this specific case, the Appellant understands that the appealed judicial body will have
applied a rule resulting from the interpretation that introduced the legal provisions referenced in the
sense that *the order of the Minister of Justice on the admissibility of the extradition request and the
promotion of compliance with the request together to a Court of Appeal do not have to be notified to
the extraditee, the person whose extradition is sought, they just need to be notified to the appointed
lawyer.* Therefore, it does not seem to us to raise doubts that such a formulation fulfils the basic elements
of a legal norm, containing a stipulation and a provision, and it can be considered that it was properly
constructed by the Appellant, although, for reasons that had already been advanced, such a hypothetical
rule, under the terms in which it was applied by the appealed judicial body, does not result from an
interpretation that has been issued to provisions of the Code of Criminal Procedure, but exclusively
from the Law of Judicial Cooperation (p. 26: "there is no provision of the LCJ to impose that the
extradition request be formally notified to the extraditee, the person whose extradition is sought,"), as,
in his own understanding, only this was applicable to the question raised, considering that there was no
regulatory omission to be filled by reference to this other statute.



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

47

B - It can also be considered that some of the parameters indicated, whose arguments were developed in his allegations, have a constitutional nature, namely the right of defence, the guarantee to the adversarial system and the guarantee to the Appeal.

C – In relation to the burden of raising the matter in a procedurally appropriate manner, it is easily verified that as soon as he was notified to file opposition following an order from Her Honour the Advisory Judge Rapporteur, and before deducting it, he argued several annulments, among which was the fact that he was not personally notified (Extradition Files, v. I, f. 164 et seq., para. 4), obtaining the appropriate response of the TRB – Barlavento Court of Appeal, considering that Article 55 does not oblige notifying personally the extraditee, the person whose extradition is sought, (Ibid, ff. 286 back and ss, *in fine*). He took up it again in the application for filing an ordinary Appeal, after being applied, with considerations of unconstitutionality (Ibid, v. II, f. 309 et seq., para. 29-33). As such, they were considered and decided upon by the Supreme Court of Justice (Ibid, II, 2.b). The issue was reconsidered by the TRB – Barlavento Court of Appeal, in the framework of *Ruling 48/2020-2*1 (Ibid., v. III, f. 1033 et seq., II, pp. 6-7), reinstated via the Ordinary Appeal for that decision (Ibid., V. III, f. 1035 et seq., A-I, para. 7 and following), and, finally, assessed by the contested decision. Therefore, there is no doubt that the question of constitutionality was posed in a timely and consistent manner throughout the process and so that the judicial bodies that intervened could know and resolve it, fulfilling this requirement of ability to know and examine.

D – The Supreme Court of Justice, after analysing the matter, considered it unfounded because in its opinion, the personal notifications that are imposed by law would only be those referred to under Article 53 of the LCJ and the extradition decision, with no unconstitutionality in this understanding since the law does not imply any determination of automatic transposition to the extradition process of all the defence guarantees that the Constitution and the International Human Rights Instruments reserve for criminal proceedings. It can therefore be accepted that the appealed judicial body had to apply a hypothetical rule according to which there is no need for personal notification to an extraditee, the person whose extradition is sought, of the ministerial decision to authorise the extradition process and the decision to promote it to an Appeal Court, as long as they are notified to their representative.



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

48

E – It cannot be said that the allegation of unconstitutionality of this normative formula is, in principle, manifestly unfounded. However, in relation to the feasibility and, above all, the usefulness of a decision of unconstitutionality, this is a question that the Court can ask. For the double reason of already having an understanding drawn up in *Ruling 50/2019, dated 27th of December, Luís Firmino v. STJ, on violation of the right to Appeal and to defence in criminal proceedings for lack of personal and direct notification of a condemnatory Ruling,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 14, dated 4th of February 2020, pp. 337-347, 2.4. (understanding reiterated by *Ruling No. 13/2020, dated 23rd of April, António Zeferino de Oliveira and Rafael Alves Lima v. STJ, on violation of the right to Appeal and defence in criminal proceedings for lack of personal and direct notification of Ruling*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 86, 23 July 2020, pp. 1792-1803, by *Ruling No. 19/2020, dated 8th of May, Paulo Alexandre Monteiro Ramos Andrade v. STJ , on the guarantee not to be kept in protective custody outside the legal deadlines*, Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 86, dated 23rd July 2020, pp. 1836-1847; and by *Ruling 25 /2021, dated 30th of April 30, Walter dos Reis v. STJ, on violation of the guarantee of not being subject to protective custody without being heard, the right to adversary proceedings and defence, the right to a prior hearing and to the Appeal,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, I Series, No. 62, dated 21st June 2021, pp. 1895-1902, 3.3), from which, from a constitutional point of view, the importance of personal notification is not based on a formal basis of having to communicate procedural acts to a person, but essentially on a teleological perspective of being able to effectively exercise their defence, contradict and eventually appeal. Therefore, the knowledge that she may have of certain decisions that impact her procedural position can either be direct or indirect, in terms of the procedural law in question.

The duty to notify the agent of a procedural act that has an impact on the interests of an extraditee, the person whose extradition is sought, is an unavoidable requirement of the principle of due process applied to the extradition process in its dimension of the right of defence, the right to exercise the adversarial system and the right to appeal of a decision that may affect their freedom. With regard to the personal notification of the extraditee, the person whose extradition is sought, this Court still maintains the understanding drawn up in these Rulings that, from a constitutional point of view, the relevance of the personal notification is limited to its instrumentality for the exercise of the guarantee of defence, of the guarantee to the adversarial system and the guarantee to the Appeal.



CERTIFIED TRANSLATION
12/09/2021
REF: 7635166
LANGUAGE REACH

More importantly, in an extradition proceeding, with regard to the effects of these rights on the obligation of personal notification, the Court cannot reach any conclusion that in a situation in which the extraditee, the person whose extradition is sought, exercises his right of defence, to contradict and to appeal through their agent, a hypothetical rule disregarding the need to notify him personally of certain procedural acts could be unconstitutional. In this sense, considering that the issue had already been the subject of repeated decisions of the Court applicable to this situation and that these judges who compose it do not see any reason to review their general understanding of the issue, it is not worth considering it more closely.

Furthermore, even were the Constitutional Court to adopt a stricter understanding of personal notification in the context of an extradition process, this would not necessarily have any effect leading to the reform of the appealed or contested Ruling , as the Supreme Court of Justice would not have to determine that the case be brought to the court, annulling all subsequent proceedings, so that the Appellant could be personally notified of the order of the Minister of Justice on the admissibility of the extradition request and the promotion of compliance with the request before a Court of Appeal and could exercise everything that, after all, he has already exercised. Because the fact is, that there is nothing in the case file to indicate that he was not aware of them through his agents, he was able to defend himself, contradict what he deemed relevant, plead null and, above all, oppose the request for extradition, as effectively he did. Therefore, the putative decision of unconstitutionality, which in addition to being very unfeasible due to the jurisprudence of this Court, would, in practice, be innocuous and unnecessary, not leading to any relevant change in the appealed decision.

F – For these reasons, the Constitutional Court decides summarily to dismiss the question of unconstitutionality raised.

3.2.2. **The interpretation that will have been given to Article 56, paragraph two, of the Law of Judicial Cooperation, and Articles 3, 151, sub-section d), g) and i), 349, 350, 358 and 363 of the Code of Criminal Procedure in the sense that the course of the passive extradition process does not require that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, be made in a hearing, but rather in consultation,**



**insofar as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge, would be inconsistent with the Constitution, due to incompatibility with the guarantees of full defence and a public hearing, as well as the principle of criminal legality.**

A – A linguistic formula constructed in terms according to which *the course of the passive extradition process does not require that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, be made in a hearing, but rather in consultation, insofar as that the law does not determine, neither directly nor indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge,* would be contrary to the Constitution, corresponds to a legal norm, even if hypothetical, insofar as it contains a provision, it integrates a statute and is characterised by the elements that represent it. Although once again, in the opinion of this Court, it does not derive, under the terms in which it was applied by the Appellate Court, from any rule of the Code of Criminal Procedure, since in the hermeneutics that promoted such a sense it is inferred exclusively from the Law of Judicial Cooperation, namely of its Article 56, second paragraph.

B – In relation to the parameters that the Appellant develops through the arguments he presented above, it appears that he understands that this hypothetical rule would be contrary to the guarantees of ample defence, provided for in paragraph 7 under Article 35 of the Constitution and in sub-section d) of paragraph 3 under Article 14 of the ICCPR - The International Covenant on Civil and Political Rights, to the publicity of the criminal hearing in paragraph 9 under Article 35 of the Constitution, as well as the principle of criminal legality recognised by paragraph 4 under Article 32 of the Fundamental Law, and by paragraph 1 under Article 9 of the ICCPR - The International Covenant on Civil and Political Rights, and Article 6 of the ACHPR, later corrected to Article 7. Regardless of its individual suitability, an issue that the Court will eventually consider on the merits, it is certain that at least some of these parameters are applicable to the specific issue and, therefore, constitutional in nature, it is assured that it raised a relevant question of constitutionality, direct or indirect. What happens is that, by virtue of what the Court has already considered preliminarily, the rights of an extraditee, the person whose extradition is sought, essentially derive from the principle of due process, therefore having a right to the defence, the adversarial system and the Appeal adequate and appropriate for the extradition process, in addition to that the objective principles of the system are applicable to it, the principle of the public hearing of the courts recognised by paragraph 4 under Article 211 of the Constitution, which should constitute the parameters to preside over this constitutionality inquiry.



C - The application of this rule ultimately refers to the Appellant's reaction to the decision of the Reporting Judge dated 7th of July 2020, which determined the continuation of the extradition process, which considered that there was omission of procedural stages for failure to carry out immediate hearing of the Applicant after the formal submission of the extradition request (para. 11), and raising its non-compliance with the principles of human dignity, due process and effective judicial protection (para. 15). In view of the answers that he was getting, he insisted with the same allegations in the subsequent interventions that he had, propitiating the posing of the question of unconstitutionality to the Supreme Court of Justice through an ordinary Appeal. Therefore, there will be no doubts that the question of direct constitutionality was posed in a timely and consistent manner throughout the process and in such a way that the lower court could recognise and assess it. On the other hand, it is not detected that it has alerted this Court of possible non-conformity of not holding a public hearing with the aforementioned sub-section d) of paragraph 2 under Article 14 of the International Covenant on Civil and Political Rights, which recognises a right of a person accused of an offense being present in the process or with other international norms, making it impossible to independently assess possible non-conformity between the applied norm and International Law.

D – The Supreme Court of Justice, analysing the matter, also considered it unfounded because it understood, referring to understandings previously drawn up in the case file, that there would be no need to speak of a violation of the adversarial principle, since the Appellant had been heard and was able to deduce opposition and that the law would not require the extraditee, the person whose extradition is sought, to be heard in person at a second hearing before the judge, such solution not violating any constitutional rule or principle, also maintaining on pages 23 of its learned decision that the hearing before the Collective of the Court of Appeal has no place in the extradition process, since the Ruling is made in consultation, as has already been shown. In its assessment, such an understanding would not be inconsistent with the Constitution, namely because the extradition process is not a criminal process, thus it is not forbidden for the ordinary legislator to establish that the trial does not take place in consultation and also because of its understanding that the orientation of these defects is that only when a hearing is determined should it be public. It is considered, therefore, that the appealed judicial body applied the contested rule.



CERTIFIED TRANSLATION
12/09/2021
REF: 7635166
LANGUAGE REACH

E – In this case, it is not verified that the Constitutional Court has considered the same issue with the outlines in which it is posed, even though it has already adopted general understandings on the constitutional provisions that refer to public hearings. When it commented on the obligation to hold hearings, it did so in the context of a criminal procedure and a sanctioning process and not exactly in an extradition process that implied the application of a real or hypothetical rule arising from the Law of International Judicial Cooperation on Criminal Matters. In the same vein, there will be no elements, from the outset, at the stage of admissibility, to consider that the claim of unconstitutionality that the Appellant brings to this Court is manifestly unfounded, nor can it be concluded that any decision of unconstitutionality of this Court will be useless and insusceptible to have an impact on the base process.

F - Therefore, the conditions are met for the Court to scrutinise on the merits the rule applied by the appealed judicial body in the sense that the *processing of the passive extradition process does not impose that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, whether made at a hearing, but in consultation, as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge*, is not in compliance with the Constitution due to incompatibility with the guarantees of the defence, the adversarial process and the Appeal and with the principle of a public hearing in the courts.

3.2.3. **The interpretation that will have been given to Articles 3, 5, 173, of the Code of Criminal Procedure, 55, paragraphs 1 and 2 (second part), 46, third paragraph, and Articles 454 and 579 of the Code of Civil Procedure in the sense of that the extraditee, the person whose extradition is sought, has the right to file opposition, but, despite the requirement for due diligence of testimonial evidence, she can only rely on the fact that he is not the person sought or that the assumptions of extradition are not met, it would be contrary to the Constitution by incompatibly with the guarantee of ample defence and with the clause that establishes the jurisdiction of the courts, of a party, and the**



12/09/2021
REF 7635166

**interpretation that will have been given to Article 155 of the CPP in the sense that it was up to an extraditee, the person whose extradition is sought, to proceed by complaint and not by Appeal to react procedurally to a decision that rejects a request for the examination of witnesses, due to non-compliance with the clause that defines a basically accusatory structure for the criminal procedure and the guarantees to the Appeal and to the effective judicial protection, provided for by the Constitution, of the other.**

A - Here, the Appellant is actually challenging two interpretations, a rule resulting from a hermeneutic determination made by the appealed judicial body according to which the extraditee, the person whose extradition is sought, has the right to file opposition, but, despite the requirement for due diligence of testimonial evidence, it can only be centred on demonstrating that he is not the person being sought and/or that the extradition requirements are not met, and another under which it was up to the extraditee, the person whose extradition is sought, to proceed by complaint and not by Appeal to react procedurally to another decision that rejected the request made by the Appellant of examination of witnesses, is/are non-conforming to the Constitution. In the Court's understanding in one case or the other, the two formulations would have a normative nature, which, for the time being, is sufficient to attest to the fulfilment of this requirement, even though the norm imputed to the Supreme Court of Justice was once again not inferred by this *Excelso Pretorio,* Supreme Body, from the provisions of the Code of Criminal Procedure, but exclusively from paragraph 2 under Article 55 and the final part of paragraph 3 under Article 46 of the Law of International Judicial Cooperation on Criminal Matters .

B – The parameters indicated, namely the right to defence, the guarantee to the Appeal and the guarantee to effective judicial protection invoked by the Appellant, have a constitutional dimension, and are therefore able to base a Ruling on the assessment of constitutional compliance. Although in this Court's understanding they all derive from Article 22 of the Constitution and from the fair and equitable process clause adapted to the extradition process, they do not fail to refer to issues of a constitutional nature.

C - The question on which the first normative segment depends was posed in a timely manner from the moment the Appellant became aware that the evidentiary steps he requested had not been carried out, namely the examination of witnesses when he was notified of Ruling TRB 244 /2019-20, dated 31st of July, a decision which ordered his extradition to the requesting State.



The TRB – Barlavento Court of Appeal, regarding the steps of evidence intended to determine the merits or not of the extradition request, ruled, using paragraph 3 under Article 43 and paragraph 2 under Article 55, in the sense that it considered them to be dilatory measures, insofar as in which they would take place within the framework of the ongoing criminal procedure in the United States of America and not before the Cape Verdean justice system (p. 11). Following this decision, the Appellant, considering that there was a Ruling by the TRB – Barlavento Court of Appeal, re-submitted the matter to the STJ - Supreme Court of Justice, charging that body with the attribution of an incorrect interpretation, as this will have prevented him from providing evidence on a set of issues that could have an impact on the extradition process (para. 34-41) and questioned the constitutionality, for violation of the contradictory and broad defence principles, and international norms, of the limitation introduced by paragraph 2 under Article 55, in the interpretation according to which the extraditee, the person whose extradition is sought, cannot bring their view of the facts, the veracity and their effective occurrence, thus being unconstitutional for being disproportionate and for violation of their fundamental rights (para. 678-702).

In relation to the second segment, the Appellant raised the question of not having questioned the witnesses he had listed, alleging violation of paragraph 3 under Article 35 of the Constitution, through an ordinary Appeal addressed to the Supreme Court of Justice (para. 158-164), which, in its regard, through *Ruling 57/2020, dated 16th of October*, understood that, as it was a mere irregularity, it should have been argued within three days from the moment he had been notified of *Ruling TRB 244 /2019-20, dated 31st of July,* which authorised his extradition. Having issued the records following that decision, since the *a quo* body, the body under appeal, considered that the irregularity embodied in the omission of pronouncement would be remedied, it posed the question again in the second ordinary Appeal that he filed, this time against *Ruling TRB 47/2010-2021, dated 4th of January*.

D - As a result of the allegation and request, on the one hand, the Supreme Court of Justice can be attributed with the application of the first rule, insofar as this body, starting from a broad consideration, and formulated in a positive way, in accordance with which, once facts are alleged, intended to substantiate any of these grounds, whether referring to the identity of the person sought, or alluding to the non-verification of the extradition assumptions, the production of evidence must be admitted to extraditing, applied a rule arising from paragraph 2 under Article 55 and paragraph 3 under Article 46 of the Law of International Judicial Cooperation in Criminal Matters



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

under which it would not be admitted to provide any evidence on the facts alleged against the extraditee, the person whose extradition is sought, only on the other allegations. In this sense, it can be admitted, at the limit, that a rule was applied by the appealed judicial body as a basis for concluding that the TRB was right in not considering the documentary evidence tending to prove any fact relating to the attributions made to the Extraditee, the person whose extradition is sought, in the States United States of America, in this specific and non-expandable sense that the only matter on which proof cannot be provided is that which refers to the facts imputed to the extraditee, the person whose extradition is sought, by the Requesting State.

In turn, in relation to the second segment, it does not seem that it can be concluded that the appealed or contested Ruling had applied the rule proposed by the Appellant for the purposes of scrutiny of constitutionality, as the Supreme Court of Justice found that the matter had already been widely dealt with by *Ruling 57/2020, dated 16th of October*, which adopted unequivocal reasoning in the sense that the right to timely raise this issue was precluded, emphasised as *ratio decidendi*, the non-timely raising of the issue. Therefore, the appealed judicial body was not Ruling on the form of the reaction, but simply that its remedy was due to the time of the reaction, which it considered not to correspond to what was required for what it classified as a mere irregularity. Thus, this Court understands that the segment of the rule as constructed by the Appellant was not applied by the appealed judicial body, so that it cannot rule on the merits of this challenge.

E - With the limitations mentioned above, considering that this Court has not rendered any decision on the matter corresponding to the first segment of the rule that it may know in such a way as to anticipate the merits, that it cannot be concluded a priori that the question of constitutionality is manifestly unfounded and that a possible decision of unconstitutionality would still be useful, nothing prevents examining this specific issue of unconstitutionality.

F - Therefore, the Court will assess on the merits the rule applied by *Ruling 28/2021, dated 16th March*, of the Supreme Court of Justice, inferred from paragraph 2 under Article 55 and from the final part of paragraph 3 under Article 46 of the Law of International Judicial Cooperation on Criminal Matters, according to which *the extraditee, the person whose extradition is sought, has the right to file opposition, but, despite the requirement for due diligence of testimonial evidence,*



56

*it can only be based on the fact that he is not the person sought or that the requirements for extradition are not met*, it is inconsistent with the Constitution due to incompatibility with the guarantee of defence.

3.2.4. **The interpretation given to Articles 4 and 39 of the Law on International Judicial Cooperation in Criminal Matters in the sense that it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the arrest and detention of individuals who, according to official information, namely that of INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts relating to this organisation have not been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use that is made of information received via this system arising from a national law, would be inconsistent with the Constitution due to incompatibility with the rule of reception of conventional international norms, with the rule that establishes the effects of non-publication of this type of act and with certain principles inherent to the Rule of Law.**

A – The Appellant considers that the Supreme Court of Justice has applied an interpretative rule according to which *it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the arrest and detention of individuals who, according to official information, namely from INTERPOL*, are sought by competent foreign authorities, *and it is not relevant that the acts relating to this international organisation have not been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use made of the information received via this system stems from a national law.* Such formulation contains normative content, namely based on a prevision and a statute, bringing together the characteristics of a norm that an abstract legislator could have created. In this sense, there is nothing to prevent the first requirement of ability to know and examine being considered fulfilled, but with the exclusion of part of the basic precept, Article 4 of the Law of International Judicial Cooperation on Criminal Matters, as at no time it seems to have served as basis for the hypothetical norm constructed by the Supreme Court of Justice, which seems to be anchored exclusively in Article 39 of this statute.



12/09/2021

57

B - The petitioner further asserts under paragraph 321 of his final arguments that such a normative statement would carry a defect of constitutionality arising from the form of its approval, namely by the fact that an ordinary law, in this case the Law of International Judicial Cooperation on Criminal Matters has submitted to an international organisation whose constitutive and regulatory instruments were not incorporated into the internal legal system of the State of Cape Verde. This follows from the key point of his argument, set out in paragraph 322, that this would violate the principle of hierarchy of sources, the principle of competence, the principle of typicality of laws, the principle of legality of administration and the principle of constitutional binding on production normative that apparently is connected to Articles 262 and 269 and to Articles of Title X of the Constitution. Although the association between these constitutional precepts and the contested rule is not very clear, insofar as a possible effect of constitutional non-conformity can be discussed with paragraph 2 under Article 12 of the Constitution and with sub-section c) of paragraph 1 under Article 269, it can be considered that there is a question of normative constitutionality underlying this question.

C - The Court understands that, despite the variations with which the issue was being dealt with, also due to the grounds that the courts that intervened several times in the actual decision-making chain of an extradition process they were using, from the moment the Supreme Court of Justice in a writ of habeas corpus presented its understanding that the Appellant's detention was carried out under the terms of what was lawful to do under Cape Verdean Law (point 4), the Appellant was consistently raising the argument, namely in the opposition he deduced (para. 18), he insisted on putting the same question in the document of Ordinary Appeal that he addressed to the Supreme Court of Justice on 13th August 2020 (para. 18), often arguing, depending on the specific grounds formulated by the TRB, the issue of Cape Verde's link to INTERPOL instruments and its domestication (p. 12), as happened in the second Ordinary Appeal (V and sub-section b) of the conclusions). Through the contested decision, the Supreme Court of Justice came to assume the interpretation attributed to it and which is challenged in the present case. Therefore, there is no doubt that the Appellant raises the question of constitutionality at the first procedural opportunity that he has after its application by a court of law.



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

58

D – Moreover, this was effectively the rule applied by the Supreme Court of Justice, when under item II.3.1, after disregarding the usefulness of any inquiry regarding the ratification and publication of these instruments, it resorted to a decisional basis according to which the question Cape Verde's international link to these INTERPOL instruments would be irrelevant, insofar as the use of this organisation's police information transmission mechanisms would derive from Cape Verde's own domestic law, as the validity title of the use that is made of the information through the INTERPOL system is a national law, approved by the Cape Verdean Parliament.

E - The Constitutional Court did not consider any issue of normative constitutional non-compliance with the same content, nor can it be said that the constitutional challenge in question is manifestly unfounded or that a possible decision of unconstitutionality would be useless, insofar as any hypothetical decision in this regard, could have an impact on the assessment of the legality of his arrest and detention and have repercussions on the contested ruling.

F - It is therefore possible to review the constitutionality of a rule arising from Article 39 of the Law on Judicial Cooperation, according to which *it is lawful for the criminal police authorities to carry out, under the terms of the procedural law in force, the arrest and detention of individuals who, according to information Officials, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to this international organisation have not eventually been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use that is made of information received via this system, stems from a national law,* due to possible incompatibility with the rules of reception of conventional international norms and the effects of their publication and with certain principles inherent to the rule of law.

3.2.5. **The interpretation that will have been given to Article 39 of the LCJ and Article 269 of the Code of Criminal Procedure, in the sense that information for the arrest and detention of a person may come to the knowledge of the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunications, as follows from Article 269 of the CPP, followed by confirmation by**



CERTIFIED TRANSLATION
12/09/2021
REF: 7635166
LANGUAGE REACH

**a warrant that is not subject to the criterion of immediacy, would be contrary to the Constitution
and International Law for incompatibility with the right to bodily freedom, with the principle of
legality and proportionality of police measures, as well as the right of a person to be informed of
the reasons for his detention and to receive immediate notification of all charges brought against
him provided for under paragraph 2 of Article 9 of the ICCPR - The International Covenant on
Civil and Political Rights.**

A – The Appellant alleges that a hypothetical rule arising from Articles 39 of the LCJ and 269,
paragraph No. 3, of the CPP was applied, according to which *information for the arrest and detention
of a person may come to the knowledge of the authorities by any means permitted by Cape Verdean
law, if there is urgency and danger in the delay by any means of telecommunications, as follows from
Article 269 of the CPP, followed by confirmation by a warrant that is not subject to any time period.*
An effect that stems from the fact that the Distinguished and Illustrious Supreme Court of Justice has
disregarded the expression "immediately" that allegedly would be part of the regime applicable by
remission. In the Constitutional Court's understanding, there are no doubts that such a formulation
would have a normative nature, insofar as it comprises a stipulation and a provision

B – Regardless of what is understood regarding the merits of the non-compliance allegations,
he refers to a constitutional dimension that adopts and establishes the right to bodily freedom and the
principles of legality and proportionality of police measures. Since the objective of the contested rule
is to strictly define the means of communication of information between the police authorities, in this
specific segment, there would not be put at stake any rights derived from paragraph 2 under Article 9
of the ICCPR - The International Covenant on Civil and Political Rights, namely those of the person
detained to be informed of the reasons for their arrest and detention and to receive immediate
notification of all charges brought against them, nor the right to information under Article 9 of the
UDHR, not least because this legal instrument, not being a treaty, cannot formally be a parameter in the
process of inspection of constitutionality, even if indirect, but conceived as a mere means of interpreting
the norms of rights, freedoms and guarantees, under paragraph 3 of Article 17 of the Constitution.

C – The Appellant alleges that this is a new issue, as its application was originally made by the
Supreme Court of Justice in the appealed or contested Ruling, which



12/09/2021

60

to be confirmed, in accordance with the jurisprudence cited of this Court (*Ruling 29/2019, dated 16th of August, Arlindo Teixeira v. STJ, referring to the rule provided for under paragraph 1 of Article 2 of Law No. 84/VI/2005, referring to the principle of holding public hearings in the courts, and the guarantee of a public hearing in criminal proceedings, as well as guarantees of a fair process, the adversarial system and ample defence,* Rapporteur Advisory Judge Pina Delgado, 4.2. and ss.), depends on a check on whether the question was raised at the first opportunity subsequent to that application. It is, in fact, only in *Ruling 28/2021, dated 16th March*, that a formula is identified to consider that the official information that legitimises the request can reach the police authority by any means allowed by Cape Verdean law, including by any means of telecommunications, followed by confirmation by warrant. Therefore, it is confirmed that this is an issue that, in general, could only have been raised procedurally after its application, considering this condition to be fulfilled.

D – In this regard, the Supreme Court of Justice, in response to the Appellant's allegation, replied that official information may reach the Cape Verdean authorities by any means permitted by Cape Verdean Law, including, in cases of urgency and danger in the delay, by any means of telecommunication, as would follow from Article 269, paragraph 3, of the Code of Criminal Procedure, followed by confirmation by warrant. There will be no doubt that this was the applied standard. However, to support his allegation of unconstitutionality, the Appellant understands that the rule effectively applied by the appealed judicial body goes beyond that insofar as it would also derive from it the element that the subsequent presentation of the arrest warrant would not impose immediacy, since this criterion under paragraph 3 of Article 269 of the Code of Criminal Procedure was not considered, which, in his view, would determine the unconstitutionality of the hypothetical rule. But, the fact is that this understanding cannot be attributed to the rule that the Supreme Court of Justice applied, since the fact is that, deliberately or not, the issue of immediacy was not considered by that body, which was limited to applying a rule according to the which *information for the arrest and detention of a person may come to the attention of the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunication, as follows from Article 269 of the CPP, followed by confirmation by warrant.*



CERTIFIED TRANSLATION
12/09/2021
REF07635166
LANGUAGE REACH

E - The exclusion in itself of a possible segment of the rule based on the expression immediacy made by the contested ruling, which even seems justified to the Constitutional Court for reasons that will be discussed below, or the possible erroneous application of the reference to the Code of Criminal Procedure does not lead back, for itself alone, to a normative issue, but simply one of conduct. Therefore, it is not subject to challenge through an Appeal for specific inspection of constitutionality, but through another constitutional appeal. The only rule that can be investigated in this type of process is the one that was effectively applied by the Supreme Court of Justice in the terms defined above. Namely because the Court has not yet had any decision on this issue, it is not manifestly unfounded and because a possible declaration of unconstitutionality would prove useful insofar as it is likely to affect the contested decision.

F - Therefore, the Court considers that it can assess on the merits the question of whether the rule applied by the appealed judicial body according to which *information for the arrest and detention of a person may come to the attention of the authorities by any means allowed by Cape Verdean Law, if there is urgency and danger in the delay by any means of telecommunications, as follows from Article 269 of the CPP, followed by confirmation by a warrant,* it is non-compliant with the Constitution due to incompatibility with the right to bodily freedom, with the principle of legality police measures and with the principle of proportionality of police measures.

3.2.6. **The interpretation that will have been given to Article 38, third paragraph, subsection a) and 39 of the LCJ, and Article 269, third paragraph, of the Code of Criminal Procedure, in the sense that a person can be arrested and detained for the purposes of extradition, without requiring the existence of a warrant or issuance of a red alert by INTERPOL and without knowing any fact that clearly justifies it, would be contrary to the Constitution and International Law for incompatibility with the right to bodily freedom provided for under Article 30 of the Constitution, the principle of legality and proportionality of the police measures provided for under paragraph 2 of Article 244, as well as the right of a person to be informed of the reasons for his arrest and detention and to receive immediate notification of all charges brought against him provided for under paragraph 2 of Article 9 of the ICCPR - The International Covenant on Civil and Political Rights.**



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 7635166

A – The Appellant considers that the Supreme Court of Justice has also applied a rule according to which a person can be detained for the purposes of extradition, without requiring that there be a warrant or issuance of a red alert by INTERPOL and without knowing any fact that clearly justifies it, a formula that, in the understanding of this Court, represents a norm and, as such, permissive of a typical scrutiny of a specific inspection of constitutionality. In this case, the hypothetical rule was also constructed from an interpretation brought under Article 39 of the Law of Judicial Cooperation International, not appearing, by the content of its decision, that the Supreme Court of Justice understood that paragraph 3 of Article 38 of the same statute or Article 269, third paragraph, of the Code of Criminal Procedure would be an applicable, or that this was necessary for the configuration of the enabling norm for arrest and detention.

B – Particularly because the Appellant indicates practically the same parameters that he defined for the previous question, some of which reveal some relationship with the contested hypothetical rule, this requirement can be considered fulfilled. However, it is necessary to comply with the parameters indicated: paragraphs 2 under Article 17, and Article 244, second paragraph, all of the Constitution, Article 6 of the African Charter, Article 9, paragraph 2, of the Covenant and Article 9 of the UDHR. Because paragraph 2 under Article 17 of the Constitution alone is incapable of being an autonomous parameter for a verification of normative constitutionality, Article 9 of the Universal Declaration of Human Rights and Peoples would be another auxiliary interpretation standard and paragraph 2 of the Article 9 of the ICCPR - The International Covenant on Civil and Political Rights, recognises the right to information of a detained person, and does not seem to have a direct connection with the contested rule, as the absence of a warrant to make an arrest of a wanted person is not the same thing as the content of a warrant, and only that one is in question in this item, the other being able to be placed in the next one. In this specific segment, what is at stake is not the right to be informed of criminal charges or other procedural information, but rather a guarantee that a person will not be arbitrarily detained. Therefore, the only parameters that fit this question would be the very right to freedom of movement and the principles of legality of police measures and the correlated principle of proportionality of police measures.

C - Regarding the timeliness of the issue of constitutionality, as well as the consistency of its maintenance, it appears that the Appellant is already in



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

opposition to extradition referred to in section III, paragraphs 40-41, that it would not be compatible with the principle of legality, the idea that a police authority of a State can deprive an individual of his freedom on the basis of an informal request from a foreign police agency, and that this principle would be violated when a warrant is required and the person is arrested without it. Subsequent to the interpretations made by the courts regarding the issue – from the outset the TRB through its *Ruling 48/2020-2021, dated 4th of January*, pp. 13-15 – continued to argue the incompatibility of the interpretations in the sense that the law did not impose the presentation of a warrant with the principle of legality (Appeal, paragraphs 65-66), a constitutional principle. On the other hand, however, it was not possible to identify the issue of compliance with International Law, which must be raised autonomously so that it can be known and appreciated by the judicial court before submitting it to the Constitutional Court.

D – The decision of the Supreme Court of Justice inserted in *Ruling 28/2021, dated 16th March*, was to reject all the Appellant's requests in this segment with the argument that, referring to its *Ruling 28/2020*, the arrest and detention was not directly requested, as he understood to be the case, it can take place even if the national judicial police authority is not yet in possession of a formal warrant, it being sufficient for it to be in possession of official information that legitimises the arrest and detention, which does not have to take the form of a request, much less of a warrant, it being certain that the latter would, as stated above, be confirmed subsequently. Therefore, the rule that the appealed judicial body applied was simply one under which a person can be detained for the purposes of extradition, without requiring a warrant, just being in possession of official information that legitimises the arrest and detention. It does not seem that the lack of news/red alert or facts that clearly justify the extradition have also been explicitly considered, since in the Ruling to which the reasoning referred, it was taken for granted that they existed, concluding that the official information had been transmitted initially by a Foreign State and then by the INTERPOL information system (p. 32) and that there was knowledge of facts that justified the detention for extradition purposes known through these communications.



E and F - With this clipping, considering that the Court has not yet rendered any decision on this matter, that the allegations of unconstitutionality are not manifestly unfounded and that a decision declaring unconstitutionality may prove useful and reverberate in the main proceedings, the Court will hear the question as to whether a rule applied according to which *a person can be arrested and detained for the purposes of extradition, without requiring that there be a warrant, as long as one is in possession of official information that legitimises his arrest and detention*, is inconsistent with the Constitution for incompatibility with the right to bodily freedom, with the principle of legality of police measures and with the principle of proportionality of police measures.

3.2.7. **If the interpretation that has been given to Articles 269, paragraphs one and four, and Article 31, paragraph three, and Article 39 of the LCJ, in violation of the imposition of immediate communication to the detainee of the reasons for his detention, would be contrary to the Constitution, due to incompatibility with the right to bodily freedom and the guarantee that the person is immediately informed, in a clear and understandable manner, of the reasons for his detention and imprisonment recognised by paragraph 4 under Article 30 of the Constitution.**

A – In the document filing the specific inspection appeal, as improved, the Appellant also invokes the occurrence of an unconstitutionality resulting from the interpretation that will have been given to Articles 269, paragraphs one and four of the Code of Criminal Procedure, and Articles 31, third paragraph and 39 of the LCJ, *in violation of the imposition of immediate communication to the detainee of the reasons for his arrest and detention*, would be contrary to the Constitution.

This interpretation cannot be known and examined by the Court because, first, as presented, it does not have a normative nature, not extracting from this formula a deontic statement that would enable this Court to proceed with its review of constitutional compliance through specific inspection of constitutionality, as is drawn up, it is just a statement about the conduct of a judicial body.

B - Second, it is very doubtful, that even implicitly, the Supreme Court has adopted any understanding that it would not be necessary to present the detainee with the reasons for his detention in his argument, since what he says, according to what



was proven from the analysis of the file that it promoted, is that the Appellant's allegation, mentioned above, did not correspond to what the police authority had declared, and that it had no reason to question the veracity of the information that had been provided for it. Even because if that had happened, what would be natural is that this might nave been raised by the interested party before the judicial authority who presented him/her following his detention so that he could decide, which did not happen and because, in fact, in his opinion, the case of confirmation of this detention with the Barlavento Court of Appeal states information that he was communicated, that there was an arrest warrant issued by INTERPOL and the reason for his detention (p. 19). Therefore, he did not deny that this duty was imposed. Based on the same normative principle, it was simply understood that, in the specific case, it had confirmed that such communication had occurred, an aspect whose verification is not for the Court to carry out in the context of specific inspection.

C – For the above reasons, the Constitutional Court cannot know and examine the merits of the interpretation attributed to the Supreme Court of Justice as it is not normative in nature and has not been applied by this judicial body.

3.2.8. **The interpretation given to Article 6, third paragraph, and Article 3, third paragraph, of the LCJ, according to which exemption from reciprocity is possible in any form of international judicial cooperation, including extradition, would be contrary to the Constitution due to incompatibility with the principle of reciprocity of advantages inserted under paragraph 1 of its Article 11, the principle of equivalency of foreigners to nationals transferred into paragraph 1 under Article 25 and the rule for the treatment of foreigners in transit provided for under Article 7 l).**

A - As alleged by the Appellant, a rule arising from Articles 3, third paragraph, and Article 6, third paragraph, both of the LCJ, was applied, according to which, by its systematic placement, the *waiver of reciprocity is possible in any form of international judicial cooperation, including extradition,* a formula that clearly corresponds to the elements required to configure a legal norm, containing a stipulation, integrating a provision, being structured as if it were a deontic or ethical statement constructed by an imaginary legislator. However, it does not seem that such a hypothetical rule refers to Article 6, paragraph 3, of the Law of International Judicial Cooperation on Criminal Matters, but possibly to paragraph 4 of the same provision,



because if the former concerns guarantees of non-application of life imprisonment, it is the latter that provides for reciprocity. But even this paragraph can only be relevant to the configuration of the specific rule applied by the Supreme Court of Justice, in its last part which, referring to paragraph 3 under Article 3, provides that the refusal imposed by the first segment when it is not guaranteed reciprocity would have, as an exception, the provisions of paragraph 3 under Article 3 of the Law.

B – The same procedural intervener argues that such an interpretative norm would suffer from a defect of unconstitutionality due to non-compliance with the principle of reciprocity of advantages provided for under paragraph 1 of Article 11 of the Constitution and the principle of equivalence of foreigners to nationals transferred into paragraph 1 of Article 25 and with a rule in Article 7, sub-section l), which would oblige the alien in transit to be treated in a manner compatible with international human rights standards, which, regardless of whether they are promising parameters or not, at this stage is sufficient to consider that there is an underlying question of constitutionality on which the Court can rule.

C - The interpretation that the courts were applying regarding reciprocity goes back to *Ruling 244/2019-20, dated 31st of July,* unpublished, transferred to the Extradition Records, v. I, 290 et seq.), in the sense that it would be possible to dispense with it whenever this proves advisable due to the nature of the fact or the need to combat certain forms of criminality (III, p. 11). From that moment, the Appellant consistently invokes the question, not only raising problems of compatibility with International Law and with ordinary law, but also with paragraph 1 under Article 11 of the Constitution, for violation of the principle of reciprocity of advantages (para. 191), doing it again in the Second Ordinary Appeal of the decision that authorised the extradition which he submitted to the Supreme Court of Justice in the conclusions qq and ss. Therefore, there will be no other determination that within what was required not only raised the question of possible application of a normative understanding likely to be unconstitutional, as it did in a timely and consistent manner throughout the process in such a way as to allow the judicial bodies involved to realise that it was a matter of constitutionality.



D – Also for this reason, the Illustrious Supreme Court of Justice, when, in item II.3.12, considered the issue raised by the Appellant that the waiver of reciprocity, as it says, would violate Article 11, paragraph one, of the Constitution, responded in the negative, determining this understanding the appeal's failure in this segment. For that reason, it cannot be ignored that the interpretative norm in question was applied by the Supreme Court of Justice as a *ratio decidendi* of the question put to it by the Appellant.

E - Despite having already developed discussions on the principle of reciprocity of advantages in the scrutiny of norms inserted in a treaty, the Court has never ruled on the specific question raised in this context that emerged from the application of an interpretative norm arising from the Law on International Judicial Cooperation in Criminal Matters. It cannot be said at this stage that the Appeal is manifestly unfounded, even though the defect in constitutionality invoked by the Appellant is not at all evident in the light of the parameters indicated, thus allowing the Constitutional Court to assess it on the merits.

F - Therefore, the Court decides to scrutinise the hypothetical rule arising from Article 6, paragraph 4, last segment, and Articles 3, paragraph 3, of the Law of International Judicial Cooperation on Criminal Matters applied by the Supreme Court of Justice, according to which *the exemption from reciprocity is possible in any form of international judicial cooperation, including extradition*, for possible non-compliance with the Constitution, for incompatibility with the principle of reciprocity of advantages, with the principle of equivalence of nationals and non-nationals and with the rules of treatment of foreigners in transit in a manner compatible with international human rights law.

**3.2.9. If the interpretation that will have been given under Article 17 of the LCJ, according to which the extradition that is authorised is so that the extraditee, the person whose extradition is sought, is subject to criminal prosecution for one of the crimes charged to him, in accordance with the guarantee offered by the requesting State, would be inconsistent with the Constitution for incompatibility with Articles 15, 17, paragraphs 4 and 5, and 18 of the Constitution.**



A – Regarding the present challenge, the Appellant tells us, through the improvement part of his petition of Appeal that the decision of the Appeal "proceeded with the application under Article 17 of the LCJ with the following meaning, "the extradition that is now authorised it is for the Extraditee, the person whose extradition is sought, to be subject to criminal prosecution for one of the crimes imputed to him, in accordance with the guarantee offered by the Requesting State", adding further that the decision does not correspond to the guarantee given by Diplomatic Note No. 103 of the United States, through which this country proposes to abandon all other charges and seek extradition only on the basis of element 1, nor does it correspond to the need for the intervention of a judicial body of the Requesting State in offering the guarantee of effective reduction of the points of the indictment in relation to the Appellant.

Therefore, as follows from the wording itself, the object of the Appellant's challenge in this segment is not a deontic statement which, in any case, does not follow from what has been set out, but is a segment of the rhetorical device part of the appealed Ruling. Therefore, in this case, a normative principle that legitimises the decision is not at issue, which is not constructed by the Appellant himself, but the actual merit of the decision itself, an element of the appealed judicial act that cannot be scrutinised by the Constitutional Court in the context of specific inspection of constitutionality.

B – The lack of explicitness of a norm and the fact that, in practice, a challenge is being launched to the decision itself and not to the normative foundation that legitimises it, would be reasons that would prevent the Constitutional Court from hearing and examining this issue. But, in addition to this, even if these obstacles to hearing and examining the merits of the matter were overcome, the parameters presented result from a block of constitutionality that, as it has not been implemented in specific principles and rules, promotes a normative vagueness that makes any inquiry unfeasible constitutionality, especially because in relation to the other parameters effectively explained, namely Article 15, which contains a generic rule imposing a duty to respect and guarantee the free exercise of rights and freedoms and the fulfilment of constitutional and legal duties, paragraphs 4 and 5 under Article 17, which regulate the restriction of rights, and Article 18, which contains three principles of the regime of rights, freedoms and guarantees - that of direct applicability, that of binding of all public entities and that of binding private entities – it is not very clear how they would be affected by these specific conducts of the appealed judicial body.



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

The only parameter that would still refer to a specific constitutional basis would be the principle of specialty if it were considered as an international customary rule that imposed an obligation on a State - Defendant - to impose on another State - Respondent - a limitation on the submission of an extraditee, the person whose extradition is sought, to criminal proceedings or execution of penalties for fact or conviction other than those authorised by the extradition decision, projecting a guarantee of title to an extraditee, the person whose extradition is sought. It is certain that if there were a rule in this regard, it would be part of Cape Verdean Law under paragraph 1 of Article 12 of the Fundamental Law. For the reason, to the extent that paragraph 4 of the same provision applies, it would occupy a supra-legal hierarchical position. There could be a situation of indirect unconstitutionality subject to scrutiny by this Court.

However, it is not possible to find the grounds on which the Appellant is based for alleging the existence of an international customary rule with such content that it would have been incorporated by the system of automatic reception of customary rules under paragraph 1 of Article 12 of the Constitution. And this is important because in the presence of an unwritten norm, the proof of its existence is essential to avoid frivolous arguments to attract a court, which should recognise them, trying to identify it, thus suggesting the main norm it represents that source of International Law, sub-section b) under paragraph 1 of Article 38 of the International Court of Justice when associating international custom with evidence.

By making consecrated very early in the *Case of the Right to Asylum* (Colombia v. Peru), dated 20th of December 1950, reproduced in *Asylum Case (Colombia v. Peru)* in: *International Court of Justice Reports of Judgements, Advisory Opinions and Orders,* The Hague, ICJ, 1950, pp. 276-277, that the party who relies on a custom (…) must prove that it is established (…)", i.e. that "the rule invoked (…) is in accordance with a uniform and constant practice of the States concerned and that this practice is the expression of a right (…)", the International Court of Justice has laid down the doctrine arising from international practice and associated with the general principle of law of the *onus probandi actori incumbit* that the burden of proof is on the person invoking the existence of an international customary norm,



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 7635166
70

which applies to both universal and regional ones. Insofar as paragraph 1 of Article 12 incorporates the customary legal regimes that internationally bind the State of Cape Verde, it also does so in relation to the procedural rules that regulate its invocation before the courts. Therefore, it is up to the procedural intervener to present the practice and *opinio juris,* an opinion of law or necessity, aimed at proving the existence of a customary rule that invokes or, at least, indicate the judicial or doctrinal authorities that would indirectly help to determine the existence of this rule under the terms represented by sub -section b) of paragraph 1 under Article 38 of the Statute of the International Court of Justice and as recently proclaimed by the Commission on International Law (*Draft Conclusions on Identification of Customary International Law With Commentaries*, New York, ILC, 2018, Conclusion 3; Conclusions 13 -14), so that from them the practice can be verified and *opinio juris,* an opinion of law or necessity, essential for the configuration of a customary rule.

But, even if it is possible to overcome the fact that the Appellant has not provided proof of practice and *opinio juris*, as he should, to support the existence of an international custom that he claims with the outline it claims to have, the Constitutional Court cannot give as justified, the idea that there would be an international customary norm in the alleged sense. Assuming that a pattern of treaties and domestic legislation (*Draft Conclusions on Identification of Customary International Law With Commentaries*, Conclusion 6.2), one can derive both a practice, and arguably an *opinio juris*, from which a Requesting State has the duty not to subject an extraditee, the person whose extradition is sought, to trial for crimes that do not result from the act granting the extradition, that same legal regime is also part of the rule that institutes an exception in the sense that, with the consent of the Respondent State, the extraditee, the person whose extradition is sought, may be subject to trial for the commission of other punishable acts or subjecting him to serving a sentence for other crimes.

This is evidenced by the practice itself and arguably the *opinio juris* that can be attributed to the State of Cape Verde, insofar as the Law of International Judicial Cooperation on Criminal Matters allows, through sub-section b) of paragraph 4 under Article 17, that the State that authorises the transfer, after previously hearing the suspect, the formal suspect or the convict, consent to the derogation of the specialty rule or the possibility that, pursuant to paragraph 5 of the same provision, the State may request the extension of cooperation to facts different from those on which the request was based,



upon a new request presented and instructed under the terms of that law. The same results from the standard of treaties that Cape Verde has celebrated in this area, namely with the Portuguese Republic (text published in the *Official Gazette*, 1st Series, No. 17, dated 7th of June 2004, pp. 402-417, Article 56, first paragraph, b)), with the Kingdom of Spain (text published in the Official Gazette, 1st Series, No. 15, 14 April 2008, Article 15 b)) or within the scope of the Community of Portuguese Language Countries (text published in the *Official Gazette*, 1st Series, No. 12, 21st February 2004, Article 6, paragraph 1, b)).

In addition, it should be noted that there are several universal and regional multilateral treaties to combat transnational organised crime that do not provide for the specialty rule, an aspect that is also taken into account by Cape Verde's special legislation, when it asserts through paragraph 1 under Article 18 that the immunity deriving therefrom ceases in cases where, by treaty, convention or international agreement to which Cape Verde is a party, there is no place to benefit from the specialty rule, as would be Article 16 of the Palermo Convention on Transnational Organised Crime and other treaties that are mirrored in its text.

As a result of this indication from Article 14 (Rule of Specialty) of the United Nations Model of Extradition Treaties, which recommends limiting it, on the one hand, to crimes whose extradition was granted by the Respondent State, but, on the other hand, foreseeing exceptions based on "any other crime that [it] consents to", contemplating that it is granted in relation to crimes that the treaty itself allows, and commenting that the discretion to consent or not is limited by the provision of the treaty, because if it allows the extradition of that crime, the State must necessarily consent (*Revised Manual on the Model Treaty on Extradition and on the Model Treaty on Mutual Assistance on Criminal Matters,* Vienna, UNODC, 2002, pp. 52-53). And also from sub-section a) of paragraph 1 under Article 34 of the Model Law on Extradition that the United Nations recommends, which provides for the possibility of subjecting the extraditee, the person whose extradition is sought, to criminal proceedings and re-extradition for crimes other than those that justified the extradition provided that, among other causes, the competent State authorities expressly give their consent (Model Law on Extradition, Vienna, UNODC, 2004, p. 57).



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

Thus, it is very debatable that this gave rise to an obligation to impose this rule on another State, much less that individual rights anchored in Customary International Law itself emerged, namely because there are also treaties, especially at this time multilateral, that do not contain the specialty rule and because a significant paragraph of bilateral treaties that provide for it also allow the Respondent State to waive the right to which it would be entitled, allowing deviations from that rule.

Therefore, the international customary rule as instructed by the Appellant does not exist in the international legal sphere. Regardless of the assessment made of this development, customary international law inevitably derives from the practice and *opinio juris* of States, without the content it expresses being in the least bit relevant. And the fact is, in the customary international dimension, the rule of specialty still leads back to a register of regulation of interstate relations, deriving from it essentially States' rights. Although they produce beneficial effects for individuals subject to extradition proceedings, they do not establish any subjective right under International Law. These, if they exist, are those that are translated into a specific treaty, which will bind its parties, or provided for by the domestic law of States with a constitutional or ordinary basis.

C - Due to lack of normative content and enforceable scrutiny parameter, the Constitutional Court will not hear and examine the question of whether the *interpretation that will have been given under Article 17 of the LCJ, according to which the extradition that is authorised is for the extraditee, the person whose extradition is sought, is subject criminal prosecution for one of the crimes charged to him,* in accordance with the guarantee offered by the requesting State, would be contrary to the Constitution.

3.2.10. **The interpretation that will have been given to Article 6, paragraph No. 2, sub-section b) of the Law of Judicial Cooperation and to Article 45, paragraph one, of the Penal Code, according to which extradition is granted to a Requesting State where it is applies the death penalty and life imprisonment when the guarantee is given by its Embassy and not by an irrevocable and binding act for its courts and other entities, it would be contrary to the Constitution due to incompatibility with the principle of equality, to the right not to be discriminated against and the obligation of the Requesting State to provide guarantees in the event of application of a perpetual measure.**



A - In this regard, the Appellant alleges verbatim in the document of improvement that the rules that the contested decision applies of the provisions indicated in the sense that "it brought to the process, through the Public Prosecutor's Office, a document in which it undertakes (...). This guarantee cannot but be considered valid and sufficient", explaining that it would be a misinterpretation to consider as a valid and sufficient guarantee that given by an Embassy of the Requesting State, allowing extradition to a country that applies the death penalty or life imprisonment, in this case to 160 years of imprisonment, since, in practice, what the rules arising from sub-section a) of paragraph 2 under Article 6 of the Law of Judicial Cooperation and paragraph 1 under Article 45 of the Penal Code would require is that the request was made by an irrevocable and binding act of its courts and other entities. And adding that the Supreme Court had accepted another understanding in a previous case before an identical diplomatic note and that extradition for political reasons would also be involved. With this formulation, whose normative content is far from being very evident, what the Appellant is questioning is the merit of the decision - which he considered that, in fact, certain guarantees provided by a State would be sufficient - as he understands, as he says, that they are misinterpretations of the applicable legal precepts, and conduct promoted by the Supreme Court of Justice throughout its decision, not a norm that has been applied by the Honourable judicial body that issued the decision whose sections were placed in crisis.

B – Since the possibility of applying the death penalty, which is not in question, is not relevant in this specific case, it is irrelevant that the Requesting State provides, amongst its list of applicable penalties, that of death. In this sense, based on the construction presented by the Appellant in his filing the Appeal, as improved, the only relevant issue is that which refers to the sentence of life imprisonment. In this regard, even if it were possible to infer a specific rule from the linguistic formulas presented by the Appellant, the main problem that arises is that, in the opinion of this Court, there is not exactly a question of constitutionality to be resolved. Precisely because, despite all the debate that has taken place and that can legitimately be continued on the goodness of the constitutional solution, the fact is that the constituent legislator of the review took a position on the issue,



whose most obvious effect was the "deconstitutionalisation" of the protection reserved for the non-national in cases of application of a life sentence.

The original version of the 1992 Constitution (published in the *Official Gazette*, 1st Series, No. 12, 25th September 1992, pp. 1-44) was achieved, insofar as it allowed only the extradition of the non-national, prohibiting that of the Cape Verdean, it was expressly limited in cases of application of the death penalty or the life sentence (Article 35, third paragraph), essentially maintaining the same regime with the constitutional revision promoted by *Constitutional Law 1/1999* (published in the *Official Gazette*, 1st Series, No. 43, Supplement, 23rd November 1999, pp. 2-34, with correction published in the *Official Gazette*, 1st Series, No. 3, 14th February 2000, pp. 17-18), since sub-section b) of paragraph 3 of the renumbered Article 37 continued with the same prohibition. All this was changed in 2010. In fact, paragraph 17 under Article 1 of Constitutional Law No. 1/2010, published in the *Official Gazette*, 1st Series, No. 17, 3rd May 2010, pp. 394-407 (according to amended version published in the *Official Gazette*, 1st Series, No. 28, 26th June 2010, pp. 1003-1009), which carried out the second ordinary revision of the Constitution, amended this constitutional provision in the part where there was a guarantee of the non-national not to be extradited for crimes that correspond to a life sentence, a guarantee that became exclusively that of the national citizen, which, with this same revision, became extraditable in some situations, according to the current Article 38. At this time, as assumed by all the judges of this Court through *Ruling 10/2020, dated 20th of March [Referring to the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rapporteur: JC Aristides R. Lima, E 7, and of the concurring vote of Advisory Judge Pina Delgado, 12.3.1, the only holders of this guarantee are national citizens.

It cannot primarily prevent such a conclusion on the unequivocal will of the legislator from being accepted by the fact that it can derive protection based on the principle of the dignity of the human being, in the principle of equality, in the principle of equality of nationals and foreigners, in the principle of human dignity, in the principle of protection of trust or in the rule that prohibits the application of the sentence of life imprisonment, since, respectively, it does not place a general limit on the constituent legislator to establish in the text of the Constitution a distinction between persons for reasons of nationality and without guaranteeing the equivalence of nationals and foreigners, even outside the scope of political rights,



namely with regard to guarantees against extradition, with the constitutional regime in force also not having any effect of prohibiting the application of the penalty in question, insofar as it is intended to prohibit it only in national territory. This is absolutely understandable, considering that what is protected when the extradition of national citizens is more intensely limited is, ultimately, a Cape Verdean national's right to belong to his land (*Ruling No. 20/2018, of 16th October, Uchechukwu Eseonwu and Chijioke Duru v. STJ, on breach of guarantee of presumption of innocence in its in dubio pro reo dimension,* Rapporteur: Advisory Judge Pina Delgado, published in the *Official Gazette*, 1st Series, No. 68, 25th October 2018, pp. 1639-1648, 1.3, in the sense that only in extreme situations and with more accentuated guarantees, is he allowed to be extradited, not happening to a national of a foreign country or stateless person.

With the loss of a constitutional standard of the guarantee with Constitutional Revision Law No. 1/2010, for this specific issue, the regime that regulates the extradition of foreigners or stateless persons is, at this moment, merely legal, insofar as the Law itself of Judicial Cooperation International in Criminal Matters makes it conditional on the provision of certain guarantees, since under the terms of sub-section f) of paragraph 1 of its Article 6, the request for cooperation is refused when respecting the offense corresponding to imprisonment or of a security measure of perpetual character, not preventing, however, from granting cooperation in such cases, if, pursuant to sub-section b) of paragraph 2 of the same provision, the Requesting State offers guarantees that such penalty or measure security will not be applied or enforced. Therefore, it is not a matter over which the Court has jurisdiction, since in the case of a deconstitutionalised domain over it, an interpretive monopoly is projected for the judicial courts and, in this case, the Supreme Court of Justice, which dictates the last word on it.

If constitutional issues still arise, they would be of a different nature. Sometimes, it seems that the Appellant's constitutional challenge is based on the interesting understanding that, after all, the problem lies with the very de-constitutionalisation of the limitation of the possibility of extradition of foreigners or stateless persons in situations of application of a life sentence, namely because they are in dissonance with constitutionalised values of the Political Community that reflect the identity of the Constitution of the Republic of Cape Verde as the dignity of the human being or equality.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

However, this being the case, the constitutionality defect would have to be imputed to paragraph 17 under *Article 1 of Constitutional Law No. 1/2010*, which established the new constitutional regime on the matter, and not to the interpretation attributed to the Supreme Court of Justice. Although it is not clear that, in the context of specific review of constitutionality, this type of scrutiny on constitutional rules would be open to the Constitutional Court, the fact is, that in this case, it would be difficult to impute the application of a constitutional rule to the appealed judicial body, which, for not having been argued, it was not even considered.

C – For these reasons, the Constitutional Court cannot hear this challenge.

3.2.11. **The interpretation that will have been given to Articles 156, paragraph one, subsection b), 157 and 161 of the Code of Criminal Procedure, in the sense that the absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of Law International Public arises from a previous assessment or political position, leading to the recognition of the status of special envoy would only fall to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status both by the sending state and by the state that was to receive him, would be inconsistent with the Constitution for incompatibility with the principle of independence of the courts, with the principle of non-intervention/non-interference in the internal affairs of other States and with rules that establish the preferential application of International Law in relation to ordinary law.**

A - It is considered that the construction presented, although referring to a hypothetical standard, reveals a deontic nature, characterised by two interconnected but autonomous regulations, respectively that: *The absolute incompetence of the Cape Verdean courts to hear a matter relating to the immunity of International Public Law results from a prior political assessment and another that the recognition of the status of Special envoy would only fall to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status by allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as special envoy, after recognition of his status by both the sending State and the receiving State.*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
RL77635166

77

B - The Appellant indicated both constitutional parameters (principle of independence of the courts; principle of non-interference and rule of precedence for the application of this instrument when there is a conflict with other conventional international regulations) and international (rule to provide for the recognition of special envoy immunities in Transit States and the principle of non-intervention). Therefore, the Constitutional Court is satisfied that the question addresses potential problems of direct constitutionality or compliance with international law.

C – Although with several nuances, the issue of jurisdictional immunities has accompanied the Appellant's allegations since the moment of his arrest and his placement in an extraordinary injunction for habeas corpus, which was filed with the secretariat of the Honourable Supreme Court of Justice on 26th June 2020. With the non-acceptance of the thesis of the absolute incompetence of Cape Verdean courts to detain and subject him to extradition proceedings, he insisted on the allegations that there would be an obligation for a Transit State to recognise inviolability and immunities from the jurisdiction of a person who has been appointed by a State to carry out a mission in another that agrees with it and that by not recognising the Republic of Cape Verde, it would be interfering in the relations between these two States in contravention of the provisions of International Law. Finally, in the last Appeal, the issue of violation of the principle of the independence of the courts, was not actually considered in sub-section t) from its conclusions that the status of special envoy does not necessarily need to be recognised by the political power, and that, thus, the appealed judicial body, by delegating this competence exclusively to the bodies that represent it, violated the principle of separation of powers and that of the independence of the courts.

D - In the understanding given by the Supreme Court of Justice, referring to a previous decision, without the consent of the State of Cape Verde for the Appellant to transit through its territory as a special envoy, the courts cannot recognise a person with the status of a special envoy and, thus, not enjoying inviolability and immunities based on the United Nations Convention on 1969 Special Missions (p. 44), which is far from corresponding to the norm whose application is attributed to it.



12/09/2021
RE 7635166

In this sense, the first part of the rule that was designed is insusceptible to be scrutinised, for the reason that it was not applied by the appealed judicial body, which, at no time, can be accused of having used as a basis for decision-making the rule according to which the absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of International Public Law stems from a previous assessment or political position. The Court's *ratio decidendi* cannot be extracted from clipped segments without connection with the previous rationalisation used by the Court. Therefore, if we pay attention to the normative reasons presented by the Supreme Court of Justice to consider that there would not be an obligation to recognise the inviolability and immunities of members of a special mission, it is that it was previously informed, through visa or notification, of the transit and not objected to, and, therefore, that status could not only result from a declaration by the sending State, but also from the consent of the State of destination and the State of transit. It is the absence of this essential consent, which, in his opinion, has not been proven, that would prevent the recognition by Cape Verdean courts of their immunities and inviolability based on this status of special envoy.

The Supreme Court of Justice did not consider itself inhibited from verifying whether the Appellant enjoyed such inviolability and immunities in Cape Verde. So much so that it proceeded to determine this question. The only thing that made the State of Cape Verde to depend (not necessarily the Government) would be to know whether or not it consented to the Applicant's transit in the country's territory as a special envoy, without, moreover, in the contested decision requiring that such was expressed, only implying that, hypothetically, it would result from the fact that Venezuela had previously informed of this transit and that this country has not objected. Therefore, considering the allegation to be unfounded because it was not established that the State of Cape Verde having been previously informed, had agreed in this way with the transit by not objecting to it. Naturally, such a rule would not have the power to be contrary to the principle of independence of the courts, as it maintains the jurisdictional function of deciding a matter within its competence, as it effectively did, without any interference from the Government and, before the assessed party, without the need to consult the same, because the Appellant admits that the Government of the Bolivarian Republic of Venezuela, for technical reasons, did not inform the State of Cape Verde in advance, only doing so after the Appellant was already on the ground and had been detained.



Regarding the issue of not having also recognised the Appellant as Alternate Permanent Representative of the Bolivarian Republic of Venezuela to the African Union, the Constitutional Court expresses its doubts whether the Supreme Court of Justice used as its *ratio decidendi* the argument that absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of International Public Law is based on a previous assessment or political position. It is true that it constructs a sentence according to which the same problem of recognition of this status by Cape Verde would persist in the specific situation, which had not yet been demonstrated in the records and that, therefore, the unilateral act of Venezuela that it intended to make someone already detained in Cape Verde for extradition purposes their representative to an organisation, would be legally irrelevant, even if it is continental, the African Union. However, in the decisive part of his argument, what he says is that the Appellant did not invoke, nor was it possible to unveil the instrument that would oblige the State of Cape Verde and its institutions to recognise the alleged immunity of the extraditee, the person whose extradition is sought, in the new capacity referred to (pp. 44-5).

Therefore, the reason for not recognising these inviolabilities and immunities in this case is essentially related to the absence of elements that would allow the Supreme Court of Justice to assess and decide on this allegation of absolute incompetence, namely because it was a unilateral act of Venezuela and because no legal basis had been indicated to support the allegation. And here the Constitutional Court would have the same difficulty even in defining specific parameters that a judicial body could use in such circumstances. Even in the context of closing arguments, where he discusses in more detail about the double protection he would enjoy, the Appellant refers generically to Customary International Law, to Conventional International Law and to the jurisprudence of the International Court of Justice, he speaks of binding legal obligations and a duty of compliance, cites the duty to peacefully resolve a dispute, invokes the duty of respect for the International Law of Diplomatic Relations and cites the Vienna Convention on Diplomatic Relations regarding U.S. jurisprudence on retroactive immunities.



But, as the Illustrious Supreme Court of Justice has very perceptively pointed out, at no time is it possible to identify the specific conventional or customary rule that binds the State of Cape Verde and that would impose a duty of recognition of inviolability and immunities from criminal jurisdiction by third party States to whoever has been appointed by another to represent them in a Regional International Organisation, specifically the African Union, without apparently any condition beyond the unilateral communication of that State, even if he was already in its territory.

Or this would depend on the existence of a conventional norm that should have been identified, or at least a customary norm that must be properly demonstrated from the presentation of the relevant practice and the *opinio juris* of the States. It doesn't seem to us that this has happened in this segment, making it almost impossible to make any assessment. It is not possible to determine whether a diplomatic representative in transit is being considered or which statute it is effectively invoking in the light of International Law, given that, in this regard, even the international rules that have been recognised to regulate similar situations do not fail to condition transit to a visa issued by the Third Party State. This issue, in addition to, in itself, limiting the hearing and examining of the matter by the Constitutional Court, denotes an inappropriate placement of an issue of non-conformity between Domestic Law and International Law, which makes it unfeasible to be placed before an ordinary judicial body, the subsequent promotion of the question of indirect unconstitutionality and its hearing and examining by this Court.

E – The segment that the Court can hear and examine was not the subject of any previous decision that allowed to reject it by mere reference to this jurisprudence, nor can it be considered, immediately, and without facing the argument presented by the procedural interveners, as manifestly unfounded or useless, or that a decision of unconstitutionality is not likely to reverberate in the main proceedings.

F – In this sense, if the Court can determine the compatibility with the Constitution and with the International Law of the segment of the rule constructed according to which *the recognition of the status of special envoy would only be the responsibility of the State of Cape Verde,*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF 07635166

*without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status by both the sending state and the receiving state to receive,* but no longer to the segment that refers to the absolute incompetence of Cape Verdean courts to hear a matter relating to the immunity of International Public Law stems from a previous assessment or political position and the allegations associated with the fact that he was appointed Alternate Ambassador of the Bolivarian Republic of Venezuela for this country.

**3.2.12. If the interpretation under Articles 15, paragraph 4, and Articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, in order to determine compliance with the ECOWAS Court of Justice decision, whose application the Supreme Court of Justice refused, on the grounds that, in order for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and ratified. Since Cape Verde did not sign the protocols that recognise jurisdiction of the ECOWAS Court of Justice in terms of human rights and since it is not a supranational organisation for the purposes of paragraph 3 under Article 12 of the Constitution, it would be contrary to the Fundamental Law, namely the principle of national sovereignty.**

A – In this case, deviating from the previous allegations, the Appellant did not charge the Appellate Court with the application of an unconstitutional rule, either real or hypothetical. Before that, it refused to apply certain norms that would bind the State of Cape Verde and that would integrate the Cape Verdean legal system. And he did so apparently because he considered the hypothetical rule arising from the combined application under Articles 15, paragraph 4, and Articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, in the sense that Cape Verde's supranational character and the linkage of Cape Verde to the legal regime of the Court of Justice would oblige Cape Verde to execute a decision imposing provisional measures imposed by that court would be contrary to the Constitution for violating the principle of national sovereignty.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

82

B – In this regard, from the analysis of the appealed decision, it is evident that this proposal for the interpretation of the legal regime was rejected by the High Court. This Supreme Body, after having raised in a transversal way, the problem of compatibility between the sovereignty of the State and a duty to comply with a decision of that court, discussed what it considered the permissive element of harmonisation between them: the consent of the State. Focusing specifically on the issue of the supra-nationality of ECOWAS, which, based on practice, rejected decisions by the sub-regional court itself in the sense that the link to the 2005 Protocol stems from the signing of this instrument, and from national doctrine, it considered, made in light of the internal constitutional order, that, if Cape Verdean courts were to recognise this regional organisation as a supranational organisation, in the sense that its acts would automatically enter the internal legal sphere, without any act of mediation, the sovereignty of Republic would be reduced to ashes. Hence, it rejects the application of paragraph 3 under Article 12 in the specific case, the same happening with paragraph 2 under Article 210, once again considering that the key issue is whether or not the State of Cape Verde consented to the exercise jurisdiction by an international court, without which any treaty would be inapplicable and would pose a risk of unilateral expansion of competences by the regional bodies themselves, unacceptable to any State. In conclusion, it established a decisive understanding that even if Cape Verde were bound by these decisions, their non-compliance would only constitute a matter of international responsibility, not resulting from an obligation to comply with these decisions by the domestic courts.

Thus, at the limit, it can be considered that the reason that led the Supreme Court to refuse the application of the rules would impose, according to the Appellant, a duty of internal compliance with the decisions of the Court of Justice of the Economic Community of West African States based on the application of paragraph 3 under Article 12 of the Constitution and paragraph 2 under Article 210 is that, in their opinion, ECOWAS is not a supranational organisation, nor having Cape Verde consented through binding, the 2005 Protocol to its jurisdiction to receive complaints for violations of rights submitted by individuals. Such putative obligation would violate the principle of national sovereignty, therefore referring to a ground or motive of constitutionality.



C – Despite the existence of a synthetic and lateral pronouncement, the issue was never the object of a specific decision by this Court. Furthermore, by itself, it would not have the power to be classified as manifestly unfounded. Therefore, the only obstacle to their full knowledge of the merits would arise from being able to discuss the capacity of a decision of this Constitutional Court to have repercussions in the main proceedings. The reason for this has to do with the fact that the refusal to apply the hypothetical rules as constructed by the Appellant, whose application the Appellate Court refused to apply for reasons of unconstitutionality concerns the assessment that exclusively considered *Ruling 7/2020, dated 2nd of December of the TJ of ECOWAS Court of Justice,* relevant in the part that determined the suspension of the extradition process until the merits were assessed and decided, which happened later through *Ruling 07/2021, of 15 March*, of the same body, the regional court, which the Supreme Court of Justice did not consider on the appealed ruling. This creates a problem of usefulness of a possible decision of unconstitutionality that the Court may pronounce in the perspective of it being able to influence the appealed decision, namely by determining its reform in the sense of the Court's decision, because it is considering the Court, which, after all, that rule with the meaning that the judicial body under appeal, refused to apply for reasons of unconstitutionality, was not unconstitutional, means that it should be applied with that same meaning. However, what happens is that the act that was intended to be carried out through that rule, the decision of the ECOWAS Court of Justice dated 7th of December, was limited to imposing the adoption of certain provisional measures, namely placing the Applicant there under house arrest under supervision of the judicial authorities of the Respondent State, in order to guarantee him better conditions of accommodation and access to medical treatment and visits, compatible with his personal situation, at the expense of the plaintiff himself, and that he was not extradited until it was to deliver the decision on the merits.

At this moment, as is evident, the factual situation concerning the first question would be overcome, with only the measure of not being extradited until the decision on the merits is issued, which has already been rendered, determining that Regional Praetorium that the Appellant's detention will have been illegal and that his continued detention violates his right to personal freedom, resulting in the imposition of that court that the Appellant be released immediately and that all procedures and processes aimed at extraditing him to the USA be interrupted, in addition to arbitrating compensation.



It does not seem to this Court that the issue raised by the Public Prosecutor's Office that it would not be possible to scrutinise norms of International Public Law in specific inspection processes prevents the admission of this constitutional issue, since the impossibility of the Constitutional Court, in general, to scrutinise treaty norms is not general, precisely because from the moment these rules are incorporated into the domestic legal system, they are subject to scrutiny as rules are covered, in this particular case, by what is provided for under sub-section a) of the paragraph of Article 281 of the Constitution, which refers to the appropriateness of an Appeal to the Constitutional Court of decisions that refuse the application, based on unconstitutionality, of "any norm", not seeming to exclude those of international origin, even because if so, even incorporated treaty norms could not be unenforced by the courts if contrary to the Constitution, as they must do.

The question here is whether, in view of this subsequent development, the judicial body under appeal, could still reform its Ruling in the sense resulting from the Constitutional Court's decision, in such a way as to ensure some useful effect to the decision. Not without some hesitation the Court considers this requirement to be fulfilled, on the assumption that a possible Ruling of non-constitutionality of the aforementioned hypothetical rule that the Supreme Court of Justice has disapproved, as the formulation of its reasoning is so broad that it could also be applied to the final decision on the merits of the regional court, would allow the appealed body to still retain jurisdictional powers to complete its fulfilment in Cape Verde. In this sense, it will be scrutinised whether the rule constructed by the Applicant according to which *Articles 15, paragraph 4, and Articles 34, 89 and 90 of the Constitutive Treaty of ECOWAS and the Protocols Relating to the Court of Justice of ECOWAS of 1991 and of 2005, would determine compliance with the decision of the ECOWAS Court of Justice* is unconstitutional as the Supreme Court of Justice considered to refuse its application.

### 3.2.13. **Other allegations of rights violations**

Throughout the written documents he was submitting to the Court and at the oral hearing, the Appellant raised some issues of violation of rights, namely regarding the existence of a warrant in his name in the file, regarding the configuration of the requirement of double criminality, regarding possible extradition for political reasons and to the Supreme Court of Justice's follow-up of its own jurisprudence on safeguards in cases of crimes for which, under the law of the Requesting State, a life sentence corresponds.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REF: 7635166

A – In relation to the warrant contained in the extradition process and which both the Appellant and the Public Prosecutor's Office insisted on drawing the attention of the Constitutional Court to, its relevance in this type of process is, for all intents and purposes, nil:

Because no rule was built that refers to the unconstitutionality of a rule that has as its object the regulation of the existence or not of a court order in the records, the question posed is, at best, a question of fact that can refer to a conduct of the appealed judicial body, but which, without the attribution of a normative character and without having been specifically challenged through the rule constructed by the Appellant, cannot be scrutinised in a process of specific inspection of constitutionality.

Furthermore, in this regard, the Supreme Court of Justice took a specific position that presupposed the existence of a court order in the file, insofar as, in answering the Appellant's question, it very clearly considers pages 20 of its decision that it would have been the Appellant himself to say in his opposition document that, quoting verbatim, the U.S. District Court for the Southern District of Florida issued an arrest warrant against the extraditee, the person whose extradition is sought, on 25th June 2019 for crimes of money laundering, which it will have been taken up in the Appeal allegations and corroborated, according to his assessment, by documents that instructed the extradition request. Since this formulation does not have a normative nature, and may at most be classified as conduct, it would not be up to the Constitutional Court to assess it in terms of specific inspection of constitutionality.

B – With regard to the issue of configuring the requirement of double criminality, it is also an issue that the Constitutional Court cannot hear and examine in this type of proceeding, since:

The segment where the question is raised has to do with a rule that the Court can hear and examine as to whether the *process of passive extradition does not impose that the Ruling in the Appeal, as a court of first instance and not a court of appeal, is made in a hearing, but in consultation, as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge.*



CERTIFIED TRANSLATION LANGUAGE REACH
12/09/2021
REF: 7635166

On the one hand, the aspects that, according to the Appellant's strategy, would be dealt with in the hearing, public or not, which did not take place, could not be scrutinised in principle as autonomous unconstitutionalities, since they, in this case, would be merely dependent unconstitutionalities. That is even if at the time of the opposition's proceedings, it had already asked this question and several others that it addressed to the trial court and the court of appeal, because unless they fall within the scope of the application of the norm, as it was constructed to strictly assess their constitutionality, it cannot be scrutinised by the Court in this type of process.

The fact is that the norm, as it was constructed "above", at no time does it encompass any part of the appealed or contested Ruling that possibly discussed the issue of double criminality. On the other hand, it appears to be the Appellant's allegation that the Supreme Court of Justice drew conclusions without duly considering the effects of the regime of regulation of conflict of criminal laws in the area, admitted without contesting that the U.S. law would apply to all acts imputed to the Appellant, including those constituting the prior crime of money laundering, a conclusion that he considers false, resulting in a violation of the Penal Code and of paragraph 4 under Article 32 of the Constitution and incurring the Supreme Court of Justice when considering that the assumption of double criminality had remained in a miscarriage of justice being fulfilled, condemning an innocent person. The entire argument seems to refer more to the attributions of conducts harmful to the Appellant's rights, than to the application of an unconstitutional rule, which, for obvious reasons and already mentioned, they are not subject to challenge through this kind of constitutional Appeal.

C - In turn, the issue of extradition for political reasons, despite having been invoked throughout the documents, is not at any time reduced to an autonomous norm subject to being scrutinised or arising from the scope of protection of any norm whose application was attributed to the Supreme Court of Justice's challenged Ruling, otherwise let's see:



The question is posed in the Appeal's petition filed by the Appellant with the Supreme Court of Justice in Q-10, simply saying that, in the present case, extradition for political reasons and a masked extradition and from a decision-making excerpt from the Supreme Court of Justice that says that "the grounds for the extradition request does not deal with facts related to the political persecution of the Venezuelan government (…) they refer to the extraditee, the person whose extradition is sought, for facts related to the practice of money laundering crimes", this being, in the its interpretation, the Supreme Court's plea to remove the political motivation for the Appellant's extradition. In the improvement document in the segment dedicated to the same issue, the same argument is reproduced, not being able to infer any specific rule built by the Appellant for the purpose of specific inspection of constitutionality and which has been applied by the Supreme Court of Justice in this regard.

In the allegations document, the question moves to item 9 referred to as violation of the principle of specialty and extradition for political reasons, but in terms of its content, it is not possible to see any standard that has this object and that has been applied by the appealed judicial body. In the next item on life imprisonment, what is done is to outline the approach followed by the Supreme Court of Justice to assess the allegation that extradition for political reasons was involved, but the excerpts of the Ruling cited above, lead to mere conduct without any resulting in a statement with normative content.

The way in which the challenge is built, what appears to be attacking are conducts perpetrated by the Supreme Court of Justice in the exercise of its jurisdictional function and not a rule that it has applied. Therefore, they are always unaffected by scrutiny in a specific inspection appeal.

D - In the same sense, the allegation that the Supreme Court of Justice will have adopted a different position in other similar cases in relation to guarantees of non-execution of the life sentence given by the United States of America, since, once again, this, at best, would lead to a conduct and not a rule that could be scrutinised by the Constitutional Court.



CERTIFIED TRANSLATION
12/09/2021
REF: 7635166
LANGUAGE REACH

4. Thus, of the twelve items raised, the Constitutional Court considers admissible to scrutiny of constitutional non-compliance, eight of them, namely 2, the first part of 3, 4, 5, 6, both with the adjustments arising from the rule actually applied by the appealed judicial body, 8, the second part of 11 and 12. Therefore, as it seems more rational to the Court from the point of view of its logical sequence, it is preferable to order the scrutiny from the applied rules that focused on the arrest of the Appellant and his subjection to an extradition process, namely those identified by the Appellant with paragraphs 4, 5, 6, and 11, second segment; then, the way in which the decision to confirm the judicial authorisation for extradition with exemption from reciprocity was reached, 8; to then face those referring to the way the process was conducted, namely 2 and 3, first part; and, finally, the refusal to apply a decision of an ECOWAS judicial body potentially incident to the process, numbered by the Appellant as 12.

So ordered - based on the legal rule from which the Constitutional Court understood that the appealed judicial body inferred the normative interpretation applied and not those that the Appellant attributed to it, and considering the parameters that the Constitutional Court may use and the development made by the Appellant and its suitability for the resolution of the constitutional cause – in ways that allow ascertaining whether:

4.1. A hypothetical rule applied by the Supreme Court of Justice in the sense that *Recognition of special envoy status is only up to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status both by the sending State and by the State that was to receive him,* would be inconsistent with the Constitution, due to incompatibility with the principle of non-intervention/non-interference in the internal affairs of other States and with rules establishing the preferential application of International Law relating to inviolability and immunities of special envoys in Transit States in relation to ordinary law.

4.2. A hypothetical standard applied by the Supreme Court of Justice arising from (Article) 39 of the Law on International Judicial Cooperation in Criminal Matters, according to *which it is lawful for criminal police authorities to carry out, under the terms of the current procedural law,*



*the arrest and detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to that international organisation have not eventually been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal system, since the use that is made of the information received via this system, stems from a national law,* is not compliant with the Constitution due to incompatibility with the rule of reception of conventional international standards, with the rule that establishes the effects of non-publication of this type of act and with certain principles inherent to the Rule of Law.

4.3. A hypothetical rule applied by the Supreme Court of Justice arising from Article 39 of the Law of International Judicial Cooperation on Criminal Matters, according to which *a person can be detained for the purpose of extradition, without requiring that there be a warrant, as long as he is in possession of information officers who legitimise their arrest and detention*, is inconsistent with the Constitution for incompatibility with the right to bodily freedom, with the principle of legality of police measures and with the principle of proportionality of police measures.

4.4. A hypothetical rule applied by the Supreme Court of Justice arising from Articles 39 of the Law of International Judicial Cooperation on Criminal Matters and Article 269 of the Code of Criminal Procedure, according to which: *Information for a person's arrest and detention may come to the attention of the authorities by any means admitted by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunications, as follows from Article 269 of the CPP, followed by confirmation by a warrant,* is non-compliant with the Constitution due to incompatibility with the right to bodily freedom, with the principle of legality of police measures and with the principle of proportionality of police measures.

4.5. A hypothetical rule applied by the Supreme Court of Justice arising from the final segment under Article 6 paragraph 4, and Article 3 paragraph 3, of the Law of International Judicial Cooperation on Criminal Matters, according to which: *The reciprocity waiver is possible in any form of international judicial cooperation, including extradition,* is contrary to the Constitution for incompatibility with the principle of reciprocity of advantages inserted in paragraph 1 of its Article 11, the principle of assimilation of foreigners to nationals translated into paragraph 1 under Article 25 and the rule for the treatment of foreigners in transit provided for under Article 7 l).



4.6. A hypothetical rule applied by the Supreme Court of Justice arising from Article 55, second paragraph, and Article 46, third paragraph, last part, of the Law of International Judicial Cooperation on Criminal Matters, according to which: *The extraditee, the person whose extradition is sought, has the right to file opposition, but, even though there is a requirement for due diligence of testimonial evidence, it can only be based on the fact that he is not the person sought or that the assumptions of extradition are not met,* is inconsistent with the Constitution, due to incompatibility as the guarantee of effective defence in an extradition proceeding.

4.7. A hypothetical rule applied by the Supreme Court of Justice arising from Article 56, paragraph two, of the Law of International Judicial Cooperation on Criminal Matters, according to which: *The process of passive extradition does not impose that the Ruling in the Appeal, as a court of first instance and not a court of Appeal, whether made in a hearing, but in consultation, as the law does not determine, either directly or indirectly, that the extraditee, the person whose extradition is sought, be heard in a second hearing before the judge,* is not in conformity with the Constitution due to incompatibility with the guarantees defence and adversary proceedings arising from the principle of fair and equitable process and the principle of holding public hearings in courts.

4.8. A hypothetical rule arising from *Articles 15, paragraph 4, and Articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with the decision of the ECOWAS Court of Justice*, which the Supreme Court of Justice refused to apply, considering that for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and ratified, as Cape Verde has not signed the protocols that recognise the competence of the ECOWAS Court of Justice in terms of human rights and since it is not a supranational organisation for the purposes of paragraph 3 under Article 12 of the Constitution, does not comply with the Constitution for incompatibility with the principle of national sovereignty, of the constitutional rules on binding of the State of Cape Verde to treaties and the principle according to which the courts cannot be deprived of their jurisdiction.



CERTIFIED TRANSLATION

12/09/2021

LANGUAGE REACH

These will be the questions to be considered on the merits below, in terms of knowing whether:

**5. The hypothetical rule applied by the Supreme Court of Justice in the sense that *recognition of the status of special envoy is only up to the State of Cape Verde, without which Cape Verdean courts cannot recognise this status, allowing a Cape Verdean court to deny recognition of an extraditee, the person whose extradition is sought, as a special envoy, after recognition of his status both by the sending state and by the state that was to receive him*, is inconsistent with the Constitution, due to incompatibility with the principle of non-intervention / non-interference in internal affairs from other States and with rules that establish the preferential application of International Law relating to the inviolability and immunities of special envoys in Transit States in relation to ordinary law.**

5.1. Regarding the allegations, in the relevant part to analyse the admitted segment of the standard constructed by the Appellant,

5.1.1. The legal thesis put forward by him that the Supreme Court of Justice had to have recognised the inviolability and immunities of the Appellant is highlighted because he was recognised as a special envoy by the sending State and by the receiving State, insofar as the prior notification would be a purely formal condition and, in this case, Venezuela was not in a position to anticipate it given the unplanned and purely technical nature of the stopover in Cape Verde. Therefore, what would matter, in such a context, would be to know if this country was informed as soon as possible, a question that he claims should be answered positively. The other condition provided for by the applicable rule would not require that consent be expressed, another aspect that the Supreme Court, in its opinion, will have misinterpreted and unconstitutionally, since, in such cases, once informed what Cape Verde should do was to object, which he did not do, infringing Venezuela's rights. He adds that Cape Verde, having been notified, albeit belatedly, was responsible for expressing this objection through formal channels to Venezuela, which it did not do either. He concludes the point, summarising an important segment of his legal thesis saying that Cape Verde should be considered a transit State that having been notified of the passage through its territory of a special mission and not having objected,



it had an obligation, under international law, to respect the immunity and inviolability of the Applicant, and not subjecting him to arrest and detention and subjecting him to extradition proceedings. The State of Cape Verde still had the duty to try to diplomatically resolve the dispute and if it had opposed it, it should have acted differently, informing Venezuela of its disagreement or declaring the Appellant persona non grata, under penalty of generating the international responsibility of the State.

5.1.2. The Public Prosecutor's Office, for its part, centred its argument on considering that such recognition would not be up to the judicial power, but exclusively to the executive power, being a political act that cannot be considered by the courts. There would be no problem of separation of powers or any other, and the courts do not bind the State to international treaties or obligations, as this always depends on political will, having nothing to do with the exercise of jurisdiction, a power that is limited to applying the right resulting from these obligations assumed by other bodies. It concludes that it is an incorrectly posed question of constitutionality.

5.2. At least as far as the status of special envoy is concerned, the possibility of the Supreme having applied a rule that made its hearing and examining of a matter of jurisdictional immunities depend on a prior political assessment, in violation of the principle of the independence of the courts, had already been ruled out. Furthermore, he knew about the issue from the first moment it was put to him, developing an argument, anchored in paragraph 4 Article 42 of the 1969 New York Convention on Special Missions, to which he attributed an international customary character, in the sense that the Cape Verdeans courts can only recognise the inviolability and immunities deriving from a special envoy status when the latter has previously informed the State of Cape Verde as a State of Transit and the latter has not objected, and such recognition cannot be imposed by a mere unilateral act of the Sending State.

5.3. From the point of view of the scrutiny that this Court must promote to answer the question, two steps are necessary. First, to analyse whether there will be any discrepancy between the international standard applied by the Supreme Court of Justice to resolve the legal issue that was posed to it and the specific shape or form of the international standard that regulates this matter in Customary International Law, as the crux of interpretive divergence seems at this point to be rooted in the nature of the requirement of prior information,



to which the appealed body attributes a constitutive role of the Transit State's obligation to recognise inviolability and immunities from criminal jurisdiction to a special envoy, and which the Appellant understands to be a mere formality, since what would determine it would be information from the Sending Status as soon as possible of the status of the person involved in special mission. Second, to verify if there is a discrepancy between the rule, in this hypothetical case, as it does not exist in the international legal system, and the rule actually in force in this sphere and also under paragraph 1 under Article 12 of the Constitution in Cape Verdean law, it would be incompatible with the principle of non-interference provided for by paragraph 1 of Article 11 of the Constitution, with the principle of non-intervention provided for by the United Nations Charter and by General International Law, insofar as it does not recognise inviolability and immunities from criminal jurisdiction the person who enjoys them, the State of Cape Verde would be interfering in the relations between the Sending State and the Receiving State.

5.4. In relation to the first part of this development, it should be noted that the Supreme Court of Justice, while correctly and clearly emphasising Cape Verde's non-binding to the 1969 New York Convention on Special Missions (not on the list of States who are Parties, prepared by the Secretary-General of the United Nations: https://treaties.uNo.org/doc/Publication/MTDSG/Volume%20I/Chapter%20III/III-9.eNo.pdf , nor has it been incorporated into the Cape Verdean legal system under the terms of paragraph 2 under Article 12), considered its Article 42 (the treaty is published in the *United Nations Treaty Series*, v. 1400, 1985, p. 231 ff.), a standard of customary nature, applying its content to the specific situation, highlighting its two basic elements. In particular in the sense that a Transit State is bound by an obligation to recognise inviolability and immunities from criminal jurisdiction only if, first, it has been informed in advance of the State's representative's travel for the purpose of a special mission and, second, that this State has not objected. This thesis is opposed by the Appellant in the sense that it would suffice for the sending State, in the impossibility of doing so beforehand, given the urgency of the trip and for technical reasons of stopovers to supply fuel without permanence, to inform the transit State, even if after his arrival in the territory, his status as a special envoy and the mission he would carry out in another State, with its consent, so that he could enjoy this protection provided for under international law.



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

5.4.1. Under the standard of customary procedure formatted from practice by the International Law Commission through the *Draft Conclusions on Identification of Customary International Law With Commentaries*, Conclusion 11.1 a), it does not seem to be concluded that the customary origin of that standard is evident when the issue began to be discussed within the International Law Commission in the decade of the late fifties of the last century. Moreover, what seemed to preside over initiatives to also address the issue of special missions, initially within the framework of projects for the regulation of diplomatic relations conducted by Special Rapporteur Sändstrom (*Yearbook of the International Law Commission 1959*, New York, United Nations, 1960, v II, pp. 122-123), more than the codification of a pre-existing norm, it was essentially to proceed with the progressive development of this area of International Law. The consolidation of the parallel customary regulation stems from a practice concurrent with the process (*Draft Conclusions on Identification of Customary International Law With Commentaries*, Conclusion 11.1 b) and c), and resulting from the 1969 Convention itself, and not strictly speaking from a pre-existing legal system that has been considered (Michael Ryan, "The Status of Agents on Special Mission in Customary International Law," *Canadian Yearbook of International Law*, v. 16, 1978, passim, p. 160, p. 186), that in the limit, can be accepted as having been constituted in relation to several norms regulated by it. Without the Constitutional Court having to rule on the customary status of all the Convention's rules, an aspect still in dispute, prevailing, in any case, the understanding that not all of them have acquired such a nature (to this day it cannot be argued that so There is broad equivalence between the rules laid down for the 1969 Convention and the parallel customary regime applicable, as the persuasive analyses of Andrew Sanger & Michael Wood, "Immunities of Members of Special Missions" in: Tom Ruys; Nicolas Angelet tell us & Luca Ferro (eds.), *The Cambridge Handbook of Immunities and International Law*, Cambridge, UK, CU P, 2019, pp. 452-480, and Al M El-Haj, "Special Missions" in: *Max Planck Encyclopaedia of Public International Public Law*, Oxford, OUP, 2019, para. 15).

5.4.2. Although the transit of people who are part of special missions may be relatively common given the intensity of current international relations, the tests to



Transit State obligations are relatively rare because, generally, the practice takes place in a way little exposed to the public eye, only coming to the fore in cases where an incident is generated, an indication of this is the relative absence of mention of this specific issue in the main study and instrument for collecting practice in the field recently promoted by the Council of Europe and carried out by the eminent internationalists and experts in this field, Michael Wood and Andrew Sanger entitled *Immunities of Special Missions*, Leiden, Boston, Brill, 2019, Part III.

Certain States, in relation to the second requirement, maintain a stricter requirement for prior consent, therefore express, and not only a non-objection that would lead to a tacit consent, as were the recent cases of Germany that defended that "if there is explicit consent to transit, customary law imposes the granting of the necessary privileges for transit" ("Replies by States – Germany" in: Ibid., p. 236) and Ukraine which emphasised that "in cases of explicit consent to transit, customary law also imposes the granting the necessary privileges for transit" ("Reply by States – Ukraine" in: Ibid., 335), to which the classic position of the United Kingdom is added based on the proposed amendment made before the 6th Committee of the United Nations General Assembly in the framework of the 1969 Convention's discussion of replacing the requirement of tacit consent resulting from the expression "has not raised any objection to it" by the requirement of explicit consent. this represented by an expression "have consented to it," which despite being defeated received thirty of the eighty-four votes of the States present and was rejected by thirty States, with the remaining twenty abstaining (v. *Draft Convention of Special Missions: Report of the 6th Committee*, Twenty-Four Session, Agenda Item 87, Rapporteur: Piet-Hein Huben, United Nations General Assembly, A/7799, 28 November 1969, para. 128-129), helping to explain the later reservations placed on it by some leading analysts by a "great number of States" (Nguyen Quoc Dihn; Patrick Daillier & Alain Pellet, *Droit International Public*, 7th ed., Paris, LGDJ , 2002, p. 748).

In turn, the practice arising from cases processed in domestic courts has also not allowed to verify, with any consistency, the conditions of obligation to recognise jurisdiction immunities by Transit States, as most of the cases known in that a duty of recognition of immunities has been affirmed are situations that exclusively involve Sending States



and Receiving States in which there is an official act accepting the special mission, the Tabatabai decisions being inscribed in this register (reproduced in English by the *International Law Reports [ILR],* v. 80, 1989, pp. 388-424, with the German originals of the decision of the Regional Court of Dusseldorf and the Federal Court of Justice available, respectively, in *Juristen Seitung*, v. 38, No. 15-16, 1983, pp. 625-629, and at https://research.wolterskluwer-online.de/document/1d1f4b19-8054-4459-b8cc-2d91b21f9bb2 ) of German courts, and the decisions of the English courts in *Regina (Freedom and Justice Party and Others) v. Secretary of State for Foreign and Commonwealth Affairs and Others,* England, Court of Appeals (Civil Division), 19 July 2018 (Arden, Sales and Irwin LJJ) reproduced in ILR, vol. 182, 2019, pp. 658-707), thus consolidating and densifying the ground of understanding already adopted by Judge Pratt in *Re Mofaz*, England, Bow Street Magistrates Court, 12 February 2004 reproduced in ILR, v. 128, 2006, pp. 709-712 and by Judge Workman in *Re Bo Xilai*, England, Bow Street Magistrates Court, 8th November 2005 reproduced in *ILR*, vol. 128, 2006, pp. 713-715, and, also despite having denied consent to visit as a special mission in the case, in *Khurts Bat v. Investigating Judge*, England, Queen's Bench Divisional Court (Moses LJ and Foskett J) reproduced in *ILR*, vol. 147, 2012, pp. 633-388.

And of some U.S. courts, within the framework of their very own system of recognition of diplomatic immunities, marked by their domestic legislation, their precedents and a tradition of court deference to the State Department's suggestions for immunities. That's what happened in *U.S.v. Sissoko* dated 3rd of September 1997, decided by the US District Court for the Southern District of Florida, available on the worldwide web page https://law.justia.com/cases/federal/district-courts/FSupp/995/1469 /1599122/ ), in which it was considered with unpersuasive reasoning in this segment, apparently establishing a relationship between what he understood to be the non-customary nature of the 1969 Convention, the fact that the United States and Gambia – the defendant's country of nationality – are not "signatories to the Convention" and the fact that no member of the Security Council is either. But, relevant even considering that the fact that the U.S. Embassy issued a diplomatic visa in his name did not mean the recognition of "full diplomatic immunities", which would depend on a State Department certification, which did not happen, unlike what has been shown in other cases in which these immunities were recognised for having occurred



confirmation, as in *Kilroy v. Windsor* (unpublished), *Weifun v. Xilai*, 1st October 2008, decided by the District Court for the District of Columbia (available in full on the worldwide web page https://www.leagle.com/decision/2008603568ffsupp2d351598) and *Abdelaziz v. Metropolitan Dade County*, decided on 18th September 1984, by the 11th Circuit of the United States Federal Court of Appeals (available at https://www.casemine.com/judgement/us/59148effadd7b0493455deb0).

However, these are cases that refer to a situation that does not involve a Third Party State and where the Receiving State recognises the special mission. With regard to the obligations of the Transit State and the conditions for exercising inviolability and immunities, the Constitutional Court has found very few cases of specific interest. One of them is *Regina v. the Governor of Pentonville Prison, Ex Parte Teja*, England, Queen's Bench Divisional Court, 19th January 1971 (Lord Parker C.J., Cairns L.J. and Melford Stevenson J.) reproduced in *ILR*, v. 52, 1979, pp. 368-381, in which it was considered that a person detained at Heathrow Airport and subject to extradition at the request of the Indian Union and who was carrying letters of credentials and a diplomatic passport to carry out official travel to various European countries on behalf of the Government of Costa Rica, would not enjoy them because, as has been said literally, the invocation of immunities as a diplomatic agent depends on the person having been somehow accepted or received by the country (pp. 372-373), which, at least, denotes that, in the understanding of this British Curia, the inviolability and immunities of such persons in States of Transit depend on some type of consent also of that State, the obligation not being imposed through a unilateral act of the Sending State, even if agreed with the Receiving State; the other is the Düsseldorf Provincial Court's own Ruling of 10th March 1983 in the *Tabatabai* case (available in English in: *ILR*, v. 80, 1989, pp. 403-411 and in full version in Juristen Seitung, v. 38 , No. 15-16, 1983, pp. 625-629), insofar as it was discussed in part, briefly and generically, as a possible case of transit, but, according to the account given, this possibility was discarded because it did not meet the necessary requirements for the recognition of immunities in such situations; and, finally, last of all, the case called *Syrian National Immunity* would have some relevance, as the Supreme Court of Austria will have set down under Articles a triangular hearing and examining perspective (Sending State, Receiving Entity and Transit State) of a special mission



CERTIFIED TRANSLATION
12/09/2021
REF 7635166
LANGUAGE REACH

to trigger inviolability and immunities. However, in an application context that involved not a receiving State, but an international organisation, leading to the application of a headquarters agreement with a State, which only by analogy could be considered as a Transit State, therefore not fully applicable to the present situation at hand (see Syrian National Immunity Case, Austria v. S, Annulment Decision, 12 OS 3/98, *International Law in Domestic Courts [ILDC]* (AT 1998), 127 ILR 88, 12th February 1998, Austria, Supreme Court of Justice).

5.4.3. This Court welcomes the idea that the majority of the member States of the International Community accept that the State of Transit is subject to a customary obligation, also represented by paragraph 4 under Article 42 of the New York Convention, of recognition of the inviolability and immunities of jurisdiction of a person who has been sent by a State to another that consents to deal with official affairs of that entity, if, cumulatively, a) it has been informed in advance and in an official manner, hence the reference to the convention on request for a visa or notification, of the transit of the person as a member of a special mission, and, thereafter, b) it has not objected to that transit.

5.5. It is the understanding of this Constitutional Court that these conclusions necessarily result from the development of international regulation in this area.

5.5.1. Deriving from the very general philosophy that the International Law Commission had to confront when it developed the regime from which these standards. If one pays attention to the general logic of the regime that begins, as far as it was possible to ascertain, to be discussed from the assumption of the Special Rapporteur by Professor Bartos and the adoption of a new perspective of approach (see the minutes of the 712th Meeting, held on 2nd of July 1963, reproduced in *Yearbook of the International Law Commission 1963*, New York, United Nations, 1964, pp. 261-267), it is framed in a philosophy of conciliation between the need for recognition of these inviolability and immunities by Transit States for to facilitate diplomatic relations between the Members of the International Community and the concern expressed by many to avoid creating excessive burdens for these States, summarised by Professor Ago's idea of finding a model that would harmonise States' reservations about a treatment equal to special missions in relation to permanent representations and the guarantee of a

