minimum of privileges and immunities to perform their duties (Proceedings of the 724th Meeting, held May 14, 1964 reproduced in *Yearbook of the International Law Commission 1964*, New York, United Nations, 1964, v. I, pp. 9-15).

In this sense, although bringing together several regulatory perspectives on the issue, the evolution of the debate demonstrates that the demand for advance information about the special mission is constant and unquestioned throughout the process, with only debates on the need to inform the State of Transit not only of the mission but also of its purpose, which was in the first version of the project, but which later fell on the requirement of no objection, a solution that remained, and some discussion promoted by the United Kingdom regarding the form of consent, which was defeated, albeit by a slight margin, already in the Sixth Committee of the General Assembly, as previously stated.

Special Rapporteur Bartos, in particular, remained firm in relation to the model he designed in the sense that it would be necessary to have advance information, through a visa application or notification of people as members of special missions, triggering inviolability and immunities if the State did not object, which made it known several times whenever any of the elements of this arrangement were discussed, recalling, at the meeting of 23 June 1965, that the essential point of mentioning the visa and the notification would be to ensure that the State was informed in advance (*Yearbook of the International Law Commission 1965*, New York, United Nations, 1966, v. I, p. 236), emphasising at the meeting on 7 July of the same year that this would be precisely the specificity of this regime in relation to the contained in the Vienna Convention (Ibid., p. 304). In 1966, through the Third Report (published in the *Yearbook of the International Law Commission 1966,* New York, United Nations, 1967, v. II, pp. 125-166), responding to Belgium's suggestion, it positioned itself in the sense that it would not be enough to apply for a visa, the reason for being a special mission in transit had to be made clear, and in relation to one from Israel it reiterated that information about the transit depended on doing so either by official notification or through a visa application (pp. 149-150). The Fourth Report presented by the Special Rapporteur took a stand against the suppression of the classification of the forms of communication of information provided for in the Article and in favour of inserting the expression "in the visa application" instead of "by the visa application" so that it would be clear that what was intended was that the visa application should state that it was due to a


12/09/2021
100

transit need of the special mission (*Yearbook of the International Law Commission 1967*, New York, United Nations, 1968, v. II, p. 102). At the Session of the International Law Commission No. 931, on 3 June, Rapporteur Bartos reiterated that the difference between Article 39 of the Draft and Article 40 of the Vienna Convention lay exclusively in paragraph 4, since it was necessary to specify the forms how the Transit State could be informed in advance and ensured that it would have the opportunity to object to the transit (*Yearbook of the International Law Commission 1967*, New York, United Nations, 1968, v. I, pp. 198-199).

In spite of these opinions, the Report presented by the body in 1967, together with the appendix with the Draft Convention which, keeping paragraph 4 of the now renumbered Article 43 concerning transit through Third State territory, commented on the provision reiterating that paragraphs 1, 2, 3 and 5 derived from Article 40 of the Vienna Convention, but paragraph 4 did not. In the view of the International Law Commission, the rule in question conditions the existence of obligations of Third Party States in relation to persons in transit, first, that the Third State has been informed in advance of the transit; second, that it did not raise any objection, adding that by including such a reference it was intended to show that the State of Transit was not subject to any obligation to permit the transit of special missions and their members through its territory (*Yearbook of the International Law Commission 1967*, New York, United Nations, 1968, v. II, p. 365).

5.5.2. The contemporary specialized doctrine that dealt with the issue was not very prodigal in commenting on this legal provision in particular, but even so, for what interests us, it emphasized the assumption inherent in the enjoyment of inviolability and immunities before the third State to the advance information made available in useful time. Thus, the aforementioned Professor MR Donnarumma ("La Convention sur les missions spéciales (8 December 1969)", Revue belge de droit international, No 8, 1972, pp. 34-79"), who points out that the regime subjects, as she says , legitimately, the obligations of Third States to have prior information and no objection and says that the advance information mentioned by number 4 of the 1969 Convention is that provided in good time (pp. 70-71), the same happening, in the Portuguese-speaking sphere , with Professor CD de Albuquerque Mello, Public International Law Course, 11th ed., Rio de Janeiro, 1997, v. II, p. 1218, in the sense that the protection afforded by this provision would be



conditional upon prior notification. The most recent commentators, in addition to not straying from this requirement of prior information, seem to be slipping into the traditional British position of the requirement of consent, although it is not made explicit whether it should be "expressed", as follows from the analysis of two of the most recognized world experts in the field, Andrew Sanger & Michael Wood, "Immunities of Members of Special Missions", op. cit., pp. 452-480, who continue to talk about the conditions of advance information, by means of a visa application or notification, but also in the State giving its consent ("has given its consent"), the same happens with the interpretation presented by Elizabeth Helen Franey, *Immunity, Individuals and International Law. Which Individuals are Immune from the Jurisdiction of National Courts under International Law?*, PhD Thesis, London, Department of Law-LSE, 2009, p. 118, and Nadia Kalb, "Immunities, Special Mission" in: *Max Planck Encyclopaedia of Public International Law*, Oxford, OUP, 2011, para. 8).

5.6. Therefore, this development is illustrative that the prior information that must be addressed to the Transit State for travel to its representative territory is the essential element on which its obligation to recognize the inviolability and immunities of criminal jurisdiction depends. A solution whose reasons are equally evident, as there is no customary rule that obliges a transit State to accept the transit of a special mission directed to another State in its territory, which is perfectly natural, considering that this presence may interfere with its own interests, namely those concerning its relations with other States, it should at least have the opportunity to oppose it. To this end, it must be informed in due time, through its bodies that conduct its foreign policy, about this displacement, in particular so that it can take a position on the matter, with a view to consenting, expressly or implicitly, or refusing it.

5.6.3. When informed in good time and in an official manner of the transit movement of a member of a special mission, the Transit State may object, expressly admit it or remain silent. Choosing one of the last two conducts, under the principle of good faith, there emerges an obligation to guarantee the inviolability and immunities that are necessary for its transit during the period indispensable for this purpose. Thus, if it is possible that someone who moves from one country to another with which he has agreed a special mission can invoke the status of envoy holder of special immunity before that State, it



will only be able to do so in respect of the Transit State if it has previously informed the competent authorities - that is to say those overseeing the State's external relations - of this transit, has sent the necessary information on the nature of the mission and the State has not objected to this, configuring in this case implicit consent. If you do otherwise, in relation to that person, no matter how much such status is recognized by a State of Sending and by a State of Receiving, there is no obligation on the State of Transit to recognize inviolability and immunities of jurisdiction. criminal, being dependent on there being a will and internal legal scope to extend them for reasons of international courtesy, but no longer due to the existence of a legal duty. It does not seem that the alleged unplanned nature of the displacement and the fact that it was made on a purely technical scale constituted exceptions to this rule under current international law.

5.6.4. Therefore, this Court cannot recognize in a norm according to which Cape Verdean courts may deny recognition to an extradited person as a special envoy after the recognition of that status by a Sending State and by a Receiving State does not comply with the international norm, conventional or customary, which binds the State of Cape Verde, an indirect constitutional non-conformity with the rule that establishes the preferential application of International Law over infra-constitutional domestic law, precisely because the international norm that was applied by the Supreme Court of Justice was not a hypothetical norm constructed by it, but exactly the customary norm that regulates the obligation of recognition of inviolability and immunities from criminal jurisdiction of persons on special missions by Transit States in the precise terms deriving from international law.

5.7. If the non-compliance of the rule applied by the *a quo* judicial body with these rules that regulate the immunities of special envoys in Transit States with the use of consistent reasoning since it was confronted with the issue, it seems very difficult for any non-compliance, either with international norms that enshrine the principle of non-intervention, or with the constitutional norm that recognizes the principle of non-interference in internal affairs.



12/09/2021

103

This is an important principle of International Law arising from the principle of sovereignty recognized by number 1 of article 2 of the United Nations Charter and by Customary International Law. Although the scope of this concept seems to diminish each time due to the internationalization of several issues that refer to traditionally internal domains in the light of the Westphalian system, namely those relating to human rights and the political regime, and by the practice of States, it translates into a prohibition of States to meddle in matters that are considered at each historical moment as part of the reserved domain of their counterparts, a concept that should also feed the constitutional principle of non-interference in the internal affairs of other States.

In the specific case, it is evident that Cape Verde in no way intruded into Venezuela's internal affairs, and it is not known that it has commented on its regime or on the internal divergences between political actors, so that the only dimension that could theoretically be at issue in the present situation would be an interference in their diplomatic relations, which are in themselves already internationalized.

5.7.1. As the hypothetical rule is limited to condition the recognition of inviolability and jurisdiction immunities in the territory of Cape Verde to a person in transit who would integrate a special mission sent by one country to another without having been sent to the State of Cape Green an advance information from which, in the absence of objection, would result an implicit consent to transit and the consequent duty to recognize inviolability and immunities, the fact is that there is no obvious incompatibility with these principles.

Firstly, because the person concerned in such a circumstance will be in the territory of Cape Verde without being informed in advance. In such a context, the relationship that would normally be processed between two countries, without Cape Verde being able to interfere with it outside of the current international understanding on non-intervention and constitutional on non-interference, imposes itself on the State of Cape Verde, against their will. This insofar as it connects its territory without its consent, even if implicit, associating the country with a relationship that may be indifferent to it or that may even interfere with the relationships it maintains        with        other        counterparts,        namely        when        people



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

who make these missions are sought by them, and without them being able to oppose this, thereby avoiding its materialisation. Therefore, the transit country is placed, against its will and without having the opportunity to take a position, as a participant in a relationship in which it is not involved between other States at the initiative of at least one of them.

5.7.2. In this sense, within the limits in which it is processed and connected to its territory, such a rule that conditions the recognition of inviolability and immunities of a person who is part of a special mission sent by a Sending State to another State that consents to it in Cape Verde to advance information, through visa or notification, insofar as this State does not object, does not violate the international legal principle of non-intervention or the constitutional principle of non-interference, and no unconstitutionality can be declared in this regard.

5.8. From the foregoing, it does not seem to this Constitutional Court that the rule applied by the Supreme Court of Justice according to which *the recognition of special envoy status only belongs to the State of Cape Verde, without which Cape Verdean courts cannot recognize this quality, allowing a Cape Verdean court to deny recognition of an extradited person as a special envoy, after recognition of his or her status both by the sending State and by the receiving State*, is not compliant with the Constitution due to incompatibility with the principle of non-intervention/non-interference in the internal affairs of other States and with rules that establish the preferential application of International Law relating to the inviolability and immunities of special envoys in Transit States in relation to ordinary law.

**6. Hypothetical rule arising from 39 of the Law on International Judicial Cooperation in Criminal Matters, according to which** *It is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to this international organization have not possibly been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal order, as the use made of the information received through this system results from a national law*, **is not compliant with the Constitution due to incompatibility with the law on reception**

12/09/2021

107

**of international conventional norms, with the rule that establishes the effects of non-publication of this type of act and with certain principles inherent to the rule of law.**

6.1. In relation to the legal claims and theses regarding the issues of unconstitutionality of this rule:

6.1.1. The appellant considers, at a point in which he explains his fundamental thesis, that the Republic of Cape Verde could not integrate, invoke or apply in its legal system, through an internal law or other legislative instrument, acts or constitutive instruments of an international body (or instrument of international cooperation), even if it were in simplified form without its reception respecting the organic and formal presuppositions provided for in a higher legal norm for violating several fundamental principles inherent to the principle of the rule of law and that, in addition, INTERPOL's Constitution and other cited texts are treaties that address the issue of ratification, a matter of domestic law regulated among others by paragraph 2 of article 12 of the Constitution. Furthermore, he considers that the country is part of the organization, but the text of INTERPOL would require approval by the National Assembly, despite being, in his opinion, an agreement in a simplified form. However, it was not published, despite the constitutional legal regime in force at the time so requiring it, which would determine its ineffectiveness, the same happening with its approval by that same sovereign body.

Without this, the Judiciary Police could not rely on INTERPOL's precepts, norms, segments or philosophy to detain a person or perform any procedural act that results in the restriction of a person's right to freedom and security because the instruments of that organization do not have legal effectiveness in the Cape Verdean legal system, not least because the unconstitutionality of this instrument was never declared by the Constitutional Court and was never confirmed by the Government and the signature is not sufficient to subject the State to all obligations arising from a treaty.

6.1.2. The Public Prosecutor's Office says that this is an irrelevant rule for the decision of the case, as the contested provision, Article 39, provides that it is the criminal police and not the INTERPOL National Office that can make an arrest.



12/09/2021

Therefore, irrespective of membership in that organization, the national criminal police can detain under that provision, as was effectively the case in this case. Thus, there would be no violation of any provision or constitutional principle as the Public Ministry, as it asserts, had been saying and, apparently, would result from an opinion that it put together.

6.2. The Supreme Court of Justice applied the described rule but did not expressly rule on its compatibility with the Constitution, because, until then, the question was more to know whether rules of the legal regime of INTERPOL could be applied in the order Cape Verdean legal.

6.3. Article 39, under the heading of detention not directly requested, provides that it is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities for the purposes of proceeding or serving a sentence for facts that notoriously justify extradition. Here, the rule challenged by the appellant is not fully identical to the rule itself resulting from this legal provision, insofar as it is complemented by a hypothetical segment resulting from a normative interpretation according to which it would not be relevant that the acts referring to this organization have not been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal order, as the use that is made of information received via this system, stems from a national law, is non-compliant with the Constitution due to incompatibility with the rule of receipt of conventional international norms and with the rule that establishes the effects of its non-publication. It seems to us that this is the nodal part of the norm that is challenged by the appellant based on the argument that it would not be constitutionally in accordance with a deontic statement, even if hypothetical, to enable national authorities to use information resulting from the police and criminal communication system of an international organization whose acts have not been ratified by the Republic of Cape Verde or published in the Cape Verdean legal system for the purpose of detaining a person.

6.4. Naturally, the norm under consideration is not one according to which a norm of a treaty not ratified by the State and published in the official journal of the Republic can be applied, namely because, as is clear from the considerations made by all, it is a



question whose interest here is limited, because it is evident that in accordance with what if applied, it was not this one, but rather a result of article 39 in the sense that, independently of Cape Verde having ratified the Constitution of INTERPOL and other instruments of this organization, national authorities could use official information transmitted through the communication system from the organization to respect persons who are being sought by foreign competent authorities for the purpose of detecting because this serious permits for an internal her. This is because, on the interesting understanding exposed by the appellant, this would generate an incompatibility with the rule of reception of conventional international standards, namely inserted in article 12, second paragraph of the Constitution and with the rule that establishes the effects of its non-publication in the official newspaper, paragraph c) of number 1 of article 269, and with principles inherent to the rule of law. It is so important to discuss in this resource in light of the parameters indicated, first evaluating possible direct non-conformity with paragraph 2 of article 12 and subparagraph c) of paragraph 1 of article 269 of the Constitution, and, second, with principles of the rule of law that are listed by Appellant.

6.5. Before dealing with these two dimensions of the problem raised in relation to the organization in question, it is important to remember that:

6.5.1. INTERPOL, as is known, is an organization whose nature has always generated some doctrinal controversy. However, currently it seems to be peaceful that, despite its particularities, the States that are part of it recognize its nature as an intergovernmental organization of a technical nature, and the fact that it was renamed in 1956, through the new Constitution, is not unimportant. with the current name of "International Organization" and not "International Commission." And of having been recognized as such by international legal acts that it signed with States, namely the headquarters agreement with the French Republic (published in the Journal Officiel de la Republique Française, of September 9, 2009, available at https://www.legifrance.gouv.fr/download/pdf?id=wPK_3Z36qKi471bVif9E56X6RWgPfNc5ur aO64WTc6E=) and through acts of domestic law such as Executive Order 12425 of June 16, 1983, signed to recognize the character of an international organization to INTERPOL for usufruct purposes of immunities in the United States of America (available on the web page where some         documents        of        the        administrations        of        the        United



States of America, namely Reagan which adopted its original version: https://www.presidency.ucsb.edu/documents/executive-order12425-international-criminal-police-organizations). The State of Cape Verde itself recognized this when it signed an agreement with it which, moreover, in the preambular part contains the expression "recognizing that INTERPOL is an intergovernmental organization" (Agreement between the Government of the Republic of Cape Verde and the International Organization of Criminal Police (INTERPOL) Concerning the Implementation of the West African Information System in Cape Verde" of April 14, 2020, approved by Resolution No. 179/IX/2020, of 4 November, published in the Official Gazette, Series I, No. 133, of November 24, 2020, pp. 2954-1958).

6.5.2. However, it is an international entity that, due to its course, has its particularities, namely the fact that it was not created by an international treaty, but through an act approved by its General Assembly, with its structure in that instrument, the Constitution, which does not provide for any form of expression of consent and subsequent entry into force, which is fixed by a date determined by article 50.

6.5.3. This, however, does not result in any insurmountable problem for its Member States because the organization's main mission is to promote mutual assistance between States, "within the limits of their right" (Article 2, paragraph 1Q) and to "establish and develop all institutions that can effectively contribute to the prevention and suppression of common crimes" (Article 2, paragraph 2), in practice leading to an intervention based on the facilitation and intermediation of cooperation between States through mechanisms of processing, storage and dissemination of data, especially through its wanted persons alert system, which is materialized through the connection resulting from the I-24/7 communication system established between the General Secretariat and the National Central Offices and between them, aimed at facilitating the communication between the national police authorities of all its members.

6.5.4. In this sense, the domestication of INTERPOL's Constitution is not imperative, namely because most of the norms are intended to proceed with the structuring of the organization, and the few that refer to some commitment of the State, namely those



arising from article 9, on the duty of the members to do what is within their power, insofar as they are compatible with their obligations, to carry out the decisions of the General Assembly, and those arising from articles 31 to 33 on the National Central Offices, in addition to refer to domestic legislation, depend on typical acts of domestic law to materialize, such as the creation of these structures and the definition of their powers, as follows from the current article 38 (former article 31) of the Organic Law of the Judiciary Police, resulting from the changes made by Legislative Decree 4/2020, of July 2, published in the *Official Gazette*, Series I, No. 76, of July 2, pp. 1542-1533 which made the first amendment to the Organic Law of the Judiciary Police (Legislative Decree 1/2008, of 18 August).

6.5.5. It remains incumbent upon Member State to verify whether, for the purposes of complying with the international obligations it assumes within the framework of an intergovernmental organization, it is or is not necessary to adopt procedures to ensure its applicability in the domestic legal order, which will always depend on whether these norms are intended. directly and without any legislative intermediation to produce domestic legal effects. Even a country like Cape Verde that adopts a monist conception of the relations between the international order and the internal order and, as such, embraces formulas for receiving International Law in the legal system of this Republic, from an international point of view what it has to guarantee is that obligations imposed conventionally are capable of being fulfilled. If necessary, promoting the necessary acts to allow for the incorporation of the standard, namely its publication; if necessary, adopting domestic legislation that guarantees its execution in the national legal order, being certain that there will always be certain treaties or rules of treaties that do not project on the internal legal order of the States. In relation to these, as their compliance depends exclusively on conducts at the international level, their publication and domestic execution are completely innocuous.

6.6. Thus, in relation to possible non-conformities of the contested rule with the first group of articles alluding to the incorporation of conventional international acts in the Cape Verdean legal system, it is the understanding of the Constitutional Court that:



6.6.1. As part of the same constitutional regime for the adoption of applicable laws, they can be analysed together, insofar as article 12, second paragraph of the Constitution, establishes the regime for the incorporation of conventional norms into the Cape Verdean legal system, accepting a conditional reception model. Referring, under the terms that this Court had been accepting and developing, namely of the *Ruling 01/2017, of January 12, referring to the constitutionality of article 13 of the Ecological Tax Law, which establishes the Regime for the Management, Consignment and Use of Collected Revenue*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, No. 10, 27 of February 2017, pp. 218-260, 4.4.1; of *Judgment 06/2018, of March 22, Adilson Danielson Barbosa v. STJ, on the violation of the right not to be discriminated against, to freedom of the body and the presumption of innocence*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, N° 21, of 11 April 2018, pp. 495-505, 5.1.1, and of *Ruling 30/2019, of 30 de August (AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights of defence, the adversary system and access to the evidence of the prosecution)*, Rapporteur: JC Pina Delgado, 6.5.1, to the need for a treaty, first, to bind the State of Cape Verde in the international order; second, that this binding has been regular, both from the point of view of International Law, therefore without any defect in the expression of consent, and of Constitutional Law, made by the competent entities and in accordance with the procedures provided for by the Fundamental Law; third, of having entered into force in the international order; and, finally, fourth, of having been published in the official journal of the Republic, the Official Gazette, thus providing for article 269, paragraph 1, paragraph c), that if publication does not occur, the treaty would be ineffective and cannot, as rule, be applied as arising from the *Judgment 01/2017, of January 12, referring to the constitutionality of article 13 of the Ecological Tax Law, which establishes the Regime for the Management, Consignment and Use of Collected Revenue*, Rapporteur: JC Pina Delgado, 2.4.2, and of *Judgment 06/2018, of March 22, Adilson Danielson Barbosa v. STJ, on the violation of the right not to be discriminated against, to freedom over the body and the presumption of innocence*, Rapporteur: JC Pina Delgado, 5.1.1. For its part, article 14 establishes a different regime for what is constitutionally designated as an agreement in simplified form, a kind of executive treaty in the light of international conventional practice, which, as such, is exclusively incumbent upon the body exercising executive powers to celebrate without the need for parliamentary authorization or presidential ratification, with no need for publication, however, with the limitation of only being



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
0307835166

able to deal with matters included in its administrative competence, and cannot bind outside this scope, as it had already been enshrined in the *Judgment No. 1/2017, of January 12, successive abstract inspection of the constitutionality of article 13 of the Ecological Tax Law, which establishes the Regime for the Management, Consignment and Destination of Collected Revenue*, Rapporteur: JC Pina Delgado, 4.4.1.

6.6.2. Insofar as the rule that was applied by the Supreme Court of Justice and that was challenged by the appellant, it moved away from any direct application in the domestic legal order of an international rule that is part of INTERPOL's legal regime, the promotion of an autonomous discussion on its reception in the Cape Verdean legal system would be innocuous, making no sense, at this time, the abstract questioning of any formal and/or organic unconstitutionality of Cape Verde's adhesion to this organization under the 1980 Constitution, insofar as which took place on November 27, 1989, therefore, before the current Constitution of 1992 came into effect, which establishes a stricter regime of international binding that this Court must control in relation to those promoted after that moment. On the other hand, although these legal instruments have not been incorporated, this becomes irrelevant, because no international standard is being received in the domestic legal system, either as an international treaty or agreement in light of paragraph 2 of article 12, or as an agreement in simplified form in the light of article 14 of the Constitution, based on any reflection that could be made on the nature of a treaty, international agreement or agreement in simplified form of the INTERPOL Constitution.

6.6.3. Therefore, in relation to these constitutional norms, a situation of constitutional non-compliance is not generated.

6.7. If the problem of the law effectively applied by the decision placed in crisis has to do with a constitutional doubt based on knowing whether an internal rule can refer to the use of official information transmitted through a communication mechanism of an organization of which the State is part , but whose legal instruments are not published in the official gazette of the Republic, only the investigation of constitutional non-compliance with the aforementioned principle of hierarchy of sources, the principle of competence, the principle of typicality of laws, the principle of legality of administration and the principle



that the appellant considers the key to the binding of the legislator in respect of the normative production, would still be able to lead to the determination of unconstitutionality. This is in the sense that such guidelines would establish a limitation directed at the legislative power to, through law, authorize the use of official information from INTERPOL as a legal basis for detaining a person, insofar as the legal acts of that organization would not have been ratified and published.

6.7.1. The norm itself, as can be seen, refers not only to official information transmitted by or through INTERPOL, but also from any external entity, as long as it is official. In this sense, they would not only cover this international organization of police cooperation, but any other entity in the international sphere, namely other States. In this sense, it would always be possible for the official information to come from a similar entity directly and not from the international one referred to by the precept. This alone suggests the difficulty of accepting the allegation of unconstitutionality specifically regarding INTERPOL because if the State of Cape Verde can cooperate with other States without any mediation on the part of this organization, it would be difficult to see the concrete problem of INTERPOL, not least because the other States would also have no logical way of incorporating their domestic legal instruments. Therefore, the fundamental problem would refer, in practice, to a material unconstitutionality of any rule that provided for the possibility of using official information from an external entity for the purposes provided for by the rule.

6.7.2. But, even if this is the consequence, it does not seem to us that it generates any disagreement with the listed principles. The norm in question was sovereignly approved by a Law of the Parliament of which it forms part, in the use of powers attributed to that constitutional body; was promulgated by the President of the Republic; and was published in the official newspaper of the Republic. Therefore, through a normative act provided for by the Constitution, by the constitutionally qualified body and through the procedures imposed by the Fundamental Law to ensure its validity and effectiveness. It came to occupy the normal position for this type of internal legal act within the national legal system, in accordance with the hierarchical position provided, at no time becoming an international norm, with the purpose of being applied by a criminal police agency under its terms . Therefore, it is not possible to see, in a basic sense, any non-conformity with the rules regarding the hierarchy



CERTIFIED TRANSLATION LANGUAGE REACH
12/09/2021
115

of sources, with the principle of competence, with the principle of typicality of laws or with the principle of legality of administration.

6.7.3. Therefore, the only viable basis would be to consider that the principle that the appellant builds that there would be a link between the legislator and the normative production would inhibit him from approving a norm that refers to a mechanism for dissemination and communication of information instituted and operated by an international organization whose constitutive instrument has not been incorporated. However, this possibility does not seem to be confirmed for this Constitutional Court. As has been mentioned several times, namely in the *leading Judgement 24/2016, of 20 October, Concerning the Revocatory Rule of the Law for the Approval of the Statute of the Public Prosecutor's Office in the part in which it has the effect of Recognizing the Possibility of Ascension to the Top of the Career of Public Prosecutors who have performed functions as Attorney General and Deputy Attorneys General*, Rapporteur: JC Pina Delgado, published in the *Official gazette*, I Series, No. 61, of 2 November 2016, pp. 2033-2054, 1.5, the democratic principle guarantees the legislator a very wide latitude to regulate issues that it deems important as long as it does so considering the Basic Law, in accordance with its procedures and limits, preserving the legitimate expectations that people have and not incurring in material non-conformities with the constitutional norms.

This space also extends to the way in which legislation is produced, in the sense of being able to draw up from endogenous elements, but also from exogenous elements or establishing external bridges. It has done this not only in relation to international developments, but extensively, for better and for worse, but within its regulatory freedom, drawing inspiration from foreign developments. It does not seem to this Court that the Constitution has any rule that inhibits the legislator from referring to an international entity, of which the State is a member, in accordance with the rules of International Law, even though its legal instruments have not been incorporated into the legal system, since the limitation resulting from this path would be based exclusively on the insusceptibility of invoking the specific rule of the treaty internally, especially for the purposes of creating obligations for individuals.

Nothing prevents a legislative body par excellence, the Parliament of the Republic, with primacy in this matter as highlighted by the *Opinion 2/2018, of 27 June, Preventive*



116

*Inspection of June, of the Legislative Authorization Law for the Amendment of the Commercial Companies Code and Autonomization of a Commercial Companies Code*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, I Series, No. 44, 2 of July 2018, pp. 1141-1156, 5, endowed with a direct democratic legitimacy, in the use of its constitutional powers, edits a rule in a legislative act that approves, refers to a mechanism of such an international organization, whose object is to merely facilitate the dissemination of criminal information by the States , as an alternative means for Cape Verdean authorities to obtain information about wanted persons and thus provide the international cooperation that the country has committed itself externally or understand that, within the limits of the law, it should offer. In fact, since article 31 of the INTERPOL Constitution is not self-executable, as it is subject to State legislation, the only way to apply its content and guarantee the legality of an arrest made in Cape Verde through information disseminated by this mechanism would be precisely the approval of a legal norm that allowed it, as the National Assembly diligently did. Therefore, nothing prevents a legislative act approved by a competent constitutional body, following procedures and in accordance with the majority provided for by the Basic Law, with the participation in the legislative process of all sovereign political bodies - precisely the same ones that participate of the internal approval process of treaties - the Government, the National Assembly and the President of the Republic, in this case proposing, approving and promulgating, not generating any fraud or subversion of the Constitution or its regime of incorporation of treaty norms.

6.7.4. Especially when, from a material point of view, the reference to the mechanism in question is, from an abstract point of view and independently of any specific problems in its application, framed by instruments that apply to the organization in question. In particular, by the INTERPOL Data Processing Regulation, which, containing rules and procedures relating to the publication of broadcasts and news, especially red news/alerts, associated with arrests for extradition purposes, by the organization's information system, also establishes the conditions for its use and an internal control mechanism that must be ensured by the General Secretariat, which is also associated with an independent external control system guaranteed by the organization's File Control Committee, through its Supervisory and Advisory Board and its Requests Chamber, to which requests for access, rectification and deletion of data processed by INTERPOL's information system can be addressed.



And also, because, in light of Cape Verdean law, namely the Law on International Judicial Cooperation in Criminal Matters, pursuant to article 64, it is guaranteed that, in cases where the person is detained following official information transmitted through the information systems recognized by article 39, it is quickly presented by the police authority that makes the arrest to the competent Public Prosecutor's Office to promote a judicial hearing. And, in case it is confirmed, this must be communicated immediately, by the quickest way, to the foreign authority of which it is interested, so that it informs in the same way whether it is going to make an extradition request, further limiting the period of detention of the person if the information does not arrive within eighteen days or if, having positive information, the extradition request is not received within forty days.

Therefore, in the opinion of this Constitutional Court, the reference made by a law approved by the competent legislative body in the course of a process provided for by the Constitution, duly promulgated and published in the official gazette of the Republic, to a mechanism to facilitate the communication of information between States that works through a credible international organization, INTERPOL, of which Cape Verde is part and recognises, but whose legal instruments have not been ratified or published in the official gazette of the Republic, in a context in which the international organization ensures all internal guarantees to the targets and the same are reinforced by Cape Verdean law, it is not inconsistent with the Constitution.

6.8. For these reasons, the Court cannot declare the unconstitutionality of the hypothetical rule inferred from article 39 of the Law on International Judicial Cooperation in Criminal Matters, according to which *It is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign authorities, and it is not relevant that the acts referring to this international organization do not have, eventually, been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal order, since the use that is made of the information received via this system, derives from a national law.*



**7. Hypothetical rule arising from article 39 of the LCJ, according to which a person can be detained for the purposes of extradition, without requiring that a warrant exists, as long as one is in possession of official information that legitimizes his detention, it is inconsistent with the Constitution due to incompatibility with the right to freedom over the body, with the principle of legality of police measures and with the principle of proportionality of police measures.**

7.1. In terms of argumentation,

7.1.1. As for the issue regarding the illegality of detention owing to the lack of an arrest warrant, it addresses this from the right to freedom over the body, considering that the detention of an individual which may result in his constitution as a defendant depends on a warrant, not the idea that the police may deprive an individual of their liberty on the basis of an informal request from a foreign police agency is compatible with the principle of legality. For this reason, the interpretation of the appealed judicial body is unconstitutional, being even more pernicious in that it deprives the appellant of having an effective knowledge of the charges that fall on him and without being able to exercise an active role in its defence, this understanding being excessive. It adds that the judgment under appeal goes so far as to consider that the arrest may not be accompanied by an arrest warrant, forgetting that it has to be processed in accordance with the current procedural law, that the red alert was issued in contravention of the rules about INTERPOL's data processing and that it seems to result that the legislator has the understanding that the provisional detention in the extradition process is a preventive detention, being illegal the intervention of this body, the entire detention process is null and without any legal effect. Hence, require the declaration of unconstitutionality of the rule.

7.1.2. The Public Prosecutor's Office, with regard to illegality due to the lack of an arrest warrant, argues that this issue does not generate any unconstitutionality either. Presenting the position that the only difference between a request for prior detention and detention not directly requested is that, in the latter case, the State of origin is not aware of the person's presence in the country. In such cases, the basis of detention would be the information existing in the criminal police authorities that a certain foreign citizen is wanted, information that may or may not be accompanied by



117

the existence of international arrest warrants. In this context, if the country of origin disseminates such information, it would take steps to make a request for the extradition of that citizen if it knew his whereabouts. It also informs that the placement of red news is carried out by the national offices of Interpol, and that they must meet certain requirements, including the delivery of an international arrest warrant, passing through the screening of the commission of *experts*.

7.2. The Appellate Court, regarding the specific question of constitutionality, the only one that matters for the purposes of this specific appeal as it was placed, reasoned that detention not directly requested can take place even if the Cape Verdean judicial authority is not yet equipped with a formal warrant, as long as you are in possession of official information that legitimizes the detention, referring to its *Ruling 28/2020*, where it had considered in discussion with Portuguese jurisprudence that this mode of detention is justified because, by disseminating official information that the person was being sought, the State responsible for its dissemination would file a request for extradition if it knew his whereabouts.

7.3. The parameters already defined by the Court to assess the possible unconstitutionality of this rule would be, therefore, the right to freedom over the body recognized by article 30 and the principles of legality and proportionality of police measures recognized by number 2 of article 244, all of the Constitution.

7.3.1. The first, as already touched upon by this Court in the *Judgment 8/2018, of 25 April, Arlindo Teixeira v. STJ , on violation of the right to trial in the shortest period of time, guarantees associated with freedom over the body and the constitutional right to legitimate defence*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, Series, No. 25, of 2 May 2018, pp. 574-596, 13, is housed in a central provision of the Cape Verdean system of fundamental rights, Article 30, which declares the natural freedom of the individual over his body and the right to personal security. It has the effect of prohibiting any total or partial deprivation of liberty that does not result from a cause established by the law and in accordance with the parameters set by the law, which result from the exceptions established by the Constitution, and which allow it among which it is found, as noted, situation such as



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

118

those arising from a court ruling for the practice of acts punishable by law with the penalty of imprisonment, preventive detention or subjection to extradition proceedings.

7.3.2. The principles that refer to police measures are enshrined in number 2 of article 244. Applying to any activity that materially can be considered police, it refers to its subordination to the principle of legality, which imposes that any action in this scope are substantiated and specified by law that establishes the conditions under which they can be undertaken by the authorized authority, and the principle of proportionality, which imposes that the law establishes balanced goals, limiting its intensity to what is strictly necessary for the purposes that justify it to be carried out.

7.4. The constitutional problem attributed to article 39 of the Law on Judicial Cooperation, in the contested part that the Constitutional Court can scrutinize, as it follows, as it has already decided, from the rule effectively applied by the Supreme Court of Justice that allows the detention of a person sought by competent foreign authorities for the purposes of criminal prosecution or the fulfilment of criminal sanctions without having to present a court order at the time of arrest, it being sufficient that the Cape Verdean authorities receive official information about this.

7.5. Article 39 contains a figure entitled "detention not directly requested", inserted in the Cape Verdean legal system by the diploma itself, configured from a normative formula according to which "it is lawful for criminal police authorities to carry out under the law criminal procedure in force, the detention of individuals" in cases where, "according to official information, they are sought by competent foreign authorities for the purpose of proceeding or serving the sentence for facts that notoriously justify extradition". It is presented following another modality of early detention - in relation to the request for extradition - that the law provides: one that is requested by a State that intends to request the extradition of a person who knows to be in Cape Verde, under the terms of the number 1 of article 38.


12/09/2021
119

7.5.1. It is clear that, in the latter case, once the person's whereabouts are known and the formal request for extradition is being prepared, the interested State must accompany the request with a set of elements referred to in the second paragraph of the same provision, including the warrant or order of provisional detention or equivalent document against the requested person and several others who, due to the predictability of the detention and the imminent extradition request, would already be in their possession and organized in accordance with the requirements of such request. In the case of a detention not directly requested, the legal element that legitimizes the detention is not the existence of a warrant or the others provided for by paragraph 2 of article 38, but, rather, official information, which, by law, and even without the Court pronounces on its constitutionality at this very moment, they are considered sufficient.

7.5.2. In a context, in which there was an evident internationalization of crime and there was an unprecedented growing capacity for movement around the planet, the solution adopted by the legislator and applied by the appealed judicial body is perfectly natural. In fact, it intersects directly with the very nature of non-directly requested detention, intended to cover various situations in which the interested State does not know with sufficient advance notice to allow it to prepare an extradition request and request provisional detention if a person you are looking for is in Cape Verde or in another identified country. Therefore, it disseminates information to several countries simultaneously, directly or through the INTERPOL communications system.

7.5.3. In such cases, it is assumed that the interested State may, without prejudice to having, directly or indirectly, disseminate official information that it is looking for a particular person, not to have sent a copy of the arrest warrant at the same time, namely because, not knowing the person's whereabouts, will only become aware of their presence in a certain State when they are informed of it, enabling them to request their extradition. In this context, the system is marked by the same bases that govern cooperation relations between States, mutual trust and the possibility of reciprocity, which ensure the necessary trust so that, first, the State of Cape Verde is assured that the person it is effectively being sought by the judicial authorities of another State, not least because in this type of relationship, the tendency to maintain the veracity of information is imposed by the continuous need for States to obtain judicial cooperation in criminal



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH
120

matters and the awareness that any deviation in this matter may imply non-cooperation by the Respondent State in the future; and, second, that by disseminating this official information you are effectively interested in obtaining custody of that person by submitting an extradition request within the legal time limit.

Furthermore, the rule must be understood within the framework of a regime that already includes certain guarantees aimed at controlling its misuse. First, because the basis for legitimizing detention is not based on any information, but only on official information, endowed, for the reasons invoked, with its own faith resulting from the way in which the States conduct international relations; second, because, in the heart of the norm and the concept of official information that can be extracted from article 39, it is implicit that they must be accompanied, a) by sufficient elements to allow the identification of the person, because only in this way is it possible to attest that the individual concerned is what is being sought; and, b) elements that allow certifying that the facts for which he is sought notoriously justify extradition; second, because the regime of non-directly requested detention is composed not only of article 39, but also of the already mentioned article 64, which, not leaving the maintenance of early detention not directly requested to the free discretion of the police authority, imposes intervention of the Public Prosecutor's Office to promote the judicial hearing, referring to the period of forty-eight hours of number 2 of article 62, also limits it in time, since the Attorney General's Office must inform the foreign authority to whom it is interested. by the fastest route, if the latter is going to make the extradition request, imposing a period of eighteen days to provide this information and a maximum period of forty days to request extradition, leading to the non-compliance with these deadlines to the release of the detainee.

7.5.4. This regime, as already pointed out, focuses, in the relevant part, on INTERPOL's communications system, which presupposes the possibility for States to transmit and disseminate information about people seeking or requesting the issuance of red news. There will be no doubt that any rule allowing a person to be detained has an impact on his freedom over the body. However, this does not always result in a non-conformity between this rule and paragraph 1 of article 30 of the Constitution, as this provision also includes several situations in         which         the         competent         public         authorities         are



allowed to deprive a person of their freedom to move around including situations that refer to the extradition process - provided that the provision of the rule, insofar as it assumes a restrictive content of this right, adjusts to the conditions provided by law for limiting rights in this way, which presupposes the intervention of the ordinary legislator, namely those that the Constitutional Court has used for this type of inquiry as drawn up in the *Judgment 7/2016, of 21 April*, Rapporteur: JC Pina Delgado, published in the *Official Gazette*, No. 35, 10 May 2016, 4.3.2.

7.5.5. If this could happen if there is a legitimate purpose, it would refer to the conditions for legitimizing restrictions provided for in numbers 4 and 5 of article 17 of the Constitution. The general purpose of the legislative solution is to allow Cape Verde to provide international judicial cooperation to a similar State that seeks a particular person for the purposes of criminal prosecution and subjection to criminal proceedings or execution of criminal sanctions, which does not fail to have the due to the principle of cooperation and the duty to participate in the fight against terrorism and transnational organized crime, provided for by paragraphs 1 and 2 of article 11 of the Basic Law, as, in the latter case, recognized by this Court through the *Judgment No. 30/2019, of 30 August, AGAM. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights to defence, the adversary system and access to the evidence of the prosecution*, Rapporteur: JC Pina Delgado, 6.5.1, and specifically to be able to do so in cases where the exact location of the person sought is not known in advance. Going beyond the issue of legal authorization to restrict, it is evident that from paragraph f) of number 3 of article 30 there is permission to affect.

If at this stage of the existence of the legislative act and its content, there is no question of retroactivity of the normative solution and the absence of generality and abstraction, the main issue would always be to verify whether such a legislative solution would be incompatible with the essential core of the law or with the duty to respect the principle of proportionality in the operation of restriction of rights. The Constitutional Court does not consider that the essential core of the law is affected by the possibility of detention without a court order, as the norm does not allow a detention to occur without any basis of legitimacy or by mere whim of the police authorities but based on in official information communicated directly by a State or through INTERPOL, which cannot be traced back to a clearly arbitrary deprivation of freedom over the body.



Even so, it could, in the abstract, prove to be an unbalanced solution if it does not adjust to the principles of adequacy, necessity and fair measure inherent to the principle of proportionality that governs the restriction of rights. It is the understanding of the Constitutional Court that, in order to achieve the legitimate purpose that the government intends to achieve, that is, the provision of international judicial cooperation in criminal matters and participate in the fight against transnational organized crime through the institution of a legal mechanism that legitimizes the detention of person, even in cases where it has not been directly requested, namely when the State concerned is not able to determine with certainty its location, one cannot but consider that the legal means that allow it when the criminal police authorities have information in their possession. officers who are wanted for facts that notoriously justify extradition is suitable. In the same sense, the Constitutional Court considers that the provision intended to cover various possible situations in which neither the authorities of the interested foreign country nor the national authorities know in advance the location of the wanted person in Cape Verde, the least restrictive means that nevertheless would allow the purpose of the rule to be achieved would be to allow, without the imperative need to present a copy of a court order of arrest or equivalent, to proceed with the arrest of the wanted person based on official information provided by a State directly or through the communications system of the INTERPOL provided that they contain sufficient elements to verify their identity and that the facts attributed to them clearly justify extradition. In the same sense, for the Constitutional Court, the measure does not excessively sacrifice the rights of an individual because, on the one hand, there is an interest of the State imposed by the Constitution in cooperating with the arrest of wanted persons who are in the territory of Cape Verde and, on the other hand, the law imposes clear limits on the conditions that enable authorities to use this possibility of early detention, establishes short terms for maintaining the deprivation of liberty in such situations, and subject it to judicial review. Therefore, it is proportional measure.

7.6. The same is true for the principle of legality of police measures and the principle of proportionality of police means.

7.6.1. In the case, because the detention does not result properly from a free decision of the authority of the national who carries out the arrest, nor from any informal means, it



12/09/2021
123

it is not a norm that allows any discretion to these authorities, namely, to detain the person for having a determined appearance or for it to appear to them that because of the way they live, behave or move, they could only be a wanted criminal, or because they saw them a particular foreign news service or why your name is mentioned informally by a friend. It does not authorize the police authorities to act voluntarily and arbitrarily without any basis of legal legitimacy, but always based on sufficient official information disseminated or provided by a similar State, namely through the communications mechanism of INTERPOL, which, in the world of relations between States shall, until evidence and history to the contrary, be considered to be proper and correct. Therefore, the norm itself already establishes the legal basis for legitimizing this police action, authorizing it to receive official information in this way as the typified circumstances materialize.

7.6.2. In this line of reasoning, the very balance from which the rule stems, by delimiting the specific situations in which the police can act, already considers the principle of proportionality, establishing clear guidelines for its action, namely by providing that it can only make this arrest if: a) it has official information transmitted by a State or by INTERPOL that the person is wanted by competent foreign authorities for the purposes of prosecution or serving a sentence; and, b) for facts that notoriously justify the extradition; c) imposing the immediate intervention of the Public Ministry in order to present the person detained by the police authorities to the judiciary for the purpose of hearing and validating the detention.

7.6.3. In short, the Constitutional Court understands that the contested rule is also not inconsistent with the principle of legality and the principle of proportionality of police measures arising from paragraph 2 of article 244.

7.7. And, therefore, it concludes that the hypothetical rule arising from article 39 of the LCJ, according to which *a person can be detained for the purpose of extradition, without requiring a warrant, as long as they are in possession of official information that legitimizes their detention* is not in violation of the Constitution.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
0000150.07635166

**8. Hypothetical rule arising from articles 39 of the Law on Judicial Cooperation and article 269 of the Code of Criminal Procedure, according to which** *information for the detention of a person can reach the authorities by any means allowed by Cape Verdean law, in case of urgency and danger in delay by any means of telecommunications, as follows from article 269 of the CPP, followed by confirmation by warrant* **, is non-compliant with the Constitution due to incompatibility with the right to freedom over the body, with the principle of legality of police measures and with the principle of proportionality of police measures.**

8.1. In terms of argumentation,

8.1.1. The appellant, in this regard, for what matters in relation to the excerpt of the rule that the Court may know, expresses the understanding that there was an excessive restriction of his fundamental rights, as the rules on communication of acts of the Code of Criminal Procedure did not apply, namely because it considers that those that lead to the detention of a person based on a letter rogatory or execution of foreign criminal sentences, fundamental duties cannot be prevailed over a fundamental right, simply based on the principle of international cooperation between States. Hence the conclusion that the detention of the extradited person is arbitrary and violates several norms.

8.1.2. In this regard, the Public Prosecutor's Office presents the thesis that the appellant's detention not directly requested would not violate the principle of proportionality, describes the legal regime and says that the detention in question and the legal regime do not deserve any reservations considering what the restrictions should be of rights, namely the principle of proportionality, and this possibility should not be considered unconstitutional, as, by way of comparison, it says that the Constitutional Court of the Portuguese Republic had already rejected.

8.2. The defendant judicial body's understanding was based on its finding that the Law's requirement for the transmission of official information intended for the detention of a person for information purposes would not take the form of a request, much less a warrant, but only official information, which could come to the knowledge of the Cape Verdean authorities by any means admitted by the law, in case there was urgency and



125
12/09/2021
REG.07835166

and danger in the delay, by any means of communication, as would follow from number 3 of article 269, followed by confirmation by warrant, to refer to the position it had set out in Judgment 28/2020 regarding references to comparative constitutional jurisprudence and doctrine pertinent.

In this regard, it appears that the Supreme Court of Justice discusses this issue at length on pages 29 and ff, when, by denying the relevance of an allegation of annulment of a red alert, it considers the figure of not directly requested detention provided for in article 39 of the Law on International Judicial Cooperation in Criminal Matters, referring to Portuguese jurisprudence, in which there is an understanding that this type of detention would be justified by the idea that, when disseminating official information that the person was being wanted, the interested State would make an extradition request if it knew her whereabouts.

8.3. The parameters for measuring the alleged unconstitutionality here are also the right to freedom over the body, the principle of legality of police measures and the principle of proportionality of police measures, carrying the basic configurations mentioned in the previous item (7).

8.4. The verification of the compatibility of a hypothetical rule that allows the transmission of official information leading to the detention of a person for the purposes of extradition through any means of telecommunications allowed by Cape Verdean Law, including, in cases where there is urgency and danger in the delay, by any means of telecommunication, with the right to freedom over the body and with the principles of legality and proportionality of police measures depend, at first, on fitting this norm within the framework of the Law on International Judicial Cooperation in criminal matter.

8.4.1. This effectively provides, as already described in 7, to which it refers, a regime of early detention entitled non-directly requested detention, distinct from the provisional detention provided for in article 38.

8.4.2. In the case of a detention not directly requested, inherently marked, at least in relation to part of the differentiated situations that may justify, owing to great



CERTIFIED TRANSLATION
12/09/2021
0763S166
LANGUAGE REACH

126

urgency, in principle, any suitable means provided for by law may be used to transmit, in this case, official information that an individual is sought for the purposes of proceedings or serving a sentence for facts that notoriously justify his extradition. In this sense, which seems to follow from the learned reasoning expressed by the Supreme Court of Justice and from the rule that it applied to decide the matter, the reference to number 3 of article 269, according to which in case of urgency and danger in the delay it will be admissible the request for detention by any means of telecommunications, followed immediately by confirmation by warrant, which did not immediately retain the expression, may reveal the understanding, correct for this Court, that such submission to procedural law was only justified in relation the means of transmission of information and not in relation to the temporal conditions of its legitimation. In these cases, in contrast to a situation in which it has been requested by the State that intends to request extradition, the legitimacy of the act being guaranteed, as official information is received, the presentation of the warrant could take place later, namely at the time when the extradition request is received.

8.5. It is easy to intuit the reason that justifies allowing, among other modalities provided for by the applicable legislation, it to be done by means of communication that are faster and with instant reception. Because in such cases situations of urgency and danger of flight may be covered, in which the interested State becomes aware that a certain person may travel to an undetermined set of States, including ours, officially informing him of this, namely through mechanism of information dissemination mechanisms or the INTERPOL alert system, so that it can carry out the arrest. The reason for this prediction is perfectly natural, since in a situation marked by great dynamism and in which the people sought are not static, being able to move to various internal and external spaces, the only way to guarantee their detention is through of a communications system that uses rapid means of transmitting official information. In this sense, perfectly adjusted to a type of process, that of extradition, marked by great speed aimed at both safeguarding the rights of the extradited person, as well as fulfilling the public interest in the provision of international cooperation, and the legislative indications inherent to the regime constructed, bearing in mind that article 64 maintains this line of use of rapid means of communication when it orders the Public



127

Prosecutor's Office to notify the arrest of the wanted person "by the quickest route possible" and to inform the interested State "by the same route" whether it is going to make an extradition request.

8.6. Under the terms of the test that is promoted in circumstances of restriction of rights, as initially outlined by the aforementioned *Judgment 7/2016, of 21 April*, Rapporteur: JC Pina Delgado, 4.3.2, per se, such provision does not appear to be constitutionally illegitimate, insofar as such objectives of the norm are only fulfilled, at least in certain circumstances, if it proves possible to quickly transmit information that leads to the arrest of a wanted person by a State pending submission of a possible extradition request - which this State already indicates it wants to materialize insofar as it circulates official information about the person - corresponding, for the reasons invoked, to public interests that the State may pursue, and whose effectiveness often depends on exploitation , within constitutional limits and in a balanced way, of means and solutions that dynamically adjust to the ways in which criminality manifests itself (*Opinion 1/2019, of 17 April, Preventive Inspection of Article 2 of the Legislative Act for the Revision of the Criminal Investigation Law in the Part in which it Changes its Article 14*, Rapporteur. JC Pina Delgado, published in the *Official Gazette* Series I, No. 44, 18 April 2019, pp. 763-789, 7.5).

8.6.1. If there is authorization to restrict and there is no possible discussion regarding the generality and abstraction of the hypothetical rule, of restrictive effect and of reaching the essential core of this right, the only possibility of considering the rule unconstitutional would result from any disproportionality of the restriction that imposes.

8.6.2. In this regard, the Court finds that, first, from the point of view of the suitability of the measure, because the purpose of the rule is only fulfilled if it is possible, in the light of official information, to effectively detain a person, it is necessary that the means of transmission to be used can be fast, swift and effective, therefore being an adequate measure to fulfil the public interest in question of providing international judicial cooperation and helping the country to fight crime; second, from the point of view of necessity, no alternative would be equally effective and less affecting in cases of urgency and danger, namely escape; third, it doesn't seem to be a unbalanced or excessive



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
0783516

128

measures considering the intensity of the public interest in granting tools to police authorities to quickly receive, provided that through reliable mechanisms, official information that may lead to the arrest of a wanted person in another country for the purposes of submission to criminal proceedings or execution of criminal sanction and situation that, due to not having its presence in a specific country, the country that seeks it does not have other effective means of making the information reach another State in which it is located or to which it travels. Thus, not being disproportionate, it does not seem that the means of transmission of information can itself generate any incompatibility with the right to freedom over the body, and the rule in question is not incompatible with the constitutional precept that recognizes it.

8.7. In the same sense, it does not lead to any arbitrary action on the part of the police authority, as the rule itself ensures the legal basis for receiving official information by these more rapid means in such urgent and dangerous situations that are transmitted by the authorities of these States to a number of other States or through the INTERPOL communications system. Therefore, this would not result in any non-compliance with the principle of legality of police action. In fact, the standard allows the use of these means, following official information, under the terms already discussed and with all the care provided for by the law, namely the limitation of the time that the detention situation is maintained and judicial control , ensures the legality of the police intervention made from official information communicated in this way, as well as the proportionality of this action, as applicable in situations of urgency and flight in which the public interest in detaining the person for the purpose of providing cooperation international criminal law justifies a faster and more effective form of transmission.

8.8. Therefore, there are no grounds to the allegation that a rule arising from articles 39 of the Law on Judicial Cooperation and article 269 of the Code of Criminal Procedure, according to which *Information for the detention of a person may reach the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunications, as follows from article 269 of the CPP, followed by confirmation by warrant*, does not comply with the Constitution due to incompatibility with the right to freedom over the body, with the principle of legality of police measures or with the principle of proportionality of police measures.



129

**9. Hypothetical rule arising from number 4 of article 6, final segment, and number 3 of article 3, according to which** *exemption from reciprocity is possible in any form of international judicial cooperation, including extradition***, is inconsistent with the Constitution due to incompatibility with the principle of reciprocity of benefits inserted in number 1 of its article 11, of the principle of equivalence of foreigners to nationals translated into number 1 of article 25 and of the rule for the treatment of foreigners in transit provided for in article 7 l).**

9.1. In terms of claims,

9.1.1. The appellant argues, in essence, that extradition is a matter of international relations, and the reciprocity of benefits is one of the principles that govern the State's international relations under the terms of number 1 of article 11 of the Constitution, which cannot be excluded from this fundamental guideline. Hence his most important legal thesis in this segment that ordinary law cannot rule out reciprocity in relations between the country and a foreign country, in this case the United States of America. It also adds the argument that it would have to do with the treatment of foreigners temporarily in Cape Verde, insofar as it would require them to be accorded treatment compatible with the norms of international law, and with the rule on the extension of rights to foreigners in the article 25, which, as he understands, only excludes political rights. These constitutional rules would prevent the reciprocity of benefits from being dispensed with in the extradition process. In the specific case, the Minister of Justice should have demanded reciprocity from the requesting State, especially since it is a foreigner in transit with limited connections to Cape Verde.

9.1.2. In turn, the Public Prosecutor's Office on the issue discusses the legal regime and essentially adheres to facts that mark the present situation, considering that the United States does not refuse to extradite in an identical situation, which they cannot do is provide an absolute guarantee in this regard. It adds that the legal basis for the appellant's extradition is the Palermo Convention, which the country undertook to comply with and, finally, that there is no obligation to refuse an extradition request for lack of reciprocity. It promotes the interpretation of number 3 of article 3 of the Law on Judicial Cooperation in the sense that the specific situation is part of a circumstance that justifies extradition, since the crime of money laundering is a form of serious criminality



12/09/2021

130

that the country is committed to fighting. In addition, it says that it is a purely political decision that is not subject to the review of the judiciary, therefore a valid and effective political act of exclusive competence of the executive power and not subject to judicial review. Therefore, even if, hypothetically, it was considered that there was an absence of reciprocity in the case, not only is this absence not a reason for mandatory refusal, as the assessment of the matter is excluded from the judiciary by virtue of the decision of the Minister of Justice.

9.2. The scholarly understanding of the decision under appeal to justify the rejection of the constitutional issue raised by the appellant is inspired by a position adopted in Portugal, where, in the eyes of the Supreme Court of Justice, despite the fact that there is a much less flexible principle of reciprocity was never considered the possibility of an unconstitutional waiver. In Cape Verde, where the principle would take the form of reciprocity of benefits, there is greater freedom of political judgment of the circumstances.

9.3. According to the regime established by article 6, paragraph 4, last segment, and article 3, paragraph third, interpreted - under the terms promoted by the Supreme Court of Justice - this Court does not raise the slightest doubt that the best possible interpretation in legal terms , namely, because, in order to recover and endorse the learned argument used, by the language used, "cooperation", and by the systematic location in the general part of the law, the ordinary legislator intended to allow the waiver of reciprocity in any form of international judicial cooperation in criminal matter regulated by the Law. Basically, the hypothetical interpretation indicated corresponds in its entirety to the rule itself inserted in these precepts. It follows that, as long as, among other grounds, the non-requirement of reciprocity is advisable due to the nature of the fact or the need to fight certain forms of criminality, the competent authority, in this case the Minister of Justice, would be authorized to dispense reciprocity in a passive extradition request.

9.4. The fact that the Venerable Court of Appeal has given the rule its most evident meaning through a legal hermeneutics that objectively does not raise any objection, does not necessarily mean that this rule cannot suffer from a defect of unconstitutionality. In fact, as the appellant indicates, it can, in the abstract, in a first line be non-conforming to



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
131

principle of reciprocity of benefits inserted in article 11, paragraph one, of the Constitution, the parameter that fits this question. A question that is the object of this concrete review of constitutionality and that naturally does not have to do with the investigation of the concrete act of the Minister of Justice to grant it, which is irrelevant for the purposes of this process, but if a rule could, In light of the Basic Law, allow reciprocity to be waived in certain situations.

9.5. The issue was not the subject of a decision by the Court, but the content of the principle has already been discussed in the context of the Successive Inspection of Constitutionality that led to the issuance of the SOFA ruling (see *Judgment 10/2020, March 20 [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rapporteur: JC Aristides R. Lima, pp. 1710-1753, and concurrent vote of JC Pina Delgado, p. 1743.

9.5.1. There would be no doubt that, in the abstract, there may be a relationship between an ordinary rule that allows for the waiver of reciprocity in a given dimension of the State's external action, such as extradition undoubtedly, and the principle of reciprocity of benefits.

9.5.2. Being integrated to number 1 of article 11, the principle of reciprocity of benefits is, for constitutional purposes, a principle imposed by the constituent legislator on the formulator of foreign policy, including the ordinary legislator if this is the case, and on the conductor of the same in the in the sense that, in an international order realistically characterized by national interests, care should be taken that Cape Verde's foreign policy is also marked by the production of benefits not only for its partners, but also for the State itself. It is an old solution of the national constitutionalism, as recalled by the *Judgment 10/2020, of March 20, (Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rapporteur: JC Aristides R. Lima, 5), particularly appealing to newly independent states created after a process of struggle for political self-determination and which intended to guard against any possibility of emergence of relations of economic dependence or



neo-colonial nature in which, despite being formally independent, continued to serve the interests of former colonial powers and hegemonic states.

9.5.3. Due to the nature of international relations, such reciprocity of benefits is not intended to be applied on a case-by-case basis but considering the integrality of the relations that Cape Verde maintains with a specific country, international organization, non-governmental organization or any legitimate international actor that cannot be contained from a temporal and material point of view. Temporal, because for the evaluation of the reciprocity of benefits, not only are current relations relevant, but also those that have occurred in the past and those that look forward to the future. received in the past from the entity concerned, as with investment, that is, what the country plans to achieve in terms of foreign policy in terms of a future bilateral or multilateral relationship; material, because it does not refer to the measurement of a specific relationship in a given segment of the panoply of interactions that take place between two entities, namely States, but allows a cross-assessment of the entire spectrum of these relationships in all areas in which they manifest themselves.

9.5.4. For obvious reasons, as it is a question of establishing guidelines for conducting a dynamic dimension of relations between States that cannot be fully controlled by the country, especially considering the difficulties that Microstates have in trying to preserve their own interests in an international context. hostile and unpredictable are not all-or-nothing rules. In fact, such precepts of article 11, on the one hand, have a low normativity and extreme ductility, as they must be weighed against several other principles in the field of foreign policy, often in opposition in specific situations, the which is evident in this case in relation to the determination of the final part of number 2 of the same provision that Cape Verde participates in the international fight against terrorism and transnational organized crime.

9.5.5. Notwithstanding the constitutional inquiry that they may be subject to, such arbitration is carried out by the political entities that conduct foreign policy, and they are responsible for carrying out the necessary consideration in each situation to establish the course of action that the State must follow.



9.6. This is particularly important because one of the reasons relating to extradition that justifies paragraph 3 of article 3 in the meaning that is the object of this concrete review of constitutionality is precisely not to condition the satisfaction of a request for cooperation on the lack of reciprocity as long as it is shown advisable because of the nature of the fact or the need to fight certain serious forms of crime.

9.6.1. First, such a solution, in a manner convergent with the Basic Law, attributes such assessment to a political authority, the Minister of Justice, who, even in the administrative phase of the process of passive extradition, in which he can make judgments of opportunity and political convenience when considers the satisfaction of an extradition request, can and should balance the various foreign policy objectives that may or may not recommend the continuation of extradition, namely all those arising from article 11.

9.6.2. Second, that same entity is allowed to satisfy the request without requesting reciprocity if, among other circumstances, this proves advisable due to the nature of the fact or the need to fight certain serious forms of criminality, something that, on a case-by-case basis, , and in accordance with these beacons, it determines, thus not applying the rule of number 4 of article 6, first segment, which subjects judicial cooperation to reciprocity, insofar as the provisions in the final part of the same precept and in the number 3 of article 3 constitutes an exception to this rule.

9.7. The Constitutional Court considers that this rule, which allows that the absence of reciprocity does not prevent the granting of extradition, given certain circumstances, is not inconsistent with the principle of reciprocity of benefits.

9.7.1. It is possible, in the abstract, that, in a long-term scenario, the systematic refusal to provide judicial cooperation in criminal matters, namely extradition by a State under equal circumstances could lead to unconstitutionality, although not necessarily normative, in the current context nothing authorizes the Court to reach this conclusion.



134

9.7.2. Regarding the rule arising from number 4 of article 6 and number 3 of article 3 of the Law on International Judicial Cooperation in Criminal Matters, there will be no doubts that there is a public interest on a constitutional basis that justifies the measure, as it allows a political entity to weigh up various constitutional principles for conducting foreign policy and determine that, in a specific case, despite no guarantees of reciprocity, it is justified to satisfy an extradition request that enhances Cape Verde's participation in the fight against transnational organized crime.

9.8. Regarding the possible non-compliance of this standard with the principle of equality of rights between foreigners and nationals,

9.8.1. In addition to the fact that this rule has different effects according to the nature of the relationship of the foreigner or stateless person with the national territory, being stronger in the case of foreigners residing legally in the national territory than in relation to foreigners in transit or in an irregular situation, the fact is that any distinction between the non-national and the national that arises from the contested legal provision in the part that applies to extradition, arises, as already discussed in relation to the crimes that correspond in the requesting State to the penalty of character. perpetual term referred to by number 2 of article 38, of guarantee that the constituent legislator chose to limit the national, since, by virtue of number 3 of the same provision, the condition of extradition to the requesting State also admits the extradition of its nationals to the State of Cape Verde, generates an exclusive guarantee of ownership of the national, not being extended to foreigners or stateless persons, due to the express will of the constituent legislator, as was already evident in the discussion promoted within the scope of the *Successive Abstract Inspection Records of Constitutionality 3//2018*, with convergent positions adopted by all judges in relation to the issue (*Official Gazette*, Series I, No. 86, of 23 July 2021, p. 1731 et seq.).

9.8.2. The provisions in article 25 and also in articles 23 and 24, having a principled dimension, are projected on the ordinary public power that should consider them in their respective areas of action. However, it is not imposed on the constituent power of review. Even though this is a reform, the only possible constraints that may limit your freedom to change the Basic Law arise from the limits namely material, which are imposed on the



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
135

constitutional review and, eventually, the insertion of norms contrary to the identity of the Cape
Verdean Constitution, namely the values that it embraces. Even because article 25 expressly refers
to other rights reserved constitutionally or legally to national citizens, nothing prevents the
constituent legislator from establishing the distinctions it deems between nationals and non-
nationals, especially in an area in which it has traditionally to guarantee the maintenance of the
national in Cape Verdean territory, establishing rights of belonging and guarantees of exclusive
entitlement of the national against his compulsory removal, either by limiting his extradition, or
by prohibiting the loss of his Cape Verdean nationality, or by prohibiting his expulsion from the
national territory, as the jurisprudence of the Court had already stated in the *Judgment No.
20/2018, of 16 October*, *Uchechukwu Ezeonwu and Chijioke Duru v. SCJ*, *on breach of guarantee
of presumption of innocence in its dimension of in dubio pro reo*, 1639-1648, 1.3, and until the
ordinary legislator, within the limits of restriction, does so. In this sense, since there is no
constitutional protection based on this parameter, the freedom of the ordinary legislative power to
approve a law that allows the satisfaction of an extradition request without ensuring reciprocity is
not constrained for this reason.

9.8.3. There is, therefore, no inconsistency between the contested rule and the principle of
equality between nationals and non-nationals.

9.9. In relation to possible non-compliance with paragraph l of article 7 of the Constitution,
which prescribes, with the relevant segmentations, that it is the fundamental task of the State to
guarantee foreigners who are in transit through the national territory, a treatment compatible with
international human rights standards,

9.9.1. It can easily be seen that, in order to constitute an enforceable norm in the specific
case, this norm depends on the existence of an international norm for the protection of human
rights that binds the State of Cape Verde which, preventing the extradition of a person without the
State demanding reciprocity from the State appellant, would lead to the non-assurance of this
minimum treatment.

9.9.2. The problem is that it is not possible to identify any international norm that could have
an effect on a sovereign state of not being able to extradite a person who is



CERTIFIED TRANSLATION

12/09/2021

No.07635166

detained in its territory in circumstances where it does not require reciprocity, for internal reasons
and in accordance with applicable law.

9.9.3. The fact that there is a reduced connection between the foreigner in transit and the
State of Cape Verde is also not the cause of this, as no parameter arising from the Constitution
emerges, especially from paragraph l) of article 7 or any other constitutional or international
provision that prohibits the law from allowing the extradition of a foreigner in transit detained in
national territory without requiring reciprocity, in these cases essentially applying the principle of
territoriality.

9.10.  Therefore, the Constitutional Court cannot conclude that hypothetical rule arising
from article 6, paragraph 4, last segment, and articles 3, paragraph 3, of the Law on Judicial
Cooperation, according to which *Waiver of reciprocity is possible in any form of
international judicial cooperation, including extradition*, does not comply with the
Constitution, due to incompatibility with the principle of reciprocity of benefits, with the principle of
equating foreigners and stateless persons with nationals and with the duty to treat foreigners in transit
in a manner compatible with international human rights standards.

**10. Hypothetical rule arising from article 55, paragraph 2, and 46, paragraph third,
last segment, of the Law on Judicial Cooperation in Criminal Matters, according to which
*The extradited person has the right to lodge an opposition, but, despite the requirement for due
diligence of testimonial evidence, he can only base this on the fact that he is not the person
claimed or that the assumptions of extradition are not met,* does not comply with the
Constitution, due to incompatibility with the defence guarantee.**

10.1. In terms of argument,

10.1.1. In relation to this item, which deals with the limitations that were imposed on the
opposition that he lodged and the steps of evidence that he requested, the appellant says that they
did not allow him to demonstrate that the facts that constitute the predicate crime of money
laundering occurred in Venezuela. Therefore, according to Cape Verde's conflict resolution rules
on the application of the country's criminal law in space, the



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

137

criminal relevance of these facts should be investigated in accordance with the law of the South American country and not of the USA, which is essential to ascertain the appellant's effective involvement in the alleged illegal behaviour. And that, in addition to that, it also did not allow him to produce evidence on other aspects, namely on his health status, on the payment of the visa, mission documents, and several others about which he could provide evidence, as he could do it in relation to the worsening of his procedural situation, the validity of his detention and the political context of his detention.

10.1.2. The Public Ministry's claims are directed towards the fact that the failure to carry out evidentiary steps does not generate any constitutional inconsistency, since even in the scope of criminal proceedings, the law attributed the power of direction to the judge, allowing it to reject useless investigations. Furthermore, it understands that the jurisprudence of Portuguese courts, other countries and Cape Verde has considered that it is not appropriate for the defendant to defend the crimes of which he is accused by the requesting State, since he will have the opportunity to do so before the courts of this country. It also considers that the appellant refers to international instruments that do not contain any provision relating to extradition, are not applicable and that he understands that he should have been authorized to present evidence to defend his procedural position, based on a wrong assumption that they are the processes of extradition trials. But that these are not intended to assess the presuppositions for the imputation of crimes to the target agent of the extradition process, but simply to ensure the existence of different evidence to allow the delivery of the extradited person to the Requesting State so that it can judge him for the facts of who is accused and assesses his guilt or innocence.

In his view, such a solution has diverse and valid foundations at its base, since the assessment of this issue would lead to: a) the sovereignty of the Requesting State being in question or restricted; b) as the assessment of the assumptions of imputation requires an understanding of the criminal law of the requesting State, its interpretation by the requested State would always be risky, as it is a foreign law, with its particularities; c) the fact that the requests do not, as a rule, specify all the grounds underlying the indictment directed at the extradited person, would lead the requested State to try to assess the guilt based on an incomplete record, thus generating a series of inconveniences; d) the



CERTIFIED TRANSLATION LANGUAGE REACH
12/09/2021
No. 07835166

138

reassessment of the assumptions of the charges against the accused would place a significant burden on the requested State, implying a thorough analysis of all evidence presented by both parties insofar as the violation of the law of the requested State would not be involved. Therefore, the segment concludes by stressing the inability of the defendant to produce evidence to support his position, but that does not result in the limitation of his defence, as he may do so before the requesting State, under the terms established by its procedural law. This would be an understanding supported by Portuguese jurisprudence that would serve as a reference to the Cape Verdean one, given the similarity between the laws and it would not be understood how these provisions could undergo such different interpretations, not constituting in Portugal the prohibition of the extradited person to present their criminal defence constitutional violation. He also says that the allegations about the fact that this prevented him from presenting objections to the principle of specialty and the prohibition of double criminality, which are pillars of the extradition process, is unfounded because these principles do not imply an analysis of evidence relating to the facts that support the accusation in the requesting State, but only of the facts on which the extradition request is based. Finally, on this first segment he says that the case law of the United States goes in the opposite direction of what is alleged by the appellant, as it would also be in line with the model adopted by the Law on International Judicial Cooperation in Criminal Matters, in the sense that both contain limitations on the presentation of evidence of defence in criminal proceedings during the extradition process. Even when this legal system allows the defendant, at the judge's discretion to present, limited evidence that aims to explain the charges against him, considering that, in the specific case, what is wanted is to directly oppose the facts that support the prosecution, this objective is in direct contravention of American and Cape Verdean jurisprudence. It concludes that the procedural regime of extradition ensures constitutionally protected guarantees of defence, namely the right to a double degree of jurisdiction, not reaching the extent to which the measure may be a violation of the principle of *ne bis in idem*.

10.2. Regarding the issue that matters for the resolution of this incident, the Supreme Court of Justice argued in the Appellate Decision that the thematic limitation of the evidence that the extradited person can do, typical of the limited litigation model, does not result in any unconstitutionality, since it is not before a pure criminal process. In this case, in its understanding, the Respondent State is not making any attribution of



CERTIFIED TRANSLATION
12/09/2021
139
LANGUAGE REACH

crime to the extraditee, nor is it a judge, in respect of his person.

The way the Constitutional Court interprets the understanding of the top body of the judicial courts based on the position it expresses on paragraph 2 of article 55 and paragraph 3 of article 46 of the Law on International Judicial Cooperation in Criminal Matters, in insofar as the first rule is limited to establishing the challenge that must be included in the opposition paper and considering that the limitation of the second applies only to the proof of facts imputed to the person extradited by the Requesting State, the allegation of facts on the other issues that do not fall under the concept of "imputed facts" it is imperative that the production of proof be admitted.

10.3. The parameters indicated by the appellant regarding this issue refer once again to article 35 of the Constitution, namely its numbers 6, 7 and 9, and to number 1 of article 22. As discussed above, the Constitutional Court does not consider that the guarantees reserved for defendants in Article 35 of the Constitution are formally applicable to the extradited person, who is constitutionally and legally, regardless of a common core of protection, subject to a different and proper regime. In this sense, what may be at issue is the other constitutional provision that the appellant himself indicates, paragraph 1 of article 22 of the Constitution, which, insofar as it includes a principle of fair process, is projected on any form of process, imposing, given the nature of each one and the stage where it is to be applied, the guarantees that refer to this conception of justice of the process, where the right of defence is clearly housed, including, in this case, also the guarantee to the adversary system. However, as mentioned above, in the understanding of the Constitutional Court, given that it is not a situation in which the State of Cape Verde itself imputes a crime to a person, the defence does not have to be conceived as broad, but as an effective and adequate defence to a type of process that, which may lead to a criminal conviction or criminal execution and consequent loss of freedom of a person, in the requested country is intended only to verify whether the positive and negative conditions of form and substance, provided for by the Constitution and by the Law to grant extradition are fulfilled, before authorizing it.



10.4. There is no doubt that a rule that prevents an extradited person from proving certain facts affects his guarantee of effective defence. However, this does not necessarily result from the unconstitutionality of such a legislative measure, considering that practically all rights, namely those that assume the nature of procedural guarantees, are subject to limitation or deviations as long as there is a legitimate purpose for such and as long as they comply with the essential conditions that justify its assignment (*Judgment 29/2019, of August 16, Arlindo Teixeira v. STJ, referring to the rule provided for by number 1 of article 2 of Law No. 84/VI/2005, referring to the principle of holding public hearings in the courts, and the guarantee of public hearing in criminal proceedings, as well as guarantees to a due process, adversarial principle and full defence*, 7.2).

10.4.1. In this case, we are faced with a traditional norm of the legal regime of extradition, which, ultimately, derives from the extradition process model that the legislator adopted in Cape Verde and which the Supreme Court of Justice has sagely designated as limited or of Belgian model. In its terms, anchoring on the premise that a criminal proceeding is not being promoted in the Respondent State to determine the guilt of a person, but merely a judgment to verify the conditions that enable the provision of international judicial cooperation through extradition are present, it would not even be up to investigate the criminally relevant facts that are imputed to the extradited. Even because these, if extradition is granted, will be subject to consideration in the competent courts of the Requesting State.

10.4.2. The legislator's options for such a model can be easily inventoried from a structural point of view once it is considered that its adoption is common in countries with a Roman-Germanic legal tradition, such as ours. But also arising from more systemic reasons to avoid proceeding with a mini-trial of the case pending in the Court of the Requesting State for preliminary determination of evidence of the guilt of an extradited person based on the analysis of facts that occurred in that country or about which has jurisdiction, whose typification would also require an in-depth analysis of a legal system with which it is not familiar, and which could, ultimately, lead to a violation of the principle of *ne bis in idem*. And also, for pragmatic reasons, to favour a speedy extradition process



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
141

that allows the State to provide effective international judicial cooperation in criminal matters; In this sense, the legislative option in question is so radically linked to the model that it would probably be necessary to change the entire process to accommodate any solution that would allow the direct discussion of these facts, namely regarding the entities authorized to intervene in the process, at the time of the process and consequently the term of provisional detention, and eventually adopt another model of extradition process.

10.4.3. When verifying these reasons justifying the legislative solution in question, there will be no doubt that the legislator could invoke a legitimate interest in limiting the guarantee of defence in extradition proceedings. However, this would certainly not be enough, considering that the constitutional compliance of such a measure would depend on being able to adapt it to the criteria of restriction of rights provided for in paragraphs 4 and 5 of article 17 of the Constitution of the Republic.

10.5. In this regard, the Constitutional Court understands that since the rule in question has a general and abstract character and does not produce any retroactive effect, the fundamental question is whether it reduces the extent of the essential core of the law or, alternatively, it is disproportionate.

10.5.1. Regarding the first item, noting that the purpose of the extradition process, as clearly prescribed by number 3 of article 46 of the Law on International Judicial Cooperation in Criminal Matters, is to decide on the granting of extradition based on its conditions in substance and in form and not exactly to determine the guilt of the extradited person. Allowing the extradited person to claim and provide evidence on any issue that does not refer to the concept of facts imputed by the Requesting State, is far from reaching the essential core of its right to defence, since it can do so in relation to anyone that refers to the discussion on the origin of the background conditions and form of granting the extradition.

10.5.2. For the same reasons, it would hardly be promising to verify the fulfilment of the proportionality requirement, since, according to the test that the Constitutional Court of Cape Verde has been applying since the aforementioned



CERTIFIED TRANSLATION
12/09/2021
20-07835166
LANGUAGE REACH

*Judgment 7/2016 of 21 April 21*, Rapporteur: JC Pina Delgado, 4.3.2, the legislative measure is
suitable, as it allows to achieve the objective that comes with it of not discussing the facts that are
imputed to the appellant because they demand more procedural time, as they lead the courts to
consider aspects of foreign law that naturally do not dominate and by anticipating a determination
which will in any case be made by the Requesting State; it is, moreover, necessary because there
would be no less restrictive means that would allow this precise end to be adequately achieved;
finally, it is balanced, considering that being available to the extradited person to provide evidence on
any other issue involving the extradition process, in relation to the facts attributed to him/her, he will
still be able to provide evidence in the courts of the Requesting State in accordance with the
procedural rules applicable, which, in any case, must correspond to the requirements of due legal
process under the terms of paragraph a) number 1 of article 6 of the Law on International Judicial
Cooperation in Criminal Matters.

10.6. For these reasons, the rule arising from number 2 of article 55 and the final part of
number 3 of article 46 of the Law on International Judicial Cooperation in Criminal Matters,
according to which *The extradited person has the right to file an opposition, but, despite the
requirement for due diligence of testimonial evidence, he can only base this on the fact that he
is not the person claimed or that the assumptions of extradition are not met,* is not inconsistent
with the Constitution, and should not be declared as such.

**11. Hypothetical rule arising from article 56, second paragraph, of the Law on
Judicial Cooperation, according to which the** *processing of the passive extradition process
does not require that the judgment in the Appeal, as a court of first instance and not a court of
appeal, be made at a hearing, but in chambers, as the law does not determine, either directly or
indirectly, that the extradited person be heard at a second hearing before the judge***, does not
comply with the Constitution due to incompatibility with the principle of holding public
hearings in courts and with the principle of fair and equitable process.**

11.1. The appellant raised this issue, namely, in his appeal to the Supreme Court of Justice
against Judgment No. 48/20-21, of January 4, handed down by the Barlavento Court of Appeal of
Barlavento. There it states in the conclusion kk) that "*In relation to the*

*hearing provided for in article 56 of the LCJ, the hearing of the extradited person was not held,
which is mandatory and essential in the judicial process of extradition".* Previously, at the
conclusion point designated as ii) it also indicates that *"the violation of the rules on the hearing
and personal notification of the Appellant provided for in articles 54, 55 and 56 of the LCJ as
practiced by the Appellate Court violates the constitutional and legal principle of the adversary
system…".*

11.2. Cutting out what is relevant for the purposes of this measurement of non-compliance with standards, the appellant focuses on considerations about the right of an accused to be heard, as currently, as he reports, has happened in Portugal, when due diligence is required, also within the spirit of the CPP. In this case, the appellant requested evidence and requested the addition of a document, making it necessary, therefore, for a public hearing to be held, which was not carried out by the Court. He also discusses the extradition process and its phases, and in the judicial phase, the appellant's hearing would take place. Denying evidence, namely the hearing, after the promotion of the judicial phase of the process, based on a previous hearing in the administrative phase, would violate paragraphs a) and b) of paragraph 1 of article 77 of the Code of Criminal Procedure, which would implement norms of constitutional law and international human rights law. He cites jurisprudence of the Constitutional Court regarding the right to be heard and for a hearing provided for by Article 35, and also national doctrine. The non-hearing of the extradited person, especially considering his request to give evidence, based on the urgency of delivering the extradited person to the requesting State would be a violation of several of the rights he holds.

11.3. The Public Prosecutor's Office, in its counter-claim, argues that it is wrong to extradite him, since *"the rule under scrutiny is clear in not requiring the hearing of the extradited person in a hearing, for the second time, and that such interpretation does not violate any constitutional rule or principle."* To support his thesis, the Honourable Attorney General of the Republic decided to cite an example of the Portuguese jurisprudence of the Constitutional Court regarding the extradition process whose normative regime inspired Cape Verdean legislation. Thus, he cited Judgment No. 192/1985, in which it is clearly stated that: *" In the extradition process, there is no place for discussion and a trial hearing: the evidence, although produced with the intervention of the extradited person, his lawyer or*



*defender, and the Public Prosecutor's Office – therefore in compliance with the adversarial rule, is not at a hearing; the decision is taken in chambers -, as it happened, whenever this falls to a collective court."*

11.4. The Supreme Court of Justice, through Judgment 28/2021, of 16 March, regarding the alleged omission of a hearing, considered that the matter had been the object of consideration and decision previously by the same jurisdictional body and that, for reasons of economy procedural, would limit itself to referring to its position contained in Judgment No. 57/2020. The content of the considerations then made is literally as follows: "*for what has already been said, the first reason invoked to support the violation of the adversarial principle - the decision-making without hearing the Appellant - does not appear to be well founded. It is effectively an uncontroversial fact that the Appellant was heard, under the terms established by law, and had the opportunity to present his opposition to the extradition request in writing."* He concluded by saying that *"the law neither directly nor indirectly imposes that the extradited person be heard in person."*

11.5. The appellant presented articles 32, No, 4, 35, Nos. 6, 7 and 9, 211, No. 4, of the Constitution as constitutional precepts where the normative parameters to assess the constitutionality of the hypothetical rule that he constructed would be housed. For the petitioner, the extradition process is a kind of criminal procedure to which all the principles provided for in the Criminal Procedure Constitution and the Code of Criminal Procedure should be applied.

However, the understanding of this Court is that not all criminal procedural principles are applicable to the extradition process, since, starting partially from the same basis, these two types of process are considered different processes and that also denote different regimes. Therefore, it is considered that the guarantees arising from article 22 of the Constitution on access to justice should be applied to the extradition process, especially the guarantee of a fair and equitable process that covers several important procedural rights, including defence, to the adversary and to the audience.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
0763-07835166

The present case calls for the following question to be asked: is it possible to restrict the rights, freedoms and guarantees that have been recognized as applicable to the extradition process?

The answer is, in general, in the affirmative, as the following guidelines contained in Judgment No. 29/2019, 30 July, 2019 must be invoked:

"*7.2. Before proceeding with the analysis of the concrete case sub judice, in order to ascertain whether the rule applied by the egregious praetorium defendant is incompatible with the Constitution, one more essential element must be brought to the fore. This is an issue that the Court has always discussed and that revolves around the possibility or not of limiting rights, freedoms and guarantees. The Constitutional Court has considered that situations in which a right, freedom and guarantee could not be affected would be very rare, thus leaning towards accepting the idea that these legal positions would have a relative character and could be limited, especially through of the restriction, when certain conditions are met, principally those provided for in paragraphs 4 and 5 of article 17 of the Constitution of the Republic.*"

The same decision deepened the reasoning in the sense of being able to limit these rights, freedoms and guarantees, since there is a constitutional provision for the restriction, as article 22 refers the regulation of rights derived from the principle of access to justice to the Law. However, even if that were not the case, by their nature, they are relative rights that would always have to be limited in some way, with a view to ensuring the exercise of other fundamental rights.

11.6. If in general it is recognized that there is enough constitutional credential to operate restrictions to rights, freedoms and guarantees such as those attributed to the extradited person, in this specific case, there are specific reasons to defend that Law No. 6/VIII/2011 of 29 of August, which establishes the principles governing International Judicial Cooperation in Criminal Matters, restricted certain rights, freedoms and guarantees applicable to the extradition process.



146

A The rule applied by the Supreme Court of Justice from which the hypothetical rule under examination was constructed follows from the provisions of article 56 (**Production of evidence**) of Law No. 6/VIII/2011 of 29 August:

*1. The steps that have been requested and those that the reporting judge deems necessary, namely, to decide on the fate of the seized items, must be carried out within a maximum period of 15 days, with the presence of the extradited person, the lawyer or lawyer appointed, and the interpreter, if necessary, as well as the Public Prosecutor's Office.*

*2. Once the production of evidence is finished, the Public Prosecutor's Office, the defender or the lawyer of the extradited person will, in turn, view the process for five days, for pleadings.*

If one interprets the norms provided for in article 56 of the Law on International Cooperation in Criminal Matters, starting, as it should, from the text, one cannot fail to agree with the Supreme Court of Justice when it asserts that "the law does not impose either directly or indirectly that the extradited person be *heard at a second hearing before the judge"*.

11.7. However, the rule applied by the Supreme Court of Justice and the hypothetical rule constructed by the appellant cannot be evaluated outside the specific context of the extradition process, and without taking into account, in particular, the right to fair and fair trial, the rights of defence , the contradictory and the audience.

In this sense, the hypothetical rule in question must be analysed in the specific context of an extradition procedure that was considered, first, by the Court of Appeal as a Court of First Instance; second, by the Supreme Court of Justice as a Court of Appeal whose cognitive power is limited by the conclusions of the appeal and by the Constitutional Court, which, as a court of appeal restricted to the question of unconstitutionality, also cannot distance itself from the pretext process in which the standard was applied.

The hypothetical norm according to which *the processing of the passive extradition process does not require the judgment in the Court of Appeal, as a court of*



CERTIFIED TRANSLATION
12/09/2021
0783 07835166
LANGUAGE REACH

*first instance and not court of appeal to be done in a hearing, but in chambers, as the law does not determine, either directly or indirectly, that the extradited person be heard in a second hearing before the judge,* this is associated with the previous question in relation to which the Constitutional Court took a position in the sense that the option for the model in which the production of evidence is not admitted except in relation to the identity of the extradited person and the assumptions of extradition is not unconstitutional. Therefore, the non-acceptance of the production of evidence regarding the facts that the Requesting State imputes to the extradited person, according to the so-called Belgian model, does not violate the Constitution, since it is a legitimate, adequate and proportional restriction.

The decision that decreed the extradition was not preceded by a second hearing or, from the appellant's perspective, it was not preceded by a hearing that should be public, because, according to the Court of Appeal of Barlavento, Judgment No. 57/2020, issued by the Supreme Court of Justice, which recognized that there had been an omission of pronouncement attributable to the Court of Second Instance with jurisdiction over the Barlavento area, as it did not rule on the request to hear the witnesses, did not constitute any nullity, having qualified the aforementioned omission as a mere irregularity that should be challenged within three days from the date on which the first Judgment was notified. And that having raised the issue only at the time he filed an appeal, he considered that the extradited person had allowed the right to do so forfeited. The Court of Appeal of Barlavento understood that if it had carried out the questioning of those witnesses, after the Supreme Court of Justice had ruled definitively on this matter, it would be violating the principle of intangibility of res judicata.

Therefore, the rule of paragraph 2 of article 56 of the Law on International Judicial Cooperation in Criminal Matters that the Supreme Court applied was based on the fact that no evidence had been produced, for reasons attributable to the appellant. Therefore, a second hearing was not warranted.

Based on this understanding, it is inferred that in cases where there is production of evidence on the identity of the extradited person and/or on the assumptions of extradition, the hearing of the extradited person for the second time and in a hearing is not excluded.



148

The holding of the hearing, which translates into the hearing of the extradited person for the second time, only occurs when the evidence required by the extradited person and authorized by the judge is carried out.

In a swift process, in which it is not disputed whether the extradited person committed or not the crime for which he is sought by the Requesting State, in a model in which it was expressly established that the production of evidence has a restricted scope, it is clear that the performance is not justified. of audience in the void.

11.8 It is now important to verify whether the hypothetical norm constructed by the appellant, according to which it is now important to verify whether the hypothetical norm constructed by the appellant, according to which *the processing of the passive extradition process does not require the judgment in the Court of Appeal, as a court of first instance and not court of appeal to be done in a hearing, but in chambers, as the law does not determine, either directly or indirectly, that the extradited person be heard in a second hearing before the judge,* would be inconsistent with the Constitution, for violating the principle of fair and equitable process.

Regarding the right to a fair trial, the Constitutional Court, through Judgment 15/2017, of July 26, Rapporteur: JC Pina Delgado, published in the Official Gazette, Series I, No. 35, 6 June, 2018, pp. 844-856 and in the Collection of Decisions of the Constitutional Court of Cape Verde, Praia, INCV, 2018 (2017), v. IV, pp. 137-176, considered that *the right to a fair trial is associated with the effectiveness of the means of defence of rights, with a concrete projection on (..) the time reserved for it, in addition to other dimensions such as equality of arms, the recognition of prerogative to exercise the adversary system, as well as to obtain a duly substantiated decision by judicial bodies composed of impartial judges. If such dimensions are inherent to it, it cannot be forgotten that this is a right that is already rationalized by the constituent legislator, precisely because it foresees the need to keep it balanced against opposing rights and the legitimate interests of the State in the matter. administration of justice. That is why the expression "equitable" is used, in the right proportion, equivalent, already including a clear nature of measurement.*

*[..]*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

149

*As a similar right, freedom and guarantee, the structure of the right to a fair trial has implications for how it can be legally complied with, namely in the context of restrictions imposed by the legislature."*

It is now recognized by the doctrine that the constitutional guarantee of a fair process does not eliminate or remove the legislator's freedom to conform the process, imposing, however, that the regulatory framework of the process assures interested parties effective means of defending their rights or legally protected interests and parity between the parties in a lawsuit. Thus, a fair process must be understood as postulating the effectiveness of the right of defence in the process, the observance of the adversarial principle and the equality of arms, as well as the equality of arms referred to above.

11.9. As for the right to an adversary proceeding, which, as stated, is a natural consequence of the right to a fair trial, since the process will never be fair, in criminal proceedings, if the defendant is not recognized the procedural opportunity to counter-claim, if so understand, and by the means it deems pertinent, the accusation against him in its various dimensions, the Court, in the context of the Alexandre Borges v. SCJ, Judgment No. 24/2018, of 13 November, Rapporteur: JC Pina Delgado, understood that "*the opportunities to exercise it derive, as already pointed out, from the Constitution of the Republic, as a subjective right emerging from the right to a fair trial provided for in its number 1 of article 22, are further increased in the case of sanctioning processes - in light of the number 6 of article 35, which provides that "The criminal procedure has a basically accusatory structure, with the instructive acts determined by the law, the indictment, the trial hearing and the appeal being submitted to the adversarial principle*".

The adversarial principle, when applied to the extradition process, thus has an instrumental vocation for the realization of the right of defence and the principle of equality of arms: from a procedural perspective, it means that no decision can be taken that affects the extradited person without be given the opportunity to speak out; in terms of equality of arms in the administration of evidence, it means that any of the interested procedural subjects, namely the one sought by the Requiring State,



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH
1210763566

must be able to summon and question witnesses about their identity and the requirements of extradition.

Reverting to the case before us, the principle of adversary proceedings is fulfilled, and the extradited person was heard at the time the law imposes it, filed opposition to the extradition request, presented documents, requested the hearing of witnesses, which was not carried out by reasons that, under the terms of the decisions of the competent courts, are attributable to it. In other words, it was always granted the right to exercise an adversarial position on the position of the Public Prosecutor's Office, having made its pronouncement after the interventions of the interested party. Therefore, the adversarial principle proves to be duly assured.

11.10. It is now necessary to verify whether the rule applied by the Supreme Court of Justice violates the principle of public hearing.

First of all, it must be said that the idea of public judgment corresponds to a democratic principle and transparency of justice that strengthens the trust that citizens have in judicial institutions. But this principle must be put into perspective when it comes to the extradition process.

Judgment No. 29/2019, of 30 July, established the following guidance on the hearing in the courts:

*"The first constitutional provision, contained in title V of Part IV, relating to the judiciary, has the stipulation that "4. Court hearings are public, unless otherwise decided by the Court, duly substantiated and issued under the law of procedure, to safeguard the dignity of people, the privacy of private life and public morals, as well as to guarantee its normal functioning" Its essential nature is not a fundamental right in kind that can be appropriated individually by the person who becomes its holder. It is, in fact, an objective principle arising from the constitutional concept of the rule of law, and which integrates the country's Judicial Constitution, embracing one of the main dimensions of publicity in criminal proceedings, according to which criminal proceedings must, on the one side, be*



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
110-07835166

151

*transparent, and on the other, allow the participation and monitoring of interested parties and the general public*"

It should be noted that the Constitutional Court did not hesitate to consider that this is an objective principle arising from the constitutional concept of the Rule of Law.

The same decision, in relation to the rule contained in no. 9 of article 35 of the Constitution, considered that the holding of a trial in a public hearing in criminal proceedings is a subjective right of the accused, *to the extent that the constitutional legislator enshrined it alongside other important criminal procedural guarantees, precisely because it wanted to strengthen the defendant's defence guarantees and ensure that the trial in criminal proceedings can be publicly controlled by all who - in theory can always attend it and make the assessments they understand about it – in order to check whether it was carried out with transparency and impartiality. Here, not because of social and popular interest in the monitoring of justice, but as a presupposition of guarantee of fair process and impartial performance of the Court and the precaution against any inadequate handling of the judicial system that could affect the rights and interests of any defendant.*

The decision, after having recognized that the defendant has the right to have his case tried at a public hearing, did not fail to recognize that, by its nature, the right to a public hearing is not absolute.

11.11. However, since the person being extradited is not an accused, it is doubtful that the rights, freedoms and guarantees reserved to the accused can be fully applied to him.

In the present case, similarly to the exercise carried out in relation to other rules whose unconstitutionality was raised, there are reasons to believe that the law that regulates the extradition process has restricted certain rights as they are incompatible with the nature of this procedural type.

It is understood, therefore, that the Law on International Judicial Cooperation in Criminal Matters does not provide that the decision on extradition has to be taken at a public hearing when there is no place for the production of evidence.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
2120835166

The extradition process is marked by special speed aimed both at safeguarding the rights of the extradited person and at realizing the public interest in providing international cooperation.

There is authorization to restrict and there is no discussion on the general and abstract nature of the applied rule, not being able to attribute retroactive effects to it, not reaching the essential core of the right of hearing, which is safeguarded in cases where there is authorization for the production of the evidence, showing the measure as suitable and adequate to satisfy the public interest of providing international judicial cooperation, being a necessary and balanced measure, it cannot be considered disproportionate and incompatible with the principle of hearing. On the other hand, it does not follow from the Constitution, the Law on International Judicial Cooperation in Criminal Matters or the Code of Criminal Procedure that the decision itself, that is, the deliberation on extradition, has to be taken in a hearing and not in a conference, as the applicant seems to suggest.

This is the guidance that is extracted from the following excerpt of Judgment No. 29/2019, of July 30: "*For in relation to this, the applicable legislation, in addition to providing that it takes place in a conference, does not oblige the Court to present the result thereof - the judgment, therefore, in the strict sense - in a public manner.*"

11.12. In these terms, the hypothetical rule arising from paragraph 2 of article 56 of the Law on Judicial Cooperation, according to which the procedure for passive extradition *does not impose that the Judgment on the Relationship*, as a court of first instance and not a court of appeal, *be done in hearing*, but as a full-bench, insofar as the law neither directly nor indirectly determines that the extradited person be heard in a second hearing before the judge, it is not inconsistent with the Constitution, as it does not violate the principle of fair and equitable process, of adversarial proceedings, nor the holding of a hearing in an extradition process, when there is no place for the production of evidence.

**12. Hypothetical norm arising from *articles 15, number 4, and articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with a decision of the ECWA-TJ*, that the Supreme Court of Justice refused to apply, considering**



**that for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and ratified, Cape Verde not having signed the protocols that recognize the competence of the ECOWAS Court of Justice in terms of human rights and since it is not a supranational organization for the purposes of paragraph 3 of article 12 of the Constitution, it does not comply with the Constitution for violating the principle of sovereignty, constitutional rules on the binding of the State of Cape Verde to treaties and the principle according to which it is not may deprive the courts of their jurisdiction.**

12.1.  Regarding the substance, the allegations presented,

12.1.1.  On the part of the appellant, it is pointed out that the appealed judicial body did not apply a rule resulting from articles 15, number 4, and articles 34, 89 and 90 of the Constitutive Treaty of ECOWAS and the Protocols referring to the Court of Justice of 1991 and 2005, which, binding Cape Verde, would oblige the country to comply with the decisions taken by the body of that community, using the argument that for a treaty to have full effectiveness it must be signed and ratified and, not being that supranational organization, they could not be incorporated from number 3 of the article 12, and because it would not comply with the national sovereignty clause of Cape Verde's Basic Law.

But, as the appellant argues, such an understanding would suffer from some problems, as, in its reading, above all, ECOWAS, having a parliament, an executive body and a court would be a supranational organization, hence its legal acts , namely the decisions of the Conference, would be incorporated directly through the mechanism established by paragraph 3 of article 12 of the Constitution. In addition, according to him, Cape Verde's position is dubious, as it appoints judges to the Court and participates in proceedings, but after being defeated, he alleges lack of jurisdiction. Furthermore, he understands that the decisions of the ECOWAS Court of Justice are binding and must be complied with by the Member States without these being able to appeal to the argument of non-domestication of its rules to avoid its execution, as, moreover, it has understood its  jurisprudence of the Regional Praetorium.



Assuming that ratification would be necessary, the fact that the Protocol enters into force provisionally under the terms of number 1 of article 11, would lead to the irrelevance of that other binding act. Finally, it would be justified to apply the decision as a matter of human rights, by the imposition of compliance resulting from the 1991 Protocol, by the effects of ratification and signature ignored by the appealed judicial body and the form of binding to the ECOWAS treaties concerned, by the vast jurisprudence of the ECW-JWT on these issues and by principles of international law that would impose their observance, namely the primacy of international law over domestic law, the essentiality of signature and ratification, and the extensive application the principle of good faith and the extensive application of the *pacta sunt servanda* principle. I should also add that the State disregards the principle of *estoppel* and the jurisdiction arising from the situation of *forum prorogatum* that it describes.

12.1.2. In turn, the Public Prosecutor's Office considered that the issue had been misplaced, not least because the Cape Verdean system would not be able to scrutinize the constitutionality of international norms relating to this organization, as the unconstitutionality of norms of domestic law and non-standards arising from the interpretation and application of Public International Law.

12.2. In the part that includes the contested segment of this part, the Supreme Court of Justice develops an articulated guideline, according to which, as this Constitutional Court understood it, the fundamental reason that determines its conclusion of unconstitutionality due to non-compliance between the constructed hypothetical rule by the appellant and the constitutional principle of national sovereignty would result from the fact that it is intended that the State of Cape Verde, and, therefore, its courts, are bound to comply with an international norm attributing jurisdiction to a regional court to which the State did not consent and consequently, was not incorporated into the domestic legal system, because neither the State signed the Protocol that provides for it, nor is ECOWAS a supranational organization.

12.3. The question that the Public Prosecutor's Office brings to judgment makes some sense, since the hypothetical rule that the Supreme Court of Justice refused to apply for reasons of unconstitutionality is elaborated by the appellant partially from rules whose construction depends on two treaties on which they hang doubts bine Cape Verde



internationally and whether they have been incorporated into domestic law, namely the 1991 and 2005 Protocols relating to the ECOWAS Court of Justice. And this is the primary issue that precedes the determination of the unconstitutionality raised, as it is necessary to verify whether the hypothetical rule constructed depends on the application of treaties that are not incorporated into the internal law of the Republic of Cape Verde. And this issue is essential even to know the problem raised by material unconstitutionality due to non- compliance with a rule that the Supreme Court of Justice has defied with the principle of national sovereignty.

12.3.1. From an analysis of the treaties in question, it is easily demonstrated that the ECOWAS Revised Treaty of 1993 binds Cape Verde – which had already become a member of the organization in 1979 – as it was duly ratified by the authorities of the Republic, in accordance with the procedures established by the Constitution. of Cape Verde 1992, published in the *Official Gazette* (Series I, No. 37, Sup., of 3 November, 1995, pp. 2-47), being also in force in the international sphere. Therefore, in this sense, the invoked article 15, number 4 - which defines the obligation to comply with the decisions of the ECOWAS Court of Justice, by the Member States, by the Community Institutions and by natural and legal persons - article 34 - which regulates the Community tourism policy, brought up here perhaps by mistake – article 89 – according to which the revised treaty and the protocols which form part of it will enter into force after its ratification by at least nine Member States in accordance with the norms constitutional provisions of each signatory State - and, finally, article 90 - under which any State may submit proposals for the purpose of amending or revising the "present treaty", establishing the competences and procedures in this matter - considered in itself , bind the State of Cape Verde and were duly domesticated under the terms of number 2 of article 12 of the Basic Law of the Republic.

12.3.2. The 1991 Protocol on the ECOWAS Court of Justice, which gave it certain powers in matters of interpretation of the Treaty or the resolution of disputes between Member States, including those involving their nationals, provided that the State takes action, or between these and the institutions of the Community, also recognizing the procedural legitimacy of the Conference, it was signed by the then Prime Minister Carlos Veiga, but it was not ratified or published in the *Official Gazette*,



its official edition in a foreign language can only be found in the official journal of the Community (see 19, July 1991, p. 4 ff.). From an International Law point of view, foreseeing this treaty in article 34 that it would enter into force provisionally when signed by the signatory Member States, there will be no doubt that, from an international point of view, it binds Cape Verde. Although the issue of non-publication may be transferred to the new constitutional order erected from 1992 onwards as a presupposition for the internal incorporation of the rules of this Protocol, which can be assessed on a case-by-case basis, and that any material unconstitutionalities that the treaty may always carry be measured for the strict purposes of assessing the conformity of international binding, it is not relevant to analyse whether the signature was promoted by a constitutionally competent authority in light of the 1980 Constitution or not and in accordance with the procedures provided for therein.

12.3.3. Unlike the case of the 2005 Protocol, which, due to its date, falls under the regime of binding the State of Cape Verde to treaties enshrined in the 1992 Constitution. ECOWAS Official Journal, v. 46, January 2005, p. 3 et seq., although not translated into Portuguese. As can be seen from this publication, and from information provided by the Cape Verdean chancellery, this country never signed and, for obvious reasons, ratified this treaty. From the analysis of the official newspaper of this Republic, namely the I Series of the Official Gazette, neither can the parliamentary approval to ratify nor the publication of its text can be identified. However, the appellant considers that ratification in this case, on the one hand, would not be necessary, since the treaty began to be applied provisionally between the Member States in its terms, and, on the other, because Cape Verde through its subsequent conduct was linked to it by virtue of the *estoppel*, issues that will be addressed further on.

12.3.4. It is both the individual effects of these precepts and protocols, as well as their conjugation, that the necessarily hypothetical norm is inferred that the appellant proposed to the appealed court, as in their construction they would determine the binding of Cape Verde to a duty to compliance with decisions of the ECOWAS Court of Justice, which corresponds to the hypothetical norm disapplied by the Supreme Court of Justice for reasons of unconstitutionality. Therefore, determining that this Constitutional Court verify that, first,



Cape Verde is bound by the Protocol of 2005 concerning the ECOWAS Court of Justice, despite not having expressly signed or ratified it, either because an implicit signature situation occurred, or because it was bound to its provisional application under the terms of the treaty itself, or because it is bound by reason for the application of the estoppel institute, or because this would result from the situation of forum prorogatum in which it will have been placed. And, second, if it is not possible to conclude that it is bound tout court to the 2005 Protocol, whether it would not result from the combined application of the 1993 Revised Treaty and the 1991 Protocol, which would bind the State of Cape Verde.

12.4. Before going into this specific discussion, it should be said that for the Constitutional Court, the central issue to be discussed from the point of view of the internal mechanism of incorporation of these norms does not have to do directly with number 3 of article 12, but essentially with its number 2.

12.4.1. As a whole, article 12 must be analysed in accordance with the purposes collimated by the constituent legislator to establish mechanisms for the incorporation of international norms from various sources of International Law, namely the two main ones, customary (number 1) and conventional (number 2). Therefore, when number 3 is interpreted, it is also in the sense that it is providing for a mechanism for incorporation, this time of normative acts of international organizations (*Judgment 30/2019, of 30 August (AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights of defence, the adversary system and access to the evidence of the prosecution)*, Rep: JC Pina Delgado, 6.5.1). Therefore, the term 'legal act' must, from the reading that is imposed due to the purposes of the provision, be read as a normative act.

12.4.2. Regarding Cape Verde's link in this way, not even the issue of supranationality seems decisive, but rather, it is more decisive to verify whether the 2005 Protocol is a normative act and whether it is expected to have a direct effect on the legal order of the States. It is not understood that any of these requirements are present, as a glance at the 2005 Protocol is enough to reach the conclusion that you are faced with a conventional instrument approved not on behalf of the Conference as a normative act of its collective competence as an International Integration Organization, but by the "High



Contracting Parties" gathered together and that they have agreed to amend a treaty, with specific treaty language, namely modifying and amending, depositing, registering with the African Union, the United Nations and such other Organizations as the Council determines. As such duly distinguished by the ECOWAS official journal itself as a protocol and not a decision of the Conference. It does not seem, therefore, to this Court that it is relevant to ask any question about the possible application of number 3 of article 12 of the Constitution, which establishes the constitutional mechanism for the incorporation of normative acts of international organizations. On the contrary, the issue must be seen in the light of number 2 of article 12 of the Constitution of the Republic, modelled to regulate the conditions for receiving conventional norms in the domestic legal system.

12.4.3. On the other hand, the Constitutional Court does not consider that the Economic Community of West African States can automatically be classified as a supranational organization because it has, as the appellant develops, a parliament, a legislative body, a Government, executive bodies, and an organ of the judiciary, the Court of Justice itself. There are several other international organizations that have all these bodies, and it would be inappropriate to classify them as supranational organizations, first of all the African Union itself and other subregional projects. At most, it would follow that they would be regional integration organizations, with no inseparable relationship between a regional integration organization and a supranational organization, and the former may perfectly give that it is marked, as it is, by an implementation project and associated with the principle of gradualism and verticalization of integration, not immediately reaching the stage of supranationality – which is more likely – or never reaching it due to the lack of will of the States or material difficulties in its implementation.

In fact, by the nature of things, if one can even consider that a supranational organization emerges from a regional integration project, it will always be the last stage of a consolidated and successful regional integration project, which we have to find out if a case, through the analysis of its norms and institutional practices that characterize it. Although in this process of densification of regional integration, entities may gradually reveal certain elements of supranationality, their classification as a supranational organization depends on cumulatively presenting characteristics such as a) recognition by Member States of the primacy



of community law created by the entity's bodies over domestic law; b) the clear definition of the competences that the Community and its institutions exercise on behalf of and by delegation of States; c) the direct effect of its normative acts on these matters within the legal order of each of these Member States. The issue of institutional structure seems to this Court to be only complementary and instrumental to these characteristics, but, in any relevant case, in the strict perspective of reflecting them formally and materially, as the executive bodies have specific decision-making powers on community matters, the parliament has effective legislative powers, and the judicial body receives jurisdiction over the bulk of matters that fall within ECOWAS competences.

Given these criteria, it is very difficult, at the present stage of development, to consider ECOWAS to be a supranational organization, an epithet which, at this moment, seems, at this stage of comparative regional institutional evolution, to apply only to the European Union. The West African entity will aim, like any regional integration organization, to reach such a stage, but it is still far from achieving it, with Member States still almost as entrenched in essential aspects of their sovereignty as before, already in the framework normative and even more in its concrete practices. As, moreover, they accept authors sympathetic to the regional integration project as Jerry Ukaigwe, *ECOWAS Law*, Berlin, Springer, 2016, pp. 14-20.

12.4.4. Even if, by mere hypothesis, ECOWAS were a supranational organization, it would pose the same problem highlighted by the Illustrious Supreme Court of Justice. For the concrete purposes of Cape Verde, which is of interest in this case, there has always been a posture of rejection of linking to any regional integration initiative that reveals a transfer of classic sovereign powers, whether that of maintaining intra-regional order by not linking to the Protocol establishing the ECOWAS Mechanism for the Prevention, Management, Resolution of Conflicts, Maintenance of Peace and Security (published in the *Official Journal of the ECOWAS*, v. 37, December 1999, p. 12 and ff.), either that which, in addition to this, adopted certain substantive community values in matters of democracy and good governance (it does not appear to be published in the official ECOWAS journal), or that which changed the regime of acts provided for in the Constitutive Treaty ( published in the *Official Journal of the ECOWAS*, v. 49, June 2006, p. 21 et seq.,) or what expanded the powers of the Court of Justice in



2005, particularly relevant in this case, as already discussed. Moreover, if one checks correctly, from the list of ECOWAS instruments to which the country is bound, regardless of political speeches, it is easy to conclude that they focus essentially on economic integration and are directly related.

12.4.5. Be that as it may, even if it were a normative act of an international organization in the broad sense, the incorporation of this type of standard through number 3 would depend, more than on the nature of the organization, especially on what is provided for in its constitutive convention, to which Cape Verde is bound, that it has the power to issue normative acts, which is attributed direct effect in the domestic legal order, in addition to the need arising from the constitutional principle of publicity of normative acts that are published in Portuguese in the official journal of the organization and/in the Cape Verde Official Gazette (*Judgment 30/2019, of 30 August, AGAM v. PGR, on violation of the right to private property, the guarantee of a judge, the private initiative and the rights of defence, the adversary system and access to the evidence of the prosecution)*, Judge: JC Pina Delgado, 6.5.1). In this specific case, Cape Verde, as already mentioned, did not commit to the 2006 Protocol that amended the Revised Treaty, namely its article 9 on the normative acts of the community. Again, it neither signed nor ratified it. Therefore, the only normative acts to which this country would be bound would be those taken by the Conference in light of the original version of that same article 9, which by virtue of the powers provided for in paragraph 1 of article 7, is limited to issuance directives on economic, scientific, technical, cultural and social harmonisation. This is obviously not the case.

12.4.6. Therefore, in the understanding of the Constitutional Court, the discussion promoted regarding the possibility of incorporating the Protocols through number 3 is not relevant, since what is at issue are conventions approved within ECOWAS and not normative acts of bodies of that organization, therefore, as previously considered, referring to number 2 of the same article 12.

12.5. And it involves addressing the elaborate legal theses put forward by the appellant, who, first, seems to extract this linkage from article 15, number 4, of the Revised Treaty, then from article 11 of the 1991 Protocol and, finally, from the direct link to the Protocol of 2005 because it is being applied provisionally, because of the



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

*estoppel*, in accordance with the application of principles of the International Law of Treaties and by virtue of the *forum prorogatum*.

12.5.1.   The thesis that article 15 of the Revised Treaty would also entail an obligation to comply with judicial decisions does not seem to be supported by reading and analysing the provisions and practices of ECOWAS. First and decisively because its number 2 refers to a protocol - in itself a legal act to which the States should be autonomously bound - the determination of the statute, the process, other matters relating to the Court, and, above all, the definition of its competences, establishing its jurisdiction, the active and passive procedural legitimacy and other determining issues. Since the Protocol is conceptualized by article 1 as an instrument of application of the Revised Treaty, which has the same legal force as it, the way of approving them has been strictly the same as that used to approve amendments to the treaty pursuant to article 90, that is, submitting them to the States gathered in a Conference that, as High Contracting Parties, discuss and eventually approve them, following the necessary internal constitutional procedures and the binding by ratification, if they so choose.

Therefore, without it having been the revised treaty to which Cape Verde is a party to define jurisdiction, questions of procedural legitimacy and others, referring to a protocol any obligation to comply with a decision of the Court would always depend on the State's consent to such competences being linked to this protocol that would define them. Accordingly, when paragraph 4 of article 15 provides that such decisions are binding, they are binding on Member States that, through specific binding to a Protocol, chose to submit to the jurisdiction of the Court of Justice and accept the exercise of the powers provided for therein.

Furthermore, as you rightly pointed out, the Supreme Court of Justice, even if such an effect was effectively produced from the Revised Treaty itself, thus granting a blank check so that any changes to the competences of the Court of Justice of the Community could pass to automatically bind the ECOWAS Member State, allowing it, for example, to exercise criminal jurisdiction, would inevitably lead, in the case of Cape Verde, to non- compliance with this normative interpretation of article 15 of the revised treaty with the principle of national sovereignty.



12.5.2. The same is true of the segment of number 2 of article 19 of the 1991 Protocol, which says that the decisions of the Court are immediately enforceable, because, for obvious reasons, according to this norm, they are. However, this does not answer the question of who and what, as it is not intended to define the jurisdiction or jurisdiction of the Court. Thus, when it is said that decisions are immediately enforceable, it is assumed that they are rendered in a situation in which the Court of Justice has jurisdiction over a State and competence in a certain matter in relation to that State. By itself, paragraph 2 of article 19 and the other provisions of the 1991 Protocol do not allow to infer any obligation of compliance by the States that signed it from a decision rendered by the Court of Justice in the framework of an individual complaint for violation of human rights, but only those arising from the powers originally provided for that did not include this matter, extending this duty in the domain under discussion in this process only to the States that also signed the 2005 Protocol.

12.5.3. Thus, from the point of view of International Law, the question refers exclusively to Cape Verde's commitment to the 2005 Protocol, which, according to the thesis put forward by the appellant, would result both from the fact that it is being applied provisionally, and from a situation of estoppel has been generated, as because this would result from certain principles of the International Law of Treaties and because we are facing a situation of *forum prorogatum*.

12.6. The forms of binding a treaty result from what is expressed in the treaty itself as a form of expression of consent, the same occurring with the terms for its entry into force. However, there may be situations in which a treaty may generate obligations and/or begin to apply even before its entry into force. Respective of the duty to refrain from undertaking acts that deprive a treaty of its object or purpose in accordance with the norm recognized by article 18 of the Vienna Convention on the Rights of Treaties between States of 1969 (text published in *United Nations Treaty Series*, v. 1155, 1980, p. 331 et seq.,), and of having to provisionally apply a treaty, as regulated by article 25 of this same legal instrument.



12.6.1. Article 11(2) of the 2005 Protocol on the Court of Justice provides that the manifestation of consent should be made by ratification, thus imposing a more solemn procedure, insofar as it comprises an initial signature in which the State would signal that it would be considering ratification, followed by a later moment in which it would materialize that intention by binding himself to it through this type of act. There will be no doubt that Cape Verde has not ratified this treaty, according to information provided by the national chancellery. Starting from the premise that there was no ratification, nor, at least, what will be consensual, signature, let us say expressly, the binding of Cape Verde would be based on other institutes of International Law.

12.6.2. Because, as the appellant points out, if a treaty provides for its provisional application, it may begin to take effect before it enters into force, in accordance with its terms and the consent of the contracting States. It is indisputable that number 1 of article 11 of the 2005 Protocol provides for its provisional application by stating that it would enter into force provisionally after being signed by the Heads of State and Government.

12.6.3. Even for States that are not party to this instrument, such as the Republic of Cape Verde (see register of States that are bound by this treaty on the page of its depositary, the Secretary-General of the United Nations https://treaties.un.org/doc/Publication/MTDSG/Volume%20II/Chapter%20XXIII/XXII I - 1.en.pdf, without the name of this State), any discussion of provisional application would inevitably depart from Article 25 of the Vienna Convention. First, because it is a rule of customary origin that binds our country regardless of formal binding to the treaty on the reference treaties; second, because it is a fact that Cape Verde at least conducts itself in matters of conventional relations as if most of the norms of the Vienna Convention were mandatory, legitimizing the understanding of the existence of a specific practice and of a conviction that it is mandatory; third, relevant to this acceptance is the reference made in the Revised Treaty to the role of the 1969 Vienna Convention on the Rights of Treaties in determining rights and obligations arising from the ECOWAS Treaty and the Revised Treaty.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021

12.6.4. Article 25 of the Vienna Convention which considers the possibility of a treaty being applied provisionally before its entry into force provided the treaty so provides (paragraph a)) or if the States that have participated in the negotiation have otherwise agreed (paragraph b)). Regardless of any theoretical question that may arise regarding the basis of the obligation to comply with a treaty that has not formally entered into force, if the State expressly agrees to apply it even before it enters into force by unequivocally indicating to the others its intention allows such a relationship to be covered by the principle of good faith, insofar as the State that signs a treaty, signalling its intention to become a party. If so, from the point of view of International Law, it would not only be obliged to accept the application of the treaty in accordance with the principle of good faith, but also the customary principle (no longer the conventional one of article 26 of the CVDTE) of *pacta sunt servanda*. Therefore, in principle, nothing prevents a treaty from being provisionally applied to a State that has consented to its application. However, for these same reasons the consent must be unequivocal.

12.6.5. In relation to the ECOWAS Protocol under discussion, the fact is that Article 11, according to which it enters provisionally into force after being signed by the Heads of State and Government, also includes a rule, according to which the signatory Member States, and ECOWAS commit to start implementing its provisions. Therefore, it is the protocol itself that, at the very least, condition any provisional application to the signing of the agreement by the Heads of State and Government, on the one hand, and the application to the signatory States on the other, when it says, unambiguously, that the "signatory States' Members" undertake to start the implementation of its provisions, showing a clear limitation in relation to the recipient of the norm, as the drafter of the 2005 Protocol instead of using the expression "Member State" deliberately opted for the term "signatory Member State", which can only designate the Member State that has participated, as is its right, in the negotiation of the proposed amendments, and has subsequently signed the Protocol, which was not the case with Cape Verde. Therefore, there is not the slightest basis for interpreting the norm in paragraph 1 of article 11 of the Protocol as imposing an obligation on a Member State that, like this Republic, has not signed it, since it will not have wanted to assume such an obligation. and because the Prime Minister lacks constitutional powers to bind the State of Cape Verde to the provisional application of treaties in this matter.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
Reg. 07635166

The idea that the provisional application of a treaty would be imposed on a State without an unequivocal expression of will would not be covered by any standard of Conventional or Customary International Law. There is no jurisprudence to support this legal thesis, nor eminent internationalists (see especially Danai Azaria, "Provisional Application of Treaties" in: Duncan Hollis (ed.), *The Oxford Guide to Treaties*, 2. ed., Oxford, OUP; 2020, p. 229 et seq., 233), who dealt with the issue recently considered the possibility that an obligation of provisional application of a treaty could emerge from a situation in which the State does not consent to it, freely expressing its will, being, as stated in one of the main representations of the state of international law in this matter (*Guide to Provisional Application of Treaties. General Commentary* reproduced in *Report of the International Commission*, General Assembly Official Records, Seventieth Session (30 April–1 June and 2 July–10 August 2018), New York, United Nations, 2018, p. 201 et seq.,), a mechanism that States are free to use or not (para. 3) marked by an essentially voluntary nature (para. 5).

The situations in which this question arose, namely in the *Arbitragem sobre a Linha de Ferro do Reno*, Belgium v. Netherlands, of 24 May 2005 decided by the Permanent Court of Arbitration (arbitration report reproduced in *Reports of International Arbitral Awards/Recueil des Sentences Arbitrales*, v. XXVII, New York, United Nations, 2008, pp. 35-125), para. 1, and in Arbitration *Kardassopoulos v. Georgia*, Case ICSID N. ARB/05/18, *Decision of Jurisdiction* 6 July, para. 83 (*Kardassopoulos v Georgia*, Decision on jurisdiction, ICSID Case No ARB/05/18, IIC 294 (2007), 6th July 2007, United Nations [UN]; World Bank; International Centre for Settlement of Investment Disputes [ICSID]), these arbitration bodies only exercised jurisdiction arising from a jurisdictional clause because they expressed their consent through a diplomatic note or signature in relation to the provisional application of treaties that provided for it. In fact, in the last report listed, the interpretation of the International Centre for the Settlement of Disputes in Investment Matters of the World Bank regarding the provisional application of treaties was in the sense that the only guideline arising from article 25 of the Vienna Convention is that the States may agree to the provisional application of treaties if they so wished, subject to the conditions they agreed upon, as a general rule of Customary International Law permissive of the

166

provisional application without the consent of the States concerned (para. 216).

Even the cited precedent of provisional application of treaties, the arbitral awards roughly referring to the *Yukos* issue heard by the Permanent Court of Arbitration (available as *Yukos Universal Limited v Russian Federation*, Interim Award on Jurisdiction and Admissibility, PCA Case No AA 227, International Investment Claims [IIC] 416 (2009), 30th November 2009, Permanent Court of Arbitration [PCA]); *Veteran Petroleum Limited v Russian Federation*, Interim Award on Jurisdiction and Admissibility, PCA Case No AA 228, IIC 417 (2009), 30th November 2009, Permanent Court of Arbitration [PCA]; *Hulley Enterprises Ltd v Russian Federation*, Interim Award on Jurisdiction and Admissibility, PCA Case No AA 226, IIC 417 (2009), 30th November 2009, Permanent Court of Arbitration [PCA]), based their conclusions that there was jurisdiction in light of the European Energy Charter and in the strict terms of the language used by its article 45 on the fact that Russia had voluntarily signed the treaty and was therefore bound by it for the period between that act and the subsequent notification to the depositary, the Portuguese Republic, that it did not intend to ratify it, which was even challenged by a District Court of the Netherlands, which annulled the awards. (*Russian Federation v Veteran Petroleum Limited and others*, Judgment, Case Nos C/09/477160/HA ZA 15-1, IIC 773 (2016), C/09/447162/HA ZA 15-2, C/09/481619/HA
ZA 15-112, 20th April 2016, Netherlands; The Hague; District Court). Although this decision was reversed by the Court of Appeals in The Hague by judgment of 10 February 2020 (decision available in Dutch language on the jurisprudence page of the Kingdom of the Netherlands maintained by the judiciary of that country: https://uitspraken.rechtspraak.nl/inziendocument?id=ECLI:NL:GHDHA:2020:234), the fact is that the basis for recognition of jurisdiction continued to be the fact that the Russian Federation signed the European Energy Charter (para. 4.3).

The Constitutional Court does not dispute that the provisional application of a treaty, under international law, may also include provisions for the settlement of disputes and assignment to international judicial, arbitration or judicial bodies. However, as the arbitration awards cited and subsequent decisions taken by Dutch courts make clear, the application of these clauses depends on whether the State has signed or otherwise



consented to with its application, which the Russian Federation did, and Cape Verde didnot.

12.6.6.  Moreover, even if the Protocol provides for the provisional application to a State that has not signed it or has otherwise demonstrated its consent, there would be an illegality in relation to the International Law of Treaties, insofar as this would amount to creating an obligation to a third State in relation to the specific treaty in violation of the principle of *pacta tertiis nec nocent nec prosunt* represented by Articles 34 and 35 of the Vienna Convention which presupposes that he accepts it expressly and in writing.

12.6.7.  In addition to generating insurmountable constitutional problems, since in the Cape Verdean constitutional system founded in 1992, the Government cannot bind the State to treaties related to participation in an international organization and in a domain alluding to the jurisdiction of the courts, therefore with a sovereign nature, even if for the purpose of provisional application, without due approval by the National Assembly, insofar as the matter listed in paragraphs a) and b) of article 179 of the Constitution can be repeated, namely by referring under the terms of the first segment of paragraph d) of article 176 of the jurisdiction of the courts, a matter absolutely reserved to Parliament, a solution expressly established to prevent the Government from having a way of bypassing the Assembly by entering into international agreements on matters within its competence which, later, by virtue of the superior hierarchical position of international standards, as established by number 4 of article 12, would derogate from the rules that in name of the people approved. In this sense, even if Cape Verde had signed an agreement that contains a rule providing for its provisional application, it would, in light of the legal-constitutional system, be null and void for not complying with the rule of the Fundamental Law that subjects these international agreements to parliamentary approval.

Not to mention the complete removal of presidential intervention which, in clear violation of the role reserved for him in this matter as the external representative of the Republic of Cape Verde with express powers to ratify after validly approved international treaties and agreements, would result from such a procedure, resulting from the idea that Cape Verde, in light of its Constitutional Law, could consent to provisional application with a mere act of acceptance promoted by the Government of the Republic. Which, for



168

for natural reasons, it would not be compatible with the established constitutional procedure of binding a treaty. Because these norms, namely paragraph a) of article 176 of the Magna Carta, would forcefully impose the intervention of the President, who has the free power to consider the international binding of the State and, deciding in this sense, promote it by ratifying or practicing any act accepted by Cape Verdean Constitutional Law and by International Law of externalization of the State's will within the scope of its competences. It is not insignificant, given the circumstances of this challenge of constitutionality, to note that the very possibility of the Constitutional Court being called to pre-emptively inspect a Protocol, even if it depends on an act of the President of the Republic pursuant to paragraph a) of article 278 of the Basic Law, it would be concerned with this procedure, which has the power to remove, with a single act, two political bodies whose participation in the process of binding this type of treaty is unavoidable and even prevent the placement of constitutional doubts that the Head of State may eventually have before allowing it to produce any effect.

What matters is that the legal system has the necessary antidotes to prevent the entry and applicability of rules arising from treaties entered into without the procedural solemnities provided for in the Constitution, precisely because, unlike the others, which, binding the State, are incorporated , these others, insofar as they were not validly approved or ratified, even if hypothetically, would bind the State internationally, are kept outside the Cape Verdean legal system and are inapplicable by the Courts.

Therefore, with the exception of very specific situations, the possibility opened by International Law for States to agree on the provisional application of treaties would hardly be compatible with our constitutional system of international binding of the State. Hence, number 2 of article 12 conditions the incorporation of such acts to: a) the validity of the binding, leading to the imperative need to observe the process provided for by the 1992 Constitution and to ensure the necessary intervention of the competent constitutional bodies; and, b) the entry into force in the domestic order to the entry into force in the international order.



12.6.8. It is concluded that not only the provisional application of the 2005 Protocol to Cape Verde has no basis in International Law, as it is not possible to identify any time when that State has consented to such application, but also because, even if so were it, due to the organic and formal unconstitutionality that it would generate, it would be inapplicable internally by Cape Verdean courts, especially by the Supreme Court of Justice, as the latter also considered.

12.7. In turn, regarding the argument that such link would result from the *estoppel* that was generated by the subsequent conduct of the State of Cape Verde, the Constitutional Court considers the following:

12.7.1. The *estoppel* is a concept developed by common law with some resemblance to the preclusion of continental law, which results in a State being unable to deny the effects of conduct that it undertakes for its benefit and that, generating some expectation in another, induces certain behaviours and causes it harm. It can be accepted that the updated version of the influential Manual of Professor Brownlie (*Brownie's Principles of International Law*, 9th. Ed. Oxford, OUP, 2019, p. 408 by referring to the constituent elements of estoppel to demand a) a clear and unambiguous statement of fact; b) voluntary, unconditional and authorized and that, moreover, c) is considered in good faith to the detriment of the other party or for the benefit of the person making the declaration - inspired by the doctrine of Professor Bowett, "Estoppel Before International Tribunals and Its Relation to Acquiescence", *British Yearbook of International Law*, v. 33, 1957, pp. 176-202, in the sense that a statement of fact must be a) clear and unambiguous, and b) voluntary, unconditional and authoritative, and there must be c) good faith reliance on the statement or to the detriment of another party that relied on it or for the benefit of who pronounced it (pp. 188-197, 202) – still reflects the understanding that States have at this moment. Also because it is very close to one of the most refined manifestations of this concept of Judge Percy Spencer in his explanation of his vote in the *Case Concerning the Temple of Preah Vihear* de 1959 in which he highlighted that the principle operates to prevent a State from challenging before a court a situation contrary to a clear and unequivocal representation it made to another State, expressly or implicitly, in which the other State was, in those circumstances, authorized to count and in fact it counted, and so they were harmed or the State that made it withdrew some benefit or advantage for itself (*Case Concerning the Temple of Preah Vihear* (Cambodia v. Thailand) in: *International*



CERTIFIED TRANSLATION
12/09/2021
LANGUAGE REACH

*Court of Justice Reports of Judgments, Advisory Opinions and Orders*, The Hague, ICJ,1962, pp. 141-142).

    12.7.2.   The same International Court of Justice in the decision of *North Sea Continental Shelf Cases* taken on 20 February, 1969, it had already shown the difficulties that exist in claiming that a State can be bound by a treaty through its conduct and not through express acts of expression of consent such as ratification would be. "lightly assume that a State that did not carry out these formalities, which always could and would have the right, in the end became bound in another way" (*North Sea Continental Shelf Cases* (RFA

v. Denmark; RFA v. The Netherlands) in: *International Court of Justice Reports of Judgments, Advisory Opinions and Orders*, The Hague, ICJ, 1969, para. 28). Therefore, the application of *estoppel* in such circumstances could only result from situations in which the State has clearly and consistently expressed its acceptance of the emerging treaty regime and at the same time other States have suffered some damage from having relied on this conduct. (*Id.*, para. 30).

    Therefore, it consolidated a very restrictive view of estoppel, applying it to several cases that it had to consider and decide cases in which it was alleged, namely in *Delimitation of the Maritime Boundary in the Gulf of Maine Zone (Canada v USA)*, of 12 October, 1984, para. 130; in *Military and Paramilitary Activities in and Against Nicaragua (Nicaragua v. USA)*, of 26 November 1984, para. 45; in *ELSI (United States v. Italy)*, 20 on June 1989, para. 53-54; in *Land and Maritime Borders between Cameroon and Nigeria (Cameroon v. Nigeria)*, de 11 June 2008, para. 57, again denying the *estoppel* configuration, with the exception of the situation evidenced by the Advisory Opinion of 21 June, 1971 on *The Legal Consequences for States of South Africa's Continued Presence in Namibia (South-West Africa) Notwithstanding the Security Council Resolution No. 276*, para. 25 (all these decisions are available at Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*,Leiden/Boston, Brill, 2012, *passim*).

    Above all, it could be said, a treaty that subjects a State to the jurisdiction of a court not only international, therefore by itself, with the potential to limit the domestic



171

independence which cannot be presumed, as a competence in matters of human rights that has the potential to interfere directly in the relations between the State, its own courts and the individuals subject to its jurisdiction, as, moreover, it is an understanding based on the international justice system since the Permanent Court of International Justice issued the iconic thesis that in international law no State may, without its consent, be compelled to submit its disputes with other States whether through mediation, arbitration or any form of amicable settlement of disputes (*Advisory Opinion on the Status of East Karelia*, P.C.I.J., Series B, No. 5, 23 of July 1923, para. 33).

12.7.3.   Therefore, accepting the possibility, from the outset, it is noted that, for reasons of logic at any time, the institute is able to support the radical conclusion that Cape Verde would be bound by the 2005 Protocol, because in its terms, it is not possible identify any statement that is clear, unambiguous and much less unconditional acceptance of the jurisdiction. First, there is no clear and unambiguous statement attributable to any authority that may bind the State of Cape Verde, nor evident conducts of assent as would be the previous acceptance of the Court's jurisdiction without reservations or conditioning, since what is argued are either negative facts – did not vote against, did not raise any objections – or else positive facts of nominating persons to occupy positions at the ECOWAS Court of Justice; second, none of these conducts even remotely correspond to a concept of clarity, unequivocal and unconditional nature, precisely because they are exercised under the permissive normative framework of International Law and Community Law.

12.7.4.   The basis for such a conclusion would essentially lie in the following factual assumptions that the Prime Minister of Cape Verde attended and participated in the session of the Conference of Heads of State and Government that approved the Protocol; in addition, the country proposed the candidacy of judges for positions in the ECOWAS Court of Justice that they were entitled to, resulting in the election of the Venerable Judges Advisers Benfeito Mosso Ramos, later Vice-President of the Court, and Januária Moreira Costa, still in office. functions, and, finally, that the Chief Justice of the Supreme Court of Justice has served as a Member of the ECOWAS Judicial Council,



formerly by the Previous Honourable Presiding Judge Fátima Coronel and currently by the Honourable Presiding Benfeito Mosso Ramos.

It turns out that all these conducts attributed to the State of Cape Verde are legitimate in the framework of the exercise of its rights, precisely because, first, the country is a full Member of ECOWAS, having the right to participate in any negotiation in which it proposes the adoption of a protocol to develop the Law of the Community, being able in relation to it, depending on the rules that have been agreed to proceed with it, to vote in favour, to vote negatively or to abstain, in the first instance, without any link to this specific conventional act, consider whether to sign it and later whether to ratify it. This is reinforced by the fact that Cape Verde is bound by the Protocol that developed the 1991 Statute of the Court of Justice of the Community. of ECOWAS and the homologous norms of customary basis, it is guaranteed this right, considering that in number 2 of this treaty on treaties it is established that "all proposals of revision of a multilateral treaty regarding the relations between all the Parties must be notified, unless otherwise provided in the treaty, all Contracting States and each of them have the right to participate: a) In deciding on the action to be taken on the proposal; b) In the negotiation and conclusion of any agreement that has as its object the revision of the treaty". And the Revised Treaty is clear in the sense that proposals are communicated to Member States who meet to consider them in conference (Article 90, second paragraph). Therefore, it is not possible to withdraw from this participation or even from the positions that the State has assumed anything that could legitimize the understanding that, through them, Cape Verde will have transmitted to third parties that it considered itself bound by the 2005 Protocol.

The same can be said of the presence of Cape Verdean magistrates as judges of the ECOWAS Court of Justice proposed by Cape Verde, which is a fact. First, because it assumes that the country signed the 1991 Protocol, which developed the Court's legal regime and thus became internationally bound to it, insofar as its entry into force provisionally was foreseen. Article 3 of the 1991 Protocol establishes that the Court is composed of independent judges chosen and appointed by the Conference from among nationals of the member states, with no limitation on the signatory States of the 2005



173

Protocol, so that this is possible. It may even be discussed whether it is a good solution to allow, strictly speaking, nationals of States who are not fully subject to the jurisdiction of the Court or who are not part of any protocol that creates a community body to apply for these positions, but the fact is that this corresponds to the sovereign will of the States when they drafted the 1991 Protocol. As the Supreme Court of Justice has rightly pointed out, such a possibility is not exactly an unprecedented solution, considering, for example, what the Statutes provide of the International Court of Justice (Articles 2 and 4), illustrated by the fact that it has on its list judges from the United States, Russia, China, France, Jamaica who, despite being members of the United Nations, chose not to award compulsory jurisdiction to that judicial body; or even the case of the African Court on Human and Peoples' Rights, which also does not condition, through article 11 et seq. of the Protocol that established it, the bringing of candidates for judge to the recognition of jurisdiction to hear individual complaints for violation of human rights provided for by number 6 of article 34.

Accordingly, nationals of the country are entitled to apply for such positions or to perform such functions insofar as they are citizens of an ECOWAS member country under the terms of the Protocol, and the country may, legitimately, in light of its own Community Law and the International Law of Treaties, participate in any initiative to amend a treaty to which it is a party, it does not seem to us that the exercise of such rights would allow an inference that it would consent to the exercise of ECOWAS human rights jurisdiction against you following complaints filed by individuals. Therefore, not exercising rights conditional on States that had recognized the competence of the ECOWAS Court of Justice to receive individual complaints in the field of human rights, this does not result in any conduct that could arouse any legitimate expectation to other Member States of the Community, to the bodies community members or persons subject to its jurisdiction who considered themselves subject to the jurisdiction of that Court.

The same can be said of the participation of the Venerable Presidents of the Supreme Court of Justice in the Judicial Council of the Community created by Decision A/DEC. 2706/06, of the Conference of Heads of State and Government, published in the *ECOWAS Official Journal*, v. 49, 2006, pp. 40-42, in the exercise of recruitment activities for judges of the Court and disciplinary functions, insofar as the criterion used by article



2 and that they are President of the Supreme Courts of Justice of the Member States of the Community or their representatives and not that they are Presidents of the Supreme Courts of Justice of the Member States that are signatories to the 2005 Protocol.

Therefore, through the conduct described, undertaken within the framework of legitimate rights exercised by the State, it does not seem to this Court that any type of *estoppel* could be configured which would result in the State of Cape Verde's binding to the 2005 Protocol referring to the Court of Justice of ECOWAS. And the absence of this determining criterion in accordance with international practice is enough to not be able to generate any preclusion in relation to the State of Cape Verde.

In addition, to the extent that the State's behaviour should be done to the detriment of another party, which, by relying on its indications, is harmed, it does not claim which entity, relying on any representations or conduct of Cape Verde , will have been prejudiced for having conducted itself on the basis of it, as required by the International Court of Justice, namely in the decision taken at the *Sovereign Case on Pedra Branca/Pular Batu Puteh, Middle Rocks* and *South Ledge (Malaysia v. Singapore)*, 23 May, 2008, available at Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, pp 1445-1473, para. 228), wondering if it would be the other ECOWAS Member States, the Community Court of Justice itself or, at the limit, the individuals subject to its jurisdiction.

12.8.  Associated with this, the appellant seems to propose to this Court that it consider that such binding resulted from some principles of the International Law of Treaties, which it considers and construes interpretively: the primacy of International Law over Domestic Law, the essentiality of signature and ratification, the extensive application of the principle of good faith and the extensive application of the principle of *pacta sunt servanda*.

12.8.1.  In general, the application of these principles is hampered by the same problem that prevents the acceptance that Cape Verde is bound by the 2005 Protocol, the absence of expression of consent by this Republic in relation to the aforementioned treaty. Even if from the point of view of International Law – but not from the Cape Verdean



175

Constitution, as will be discussed below - it is possible to infer a principle of the primacy of International Law over Domestic Law, namely in light of the guidelines issued by article 27 of the 1969 Vienna Convention, such prevalence will only manifest itself when the State it assumes, within the framework of conventional freedom, that it has an obligation provided for by a treaty and not outside of it; even if it is accepted that there is a principle of good faith and a principle of mandatory compliance without the turbine of extensive application, the fact is that both, of course, impose a duty to comply with a treaty in good faith when the State has, freely and without any defect in the manifested consent, its will to be a party to it; and, finally, if the idea of the essentiality of signature and ratification is that a State can be bound by a treaty without such specific acts, as a general statement, it would not contend with any notion that the Constitutional Court might adopt, as the manifestation of consent can occur according to the terms adopted by the States that participated in the negotiation, which are free to establish other ways of showing consent, including one that is not listed in the example of article 11 of the Vienna Convention. However, this would not result in any binding effect because the forms of expression of consent to a treaty are defined by these same States at the time they negotiate it - among which the most common are signature, ratification, accession and the exchange of constitutive instruments of the treaty – whichever particular agreement they reach. Therefore, in a case where it is established that it is made through ratification, corresponding to the situation in question, it can only be made through ratification and in this case by the only type of ratification that is recognized by international law, necessarily expressed and promoted by the own state.

12.8.2. Moreover, even if from the point of view of International Law there were some binding effect of these principles, they would not have the power to determine the internal application of the 2005 Protocol. In the first place, because, from the perspective of Cape Verdean Constitutional Law the primacy is of the Internal Law, specifically the Constitutional, by force of the principle of the supremacy of the Constitution proclaimed by its number 3 of the article 3Q; by the infra-constitutional hierarchical position that international norms occupy in the national legal system under the terms of this provision together with number 4 of article 12 of the Fundamental Law; and the fact that these rules are subject to review of constitutionality, and consequently the disapplication and declaration of non-compliance with

176




the Magna Carta, as this case also demonstrates and before it made *Judgement 10/2020, of 20 March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides

R. Lima, passim. The Constitutional Court states, without any ambiguity, that, regardless of international acts, of International Law or Community Law, to which the State is or will be bound, the values espoused by the Constitution will always be the ultimate and maximum gauge of validity of any of these standards (*Judgement 06/2018, of 22 March, Adilson Danielson Barbosa v. SCJ, about the violation of the right not to be discriminated, to the freedom of the body and the presumption of innocence*, Rep: JC Pina Delgado, para.

5.1.1) and this Constitutional Court is its guardian and defender of the identity of the Political Community par excellence, always being able to scrutinize its compliance with the elements that characterize the constitutional identity of human dignity, freedom, democracy, national independence, equality, solidarity, justice and peace; its compatibility with the essential core of national sovereignty and the regularity of the action of international entities (organizations or their executive, normative or judicial bodies) based on and within the limits of the powers transferred to it by the State under the terms of the Basic Law. Second, because, as the Venerable Supreme Court of Justice concluded, if international law were to impose an obligation to comply with a decision of a Regional Court to which the State did not attribute powers to exercise jurisdiction in a given matter, this would inevitably result in a violation of the principle of national sovereignty.

12.9. Finally, the question of the institute of forum prorogatum, corresponding to the punctual acceptance of jurisdiction by a court by express consent or by the conduct of a State, in itself could be relevant in the context of a discussion on a specific duty of the latter to comply with a court decision. taken in a case in which it had granted specific jurisdiction to an International Court, even if the latter did not have it initially, through express manifestation or, under certain circumstances, implicit conduct, but is no longer relevant for the purposes of determining the binding of the State to that treaty. In other words, even if you were facing a situation of timely acceptance of jurisdiction in a specific case, the effects of such acceptance they could never go beyond this case to determine the State's commitment to the Treaty establishing the Statute of an International Court, and/or fixing its composition, powers and jurisdiction and its rules of operating and process.



Even so, it is very doubtful that in this case there is a specific and specific attribution of jurisdiction by Cape Verde to the ECOWAS Court of Justice to judge the complaint filed by the appellant Mr Alex Saab in terms acceptable to international law, and, above all, to the Brazilian Constitutional Law.

12.9.1. The recognition of this form of attribution of exceptional jurisdiction is linked almost exclusively to the experience of the Permanent Court of International Justice, the judicial body associated with the League of Nations system, and to the work of the International Court of Justice. Although the Rules of Procedure of the International Court of the Law of the Sea (Article 54, paragraph 5) provide for it, any jurisprudence in this regard from courts other than those two is equally unknown. In relation to Human Rights courts, due to the level of interference they have in the sovereignty of States and in the relations they maintain with individuals in their territory, its application is at least unusual, and it does not seem to appear in procedural rules that are applicable to them. applicable. In fact, the only identification of discussion on the use of this basis for the assumption of jurisdiction by an international court for the protection of rights was promoted by a vote cast by a judge of the African Court of Human and Peoples' Rights without further consequences to date (*Yogogombaye v. Senegal, Jurisdiction*, Separate Opinion: Ouguergouz, Judgement of 15 December 2009 reproduced in *Reports of Judgments, Advisory Opinions, and Other Decisions of the African Court on Human and People' Rights – African Law Report*, Pretoria, PULP, 2019, p. 10 et seq.,) although also subject to the assumption of consent. (para. 21).

12.9.2. In this phase of the evolution of International Law, contrary to what initially happened with the Permanent Court of International Justice and the International Court of Justice, this possibility, if it exists, should in principle be included in a Statute or, at the very least, in a Procedural Regulation. where the conditions under which the international judiciary can assume jurisdiction in such circumstances are established, as is currently the case with the Grócio Palace Court and the Hamburg Court. It has not been possible to identify in any rule applicable to the ECOWAS Court of Justice that its Jurisdiction may be based on



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG.07835166

178

a *forum prorogatum* nor is it possible to conclude that at any time or in this specific case this regional judicial body has based its jurisdiction on such these bases.

12.9.3. But, even if it is considered that this form of establishment of jurisdiction is currently the result of a customary rule - perhaps based on the practice of States of accepting opinions taken by those two courts in these circumstances, and dogmatically founded on the principle of good faith – there are two problems that would have to be overcome. First, it refers exclusively to disputes between States and not disputes between a person and a State; second, its evolution has increasingly emphasized the role of express State consent and increasingly limited the situations in which consent for conduct is acceptable. If the first problem, in general, can be surmountable, the second does not seem so easy, given the elements that have evidenced the international jurisprudential practice in this matter and the reaction of the States.

12.9.4. It should be noted that the relatively wide use of the institute in the period of operation of the Permanent Court of International Justice - although not exactly clear, since of the twelve judges, four diverged in the main case in which the issue mentioned below was discussed - that led this historic Court and predecessor of the Court of The Hague to assume jurisdiction for the mere conduct of a State to appear in court without raising preliminary objections to jurisdiction and only discussing the merits or only doing so late in the process after having consented to the exercise from this jurisdiction (*Minority Rights in Upper Silesia (Minority Schools)*, Germany v. Poland, of 26 April 1928, PC.I.J., Series A, No. 15, 1928 pp. 20-25), the reception of the figure was getting more and more narrow in the scope of the practice of these courts.

The International Court of Justice has always preferred to follow a more cautious line, as even the elements that stem from the decision taken in the *Corfu Channel Case* (United Kingdom v. Albania), of 25 March, 1948, reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, p. 49 et seq., required that consent be voluntary and unquestionable, deriving from a letter in which Albania said that it fully accepted the Security Council's recommendation to submit the litigation to be heard by the International Court of Justice



179

(p. 51), and, right after, in the case of *Anglo-Iranian Oil Company (United Kingdom v. Iran)*, of 22 July 1952, the criteria of the International Court of Justice became increasingly tighter in relation to jurisdiction based on *forum prorogatum* (decision reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, pp. pp. 162-163).

After that, this possibility was reduced to the regulatory norm, subjecting it to relatively strict criteria, which arise from number 5 of article 38 of its 1978 Procedural Regulation, which is still in force. In particular, when a State proposes that the Court establish its jurisdiction on consent yet to be given, it must transmit the petition to that State, and the case cannot be listed unless and until this State consents to the exercise of jurisdiction by the Court in this case. If this was already the case from a normative point of view, its jurisprudence ended up consolidating this very limited and responsible acceptance of the forum prorogatum, especially in relation to situations of implicitconsent.

So, in the *Case on the Application of the Convention for the Prevention and Punishment of the Crime of Genocide* (Bosnia and Herzegovina v. Yugoslavia (Serbia and Montenegro), of 11 of July 1996 (also reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946- 2012*, para. 40, asserted that the fact that the Respondent State had also requested the adoption of provisional measures that transcended the treaty on which the exercise of jurisdiction depended, but subsequently unequivocally denied the jurisdiction of the Court would lead to it not being able to conclude that it gave its consent voluntarily and without dispute (para. 40). And, above all, leaving an understanding that it did not constitute *forum prorogatum* to participate in proceedings when the State expressly and repeatedly objects to the assumption of jurisdiction in all its stages (*Case on Military and Paramilitary Activities in Congo Territory*, (RDC v. Ruanda), of 3 of February 2006, reproduced in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, para. 22). Therefore, it does not follow from the mere fact that the State appears at the Court that it has agreed to submit to its jurisdiction (idem). As it finally concluded, in one of the few cases in which it decided on the merits following the



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG.07835166

assumption of jurisdiction by *forum prorogatum* following the express consent of the Respondent State, synthesized that the consent that allows the Court to assume jurisdiction must be certain and the consent must either be explicit or clearly inferred from the relevant conduct of a State. (*Certain Questions About Mutual Assistance in Criminal Matters*, Djibouti v. France, 4 June 2008, also available in Guenther Dahlhoff (ed.), *International Court of Justice, Digest of Judgements and Advisory Opinions, Canon and Case Law 1946-2012*, Leiden/Boston, Brill, 2012, para. 62).

12.9.5. What this development reveals is that a) the existence of *forum prorogatum* situation is determined on a case-by-case basis, evaluating evidence of acceptance of jurisdiction by a State, and the court should only be satisfied when there are clear and unambiguous indications of such consent; b) the normal form of recognition of *forum prorogatum* is through the express consent of a respondent State and on its terms; c) the implicit consent arising from the conduct of participation in the process is exceptional; d) and accepted by the courts and the States only in circumstances in which they do not raise any objection to the jurisdiction of the Court until the decision on the merits.

12.9.6. Even if the application of this legal principle were accepted in the context of a dispute between a State and the individual under the rules applicable to the ECOWAS Court of Justice, the reality is that the criteria themselves are defeated by the claims of the appellant who recognizes that the "question of incompetence was raised by the Republic of Cape Verde in its defence of the request for provisional measures" and that in "its defence in the substantive process it also challenged the jurisdiction of the ECOWAS Court of Justice" and that "after the dismissal of these preliminary objections (. ..) renounced its sovereign immunity and submitted to the jurisdiction of the ECOWAS Court of Justice". If what matters for the constitution of the basis of jurisdiction based on *forum prorogatum* is not the reaction of the Court, but the raising of the jurisdictional issue by the State, the country will have consistently and in a timely manner raised objections in relation to its material jurisdiction in relation to individual complaints for violation of human rights. Thus, it is not the fact that participation in the process would trigger the acceptance of the Court's jurisdiction, but, moreover, that such participation indicates, by the Conduct of the State, that the latter, voluntarily and unequivocally, considered the



181

jurisdictional issues to be overcome by discussing only the merits of the allegations.

In the specific case, participation in the proceedings until the end would always be justified because Cape Verde, in light of the 1991 Protocol, which it signed, is, for the reasons mentioned, part of the Court of Justice, therefore, a continuous stance of refusal to participate, even if possible, would not be required, as if it were a completely foreign institution. While it is true that the State of Cape Verde did not always raise the issue of the Court's incompetence, it did so most of the times when this was possible, namely in a response filed on 24 November, 2020 at the Registry of the Court of Abuja , in which, after developing arguments, concluded that this court would be incompetent to hear the plaintiff's request by the State of Cape Verde, as it understood, not being a member of the Court and as it had not adhered to the 2005 Protocol (Conclusion a), p. 14), even during the oral hearing held on 5 February, the Cape Verdean Lawyer conveyed to the Court his position that it did not have jurisdiction for this case, a position which, according to the Procedural Regulation of the Court, was still going to time to be considered, then in a document on 10 March, alerting the Court that in the decision of 2 December, 2020, in which it determined that the State adopt provisional measures established therein, it had not ruled on the exception of jurisdiction raised, since, in his opinion, the lack of jurisdiction of the court over the Defendant with regard to the Plaintiff and the lack of jurisdiction of the Court with regard to the request presented by the Plaintiff should be considered, essentially because, in his opinion, the Republic of Cape Verde was neither a signatory nor a party to the 2005 Complementary Protocol (p. 1); even after the decision on the merits had been taken, being less relevant, he insisted on the issue, claiming the nullity of Judgment TJ-ECOWAS 07/2021, of 15 March. Given this scenario, the Constitutional Court finds it difficult to consider that there has been conduct of unequivocal acceptance of the Court's jurisdiction regarding the decision on the merits, conveying the idea that it consented to the ECOWAS Court of Justice hearing the complaint filed by the Sir Alex Saab on the merits.

The ECOWAS Court of Justice, unlike all cases where an international judicial body has agreed to assume jurisdiction based on the doctrine of *forum prorogatum*, at no



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG.07835166

182

time did it base it on these terms, even when it had the opportunity to decide the nullity of its Judgment 07/2021, of 15 March, through Decision (Ruling) 05/2021, of 24 June, when it reiterated its traditional understanding that its jurisdiction follows from paragraph 4 of article 9 of the 2005 Protocol, which simply means that there is an allegation of violation of human rights and that it is imputed to a Member State (para. 91-93), it is assumed that regardless of its being signatory or not of this legal act. Therefore, for the Constitutional Court itself, from the point of view of International Law, the conclusion that this is a situation of assumption of jurisdiction through *forum prorogatum* is a conclusion that it cannot endorse, because neither the court that rendered the decision supported itself on such a basis, nor could it do so, considering the rules applicable to it.

But, this is not even the fundamental issue that would make it impossible to apply the decisions taken by the ECOWAS Court of Justice in Cape Verde, as even if it resulted from the course of the process and the behaviour of the State that, by its conduct, accepted the given With regard to the jurisdiction of the ECOWAS Court of Justice in relation to the specific complaint addressed to it by Mr Alex Saab, the question arises whether, from a constitutional point of view: a) can the Government, through international conduct that takes the form of a unilateral legal act or not, bind the State in a matter that involves the jurisdiction of the courts constitutionally assigned to the Assembly?; b) could such international conduct constitute a rule of acceptance of jurisdiction capable of being internalized?; c) Are Cape Verdean courts obliged to apply them?

The answer to these questions is all negative because, first of all, the Government does not have any competence to accept, expressly or by conduct, the jurisdiction of an international court whose decision will have repercussions on Cape Verdean domestic law unless it is entitled to do so by the existence of a treaty to which the State is regularly bound, pursuant to paragraph 2 of article 12, namely with the due approval of the National Assembly, or alternatively by a general or special law necessarily approved by the Parliament, since it would deal with matters within the jurisdiction of the courts; second, in the absence of such conditions, no judicial body has any obligation to comply with or



CERTIFIED TRANSLATION

LANGUAGE REACH

12/09/2021

REG.07835166

183

execute an international court's decision to which the Government, through its conduct, had given jurisdiction to hear a particular case. As the Supreme Court of Justice says, this, at best, could generate a non-compliance with an obligation due in the international sphere and the international responsibility of the State, but not a duty of compliance by Cape Verdean courts.

12.10. The thesis of the integration of the ECOWAS Treaty, the 1991 Protocol and the 2005 Protocol, in the opinion of this Court, is also not sufficiently convincing.

12.10.1. The main reason is that we are facing a set of treaties that are being created from a changing and adjustable dynamics typical of a regional integration community. The bottom line is that until 2006, the ECOWAS legal system was developed in a classic way from a Revised Treaty of 1993 that refounded the Community and absorbed a set of Protocols approved under the Original Treaty. This basic legal instrument would classically serve as the Community's primary law, intended to be developed by other treaties called Protocols. All of them with the nature of a treaty, which meant that they only bound States that understood, according to the principle of conventional freedom, to be subordinate to them, in accordance with their interest in promoting regional integration in its most diverse axes, namely economic integration, institutional integration, defence and security integration and judicial integration and protection of rights. Therefore, the obligations provided for by the Protocols and their revisions do not automatically apply to all Member States, but only to the extent that they have consented to those obligations under the terms of a particular protocol.

This is neither more nor less what Article 89 of the Revised Treaty stipulates when they establish a mechanism for manifesting consent through a) ratification and, b) consequently, because it only makes sense to provide such a figure in such cases of internal consent to bind, is that this is done in accordance with the constitutional norms of each signatory State. Therefore, the norm itself establishes two regimes, which cannot be confused. The first, regarding entry into force, establishing that it and the protocols that are part of it enter into force with nine ratifications; the second, which defines the



form of manifestation of consent by ratification, by its express nature, recognizing the freedom of each State to consider whether or not it is bound by the Revised Treaty itself and any protocol associated with it. It is Article 90 that reinforces this idea by referring it to the consideration of all Member States for ratification, in accordance with their constitutional procedures. It would make no sense to have rules with such content if what is called ratification by sampling, automatic ratification or implicit ratification were possible, concepts that are, at the very least, very unusual in the International Law of Treaties, which the Court does not consider recognized in this sphere legal.

12.10.2. The change in this paradigm is only tested with the approval of a new regime of normative acts of the Community in 2006 through the Protocol that amended article 9 of the Revised Treaty, but this also does not bind the country, as previously verified by the Court. Therefore, even the idea that it would be facing a new regime of approval, which would make it possible to impose on a State new legal obligations through an unconventional act depends on, ultimately, having a treaty in which the State expresses its consent with this development and this is what did not exist until 2006, when all the development of the matters foreseen by the revised treaty and the densification of the community legal regime was done through protocols that presuppose the consent of the States, for the reasons explained and by application of the International Law of the Treaties. In this sense, the State's obligations will have to be evaluated in a segmented and autonomous way from the ECOWAS Revised Treaty, from the 1991 Protocol, for the States that have become party to it or that have consented to its provisional application, and also those who were bound to comply with the 2005 Protocol by having formally signed it, and not as if it were a normative block applicable to *erga omnes*. To the extent that the State of Cape Verde specifically did not do so, the Constitutional Court cannot conclude that the country is bound by this instrument at this time, as, moreover, in 2017, it had already considered laterally through an *obiter* formulated in the *Judgement 11/2017, on 22 June*, *Maria de Lurdes v. STJ, on violation of the right to found a family for non- recognition of de facto union*, Rep: JC Pina Delgado, published in the *Official Gazette*, Series I, No. 42, 21 July 2017, pp. 933-950, 1.1.



12/09/2021

REG.07835166

185

12.11. Therefore, owing to all that has been set out, the Constitutional Court cannot fail to consider that the State of Cape Verde is not bound by the 2005 Protocol and its provisional application clause as it did not sign not ratify it, was not obliged to comply with a treaty to which it did not give its assent and to comply with a judicial decision of a regional court which did not recognize competence in matters of individual complaints for violation of human rights, in general or in the specific case, and as it had not behaved in such a way as give reason to imply such recognition of jurisdiction and the consequent duty of compliance.

12.11.1. Thus, it endorses the understanding already drawn up by the Supreme Court of Justice that in cases in which the State of Cape Verde has not expressed consent to be bound by a treaty and does not attribute specific jurisdiction to an international court for the fulfilment of that treaty and the domestic execution of that decision would have great potential to unconstitutionally affect the principle of national sovereignty, enshrined in number 1 of article 1 of the Constitution of the Republic, with corollaries in number 1 of article 11 of the Magna Carta and reflected in article 119 which enshrines the courts as organs of sovereignty.

12.11.2. This principle, which has already been analysed by this Court, which has ruled on it in the *Judgment 10/2020, of 20 of March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides R. Lima, B, in the sense of being a very important value of our Republic, umbilically linked to the principle of national independence, representing a decisive moment for the existence of the Political Community. Therefore, one of the mainstays of the Constitution's identity under the terms of the Preamble, article 1, paragraph 1 of article 11, whose protection is expressly and primarily entrusted to the State as a fundamental task by article 7 and protected as a material limit to the constitutional revision by paragraph a) of number 1 of article 290 of the Constitution.

According to this principle, within the territory that, in light of article 6 of the Constitution and International Law, belongs to the Republic, which as an independent entity, exercises sovereign powers to the exclusion of all other entities, not allowing them to interfere here (See the arbitration report written by internationalist Max Huber in the



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG.07835166

arbitration on the Island of Palma (Netherlands and United States of 4 April 1928, reproduced in *Reports of International Arbitral Awards/Recueil des Sentences Arbitrales*, v. XXVII, New York, United Nations, 2006, v. II, pp. 829-871, 838), which according to this Court had already settled through *Ruling 10/2020, of 20 March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides R. Lima, B 1, embraces the exclusivity of the power to judge.

The principle of respect for International Law provided for in number 1 of article 11 of the Fundamental Law may contain a guideline for the State to always openly assess membership of initiatives leading to the strengthening of the *international rule of law*, arising from this same provision, the constitutional basis for the State reduces various dimensions of its international relations to internationally binding commitments, including with a view to engaging in regional integration processes, namely in Africa by virtue of number 7 of the same provision. Thus, the constitutional legitimacy of the delegation of some sovereign powers is assumed, as long as they are transferred reversibly, proportionally, taking into account the stage of the integration process in question and the consistency of the process, and the essential core of national sovereignty proclaimed by number 1 of article 1 is not affected. However, although the Constitution allows for such a possibility, it is evident that this can only happen in cases where: a) the State of Cape Verde voluntarily, freely - therefore, in the exercise of its conventional freedom and without any vice of consent - expresses, concludes agreements or undertakings which result in any limitation on their sovereignty; b) this is done by Organs constitutionally competent bodies and in accordance with the procedures prescribed by the Fundamental Law; c) this occurs in a materially compatible way with other constitutional norms, especially the values that structure the Republic, as provided for in the Fundamental Law. When a putative international obligation to bind Cape Verde to a treaty to which it did not consent or which imposes on it the execution of a decision of an international court that exercises a competence that the State has not attributed to it, the Supreme Court of Justice could not be more certain. by refusing to apply the rule for incompatibility with the principle of national sovereignty, especially because in this case judicial sovereignty is affected.



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG.07835166

The basis for such a duty of compliance cannot be found in number 2 of article 210 of the Constitution. Since the State of Cape Verde has not been bound by the 2005 Protocol and has in no way consented to the jurisdiction of the ECOWAS Court of Justice to receive complaints from individuals for human rights violations under the constitutional rules in force to bind the State internationally in matters of jurisdiction of courts, there is no internal authority to enforce such decisions.

12.11.3. When, moreover, in addition to this non-compliance with the principle of national sovereignty that results from the fact that the intention is to enforce a decision in a framework in which the State has not consented, through signature and ratification, to the exercise of a power by an international judicial entity, under the terms of the Cape Verdean Constitution, even if that had happened, it would be, for reasons already advanced, facing an organic or formal unconstitutionality, precisely because in our constitutional system the Government does not have the power to bind the State to an international act that introduces significant changes in the structure and powers of the courts and the independence of the courts, hosting an international court, without parliamentary approval and without the consent of the President of the Republic.

To add to the constitutional problems generated by the understanding of the ECOWAS Court of Justice itself, based on a sustained interpretation of the 2005 Protocol that the admissibility of claims for violation of rights is not conditioned by the exhaustion of internal remedies (*Judgement 6/2008, of 27 October 2008*, *Koraou v. Niger*, reproduced in *Community Court of Justice of ECOWAS Law Report*, Abuja, CCJ, 2011, v. I (2004- 2009), p. 217 et seq., para. 48) and of having attributed to this judicial body competence concurrent with the courts of the States and prevailing in case of conflict (*Judgement 4/2009, Saydikhan v. Gambia*, of 30 June 2009, reproduced in *Community Court of Justice of ECOWAS Law Report*, Abuja, CCJ, 2011, v. II (2010), p. 139 et seq., para 49).

For obvious reasons, the manner in which the ECOWAS Court of Justice interprets, in general, its powers, its jurisdiction and the presuppositions for the admissibility of claims is totally alien to the Constitutional Court. However, in the case of a situation that refers to the execution of decisions based on such rules, real or



188

hypothetical, Community Law in the Republic of Cape Verde, in order to impose a duty of compliance to an internal judicial body, cannot fail to consider that, at least in situations where such intervention takes place while the courts maintain their jurisdictional power in a matter so intrinsically linked to its basic function of protecting rights, according to article 209 of the Fundamental Law, as is the case in point, which focused on an issue still pending at the Barlavento Court of Appeal, it would generate problems of material unconstitutionality. From the outset with the core of the principle of national sovereignty in its dimension of judicial sovereignty.

Since this Court had already considered in *Judgement 10/2020, of 20 March, [Concerning the Unconstitutionality of the Rules of the Agreement on the Status of Forces between Cape Verde and the United States of America]*, Rep: JC Aristides R. Lima, B 15, that the removal of the jurisdiction of the national courts of judgment on certain fundamental issues, in this case, despite being before a community judicial body and not a foreign one, would generate a possible incompatibility with the principle, also linked to the principle of sovereignty and the principle of the independence of the courts, according to which a national court cannot be deprived of the powers established by the Constitution and the law. Because, after all, a judicial body that acts as the first instance is already imposed on, and then on, all ordinary and special courts that could intervene an obligation to execute a decision without even having the opportunity to consider the allegations of violation of rights. Therefore, even if the Protocol had been ratified by Cape Verde, its application in circumstances in which there was no exhaustion of available domestic remedies would generate the unconstitutionality of the rule that underlies it, in this particular case.

12.12. For these reasons, the Constitutional Court confirms the unconstitutionality of a hypothetical rule arising from *articles 15, number 4, and articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with a decision by the ECOWAS*, that the Supreme Court of Justice refused to apply due to non-compliance with the principle of national sovereignty, considering that for a treaty to enter the domestic legal sphere and be fully effective in accordance with the Constitution, it must be signed and



CERTIFIED TRANSLATION
LANGUAGE REACH
12/09/2021
REG.07835166

189

ratified with Cape Verde not having signed protocols that recognize the competence of the ECOWAS Court of Justice in terms of human rights and ECOWAS not being a supranational organization for the purposes of Article 12(3) of the Constitution. As it is incompatible with the principle of national sovereignty, the constitutional rules on the binding of the State of Cape Verde to treaties and the principle according to which the courts cannot be deprived of their jurisdiction, a duty declared unconstitutional with general mandatory force.

### III. Decision

For these reasons, the Constitutional Court, meeting in Plenary, decides,

1. Regarding the admissibility of the questions,

a) Unanimously, dismissed the second segment of the 3rd question posed by the appellant, considering that article 155 of the CPP will have been interpreted in the sense that *it was up to an extradited person to proceed by complaint and not by appeal to react procedurally to a decision that rejects a request for questioning of witnesses*, for alleged non-compliance with the Constitution;

b) Unanimously, dismissed the 7th question posed by the appellant arising from the interpretation that will have been given to articles 269, paragraphs one and four of the Code of Criminal Procedure, and articles 31, paragraph three, and 39 of the LCJ, in violation of the imposition of immediate communication to the detainee of the reasons for his detention, for alleged non-compliance with the Constitution;

c) Unanimously, dismissed the 9th question posed by the appellant arising from the interpretation that will have been given to article 17 of the LCJ, according to which the extradition that is authorized is for the extradited person to be subject to criminal proceedings for one of the crimes that it is charged, in accordance with the guarantee offered by the requesting State, for alleged non-compliance with the Constitution;

d) Unanimously, dismissed the first segment of the 10th question posed by the appellant arising from the interpretation given to articles 6, No. 2, paragraph b) of the Law on Judicial Cooperation and 45, paragraph one of the Criminal Code, according to which extradition is

granted to a Requesting State where the death penalty and life imprisonmentapply when the guarantee is given by its embassy and not by an irrevocable and binding act for its courts and others entities, for alleged non-compliance with the Constitution;

e) Unanimously, dismissed the first segment of the 11th question posed by the appellant arising from the interpretation given to articles 156, paragraph 1, point b), 157 and 161 of the Code of Criminal Procedure, in the sense that the absolute incompetence of the courts Cape Verdeans to hear a matter related to the immunity of Public International Law results from a previous assessment or political position, due to allegednon-compliance with the Constitution.

2. On the merits,

a) Unanimously, in a summary manner, does not declare as being unconstitutional a hypothetical rule inferred from article 55, paragraph one, of the Law on International Judicial Cooperation in Criminal Matters, in the sense that *The order of the Minister of Justice on the admissibility of the extradition request and the promotion of compliance with the request before a Court of Appeal do not have to be personally notified to the extradited person, it is sufficient that they are notified by the appointed lawyer.*.

b) Unanimously, do not declare as being unconstitutional the hypothetical rule applied by the Supreme Court of Court in the sense that *Recognition of the status of special envoy is solely incumbent upon the State of Cape Verde, without which Cape Verdean courts cannot recognize this quality, allowing a Cape Verdean court to deny recognition of an extradited person as a special envoy, after recognition of their status both by the sending State and by the receiving State*;

c) Unanimously, do not declare as being unconstitutional the hypothetical rule arising from article 39 of the Law on International Judicial Cooperation in Criminal Matters according to which *It is lawful for the criminal police authorities to carry out, under the terms of the current procedural law, the detention of individuals who, according to official information, namely from INTERPOL, are sought by competent foreign*



*authorities, and it is not relevant that the acts referring to this international organization have not eventually been ratified by the Republic of Cape Verde or published in the Cape Verdean internal legal order, since the use that is made of the information received via this system, stems from a national law.*

d)  Unanimously, do not declare the hypothetical rule arising from article 39 of the Law on International Judicial Cooperation in Criminal Matters according to which *a person can be detained for the purpose of extradition, without requiring a warrant, as long as they are in possession of official information that legitimizes their detention.*

e)  Unanimously, do not declare the hypothetical rule arising from article 39 of the Law on International Judicial Cooperation in Criminal Matters and article 269 of the Code of Criminal Proceedings, according to which *Information for the detention of a person may reach the authorities by any means allowed by Cape Verdean law, if there is urgency and danger in delay by any means of telecommunications, as follows from article 269 of the CPP, followed by confirmation by warrant.*

f)  Unanimously, do not declare the hypothetical rule arising from article 6, paragraph 4, final segment, and article 3, paragraph 3, of the Law on International Judicial Cooperation in Criminal Matters according to which *Waiver of reciprocity is possible in any form of international judicial cooperation, including extradition.*

g)  Unanimously, do not declare the rule arising from number 2 of article 55 and the final part of number 3 of article 46 of the Law on International Judicial Cooperation in Criminal Matters to be unconstitutional, according to which *The extradited person has the right to file an opposition, but, despite the requirement for due diligence of testimonial evidence, this can only be based on the fact that he is not the person claimed or that the requirements for extradition are not met.*

h)  By majority, did not declare the hypothetical rule arising from article 56, para.



56, of the law on Judicial Cooperation to be unconstitutional, according to which *The course of the passive extradition process does not require that the judgment in the Appeal, as a court of first instance and not a court of appeal, be made at a hearing, but in chambers, as the law does not determine, either directly or indirectly, that the extradited person be heard at a second hearing before the judge.*

i) Unanimously, confirm and declare the unconstitutionality of a hypothetical rule arising from *articles 15, number 4, and articles 34, 89 and 90 of the ECOWAS Constitutive Treaty and the Protocols Relating to the ECOWAS Court of Justice of 1991 and 2005, which would determine compliance with a decision of the ECWA-TJ*, that the Supreme Court of Justice refused to apply, due to non-compliance with the principle of national sovereignty, with the constitutional rules on the binding of the State of Cape Verde to treaties and with the principle according to which the courts cannot be deprived of their competence.

3. Dismiss the appeal lodged by Mr. Alex Saab.

To be registered, notified and published.

Praia, 30 August 2021

By the Court,

*José Pina Delgado*
*Aristides R. Lima*
*João Pinto Semedo*

**COMPLIANT**
Judicial Secretariat of the Constitutional Court, on 7 September 2021.
The Secretary,

*João Borges*





# CONSTITUTIONAL COURT

## VOTE DECLARATION BY JUDGE PINA DELGADO

Despite sharing all the other understandings that were collectively adopted, in relation to item 2h of the decision-making part, I think that the contested hypothetical rule should have been declared unconstitutional. In situations in which a person involved in extradition proceedings before a court that, despite being appealed, acts as a first instance, requires evidence to be taken, namely the examining of witnesses, aimed at corroborating any allegation made that does not fall under the concept of facts imputed by the Requesting State, and the judicial body in question does not expressly reject the request of its production under the law, a norm that does not impose the holding of a public and oral hearing, so that they can be heard or examined and so that each party can support its position, is incompatible with the right of defence of the extradited person who is extended the guarantee to fair process under paragraph 1 of article 22 of the Constitution and with the principle of publicity of court hearings provided for in paragraph 4 of article 211 also of the Fundamental Law, which applies broadly in cases where the judicial bodies function as the first instance.

Judge,

*José Pina Delgado*

**COMPLIANT**

Judicial Secretariat of the Constitutional Court, on 7 September 2021.
The Secretary,

*João Borges*



12/09/2021

194